**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

| | |
|---|---|
| BRETT LORENZO FAVRE, **)** | |
| **)** | Case No. 2:23-cv-45-KS-MTP |
| Plaintiff, **)** | |
| **)** | |
| v. **)** | |
| **)** | |
| PATRICK JUSTIN MCAFEE, **)** | |
| **)** | |
| Defendant. **)** | |
| **)** | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Alex Purvis (MSB 100673)
Michael Williams (MSB 104537)
James Stephen Fritz, Jr. (MSB 105936)
**BRADLEY ARANT BOULT
CUMMINGS LLP**
One Jackson Place
188 E Capitol Street, Suite 1000
Jackson, MS 39201
Phone:  601.948.8000
Fax:  601.948.3000
apurvis@bradley.com
mcwilliams@bradley.com
sfritz@bradley.com

Sarah A. Decker (*pro hac vice*)
Thomas J. Smith (*pro hac vice*)
Curtis B. Krasik (*pro hac vice*)
**K&L GATES LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone:  412.355.6500
Fax:  412.355.6501
sarah.decker@klgates.com
thomas.smith@klgates.com
curtis.krasik@klgates.com

*Counsel for Defendant Patrick Justin McAfee*

## I.   <u>INTRODUCTION</u>

Plaintiff, NFL Hall-of-Famer Brett Favre, has been sued by the Mississippi Department of Human Services ("MDHS") for his alleged involvement in the diversion of millions of dollars of welfare funds to himself personally, to his company, to a for-profit biotechnology company in which he was the largest individual stockholder, and to his alma mater for construction of a volleyball facility that he had agreed to personally fund (the "MDHS Lawsuit").  As publicly stated in official proceedings by both MDHS and the Mississippi Office of the State Auditor ("Auditor's Office"), those funds were earmarked for the assistance of Mississippi's neediest families, and there was no appropriate purpose for their payment to Favre and others for Favre's pet projects.  The Mississippi welfare fraud scandal, as it has become publicly known, and specifically the MDHS Lawsuit and Favre's involvement, has been the subject of intense public scrutiny and media attention for nearly three years.  Favre's attempt now to deflect attention away from MDHS's highly publicized claims against him and to silence media defendants from reporting on such claims should not be countenanced.

Favre's Complaint ignores the MDHS Lawsuit entirely, and instead attempts to paint Favre as the defamed victim of two cherry-picked statements and a tweet allegedly made by comedic sports analyst and broadcaster Pat McAfee.  It is apparent, however, that when taken in context as required by Mississippi law, McAfee's comments are not actionable defamation.  First, the comments were not false statements of fact about Favre.  Second, as comments on official proceedings by MDHS and the Auditor's Office, McAfee's statements were privileged.

Furthermore, as a public figure, Favre has utterly failed to plead the essential element of "actual malice," which permits recovery only if McAfee acted with a high degree of awareness of the falsity of his statements or entertained serious doubts as to their truth.  In light of the

abundant public allegations against Favre in the MDHS Lawsuit, and in the multitude of similar media reports about the Mississippi welfare fraud scandal and Favre's involvement in it, Favre has not—and, plainly, cannot—plead actual malice.  Finally, Favre failed to give McAfee the requisite 10-days-notice of suit, which, alone, is grounds for dismissal of the Complaint.

In meritless cases like this one, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive, baseless litigation.  As a public figure bringing suit against a media defendant for reporting on matters of public concern, which are the subject of official proceedings and detailed at length in public records, Favre cannot state a claim for defamation upon which relief can be granted.  Therefore, the Complaint must be dismissed, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.    FACTUAL BACKGROUND

In some ways, the factual background is quite simple—McAfee addressed Favre's involvement in the Mississippi welfare fraud scandal in a few seconds of commentary on a three-hour-plus broadcast and referenced Favre in a tweet.  But, as the abundant case law cited below makes clear, the Court must consider the context and surrounding circumstances of the utterances complained about, including that they are attributable to official proceedings and are about a public figure's involvement in a matter of public concern.  This factual background cites just some of the extensive public records related to the MDHS Lawsuit.  All cited exhibits may be considered by the Court in deciding this Rule 12(b)(6) motion to dismiss.

Exhibit A is the subject segment of the November 30, 2022 broadcast of The Pat McAfee Show ("The Show"), which is expressly referenced in and integral to the Complaint as the source of the allegedly defamatory statements.[1]  *See* Complaint ("Cmpl."), ECF No. 1-2 at MEC No. 2 ¶

---

[1] Exhibit A is a conventionally filed disk containing a two-minute-and-35-second segment of the November 30 broadcast, which is available in full at https://www.youtube.com/watch?v=ArwPSlqi1oU.

18.  All other exhibits are public records or other materials of which the Court may take judicial notice, including, *e.g.*, public filings in the MDHS Lawsuit.  *See Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." (citation omitted)).[2]  As the Fifth Circuit has instructed, "[w]hen reviewing a motion to dismiss, a district court must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Funk*, 631 F.3d at 783 (internal quotations and citation omitted).  "If, based on the facts pleaded and judicially noticed, a successful affirmative defense appears, then dismissal under Rule 12(b)(6) is proper." *Hall v. Hodgkins*, 305 F. App'x 224, 227-28 (5th Cir. 2008) (citation omitted); *see, e.g.*, *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 588-93 (5th Cir. 2020) (affirming dismissal of complaint based on affirmative defense established by judicially noticed public records).

A.     **In May 2020, the Auditor's Office Announced Discovery of the Misuse of Tens of Millions of Dollars of Welfare (TANF) Funds.**

On May 4, 2020—more than two years before the November 30, 2022 broadcast of The Show in which McAfee made the allegedly defamatory statements cited in the Complaint—the Auditor's Office announced its determination that "[m]illions of dollars of grants from [MDHS] were misspent, converted to personal use, spent on family members and friends of staffers and grantees, or wasted," including by the Mississippi Community Education Center ("MCEC"), a non-profit that received substantial MDHS grants over the prior three years, mostly from the Temporary Assistance for Needy Families (TANF) program.  Ex. B.  TANF is a program to

---

[2] *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (facts may be judicially noticed if they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned") (citation omitted)).

"help low-income families with children achieve economic self-sufficiency."[3]  The Auditor's Office found "extensive misspending" by MCEC, which "made multiple donations with TANF money—like donations to . . . universities—and provided no proof the donations were used to help the needy."  *See id.*  Some of the "questioned costs" were:

- $1.1 million paid by MCEC to Favre Enterprises, Inc. ("Favre Enterprises"), Favre's company, on a contract for speaking engagements, because auditors were unable "to verify that any work was performed in order to fulfill the contract," Ex. C at 92; and

- $5 million paid by MCEC to the University of Southern Mississippi ("USM") Athletic Foundation (the "USMAF") on a "sublease" for use of a "Wellness Center" on campus, because auditors determined that the payment was "a donation to the [USMAF] for the construction of the Wellness Center and not a lease of the property," *id.* at 106-07.

**B.     In October 2021, the Auditor's Office Issued a Demand to Favre for Repayment of Misdirected TANF Funds.**

On October 12, 2021, the Auditor's Office announced confirmation of its findings by an independent forensic audit commissioned by MDHS.  Ex. D.  The Auditor's Office served demands on multiple parties, including Favre and Favre Enterprises, for repayment of a total of $77 million in misspent TANF funds.  *See id.*  Specifically from Favre and Favre Enterprises, the Auditor's Office demanded repayment of $828,000.  *See id.*

**C.     In May 2022, MDHS Sued Favre for His Alleged Involvement in the Misdirection of TANF Funds to Himself, Favre Enterprises, and Biotechnology Company Prevacus.**

On May 9, 2022, MDHS filed a civil lawsuit against, among others, Favre and Favre Enterprises (previously defined, the "MDHS Lawsuit").  Ex. E.  The MDHS Lawsuit accused Favre and Favre Enterprises of conspiring with Nancy New, then-Chief Executive Officer of MCEC, to divert $1.1 million in TANF funds to Favre and Favre Enterprises in exchange for speeches and autograph signings Favre never performed:

---

[3] *Temporary Assistance for Needy Families (TANF)*, U.S. Dep't of Health & Hum. Servs., https://www.acf.hhs.gov/ofa/programs/temporary-assistance-needy-families-tanf (last visited Mar. 20, 2023); *see also* Miss. Code Ann. § 43-17-1(4) (outlining the permissible uses of TANF funds).

| Defendants Who Agreed to Diversion of TANF Funds to Non-TANF Purposes: | Recipients of Diverted TANF Funds: | Amount of TANF Funds Diverted: | Non-TANF Purpose of Transfer: | Date of Transfer Diverting TANF Funds: |
|---|---|---|---|---|
| | | * | * | * |
| Brett L. Favre, Favre Enterprises, Inc., MCEC & Nancy New | Brett L. Favre and Favre Enterprises, Inc. | $1,100,000. | Autographs and 4 speeches (never performed) | +Dec. 2017 ($500,000) & June 2018 ($600,000) |

*Id.* ¶¶ 115, 130, 137-38.  MDHS alleged: "***Certainly no services were performed by Favre that had anything to do with the pursuit of lawful TANF purposes.***"  *Id.* ¶ 137 (emphasis added).

The MDHS Lawsuit also accused Favre of diverting $2.1 million of TANF funds for non-TANF purposes to Prevacus, Inc. ("Prevacus"), "a private, for-profit biotechnology corporation in which Favre" was "the largest individual outside investor and holder of corporate stock":

| Jacob VanLandingham, Prevacus, Inc., PreSolMD, LLC Brett Favre, Nancy New, Jesse New, Zachary New & John Davis | Prevacus, Inc. and PreSolMD LLC (affiliated for-profit biotech companies) | $2,100,000. | Personal Stock Ownership by Nancy New and son Zachary New in Prevacus, Inc. and ownership interests in PreSolMD LLC | Jan. 18, 2019 ($750,000), April 8, 2019 ($500,000), May 10, 2019 ($250,000), July 16, 2019 ($400,000), Sept. 24, 2019 ($100,000), & Oct. 7, 2019 ($100,000) |
|---|---|---|---|---|

*Id.* ¶¶ 115-16.  Specifically, MDHS alleged that ***Favre "urged" the Chief Executive Officer of Prevacus "to solicit Nancy New to use MDHS grant proceeds to invest in the stock of Prevacus***" in the personal names of herself and her son, Zachary New.  *Id.* ¶ 117 (emphasis added).  According to MDHS, Favre hosted a stock sales presentation at his house attended by

Nancy and Zachary New, then-MDHS Executive Director John Davis, the Prevacus CEO, and

others. *Id.* ¶¶ 119-20.  MDHS alleged:

> As each of those parties knew, or should and would have known if they had exercised reasonable care . . . , any such use of such TANF funds was inconsistent with the pursuit of lawful TANF purposes (or with any other purpose of any grant funds received by MDHS from the United States Government), and was therefore an illegal transaction under statutory and common law.

> Defendants Favre, [the Prevacus CEO], Prevacus, and PreSolMD [a Prevacus affiliate], nevertheless agreed to act together, and with Nancy New and Zachary New, for Nancy New and Zachary New to use TANF grant funds received from MDHS to invest substantial funds in ownership interests in both Prevacus and PreSolMD, in the personal names of Nancy New and Zachary New, to the financial benefit of all six such Defendants.

*Id.* ¶¶ 122-23.

**D.    In September 2022, Evidence Was Filed in the MDHS Lawsuit Demonstrating Favre's Involvement in the Misdirection to USM of Even More TANF Funds.**

On September 12, 2022—two months prior to The Show's November 30 broadcast—

MCEC filed a motion to compel the production of documents by non-party and former

Mississippi Governor Phil Bryant in connection with the MDHS Lawsuit.  Ex. F.  In the motion,

MCEC asserted that it paid $1.1 million in TANF funds "expressly to provide Favre with

additional funds for construction of the Volleyball Facility" at USM.  *Id.* ¶ 6.  In support of its

motion, MCEC attached text messages to and from Favre which it claimed showed that Bryant

"knew that Favre was seeking grant funds from MDHS to build the Volleyball Facility . . . ."  *Id.*

¶ 11.  Those exhibits included the following text messages between Favre and Nancy New:

- Favre's text to New on July 24, 2017 expressing excitement that then-MDHS Executive Director John Davis had committed $4 million to the volleyball facility.  Ex. G.

- Favre's text to New on August 3, 2017 asking:  "***If you were to pay me is there anyway [sic] the media can find out where it came from and how much?***"  Ex. H (emphasis added).  New responded: "No, we never have had that information publicized.  ***I understand you being uneasy about that though.***"  *Id.* (emphasis added).

- Favre's text to New on May 30, 2019 asking if she was "still confident [she] can cover the [$]1.8" million in remaining costs.  Ex. I.  New responded:  "In a meeting with [then-MDHS Executive Director] John Davis now. . . . We are on board!"  *Id.*

On September 23, 2022, Bryant filed a response to MCEC's motion to compel asserting that, "unbeknownst to [him], ***New and Favre were pursuing MDHS funds for the USM Volleyball Center*.**"  Ex. J at 10-11 (emphasis added).  Bryant also attached texts to his filing, including a text in which Favre suggested that MCEC compensate him for "a few radio spots," expressly so that he could pass that money along to USM for construction of the volleyball facility.  *Id.* at 11.  Regarding the heavily reported August 3, 2017 text thread between Favre and New, Bryant's filing stated that Favre was "express[ing] uneasiness to New about their arrangement being leaked to the press[.]"  *Id.* at 12.

Notably, the filing cited multiple news articles about Favre's involvement, including:

- An April 4, 2022 article, part of Mississippi Today's series called "The Backchannel," titled *Phil Bryant had his sights on a payout as welfare funds flowed to Brett Favre*, reporting that Favre "was trying to tap the state for resources to make himself a profit or to resemble a charitable alumnus of [USM]."  Ex. K (cited in Ex. J at 19).

- An April 6, 2022 article, also from Mississippi Today's The Backchannel series, titled *'You stuck your neck out for me': How Brett Favre used fame and favors to pull welfare dollars*, reporting that "Brett Favre pressed Mississippi welfare officials to steer taxpayer funds to his pet projects — one of which he planned to profit from."  Ex. L (italics omitted) (cited in Ex. J at 20).

- A September 16, 2022 article, another in Mississippi Today's The Backchannel series, titled *Former Gov. Phil Bryant helped Brett Favre secure welfare funding for USM volleyball stadium, texts reveal*, reporting that "Bryant, Favre, New, Davis and others worked together to channel at least $5 million of the state's welfare funds to build a new volleyball stadium at [USM], where Favre's daughter played the sport."  Ex. M (also noting that, "[w]hen Mississippi Today asked Favre by text in 2020 if he had discussed the volleyball project with the governor, Favre said, simply: 'No.'") (cited in Ex. J at 17).

- A September 16, 2022 article by The Mississippi Free Press titled *In-Depth: How Brett Favre Got $6 Million in Welfare Funds for a Volleyball Stadium*, reporting on Favre's texts and citing a statement by the State Auditor on CNN that "multiple prosecutors' offices [are] looking at this and they're going to make a decision about who faces criminal charges."  Ex. N (cited in Ex. J at 19).

These are just drops in the bucket of media coverage on the MDHS Lawsuit and Favre's involvement in the welfare fraud scandal.

MDHS filed a First Amended Complaint in the MDHS Lawsuit on December 13, 2022, which, among other things, named the USMAF as a defendant; asserted additional allegations against Favre, including allegations related to his involvement in the misdirection of TANF funds for the prohibited purpose of brick and mortar construction of the volleyball facility at USM, under the guise of a "sublease" between MCEC and the USMAF; and sought substantially higher damages from Favre, including repayment of the $5 million allegedly paid by MCEC for construction of the volleyball facility.  Ex. O.  The MDHS Lawsuit remains pending against both Favre and Favre Enterprises, with MDHS recently having filed on March 13, 2023 its opposition to Favre's motion to dismiss.  Ex. P.

**E.      Favre's Alleged Co-Conspirators Have Pled Guilty to Crimes Involving the Misdirection of TANF Funds, Including to Prevacus and USM.**

Nancy and Zachary New were each indicted by the State of Mississippi in January 2022. Exs. Q-R.  They pled guilty on April 22, 2022 to, among other charges, three counts each of wire fraud for their involvement in the transmission of MCEC's limited purpose grant funds to Prevacus "for purposes not allowed pursuant to the limited purpose grants from which the funds originated[.]"  Exs. S at 7 & T at 6-7.  Zachary New also pled guilty to one count of fraud against the government for his involvement in the transfer of $4 million in TANF funds "for the construction of a volleyball center at [USM], which was prohibited under the limited use guidelines of the grants from which the funds originated[.]"  Ex. T at 6.  He allocuted to having acted with John Davis and others "to disguise the USM construction project as a 'lease' as a means of circumventing the limited purpose grant's strict prohibition against 'brick and mortar'

construction projects[.]"[4]  *Id.*

John Davis was also indicted by the State in April 2022.  Ex. U.  On September 21, 2022, an Order of *Nolle Prosequi* was entered in the case against Davis upon the announcement of his global plea resolution with state and federal authorities whereby Davis "agreed to fully cooperate . . . in the prosecution of any and all additional criminally charged defendants, in State or Federal Court, for the criminal misuse of Federal TANF grant funds, State of Mississippi Funds, [MCEC] funds or any other funds available to or through" MDHS.[5]  Ex. V.  Criminal investigation into the Mississippi welfare fraud scandal remains ongoing.

**F.     On February 9, 2023, Favre Sued McAfee for Defamation.**

McAfee is the host of a nationally-distributed comedic sports media broadcast called The Pat McAfee Show (previously defined "The Show"), known for its energetic, comical, unfiltered, and unconventional reporting on sports and pop-culture.  The daily broadcast airs live on The Show's YouTube page Monday through Friday, 48 weeks a year, from noon to approximately 3:30 pm EST.  Segments of The Show that are particularly topical and easier to digest in a shorter fashion are clipped and uploaded to The Show's social media platforms.

Throughout each broadcast, McAfee, The Show's team of regular contributors, and its guests talk about current events and hot topics that are generating internet headlines around the sports universe.  Given McAfee's history as a punter for the Indianapolis Colts, The Show's subject matter is dedicated mostly to NFL football with some coverage of other sports and humorous subjects found on the internet.  McAfee's loyal following of listeners join The Show as a mental reprieve while at home, their jobs, in class, or battling life's more serious challenges.

---

[4] The News were also federally indicted on related but different charges, which are still pending.
[5] Davis was also federally indicted on related but different charges and pled guilty to conspiracy and theft concerning programs receiving federal funds related to the misdirection of TANF funds.  Ex. W.

The Show has advertising partners but is independently owned and operated.  McAfee and The Show have in many ways managed to disrupt the historically corporate sports media landscape.

On February 9, 2023, Favre sued McAfee for defamation.  Favre's lawsuit was originally filed in the Circuit Court of Lamar County.  McAfee timely removed the lawsuit to this Court.

Favre's Complaint alleges that McAfee defamed him by the following two statements purportedly made on the November 30, 2022 broadcast of The Show: (1) "Every time his name gets brought up, we have to mention that he tied the hands of the poor people and took money right out of their pockets"; and (2) "[Favre is] certainly in the middle of stealing from poor people in Mississippi right now."  Cmpl. ¶ 18 (alteration in Complaint).  As reflected in the below verbatim transcript of the broadcast, however, the Complaint materially alters McAfee's statements, which, in reality, were prefaced with, "from the information that we have currently," and followed McAfee's express acknowledgement that, "obviously, Brett Favre Enterprises is alleging that this is all wrong."  Ex. A.  Favre also alleges he was defamed by the following December 24, 2022 tweet on The Show's Twitter page:



Cmpl. ¶ 19.

The cherry-picked and out-of-context statements cited in the Complaint constituted an approximately 85-second segment of The Show's more-than-three-hour broadcast in which

McAfee and his team conversed about a joke made during the prior day's show:

| | |
|---|---|
| McAfee: | Honestly, there are limited times when I go, brain, what a good job there. |
| Other: | Mm-hmm. |
| McAfee: | As Aaron's talking about, you know, learning about being tough from the guy that played football before him— |
| Other: | Yeah. |
| McAfee: | Brett Favre at Green Bay, my brain literally was like 'we're in holiday season. Brett Favre, what did he do? He didn't just steal from the poor. Yeah, he did that. What else? Oh, he is the actual— |
| Other: | Yeah. |
| McAfee: | Sticky-finger bandits— |
| Other: | Yep. That's right. |
| McAfee: | From Home Alone 2— |
| Other: | Mm-hmm. |
| McAfee: | In New York.' So then I mentioned that to Aaron. I think it took a couple seconds for everything to settle in, and then there was a 'Jesus.' |
| Other: | Yeah. |
| McAfee: | I was just waiting. My brain was like so happy. I was so pumped. I'm like 'good for you, man. Way to put that together.' And we have to make sure that it's mentioned every time that man's mentioned. |
| Other: | Have to. |
| McAfee: | Because that is a big deal that that happened. |
| Other: | Terrible. |
| McAfee: | That's a big deal. Now obviously, Brett Favre Enterprises is alleging that this is all wrong. |
| Other: | That's right. |
| McAfee: | And I can't wait— |
| Other: | A big ruse. |
| McAfee: | And I can't wait to hear BFE— |
| Other: | BFE. |
| McAfee: | You know, drop BFE, Brett Favre Enterprises, I can't wait for bum f*** Egypt to drop Brett Favre Enterprises's side of the story, and we will judge it accordingly. |
| Other: | Right. |

| McAfee: | But from the information that we have currently, every time his name gets brought up, we have to mention— |
| Other: | Hands are tied.  Have to do it. |
| McAfee: | Yep.  He, he tied the hands of the poor people and took money right out of their pockets. |
| Other: | That's right. |
| McAfee: | And we have to talk about that, even though a football player, incredibly tough football player— |
| Other: | Sure. |
| McAfee: | Football player, good football player, did a lot of things, certainly in the middle of stealing from poor people in Mississippi right now. |
| Other: | Absolutely. |
| McAfee: | Have to chat about that. |

Ex A.[6]  Taking McAfee's statements in context, the Complaint does not state a claim upon which relief can be granted and, thus, McAfee moves this Court to dismiss the Complaint, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## III.   <u>STANDARD OF REVIEW</u>

To survive a Rule 12(b)(6) motion, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) (first quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and then *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To be plausible, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  While the Court "must accept all well-pleaded facts as true and . . . view them in the light most favorable to the plaintiff," the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* (alteration in original) (citations omitted).  "'[D]etermining whether a complaint states a plausible claim for

---

[6] The 85 seconds of content transcribed above runs from 11:34 through 12:59 of the full broadcast (i.e., 00:54 through 2:19 of the segment at Exhibit A).

relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Because meritless defamation lawsuits like this one risk chilling free speech by forcing media defendants to incur unnecessary litigation costs, courts routinely dismiss them at the pleadings phase on the grounds asserted in this motion.  *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (dismissing complaint for failure to plausibly allege actual malice and noting the "powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation"); *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("[S]ummary proceedings are essential in the First Amendment area because if a suit entails long and expensive litigation, then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails.") (internal quotations and citation omitted)); *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013) ("Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage.") (internal quotations and citation omitted)), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

This Court has likewise ruled that "the nature of a libel action lends itself to judicial scrutiny in the early stages of a defamation lawsuit."  *Mitchell v. Random House, Inc.,* 703 F. Supp. 1250, 1258 n.10 (S.D. Miss. 1988) (granting motion to dismiss by media defendant), *aff'd*, 865 F.2d 664 (5th Cir. 1989).  Because "in a libel suit the central event—the communication about which suit has been brought—is usually before the judge at the pleading stage[,] . . . [t]he trial court may . . . at the earliest stages, make sound determinations as to issues relating to the communication of which complaint is made."  *Id.* (citation omitted).  As a result, "[c]ourts routinely consider on motions to dismiss issues [like those asserted here] such as

whether the statement at bar is capable of bearing a defamatory meaning, . . . whether it is protected opinion, . . . and whether the suit is barred by privilege and frequently grant motions on these grounds and others." *Id.*

## IV.   <u>ARGUMENT</u>

The elements of a defamation claim are "(1) a false and defamatory statement concerning plaintiff; (2) unprivileged publication to third party; (3) fault amounting at least to negligence on part of publisher; (4) and either actionability of statement irrespective of special harm or existence of special harm caused by publication." *Armistead v. Minor*, 815 So. 2d 1189, 1193 (Miss. 2002) (citation omitted). As a public figure, Favre faces "the additional burden of proving actual malice[.]" *Id.* (quoting *Masson v. New Yorker Mag., Inc.,* 501 U.S. 496, 510 (1991)).

Favre's Complaint against McAfee should be dismissed for four reasons. <u>First</u>, the Complaint pleads no false statement of fact. <u>Second</u>, the Complaint pleads no unprivileged publication. <u>Third</u>, the Complaint pleads no plausible allegations of actual malice. <u>Fourth</u>, Favre did not give McAfee the requisite 10-days-notice of suit.

## A.   **THE COMPLAINT PLEADS NO FALSE STATEMENT OF FACT**

"[T]he court determines whether the statement bears the meaning ascribed to it by the plaintiff and whether this meaning is defamatory." *Perkins v. Littleton*, 270 So. 3d 208, 215 (Miss. Ct. App. 2018) (quoting *Fulton v. Miss. Publishers Corp.*, 498 So. 2d 1215, 1216 (Miss. 1986)). "If the court decides against the plaintiff on either of these questions, the case is ended." *Id.* at 215-16 (quoting *Fulton*, 498 So. 2d at 1216). Here, the Complaint pleads no actionable defamatory statements because (1) the November 30 statements do not contain false statements of fact; and (2) the December 24 tweet is nonactionable innuendo.

14

1.    **The November 30 Statements Are Not Actionable Because They Do Not Contain False Statements of Fact.**

Defamation requires a false statement of fact about the plaintiff. *E.g., Armistead*, 815 So. 2d at 1193 (citation omitted). "The plaintiff bears the burden to prove such falsity." *Id.* at 1194 (citing *Blake v. Gannett Co.,* 529 So. 2d 595, 602 (Miss. 1988)) (other citation omitted). Thus, "[t]he threshold question in a defamation suit is whether the published statements are false." *Id.* (quoting *Franklin,* 722 So. 2d at 692) (other citation omitted).

In determining whether a statement contains a false statement of fact, "[t]he said-to-be-offending words must be set in the context of the entire utterance. Their complexion draws color from the whole." *Lawrence v. Evans*, 573 So. 2d 695, 698 (Miss. 1990) (citing *Whitten v. Com. Dispatch Publ'g Co.*, 487 So. 2d 843, 845 (Miss. 1986); *Manasco v. Walley*, 63 So. 2d 91, 95 (Miss. 1953)). A statement is true if it is "***substantially*** true"; it "need not be literally true." *E.g.*, *Pittman v. Gannett River States Publ'g Corp.*, 836 F. Supp. 377, 381 n.5 (S.D. Miss. 1993) (emphasis added) (first citing *Blake,* 529 So. 2d at 603; and then Rest. 2d Torts § 581 cmt. f). As the U.S. Supreme Court has explained:

> Minor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting, of the libelous charge be justified." Put another way, ***the statement is not considered false, unless it*** "***would have a different effect on the mind of the reader from that which the pleaded truth would have produced.***"

*Masson*, 501 U.S. at 517 (emphasis added) (citations omitted).

"[T]he First Amendment protects 'imaginative expression' or 'rhetorical hyperbole' when such statements 'cannot reasonably be interpreted as stating ***actual facts*** about an individual.'" *Perkins*, 270 So. 3d at 217 (emphasis added) (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (recognizing that rhetorical hyperbole and imaginative expression have "traditionally added much to the discourse of our Nation") (citation omitted)). Such statements

15

are protected when "the context in which they appeared alerted the reader that the statements were not to be read as factual allegations." *Id.* (citations omitted).

Consistent with these principles and the U.S. Supreme Court's *Milkovich* decision, the Mississippi Supreme Court in *Roussel v. Robbins*, 688 So. 2d 714, 716 (Miss. 1996), adopted the following as "correct statements of [defamation] law with regard to opinions":

> [I]n order to ensure "uninhibited, robust, and wide-open" debate on matters of public concern, "***a statement of opinion relating to matters of public concern*** which does not contain a provably false factual connotation," or ***which "cannot 'reasonably [be] interpreted as stating actual facts' about an individual***," continues to receive full constitutional protection.

*Keohane v. Wilkerson*, 859 P.2d 291, 296 (Colo. Ct. App. 1993) (emphasis added) (quoting *Milkovich*, 497 U.S. at 20)) (other citations omitted).  Here, there can be no question that the statements pled in the Complaint relate to a matter of public concern—Favre's involvement in the Mississippi welfare fraud scandal—and the November 30 statements cannot reasonably be interpreted as stating actual facts about Favre.

As explained in *Keohane*, cited with authority by the Mississippi Supreme Court, in considering whether the November 30 statements are actionable, the Court must determine whether they are "***reasonably susceptible to being understood as an actual assertion of fact***." 859 P.2d at 296 (emphasis added).  The Court is "not limited to the literal meaning of the words contained in the statement." *Id.*  Instead, it "must consider the impression created by the words as well as ***the general tenor of the conversation*** or article from the point of view of the reasonable person," as well as other factors including "the ***phrasing*** of the statement, the ***context*** in which it appears, and the ***surrounding circumstances*** of its publication[.]" *Id.* at 296-97 (emphasis added) (citations omitted).  In the analogous context of a provocative, opinion-based news show, the Ninth Circuit recently found:

> [T]he broad context of [Rachel] Maddow's show makes it more likely that her audiences will expect her to use subjective language that comports with her political opinions. . . . Although MSNBC produces news, Maddow's show in particular is more than just stating the news—Maddow is invited and encouraged to share her opinions with her viewers.  In turn, Maddow's audience anticipates her effort to persuade others to [her] position[ ] by use of epithets, fiery rhetoric or hyperbole. Therefore, the medium through which the contested statement was made supports Maddow's argument that a reasonable viewer would not conclude the statement implies an assertion of fact.

*Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1157 (9th Cir. 2021) (internal quotations and citations omitted) (defamation suit against MSNBC host for saying that OAN "really literally is paid Russian propaganda" based on article that OAN reporter was also paid by the Kremlin).

Here, like in *Maddow*, it is apparent from the comedic and unfiltered context of The Show that a reasonable listener would expect McAfee to use subjective language, epithets, fiery rhetoric and hyperbole, and to share his opinions.  The Show is notorious for its unconventional and humorous reporting on hot topics in sports.  For example, McAfee kicked off the subject segment on the November 30, 2022 broadcast by joking that Favre is "the actual sticky finger bandits from Home Alone 2 in New York."  Ex. A.  McAfee then joked that he couldn't "wait for bum f*** Egypt to drop Brett Favre Enterprises's side of the story," which he said should be "judge[d ] accordingly."  *Id.*  Throughout the segment, McAfee did "not implicitly assert any firsthand knowledge inaccessible to [The Show's] audience"—because he has none.  *See Keohane*, 859 P.2d at 299 (citations omitted) (recognizing the importance of commentary on matters of public concern as a means to "stimulate[] public pressure for answers from those who know more").  Given this and the general tenor of The Show and subject segment, a reasonable listener would not have taken McAfee's statements as assertions of fact about Favre.

McAfee's "use of hyperbolic rhetoric bolsters this conclusion."  *See Maddow*, 8 F.4th at 1160 ("'[L]oose, figurative, or hyperbolic language ... negate[s] the impression' that the

contested statement is an assertion of fact." (quoting *Milkovich*, 497 U.S. at 21)).  For example, McAfee's use of the phrases "tied the hands of," "took from the pockets of," "stealing," and "in the middle of," Ex. A, support the position that a reasonable listener would not have interpreted his statements as actual facts.  *See id.* ("[C]olorful, figurative rhetoric may be held not actionable because reasonable minds would not take [it] to be factual[.]" (internal quotations and citation omitted)).  McAfee also made expressly clear that he was not stating actual facts about Favre, but rather commenting and sharing his opinions on the allegations, by prefacing his comments with, "from the information that we have currently," and, "obviously, Brett Favre Enterprises is alleging that this is all wrong."  Ex. A.  Favre's deliberate (and improper) omission of the phrase "from the information that we have currently" when quoting McAfee is telling; Favre hopes this Court will ignore its obligation to consider this critical context.  The Court should not.

Moreover, even if the November 30 statements reasonably could be interpreted as stating actual facts about Favre, the facts would be substantially true.  Prior to the November 30 Show:

- Favre was sued by MDHS for his involvement in the diversion of $3.2 million in TANF funds away from the poor people of Mississippi to himself, Favre Enterprises, and Prevacus.  Ex. E.
- Filings in the MDHS Lawsuit and multiple media articles (some cited in filings) alleged Favre's involvement in the misdirection of an additional $5 million in TANF funds to his alma mater, USM, for construction of a volleyball facility.  Exs. F-N.
- Text messages attached to certain of the filings show Favre expressing concern that the media may find out the source of the funding for the volleyball facility, i.e., TANF funds funneled through MCEC with the cooperation of Favre's alleged co-conspirators, Nancy and Zachary New, who pled guilty prior to the November 30 broadcast to crimes related to the misdirection of TANF funds.  Exs. G-I & S-T.

A verbatim recitation of these facts would have produced no different effect on the minds of The Show's listeners than McAfee's hyperbolic rhetoric that, although Favre denies it, "from the information that we have currently," "he tied the hands of the poor people and took money right out of their pockets" (which, in context, immediately followed another contributor's banter

18

that *The Show's* "hands are tied" in that it cannot overlook the allegations against Favre). Ex. A. That statement is substantially true and cannot form the basis of a defamation claim. *See Masson*, 501 U.S. at 517. It is also substantially true that Favre has found himself "in the middle of stealing from poor people in Mississippi right now." Ex. A. Indeed, MDHS is suing him for misappropriating welfare funds that should have benefited poor Mississippians. Exs. E & O.

## 2. **The December 24 Tweet Is Nonactionable Innuendo.**

McAfee's December 24 tweet does not state any fact about Favre at all; at most, it is mere innuendo which cannot be defamatory under Mississippi law. To be actionable, "defamation must be clear and ***unmistakable from the words themselves*** and ***not be the product of innuendo, speculation or conjecture***." *Perkins*, 270 So. 3d at 216 (emphasis added) (quoting *J. Publ'g Co. v. McCullough*, 743 So. 2d 352, 360 (Miss. 1999)); *see also Lawrence*, 573 So. 2d at 698 (citations omitted). As made clear by the Mississippi Supreme Court, this "restriction[] upon the action for defamation [is] and must be strictly enforced." *Perkins*, 270 So. 3d at 213 (quoting *Ferguson v. Watkins*, 448 So. 2d 271, 275 (Miss. 1984)). Here, the words "Devonta Smith doing 'The Favre' after that touchdown was crazy" do not state any fact whatsoever about Favre, and any purported defamatory meaning would be solely the product of innuendo, speculation and conjecture about what was meant by "doing 'The Favre.'" *See* Cmpl. ¶ 19.

## B. **THE COMPLAINT PLEADS NO UNPRIVILEGED PUBLICATION**

Favre's defamation claim also fails because McAfee's statements are indisputably attributable to allegations made against Favre in the MDHS Lawsuit and information disclosed by the Auditor's Office and, thus, are privileged under the First Amendment and Mississippi law.

An "unprivileged publication to a third party" is a necessary element of a defamation claim that must be proved by the plaintiff. *Pittman*, 836 F. Supp. at 381 (citations omitted). The First Amendment shields "accurate reports of judicial proceedings" and other government

investigations.  *Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976); *see Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838-39 (1978).  Mississippi law likewise recognizes an "official proceedings privilege," pursuant to which "the 'publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."  *Pittman*, 836 F. Supp. at 382 (quoting *Brocato v. Miss. Publishers Corp.,* 503 So. 2d 241, 244 (Miss. 1987) (quoting Rest. 2d Torts § 611)).  As explained by this Court, to hold otherwise "might sap the vigor from public debate, and dissuade the press from reporting important information due to the threat of legal action."  *Id.*

Applicability of the official proceedings privilege is "a matter for the court to decide." *McDonald v. Raycom TV Broad., Inc.*, 665 F. Supp. 2d 688, 690 (S.D. Miss. 2009) (quoting *Pittman*, 836 F. Supp. at 382).  "[S]o long as the [allegedly defamatory statement] is a fair and accurate republication of an official report, [it] is protected, even if the official report is itself false or inaccurate."  *Id.*  For a report to be fair and accurate, "[i]t is enough that it conveys to the persons who read it a substantially correct account of the proceedings."  *Pittman*, 836 F. Supp. at 384 (citation omitted).  The allegedly defamatory statement need only "be ***attributable*** to an official document or proceeding."  *Id.* at 382 (emphasis added)*.*  "***This does not mean that each quote or statement must be specifically attributed to an official document or proceeding.*** Rather, it is necessary only that, when considered in context, it is clear that the [allegedly defamatory statement] is quoting, paraphrasing or otherwise drawing upon official documents or proceedings."  *Id.* at 382-83 (emphasis added) (citation omitted).

20

The analysis by this Court in *Pittman* is squarely on-point.  There, the Court applied the official proceedings privilege as a bar to plaintiff Pittman's claim that the defendant had defamed him by falsely stating that he was the "leader" of a prostitution ring:

> **[S]imilar allegations were made in numerous other public documents**, including police investigation reports, arrest reports, and the indictment of [non-parties] and others for running a prostitution ring, **_any of which were potential sources of defendant's remarks_**.  Defendant . . . certainly was aware of the underlying allegations. . . .  **The scandal was the subject of intense public attention, which culminated in numerous media reports, including newspaper articles, of the cases and investigations.  The public was aware that numerous official hearings and proceedings had taken place prior to the publication of the challenged articles, and readers, the intended beneficiaries of the privilege, would logically have realized that previously-published articles and official proceedings were the sources for the alleged defamatory remarks.**

*Id*. at 383-84 (emphasis added).  The same logic applies to protect McAfee's comments here.

McAfee's allegedly defamatory statements are attributable to any number of reports of official actions or proceedings or public meetings on Favre's involvement in the diversion of TANF funds away from Mississippi's poorest families.  For example:

- The complaint in the MDHS Lawsuit, filed more than six months prior to The Show's November 30 broadcast, alleged that Favre and Favre Enterprises accepted $1.1 million in TANF funds from MCEC purportedly in exchange for speeches and autograph signings he never performed.  Ex. E ¶ 137 ("Certainly no services were performed by Favre that had anything to do with the pursuit of lawful TANF purposes.").

- The MDHS complaint also named Favre as a defendant who agreed to divert $2.1 million in TANF funds for non-TANF purposes to Prevacus, "a private, for-profit biotechnology corporation in which Favre" was "the largest individual outside investor and holder of corporate stock."  *Id.* ¶¶ 115-16.

- Nancy and Zachary New, Favre's alleged co-conspirators, pled guilty to three counts each of wire fraud related to the transmission of MCEC's limited purpose grant funds to Prevacus "for purposes not allowed pursuant to the limited purpose grants from which the funds originated[.]"  Exs. S at 7 & T at 6-7.

- Zachary New also pled guilty to one count of fraud against the government for his involvement in the transfer of $4 million in TANF funds "for the construction of a volleyball center at [USM], which was prohibited under the limited use guidelines of the grants from which the funds originated[.]"  Ex. T at 6.

In sum, like in *Pittman*, the "scandal" McAfee was reporting on "was the subject of intense public attention, which culminated in numerous media reports" to which the allegedly defamatory statements were attributable. 836 F. Supp. at 384. Accordingly, as in *Pittman*, McAfee was privileged to report, expressly "from the information that we have currently," that Favre diverted money from the poor people of Mississippi to his own benefit. Ex. A. Also like in *Pittman*, "the public was aware that numerous official hearings and proceedings had taken place prior to [McAfee's] challenged [statements], and [listeners], the intended beneficiaries of the privilege, would logically have realized that previously-published articles and official proceedings were the sources for the alleged defamatory remarks." 836 F. Supp. at 384.

## C.  THE COMPLAINT PLEADS NO PLAUSIBLE ALLEGATIONS OF ACTUAL MALICE

Not only has Favre failed to plead any actionable speech, but he has also failed to plausibly allege actual malice. In recognition of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964), the U.S. Supreme Court has held that the First Amendment provides heightened protection against defamation suits brought by individuals "who, by reason of the notoriety of their achievements or the vigor or success with which they seek the public's attention, are properly classified as public figures." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). Favre cannot dispute that he is such a public figure.

As a public figure, Favre faces "the additional burden of proving actual malice by clear and convincing evidence." *Armistead*, 815 So. 2d at 1193 (citations omitted). "Actual malice" is "a statement made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (quoting *Masson*, 501 U.S. at 510). Favre must allege facts sufficient to give rise to a reasonable inference that McAfee "made a false publication with a ***high degree of***

*awareness of … probable falsity*, or must have **entertained serious doubts as to the truth** of his publication." *Id.* (alteration in original) (emphasis added) (citation omitted). Because the actual malice standard is a subjective one requiring that the defendant "***in fact entertained serious doubts*** as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added), a reckless disregard for the truth "requires more than a departure from reasonably prudent conduct." *Harte-Hanks Commc'ns, Inc. v Cannaughton*, 491 U.S. 657, 688 (1989). Allegations "that the defendant published the defamatory material in order to increase its profits [do not] suffice to prove actual malice." *Id.* at 667 ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."). Nor do allegations suffice that the defendant's "motive in publishing a [statement] . . . [was] to increase its circulation[.]" *Id.* at 665. "[T]he constitutional focus is on the defendant's attitude toward the truth, not his attitude toward the plaintiff." *Walker*, 938 F.3d at 744 (citation omitted).

This standard has been more rigorously applied since *Iqbal* and *Twombly*. Indeed, since *Iqbal* and *Twombly*, every Circuit that has considered the matter, including the Fifth Circuit, has held that a defamation claim may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice. *See, e.g.*, *id.* at 744-45 ("Such scant assertions are insufficient to allow the court to infer more than a mere possibility of misconduct. . . . [T]he deficiency of Appellant's 'actual malice' allegations provides an independent, standalone basis for dismissal of [his] defamation claims.").[7]

---

[7] *See also Michel*, 816 F.3d at 702 ("[A] defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice."); *DF Pace v. Baker-White*, 850 F. App'x 827, 831-32 (3d Cir. 2021) (finding plaintiff Pace's "conclusory allegations" of actual malice "insufficient" because "[a]t the pleading stage, a public figure, like Pace, must allege *facts* to support an inference of actual malice") (emphasis in original)); *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 956 (8th Cir. 2020) ("Thus, if Nelson Auto is a public

The totality of Favre's allegations of actual malice is the conclusory averment set forth in paragraph 27 of the Complaint that "McAfee acted with actual malice, and with knowledge of the falsity of the defamatory statements, or at a minimum with reckless disregard for their falsity by purposefully avoiding the truth and, in fact, lying that Favre committed what are serious crimes in the state of Mississippi."  Cmpl. ¶ 27.  Such conclusory allegations are woefully inadequate.  *See, e.g.*, *Walker*, 938 F.3d at 744-45.  Favre pleads no facts to satisfy his rigorous burden of establishing that McAfee subjectively entertained serious doubts as to the truth of his statements; and frankly, given the abundant public allegations, both in official proceedings by MDHS and the Auditor's Office and in the multitude of similar media reports, he plainly *cannot*.

Indeed, as recently as last week, MDHS reaffirmed its allegations against Favre, stating that the facts pled in the MDHS Lawsuit were "carefully and thoroughly" pled based on a "mountain of text messages" reflecting Favre's involvement in the scheme.  Ex. P at 32.  Strongly opposing Favre's motion to dismiss the MDHS Lawsuit, MDHS asserted:

> Favre can argue to a jury that he was just ignorantly supporting his favorite causes—his daughter's volleyball team and a for-profit drug company—and that he didn't mean to direct federal grant money away from Mississippi's poorest citizens.  While he's at it, he can explain why he planned on rewarding a public official [John Davis] with a $75,000 truck for the receipt of federal funds.  But he cannot obtain dismissal on the pleadings.

---

figure, federal law requires that its Amended Complaint plead sufficient facts to support a plausible finding of actual malice."); *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) ("[A] public figure plaintiff must plead . . . enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of actual malice.") (internal quotations and citation omitted)); *McDonald v. Wise*, 769 F.3d 1202, 1220 (10th Cir. 2014) (finding that the plaintiff's "factual allegations raise the reasonable inference" that the defendant acted with actual malice); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) ("States of mind may be pleaded generally, but a plaintiff still must point to details sufficient to render a claim plausible."); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("[M]alice must still be alleged in accordance with Rule 8—a 'plausible' claim for relief must be articulated."); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (D.C. Cir. 2012) ("[T]o make out a plausible malice claim, a plaintiff must still lay out enough facts from which malice might reasonably be inferred.").

*Id.* at 26 (referencing a January 14, 2019 text from Favre to the Prevacus CEO suggesting that if the investment of federal grant funds in Prevacus works out, they should buy then-MDHS Executive Director John Davis a truck).  The Complaint's mere regurgitation of the actual malice standard does not come close to the high bar of plausibly pleading actual malice.

**D.      FAVRE FAILED TO GIVE MCAFEE TEN-DAYS-NOTICE OF SUIT**

The Complaint also must be dismissed because Favre did not give McAfee 10-days-notice of the allegedly defamatory statements before filing suit.  Mississippi law requires that:

> Before any civil action is brought for publication, in a newspaper domiciled and published in this state or authorized to do business in Mississippi so as to be subject to the jurisdiction of the courts of this state, of a libel, or against any radio or television station domiciled in this state, the plaintiff shall, *at least ten (10) days before instituting any such action*, serve notice in writing on the defendant at its regular place of business, specifying the article, broadcast or telecast, and the statements therein, which he alleges to be false and defamatory.

Miss. Code Ann. § 95-1-5(1) (emphasis added).[8]  As Favre alleges that McAfee is subject to the jurisdiction of this Court, Favre was required to comply with this statute, which the Mississippi Supreme Court has held "is clearly *a necessary preliminary step* to the proper filing of a libel action[.]"  *Brocato*, 503 So. 2d at 243 (emphasis added) (citation omitted).

The Complaint states that Favre's counsel "demanded that McAfee retract and apologize for his defamatory statements" on February 3, 2023, and suit was filed on February 9, 2023—*just six days later*.  For this reason alone, the Complaint must be dismissed.  *See, e.g.*, *King v. Mississippi*, No. 3:14-CV-157-CWR-FKB, 2015 WL 370175, at *4 n.11 (S.D. Miss. Jan. 27, 2015) (citing *Brocato*, 503 So. 2d at 243) ("With respect to the media Defendants, the defamation claim . . . would have to be dismissed because the Plaintiffs did not provide those Defendants notice required by Miss.Code.Ann. 95-1-5 before filing this action.").

---

[8] The "statute also applies to . . . other forms of news reporting services such as . . . cable or satellite news transmissions."  *Pannell v. Associated Press*, 690 F. Supp. 546, 549 n.2 (N.D. Miss. 1988).

## V.  <u>CONCLUSION</u>

WHEREFORE, Defendant Patrick Justin McAfee respectfully requests that the Court grant his Motion to Dismiss Plaintiff's Complaint, dismiss the Complaint with prejudice, and grant such other and further relief as the Court deems just and proper.

Dated:  March 31, 2023                              Respectfully submitted,


                                                    /s/ Sarah A. Decker
                                                    Sarah A. Decker (admitted *pro hac vice*)
                                                    Thomas J. Smith (admitted *pro hac vice*)
                                                    Curtis B. Krasik (admitted *pro hac vice*)
                                                    **K&L GATES LLP**
                                                    K&L Gates Center
                                                    210 Sixth Avenue
                                                    Pittsburgh, PA 15222
                                                    Phone:  412.355.6500
                                                    Fax:  412.355.6501
                                                    sarah.decker@klgates.com
                                                    thomas.smith@klgates.com
                                                    curtis.krasik@klgates.com

                                                    /s/ Alex Purvis
                                                    Alex Purvis (MSB 100673)
                                                    Michael Williams (MSB 104537)
                                                    James Stephen Fritz, Jr. (MSB 105936)
                                                    **BRADLEY ARANT BOULT**
                                                    **CUMMINGS LLP**
                                                    One Jackson Place
                                                    188 E Capitol Street, Suite 1000
                                                    Jackson, MS 39201
                                                    Phone:  601.948.8000
                                                    Fax:  601.948.3000
                                                    apurvis@bradley.com
                                                    mcwilliams@bradley.com
                                                    sfritz@bradley.com

                                                    *Counsel for Defendant Patrick Justin McAfee*

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will notify and serve all counsel of record.

*/s/ Alex Purvis*