

# State of Mississippi

## Single Audit for Year Ending June 30, 2019
Mississippi Office of the State Auditor
Shad White

**Exhibit C**

(This page left blank intentionally.)



# STATE OF MISSISSIPPI
## OFFICE OF THE STATE AUDITOR
### SHAD WHITE

April 30, 2020

The Governor, Members of the Legislature
and Citizens of the State of Mississippi

I am pleased to submit the *Single Audit Report* of the State of Mississippi for the fiscal year ended June 30, 2019. Our audit was conducted in accordance with the requirements of the Single Audit Act Amendments of 1996, the provisions of the Office of Management and Budget (OMB) *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (contained in Title 2 of the U.S. Code of Federal Regulations Part 200)*, and the State of Mississippi's audit requirements.

The Single Audit process requires the coordination and cooperation of many state government entities. We are particularly grateful for the efforts of the Mississippi Department of Finance and Administration in compiling data.

While I am pleased to report that, for the thirty-second consecutive year, DFA was awarded the Government Finance Officers Association of the United States and Canada's Certificate of Achievement for Excellence in Financial Reporting, it is important to note that this award is bestowed on DFA for its adherence to standards when compiling the report, and does not consider the actual financial condition of the state.

Additionally, it is important to note that my office issued an unmodified opinion on those financials, but that in order to do so, multiple significant adjustments to the financial reports submitted by state agencies were required. I would encourage you to review the audit findings issued by my office and other independent CPA firms. These audit findings are a vital part of our report as they acknowledge weaknesses existing in our state agencies that should be addressed by management and those charged with governance.

Mississippi's *Comprehensive Annual Financial Report* for fiscal year 2019 and our report thereon, dated December, 20, 2019, has been issued under separate cover and is available electronically at http://www.dfa.state.ms.us/ or by writing to the address below:

> Mississippi Department of Finance and Administration
> Attention: Bureau of Financial Reporting
> P. O. Box 267
> Jackson, MS 39205

Respectfully submitted,

**SHAD WHITE**
State Auditor

i

(Page Left Blank Intentionally)

# STATE OF MISSISSIPPI
## Fiscal Year 2019

**Expenditures of Federal Awards by Federal Department**



**Expenditures of Federal Awards by State Grantee Agency**



# STATE OF MISSISSIPPI
# Fiscal Year 2019







(This page left blank intentionally.)

# STATE OF MISSISSIPPI

**SINGLE AUDIT REPORT**

**For the Year Ended June 30, 2019**

**TABLE OF CONTENTS**

|  | **Page** |
|---|---|

**I.   AUDIT REPORTING:**

Independent Auditor's Report on Internal Control over Financial Reporting and on Compliance and Other Matters Based on an Audit of Financial Statements Performed in Accordance with *Government Auditing Standards* ................................................................. 1

Independent Auditor's Report on Compliance for Each Major Federal Program; Report on Internal Control over Compliance; and Report on Schedule of Expenditures of Federal Awards Required by Uniform Grant Guidance 5

Schedule of Expenditures of Federal Awards by Federal Department .................................................................. 13

Schedule of Expenditures of Federal Awards by State Grantee Agency .............................................................. 23

Notes to the Schedule of Expenditures of Federal Awards ........................................................................ 37

Schedule of Findings and Questioned Costs:

Part 1 - Summary of Auditor's Results .................................................... 45

Part 2 - Financial Statement Findings .................................................... 49

Part 3 - Federal Award Findings and Questioned Costs .......................... 75

**II.   SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS:**

Instructions to Management .......................................................... 291

Index Listed by Finding Number .................................................. 293

**STATE OF MISSISSIPPI**
**Table of Contents (concluded)**

**Page**

Index Listed by State Grantee Agency ........................................................ 295

Summary Schedules of Prior Federal Audit Findings
(Categorized by State Grantee Agency) .................................. 297


**III.   MANAGEMENT RESPONSES AND CORRECTIVE ACTION PLANS:**

Instructions to Management .......................................................... 317

Management Responses and Corrective Action Plans
(Categorized by State Grantee Agency) .................................. 319


**IV.   INDICES:**

Index of Financial Statement Findings and Responses
Financial Statement Findings and Recommendations ................... 379
Management Reponses and Corrective Action Plans   .................. 379

Index of Federal Award Findings and Questioned Costs
Listed by Federal Department ................................................... 381

Index of Federal Award Findings and Questioned Costs
Listed by State Grantee Agency ............................................... 383

Index of Federal Award Findings and Questioned Costs
Listed by Finding Number ....................................................... 385

Index of Management Responses to Federal Award Findings and Corrective Action Plans
Listed by State Grantee Agency ............................................... 387


**V.   ACKNOWLEDGMENTS** .......................................................... 389

# I. AUDIT REPORTING



(This page left blank intentionally.)



**STATE OF MISSISSIPPI**
**OFFICE OF THE STATE AUDITOR**
**SHAD WHITE**
AUDITOR

**INDEPENDENT AUDITOR'S REPORT ON**
**INTERNAL CONTROL OVER FINANCIAL REPORTING**
**AND ON COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF**
**FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE**
**WITH *GOVERNMENT AUDITING STANDARDS***

The Governor, Members of the Legislature
and Citizens of the State of Mississippi

We have audited, in accordance with the auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States,  the financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund and the aggregate remaining fund information of the State of Mississippi (the State), as of and for the year ended June 30, 2019, and the related notes to the financial statements which collectively comprise the State's basic financial statements, and have issued our report thereon dated December 20, 2019.  Our report includes a reference to other auditors who audited the financial statements of the following, as described in our report on the State of Mississippi's financial statements:

- ▪ <u>Government-wide Financial Statements</u>

  - • <u>Governmental Activities</u>

    – the Department of Environmental Quality Clean Water State Revolving Loan Fund, the Department of Health Local Governments and Rural Water Systems Improvements Revolving Loan Fund, the State Agencies Self-Insured Workers' Compensation Trust Fund, and selected funds at the Department of Marine Resources, the Department of Employment Security, the Mississippi Development Authority, and the Department of Public Safety which, in the aggregate, represent 4% and 1%, respectively, of the assets and revenues of the governmental activities;

- ▪ <u>Business-type Activities</u>

    – AbilityWorks, Inc. within the Department of Rehabilitation Services, the Port Authority at Gulfport, the Mississippi Prepaid Affordable College Tuition Program, the Veterans' Home Purchase Board, the Department of Finance and Administration State Life and Health Plan, and the Unemployment Compensation Fund which, in the aggregate, represent 98% and 97%, respectively, of the assets and revenues of the business-type activities;

- Component Units

  – the Universities and the nonmajor component units.

- Fund Financial Statements

  - Governmental Funds

    – the Department of Environmental Quality Clean Water State Revolving Loan Fund, the Department of Health Local Governments and Rural Water Systems Improvements Revolving Loan Fund, the State Agencies Self-Insured Workers' Compensation Trust Fund, and selected funds at the Department of Marine Resources, the Department of Employment Security, the Mississippi Development Authority, and the Department of Public Safety which, in the aggregate, represent 4% and 1%, respectively, of the assets and revenues of the General Fund;

  - Proprietary Funds

    – the Port Authority at Gulfport, the Mississippi Prepaid Affordable College Tuition Program, the Department of Finance and Administration State Life and Health Plan, and the Unemployment Compensation Fund which are considered major enterprise funds;

  - Aggregate Remaining Funds

    – Nonmajor enterprise funds for AbilityWorks, Inc. within the Department of Rehabilitation Services and the Veterans' Home Purchase Board;

    – Other Employee Benefits Trust Fund – State Life and Health Insurance Plan;

    – the Pension Trust Funds;

    – the Private-Purpose Trust Funds of the Mississippi Affordable College Savings Program;

    all of which represent 100% and 100%, respectively, of the assets and revenues of the aggregate remaining funds.

Except for the major component unit Universities, this report includes our consideration of the results of the other auditors' testing of internal control over financial reporting and compliance and other matters that are reported on separately by those auditors.  However, this report, insofar as it relates to the results of the other auditors, is based solely on the reports of the other auditors.  This report does not include the results of the other auditor's testing of internal control over financial reporting and compliance and other matters for the major component unit Universities that are reported on separately by those auditors.

The financial statements of the Mississippi State University Foundation, Inc., the University of Mississippi Foundation, the University of Southern Mississippi Foundation, the University of Mississippi Medical Center Educational Building Corporation, the University of Mississippi Medical Center Tort Claims Fund, the State Institutions of Higher Learning Self-Insured Workers' Compensation Fund and the State Institutions of Higher Learning Tort Liability Fund,  which were audited by other auditors upon whose reports we are relying, were not audited in accordance with *Government Auditing Standards*, and accordingly this report does not include reporting on internal control over financial reporting or instances of reportable noncompliance associated with these funds or entities.

**Internal Control over Financial Reporting**

In planning and performing our audit of the financial statements, we and other auditors considered the State of Mississippi's internal control over financial reporting (internal control) to determine the audit procedures that are appropriate in the circumstances for the purpose of expressing our opinions on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the State of Mississippi's internal control. Accordingly, we do not express an opinion on the effectiveness of the State of Mississippi's internal control.

Our and the other auditors' consideration of internal control was for the limited purpose described in the preceding paragraph and was not designed to identify all deficiencies in internal control that might be material weaknesses or significant deficiencies and therefore, material weaknesses or significant deficiencies may exist that were not identified. However, as described in the accompanying "Schedule of Findings and Questioned Costs: Part 2 – Financial Statement Findings", we and other auditors identified certain deficiencies in internal control that we consider to be material weaknesses and significant deficiencies.

A *deficiency in internal control* exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, misstatements on a timely basis. A *material weakness* is a deficiency, or a combination of deficiencies, in internal control such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected on a timely basis. We consider the deficiencies described in the accompanying "Schedule of Findings and Questioned Costs: Part 2 – Financial Statement Findings" as items 2019-001, 2019-002, 2019-003, 2019-004, 2019-005, 2019-006, 2019-008, 2019-012, 2019-014, 2019-015, and 2019-017 to be material weaknesses.

A *significant deficiency* is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance. We consider the deficiencies described in the accompanying "Schedule of Findings and Questioned Costs: Part 2 – Financial Statement Findings" as items 2019-007, 2019-009, 2019-010, 2019-011, 2019-013, and 2019-016 to be significant deficiencies.

We and the other auditors also noted certain matters involving the internal control over financial reporting, which we have reported to management of the applicable state agencies and institutions of the State of Mississippi in separate communications.

**Compliance and Other Matters**

As part of obtaining reasonable assurance about whether the State of Mississippi's financial statements are free from material misstatement, we and other auditors performed tests of its compliance with certain provisions of laws, regulations, contracts and grant agreements, noncompliance with which could have a direct and material effect on the determination of financial statement amounts. However, providing an opinion on compliance with those provisions was not an objective of our audit, and accordingly, we do not express such an opinion. The results of our tests disclosed no instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards.*

We and the other auditors also noted certain matters which we have reported to management of the State of Mississippi in separate communications.

**Management's Response to Finding**

Management's response to the findings identified in our audit is described in the accompanying "Management's Response and Corrective Action Plan" section. Management's response was not subjected to the auditing procedures applied in the audit of the financial statements and, accordingly, we express no opinion on it.

**Purpose of this Report**

The purpose of this report is solely to describe the scope of our testing of internal control and compliance and the result of that testing, and not to provide an opinion on the effectiveness of the State of Mississippi's internal control or on compliance.  This report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the entity's internal control and compliance.  Accordingly, this communication is not suitable for any other purpose.   However, this report is a matter of public record and its distribution is not limited.

**Stephanie C. Palmertree, CPA, CGMA**
Director, Financial and Compliance
Audit Division

Jackson, Mississippi
December 20, 2019

4



# STATE OF MISSISSIPPI
## OFFICE OF THE STATE AUDITOR
### SHAD WHITE
AUDITOR

## INDEPENDENT AUDITOR'S REPORT ON COMPLIANCE  FOR EACH MAJOR FEDERAL PROGRAM; REPORT ON INTERNAL CONTROL OVER COMPLIANCE; AND REPORT ON SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS REQUIRED BY UNIFORM GUIDANCE

The Governor, Members of the Legislature
and Citizens of the State of Mississippi

**Report on Compliance for Each Major Federal Program**

We and other auditors have audited the State of Mississippi's (the State) compliance with the types of compliance requirements described in the *OMB Compliance Supplement* that could have a direct and material effect on each of the State's major federal programs for the year ended June 30, 2019.  We did not audit the HIV Care Formula Grants.  That program was audited by other auditors whose report has been furnished to us. This report includes our consideration of the results of the other auditors' testing of compliance and internal control over compliance that are reported on separately by those other auditors. However, this report, insofar as it relates to the results of the other auditors, is based solely on the reports of the other auditors.  The State of Mississippi's major federal programs are identified in the Summary of Auditor's Results section of the accompanying Schedule of Findings and Questioned Costs.

**Management's Responsibility**

Management is responsible for compliance with federal statutes, regulations, and the terms and conditions of its federal awards applicable to its federal programs.

**Auditor's Responsibility**

Our and the other auditors' responsibility is to express an opinion on compliance for each of the State's major federal programs based on our audit of the types of compliance requirements referred to above.

The State of Mississippi's basic financial statements include the operations of the State's public universities, as a major component unit within the discretely presented component units, which received $1,034,933,036 in federal awards which is not included in the State's schedule during the year ending June 30, 2019.  Our audit, described below, did not include the operations of the public universities because the universities component unit engaged other auditors to perform an audit in accordance with the provisions of Uniform Guidance, which has not been issued as of April 30, 2019.

Except as discussed in the following paragraph, we and other auditors conducted our audits of compliance in accordance with auditing standards generally accepted in the United States of America; the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States; and the audit requirements of Title 2 U.S. *Code of Federal Regulations* Part

Independent Auditor's Report on Compliance For Each Major Federal Program;
Report on Internal Control Over Compliance; and Report on Schedule of
Expenditures of Federal Awards Required by Uniform Guidance

200, *Uniform Administrative Requirements, Cost Principles,* and *Audit Requirements for Federal Awards* (Uniform Guidance). Those standards and the Uniform Guidance require that we and other auditors plan and perform the audit to obtain reasonable assurance about whether noncompliance with the types of compliance requirements referred to above that could have a direct and material effect on a major federal program occurred.  An audit includes examining, on a test basis, evidence about the State of Mississippi's compliance with those requirements and performing such other procedures as we considered necessary in the circumstances.  We believe that our audit, and the reports of other auditors, provides a reasonable basis for our qualified and unmodified opinions on compliance for each major federal program. However, our audit, and the audits of other auditors, do not provide a legal determination of the State of Mississippi's compliance.

The scope of this audit did not include testing transactions and records from the major federal programs of the public universities of Mississippi.  The audit of those federal programs was conducted in accordance with the provisions of Uniform Guidance, and a separate report was issued.

**Basis for Adverse Opinion On the SNAP Cluster, TANF Cluster, CCDF Cluster, Social Services Block Grant (SSBG) and Low Income Home Energy Assistance Program (LIHEAP) Program**
As described in the accompanying "Schedule of Findings and Questioned Costs: Part 3 – Federal Award Findings and Questioned Costs," the State of Mississippi did not comply with requirements regarding the following:

| Finding # | CFDA # | Program/Cluster Name | Compliance Requirement |
|---|---|---|---|
| 2019-030 | 10.551; 10.561; 93.558; 93.575; 93.596; 93.667 | SNAP Cluster<br>TANF Cluster<br>CCDF Cluster<br>Social Services Block Grant | Activities Allowed/Allowable Costs |
| 2019-031 | 10.551; 10.561 | SNAP Cluster | Activities Allowed/Allowable Costs |
| 2019-032 | 93.558 | TANF Cluster | Activities Allowed/Allowable Costs |
| 2019-033 | 93.575; 93.596 | CCDF Cluster | Activities Allowed/Allowable Costs |
| 2019-034 | 10.551; 10.561; 93.558 | SNAP Cluster<br>TANF Cluster | Activities Allowed/Allowable Costs |
| 2019-035 | 93.558 | TANF Cluster | Cash Management |
| 2019-036 | 93.575; 93.596 | CCDF Cluster | Eligibility |
| 2019-037 | 93.575; 93.596 | CCDF Cluster | Matching, Level of Effort, Earmarking |
| 2019-038 | 93.575; 93.596 | CCDF Cluster | Period of Performance |
| 2019-039 | 93.558 | TANF Cluster | Procurement, Suspension and Debarment |
| 2019-040 | 10.551; 10.561 | SNAP Cluster | Procurement, Suspension and Debarment |
| 2019-041 | 93.558 | TANF Cluster | Reporting |
| 2019-042 | 10.551; 10.561; 93.558; 93.575; 53.596; 93.667; 93.568 | SNAP Cluster<br>TANF Cluster<br>CCDF Cluster<br>Social Services Block Grant<br>Low Income Home Energy Assistance Program | Subrecipient Monitoring |
| 2019-043 | 10.551; 10.561; 93.558; 93.575; 53.596; 93.667; | SNAP Cluster<br>TANF Cluster | Subrecipient Monitoring |

Independent Auditor's Report on Compliance For Each Major Federal Program;
Report on Internal Control Over Compliance; and Report on Schedule of
Expenditures of Federal Awards Required by Uniform Guidance

| | 93.568 | CCDF Cluster<br>Social Services Block Grant<br>Low Income Home Energy<br>Assistance Program | |
|---|---|---|---|

**Adverse Opinion on SNAP Cluster, TANF Cluster, CCDF Cluster, Social Services Block Grant (SSBG) and Low Income Home Energy Assistance Program (LIHEAP) Program**

In our opinion, because of the significance of the matters discussed in the Basis for Adverse Opinion paragraph, the State of Mississippi did not comply, in all material respects, with the types of compliance requirements referred to above that could have a direct and material effect on the SNAP Cluster, TANF Cluster, CCDF Cluster, SSBG, and the LIHEAP Program for the year ended June 30, 2019.

**Basis for Qualified Opinion on the Highway Planning and Construction Cluster, Hazard Mitigation Grant Program, Title I Grants to Local Educational Agencies Program, Improving Teacher Quality State Grants, Medicaid Cluster, Children's Health Insurance Program (CHIP), and State Survey Certification of Health Care Providers and Suppliers (Title XIX) Medicaid**

As described in the accompanying "Schedule of Findings and Questioned Costs: Part 3 – Federal Award Findings and Questioned Costs," the State of Mississippi did not comply with requirements regarding the following:

| Finding # | CFDA # | Program/Cluster Name | Compliance Requirement |
|---|---|---|---|
| 2019-020 | 20.205; 20.219 | Highway Planning and Construction Cluster | Subrecipient Monitoring |
| 2019-021 | 20.205; 20.219 | Highway Planning and Construction Cluster | Special Tests and Provisions – Wage Rate Requirements |
| 2019-022 | 20.205;20.219 | Highway Planning and Construction Cluster | Special Tests and Provisions – Quality Assurance Program |
| 2019-023 | 97.039 | Hazard Mitigation Grant Program (HMGP) | Allowable Costs and Activities Allowed |
| 2019-024 | 97.039 | Hazard Mitigation Grant Program (HMGP) | Cash Management |
| 2019-025 | 97.039 | Hazard Mitigation Grant Program (HMGP) | Subrecipient Monitoring |
| 2019-026 | 84.010; 84.367 | Title I Grants to Local Educational Agencies Improving Teacher Quality State Grant | Subrecipient Monitoring |
| 2019-027 | 93.775; 93.777; 93.778; 93.767 | Medicaid Cluster Children's Health Insurance Program (CHIP) | Eligibility |
| 2019-028 | 93.775; 93.777; 93.778 | Medicaid Cluster | Special Tests and Provisions – ADP Risk Analysis and System Security Review Requirements |
| 2019-029 | 93.775; 93.777; 93.778; 93.796 | Medicaid Cluster State Survey Certification of Health Care Providers and Suppliers (Title XIX) Medicaid | Special Tests- Provider Health and Safety Standards |

Compliance with such requirements is necessary, in our opinion, and the opinion of other auditors, for the State of Mississippi to comply with the requirements applicable to those programs.

Independent Auditor's Report on Compliance For Each Major Federal Program;
Report on Internal Control Over Compliance; and Report on Schedule of
Expenditures of Federal Awards Required by Uniform Guidance

**Qualified Opinion on the Qualified Opinion on the Highway Planning and Construction Cluster, Hazard Mitigation Grant Program, Title I Grants to Local Educational Agencies Program, Improving Teacher Quality State Grants, Medicaid Cluster, Children's Health Insurance Program (CHIP) and State Survey Certification of Health Care Providers and Suppliers (Title XIX) Medicaid**

In our opinion, based on our audit and the report of other auditors, except for the noncompliance described in the Basis for Qualified Opinion paragraph, the State of Mississippi complied, in all material respects, with the types of compliance requirements referred to above that could have a direct and material effect on the Highway Planning and Construction Cluster, Hazard Mitigation Grant Program, Title I Grants to Local Educational Agencies Program, Improving Teacher Quality State Grants, Medicaid Cluster, Children's Health Insurance Program (CHIP), and State Survey Certification of Health Care Providers and Suppliers (Title XIX) Medicaid Program for the year ended June 30, 2019.

**Unmodified Opinion on Each of the Other Major Federal Programs**

In our opinion, based on our audit and the reports of other auditors, the State of Mississippi complied, in all material respects, with the types of compliance requirements referred to above that could have a direct and material effect on each of its other major federal programs identified in the Summary of Auditor's Results section of the accompanying Schedule of Findings and Questioned Costs for the year ended June 30, 2019. We did not test the transactions and records of the major federal programs administered by the state's public universities for compliance with any requirements referred to above to determine the effects of such noncompliance, if any.

**Other Matters**

The results of our auditing procedures disclosed other instances of noncompliance, which are required to be reported in accordance with OMB Uniform Guidance and which are described in the accompanying "Schedule of Findings and Questioned Costs: Part 3 - Federal Award Findings and Questioned Costs" as items 2019-018, 2019-019, and 2019-034. Our opinion on each major federal program is not modified with respect to these matters.

The responses by state agencies to the noncompliance findings identified in our audit, and the audits of other auditors, are described in the accompanying "Section III – Management Responses and Corrective Action Plans." Management's responses were not subjected to the auditing procedures applied in the audit of compliance and, accordingly, we express no opinion on the responses.

We also noted other immaterial instances of noncompliance which have been reported to management of the State of Mississippi in separate communications.

**Report on Internal Control Over Compliance**

The management of the State of Mississippi is responsible for establishing and maintaining effective internal control over compliance with the types of compliance requirements referred to above. In planning and performing our audit of compliance, we and other auditors considered the State of Mississippi's internal control over compliance

In planning and performing our audit of compliance, we considered the State's internal control over compliance with the types of requirements that could have a direct and material effect on each major federal program to determine the auditing procedures that are appropriate in the circumstances for the purpose of expressing an opinion on compliance for each major federal program and to test and report on internal control over compliance in accordance with Uniform Guidance, but not for the purpose of

Independent Auditor's Report on Compliance For Each Major Federal Program;
Report on Internal Control Over Compliance; and Report on Schedule of
Expenditures of Federal Awards Required by Uniform Guidance

expressing an opinion on the effectiveness of internal control over compliance. Accordingly, we do not express an opinion on the effectiveness of the State of Mississippi's internal control over compliance. We excluded the federal programs of the State's public universities, as discussed in the fifth paragraph of this report.

Our and the other auditors' consideration of internal control over compliance was for the limited purpose described in the preceding paragraph and was not designed to identify all deficiencies in internal control over compliance that might be material weaknesses or significant deficiencies and therefore, material weaknesses or significant deficiencies may exist that were not identified. However, as discussed below, we and the other auditors identified certain deficiencies in internal control over compliance that we consider to be material weaknesses and significant deficiencies.

A *deficiency in internal control over compliance* exists when the design or operation of a control over compliance does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, noncompliance with a type of compliance requirement of a federal program on a timely basis. A *material weakness in internal control over compliance* is a deficiency, or a combination of deficiencies, in internal control over compliance, such that there is a reasonable possibility that material noncompliance with a type of compliance requirement of a federal program will not be prevented, or detected and corrected, on a timely basis. We and the other auditors consider the deficiencies in internal control over compliance described in the accompanying "Schedule of Findings and Questioned Costs: Part 3 - Federal Award Findings and Questioned Costs" as items 2019-020, 2019-021, 2019-023, 20019-024, 2019-025, 2019-026, 2019-027, 2019-028, 2019-029, 2019-030, 2019-031, 2019-032, 2019-033, 2019-035, 2019-039, 2019-042, and 2019-043 to be material weaknesses.

A *significant deficiency in internal control over compliance* is a deficiency, or a combination of deficiencies, in internal control over compliance with a type of compliance requirement of a federal program that is less severe than a material weakness in internal control over compliance, yet important enough to merit attention by those charged with governance. We consider the deficiencies in internal control over compliance described in the accompanying "Schedule of Findings and Questioned Costs: Part 3 – Federal Award Findings and Questioned Costs" as items 2019-018, 2019-019, 2019-022, 2019-034, 2019-036, 2019-037, 2019-038, 2019-040, 2019-041, and 2019-044 to be significant deficiencies.

The responses by state agencies to the internal control over compliance findings identified in our audit, and the audits of other auditors, are described in the accompanying "Section III – Management Responses and Corrective Action Plans." Management's responses were not subjected to the auditing procedures applied in the audit of compliance and, accordingly, we express no opinion on the responses.

We also noted other matters involving internal control over compliance and its operation, which have been reported to management of the State of Mississippi in separate communications.

The purpose of this report on internal control over compliance is solely to describe the scope of our testing of internal control over compliance and the results of that testing based on the requirements of Uniform Guidance. Accordingly, this report is not suitable for any other purpose. However, this report is matter of public record and its distribution is not limited.

**Report on Schedule of Expenditures of Federal Awards Required by OMB Uniform Guidance**

We have audited the financial statements of the governmental activities, the business-type activities, the aggregate discretely presented component units, each major fund, and the aggregate remaining fund information of the State of Mississippi as of and for the year ended June 30, 2019, and the related notes to the financial statements, which collectively comprise the State of Mississippi's basic financial statements.

9

Independent Auditor's Report on Compliance For Each Major Federal Program;
Report on Internal Control Over Compliance; and Report on Schedule of
Expenditures of Federal Awards Required by Uniform Guidance

We issued our report thereon dated December 20, 2019 which contained unmodified opinions on those financial statements.  We did not audit the financial statements of:

- <u>Government-wide Financial Statements</u>

  - <u>Governmental Activities</u>

    - the Department of Environmental Quality Clean Water State Revolving Loan Fund, the Department of Health Local Governments and Rural Water Systems Improvements Revolving Loan Fund, the State Agencies Self-Insured Workers' Compensation Trust Fund, and selected funds at the Department of Marine Resources, the Department of Employment Security, the Mississippi Development Authority, and the Department of Public Safety, which, in the aggregate, represent 4% and 1%, respectively, of the assets and revenues of the governmental activities;

  - <u>Business-type Activities</u>

    - AbilityWorks, Inc. within the Department of Rehabilitation Services, the Port Authority at Gulfport, the Mississippi Prepaid Affordable College Tuition Program, the Veterans' Home Purchase Board, the Department of Finance and Administration State Life and Health Plan, and the Unemployment Compensation Fund which, in the aggregate, represent 98% and 97%, respectively, of the assets and revenues of the business-type activities;

  - <u>Component Units</u>

    - the Universities and the nonmajor component units.

- <u>Fund Financial Statements</u>

  - <u>Governmental Funds</u>

    - the Department of Environmental Quality Clean Water State Revolving Loan Fund, the Department of Health Local Governments and Rural Water Systems Improvements Revolving Loan Fund, the State Agencies Self-Insured Workers' Compensation Trust Fund, and selected funds at the Department of Marine Resources, the Department of Employment Security, the Mississippi Development Authority, and the Department of Public Safety, which, in the aggregate, represent 4% and 1%, respectively, of the assets and revenues of the General Fund;

  - <u>Proprietary Funds</u>

    - the Port Authority at Gulfport, the Mississippi Prepaid Affordable College Tuition Program, the Department of Finance and Administration State Life and Health Plan, and the Unemployment Compensation Fund which are considered major enterprise funds;

  - <u>Aggregate Remaining Funds</u>

    - Nonmajor enterprise funds for AbilityWorks, Inc. within the Department of

Independent Auditor's Report on Compliance For Each Major Federal Program;
Report on Internal Control Over Compliance; and Report on Schedule of
Expenditures of Federal Awards Required by Uniform Guidance

Rehabilitation Services and the Veterans' Home Purchase Board;

- Other Employee Benefits Trust Fund – State Life and Health Insurance Plans;

- the Pension Trust Funds;

- the Private-Purpose Trust Funds of the Mississippi Affordable College Savings Program;

all of which represent 100% and 100%, respectively, of the assets and revenues of the aggregate remaining funds.

Those financial statements were audited by other auditors whose reports thereon have been furnished to us; and our opinions, insofar as they relate to the amounts included for those agencies, funds, and component units, are based on the reports of the other auditors.

The State of Mississippi has excluded federal programs administered by public universities from the accompanying schedules of expenditures of federal awards, as more fully described in Note 2 to the schedules. The State's public universities were audited in accordance with statutory requirements and the provisions of Uniform Guidance, and a separate report was issued.

Our audit and the audits of the other auditors were conducted for the purpose of forming our opinions on the financial statements that collectively comprise the State of Mississippi's basic financial statements. The accompanying Schedule of Expenditures of Federal Awards by Federal Department is presented for purposes of additional analysis as required by Uniform Guidance and is not a required part of the basic financial statements. Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the basic financial statements. Although not required by Uniform Guidance, the Schedule of Expenditures of Federal Awards by State Grantee Agency is presented for purposes of additional analysis. The information in the schedule of expenditures of federal awards has been subjected to the auditing procedures applied by us and other auditors in the audit of the basic financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the basic financial statements or to the basic financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, based upon our audit and the audit reports of the other auditors, except for the effects of the omission described in the preceding paragraph, the schedule of expenditures of federal awards is fairly stated in all material respects in relation to the basic financial statements as a whole.

*Stephanie C. Palmertree*

**Stephanie C. Palmertree, CPA, CGMA**
Director, Financial and Compliance
Audit Division

Jackson, Mississippi
April 30, 2020

(This page left blank intentionally.)

# Schedule of Expenditures of Federal Awards by Federal Department



(This page left blank intentionally.)

# STATE OF MISSISSIPPI
## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY FEDERAL DEPARTMENT
## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department /Program Name | | Amount Passed to Subrecipients | Federal Expenditures/ Distributions/ Issuances |
|---|---|---|---|---|
| | **U.S. DEPARTMENT OF AGRICULTURE** | | | |
| 10.025 | Plant and Animal Disease, Pest Control, and Animal Care | Agriculture and Commerce / Animal Health | N/A $ | 743,930 |
| 10.069 | Soil and Water Conservation | Soil and Water Conservation Commission | N/A | 5,337 |
| 10.163 | Market Protection and Promotion | Agriculture and Commerce | N/A | 25,272 |
| 10.170 | Specialty Crop Block Grant Program – Farm Bill | Agriculture and Commerce | 243,900 | 276,569 |
| 10.171 | National Organic Certification Cost Share Program | Agriculture and Commerce | N/A | 900 |
| 10.331 | Food Insecurity Nutrition Incentive Grants Program | Agriculture and Commerce | N/A | 5,069 |
| 10.475 | Cooperative Agreements with States for Intrastate Meat | Agriculture and Commerce | N/A | 1,607,396 |
| 10.535 | USDA SNAP Integrity Education | Human Services | N/A | 67,399 |
| 10.557 | Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) | Health | 2,628,394 | 70,328,586 |
| 10.558 | Child and Adult Care Food Program (CACFP) | Education | 48,524,756 | 51,534,837 |
| 10.560 | State Administrative Expenses for Child Nutrition | Education | N/A | 4,124,101 |
| 10.578 | WIC Grants To States (WGS) | Health | 57,560 | 348,003 |
| 10.579 | Child Nutrition Discretionary Grants Limited Availability | Education | 197,447 | 197,427 |
| 10.580 | Supplemental Nutrition Assistance Program, Process and Technology Improvement Grants | Human Services | N/A | 250,328 |
| 10.582 | Fresh Fruit and Vegetable Program | Education | 2,087,055 | 2,087,674 |
| 10.596 | Pilot Projects to Reduce Dependency and Increase Work Requirements and Work Effort under SNAP | Human Services | N/A | 3,430,974 |
| 10.664 | Cooperative Forestry Assistance | Forestry Commission | N/A | 5,297,412 |
| 10.902 | Soil and Water Conservation | Agriculture and Commerce / Soil and Water Conservation Commission | 175,585 | 2,731,778 |
| 10.904 | Soil and Water Conservation | Soil and Water Conservation Commission | N/A | 1,216,140 |
| 10.912 | Soil and Water Conservation | Environmental Quality/ Soil and Water Conservation Commission | 81,719 | 114,845 |
| 10.913 | Soil and Water Conservation | Soil and Water Conservation Commission | N/A | 16,575 |
| 10.916 | NRCS Watershed Rehabilitation Program | Soil and Water Conservation Commission | N/A | 510,030 |
| 10.950 | Agricultural Statistics Reports | Agriculture and Commerce | N/A | 28,867 |
| | ***SUBTOTAL*** | | | *144,949,449* |
| | **SNAP Cluster** | | | |
| 10.551 | Supplemental Nutrition Assistance Program (SNAP) | Human Services | N/A | 620,174,079 |
| 10.561 | State Administrative Matching Grants for the Supplemental Nutrition Assistance Program | Human Services | 2,606,905 | 31,937,548 |
| | ***Total SNAP Cluster*** | | | *652,111,627* |
| | **Child Nutrition Cluster** | | | |
| 10.553 | School Breakfast Program (SBP) | Education | 64,803,856 | 64,908,970 |
| 10.555 @ | National School Lunch Program (NSLP) | Education | 172,017,428 | 192,112,358 |
| 10.556 | Special Milk Program for Children (SMP) | Education | 4,192 | 4,770 |
| 10.559 @ | Summer Food Service Program for Children (SFSPC) | Education | 7,538,597 | 7,998,126 |
| | ***Total Child Nutrition Cluster*** | | | *265,024,224* |
| | **Food Distribution Cluster** | | | |
| 10.565 | Commodity Supplemental Food Program | Health/ Human Services | 438,798 | 929,385 |
| 10.568 | Emergency Food Assistance Program (Administrative Costs) | Human Services | 178,928 | 1,194,458 |
| 10.569 | Emergency Food Assistance Program (Food Commodities) | Human Services | N/A | 5,410,380 |
| | ***Total Food Distribution Cluster*** | | | *7,534,223* |
| | **Forest Service Schools and Roads Cluster** | | | |
| 10.665 | Schools and Roads - Grants to States | Treasury | N/A | 5,103,924 |
| | ***Total Forest Service Schools and Roads Cluster*** | | | *5,103,924* |
| | **TOTAL U.S. DEPARTMENT OF AGRICULTURE** | | | $ 1,074,723,447 |
| | **U.S. DEPARTMENT OF COMMERCE** | | | |
| 11.407 | Inter jurisdictional Fisheries Act of 1986 | Marine Resources | N/A | 148,430 |

(continued)
See accompanying Notes to the Schedules of Expenditures of Federal Awards

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY FEDERAL DEPARTMENT

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department /Program Name | | Amount Passed to Subrecipients | Federal Expenditures/ Distributions/ Issuances |
|---|---|---|---|---|
| 11.419 | Coastal Zone Management Administration Awards | Marine Resources | N/A | 1,358,253 |
| 11.420 | Coastal Zone Management Estuarine Research Reserves | Marine Resources | N/A | 699,819 |
| 11.434 | Cooperative Fishery Statistics | Marine Resources | N/A | 60,723 |
| 11.454 | Unallied Management Projects | Marine Resources | N/A | 2,007,038 |
| 11.472 | Creation of Mobile Single Set Production System for the Eastern Oyster | Marine Resources | N/A | 47,936 |
| 11.557 | Broadband Technology Opportunities Program (BTOP) | Governor's Office | N/A | 4,295,866 |
| 11.617 | NERR Changes | Marine Resources | N/A | 41,813 |
| | **TOTAL U.S. DEPARTMENT OF COMMERCE** | | $ | 8,659,878 |
| | | | | |
| | **U.S. DEPARTMENT OF DEFENSE** | | | |
| 12.002 | Procurement Technical Assistance For Business Firms | MS Development Authority | N/A | 367,278 |
| 12.106 | Flood Control Projects (Passed-through from the U.S. Army Corps of Engineers).  Identifying numbers  assigned on the pass through entity – DACW01-3-91- 0543, DACW38-91-H-0007, DACW01-3-92-0411,  DACW38-3-09-176, DACW01-3-91-0500, DACW01- 3-96-0023, DACW38-3-12-9, and DACW01-3-92-0410. | Wildlife, Fisheries & Parks | N/A | 1,482,038 |
| 12.113 | State Memorandum of Agreement Program for the Reimbursement of Technical Services | Environmental Quality | N/A | 146,347 |
| 12.400 | Military Construction, National Guard | Military Department | N/A | 9,811,981 |
| 12.401 | National Guard Military Operations and Maintenance (O&M) Projects | Military Department | N/A | 97,199,875 |
| 12.404 | National Guard ChalleNGe Program | Military Department | N/A | 4,491,697 |
| | **TOTAL U.S. DEPARTMENT OF DEFENSE** | | $ | 113,499,216 |
| | | | | |
| | **U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT** | | | |
| 14.900 | Lead-Based Paint Hazard Control in Privately-Owned Housing | Health | N/A | 4,344 |
| 14.228 | Community Development Block Grants / State's Program and Non-Entitlement Grants in Hawaii | MS Development Authority | N/A | 73,466,546 |
| | **TOTAL U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT** | | $ | 73,470,890 |
| | | | | |
| | **U.S. DEPARTMENT OF THE INTERIOR** | | | |
| 15.250 | Regulation of Surface Coal Mining and Surface Effects of Underground Coal Mining | Environmental Quality | N/A | 189,835 |
| 15.252 | Abandoned Mine Land Reclamation (AMLR) Program | Environmental Quality | N/A | 19,597 |
| 15.435 | GoMESA | Marine Resources | N/A | 6,617,295 |
| 15.608 | Fish and Wildlife Management Assistance | Environmental Quality | 8,151 | 16,545 |
| 15.615 | Cooperative Endangered Species Conservation Fund | Wildlife, Fisheries & Parks | 43,425 | 132,816 |
| 15.622 | Sportfishing and Boating Safety Act | Marine Resources | 23,449 | 23,449 |
| 15.630 | Coastal Program | Wildlife, Fisheries & Parks | N/A | 7,501 |
| 15.634 | State Wildlife Grants | Wildlife, Fisheries & Parks | N/A | 232,147 |
| 15.650 | Research Grants (Generic) | Wildlife, Fisheries & Parks | 16,156 | 16,156 |
| 15.808 | U.S. Geological Survey – Research and Data Collection | Environmental Quality | N/A | 24,824 |
| 15.810 | National Cooperative Geologic Mapping Program | Environmental Quality | N/A | 56,214 |
| 15.814 | National Geological and Geophysical Data Preservation | Environmental Quality | N/A | 15,000 |
| 15.904 | Historic Preservation Fund Grants-In-Aid | Archives and History | 66,071 | 818,763 |
| 15.916 | Outdoor Recreation – Acquisition, Development and Planning | Wildlife, Fisheries & Parks | N/A | 61,421 |
| 15.928 | Civil War Battlefield Land Acquisition Grants | Archives and History | N/A | 12,327 |
| 15.939 | National Heritage Area Federal Financial Assistance | Marine Resources | N/A | 389,620 |
| 15.980 | National Ground-Water Monitoring Network | Environmental Quality | N/A | 2,234 |
| | *SUBTOTAL* | | | *8,635,744* |
| | | | | |
| | **Fish and Wildlife Cluster** | | | |
| 15.605 | Sport Fish Restoration | Marine Resources / Wildlife, Fisheries & Parks | 347,454 | 5,697,961 |
| 15.611 | Wildlife Restoration and Basic Hunter Education | Wildlife, Fisheries & Parks | 366,023 | 8,074,064 |
| | *Total Fish and Wildlife Cluster* | | | *13,772,025* |
| | **TOTAL U.S. DEPARTMENT OF THE INTERIOR** | | $ | 22,407,769 |

(continued)
See accompanying Notes to the Schedules of Expenditures of Federal Awards

# STATE OF MISSISSIPPI
## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY FEDERAL DEPARTMENT
### FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department /Program Name | | Amount Passed to Subrecipients | Federal Expenditures/ Distributions/ Issuances |
|---|---|---|---|---|
| **U.S. DEPARTMENT OF JUSTICE** | | | | |
| 16.017 | Sexual Assault Services Formula Program | Health/ Public Safety | 268,035 | 292,840 |
| 16.540 | Juvenile Justice and Delinquency Prevention – Allocation to States | Public Safety | 87,456 | 272,076 |
| 16.543 | Missing Children's Assistance | Attorney General | N/A | 250,593 |
| 16.554 | National Criminal History Improvement Program (NCHIP) | Public Safety | N/A | 96,727 |
| 16.560 | National Institute of Justice Research, Evaluation, and Development Project Grants | Public Safety | N/A | (25,488) |
| 16.575 | Crime Victim Assistance | Health/ Public Safety | 15,398,379 | 15,398,379 |
| 16.576 | Crime Victim Compensation | Attorney General | N/A | 1,317,517 |
| 16.582 | Crime Victim Assistant/ Discretionary Grants | Health | 11,298 | 11,298 |
| 16.588 | Violence Against Women Formula Grants | Health/ Public Safety | 1,229,814 | 2,147,597 |
| 16.590 | Grants to Encourage Arrest Policies and Enforcement of Protection Orders Program | Attorney General | N/A | 64,768 |
| 16.593 | Residential Substance Abuse Treatment for State Prisoners | Public Safety | 200,475 | 248,330 |
| 16.738 | Edward Byrne Memorial Justice Assistance Grant Program | Public Safety | 1,535,867 | 2,432,756 |
| 16.741 | DNA Backlog Reduction Program | Public Safety | N/A | 614,754 |
| 16.742 | Paul Coverdell Forensic Sciences Improvement Grant Program | Public Safety | 94,136 | 101,545 |
| 16.754 | Harold Rogers Prescription Drug Monitoring Program | Board of Pharmacy/ Health | 57,473 | 287,850 |
| 16.812 | Second Chance Act Reentry Initiative | Mental Health | 167,398 | 197,070 |
| 16.816 | John R. Justice Prosecutors and Defenders Incentive Act | Attorney General | N/A | 36,278 |
| 16.922 | Equitable Sharing Program | Public Safety | N/A | 938,916 |
| 16.UN1 | DEA Task Force | Public Safety | N/A | 142,479 |
| 16.UN5 | U.S. Marshall Service | Public Safety | N/A | 16,316 |
| | **TOTAL U.S. DEPARTMENT OF JUSTICE** | | $ | 24,842,601 |
| | | | | |
| | **U.S. DEPARTMENT OF LABOR** | | | |
| 17.002 | Labor Force Statistics | Employment Security | N/A | 684,214 |
| 17.225 # | Unemployment Insurance | Employment Security | N/A | 93,950,625 |
| 17.235 | Senior Community Service Employment Program | Employment Security | 745,723 | 803,914 |
| 17.245 | Trade Adjustment Assistance | Employment Security | N/A | 309,931 |
| 17.261 | WIA/WIOA Pilots, Demonstrations, and Research Projects | Employment Security | 1,144,559 | 1,187,759 |
| 17.268 | Alien Labor Cert | Employment Security | N/A | 8,477 |
| 17.271 | Work Opportunity Tax Credit Program (WOTC) | Employment Security | N/A | 131,024 |
| 17.273 | Temporary Labor Certification for Foreign Workers | Employment Security | N/A | 146,644 |
| 17.277 | Workforce Investment Act (WIA) National Emergency Grants | Employment Security | N/A | 17,523 |
| 17.281 | WIA/WIOA Dislocated Worker National Reserve Technical Assistance and Training | Employment Security | N/A | (773) |
| 17.285 | Apprenticeship USA Grants | Employment Security | 350,511 | 389,805 |
| 17.600 | Mine Health and Safety Grants | Environmental Quality | N/A | 29,936 |
| | *SUBTOTAL* | | | *97,659,079* |
| | **Employment Service Cluster** | | | |
| 17.207 | Employment Service / Wagner-Peyser Funded Activities | Employment Security | N/A | 5,386,947 |
| 17.801 | Disabled Veterans' Outreach Program (DVOP) | Employment Security | N/A | 1,269,400 |
| | ***Total Employment Service Cluster*** | | | *6,656,347* |
| | **WIA Cluster** | | | |
| 17.258 | WIOA Adult Program | Employment Security | 7,483,491 | 9,326,449 |
| 17.259 | WIOA Youth Activities | Employment Security | 9,395,184 | 10,366,080 |
| 17.278 | WIA/WIOA Dislocated Worker Formula Grants | Employment Security | 11,976,767 | 13,715,387 |
| | **Total WIA Cluster** | | | *33,407,916* |
| | **TOTAL U.S. DEPARTMENT OF LABOR** | | $ | 137,723,342 |
| | | | | |
| | **U.S. DEPARTMENT OF TRANSPORTATION** | | | |
| 20.200 | Highway Research and Development Program | Transportation | N/A | 81,316 |
| 20.215 | Highway Training and Education | Transportation | N/A | 283,199 |
| 20.218 | National Motor Carrier Safety | Public Safety/ Transportation | N/A | 2,625,563 |
| 20.232 | Commercial Driver's License Program Improvement Grant | Public Safety | N/A | 322,793 |
| 20.234 | Safety Data Improvement Program | Public Safety | N/A | 187,100 |

(continued)
See accompanying Notes to the Schedules of Expenditures of Federal Awards

# STATE OF MISSISSIPPI
## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY FEDERAL DEPARTMENT
### FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department /Program Name | | Amount Passed to Subrecipients | Federal Expenditures/ Distributions/ Issuances |
|---|---|---|---|---|
| 20.237 | Fed Aviation Adm-FAA | Public Safety/ Transportation | N/A | 249,023 |
| 20.301 | Railroad Safety | Transportation | N/A | 5,675 |
| 20.314 | Railroad Development | Transportation | N/A | 102,003 |
| 20.505 | Metropolitan Transportation Planning and State and Non-Metropolitan Planning and Research | Transportation | 276,379 | 276,379 |
| 20.509 | Formula Grants for Rural Areas | Transportation | 13,634,864 | 16,453,247 |
| 20.614 | Alcohol Open Container Requirements for Public Safety | Public Safety | N/A | 92,920 |
| 20.700 | Pipeline Safety Program Base Grant | Public Service Commission | N/A | (20,317) |
| 20.703 | Interagency Hazardous Materials Public Sector Training and Planning Grants | Emergency Management | 190,749 | 276,163 |
| 20.720 | Damage Prevention | Public Service Commission | N/A | 30,000 |
| 20.721 | 811 One Call | Public Service Commission | N/A | 44,293 |
| 20.933 | National Infrastructure Investments | Transportation | 7,167,404 | 8,155,698 |
| | *SUBTOTAL* | | | *29,165,055* |
| | **Highway Planning and Construction Cluster** | | | |
| 20.205 | Highway Planning and Construction | Transportation | 32,716,654 | 570,621,696 |
| 20.219 | Recreational Trails Program | Wildlife, Fisheries & Parks/Transportation | 952,209 | 1,605,849 |
| | *Total Highway Planning and Construction Cluster* | | | *572,227,545* |
| | **Transit Services Programs Cluster** | | | |
| 20.513 | Enhanced Mobility of Seniors and Individuals with Disabilities | Transportation | 2,104,380 | 2,289,851 |
| 20.516 | Job Access and Reverse Commute Program | Transportation | 100,973 | 101,285 |
| 20.521 | New Freedom Program | Transportation | N/A | 16,517 |
| | *Total Transit Services Programs Cluster* | | | *2,407,653* |
| | **Federal Transit Cluster** | | | |
| 20.526 | Bus and Bus Facilities Formula Program | Transportation | 204,117 | 1,816,186 |
| | *Total Federal Transit Cluster* | | | *1,816,186* |
| | **Highway Safety Cluster** | | | |
| 20.600 | State and Community Highway Safety | Public Safety | 4,784,962 | 7,123,194 |
| | *Total Highway Safety Cluster* | | | *7,123,194* |
| | **TOTAL U.S. DEPARTMENT OF TRANSPORTATION** | | $ | 612,739,633 |
| | **U.S. DEPARTMENT OF THE TREASURY** | | | |
| 21.015 | Resources and Ecosystems Sustainability, Tourist Opportunities, and Revived Economies of the Gulf Coast | Marine Resources/ Environment Quality | 9,785,253 | 11,051,796 |
| | **TOTAL U.S. DEPARTMENT OF THE TREASURY** | | $ | 11,051,796 |
| | **APPALACHIAN REGIONAL COMMISSION** | | | |
| 23.002 | Appalachian Area Development | MS Development Authority/ Transportation | N/A | 10,379,582 |
| 23.011 | Appalachian Research, Technical Assistance, and Demonstration Projects | MS Development Authority/Health/ Education | 158,224 | 259,663 |
| | **TOTAL APPALACHIAN REGIONAL COMMISSION** | | $ | 10,639,245 |
| | **GENERAL SERVICES ADMINISTRATION** | | | |
| 39.003 @ | Donation of Federal Surplus Personal Property | Finance and Administration | N/A | 1,708,017 |
| | **TOTAL GENERAL SERVICES ADMINISTRATION** | | $ | 1,708,017 |
| | **NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES** | | | |
| 45.025 | Promotion of the Arts - Partnership Agreements | Arts Commission | 814,629 | 814,629 |
| 45.130 | Promotion of the Humanities Challenge Grants | Archives and History | N/A | 31,606 |
| 45.149 | Promotion of the Humanities Division of Preservation and Access | Archives and History | N/A | 5,863 |

(continued)
See accompanying Notes to the Schedules of Expenditures of Federal Awards

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY FEDERAL DEPARTMENT

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department /Program Name | | Amount Passed to Subrecipients | Federal Expenditures/ Distributions/ Issuances |
|---|---|---|---|---|
| 45.168 | National Digital Newspaper Program | Archives and History | N/A | 113,591 |
| 45.301 | Museums for America | Archives and History | N/A | 8,243 |
| 45.310 | Grants to States | Library Commission | 356,896 | 1,818,162 |
| | **TOTAL NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES** | | $ | **2,792,094** |
| | | | | |
| | **SMALL BUSINESS ADMINISTRATION** | | | |
| 59.061 | State Trade and Export Promotion Pilot Grant Program | MS Development Authority | N/A | 389,197 |
| | **TOTAL SMALL BUSINESS ADMINISTRATION** | | $ | **389,197** |
| | | | | |
| | **U.S. DEPARTMENT OF VETERANS AFFAIRS** | | | |
| 64.124 | All-Volunteer Force Educational Assistance | Veterans Affairs Board | N/A | 153,374 |
| | **TOTAL U.S. DEPARTMENT OF VETERANS AFFAIRS** | | $ | **153,374** |
| | | | | |
| | **ENVIRONMENTAL PROTECTION AGENCY** | | | |
| 66.032 | State Indoor Radon Grants | Health | N/A | 31,762 |
| 66.034 | Surveys, Studies, Research, Investigations, Demonstrations, and Special Purpose Activities Relating to the Clean Air Act | Environmental Quality | N/A | 401,168 |
| 66.040 | State Clean Diesel Grant Program | Environmental Quality | 422,083 | 422,083 |
| 66.419 | Water Pollution Control State, Interstate, and Tribal Program Support | Environmental Quality | N/A | 227,828 |
| 66.432 | State Public Water System Supervision | Health | N/A | 1,042,058 |
| 66.433 | State Underground Water Source Protection | Oil and Gas Board | N/A | 103,000 |
| 66.454 | Water Quality Management Planning | Environmental Quality | N/A | 130,135 |
| 66.460 | Nonpoint Source Implementation Grants | Environmental Quality | 2,257,476 | 2,797,598 |
| 66.472 | Beach Monitoring and Notification Program  Implementation Grants | Environmental Quality | N/A | 176,763 |
| 66.605 | Performance Partnership Grants | Agriculture and Commerce/ Environmental Quality | N/A | 7,874,786 |
| 66.606 | Survey's, Studies, Investigations and Special Purpose  Grants | Environmental Quality | N/A | 54,203 |
| 66.701 | Toxic Substances Compliance Monitoring Cooperative Agreements | Environmental Quality | N/A | 58,012 |
| 66.707 | TSCA Title IV State Lead Grants Certification of  Lead-Based Paint Professionals | Environmental Quality | N/A | 301,482 |
| 66.708 | Pollution Prevention Grants Program | Environmental Quality | N/A | 53,317 |
| 66.802 | Superfund State, Political Subdivision, and Indian Tribe Site-Specific Cooperative Agreements | Environmental Quality | N/A | 130,162 |
| 66.804 | Underground Storage Tank Prevention, Detection and Compliance Program | Environmental Quality | N/A | 370,721 |
| 66.805 | Leaking Underground Storage Tank Trust Fund Corrective Action Program | Environmental Quality | N/A | 870,012 |
| 66.809 | Superfund State and Indian Tribe Core Program Cooperative Agreements | Environmental Quality | N/A | 31,096 |
| | *SUBTOTAL* | | | *15,076,186* |
| | | | | |
| | **Clean Water State Revolving Fund Cluster** | | | |
| 66.458 | Capitalization Grants for Clean Water State Revolving Funds | Environmental Quality | N/A | 18,404,259 |
| | *Total Clean Water State Revolving Fund Cluster* | | | *18,404,259* |
| | | | | |
| | **Drinking Water State Revolving Fund Cluster** | | | |
| 66.468 | Capitalization Grants for Drinking Water State Revolving Funds | Health | N/A | 15,611,989 |
| | *Total Drinking Water State Revolving Fund Cluster* | | | *15,611,989* |
| | **TOTAL ENVIRONMENTAL PROTECTION AGENCY** | | $ | **49,092,434** |
| | | | | |
| | **U.S. DEPARTMENT OF ENERGY** | | | |
| 81.041 | State Energy Program | MS Development Authority | N/A | 402,717 |
| 81.042 | Weatherization Assistance for Low-Income Persons | Human Services | N/A | (30,222) |
| 81.136 | DOE Salmon Testing Site | Health | N/A | 92,038 |
| | **TOTAL U.S. DEPARTMENT OF ENERGY** | | $ | **464,533** |

(continued)
See accompanying Notes to the Schedules of Expenditures of Federal Awards

# STATE OF MISSISSIPPI
## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY FEDERAL DEPARTMENT
## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department /Program Name | | Amount Passed to Subrecipients | Federal Expenditures/ Distributions/ Issuances |
|---|---|---|---|---|
| | **U.S. DEPARTMENT OF EDUCATION** | | | |
| | | Board for Community and | | |
| 84.002 | Adult Education – Basic Grants to States | Junior Colleges | 6,627,041 | 6,627,041 |
| 84.010 | Title I Grants to Local Educational Agencies | Education | 193,299,182 | 195,849,920 |
| 84.011 | Migrant Education – State Grant Program | Education | 770,358 | 898,469 |
| 84.013 | Title I State Agency Program for Neglected and Delinquent Children and Youth | Education | 462,416 | 465,792 |
| 84.048 | Career and Technical Education – Basic Grants to States (Perkins IV) | Education | 9,909,385 | 9,909,385 |
| 84.126 | Rehabilitation Services – Vocational Rehabilitation Grants to States | Rehabilitation Services | N/A | 42,557,302 |
| 84.144 | Migrant Education – Coordination Program | Education | N/A | 51,084 |
| 84.177 | Rehabilitation Services – Independent Living Services for Older Individuals Who are Blind | Rehabilitation Services | N/A | 268,175 |
| 84.181 | Special Education – Grants for Infants and Families | Health | 585,896 | 3,740,293 |
| 84.187 | Supported Employment Services for Individuals with the Most Significant Disabilities | Rehabilitation Services | N/A | 292,920 |
| 84.196 | Education for Homeless Children and Youth | Education | 771,952 | 850,601 |
| 84.287 | Twenty-First Century Community Learning Centers | Education | 5,913,823 | 5,913,823 |
| 84.305 | Education Research, Development and Dissemination | Education | N/A | 8,515 |
| 84.323 | Special Education – State Personnel Development | Education | 968,847 | 968,847 |
| 84.358 | Rural Education | Education | 5,465,412 | 5,705,173 |
| 84.365 | English Language Acquisition State Grants | Education | 1,347,444 | 1,398,551 |
| 84.366 | Mathematics and Science Partnerships | Education | 173,922 | 201,955 |
| 84.367 | Support Effective Instruction State Grants | Education | 27,979,706 | 27,979,706 |
| 84.369 | Grants for State Assessments and Related Activities | Education | N/A | 250,595 |
| 84.372 | Statewide Data Systems | Education | N/A | 1,121,896 |
| 84.424 | Title IV-SSAE State Activities | Education | 7,373,084 | 7,433,679 |
| 84.938 | Hurricane Education Recovery | Education | 539,933 | 539,933 |
| | **SUBTOTAL** | | | *313,033,655* |
| | **Special Education Cluster (IDEA)** | | | |
| 84.027 | Special Education – Grants to States (IDEA, Part B) | Education | 109,759,753 | 122,145,880 |
| 84.173 | Special Education – Preschool Grants (IDEA, Preschool) | Education | 4,132,196 | 4,132,194 |
| | ***Total Special Education Cluster (IDEA)*** | | | *126,278,074* |
| | **School Improvement Grants Cluster** | | | |
| 84.377 | School Improvement Grants | Education | 3,770,398 | 4,001,404 |
| | ***Total School Improvement Grants Cluster*** | | | *4,001,404* |
| | **TOTAL U.S. DEPARTMENT OF EDUCATION** | | **$** | **443,313,133** |
| | **GULF COAST ECOSYSTEM RESTORATION COUNCIL** | | | |
| 87.051 | Gulf Coast Ecosystem Restoration Council Comprehensive Plan Component Program | Environmental Quality | 208,677 | 993,651 |
| 87.052 | Gulf Coast Ecosystem Restoration Council Oil Spill Impact Program | Environmental Quality | N/A | 580,265 |
| | **TOTAL GULF COAST ECOSYSTEM RESTORATION COUNCIL** | | **$** | **1,573,916** |
| | **Election Assistance Commission** | | | |
| 90.404 | 2018 HAVA Election Security Grants | Secretary of State | 427,460 | 705,573 |
| | **TOTAL Election Assistance Commission** | | **$** | **705,573** |
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | | |
| 93.041 | Special Programs for the Aging – Title VII, Chapter 3 - Programs for Prevention of Elder Abuse, Neglect, and Exploitation | Human Services | 25,719 | 34,644 |
| 93.042 | Special Programs for the Aging – Title VII, Chapter 2 - Long-Term Care Ombudsman Services for Older Individuals | Human Services | 123,793 | 229,504 |
| 93.043 | Special Programs for the Aging – Title III, Part D – Disease Prevention and Health Promotion Services | Human Services | 149,386 | 187,392 |
| 93.052 | National Family Caregiver Support, Title III, Part E | Human Services | 1,011,349 | 1,126,326 |

(continued)

See accompanying Notes to the Schedules of Expenditures of Federal Awards

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY FEDERAL DEPARTMENT

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department /Program Name | | Amount Passed to Subrecipients | Federal Expenditures/ Distributions/ Issuances |
|---|---|---|---|---|
| 93.069 | Public Health Emergency Preparedness | Health | N/A | (15,191) |
| 93.070 | Environmental Public Health and Emergency Response | Health | 147,514 | 419,785 |
| 93.071 | Medicare Enrollment Assistance Program | Human Services | 17,728 | 333,591 |
| 93.072 | Lifespan Respite Care Program | Human Services | N/A | 5,591 |
| 93.073 | Birth Defects and Developmental Disabilities – Prevention and Surveillance | Health | N/A | 119,501 |
| 93.074 | Hospital Preparedness Program (HPP) and Public Health Emergency Preparedness (PHEP) Aligned Cooperative Agreements | Health/ Emergency Management | 1,311,283 | 8,403,326 |
| 93.079 | Cooperative Agreements to Promote Adolescent Health through School-Based HIV/STD Prevention and  School-Based Surveillance | Education | N/A | 22,938 |
| 93.092 | Affordable Care Act (ACA) Personal Responsibility Education Program | Health | 188,062 | 362,372 |
| 93.103 | Food and Drug Administration – Research | Health/ Agriculture and Commerce/ Marine Resources | 10,000 | 410,913 |
| 93.104 | CXPD | Mental Health | 1,835,893 | 2,156,454 |
| 93.110 | Maternal and Child Health Federal Consolidated Programs | Health/ Mental Health | N/A | 96,759 |
| 93.116 | Project Grants and Cooperative Agreements for Tuberculosis Control Programs | Health | N/A | 745,556 |
| 93.127 | Emergency Medical Services for Children | Health | N/A | 125,040 |
| 93.130 | Cooperative Agreements to States / Territories for the Coordination and Development of Primary Care Offices | Health | 4,974 | 193,959 |
| 93.136 | Injury Prevention and Control Research and State and Community Based Programs | Health | 276,148 | 465,306 |
| 93.137 | Impact of Preschool Obesity Prevention Curriculum Enhanced with Positive Behavioral Support | Health | 346,635 | 446,047 |
| 93.150 | Projects for Assistance in Transition from Homelessness (PATH) | Mental Health | 284,533 | 296,071 |
| 93.197 | Childhood Lead Poisoning Prevention Projects, State and Local Childhood Lead Poisoning Prevention and Surveillance of Blood Lead Levels in Children | Health | N/A | 203,237 |
| 93.217 | Family Planning – Services | Health | 989,085 | 4,224,356 |
| 93.235 | Affordable Care Act (ACA) Abstinence Education Program | Human Services | N/A | 1,347,567 |
| 93.236 | Grants to States to Support Oral Health Workforce Activities | Health | 15,164 | 458,797 |
| 93.241 | State Rural Hospital Flexibility Program | Health | 108,539 | 382,428 |
| 93.243 | Substance Abuse and Mental Health Services – Projects of Regional and National Significance | Mental Health | 1,733,707 | 2,190,179 |
| 93.251 | Universal Newborn Hearing Screening | Health | 60,364 | 163,342 |
| 93.262 | Occupational Safety and Health Program | Health | N/A | 63,604 |
| 93.268 @ | Immunization Cooperative Agreements | Health | 58,024 | 46,869,900 |
| 93.270 | Adult Viral Hepatitis Prevention and Control | Health | 57,017 | 157,536 |
| 93.283 | Centers for Disease Control and Prevention -  Investigations and Technical Assistance | Health | 87,403 | 2,824,145 |
| 93.296 | State Partnership Grant Program to Improve Minority Health | Health | 97,959 | 166,091 |
| 93.301 | Small Rural Hospital Improvement Grant Program | Health | 329,949 | 408,353 |
| 93.305 | National State Based Tobacco Control Programs | Health | 199,736 | 804,071 |
| 93.314 | Early Hearing Detection and Intervention Information System (EHDI-IS) Surveillance Program | Health | N/A | 158,386 |
| 93.323 | Epidemiology and Laboratory Capacity for Infectious  Diseases (ELC) | Health | 183,768 | 1,663,387 |
| 93.324 | State Health Insurance Assistance Program | Human Services | 314,019 | 586,685 |
| 93.336 | Behavioral Risk Factor Surveillance System | Health | N/A | 299,454 |
| 93.354 | Public Health Emergency Response:  Cooperative Agreement for Emergency Response: Public Health Crisis Response Public Health Crisis Response | Health | 42,725 | 412,843 |
| 93.367 | Flexible Funding Model - Infrastructure Development and Maintenance for State Manufactured Food Regulatory Programs | Health | N/A | 109,786 |
| 93.369 | ACL Independent Living State Grants | Rehabilitation Services | N/A | 215,004 |
| 93.426 | Improving the Health of Americans through Prevention and Management of Diabetes and Heart Disease and Stroke | Health | 153,685 | 1,443,218 |
| 93.434 | Every Student Succeeds Act/Preschool Development Grants | Board for Community and Junior Colleges | N/A | 152,162 |
| 93.464 | ACL Assistive Technology | Rehabilitation Services | N/A | 379,162 |
| 93.500 | Pregnancy Assistance Fund Program | Health | 123,799 | 890,229 |

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY FEDERAL DEPARTMENT

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department /Program Name | | Amount Passed to Subrecipients | Federal Expenditures/ Distributions/ Issuances |
|---|---|---|---|---|
| 93.505 | Affordable Care Act (ACA) Maternal, Infant, and Early Childhood Home Visiting Program | Human Services | N/A | 2,608,473 |
| 93.506 | ACA Nationwide Program for National and State Background Checks for Direct Patient Access Employees of Long Term Care Facilities and Providers | Health | N/A | 78,458 |
| 93.511 | Consumer Assistance | Insurance | N/A | 7,653 |
| 93.521 | The Affordable Care Act: Building Epidemiology, Laboratory, and Health Information Systems Capacity in the Epidemiology and Laboratory Capacity for Infectious Disease (ELC) and Emerging Infections Program (EIP) Cooperative Agreements; PPHF | Health | 146,047 | 105,320 |
| 93.556 | Promoting Safe and Stable Families | Human Services | N/A | 3,345,913 |
| 93.563 | Child Support Enforcement | Human Services | N/A | 29,950,977 |
| 93.566 | Refugee and Entrant Assistance – State Administered  Programs | Human Services | N/A | 1,800,645 |
| 93.568 | Low-Income Home Energy Assistance | Human Services | 22,797,306 | 30,213,382 |
| 93.569 | Community Services Block Grants | Human Services | 8,158,449 | 11,750,785 |
| 93.586 | State Court Improvement Program | Supreme Court | N/A | 496,851 |
| 93.590 | Community-Based Child Abuse Prevention Grants | Human Services | N/A | 239,137 |
| 93.597 | Grants to States for Access and Visitation Programs | Human Services | N/A | 97,839 |
| 93.599 | Chafee Education and Training Vouchers Program (ETV) | Human Services | N/A | 586,683 |
| 93.600 | Head Start | Governor's Office | N/A | 175,000 |
| 93.603 | Adoption Incentive Payments | Human Services | N/A | 320,114 |
| 93.630 | Developmental Disabilities Basic Support and Advocacy Grants | Mental Health | 675,904 | 1,052,723 |
| 93.645 | Stephanie Tubbs Jones Child Welfare Services Program | Human Services | N/A | 3,596,091 |
| 93.658 | Foster Care – Title IV-E | Human Services | N/A | 34,875,148 |
| 93.659 | Adoption Assistance | Human Services | N/A | 16,811,800 |
| 93.667 | Social Services Block Grant | Human Services | N/A | 13,191,287 |
| 93.669 | Child Abuse and Neglect State Grants | Human Services | N/A | 50,987 |
| 93.671 | Family Violence Prevention and Services / Domestic  Violence Shelter and Supportive Services | Health | 788,495 | 970,840 |
| 93.674 | Chafee Foster Care Independence Program | Human Services | N/A | 500,864 |
| 93.733 | Capacity Building Assistance to Strengthen Public Health Immunization Infrastructure and Performance – Financed in Part by the Prevention and Public Health Fund (PPHF) | Health | N/A | 183,579 |
| 93.734 | Empowering Older Adults and Adults with Disabilities  through Chronic Disease Self-Management Education Programs – financed by Prevention and Public Health Funds (PPHF) | Health | N/A | 68,045 |
| 93.735 | State Public Health Approaches for Ensuring Quitline Capacity – Funded in Part by Prevention and Public Health Funds (PPHF) | Health | 190,678 | 106,211 |
| 93.752 | Cancer Prevention and Control Programs for State, Territorial and Tribal Organizations financed in part by  Prevention and Public Health Funds | Health | N/A | 2,421 |
| 93.753 | Child Lead Poisoning Prevention Surveillance Financed in  part by Prevention and Public Health (PPHF) Program | Health | N/A | 20,962 |
| 93.757 | State and Local Public Health Actions to Prevent Obesity, Diabetes, Heart Disease and Stroke (PPHF) | Health | 169,007 | 697,943 |
| 93.758 | Preventative Health and Health Services Block Grant funded solely with Prevention and Public Health Funds (PPHF) | Health | 42,890 | (189,089) |
| 93.767 | Children's Health Insurance Program | Medicaid | N/A | 260,903,865 |
| 93.788 | Opioid STR | Mental Health | 6,013,863 | 6,866,324 |
| 93.791 | Money Follows the Person Rebalancing Demonstration | Medicaid | N/A | 939,530 |
| 93.796 | LIC and Cert 16-18 | Medicaid | N/A | 1,917,777 |
| 93.815 | Domestic Ebola Supplement to the Epidemiology and Laboratory Capacity for Infectious Diseases (ELC) | Health | 272,926 | 635,734 |
| 93.816 | Preventing Heart Attacks and Strokes in High Need Areas | Health | 1,511,240 | 3,636,881 |
| 93.817 | Hospital Preparedness Program (HPP) Ebola Preparedness and Response Activities | Health | N/A | 26,456 |
| 93.881 | The Health Insurance Enforcement and Consumer  Protections Grant Program | Insurance | N/A | 147,462 |
| 93.898 | Cancer Prevention | Health | N/A | 249,107 |
| 93.913 | Grants to States for Operation of Offices of Rural Health | Health | 46,526 | 160,911 |
| 93.917 | HIV Care Formula Grants | Health | 905,263 | 16,829,509 |
| 93.940 | HIV Prevention Activities – Health Department Based | Health | 633,889 | 3,093,415 |

# STATE OF MISSISSIPPI
## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY FEDERAL DEPARTMENT
## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department /Program Name | | Amount Passed to Subrecipients | Federal Expenditures/ Distributions/ Issuances |
|---|---|---|---|---|
| 93.944 | Human Immunodeficiency Virus (HIV) / Acquired Immunodeficiency Virus Syndrome (AIDS) Surveillance | Health | 2,558 | 308,607 |
| 93.945 | Assistance Programs for Chronic Disease Prevention and Control | Health | N/A | (84,900) |
| 93.946 | Cooperative Agreements to Support State-Based Safe Motherhood and Infant Health Initiative Programs | Health | 117,268 | 345,992 |
| 93.958 | Block Grants for Community Mental Health Services | Mental Health | 4,347,472 | 4,565,431 |
| 93.959 | Block Grants for Prevention and Treatment of Substance Abuse | Mental Health | 12,083,490 | 12,639,169 |
| 93.977 | Preventive Health Services – Sexually Transmitted Diseases Control Grants | Health | 47,511 | 1,079,094 |
| 93.991 | Preventive Health and Health Services Block Grant | Health | 37,087 | 1,537,058 |
| 93.994 | Maternal and Child Health Services Block Grant to the States | Health | 872,998 | 9,737,537 |
| | **SUBTOTAL** | | | *561,991,807* |
| | **Aging Cluster** | | | |
| 93.044 | Special Programs for the Aging – Title III, Part B – Grants for Supportive Services and Senior Centers | Human Services | 3,583,607 | 4,031,084 |
| 93.045 | Special Programs for the Aging – Title III, Part C – Nutrition Services | Human Services | 2,932,209 | 3,939,222 |
| 93.053 | Nutrition Services Incentive Program | Human Services | 513,023 | 1,667,808 |
| | **Total Aging Cluster** | | | *9,638,114* |
| | **TANF Cluster** | | | |
| 93.558 | Temporary Assistance for Needy Families (TANF) State Programs | Human Services | 38,559,246 | 87,889,397 |
| | **Total TANF Cluster** | | | *87,889,397* |
| | **CCDF Cluster** | | | |
| 93.575 | Child Care and Development Block Grant | Human Services | 3,576,784 | 81,361,758 |
| 93.596 | Child Care Mandatory and Matching Funds of the Child Care and Development Fund | Human Services | 1,298,173 | 23,960,744 |
| | **Total CCDF Cluster** | | | *105,322,502* |
| | **Medicaid Cluster** | | | |
| 93.775 | State Medicaid Fraud Control Units | Attorney General | N/A | 2,580,587 |
| 93.777 | State Survey and Certification of Health Care Providers and Suppliers (Title XVIII) Medicare | Health | N/A | 2,450,518 |
| 93.778 | Medical Assistance Program | Medicaid | N/A | 4,155,687,791 |
| | **Total Medicaid Cluster** | | | *4,160,718,896* |
| | **TOTAL U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | | $   4,925,560,716 |
| | **CORPORATION FOR NATIONAL AND COMMUNITY SERVICE** | | | |
| 94.016 | Senior Companion Program | Human Services | N/A | 154,154 |
| | **Total Foster Grandparent/Senior Companion Cluster** | | | *154,154* |
| | **TOTAL CORPORATION FOR NATIONAL AND COMMUNITY SERVICE** | | | $   154,154 |
| | **EXECUTIVE OFFICE OF THE PRESIDENT** | | | |
| 95.001 | High Intensity Drug Trafficking Areas Program | Public Safety | N/A | 1,061,519 |
| | **TOTAL EXECUTIVE OFFICE OF THE PRESIDENT** | | | $   1,061,519 |
| | **SOCIAL SECURITY ADMINISTRATION** | | | |
| 96.008 | Social Security – Work Incentives Planning and Assistance Program | Rehabilitation Services | N/A | 304,060 |
| | **SUBTOTAL** | | | *304,060* |
| | **Disability Insurance / SSI Cluster** | | | |
| 96.001 | Social Security – Disability Insurance (DI) | Rehabilitation Services | N/A | 25,626,433 |
| | **Total Disability Insurance / SSI Cluster** | | | *25,626,433* |
| | **TOTAL SOCIAL SECURITY ADMINISTRATION** | | | $   25,930,493 |

(continued)
See accompanying Notes to the Schedules of Expenditures of Federal Awards

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY FEDERAL DEPARTMENT

### FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department /Program Name | | Amount Passed to Subrecipients | Federal Expenditures/ Distributions/ Issuances |
|---|---|---|---|---|
| | **DEPARTMENT OF HOMELAND SECURITY** | | | |
| 97.001 | Mississippi Interoperable Communications Grant | Public Safety | 2,592,842 | 2,592,842 |
| 97.012 | Boating Safety Financial Assistance | Wildlife, Fisheries & Parks | N/A | 769,721 |
| 97.023 | Community Assistance Program State Support Services Element (CAP-SSSE) | Emergency Management | N/A | 266,646 |
| 97.036 | Disaster Grants – Public Assistance (Presidentially Declared Disasters) | Emergency Management | 53,903,501 | 56,454,065 |
| 97.039 | Hazard Mitigation Grant | Emergency Management | 10,980,833 | 19,345,528 |
| 97.041 | National Dam Safety Program | Environmental Quality | N/A | 428,438 |
| 97.042 | Emergency Management Performance Grants | Emergency Management | 2,627,394 | 4,227,504 |
| 97.043 | State Fire Training Systems Grants | Insurance | N/A | 19,213 |
| 97.044 | Assistance to Firefighter Grant | Insurance | N/A | 242,845 |
| 97.045 | Cooperating Technical Partners | Environmental Quality/ Emergency Management | N/A | 1,977,480 |
| 97.047 | Pre-Disaster Mitigation | Emergency Management | N/A | 5,429 |
| 97.056 | FY16 Port Security Grant | Marine Resources/ Public Safety/ Wildlife, Fisheries and Parks | N/A | 558,228 |
| 97.067 | Homeland Security Grant Program | Animal Health/ Marine Resources/ Public Safety/ Emergency Management | 3,305,077 | 4,173,606 |
| 97.082 | Earthquake Consortium | Emergency Management | N/A | 35,674 |
| 97.089 | Driver's License Security Grant Program | Public Safety | 2,290,358 | 2,408,376 |
| 97.120 | FY 2018 First Hands | Insurance | | 29 |
| | **TOTAL DEPARTMENT OF HOMELAND SECURITY** | | $ | 93,505,624 |
| | **TOTAL EXPENDITURES OF FEDERAL AWARDS** | | $ | 7,636,162,594 |

**EXPLANATION OF FOOTNOTE REFERENCE:**
Program Number with UN denotes unknown CFDA numbers.
\# The total expenditures for CFDA No. 17.225 include state expenditures of $60,625,477 and federal expenditures of $33,325,148.
@ Denotes federal programs with noncash benefits.

# Schedule of Expenditures of Federal Awards by State Grantee Agency



(This page left blank intentionally.)

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| | **Agriculture and Commerce** | | |
| | **U.S. DEPARTMENT OF AGRICULTURE** | | |
| 10.025 | Plant and Animal Disease, Pest Control, and Animal Care | $ | 101,957 |
| 10.163 | Market Protection and Promotion | | 25,272 |
| 10.170 | Specialty Crop Block Grant Program – Farm Bill | 243,900 | 276,569 |
| 10.171 | National Organic Certification Cost Share Program | | 900 |
| 10.331 | Food Insecurity Nutrition Incentive Grants Program | | 5,069 |
| 10.475 | Cooperative Agreements with States for Intrastate Meat and Poultry Inspection | | 1,607,396 |
| 10.902 | Soil and Water Conservation | | 38,193 |
| 10.950 | Agricultural Statistics Reports | | 28,867 |
| | **Total U.S. DEPARTMENT OF AGRICULTURE** | | 2,084,223 |
| | **ENVIRONMENTAL PROTECTION AGENCY** | | |
| 66.605 | Performance Partnership Grants | | 423,690 |
| | **U.S. Department of Health and Human Services** | | |
| 93.103 | Food and Drug Administration – Research | | 300,728 |
| | **TOTAL Agriculture and Commerce** | $ | 2,808,641 |
| | **Animal Health** | | |
| | **U.S. DEPARTMENT OF AGRICULTURE** | | |
| 10.025 | Plant and Animal Disease, Pest Control, and Animal Care | | 641,973 |
| | **DEPARTMENT OF HOMELAND SECURITY** | | |
| 97.067 | Homeland Security | | (1,078) |
| | **TOTAL Animal Health** | $ | 640,895 |
| | **Archives and History** | | |
| | **U.S. DEPARTMENT OF THE INTERIOR** | | |
| 15.904 | Historic Preservation Fund Grants-In-Aid | 66,071 | 818,763 |
| 15.928 | Civil War Battlefield Land Acquisition Grants | | 12,327 |
| | **Total U.S. DEPARTMENT OF THE INTERIOR** | | 831,090 |
| | **NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES** | | |
| 45.130 | Promotion of the Humanities Challenge Grants | | 31,606 |
| 45.149 | Promotion of the Humanities – Division of Preservation and Access | | 5,863 |
| 45.168 | National Digital Newspaper Program | | 113,591 |
| 45.301 | Museums for America | | 8,243 |
| | **Total NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES** | | 159,303 |
| | **TOTAL Archives and History** | $ | 990,393 |
| | **Arts Commission** | | |
| | **NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES** | | |
| 45.025 | Promotion of the Arts - Partnership Agreements | 814,629 | 814,629 |
| | **TOTAL Arts Commission** | $ | 814,629 |
| | **Attorney General** | | |
| | **U.S. DEPARTMENT OF JUSTICE** | | |
| 16.543 | Missing Children's Assistance | | 250,593 |
| 16.576 | Crime Victim Compensation | | 1,317,517 |
| 16.590 | Grants to Encourage Arrest Policies and Enforcement of Protection Orders Program | | 64,768 |

(continued)

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| 16.816 | John R. Justice Prosecutors and Defenders Incentive Act | | 36,278 |
| | ***Total U.S. DEPARTMENT OF JUSTICE*** | | *1,669,156* |
| | | | |
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| 93.775 | State Medicaid Fraud Control Units | | *2,580,587* |
| | **TOTAL Attorney General** | | **$      4,249,743** |
| | **Board for Community and Junior Colleges** | | |
| | | | |
| | **U.S. DEPARTMENT OF EDUCATION** | | |
| 84.002 | Adult Education – Basic Grants to States | 6,627,041 | *6,627,041* |
| | | | |
| | **U.S. Department of Health and Human Services** | | |
| 93.434 | Every Student Succeeds Act/Preschool Development Grants | | *152,162* |
| | **TOTAL Board for Community and Junior Colleges** | | **$      6,779,203** |
| | **Education** | | |
| | | | |
| | **U.S. DEPARTMENT OF AGRICULTURE** | | |
| 10.553 | School Breakfast Program (SBP) | 64,803,856 | 64,908,970 |
| 10.555 @ | National School Lunch Program (NSLP) | 172,017,428 | 192,112,359 |
| 10.556 | Special Milk Program for Children (SMP) | 4,192 | 4,770 |
| 10.558 | Child and Adult Care Food Program (CACFP) | 48,524,756 | 51,534,837 |
| 10.559 @ | Summer Food Service Program for Children (SFSPC) | 7,538,597 | 7,998,126 |
| 10.560 | State Administrative Expenses for Child Nutrition | | 4,124,101 |
| 10.579 | Child Nutrition Discretionary Grants Limited Availability | 197,447 | 197,447 |
| 10.582 | Fresh Fruit and Vegetable Program | 2,087,055 | 2,087,674 |
| | ***Total U.S. DEPARTMENT OF AGRICULTURE*** | | *322,968,264* |
| | | | |
| | **APPALACHIAN REGIONAL COMMISSION** | | |
| 23.011 | Career Team ARC Grant - CTE | 158,224 | *158,224* |
| | | | |
| | **U.S. DEPARTMENT OF EDUCATION** | | |
| 84.010 | Title I Grants to Local Educational Agencies | 193,299,182 | 195,849,920 |
| 84.011 | Migrant Education – State Grant Program | 770,358 | 898,469 |
| 84.013 | Title I State Agency Program for Neglected and Delinquent Children and Youth | 462,416 | 465,792 |
| 84.027 | Special Education – Grants to States (IDEA, Part B) | 109,759,753 | 122,145,880 |
| 84.048 | Career and Technical Education – Basic Grants to States (Perkins IV) | 12,605,273 | 9,909,385 |
| 84.144 | Migrant Education – Coordination Program | | 51,084 |
| 84.173 | Special Education – Preschool Grants (IDEA, Preschool) | 4,132,196 | 4,132,194 |
| 84.196 | Education for Homeless Children and Youth | 771,952 | 850,601 |
| 84.287 | Twenty-First Century Community Learning Centers | 6,136,587 | 5,913,823 |
| 84.305 | Education Research, Development and Dissemination | | 8,515 |
| 84.323 | Special Education – State Personnel Development | 968,847 | 968,847 |
| 84.358 | Rural Education | 5,465,412 | 5,705,173 |
| 84.365 | English Language Acquisition State Grants | 1,347,444 | 1,398,551 |
| 84.366 | Mathematics and Science Partnerships | 173,922 | 201,955 |
| 84.367 | Support Effective Instruction State Grants | 28,275,655 | 27,979,706 |
| 84.369 | Grants for State Assessments and Related Activities | | 250,595 |
| 84.372 | Statewide Data Systems | | 1,121,896 |
| 84.377 | School Improvement Grants | 3,770,398 | 4,001,404 |
| 84.424 | Title IV - SSAE State Activities | 7,373,084 | 7,433,679 |
| 84.938 | Hurricane Education Recovery | 539,933 | 539,933 |
| | ***Total U.S. DEPARTMENT OF EDUCATION*** | | *389,827,402* |
| | | | |
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| 93.079 | Cooperative Agreements to Promote Adolescent Health through School-Based HIV/STD Prevention and School-Based Surveillance | | *22,938* |
| | **TOTAL Education** | | **$    712,976,828** |

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| | **Emergency Management** | | |
| | **U.S. DEPARTMENT OF TRANSPORTATION** | | |
| 20.703 | Interagency Hazardous Materials Public Sector Training and Planning Grants | 190,749 | 276,163 |
| | **U.S. Department of Health and Human Services** | | |
| 93.074 | Hospital Preparedness Program (HPP) and Public Health Emergency Preparedness (PHEP) Aligned Cooperative Agreements | | (146,137) |
| | **DEPARTMENT OF HOMELAND SECURITY** | | |
| 97.023 | Community Assistance Program State Support Services Element (CAP-SSSE) | | 266,646 |
| 97.036 | Disaster Grants – Public Assistance(Presidentially Declared Disasters) | 53,903,501 | 56,454,065 |
| 97.039 | Hazard Mitigation Grant | 10,980,833 | 19,345,528 |
| 97.042 | Emergency Management Performance Grants | 2,627,394 | 4,227,504 |
| 97.045 | Cooperating Technical Partners | | 13,312 |
| 97.047 | Pre-Disaster Mitigation | | 5,429 |
| 97.067 | Homeland Security Grant Program | | (15,766) |
| 97.082 | Earthquake Consortium | | 35,674 |
| | ***Total DEPARTMENT OF HOMELAND SECURITY*** | | 80,332,392 |
| | **TOTAL Emergency Management** | $ | 80,462,418 |
| | **Employment Security** | | |
| | **U.S. DEPARTMENT OF LABOR** | | |
| 17.002 | Labor Force Statistics | | 684,214 |
| 17.207 | Employment Service / Wagner-Peyser Funded Activities | | 5,386,947 |
| 17.225 @ | Unemployment Insurance | | 93,950,625 |
| 17.235 | Senior Community Service Employment Program | 745,723 | 803,914 |
| 17.245 | Trade Adjustment Assistance | | 309,931 |
| 17.258 | WIOA Adult Program | 7,483,491 | 9,326,449 |
| 17.259 | WIOA Youth Activities | 9,395,184 | 10,366,080 |
| 17.261 | WIA/WIOA Pilots, Demonstrations, and Research Projects | 1,144,559 | 1,187,759 |
| 17.268 | Alien Labor Cert | | 8,477 |
| 17.271 | Work Opportunity Tax Credit Program (WOTC) | | 131,024 |
| 17.273 | Temporary Labor Certification for Foreign Workers | | 146,644 |
| 17.277 | Workforce Investment Act (WIA) National Emergency Grants | | 17,523 |
| 17.278 | WIA/WIOA Dislocated Worker Formula Grants | 11,976,767 | 13,715,387 |
| 17.281 | WIA/WIOA Dislocated Worker National Reserve Technical Assistance and Training | | (773) |
| 17.285 | Apprenticeship USA Grants | 350,511 | 389,805 |
| 17.801 | Disabled Veterans' Outreach Program (DVOP) | | 1,269,400 |
| | ***Total U.S. DEPARTMENT OF LABOR*** | | 137,693,406 |
| | **TOTAL Employment Security** | $ | 137,693,406 |
| | **Environmental Quality** | | |
| | **U.S. DEPARTMENT OF Agriculture** | | |
| 10.912 | Soil and Water Conservation | 81,719 | 81,719 |
| | **U.S. DEPARTMENT OF DEFENSE** | | |
| 12.113 | State Memorandum of Agreement Program for the Reimbursement of Technical Services | | 146,347 |
| | **U.S. DEPARTMENT OF THE INTERIOR** | | |
| 15.250 | Regulation of Surface Coal Mining and Surface Effects of Underground Coal Mining | | 189,835 |

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| 15.252 | Abandoned Mine Land Reclamation (AMLR) Program | | 19,597 |
| 15.608 | Fish and Wildlife Management Assistance | 8,151 | 16,545 |
| 15.808 | U.S. Geological Survey – Research and Data Collection | | 24,824 |
| 15.810 | National Cooperative Geologic Mapping Program | | 56,214 |
| 15.814 | National Geological and Geophysical Data Preservation | | 15,000 |
| 15.980 | National Ground-Water Monitoring Network | | 2,234 |
| | ***Total U.S. DEPARTMENT OF THE INTERIOR*** | | *324,249* |
| | | | |
| | **U.S. DEPARTMENT OF LABOR** | | |
| 17.600 | Mine Health and Safety Grants | | *29,936* |
| | | | |
| | **U.S. DEPARTMENT OF THE TREASURY** | | |
| 21.015 | Resources and Ecosystems Sustainability, Tourist Opportunities, and Revived Economies of the Gulf Coast | 9,785,253 | *10,739,286* |
| | | | |
| | **ENVIRONMENTAL PROTECTION AGENCY** | | |
| 66.034 | Surveys, Studies, Research, Investigations, Demonstrations, and Special Purpose Activities Relating to the Clean Air Act | | 401,168 |
| 66.040 | State Clean Diesel Grant Program | 445,920 | 422,083 |
| 66.419 | Water Pollution Control State, Interstate, and Tribal Program Support | | 227,828 |
| 66.454 | Water Quality Management Planning | | 130,135 |
| 66.458 | Capitalization Grants for Clean Water State Revolving Funds | | 18,404,259 |
| 66.460 | Nonpoint Source Implementation Grants | 2,257,476 | 2,797,598 |
| 66.472 | Beach Monitoring and Notification Program Implementation Grants | | 176,763 |
| 66.605 | Performance Partnership Grants | | 7,451,096 |
| 66.606 | Surveys, Studies, Investigations and Special Purpose Grants | | 54,203 |
| 66.701 | Toxic Substances Compliance Monitoring Cooperative Agreements | | 58,012 |
| 66.707 | TSCA Title IV State Lead Grants Certification of Lead-Based Paint Professionals | | 301,482 |
| 66.708 | Pollution Prevention Grants Program | | 53,317 |
| 66.802 | Superfund State, Political Subdivision, and Indian Tribe Site-Specific Cooperative Agreements | | 130,162 |
| 66.804 | Underground Storage Tank Prevention, Detection and Compliance Program | | 370,721 |
| 66.805 | Leaking Underground Storage Tank Trust Fund Corrective Action Program | | 870,012 |
| 66.809 | Superfund State and Indian Tribe Core Program Cooperative Agreements | | 31,096 |
| | ***Total ENVIRONMENTAL PROTECTION AGENCY*** | | *31,879,935* |
| | | | |
| | **GULF COAST ECOSYSTEM RESTORATION COUNCIL** | | |
| 87.051 | Gulf Coast Ecosystem Restoration Council Comprehensive Plan Component Program | 208,677 | 993,651 |
| 87.052 | Gulf Coast Ecosystem Restoration Council Oil Spill Impact Program | | 580,265 |
| | ***Total GULF COAST ECOSYSTEM RESORATION COUNCIL*** | | *1,573,916* |
| | | | |
| | **DEPARTMENT OF HOMELAND SECURITY** | | |
| 97.041 | National Dam Safety Program | | 428,438 |
| 97.045 | Cooperating Technical Partners | | 1,964,168 |
| | ***Total DEPARTMENT OF HOMELAND SECURITY*** | | *2,392,606* |
| | **TOTAL Environmental Quality** | | $ **47,167,994** |

### Finance and Administration

| | | | |
|---|---|---|---|
| | **GENERAL SERVICES ADMINISTRATION** | | |
| 39.003 @ | Donation of Federal Surplus Personal Property | | *1,708,017* |
| | **TOTAL Finance and Administration** | | $ **1,708,017** |

### Forestry Commission

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| | **U.S. DEPARTMENT OF AGRICULTURE** | | |
| 10.664 | Cooperative Forestry Assistance | | 5,297,412 |
| | **TOTAL Forestry Commission** | $ | 5,297,412 |
| | **Governor's Office** | | |
| | **U.S. DEPARTMENT OF COMMERCE** | | |
| 11.557 | ARRA – Broadband Technology Opportunities Program (BTOP) | | 4,295,866 |
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| 93.600 | Head Start | | 175,000 |
| | **TOTAL Governor's Office** | $ | 4,470,866 |
| | **Health** | | |
| | **U.S. DEPARTMENT OF AGRICULTURE** | | |
| 10.557 | Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) | 2,628,394 | 70,328,586 |
| 10.565 | Commodity Supplemental Food Program | 438,798 | 324,191 |
| 10.578 | WIC Grants to States (WGS) | 57,560 | 348,003 |
| | **Total U.S. DEPARTMENT OF AGRICULTURE** | | 71,000,780 |
| | **U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT** | | |
| 14.900 | Lead-Based Paint Hazard Control in Privately-Owned Housing | | 4,344 |
| | **DEPARTMENT OF JUSTICE** | | |
| 16.017 | FY 2016 SAS Formula Project | 268,035 | 292,840 |
| 16.575 | Crime Victim Assistance | 16,019,042 | 15,398,379 |
| 16.582 | Crime Victim Assistance/Discretionary Grants | 11,298 | 11,298 |
| 16.588 | Violence Against Women Formula Grants | 1,229,814 | 1,637,313 |
| 16.754 | Harold Rogers Prescription Monitoring | 57,473 | 142,882 |
| | *Total DEPARTMENT OF JUSTICE* | | 17,482,712 |
| | **Appalachian Regional Commission** | | |
| 23.011 | Appalachian Research, Technical Assistance, and Demonstration Projects | | (28,310) |
| | **ENVIRONMENTAL PROTECTION AGENCY** | | |
| 66.032 | State Indoor Radon Grants | | 31,762 |
| 66.432 | State Public Water System Supervision | | 1,042,058 |
| 66.468 | Capitalization Grants for Drinking Water State Revolving Funds | | 15,611,989 |
| | *Total ENVIRONMENTAL PROTECTION AGENCY* | | 16,685,809 |
| | **U.S. DEPARTMENT OF ENERGY** | | |
| 81.136 | DOE Salmon Testing Site | | 92,038 |
| | **U.S. DEPARTMENT OF EDUCATION** | | |
| 84.181 | Special Education – Grants for Infants and Families | 585,896 | 3,740,293 |
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| 93.069 | Public Health Emergency Preparedness | | (15,191) |
| 93.070 | Environmental Public Health and Emergency Response | 147,514 | 419,785 |
| 93.073 | Surveillance, Intervention, and Referral to Services Activities for Infants with Microphaly or Other Adverse Outcomes linked with The Zika Virus | | 119,501 |
| 93.074 | Hospital Preparedness Program (HPP) and Public Health Emergency Preparedness(PHEP) Aligned Cooperative Agreements | 1,311,283 | 8,549,463 |
| 93.092 | Affordable Care Act (ACA) Personal Responsibility Education Program | 188,062 | 362,372 |
| 93.103 | Food and Drug Administration – Research | 10,000 | 95,167 |
| 93.110 | Maternal and Child Health Federal Consolidated Programs | | 75,870 |

(continued)
See accompanying Notes to the Schedules of Expenditures of Federal Awards        27

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| 93.116 | Project Grants and Cooperative Agreements for Tuberculosis Control Programs | | 745,556 |
| 93.127 | Emergency Medical Services for Children | | 125,040 |
| 93.130 | Cooperative Agreements to States / Territories for the Coordination and Development of Primary Care Offices | 4,974 | 193,959 |
| 93.136 | Injury Prevention and Control Research and State and Community Based Programs | 276,148 | 465,306 |
| 93.137 | Impact of Preschool Obesity Prevention Curriculum Enhanced with Positive Behavioral Supports | 346,635 | 446,047 |
| 93.197 | Childhood Lead Poisoning Prevention Projects, State and Local Childhood Lead Poisoning Prevention and Surveillance of Blood Lead Levels in Children | | 203,237 |
| 93.217 | Family Planning – Services | 989,085 | 4,224,356 |
| 93.236 | Grants to States to Support Oral Health Workforce Activities | 15,164 | 458,797 |
| 93.241 | State Rural Hospital Flexibility Program | 108,539 | 382,428 |
| 93.251 | Universal Newborn Hearing Screening | 60,364 | 163,342 |
| 93.262 | Occupational Safety and Health Program | | 63,604 |
| 93.268 @ | Immunization Cooperative Agreements` | 58,024 | 46,869,900 |
| 93.270 | Adult Viral Hepatitis Prevention and Control | 57,017 | 157,536 |
| 93.283 | Centers for Disease Control and Prevention –Investigations and Technical Assistance | 87,403 | 2,824,145 |
| 93.296 | State Partnership Grant Program to Improve Minority Health | 97,959 | 166,091 |
| 93.301 | Small Rural Hospital Improvement Grant Program | 329,949 | 408,353 |
| 93.305 | National State Based Tobacco Control Programs | 199,736 | 804,071 |
| 93.314 | Early Hearing Detection and Intervention Information System (EHDI-IS) Surveillance Program | | 158,386 |
| 93.323 | Epidemiology and Laboratory Capacity for Infectious Diseases (ELC) | 183,768 | 1,663,387 |
| 93.336 | Behavioral Risk Factor Surveillance System | | 299,454 |
| 93.354 | Public Health Emergency Response:  Cooperative Agreement for Emergency Response: Public Health Crisis Response Public Health Crisis Response | 42,725 | 412,843 |
| 93.367 | Flexible Funding Model - Infrastructure Development and Maintenance for State Manufactured Food Regulatory Programs | | 109,786 |
| 93.426 | Improving the Health of Americans through Prevention and Management of Diabetes and Heart Disease and Stroke | 153,685 | 1,443,218 |
| 93.500 | Pregnancy Assistance Fund Program | 123,799 | 890,229 |
| 93.506 | ACA Nationwide Program for National and State Background Checks for Direct Patient Access Employees of Long Term Care Facilities and Providers | | 78,458 |
| 93.521 | The Affordable Care Act: Building Epidemiology, Laboratory, and Health Information Systems Capacity in the Epidemiology and Laboratory Capacity for Infectious Disease (ELC) and Emerging Infections Program (EIP) Cooperative Agreements; PPHF | 146,047 | 105,320 |
| 93.671 | Family Violence Prevention and Services / Domestic Violence Shelter and Supportive Services | 788,495 | 970,840 |
| 93.733 | Capacity Building Assistance to Strengthen Public Health Immunization Infrastructure And Performance – Financed in Part by the Prevention and Public Health Fund (PPHF) | | 183,579 |
| 93.734 | Empowering Older Adults and Adults with Disabilities through Chronic Disease Self-Management Education Programs  – financed by Prevention and Public Health Funds (PPHF) | | 68,045 |
| 93.735 | State Public Health Approaches for Ensuring Quitline Capacity | 190,678 | 106,211 |
| 93.752 | Cancer Prevention and Control Programs for State | | 2,421 |
| 93.753 | Child Lead Poisoning Prevention Surveillance Financed in Part by Prevention and Public Health Program (PPHF) | | 20,962 |
| 93.757 | State and Local Public Health Actions to Prevent Obesity, Diabetes, Heart Disease And Stroke (PPHF) | 169,007 | 697,943 |
| 93.758 | Preventative Health and Health Services Block Grant funded solely with Prevention and Public Health Funds (PPHF) | 42,890 | (189,089) |
| 93.777 | State Survey and Certification of Health Care Providers and Suppliers (Title XVIII) Medicare | | 2,450,518 |
| 93.815 | Domestic Ebola Supplement to the Epidemiology and Laboratory Capacity for Infectious Diseases (ELC) | 272,926 | 635,734 |

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| 93.816 | Mississippi Delta Health Collaborative | 1,511,240 | 3,636,881 |
| 93.817 | Hospital Preparedness Program (HPP) Ebola Preparedness and Response Activities | | 26,456 |
| 93.898 | Cancer Prevention | | 249,107 |
| 93.913 | Grants to States for Operation of Offices of Rural Health | 46,526 | 160,911 |
| 93.917 | HIV Care Formula Grants | 905,263 | 16,829,509 |
| 93.940 | HIV Prevention Activities – Health Department Based | 633,889 | 3,093,415 |
| 93.944 | Human Immunodeficiency Virus (HIV) / Acquired Immunodeficiency Virus Syndrome (AIDS) Surveillance | 2,558 | 308,607 |
| 93.945 | Assistance Programs for Chronic Disease Prevention and Control | | (84,900) |
| 93.946 | Cooperative Agreements to Support State-Based Safe Motherhood and Infant Health Initiative Programs | 117,268 | 345,992 |
| 93.977 | Preventive Health Services – Sexually Transmitted  Diseases Control Grants | 47,511 | 1,079,094 |
| 93.991 | Preventive Health and Health Services Block Grant | 37,087 | 1,537,058 |
| 93.994 | Maternal and Child Health Services Block Grant to the States | 872,998 | 9,737,537 |
| | ***Total U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES*** | | *115,336,647* |
| | **TOTAL Health** | | **224,314,313** |

### Human Services

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| | **U.S. DEPARTMENT OF AGRICULTURE** | | |
| 10.535 | USDA SNAP Integrity Education | | 67,399 |
| 10.551 | Supplemental Nutrition Assistance Program (SNAP) | | 620,174,079 |
| 10.561 | State Administrative Matching Grants for the  Supplemental Nutrition Assistance Program | 2,606,905 | 31,937,548 |
| 10.565 | Commodity Supplemental Food Program | | 605,194 |
| 10.568 | Emergency Food Assistance Program (Administrative Costs) | 178,928 | 1,194,458 |
| 10.569 | Emergency Food Assistance Program (Food Commodities) | | 5,410,380 |
| 10.580 | Supplemental Nutrition Assistance Program, Process and Technology Improvement Grants | | 250,328 |
| 10.596 | Pilot Projects to Reduce Dependency and Increase Work Requirements and Work Effort under SNAP | | 3,430,974 |
| | ***Total U.S. DEPARTMENT OF AGRICULTURE*** | | *663,070,360* |
| | **U.S. DEPARTMENT OF ENERGY** | | |
| 81.042 | Weatherization Assistance for Low-Income Persons | | *(30,222)* |
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| 93.041 | Special Programs for the Aging – Title VII, Chapter 3 – Programs for Prevention of Elder Abuse, Neglect, and Exploitation | 25,719 | 34,644 |
| 93.042 | Special Programs for the Aging – Title VII, Chapter 2 – Long-Term Care Ombudsman Services for Older Individuals | 123,793 | 229,504 |
| 93.043 | Special Programs for the Aging – Title III, Part D – Disease Prevention and Health Promotion Services | 149,386 | 187,392 |
| 93.044 | Special Programs for the Aging – Title III, Part B – Grants for Supportive Services and Senior Centers | 3,583,607 | 4,031,084 |
| 93.045 | Special Programs for the Aging – Title III,  Part C – Nutrition Services | 2,932,209 | 3,939,222 |
| 93.052 | National Family Caregiver Support, Title III, Part E | 1,011,349 | 1,126,326 |
| 93.053 | Nutrition Services Incentive Program | 513,023 | 1,667,808 |
| 93.071 | Medicare Enrollment Assistance Program | 17,728 | 333,591 |
| 93.072 | Lifecare Respite Care Program | | 5,591 |
| 93.235 | Affordable Care Act (ACA) Abstinence Education Program | | 1,347,567 |
| 93.324 | State Health Insurance Assistance Program | 314,019 | 586,685 |
| 93.505 | Affordable Care Act (ACA) Maternal, Infant, and Early  Childhood Home Visiting Program | | 2,608,473 |
| 93.556 | Promoting Safe and Stable Families | | 3,345,913 |
| 93.558 | Temporary Assistance for Needy Families (TANF) State Programs | 38,559,246 | 87,889,397 |
| 93.563 | Child Support Enforcement | | 29,950,977 |
| 93.566 | Refugee and Entrant Assistance – State Administered Programs | | 1,800,645 |
| 93.568 | Low-Income Home Energy Assistance | 22,797,306 | 30,213,382 |

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| 93.569 | Community Services Block Grants | 8,158,449 | 11,750,785 |
| 93.575 | Child Care and Development Block Grant | 3,576,784 | 81,361,758 |
| 93.590 | Community-Based Child Abuse Prevention Grants | | 239,137 |
| 93.596 | Child Care Mandatory and Matching Funds of the Child Care and Development Fund | 1,298,173 | 23,960,744 |
| 93.597 | Grants to States for Access and Visitation Programs | | 97,839 |
| 93.599 | Chafee Education and Training Vouchers Program (ETV) | | 586,683 |
| 93.603 | Adoption Incentive Payments | | 320,114 |
| 93.645 | Stephanie Tubbs Jones Child Welfare Services Program | | 3,596,091 |
| 93.658 | Foster Care – Title IV-E | | 34,875,148 |
| 93.659 | Adoption Assistance | | 16,811,800 |
| 93.667 | Social Services Block Grant | | 13,191,287 |
| 93.669 | Child Abuse and Neglect State Grants | | 50,987 |
| 93.674 | Chafee Foster Care Independence Program | | 500,864 |
| | **Total U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | *356,641,438* |
| | **CORPORATION FOR NATIONAL AND COMMUNITY SERVICE** | | |
| 94.016 | Senior Companion Program | | 154,154 |
| | **TOTAL Human Services** | | **$ 1,019,835,730** |

### Insurance

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| 93.511 | Consumer Assistance | | 7,653 |
| 93.881 | The Health Insurance Enforcement and Consumer Protections Grant Program | | 147,462 |
| | **Total U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | *155,115* |
| | **DEPARTMENT OF HOMELAND SECURITY** | | |
| 97.043 | State Fire Training Systems Grants | | 19,213 |
| 97.044 | Assistance to Firefighters Grant | | 242,845 |
| 97.120 | FY 2018 First Hands | | 28 |
| | **Total U.S. DEPARTMENT OF HOMELAND SECURITY** | | *262,086* |
| | **TOTAL Insurance** | | **$ 417,201** |

### Library Commission

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| | **NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES** | | |
| 45.310 | Grants to States | 356,896 | *1,818,162* |
| | **TOTAL Library Commission** | | **$ 1,818,162** |

### Marine Resources

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| | **U.S. DEPARTMENT OF COMMERCE** | | |
| 11.407 | Interjurisdictional Fisheries Act of 1986 | | 148,430 |
| 11.419 | Coastal Zone Management Administration Awards | | 1,358,253 |
| 11.420 | Coastal Zone Management Estuarine Research Reserves | | 699,819 |
| 11.434 | Cooperative Fishery Statistics | | 60,723 |
| 11.454 | Unallied Management Projects | | 2,007,038 |
| 11.472 | Creation of a Mobile Single Set Production System for the Easter Oyster | | 47,936 |
| 11.617 | NERR Changes | | 41,813 |
| | **Total U.S. DEPARTMENT OF COMMERCE** | | *4,364,012* |
| | **U.S. DEPARTMENT OF THE INTERIOR** | | |
| 15.435 | GoMESA | | 6,617,295 |
| 15.605 | Sport Fish Restoration Program | 300,899 | 764,121 |
| 15.622 | Sportfishing and Boating Safety Act | 23,449 | 23,449 |
| 15.939 | National Heritage Area Federal Financial Assistance | | 389,620 |

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| | *Total U.S. DEPARTMENT OF THE INTERIOR* | | *7,794,485* |
| | **U.S. DEPARTMENT OF JUSTICE** | | |
| | **DEPARMENT OF TREASURY** | | |
| 21.015 | Off-Bottom Oyster Aquaculture | | *312,510* |
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| 93.103 | Gulf of Mexico Program | | *15,018* |
| | **DEPARTMENT OF HOMELAND SECURITY** | | |
| 97.056 | FY16 Port Security Grant | | 49,218 |
| 97.067 | MS Homeland Security Grant | | 49,035 |
| | *Total DEPARTMENT OF HOMELAND SECURITY* | | *98,253* |
| | **TOTAL Marine Resources** | | $ 12,584,278 |
| | **Medicaid** | | |
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| 93.767 | Children's Health Insurance Program | | 260,903,865 |
| 93.778 | Medical Assistance Program | | 4,155,687,791 |
| 93.791 | Money Follows the Person Rebalancing Demonstration | | 939,530 |
| 93.796 | LIC & CERT | | 1,917,777 |
| | *Total U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES* | | *4,419,448,963* |
| | **TOTAL Medicaid** | | $ 4,419,448,963 |
| | **Mental Health** | | |
| | **DEPARTMENT OF JUSTICE** | | |
| 16.812 | Second Chance Act Reentry Initiative | 167,398 | *197,070* |
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| 93.104 | CXPD | 1,835,893 | 2,156,454 |
| 93.110 | Maternal and Child Health Federal Consolidated Programs | | 20,889 |
| 93.150 | Projects for Assistance in Transition from Homelessness (PATH) | 284,533 | 296,071 |
| 93.243 | Substance Abuse and Mental Health Services – Projects of Regional and National Significance | 1,733,707 | 2,190,179 |
| 93.630 | Developmental Disabilities Basic Support and Advocacy Grants | 675,904 | 1,052,723 |
| 93.788 | Opioid STR | 6,013,863 | 6,866,324 |
| 93.958 | Block Grants for Community Mental Health Services | 4,347,472 | 4,565,431 |
| 93.959 | Block Grants for Prevention and Treatment of Substance Abuse | 12,083,490 | 12,639,169 |
| | *Total U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES* | | *29,787,240* |
| | **TOTAL Mental Health** | | $ 29,984,310 |
| | **Military Department** | | |
| | **U.S. DEPARTMENT OF DEFENSE** | | |
| 12.400 | Military Construction, National Guard | | 9,811,981 |
| 12.401 | National Guard Military Operations and Maintenance (O&M) Projects | | 97,199,875 |
| 12.404 | National Guard Challenge Program | | 4,491,697 |
| | *Total U.S. DEPARTMENT OF DEFENSE* | | *111,503,553* |
| | **TOTAL Military Department** | | $ 111,503,553 |
| | **MS Development Authority** | | |
| | **U.S. DEPARTMENT OF DEFENSE** | | |
| 12.002 | Procurement Technical Assistance For Business Firms | | *367,278* |
| | **U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT** | | |

(continued)

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| 14.228 | Community Development Block Grants / State's Program and Non-Entitlement Grants in Hawaii | | 73,466,546 |
| | **APPALACHIAN REGIONAL COMMISSION** | | |
| 23.002 | Appalachian Area Development | | 10,373,332 |
| 23.011 | Appalachian Research, Technical Assistance, and Demonstration Projects | | 129,749 |
| | *Total APPALACHIAN REGIONAL COMMISSION* | | *10,503,081* |
| | **SMALL BUSINESS ADMINISTRATION** | | |
| 59.061 | State Trade and Export Promotion Pilot Grant Program | | *389,197* |
| | **U.S. DEPARTMENT OF ENERGY** | | |
| 81.041 | State Energy Program | | *402,717* |
| | **TOTAL MS Development Authority** | | $   85,128,819 |
| | **Oil and Gas Board** | | |
| | **ENVIRONMENTAL PROTECTION AGENCY** | | |
| 66.433 | State Underground Water Source Protection | | *103,000* |
| | **TOTAL Oil and Gas Board** | | $   103,000 |
| | **Board of Pharmacy** | | |
| | **U.S. DEPARTMENT OF JUSTICE** | | |
| 16.754 | Harold Rogers Prescription Monitoring | | *144,968* |
| | **TOTAL Board of Pharmacy** | | $   144,968 |
| | **Public Safety** | | |
| | **U.S. DEPARTMENT OF JUSTICE** | | |
| 16.540 | Juvenile Justice and Delinquency Prevention – Allocation to States | 87,456 | 272,076 |
| 16.554 | National Criminal History Improvement Program (NCHIP) | | 96,727 |
| 16.560 | National Institute of Justice Research, Evaluation, and Development Projec Grants | | (25,488) |
| 16.588 | Violence Against Women Formula Grants | | 510,284 |
| 16.593 | Residential Substance Abuse Treatment for State Prisoners | 200,475 | 248,330 |
| 16.738 | Edward Byrne Memorial Justice Assistance Grant Program | 1,535,867 | 2,432,756 |
| 16.741 | DNA Backlog Reduction Program | | 614,754 |
| 16.742 | Paul Coverdell Forensic Sciences Improvement Grant Program | 94,136 | 101,545 |
| 16.922 | Equitable Sharing Program | | 938,916 |
| 16.UN1 | DEA Task Force | | 142,479 |
| 16.UN5 | U.S. Marshall Service | | 16,316 |
| | *Total U.S. DEPARTMENT OF JUSTICE* | | *5,348,695* |
| | **U.S. DEPARTMENT OF TRANSPORTATION** | | |
| 20.218 | National Motor Carrier Safety | | 2,625,563 |
| 20.232 | Commercial Driver's License Program Improvement Grant | | 322,793 |
| 20.234 | Safety Data Improvement Program | | 187,100 |
| 20.237 | Fed Aviation Adm-FAA | | 114,023 |
| 20.600 | State and Community Highway Safety | 4,784,962 | 7,123,194 |
| 20.614 | National Highway Traffic Safety Administration Discretionary Safety Grants and Cooperative Agreements | | 92,920 |
| | *Total U.S. DEPARTMENT OF TRANSPORTATION* | | *10,465,593* |
| | **EXECUTIVE OFFICE OF THE PRESIDENT** | | |
| 95.001 | High Intensity Drug Trafficking Areas Program | | *1,061,519* |
| | **DEPARTMENT OF HOMELAND SECURITY** | | |
| 97.001 | Mississippi Interoperable Communications Grant | 2,592,842 | 2,592,842 |

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| 97.056 | FY16 Port Security Grant | | (73,000) |
| 97.067 | Homeland Security Grant Program | 3,305,077 | 4,141,415 |
| 97.089 | Driver's License Security Grant Program | 2,290,358 | 2,408,376 |
| | ***Total DEPARTMENT OF HOMELAND SECURITY*** | | *9,069,633* |
| | **TOTAL Public Safety** | | **$ 25,945,440** |

### Public Service Commission

| | | | |
|---|---|---|---|
| | **U.S. DEPARTMENT OF TRANSPORTATION** | | |
| 20.700 | Pipeline Safety Program Base Grant | | (20,317) |
| 20.720 | Damage Prevention | | 30,000 |
| 20.721 | 811 One Call | | 44,293 |
| | **TOTAL Public Service Commission** | | **$ 53,976** |

### Rehabilitation Services

| | | | |
|---|---|---|---|
| | **U.S. DEPARTMENT OF EDUCATION** | | |
| 84.126 | Rehabilitation Services – Vocational Rehabilitation Grants to States | | 42,557,302 |
| 84.177 | Rehabilitation Services - Independent Living Services for Older Individuals Who are Blind | | 268,175 |
| 84.187 | Supported Employment Services for Individuals with the Most Significant Disabilities | | 292,920 |
| | ***Total U.S. DEPARTMENT OF EDUCATION*** | | *43,118,397* |
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| 93.369 | ACL Independent Living State Grants | | 215,004 |
| 93.464 | ACL Assistive Technology | | 379,162 |
| | ***Total U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES*** | | *594,166* |
| | **SOCIAL SECURITY ADMINISTRATION** | | |
| 96.001 | Social Security – Disability Insurance (DI) | | 25,626,433 |
| 96.008 | Social Security – Work Incentives Planning and Assistance Program | | 304,060 |
| | ***Total SOCIAL SECURITY ADMINISTRATION*** | | *25,930,493* |
| | **TOTAL Rehabilitation Services** | | **$ 69,643,056** |

### Secretary of State

| | | | |
|---|---|---|---|
| | **ELECTION ASSISTANCE COMMISSION** | | |
| 90.404 | 2018 HAVA Election Security Grants | 427,460 | *705,573* |
| | **TOTAL Rehabilitation Services** | | **$ 705,573** |

### Soil and Water Conservation Commission

| | | | |
|---|---|---|---|
| | **U.S. DEPARTMENT OF AGRICULTURE** | | |
| 10.069 | CRP Plan Development | | 5,337 |
| 10.902 | Soil and Water Conservation | 175,585 | 2,693,585 |
| 10.904 | Rocky Carter Bayou | | 1,216,140 |
| 10.912 | Ecological Site Description/GLCI 113 | | 33,126 |
| 10.913 | WQ Liaison | | 16,575 |
| 10.916 | NRCS Watershed Rehabilitation Program | | 510,030 |
| | ***Total U.S. DEPARTMENT OF AGRICULTURE*** | | *4,474,793* |
| | **TOTAL Soil and Water Conservation Commission** | | **$ 4,474,793** |

### Supreme Court

| | | | |
|---|---|---|---|
| | **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | | |
| 93.586 | State Court Improvement Program | | *496,851* |

(continued)
See accompanying Notes to the Schedules of Expenditures of Federal Awards   33

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| | **TOTAL Supreme Court** | | **$              496,851** |
| | **Transportation** | | |
| | **U.S. DEPARTMENT OF TRANSPORTATION** | | |
| 20.200 | Highway Research and Development Program | | 81,316 |
| 20.205 | Highway Planning and Construction | 32,716,654 | 570,621,696 |
| 20.215 | Highway Training and Education | | 283,199 |
| 20.237 | CVISION Grant | | 135,000 |
| 20.301 | Railroad Safety | | 5,675 |
| 20.314 | Railroad Development | | 102,003 |
| 20.505 | Metropolitan Transportation Planning and State and Non-Metropolitan Planning and Research | 276,379 | 276,379 |
| 20.509 | Formula Grants for Rural Areas | 13,634,864 | 16,453,247 |
| 20.513 | Enhanced Mobility for Seniors and Individuals with Disabilities | 2,104,380 | 2,289,851 |
| 20.516 | Job Access and Reverse Commute Program | 100,973 | 101,285 |
| 20.521 | New Freedom Program | | 16,517 |
| 20.526 | Bus and Bus Facilities Formula Program | 204,117 | 1,816,186 |
| 20.933 | National Infrastructure Investments | 7,167,404 | 8,155,698 |
| | ***Total U.S. DEPARTMENT OF TRANSPORTATION*** | | *600,338,052* |
| | **Appalachian Regional Commission** | | |
| 23.002 | ACL Independent Living State Grants | | *6,250* |
| | **TOTAL Transportation** | | **$           600,344,302** |
| | **Treasury** | | |
| | **U.S. DEPARTMENT OF AGRICULTURE** | | |
| 10.665 | Schools and Roads – Grants to States | | *5,103,924* |
| | **TOTAL Treasury** | | **$               5,103,924** |
| | **Veterans Affairs Board** | | |
| | **U.S. DEPARTMENT OF VETERANS AFFAIRS** | | |
| 64.124 | All-Volunteer Force Educational Assistance | | *153,374* |
| | **TOTAL Veterans Affairs Board** | | **$                  153,374** |
| | **Wildlife, Fisheries and Parks** | | |
| | **U.S. DEPARTMENT OF DEFENSE** | | |
| 12.106 | Flood Control Projects (Passed-through from the U.S. Army Corps of Engineers). Identifying numbers assigned DACW38-91-H-0007, DACW01-3-92-0411, DACW38-3-09-176,DACW01-3-91-0500,DACW01-3-96-0023,DACW38-3-12-9, and DACW01-3-92-0410. | | *1,482,038* |
| | **U.S. DEPARTMENT OF THE INTERIOR** | | |
| 15.605 | Sport Fish Restoration | 46,555 | 4,933,840 |
| 15.611 | Wildlife Restoration and Basic Hunter Education | 366,023 | 8,074,064 |
| 15.615 | Cooperative Endangered Species Conservation Fund | 43,425 | 132,816 |
| 15.630 | Coastal Program | | 7,501 |
| 15.634 | State Wildlife Grants | | 232,147 |
| 15.650 | Research Grants (Generic) | 16,156 | 16,156 |
| 15.916 | Outdoor Recreation – Acquisition, Development and Planning | | 61,421 |
| | ***Total U.S. DEPARTMENT OF THE INTERIOR*** | | *13,457,945* |
| | **U.S. DEPARTMENT OF TRANSPORTATION** | | |
| 20.219 | Recreational Trails Program | 952,209 | *1,605,849* |

# STATE OF MISSISSIPPI

## SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS BY STATE GRANTEE AGENCY

## FOR THE YEAR ENDED JUNE 30, 2019

| CFDA Number | State Agency/Federal Department/Program Name | Amount Passed to Subrecipients | Federal Expenditures/Distributions/Issuances |
|---|---|---|---|
| | **DEPARTMENT OF HOMELAND SECURITY** | | |
| 97.012 | Boating Safety Financial Assistance | | 769,721 |
| 97.056 | FEMA-1604-DR (KAWP) | | 582,010 |
| | *Total U.S. DEPARTMENT OF HOMELAND SECURITY* | | *1,351,731* |
| | **TOTAL Wildlife, Fisheries and Parks** | $ | **17,897,563** |
| | **TOTAL EXPENDITURES OF FEDERAL AWARDS:** | $ | **7,636,162,594** |

**EXPLANATION OF FOOTNOTE REFERENCE:**
Program Number with UN denotes unknown CFDA numbers.
# The total expenditures for CFDA No. 17.225 include state expenditures of $60,625,477 and federal expenditures of $33,325,148.
@ Denotes federal programs with noncash benefits.

(This page left blank intentionally.)

# Notes to the Schedules of Expenditures of Federal Awards



(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

---

**NOTES TO THE SCHEDULES OF EXPENDITURES OF FEDERAL AWARDS**
**FOR THE YEAR ENDED JUNE 30, 2019**

---

## NOTE 1:  PURPOSE OF THE SCHEDULES

Office of Management and Budget (OMB) *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (contained in Title 2 of the U.S. Code of Federal Regulations Part 200),* requires a schedule of expenditures of federal awards showing total federal awards expended for each individual federal program as identified in the *Catalog of Federal Domestic Assistance* (CFDA).  To comply with this requirement, the Department of Finance and Administration required each state agency to prepare and submit a schedule of expenditures of federal awards.  Information contained in these schedules was combined by the Department of Finance and Administration to form the accompanying schedules of expenditures of federal awards.  Federal programs which have not been assigned a CFDA number have been identified.  Because the Schedule presents only a selected portion of the operations of the State, it is not intended to and does not present the Financial Position, Changes in Net Position or Cash Flows of the State.

## NOTE 2:  SIGNIFICANT ACCOUNTING POLICIES

A.   Basis of Presentation - The information in the accompanying schedules of expenditures of federal awards is presented in accordance with OMB Title 2 of the U.S. Code of Federal Regulations Part 200 (Uniform Guidance).  The Schedule of Expenditures of Federal Awards by Federal Department presents a summary of federal awards expended by federal department and CFDA number.  The Schedule of Expenditures of Federal Awards by State Grantee Agency presents federal awards expended by recipient agencies of the State of Mississippi.

- Federal Financial Assistance - Pursuant to the Single Audit Act Amendments of 1996 (Public Law 104-156) and Uniform Guidance, federal financial assistance is defined as assistance provided by a federal agency, either directly or indirectly, in the form of grants, cooperative agreements, loans, loan guarantees, property (including donated surplus property), interest subsidies, insurance, direct appropriations or other assistance.  Accordingly, nonmonetary federal assistance, including food commodities, immunizations and surplus property, is included in federal financial assistance and, therefore, is reported on the schedules of expenditures of federal awards.  Federal financial assistance does not include direct federal cash assistance to individuals or procurement contracts used to buy goods or services from vendors.

- Major Programs - The Single Audit Act Amendments of 1996 and Uniform Guidance establish a risk-based approach to determine which federal programs are major based on certain expenditure thresholds and risk criteria.  According to the state's Single Audit Report for the fiscal year ended June 30, 2019, federal expenditures, distributions or issuances totaled $7,636,162,594.  This established the threshold for Type A programs as those with federal expenditures, distributions or issuances which exceeded $22,908,488.  For the fiscal year 2019 audit, there were initially twenty-six programs with expenditures exceeding the Type A threshold.  Of those twenty-six, two High-Risk Type A programs and one Low-Risk Type A program fell below the Type A threshold based on actual expenditures.  Therefore, final assessment yielded only twenty-three Type A programs over the Type A threshold.  Of these twenty-three programs, eleven Type A programs were identified as low risk.  Risk assessments of Type B programs were performed until the appropriate number of high risk Type B programs were identified.  Therefore, for fiscal year 2019, sixteen federal award programs, comprising twelve high risk Type A programs and four high risk Type B programs, were audited as major programs for the State of Mississippi.

**STATE OF MISSISSIPPI**
**Notes to Schedules of Expenditures of Federal Awards (continued)**

*Catalog of Federal Domestic Assistance* - The *Catalog of Federal Domestic Assistance* (CFDA) is a government-wide compendium of individual federal programs. Each program included in the catalog is assigned a five-digit program identification number (CFDA number) which is reflected in the accompanying schedules. The first two digits of the CFDA number designate the federal agency and the last three digits designate the federal assistance program within the federal agency.

For programs that have not been assigned a CFDA number, the number shown in the Schedule is the federal agency's 2 digit prefix followed by "UN" and digits to identify one or more Federal award lines which form the program.

- *Cluster of Programs* – A grouping of closely related programs with different CFDA numbers that share common compliance requirements is considered a cluster of programs. The accompanying Schedules have been designed to present federal financial assistance information by clusters.

- *Amount Provided to Subrecipients* – The amount of federal assistance that the State provided to subrecipients under each federal program is presented in a separate column in the accompanying Schedules according to requirements in Uniform Guidance. A subrecipient is defined by Uniform Guidance as a non-federal entity that receives a subaward from a pass-through entity to carry out part of a federal program.

- *Indirect Cost Rate* – As detailed in Uniform Guidance, State Agencies may elect to charge a de minimis cost rate of 10% of modified total direct costs which may be used indefinitely if said Agencies have not previously negotiated a separate indirect cost rate with the federal entity. Except for those agencies listed in Appendix A, all other State agencies covered in this report have elected to use the 10% de minimis rate.

B. <u>Reporting Entity</u> - The accompanying schedules include all federal programs administered by the State of Mississippi, except for the programs accounted for by the major component unit, Universities, within the component units section of the financial statements, for the year ended June 30, 2019. Expenditures of federal awards provided to the state's public universities and related entities were audited by other auditors in accordance with statutory requirements and the provisions of Office of Management and Budget (OMB) *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (contained in Title 2 of the U.S. Code of Federal Regulations Part 200)*; and a separate report not yet issued as of April 30, 2020.

C. <u>Basis of Accounting</u> - Federal programs included in the accompanying schedules are accounted for in the state's governmental and proprietary funds. Governmental funds are accounted for by using the current financial resources measurement focus and the modified accrual basis of accounting and proprietary funds by using the economic resources measurement focus and the accrual basis of accounting, in conformity with accounting principles generally accepted in the United States of America as prescribed by the Governmental Accounting Standards Board. Negative amounts reflected in the accompanying Schedules represent adjustments or credits made in the normal course of business to amounts reported as expenditures in prior years.

Amounts reflected as distributions in the accompanying schedules for donated federal surplus property are based on an estimated average fair market value of 23.3 percent of the original acquisition cost as assigned by the federal government. The amounts reflected in the financial statements of the State of Mississippi for the fiscal year ended June 30, 2019, for distributed surplus property are valued at the handling and shipping costs, which more closely approximate fair market value at the date of the transfer of the surplus property to the State of Mississippi.

The value of food commodity distributions within the National School Lunch Program on the accompanying schedules was calculated using the U.S. Department of Agriculture, Food and Nutrition Service commodity price list in effect at the date of distribution.

**STATE OF MISSISSIPPI**
**Notes to Schedules of Expenditures of Federal Awards (continued)**

The state issues food stamp benefits in electronic form, and benefits are recognized as expenditures when recipients use the benefits.

D.  <u>Expenditures and Expenses</u> - Certain transactions relating to expenditures of federal awards may appear in records of more than one state grantee agency.  To avoid duplication and the overstatement of the aggregate level of federal awards expended by the State of Mississippi, the following policies have been adopted:

1.  When monies are received by one state grantee agency and redistributed (expended) to another state grantee agency (i.e., a pass-through of funds by the primary recipient state grantee agency to a subrecipient state grantee agency), the federal financial assistance will be reflected in the primary receiving/expending state grantee agency's accounts.

2.  Purchases of services between state grantee agencies using federal monies will be recorded as *expenditures* or *expenses* on the purchasing agency's records and as *revenues* for services rendered on the providing agency's records.  Therefore, the expenditure of federal awards is attributed to the purchasing agency, which is the primary receiving/expending state grantee agency.

## NOTE 3:  OTHER

A.  All federal expenditures/distributions/issuances included in the accompanying schedules represent assistance received directly from the federal government, unless otherwise noted.  Federal financial assistance received indirectly from the federal government (i.e., passed-through from entities outside of the State of Mississippi) is noted parenthetically.

B.  The accompanying schedules of expenditures of federal awards include distributions of donated surplus personal property (CFDA 39.003) of $1,708,017.  These distributions were valued based on an estimated average fair market value of 23.3 percent of the original acquisition cost assigned by the federal government.  These distributions were reported in the financial statements of the State of Mississippi for the year ended June 30, 2019, as charges for sales and services of $718,522.  The amount was based upon handling and shipping costs at the date of transfer to the state.

C.  Expenditures reflected in the CFDA 14.228 - Community Development Block Grants/State's program include disbursements made for grants and new loans totaling $1,036,980.  Program income generated by the program in previous years was used to make these grants and new loan payments.  In subsequent years, the program income generated from the repayment of loans will be deposited into a revolving loan fund to be redistributed to the local governments under CFDA 14.228 for program activities.  At June 30, 2019, the outstanding loan balance for the program totaled $3,817,445.

D.  The Unemployment Insurance program (CFDA 17.225) is administered through a unique federal-state partnership that was founded upon federal law, but implemented through state law.  For the purposes of presenting the expenditures of this program in the accompanying schedules of expenditures of federal awards, both state and federal funds have been considered federal awards expended as denoted with an # to the right of the CFDA number.  The breakdown of the state and federal portions of the total program expenditures is as follows:

|                  |              |
|------------------|-------------:|
| State Portion    | $ 60,625,477 |
| Federal Portion  |   33,325,148 |
| Total            | $ 93,950,625 |

E.  Expenditures reflected in CFDA 66.458 - Capitalization Grants for Clean Water State Revolving Funds - include loans to local governments for developing or constructing water treatment facilities.  The funding source for these loans includes federal grant funds and state funds.  In subsequent years, local governments will be required to repay these funds to the Mississippi Department of Environmental

39

**STATE OF MISSISSIPPI**
**Notes to Schedules of Expenditures of Federal Awards (continued)**

Quality.  When received, these funds will be redistributed to local governments through new loans for additional water treatment facility projects.  The outstanding loan balance for the year ended June 30, 2019, was $423,578,239.  Total disbursements for new loans for the year ended June 30, 2019, totaled $31,297,670.  Administrative costs associated with the program for the year ended June 30, 2018, totaled $1,076,275.

F.  Expenditures reflected in CFDA 66.468 - Capitalization Grants for Drinking Water State Revolving Funds - include loans to counties, municipalities and other tax exempt water systems organizations for construction of new water systems, the expansion or repair of existing water systems, and/or the consolidation of new or existing water systems.  The funding source for these loans includes federal grant funds and state funds.  In subsequent years, the entities will be required to repay these funds to the Mississippi Department of Health.  When received, these funds will be used to make new loans for the program activities.  The outstanding loan balance for the year ended June 30, 2019, was $172,391,415.  Total disbursements for new loans made during fiscal year 2019 totaled $20,737,825.  Administrative costs associated with the program for the year ended June 30, 2019, totaled $1,168,780.

G.  State Aid Road Construction is a division of the Mississippi Department of Transportation (MDOT).  Federal financial assistance in the amount of $42,895,175 related to State Aid Road Construction is included on the schedules of expenditures of federal awards under Transportation Department program 20.205 - Highway Planning and Construction.

H.  Noncash Assistance.

The State of Mississippi participated in several federal programs in which noncash benefits were provided through the state to eligible program participants.  These noncash benefits programs are identified on the schedules of expenditures of federal awards with an @ to the right of the CFDA number.  A listing of these programs follows:

| CFDA Number | Program Name |
| --- | --- |
| 10.555 | National School Lunch Program (NSLP) |
| 10.559 | Summer Food Service Program for Children (SFSPC) |
| 39.003 | Donation of Federal Surplus Personal Property |
| 93.268 | Immunization |

- *CFDA 10.555 — National School Lunch Program received $192,112,358 including cash assistance and noncash assistance.  Cash assistance totaled $172,234,907 and noncash assistance totaled $19,877,451.*

- *CFDA 10.559 — Summer Food Service Program for Children expended $7,998,126 including cash assistance and noncash assistance.  Cash assistance totaled $7,961,485 and noncash assistance totaled $36,641.*

- *CFDA 93.268 — Immunization Grants received $46,869,900 including cash assistance and noncash assistance.  Cash assistance totaled $3,616,154 and noncash assistance totaled $43,253,746.*

I.  Contingencies.

The State of Mississippi has received federal grants for specific purposes that are subject to audit by the grantor agencies.  Entitlements to these resources are generally conditional upon compliance with the terms and conditions of grant agreements and applicable federal regulations, including the expenditure of resources for allowable purposes.  Any disallowance resulting from an audit may become a liability of the State.

**STATE OF MISSISSIPPI**
**Notes to Schedules of Expenditures of Federal Awards (continued)**

The Office of the Governor – Division of Medicaid has been notified by the Centers for Medicare and Medicaid Services (CMS) of a potential claim relative to potential overpayments by CMS under Medical Assistance Program grants that may have been made between 1981 and 2009 to a number of states, including Mississippi. CMS is working with the Division of Medicaid, as well as various other states, to resolve the discrepancies. The amount questioned by CMS approximates $28 million for the Division of Medicaid.

Additionally, the Division of Medicaid has also been notified by the Office of the Inspector General (OIG) of a potential claim relative to unallowable school-based Medicaid administrative costs for federal fiscal years 2010 through 2012. The amount determined by the OIG to be unallowable was $21,200,000.

J.   The State of Mississippi's major federal programs for the year ended June 30, 2019, were based on federal expenditures/distributions/issuances and risk assessments as defined in Note 2:A. Those programs are as follows:

| CFDA Number | Program Name |
| --- | --- |
| | Supplemental Nutrition Assistance Program Cluster |
| 10.551 | Supplemental Nutrition Assistance Program (SNAP) |
| 10.561 | State Administrative Matching Grants for the Supplemental Nutrition Assistance Program |
| 12.400* | National Guard Military Construction Projects |
| | WIA Cluster |
| 17.258 | WIOA Adult Program |
| 17.259 | WIOA Youth Activities |
| 17.278 | WIA/WIOA Dislocated Worker Formula Grants |
| | Highway Planning and Construction Cluster |
| 20.205 | Highway Planning and Construction |
| 20.219 | Recreational Trails Program |
| 84.010 | Title I Grants to Local Educational Agencies |
| 84.126 | Rehabilitation Services – Vocational Rehabilitation Grants to States |
| 84.367 | Support Effective Instruction State Grants |
| | TANF Cluster |
| 93.558 | Temporary Assistance for Needy Families (TANF) State Programs |
| 93.568 | Low-Income Home Energy Assistance |
| | CCDF Cluster |
| 93.575 | Child Care and Development Block Grant |
| 93.596 | Child Care Mandatory and Matching Funds of the Child Care and Development Fund |
| 93.658 | Foster Care – Title IV-E |
| 93.667* | Social Services Block Grant |

**STATE OF MISSISSIPPI**
**Notes to Schedules of Expenditures of Federal Awards (continued)**

| | |
|---|---|
| 93.767 | Children's Health Insurance Program |
| | |
| | Medicaid Cluster |
| 93.775 | State Medicaid Fraud Control Units |
| 93.777 | State Survey and Certification of Health Care Providers and Suppliers (Title XVIII) Medicare |
| 93.778 | Medical Assistance Program |
| | |
| 93.917* | HIV Care Formula Grants |
| | |
| 97.039* | Hazard Mitigation Grant |

*Denotes a Type B Program

**STATE OF MISSISSIPPI**
**Notes to Schedules of Expenditures of Federal Awards (continued)**

**Appendix "A"**

The following state agencies have negotiated an indirect cost rate and have not opted to use the de minimis rate of 10% as allowed in Uniform Guidance:

Board of Animal Health
Department of Education
Department of Agriculture and Commerce
Department of Employment Security
Department of Environmental Quality
Department of Finance and Administration
Department of Health
Department of Human Services
Department of Marine Resources
Department of Mental Health
Department of Transportation
Department of Rehabilitation Services
Department of Wildlife Fisheries and Parks
Division of Medicaid
Mississippi Attorney General
Mississippi Development Authority
Mississippi Emergency Management
Mississippi Military Department

(This page left blank intentionally.)

# Schedule of Findings and Questioned Costs
# Part 1 – Summary of Auditor's Results



(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

**SCHEDULE OF FINDINGS AND QUESTIONED COSTS
FOR THE YEAR ENDED JUNE 30, 2019**

**PART 1 - SUMMARY OF AUDITOR'S RESULTS**

*Financial Statements*

Type of auditor's report issued:                                      <u>**Unmodified**</u>

Internal control over financial reporting:

- Material weaknesses identified?                     <u> X </u> yes      ___ no

- Significant deficiencies identified?                 <u> X </u> yes    ___ none reported

Noncompliance material to financial
   statements noted?                                      <u> X </u> yes    ___ no

*Federal Awards*

Internal control over major programs:

- Material weaknesses identified?                     <u> X </u> yes      ___ no

- Significant deficiencies identified?                 <u> X </u> yes      ___ none reported

Type of auditor's report issued on compliance for major programs:

> <u>**Unmodified for all major programs except for Highway Planning and Construction Cluster (CFDA 20.205/20.219); Title I Grants to Local Educational Agencies (84.010); Supporting Effective Instruction State Grant (84.367); Hazard Mitigation Grant Program (CFDA 97.039); Children's Health Insurance Program (CFDA 93.767);  Medicaid Cluster (93.775/93.777/93.778); and State Survey Certification of Health Care Providers and Suppliers (Title XIX) Medicaid, which were qualified;  the SNAP Cluster (10.551/10.561);  CCDF  Cluster  (96.575/93.596);  TANF  Cluster (93.558), Social Services Block Grant Program (93.667); and the Low Income Home Energy Assistance Program (93.568) which are adverse; and except for the state's public universities for which a separate report will be issued.**</u>

Any audit findings disclosed that are
   required to be reported in accordance
   with 2 CFR 200.516(a)?                                  <u> X </u> yes

**STATE OF MISSISSIPPI**
**Schedule of Findings and Questioned Costs**
**Part 1 - Summary of Auditor's Results (continued)**

**CFDA**
**Number**       **Major Program Identification**

SNAP Cluster
10.551          Supplemental Nutrition Assistance Program
10.561          State Administrative Matching Grants for the Supplemental Nutrition
                Assistance Program

12.400*         National Guard Military Construction Projects

WIA Cluster
17.258          WIOA Adult Program
17.259          WIOA Youth Activities
17.278          WIA/WIOA Dislocated Worker Formula Grants

Highway Planning and Construction Cluster
20.205          Highway Planning and Construction
20.219          Recreational Trails Program

84.010          Title I Grants to Local Educational Agencies

84.126          Rehabilitation Services – Vocational Rehabilitation Grants to States

84.367          Supporting Effective Instruction State Grants

TANF Cluster
93.558          Temporary Assistance for Needy Families (TANF) State Programs

93.568          Low-Income Home Energy Assistance

CCDF Cluster
93.575          Child Care and Development Block Grant
93.596          Child Care Mandatory and Matching Funds of the Child Care
                and Development Fund

93.658          Foster Care – Title IV-E

93.667*         Social Services Block Grant

93.767          Children's Health Insurance Program

**STATE OF MISSISSIPPI**
**Schedule of Findings and Questioned Costs**
**Part 1 - Summary of Auditor's Results (concluded)**

|  | Medicaid Cluster |
|---|---|
| 93.775 | State Medicaid Fraud Control Units |
| 93.777 | State Survey and Certification of Health Care Providers and Suppliers (Title XVIII) Medicare |
| 93.778 | Medical Assistance Program |
| 93.917* | HIV Care Formula Grant |
| 97.039* | Hazard Mitigation Grant |
| 93.796** | State Survey Certification of Health Care Providers and Suppliers (Title XIX) Medicaid |

*Denotes a Type B Program
**Program was not fully audited but Material Noncompliance was discovered during audit of Medicaid Cluster.  In order to properly report information in the Federal Audit Clearinghouse, program was listed as a Major Program so that audit finding could be entered.

Dollar threshold used to distinguish between
Type A and Type B programs:                                    $22,908,488

Auditee qualified as low-risk auditee?                    ____ yes    __X__ no

47

(This page left blank intentionally.)

# Schedule of Findings and Questioned Costs
# Part 2 – Financial Statement Findings



(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**FOR THE YEAR ENDED JUNE 30, 2019**

**PART 2 – FINANCIAL STATEMENT FINDINGS**

**Introduction**

This part of the Schedule of Findings and Questioned Costs presents audit findings classified as material weaknesses, significant deficiencies and material noncompliance that are related to the financial statements and are required to be reported in accordance with *Government Auditing Standards*.

Findings are arranged in order by state agency.  Each finding has one of the following designations:

- **Material Weakness** – A deficiency, or a combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the state's financial statements will not be prevented, or detected and corrected on a timely basis.

- **Significant Deficiency** – A deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

- **Material Noncompliance** – Matters coming to the auditor's attention relating to the state's compliance with certain provision of laws, regulations, contracts and grant agreements, noncompliance with which could have a direct and material effect on the determination of the financial statement amounts.

(This page left blank intentionally.)

## STATE OF MISSISSIPPI

---

### SCHEDULE OF FINDINGS AND QUESTIONED COSTS
### FOR THE YEAR ENDED JUNE 30, 2019

---

## PART 2 – FINANCIAL STATEMENT FINDINGS

**Finding Number**          **Finding and Recommendation**

**DEPARTMENT OF EDUCATION**

*Significant Deficiency*

| | |
|---|---|
| **2019-010** | Controls Should Be Strengthened over MAGIC Segregation of Duties, Business Role Assignments and Quarterly Security Certification Process. |
| **Repeat Finding** | No. |
| **Criteria** | *The Internal Control – Integrated Framework,* published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and the *U.S. Government Accountability Office Standards for Internal Control in the Federal Government* (Green Book) specify that a satisfactory control environment is only effective when control activities exist, such as proper segregations of duties. Segregation of duties is the sharing of responsibilities within a key process and dispersing the critical functions of that process to more than one person. |
| | Additionally, the *Mississippi Agency Accounting Policies and Procedures* (MAAPP) manual section 30.60.00 requires security roles in the Mississippi Accountability System for Government Information and Collaboration (MAGIC) to be assigned to an employee based on his or her job duties, and that security roles be reviewed quarterly by agencies to ensure duties are properly segregated. The Department of Finance and Administration (DFA) issued the *MAGIC Roles and Definitions* policy document to inform agencies of roles that should be separated to reduce conflicts as well as other role requirements. |
| **Condition** | The Mississippi Department of Education (MDE) submitted certifications to DFA quarterly during state fiscal year 2019 stating that it was in compliance with MAGIC security policies.  Upon review of the security roles assigned, the agency had conflicts to assigned duties, as detailed below. |
| | During our review of MAGIC security roles at MDE during fiscal year 2019, we noted: |

- Ten security role conflicts between accounts payable and accounts receivable functions;
- Three roles assigned to MDE personnel that are not allowed for the agency;
- Two roles required to be assigned at the agency but were not;
- Lack of effective review of security role information that was certified by the agency.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

| | |
|---|---|
| **Cause** | The agency did not properly review and monitor MAGIC security roles assigned to employees. |
| **Effect** | Failure to properly segregate duties and limit user access among agency personnel greatly increases the risk of fraud, misappropriation of assets, inappropriate changes to data or files, and unauthorized activity which can result in material misstatements of financial statements. |
| **Recommendation** | We recommend the Mississippi Department of Education strengthen controls over MAGIC security access and ensure that roles are properly assigned and duties are segregated. |
| **Views of Responsible Officials** | Management at the Department of Education concurs with the finding. See additional comments in the Corrective Action Plan on page 319 of this audit report. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

---

**DEPARTMENT OF FINANCE AND ADMINISTRATION**

*Material Weakness*

| | |
|---|---|
| **2019-014** | Strengthen Controls Over the Change Logs of the Statewide Payroll and Human Resource System (SPAHRS). |
| **Repeat Finding** | Yes; 2018-008; Material Weakness finding. |
| **Criteria** | Good internal controls dictate that all transactions and other significant events be clearly documented and readily available for examination.  This audit trail, or security audit log, documentation should include evidence on how transactions are initiated, processed, recorded, and summarized.  Proper audit trail documentation also includes evidence of transactions that may have been voided, deleted, or changed after approval and initiation.  A "change log" should also be maintained that summarizes any changes, especially those in the production environment.  Periodic reconciliations between the change log and a list of approved changes should be performed to ensure all changes have been approved and authorized. |
| **Condition** | During testwork performed for fiscal year 2019, we noted the following: |

- Security logging was not enabled in the Natural Security log settings;
- Reconciliations between approved changes and changes occurring in the change log are not being performed.

| | |
|---|---|
| **Cause** | There are inadequate controls surrounding SPAHRS security logging. |
| **Effect** | Failure to adequately log transactional changes and to periodically review logs for appropriateness could result in untimely modification of data, security configuration changes, or fictitious transactions. |
| **Recommendation** | We recommend that the Department of Finance and Administration enable the Natural Security logging functionality and strengthen controls over the periodic review of such logs. |
| **Views of Responsible Officials** | Management at the Department of Finance and Administration concurs with the finding. See additional comments in the Corrective Action Plan on page 321 of this audit report. |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| **2019-015** | The State of Mississippi Should Require Chief Fiscal Officers of State Agencies to hold Minimum Accounting Qualification and Attend Mandatory Training. |
| **Repeat Finding** | Yes; 2016-012, 2017-006, and 2018-024; Material Weakness Findings. |
| **Criteria** | *Section 7-7-3 Miss. Code Ann. (1972)* states that the State Fiscal Officer (as defined *by Section 21-104-6 Miss. Code Ann. (1972)* as the Executive Director of the |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

Department of Finance and Administration shall conduct training seminars on a regular basis to ensure that agencies have access to persons proficient in the correct use of the statewide accounting system.

*Section 7-7-211 Miss. Code Ann. (1972)* authorizes the State Auditor to establish training course and programs for the personnel of the various state and local governmental entities. These courses shall include, but are not limited to, topics on internal control, purchasing and property, governmental accounting and financial reporting, and internal auditing.

*The Internal Control – Integrated Framework* published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) specifies that a satisfactory control environment is only effective when there is a commitment to competence that demonstrates a commitment to retain competent employees. This principle of competency can be achieved through analysis of skills required for positions, training and development training.

**Condition**
During testing for fiscal year 2019, we noted, through inquiry and observation, that the overall expertise level of accounting staff in various state agencies was not consistent, and that job requirements often did not specify applicants hold any specific accounting or governmental knowledge. We also noted that, although the Department of Finance and Administration (DFA) held GAAP conversion and accounting training courses to aid state agencies in compiling financial information, it was not a mandatory requirement and often agency personnel did not attend. Likewise, qualification and skill requirements were not consistently applied to Chief Financial Officers throughout the various state agencies.

The lack of overall understanding and application of proper accounting standards required the centralized accounting function of the state, DFA, to prepare significant adjusting and reclassification entries in order to prevent material misstatement. While the majority of entries would not have materially misstated accounts individually, in the aggregate, without adjustment, the financials would have been materially misstated.

**Cause**
Lack of consistently applied agency qualifications for accounting personnel.

**Effect**
The failure of the State to hire and retain competent staff could result in material misstatement of the financial statements.

**Recommendation**
We recommend the Department of Finance and Administration implement mandatory training sessions for accounting personnel and Chief Fiscal Officers. Additionally, we recommend the State of Mississippi implement minimum qualifications for Chief Financial Officers.

**Views of Responsible Officials**
Management at the Department of Finance and Administration concurs with the finding. See additional comments in the Corrective Action Plan on page 322 of this audit report.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

---

*Significant Deficiency*
*Immaterial Noncompliance*

| | |
|---|---|
| **2019-016** | <u>Strengthen Controls Over the Vendor Master File and Issuance of Payments to One Time Vendors to Ensure Compliance with Internal Revenue Service Regulations.</u> |
| **Repeat Finding** | Yes; 2015-032, 2016-016, 2017-003, and 2018-032; Significant Deficiency Findings. |
| **Criteria** | The Department of Finance and Administration (DFA) is responsible for final approval of certain types of warrants issued by the State of Mississippi.  These warrants are initially approved at the Agency level and then routed to DFA for final approval.  Before warrants can be approved for payment, vendor information must be entered into the State's accounting system – Mississippi's Accountability System for Government Information and Collaboration (MAGIC).  Vendors are then assigned a unique numerical identifier so that payments can be documented and an audit trail can be reviewed. |
| | Occasionally, warrants need to be issued on a singular basis to vendors.  These "one-time vendor" warrants are assigned a default vendor number by agency and are not assigned a unique identifier.  If, during the course of business, the same vendor requires additional warrants, agencies are required to request vendor information and enter the vendor into the MAGIC system, thereby assigning a unique identifier for future transactions. |
| | In order to comply with *The Code of Laws of the United States of America* (26 U.S. Code Section 6041) regulations on the issuance of payments of $600 or more, DFA has written policies to prohibit the use of the "one-time vendor" distinction for any person or business issued a warrant for over $600 for services rendered.  DFA has classified certain expense general ledger accounts as "1099 vendor accounts" and will not approve warrants to any "one-time vendor" when these general ledger accounts are expensed. |
| **Condition** | During testwork performed for the fiscal year 2019 audit, we noted the following exceptions: |
| | • 1,963 instances in which the vendors classified as one time vendors were paid multiple warrants from the same state agency; therefore, vendor information was not appropriately requested or entered in the vendor master file; |
| | • Vendor master file data was not reviewed to ensure accuracy and completeness including W-9 Information. |
| **Cause** | DFA does not have adequate controls over the review of vendor master data. |
| **Effect** | Failure to periodically review vendor master data to ensure accurate and complete vendor information has been requested and entered can lead to an increased risk of creating fictitious, incorrect, or duplicate payments and a possible misstatement of |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

|  |  |
|---|---|
|  | financial position.  Additionally, failure to review one-time vendor payments could result in erroneous tax reporting. |
| **Recommendation** | We recommend that the Department of Finance and Administration strengthen policies over the use of the one-time vendor code and conduct a regular review of the vendor master file to ensure complete and accurate vendor information has been entered. |
| **Views of Responsible Officials** | Management at the Department of Finance and Administration acknowledges the finding. See additional comments in the Corrective Action Plan on page 324 of this audit report. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

## DEPARTMENT OF HEALTH – DRINKING WATER SYSTEMS IMPROVEMENTS REVOLVING LOAN FUND

*Material Weakness*

| | |
|---|---|
| **2019-008** | Strengthen Controls Over the Cutoff of Loan Related Receivables and Payables. |
| **Repeat Finding** | No. |
| **Criteria** | Management is responsible for establishing and maintaining effective internal control over financial reporting, including the basic financial statements and related notes to the financial statements.  Internal controls should allow management or employees in the normal course of performing their assigned functions to prevent or detect material misstatements in the financial reporting of all funds. |
| **Condition** | Drinking Water Systems Improvements Revolving Loan Fund (Fund) procedures for the proper cutoff of loan related receivable and payables incurred before year-end but paid either during or after the lapse period need to be established. |
| **Cause** | Although Fund internal control procedures in place at year-end include a process for the identification and recording of accruals, the process did not include a step to fully consider those items charged into general ledger account 67998000: Prior Year Expense during the subsequent fiscal year. |
| **Effect** | As a result, an audit adjustment was proposed and recorded related to the cutoff of these loan related receivables and payables. |
| **Recommendation** | We recommend management expand the year-end close process or the GAAP Packet preparation process over the cutoff of loan related receivables and payables to include an evaluation of those items charged to general ledger account 67998000: Prior Year Expense in the subsequent fiscal year. |
| **Views of Responsible Officials** | Management at the Department of Health – Drinking Water Systems Improvements Revolving Loan Fund concurs with the finding. See additional comments in the Corrective Action Plan on page 335 of this audit report. |

57

(This page left blank intentionally.)

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

---

**DEPARTMENT OF HUMAN SERVICES**

*Material Weakness*

| | |
|---|---|
| **2019-012** | <u>Controls Should Be Strengthened to Ensure Management's "Tone at the Top" Does Not Allow for the Circumventing of Policies, Procedures, State Law, and/or Federal Regulations.</u> |
| **Repeat Finding** | No. |
| **Criteria** | The *Internal Control – Integrated Framework* published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and the *U.S. Government Accountability Office Standards for Internal Control in the Federal Government* (Green Book) specify that a satisfactory control environment is only effective when there is a commitment to integrity and ethical values. This principle of "tone at the top" management serves as the foundation of all other components of internal control. |
| **Condition** | During fiscal year 2019, the Executive Director and several members of the Executive Management Team at the Mississippi Department of Human Services (MDHS) threatened and intimidated employees regarding pervasive and widespread fraud, waste, and abuse. Employees operated under widespread fear of retaliation for questioning the legality or appropriateness of any directive from the Executive Director or his team. Employees were aware of possible fraudulent activities and inappropriate actions regarding the Temporary Assistance of Needy Families (TANF) subgrantees, and did not report such activities to federal or state auditors when questioned. When auditors inquired why individuals did not confide these suspicions to those charged with governance or auditors, employees stated that they were scared of immediate termination or additional retaliation. |

Additionally, the Executive Director ceased the TANF State Plan approved method of procuring subgrantee services based on an independent scoring rubric and process and replaced the existing procurement method with a system where the director unilaterally decided when grants were awarded and for how much they were funded. Due to this change, one subgrantee's funding was increased from approximately $2 million to $20 million over three years.

The Executive Management Team in place during fiscal year 2019 did not exhibit appropriate "tone at the top" leadership. Management not only allowed, but also participated in, significant fraud, waste, and abuse of TANF funds. These practices not only severely limited resources that should have been available to those qualifying for TANF assistance, but could cause clawbacks of federal resources. Additionally, misuse of TANF funds, specifically intentional misuse of funds, can trigger penalty clauses as outlined in Uniform Grant Guidance. These penalty clauses could either be repayment of funds, or reduction in State assistance amounts in subsequent quarters.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

---

Examples of fraud, waste and abuse include:
- Employees from the Office of Monitoring within MDHS were pulled from subgrantees when issues were discovered in order to conceal questioned costs;
- Exorbitant conferences were held for MDHS employees;
- Fees and expenses for contractors were paid when contracts required contractor to pay for all expenses;
- First Class airfare and extensive travel expenses were paid for members of the Executive Management Team and non-employees;
- Subgrantees were encouraged to use specific vendors – specifically members of the Executive Director's family.

The Executive Director in place during the fiscal year under audit resigned his post in July 2019, and a new Executive Director was appointed as of August 2019. The new Executive Director replaced many members of the Executive Management Team and began implementing new policies. These new policies have not been audited as of the date of this report as they relate to the subsequent fiscal year.

**Cause**
Executive Management at MDHS did not possess or encourage ethical business practices or appropriate grant management.

**Effect**
Without ethical leadership and an appropriate "tone at the top", fraud, waste, and abuse can occur and lead to the intentional misuse of federal funds. The misuse of federal funds can cause a reduction in federal assistance for the State of Mississippi.

**Recommendation**
We recommend Management at the Mississippi Department of Human Services evaluate all policies and procedures to ensure ethical and appropriate business practices. Additionally, we recommend employees and management undergo training classes on exhibiting appropriate "tone at the top" leadership and adopting an ethical work culture.

**Views of Responsible**
**Officials**
Management at the Department of Human Services concurs with the finding. See additional comments in the Corrective Action Plan on page 327 of this audit report.

---

*Significant Deficiency*

**2019-013**
<u>Controls Should Be Strengthened over MAGIC Segregation of Duties, Business Role Assignments and Quarterly Security Certification Process.</u>

**Repeat Finding**
Yes; 2018-034; Significant Deficiency Finding.

**Criteria**
The *Internal Control – Integrated Framework* published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and the *U.S. Government Accountability Office Standards for Internal Control in the Federal Government* (Green Book) specify that a satisfactory control environment is only effective when control activities exist, such as proper segregation of duties.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

Segregation of duties is the sharing of responsibilities within a key process and dispersing the critical functions of that process to more than one person.

Additionally, the *Mississippi Agency Accounting Policies and Procedures* (MAAPP) manual section 30.60.00 requires security roles in the Mississippi Accountability System for Government Information and Collaboration (MAGIC) to be assigned to an employee based on his or her job duties, and that security roles be reviewed quarterly by agencies to ensure duties are properly segregated. The Department of Finance and Administration (DFA) issued the *MAGIC Roles and Definitions* policy document to inform agencies of roles that should be separated to reduce conflicts as well other role requirements.

**Condition**

The Mississippi Department of Human Services (MDHS) submitted certifications to the Department of Finance and Administration (DFA) quarterly during state fiscal year 2019 stating that it was in compliance with MAGIC security policies. Upon review of the security roles assigned, the agency had conflicts to assigned duties, as detailed below.

During our review of MAGIC security roles at MDHS during fiscal year 2019, we noted:

- Thirty-two security role conflicts between accounts payable and accounts receivable functions;
- Sixteen instances of roles assigned to MDHS personnel that have no matching security role;
- Seven instances of roles assigned to MDHS personnel that are not allowed for the agency;
- Seven instances in which roles were assigned to MDHS personnel without the required oversight roles being assigned;
- One instances in which roles were still assigned to employees after their employment ended with the agency;
- Lack of effective review of information that was certified by agency.

**Cause**

The agency did not properly review and monitor MAGIC security roles assigned to employees.

**Effect**

Failure to properly segregate duties and limit user access among agency personnel increases the risk of misappropriation of assets, inappropriate changes to data or files, and unauthorized activity which can result in material misstatements of financial statements.

**Recommendation**

We recommend the Mississippi Department of Human Services strengthen controls over MAGIC security access and ensure that roles are properly assigned, duties are segregated, and separated employees have their access removed in a timely manner.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

---

**Views of Responsible**
**Officials**           Management at the Department of Human Services concurs with the finding. See
                        additional comments in the Corrective Action Plan on page 328 of this audit report.

---

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

---

<u>**DEPARTMENT OF PUBLIC SAFETY**</u>

*Significant Deficiency*

| | |
|---|---|
| **2019-011** | <u>Strengthen Controls over the Purchase of Capital Assets.</u> |
| **Repeat Finding** | No. |
| **Criteria** | Management should have internal control procedures in place to ensure that capital asset transactions are recorded and paid for in each Fund timely and appropriately. |
| **Condition** | Certain capital asset expenses were purchased in one fund and an erroneous entry was recorded to a separate fund incorrectly. |
| **Cause** | Two vehicles were originally accounted for and recorded utilizing a purchase order in a separate fund of the Department. An additional erroneous journal entry was made to fund 2271100000 to also record the assets. |
| **Effect** | This resulted in $155,044 of the capital asset expenditures being incorrectly recorded in fund 2271100000 and an adjusting journal entry to correct the differences. |
| **Recommendation** | Management should institute a process to reconcile payments with outstanding purchase orders and the funds in which these entries are recorded. This will ensure that management reports are more accurate throughout the fiscal year, and lessen issues that may occur in the future. |
| **Views of Responsible Officials** | Management at the Department of Public Safety concurs with the finding. See additional comments in the Corrective Action Plan on page 329 of this audit report. |

---

(This page left blank intentionally.)

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

---

<u>DEVELOPMENT AUTHORITY</u>

*Material Weakness*

| | |
|---|---|
| **2019-017** | <u>Strengthen Controls over Financial Reporting.</u> |
| **Repeat Finding** | No. |
| **Criteria** | The entity is required to establish and maintain effective internal control over financial reporting to ensure that the information is reliable and accurate. |
| **Condition** | The prior year financial statements reported loan receivables for five separate funds based on the modified accrual basis instead of full accrual basis. As a result, the total fund balance at July 1, 2018 was understated by $183,546,047. |
| **Cause** | The correction was due to an error that was not identified in a timely manner. |
| **Effect** | The beginning fund balance for the five related funds were materially understated. |
| **Recommendation** | We recommend that Mississippi Development Authority review current procedures related to the review of prepared financial statements, and enhance procedures (as deemed necessary) to ensure that the review identify errors in a timely manner. |
| **Views of Responsible Officials** | Management at the Development Authority concurs with the finding. See additional comments in the Corrective Action Plan on page 331 of this audit report. |

---

(This page left blank intentionally.)

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

---

## OFFICE OF THE STATE TREASURER

*Significant Deficiency*

| | |
|---|---|
| **2019-009** | Strengthen Controls to Ensure Reports Issued Are Correct for End User. |
| **Repeat Finding** | No. |
| **Criteria** | *The Internal Control – Integrated Framework* published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) specifies that a satisfactory control environment is only effective when information and communication such as reports, identifies, captures, and communicates pertinent information in a form and timeframe that enables people to carry out their responsibilities. |
| **Condition** | During review of "Equity in Internal Investment Fair Market Value Adjustment", auditor noted support from QED (Treasury's Internal Investment Software) did not agree to confirmed amounts.  Inquiry with Treasury Investment Director noted the third party used to maintain market information for treasury internal system (QED) was not properly updating the system to reflect market values.  The initial report showed a market loss of $21,263,911.52; however, the confirmed amounts showed a market gain of $3,511,324.57. |
| | Department of Finance and Administration (DFA) will adjust equity in internal investment on a yearly basis to market value of investments.  Correct fair market value was not used in adjustment of asset account equity in internal investment pool. This resulted in an understatement of $24,775,236.09 to the statewide equity in internal investment pool. |
| **Cause** | Agency worked with a third party to correct internal systems to display market values properly; however, agency did not provide corrected copies of report to users. |
| **Effect** | Failure to reissue corrected reports in a timely manner resulted in an erroneous entry into the State Accounting System MAGIC.  Equity in Internal Investment was understated for fiscal year 2019 and required an audit adjustment. |
| **Recommendation** | We recommend the Office of the State Treasurer strengthen controls to ensure reports issued are correct for end user. |
| **Views of Responsible Officials** | Management at the Office of the State Treasurer concurs with the finding. See additional comments in the Corrective Action Plan on page 339 of this audit report. |

---

(This page left blank intentionally.)

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

---

## PRISON INDUSTRIES CORPORATION

*Material Weakness*

| | |
|---|---|
| **2019-001** | Controls Related to Segregation of Duties Should Be Strengthened. |
| **Repeat Finding** | Yes; 2018-036. |
| **Criteria** | A financial reporting system requires appropriate segregation of duties to ensure that all relevant information is processed in a timely manner and appropriately assimilated into the financial reporting process. |
| **Condition** | Certain deficiencies in internal control result from a lack of segregation of duties. |
| **Cause** | Due to the limited number of accounting personnel working for the Corporation, certain critical accounting duties have been combined and assigned to employees based on availability. During the year ended June 30, 2019, the majority of the accounting duties were performed by one individual. However, the Controller prepares and pays payroll with no documented review. Journal entries prepared by the Controller had no evidence of review either. The accounts receivable clerk handles both billings and collections and manages the customer master file. Similarly, the accounts payable clerk handles both disbursements and manages the supplier master file. |
| **Effect** | Inadequate segregation of duties prevents the Corporation from safeguarding its assets. |
| **Recommendation** | To the extent possible, duties should be segregated to serve as a check and balance to maintain the best control system possible. |
| **Views of Responsible Officials** | Management at the Prison Industries Corporation concurs with the finding. See additional comments in the Corrective Action Plan on page 333 of this audit report. |

----------------------------------------------------------------------------------------------

| | |
|---|---|
| **2019-002** | Controls Related to Maintenance of Source Documents Should Be Strengthened. |
| **Repeat Finding** | Yes; 2018-037; Material Weakness Finding. |
| **Criteria** | A financial reporting system requires an appropriate review function to ensure that all relevant information is processed correctly and appropriately assimilated into the financial reporting process. |
| **Condition** | There were instances during our audit whereby source documentation requested was not readily available. Many of the inventory cost invoices could not be located timely. Additionally, certain travel documentation tested did not include attached receipts, description of the expense or other documentation to substantiate business purpose. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

| | |
|---|---|
| **Cause** | The company does not have adequate processes to ensure source documents are retained and filed in a readily accessible location. |
| **Effect** | Inadequate controls over review and maintenance of source documentation could result in inaccurate accounting information. |
| **Recommendation** | We recommend policies be strengthened so that review functions and business purposes are documented and source documentation is better maintained. |
| **Views of Responsible Officials** | Management at the Prison Industries Corporation concurs with the finding. See additional comments in the Corrective Action Plan on page 333 of this audit report. |

| | |
|---|---|
| **2019-003** | Controls Over Inventory Should Be Strengthened. |
| **Repeat Finding** | Yes; 2018-038; Material Weakness Finding. |
| **Criteria** | Inventories held by the Corporation are an important part of its overall financial reporting system and requires appropriate controls over pricing, existence and obsolescence. |
| **Condition** | During our inventory cost testing, Differences were noted whereby certain costs used to extend the inventory did not agree with recent inventory prices. Also, some extensions on the June 30, 2019 inventory valuation by department were not mathematically correct. It was also noted that some inventory source documents are located at remote locations rather than the administrative central office. |
| **Cause** | The Corporation has a small staff and lacks entity level control structure that is needed to ensure that inventory is accounted for accurately. |
| **Effect** | Inadequate controls over the inventory control process could result in material misstatements. |
| **Recommendation** | We recommend policies be strengthened so that deficiencies noted above do not reoccur. The Corporation should implement policies, procedures and a review process to ensure inventory is accurately calculated and reported. |
| **Views of Responsible Officials** | Management at the Prison Industries Corporation concurs with the finding. See additional comments in the Corrective Action Plan on page 334 of this audit report. |

| | |
|---|---|
| **2019-004** | Controls Related to Property Control System Should Be Strengthened. |
| **Repeat Finding** | Yes; 2018-039; Material Weakness Finding. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

| | |
|---|---|
| **Criteria** | Fixed assets held by the Corporation are an important part of its overall financial reporting system and requires appropriate controls over existence and potential impairment. |
| **Condition** | The Corporation's subsidiary fixed asset schedules were never reconciled back to the adjusted depreciation schedules as of the June 30,2018 audit.  The June 30, 2018 audit entries were recorded on the general ledger without properly reconciling back to the fixed asset subsidiary, thereby resulting in discrepancies between the two. |
| **Cause** | This was an oversight by the accounting staff due to the lack of controls because of the size of the staff. |
| **Effect** | This caused delays in the current audit due to beginning balances per the fixed asset subsidiary having to be reconciled. Inadequate controls over property could result in material misstatements. |
| **Recommendation** | We recommend policies be implemented to reconcile back the fixed asset subsidiary records back to the general ledger for agreement. |
| **Views of Responsible Officials** | Management at the Prison Industries Corporation concurs with the finding. See additional comments in the Corrective Action Plan on page 334 of this audit report. |

| | |
|---|---|
| **2019-005** | <u>Controls Related to Pension and Postemployment Benefit Liability Should Be Strengthened.</u> |
| **Repeat Finding** | Yes; 2018-040; Material Weakness Finding. |
| **Criteria** | Pension and postemployment benefit liabilities and related deferred inflows and outflows held by the Corporation are an important part of its overall financial reporting system and requires appropriate controls over existence and obsolescence. |
| **Condition** | To a large extent, the Corporation relies on its external auditors to calculate the Corporation's allocation of pension and postemployment benefit liabilities. However, the external auditor cannot be considered part of an entity's system of control. Therefore, the adjustments calculated and proposed to the Corporation by the external auditor represent deficiencies in internal control. |
| **Cause** | The Corporation has a small staff and lacks the experience needed to ensure that these calculations are accounted for accurately. |
| **Effect** | Inadequate controls over pension and postemployment benefit liabilities could result in material misstatements. |
| **Recommendation** | We recommend the Corporation staff prepare the pension and postretirement calculations in the future and post the adjustments to these accounts prior to the audit. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

| | |
|---|---|
| **Views of Responsible Officials** | Management at the Prison Industries Corporation concurs with the finding. See additional comments in the Corrective Action Plan on page 334 of this audit report. |

---

| | |
|---|---|
| **2019-006** | Controls Related to Reconciliations, Review, and Close-out Process for Financial Reporting Should Be Strengthened. |
| **Repeat Finding** | Yes; 2018-041; Material Weakness Finding. |
| **Criteria** | A financial reporting system requires entity level controls to be constructed so reconciliations are prepared to support trial balance amounts, and an appropriate review function be put in place to ensure that all relevant information is accumulated correctly for general ledger close-out and financial reporting. |
| **Condition** | To a large extent, the Corporation relies on its external auditors as a buffer for corrections that are needed to the general ledger accounts.  As part of the audit, in addition to other areas noted previously, adjustments to receivables, revenue, bad debts, prepaid expenses, accounts payable, and accrued leave were necessary to present the Corporation's financial statements in conformity with generally accepted accounting principles. However, the external auditor cannot be considered part of an entity's system of control. Therefore, the adjustments calculated and proposed to the Corporation by the external auditor represent deficiencies in internal control. |
| **Cause** | The Corporation has a small staff and lacks entity level control structure that would be needed to ensure that comprehensive reconciliations are prepared, review processes are completed, and financial statements prepared in accordance with accounting principles generally accepted in the United States. |
| **Effect** | Inadequate controls over reconciliations, review, and the close-out process for financial reporting could result in material misstatements. |
| **Recommendation** | We recommend the Corporation implement policies to segregate as many accounting functions as possible. |
| **Views of Responsible Officials** | Management at the Prison Industries Corporation concurs with the finding. See additional comments in the Corrective Action Plan on page 335 of this audit report. |

---

*SIGNIFICANT DEFICIENCY*

| | |
|---|---|
| **2019-007** | Controls Related to Information Technology General Controls (ITGC) Should Be Strengthened. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 2 – Financial Statement Findings (continued)**

| | |
|---|---|
| **Repeat Finding** | Yes; 2018-042; Significant Deficiency Finding. |
| **Criteria** | Information reporting systems are a critical component of the overall financial reporting system. The Committee of Sponsoring Organizations of the Treadway Commission (COSO) developed a model for evaluating controls that has been adopted as the generally accepted framework for internal control and is widely recognized as the definitive standard against which organizations measure the effectiveness of their systems of internal control. |
| **Condition** | During the course of our audit, we noted certain deficiencies related to the information technology environment. The Corporation's servers were not maintained in a secure environment. The server room was not locked and lacked the expected environmental controls such as a dedicated air conditioning unit, temperature monitoring and backup generator, although an uninterruptible power supply (UPS) is used. The Corporation should revise its practice to ensure proper safeguarding of its servers and data. Certain ITGC responsibilities are contracted out to a third party. Nevertheless, the Corporation is still responsible for services provided by the third party and determining that its data is secure. From a broader perspective, we noted the Corporation did not have formally documented ITGC policies governing the security, availability, processing integrity, confidentiality and privacy of data. The Corporation did move to a cloud-based backup system, however the other issues as mentioned above had not been corrected as previously noted in the prior year audit. |
| **Cause** | The Corporation has a small staff and outsources key functions of its technology environment controls, with limited supervision. |
| **Effect** | Inadequate ITGC controls and policies could result in a loss of accounting information or interruption of the operations. |
| **Recommendation** | We recommend the Corporation enter into a written agreement with the third party and define how the third party is to secure its data, in addition to identifying measurable metrics to evaluate the services delivered by the third party service provider. We recommend the Corporation develop and implement a comprehensive set of ITGC policies. The Corporation should work with its outsourced provider to develop and implement policies to ensure all data is secure and move forward with a cloud based system. |
| **Views of Responsible Officials** | Management at the Prison Industries Corporation concurs with the finding. See additional comments in the Corrective Action Plan on page 335 of this audit report. |

(This page left blank intentionally.)

# Schedule of Findings and Questioned Costs
# Part 3 – Federal Award Findings and Questioned Costs



(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**FOR THE YEAR ENDED JUNE 30, 2019**

**PART 3 – FEDERAL AWARD FINDINGS AND QUESTIONED COSTS**

**Introduction**

This part of the Schedule of Findings and Questioned Costs presents audit findings required to be reported by *OMB Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards 2 CFR 200, Section 5.16*

Findings are grouped by federal funding agency and then organized by state agency. Findings within the state agency are listed in order by type of compliance requirement as listed in Appendix XI to the *OMB Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards 2 CFR 200.*

Each finding has one of the following designations:

❖ **Material Weakness** – A *material weakness in internal control over compliance* is a deficiency, or combination of deficiencies, in internal control over compliance such that there is a reasonable possibility that material noncompliance with a type of compliance requirement of a federal program will not be prevented, or detected and corrected on a timely basis.

❖ **Significant Deficiency** – A *significant deficiency in internal control over compliance* is a deficiency, or a combination of deficiencies, in internal control over compliance with a type of compliance requirement of a federal program that is less severe than a material weakness in internal control over compliance, yet important enough to merit attention by those charged with governance.

❖ **Material Noncompliance** – Conditions representing noncompliance with the provisions of laws, regulations, contracts or grant agreements, that in the auditor's judgment have a direct and material effect on a major federal program.

❖ **Immaterial Noncompliance** – Conditions representing noncompliance with the provisions of laws, regulations, contracts, or grant agreements that do not have a direct and material effect on a major federal program.

(This page left blank intentionally.)

## STATE OF MISSISSIPPI

## SCHEDULE OF FINDINGS AND QUESTIONED COSTS
## FOR THE YEAR ENDED JUNE 30, 2019

### PART 3 – FEDERAL AWARD FINDINGS AND QUESTIONED COSTS

### U.S. DEPARTMENT OF AGRICULTURE

**Finding Number**        **Finding and Recommendation**

**DEPARTMENT OF HUMAN SERVICES**

**ACTIVITIES ALLOWED/ALLOWABLE COSTS**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-030** | The Mississippi Department of Human Services Should Strengthen Controls to Ensure Compliance with Subrecipient Allowable Cost Activities. |
| **CFDA Number(s)** | 10.551 Supplemental Nutrition Assistance Program (SNAP)<br>10.561 State Administrative Matching Grants for the Supplemental Nutrition Assistance Program (SNAP)<br>93.558 Temporary Assistance for Needy Families (TANF)<br>93.575 Child Care and Development Block Grant (CCDF)<br>93.596 Child Care Mandatory and Matching Funds of the Child Care and Development Fund (CCDF)<br>93.667 Social Services Block Grant (SSBG) |

**Federal Award**

| | | |
|---|---|---|
| 12-35-2841 (SNAP) | G1701MSTANF | G1701MSCCDF |
| 2017IQ390345 | G1801MSTANF | G1801MSCCDF |
| 2018IQ390345 | G1901MSTANF | G1901MSCCDF |
| | G1702MSTANF | |

**Questioned Costs**        $94,164,608.  See chart at the end of finding for detailed information.

**Repeat Finding**        No.

**Statistically Valid**        Varying types of sampling and testing techniques were used; some are considered statistically valid and some are not.  During the initial planning phase of the audit, auditor identified population as two separate and distinct groups – 1) Payments made by MDHS for services other than direct assistance to recipients 2) Payments made to first tier subgrantees.  However, due to increased fraud risk during the audit, transactions were subdivided into many different populations so that statistical projection of error rates could be utilized.  High risk populations were examined at 100 percent, moderate risk populations were sampled individually, and low risk items were grouped in one population to sample.  Additionally, after initial testing, it was determined that fraud risk was still at a high level and a nomenclature review over the populations was performed to pull out specific transactions as individually significant.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

**Background**

Auditors were alerted to significant areas of fraud risk by the Governor of Mississippi on June 21, 2019. An internal audit performed by staff of MDHS uncovered a possible fraudulent scheme involving a third party contractor in the TANF program and the Executive Director of MDHS at that time (JD). Investigators from the OSA Investigative Division and financial auditors worked to piece together information about this scheme and subsequently indicted six individuals involved in a conspiracy to steal (by a variety of means) approximately $4 million in TANF funds. The initial investigation into the theft coincided with the fiscal year 2019 Single Audit. Due to this known fraud, auditors considered many areas of grant expenditures to be high risk. In order to properly account for and describe the significant areas of waste, fraud, and abuse that were uncovered during the subsequent investigation and audit, the finding format of this particular finding will vary.

**Criteria**

**Applicable Internal Controls**: *The Committee of Sponsoring Organizations of the Treadway Commission (COSO)* and *the United States Government Accountability Office (GAO) Green Book* dictates that in order for organizations to have effective internal control, the organization should have an effective control environment. A component of an effective control environment is proper oversight ability, accountability and commitment to ethical values.

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.404)* states "A cost is reasonable - if in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. The question of reasonableness is particularly important when the entity is predominately federally funded. In determining reasonableness of a given cost, consideration must be given to: (a) Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the non-Federal entity or the proper and efficient performance of the Federal award. (b) The restraints or requirements imposed by such factors as: sound business practices; arm's-length bargaining; Federal, state, local, tribal, and other laws and regulations; and terms and conditions of the Federal award. (c) Market prices for comparable goods or services for the geographic area. (d) Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the non-Federal entity, its employees, where applicable its students or membership, the public at large, and the Federal Government. (e) Whether the non-Federal entity significantly deviates from its established practices and policies regarding the incurrence of costs, which may unjustifiably increase the Federal award's cost."

*The Code of Federal Regulations (2 cfr 200.405 (a))* states "A cost is allocable to a particular Federal award or other cost objective if the goods or services involved are chargeable or assignable to that Federal award or cost objective in accordance with relative benefits received."

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

MDHS requires each subgrantee to attest by signature that they have read and understood the Subgrantee Manual issued by MDHS before payments on awards can be made. Additionally, each subgrant administered by MDHS is governed by the standard Subgrantee Agreement which sets out specific regulations that govern the subgrant.

The Office of Family Assistance, a Division of the Office of Administration for Children and Families and the grantor of TANF funds, states there are four tenets of the TANF program –

1) To provide assistance to needy families so that children can be cared for in their own homes or in the homes of relatives;
2) End the dependence of needy parents by promoting job preparation, work, and marriage;
3) Prevent and reduce the incidence of out-of-wedlock pregnancies; and
4) Encourage the formation and maintenance of two-parent families.

The Office of Family Assistance produced *Q&A: Use of Funds*, published on May 2, 2013, which clarifies the use of funds for "needy" families and is copied, verbatim, below:

**"Q1: May States help the non-needy with services that are consistent with TANF purpose one or two as long as those services fall outside the definition of assistance?"**

**"A1:** No. The first two statutory purposes (related to caring for children in their own homes and ending dependence) are expressly for the needy. Therefore, the statute envisions that States would serve only the needy when they are conducting activities or providing benefits that are reasonably calculated to accomplish TANF purpose one or two. This means that States would have to develop and apply criteria of financial need in these cases. However, States may use Federal TANF funds to help both the needy and the non-needy with benefits or services that are reasonably calculated to accomplish TANF purpose three or four (which relate to reducing out-of-wedlock pregnancies and the formation and maintenance of two-parent families). In serving the non-needy, States may use only segregated Federal TANF funds."

While states are allowed and encouraged to use creative mechanisms to accomplish the four main goals of TANF, the core purpose of the grant is to assist the needy. States are allowed, in their State Plan, to define the eligibility of needy per tenet and/or initiative. *The TANF State Plan*, as prepared by MDHS, states the following income limits/thresholds for determining the eligibility of individuals for each initiative:

- Intensive Youth Supervision Programs – To provide a diversionary, community based intensive supervision program for youth offenders. Individuals must be at or below 300 percent of the Federal Poverty Level.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- Child Care Enhancements – To end the dependence of needy parents on government benefits by promoting job preparation, work and marriage. Must be TANF participants, or low income families at risk of going onto TANF that are eligible for CCDF.
- Responsible Fatherhood Initiative – To encourage the formation and maintenance of two-parent families and prevent and reduce out-of-wedlock pregnancies. Financial eligibility determination is not required for this program.
- Post-Employment Assistance Programs – To end the dependence of needy parents on government benefits by promoting job preparation and work. Families eligible for this program are not required to be TANF eligible, but must be at or below 200 percent of the Federal Poverty Level.
- TANF Prevention/Intervention – To develop projects in community-based settings to prevent and reduce at-risk behaviors among youth and their families to prevent or break the cycle of welfare dependence. Financial eligibility determination is not required for this program.
- Healthy Choices, Brighter Future Initiative – To involve community, faith-based organizations, schools and families in the establishment of educational and training programs on youth leadership development and teen pregnancy prevention promoting abstinence. Financial eligibility determination is not required for this program.

Additionally, based on the availability of funds, the following initiatives are outlined in the TANF State Plan:

- TANF Summer Enrichment Program – no eligibility criteria are defined.
- TANF Work Program - no eligibility criteria are defined.
- Crisis Intervention Program – Families are not required to be TANF eligible but must be below 150 percent of the Federal Poverty Level.
- Funds may be made available to Attorney General to implement programs that serve at risk youth. No eligibility criteria are defined.
- TANF Funds may be used for temporary care of children in foster care. Families eligible for this program are not required to be TANF eligible but must be below 300 percent of the Federal Poverty Level.
- Families First Resource Centers – Individuals must be at or below 300 percent of the Federal Poverty Level.
- TANF funds may be used to provide family preservation services to families with dependent children. Families must be at or below 300 percent of the Federal Poverty Level.
- State Coalition of the Young Men's Christian Association (YMCA) for the purpose of developing and implementing statewide programs that serve the unmet needs of youth by way of Adolescent Offenders and Teen Leadership Programs. Individuals eligible for this program are not required to be TANF eligible, but must be at or below 300 percent of the Federal Poverty Level.

The *MDHS Subgrant/Contract Manual* states in Section 5, under the heading "Financial Management – Accounting Procedures" that "Separate financial records

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

shall be maintained for each subgrant. Separation serves record keeping requirements and also eliminates potential conflicts with the subgrantees' usual record keeping systems which may reflect a different fiscal year, or accounting by function or department rather than by subgrant or work activity. Each subgrantee shall maintain one set of accounting records for the entire subgrantee entity which shall separately identify the receipts and disbursements for each subgrant or other source of funds. The subgrantee shall be able to isolate and trace every subgrant dollar from receipt to expenditure and have on file appropriate supporting documentation for each transaction.

Examples of documentation are vendor invoices, bills of lading, purchase orders, payment vouchers, payrolls, bank statements and reconciliations, documentation to verify that only eligible clients were served; employee activity sheets to verify activities performed and the actual hours worked for each activity/subgrant; and, cash receipt logs to verify all funds received and the actual date of receipt."

Due to the substantial amount of questioned costs found during the fiscal year 2019 audit, questioned costs are grouped by category/type of expenditure below. Each bulleted item below will also state the specific law, regulation or control that was violated.

**Condition**

During the audit of fiscal year 2019, auditors noted that MDHS Executive Leadership (specifically the former Executive Director, JD) participated in a widespread and pervasive conspiracy to circumvent internal controls, state law, and federal regulations in order to direct MDHS grant funds to certain individuals and groups. Executive Director JD purposefully and willfully disregarded federal and state procurement regulations in order to award a substantial portion of grant funds from the TANF program to two specific subgrantees. These two subgrantees were granted monies under the *Families First Resource Center* portion of the TANF State Plan, which requires verification of eligibility criteria, defined as income at or below 300 percent of the Federal Poverty Level.

Executive Director JD then instructed these two subgrantees - Mississippi Community Education Center (MCEC) and Family Resource Center of North Mississippi (FRC) - on which organizations and individuals to fund with third tier grants. During the audit, auditors asked both of the two subgrantees to provide any evidence or verification to support claims that MDHS approved transactions or instructed the subgrantees to fund certain projects. Both claimed that instructions were verbal and could not provide proof. Auditors were able to verify some transactions were approved by Executive Director JD and MDHS executive staff (both current and former) by performing a review of MDHS internal documents. It is important to note that the subgrantees signed and attested to the subgrantees' responsibility to ensure compliance with the regulations, policies, guidelines, and requirements imposed by the Federal grantor agency and MDHS. The subgrantees also signed and attested that the relationship between MDHS and the subgrantee is not one of an employer-employee relationship, and that there should not be relationship such as principal and agent; partners; joint ventures; or any other similar relationship between MDHS and the Subgrantee.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Additionally, Executive Director JD instructed MDHS staff to disregard federal regulations concerning monitoring and allowable costs to ensure that grant funds continued to flow to these subgrantees. Executive Director JD, upon accepting the position of Executive Director in January 2016, continued to fund these two subgrantees with large grants in fiscal years 2017, 2018 and 2019. JD expanded on the existing grants with TANF and also began funding MCEC and FRC with additional awards generated from the CCDF, SNAP, MVAP, and TFAP federal programs. Total amount funded to each of these two subgrantees referenced above is noted below:

| Initial Awards plus/less any Modifications | | |
|---|---|---|
| | MCEC | FRC |
| TANF 2019 | $19,422,992 | $7,500,000 |
| TANF 2018 | $18,843,072 | $17,620,170 |
| TANF 2017 | $1,000,000 | $12,971,208 |
| SNAP 2019 | $1,034,685 | N/A |
| SNAP 2018 | $2,615,774 | N/A |
| CCDF 2019 (From MS Community College Board by grant from MDHS)* | $2,268,381 | $2,177,483 |
| CCDF 2018 (From MDHS directly) | $3,484,592 | $500,000 |
| SSBG 2018 | $3,000,000 | $3,000,000 |
| SSBG 2017 | N/A | $900,000 |
| Other unaudited federal grants**2019 | N/A | $497,987 |
| Other unaudited federal grants**2018 | $30,000 | $527,987 |
| Other unaudited federal grants** 2017 | $30,000 | N/A |
| *MCEC and FRC are second tier subgrants from MS Community College Board | | |
| **MAVP and TFAP, included for informational purposes only. | | |

Both MCEC and FRC also awarded subgrants of federal monies to different programmatic groups (hereafter "second tier subgrants"). Additionally, MCEC and FRC expended federal grant funds on administrative expenses and contracts. In order to opine on the allowable costs compliance requirement, and, due to MDHS' repeated material weakness and material noncompliance findings for Subrecipient Monitoring in prior years Single Audit Reports, auditors felt obligated to review programmatic and administrative expenditures at the first tier subgrantee level due to the materiality of the grant awards.

Audit work performed at MCEC and FRC determined that federal monies had been comingled with other sources of revenue – namely fundraising revenue. Both entities utilized classification codes to identify the source of the income when paying vendors or coding expenses. However, through inquiry and analysis, auditors were able to determine that MCEC used their "MDHS Grant Fund" bank account to pay all expenses of the nonprofit – whether the expenses were federal, state or private. Additionally, when audit personnel asked for details about their record keeping, auditors were told that even though fundraising monies were deposited into the "MDHS Grant Fund" bank account, they were then transferred to their own bank accounts for proper record keeping, but all expenses were still

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

made from the MDHS Grant Account; thereby using grant funds for all expenses whether federal, state or private.

Based on financial records of MCEC, MCEC did not maintain enough private, nongovernmental grant revenue to pay for the private expenditures made by the nonprofit (fundraising expenses, investments, profit sharing contributions, etc). Moreover, auditors were able to determine that MCEC falsified requested documents and general ledgers that were provided to the auditor. These falsified documents included contracts with artificial scopes to indicate possible adherence with TANF guidelines, forged signatures on contracts, general ledgers and expense reports with transactions removed, etc. Additionally, information provided to auditors often contradicted information that had been provided to MDHS. Finally, auditors noted that some transactions that were originally coded in the accounting software as "TANF expenditures" were changed to "Administrative expenditures" after staff from the Office of the State Auditor (OSA) inquired about TANF expenditures. Therefore, unless auditors could determine that private expenditures were paid for with 100 percent private funds, the expenditures were included in the nomenclature review of transactions.

FRC's financial records were found to be inconsistent in their treatment of different expenditures and the classification of those expenditures. Subgrant payments were coded to a variety of expense codes, and payees were coded as both vendors and "other names" in the financial records. In one instance, similar payments for a transaction were coded as "Consulting", "Contractual" and "Subsidies, Loans, and Grants". Based on information in the accounting records, FRC coded expenses based on preliminary budgetary figures and not based on actual cost categories.

The following exceptions were noted during the testwork of expenditures at the MDHS level and first tier subgrantee level. It should be noted that some recipients of funds from both MCEC and FRC were not aware that they were being awarded federal monies when granted contracts, grants, or awards. Neither MCEC or FRC provided the required federal information on any contract, grant, or award that stated the source of the funds, including the name of the Federal Program or the CFDA number. Without these required disclosures, auditors are unable to determine if contractors or second tier subgrantees of MCEC and FRC were aware of allowable cost criteria or restrictions.

All amounts questioned below are TANF funds unless otherwise noted. While this report is for fiscal year ended June 30, 2019, auditor determined that there were substantial questioned costs in prior fiscal years. When questioned costs were discovered in prior fiscal years, that information has also been included in this report for informational reasons.

<u>Personal Benefit Contracts/Related Party Contracts</u>

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*The Code of Federal Regulations (2 cfr 200.318(c))* states no employee, officer, or agent of a grantee may participate in the selection, award or administration of a contract supported by a federal award if he or she has a real or apparent conflict of interest. Conflicts of interest are defined as any instance when the officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated, has a financial or other interest in or a tangible personal benefit from a firm is considered for a contract supported by federal awards.

*The Code of Federal Regulations (2 cfr 200.459(a))* states that, in order to be paid as a consultant, a person must possess a special skill, and not be considered an officer or employee of the entity.

Signed subgrant agreements between MDHS and the subgrantees state in *Section XXIX – Conflict of Interest* - "Subgrantee must ensure that there exists no direct or indirect conflict of interest in the performance of the Subgrant. Subgrantee must warrant that no part of federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts in exchange for acting as an officer, agent, employee, subcontractor or consultant to the Subgrantee in connection with any work contemplated or pertaining to the Subgrant."

In *Section VI – Relationship of the Parties*, it states, "It is expressly understood and agreed that MDHS enters into this Subgrant with Subgrantee on a purchase of service basis and not on an employer-employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Subgrantee, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Subgrantee. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Subgrantee hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Subgrantee."

The *MDHS Subgrant/Contract Manual*, which subgrants must attest to have read and understood prior to receiving grant awards, states in Section 6, under the heading "Open and Free Competition" that "all procurement transactions shall be conducted in a manner that provides maximum open and free competition consistent with…applicable federal law. Procurement procedures shall not restrict or eliminate competition…Examples of what is considered to be restrictive of competition include, but are not limited to…noncompetitive contracts to consultants that are on retainer contracts…organizational conflicts of interest."

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted the following violations regarding conflicts of interest:

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- MCEC awarded contracts for services to members of Executive Director JD's immediate family, including a company owned by his brother-in-law and his nephew.

  o JD's brother-in-law was initially contracted for a business lease of property in the amount of $365,000. The property was located in Brookhaven, MS and was leased for a three-year period for a sum of $88,333 annually, with a $100,000 non-refundable security deposit. The effective date of the lease was upon "completion of the building" indicating that the property was not available for use when the lease was signed (February 2, 2019). However, the lessor was paid three payments totaling $365,050 between February 5, 2019 and February 7, 2019.

    On May 2, 2019, MCEC notified the lessor that they would be terminating the lease in 60 days from the date of the letter, and would request reimbursement of any unused rental payments and that those payments should be reimbursed on August 15 and September 15, 2019. Based on inquiry with MCEC personnel and a review of MCEC financial records, no repayment of any funds was ever made.

    **Questioned costs in fiscal year 2019- $365,050**

  o JD's brother-in-law was contracted as the "Leadership Outreach Coordinator" for a sum of $150,000. The contract term was from June 1, 2018 to September 30, 2019. However, the total fee of the contract was paid in a lump sum on June 1, 2018.

    **Questioned costs in fiscal year 2018 - $150,000**

  o JD's nephew was contracted to coordinate and create a Coding Academy and Website Design program in the amount of $139,500 for the period of February 1, 2019 to January 31, 2020. A lump sum payment in the amount of $139,500 was made on February 2, 2019. Additionally, travel in conjunction with the contract in the amount of $1,309 was reimbursed.

    **Questioned costs in fiscal year 2019- $140,809**

  o JD's nephew was also employed by MCEC from July 16, 2018 through February 15, 2019 at a semimonthly salary of $5,000 (annualized to $120,000 annually). For the period of February 1st through 15th in 2019, he was both contracted and employed by MCEC for an overlapping period. Gross pay for the period totaled $67,769.23.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Questioned costs in fiscal year 2019- $67,769**

- FRC awarded contracts and employed the same individuals as MCEC above.

  o JD's brother-in-law was employed by FRC from July 1, 2018 to July 15, 2019. Gross pay for the period totaled $93,600. These funds were paid via the Early Childhood Academy grant funded by MDHS through the CCDF grant.

    **Questioned costs for fiscal year 2019 - $93,600 (CCDF)**

  o JD's nephew was also employed by FRC from October 17, 2017 through July 12, 2018. Gross pay for the period totaled $55,625. For the period of June 15th through July 12, 2018, he was both contracted and employed by FRC for an overlapping period. Additionally, travel in conjunction with the contract in the amount of $14,368 was reimbursed. While the amount of the contract was paid prior to fiscal year 2019, it is included in this report because it was discovered by auditors during the 2019 audit.

    **Questioned costs in fiscal year 2018 - $63,975**
    **Questioned costs in fiscal year 2019 - $6,018**

  o JD's nephew was contracted to coordinate and create a Coding Academy and Website Design program in the amount of $130,000 for the period of June 15, 2018 to June 14, 2019. A lump sum payment in the amount of $130,000 was made on July 16, 2018. Additionally, travel in conjunction with the contract in the amount of $14,278 was reimbursed. The travel reimbursements are often from Mississippi to New Orleans and include mileage reimbursements, hotel stays, per diem reimbursement, in room dining in addition to per diem, etc. The contract states that the contract amount should be inclusive of all fees necessary to complete the program; therefore, even if the initial contract was made at an arm's length bargaining arrangement, the travel would be questioned. Based on inquiry with personnel at FRC, the travel was needed so that JD's nephew could obtain the necessary skills to teach the coding academy.

    **Questioned costs in fiscal year 2019- $144,278**

- MDHS also employed JD's nephew from September 16, 2016 to October 15, 2017 at varying salaries ranging from $36,177 to $45,000. His ending salary, $45,000, was paid from TANF funds in fiscal year 2018. Due to the intertwined and familial relationship, it is necessary to question the salary payments plus fringe. Actual salary payments plus fringe included $50,173 in FY 2017 and $19,477 in FY 2018.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

**Questioned costs in fiscal year 2017 - $50,173**
**Questioned costs in fiscal year 2018 - $19,477**

*Total amount paid to JD's brother-in-law – $608,650*
*Total amount paid to JD's nephew – $492,499*

*Total amount questioned in 2017 – $50,173*
*Total amount questioned in 2018 – $233,452*
*Total amount questioned in 2019 – $723,924*
*Total amount questioned in 2019 – $93,600 (CCDF)*

<u>Governmental Relations/Lobbyists</u>

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.450)* states that the cost of certain influencing activities associated with obtaining grants, contracts, cooperative agreements, or loans is an unallowable cost.  Additionally, paragraph (c) puts additional restrictions on nonprofit organizations, such as MCEC and FRC.  Those restrictions include any costs to influence the outcome of any federal, state, or local election, referendum, initiative, or similar procedure through in-kind or cash contributions, endorsements, publicity, or similar activity is unallowable.  Any legislative liaison activity, including attendance at legislative sessions or committee hearings, gathering information regarding legislation, and analyzing the effects of legislation is also unallowable.

*The Code of Federal Regulations Title 45. Public Welfare (45 cfr 93.100(a))* states that no appropriated funds may be expended by the recipient of a Federal contract, grant, loan, or cooperative agreement to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any of the following covered Federal actions: the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

The *MDHS Subgrant/Contract Manual*, which subgrantees must attest to have read and understood prior to receiving grant awards, sets out and defines the regulations that subgrantrees and lower-tier subrecipients must follow, including the "*Restrictions on Lobbying – Common Rule (P.L 101-121, Section 319)."*

*Internal Revenue Service Publication 4221-PC (Revised 3-2018)* states "A public charity is not permitted to engage in substantial legislative activities (commonly known as lobbying).  An organization will be regarded as attempting to influence legislation if it contacts, or urges the public to contact, members or employees of a legislative body for purposes of proposing, supporting or opposing legislation, or

87

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

advocates the adoption or rejection of legislation…. a 501(c)(3) organization may…risk losing its tax-exempt status and/or be liable for excise taxes."

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted the following violations regarding Governmental Relations/Lobbying:

- MCEC entered into multiple contractual agreements with consulting firms in order to maintain governmental revenue streams or to lobby on behalf of their organization, the Families First Initiative, or MDHS. Based on a nomenclature review of the financial records, auditors were able to determine the following unallowable lobbying contracts:

  o AvantGarde Strategies was paid $21,000 in FY 2019, but no contract was provided to the auditor.
  o Inside Capital was paid $14,000 in FY 2017; $150,325 in FY 2018; and $154,000 in FY 2019 for a total of $318,325.  No contract was provided to the auditor.
  o Lucas Compton was contracted by MCEC for services including sustaining federal revenue streams and bipartisan advocacy.  The contract was for the period of October 1, 2017 through October 1, 2018.  Actual payments included $36,000 in FY 2018 and $36,000 in FY 2019 for a total of $72,000.

     **Questioned costs for fiscal year 2017 – $14,000**
     **Questioned costs for fiscal year 2018 – $186,325**
     **Questioned costs for fiscal year 2019 – $211,000**

- FRC entered into a contractual agreement with Lucas Compton for $84,000 in fiscal year 2018.  Auditor did not have a copy of the contract to determine the performance period of the contract.

     **Questioned costs for fiscal year 2018 – $84,000**

  *Total amount questioned in 2017 – $14,000*
  *Total amount questioned in 2018 – $270,325*
  *Total amount questioned in 2019 – $211,000*

Consulting

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.459(a))* states that costs of professional and consultant services rendered by persons who are members of a particular profession or possess a special skill, and who are not officers or employees of the

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

non- Federal entity, are allowable, subject to paragraphs (b) and (c) when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Federal government.

*The Code of Federal Regulations (2 cfr 200.318(d))* states that the subgrantee must avoid acquisition of unnecessary or duplicative items.

Signed subgrant agreements between MDHS and the subgrantees state, in *Section XI "Agreements by Subgrantee" – A. General Responsibility*, that entities currently in a contractual relationship with MDHS to provide the same or similar services are not eligible to enter into a Contract/Subcontract with the Subgrantee.

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted the following violations regarding consultants:

- MCEC entered into multiple contractual agreements with consulting firms on behalf of their organization, the Families First Initiative, or MDHS.  These consulting contracts were often for duplicative services for overlapping time periods and were for large sums of money. Additionally, auditors could find no evidence that any type of procurement regulations were followed in securing these contracts. Both MCEC and FRC indicated to auditors that former Executive Director JD instructed both subgrantees to enter into contracts with some of these individuals.  Due to the excessive fees paid for these contracts and the duplicative services, auditor considers these costs to be unreasonable, and therefore questioned.  Additionally, many of the expenses coded to "Consulting" in MCEC's general ledger do not appear to be for legitimate consulting services.  Those expenditures will be detailed in additional sections based on the actual purpose of the purchases. Based on a nomenclature review of the financial records and a detailed review of contracts, auditors were able to determine the following questioned costs (names of private individuals will not be used due to restrictions on personally identifiable information (PII)):

  o The Stephen Group was contracted to provide strategic organizational, process and management consulting services and provide Families First with project management support surrounding the concept of generational poverty.  The term of the contract was for the period of November 28, 2017 through November 27, 2018 with a renewal option for December 1, 2018 through December 1, 2019.  The initial contract was not to exceed $500,000 and was to be split between MCEC and FRC.  Actual payments on the contract included $74,157 in FY 2018 and $139,256 in FY 2019 for a total of $213,413.
  o Consultant 1 was contracted to perform services but no copy of the contract was made available to auditors.  Payments included $34,000 in FY 2018 and $6,000 in FY 2019 for a total of $40,000.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

- o Consultant 2 was paid for consulting services regarding curriculum. Payments included $97,500 in FY 2018.
- o NCC Ventures was contracted to plan and coordinate industry sector initiatives with small businesses, and to provide training regarding workforce development. Contracted amount was $50,000. Actual payments totaled $41,667 in FY 2018; $4,167 in FY 2019 for a total of $45,834
- o Institute of Project Management was contracted for services coded as consulting in the general ledger; however, no contract was provided to auditors. Payments included $45,000 in FY 2018.

**Questioned costs for fiscal year 2018 – $292,324**
**Questioned costs for fiscal year 2019 – $149,423**

- FRC entered into contractual agreements with the same consulting organizations as MCEC, as follows:

  - o The Stephen Group was contracted to provide strategic organizational, process and management consulting services and provide Families First with project management support surrounding the concept of generational poverty. The term of the contract was for the period of November 28, 2017 through November 27, 2018 with a renewal option for December 1, 2018 through December 1, 2019. The initial contract was not to exceed $500,000 and was to be split between MCEC and FRC. Actual payments on the contract included $65,394 in FY 2018 and $142,053 in FY 2019 for a total of $207,447.
  - o CG Consulting was contracted for $16,000 from August 2, 2018 to July 31, 2019. The scope of the project was for professional development plans, training, and evaluation plans. Actual payments of $8,000 were made in fiscal year 2019.
  - o NCC Ventures was also contracted by FRC for workforce development training, but no contract was provided to auditors. Actual payments included $50,000 in FY 2018.

**Questioned costs for fiscal year 2018 – $115,394**
**Questioned costs for fiscal year 2019 – $150,053**

- MDHS also entered into a consulting contract with NCC Ventures during FY 2018 for a total of $72,900 from December 1, 2017 to May 31, 2018. The contract was paid out in equal installments of $12,150 from March 2018 to September 2018, which is four months after the contract end date. The entire contract amount of $72,900 was paid. This amount is questioned in Finding #2019-039.

*Total amount questioned in 2018 – $407,718*
*Total amount questioned in 2019 – $299,476*

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Payments for Sports/Coaches/Sporting Celebrities

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.459(a))* states that costs of professional and consultant services rendered by persons who are members of a particular profession or possess a special skill, and who are not officers or employees of the non- Federal entity, are allowable, subject to paragraphs (b) and (c) when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Federal government.

*The Code of Federal Regulations (2 cfr 200.434(a))* states the costs of contributions and donations, including cash, property, and services from the grantee to other entities are unallowable.

*The Code of Federal Regulations (2 cfr 200.469)* states the costs incurred for intramural activities, student publications, student clubs, and other student activities, are unallowable, unless specifically provided for in the Federal award.

*The TANF State Plan* states TANF funds may be used to fund the expansion of the Families First Resource Centers.  Through these centers, MDHS will advance the development, expansion and enhancement of a statewide network of community-based, prevention focused, parent resource centers that offer assistance to families. To encourage the formation and maintenance of two-parent families and reduce out of wedlock pregnancies the centers will:

- Provide early comprehensive support for parents;
- Promote the development of parenting skills;
- Promote the independence of families;
- Increase family stability;
- Improve family access to resources and opportunities for assistance;
- Focus on prevention of teenage pregnancy while supporting teen parents;
- Support the needs of families with children with disabilities; and,
- Provide a safe place for supervised children.

Families eligible for this program are not required to be TANF eligible, but must be at or below 300 percent of the Federal Poverty Level.

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted the following violations:

- MCEC expended federal grant monies to fund multiple sports programs.  MCEC could not provide any documentation supporting the correlation of these sports programs to any of the four tenets of TANF, nor did MCEC utilize any criteria to establish eligibility for

91

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

these programs.  Additionally, as detailed below, the auditor does not consider the costs of some of the programs reasonable or necessary to meet federal requirements.

o   Favre Enterprises was contracted to appear at several events, record promotions, and provide autographs for marketing materials from July 1, 2017 through July 31, 2018.   Additional contract information provided that the contract fee would be paid in installments and would include three (3) speaking engagements, one (1) radio spot and one (1) keynote address.  There was no mention of the contract price in the contract supplied to auditors.  When auditors requested further details on the performance of the contract, specifically the dates of any speaking engagements, MCEC provided a list of dates and events that fulfilled the contract terms; however, upon a cursory review of those dates, auditors were able to determine that the individual contracted did not speak nor was he present for those events.  Two payments were made to Favre Enterprises – one for $500,000 in December 2017 and one for $600,000 in June 2018.

Due to the inability to verify that any work was performed in order to fulfill the contract, and due to the unreasonable amount paid, the entire payment of $1,100,000 paid in FY 2018 is questioned.

o   Rick Rigsby Communications was paid $52,100 for motivational speaking in April 2019.  No contract was provided to auditor; therefore, correlation to TANF cannot be verified.

o   Diamond Design and Construction was paid $42,750 in FY 2019 to convert and line Field 8 for the North Jackson Youth Baseball League.  The field is located next to New Summit School, the school owned and operated by the Director of MCEC (NN).  According to inquiry, Field 8 was often utilized as a baseball field for New Summit Academy.

Due to the inability to verify that this work was related to TANF, including no correlation to any tenet of TANF, and due to the risk that this payment was made for the personal use of those involved with MCEC, this payment is questioned.

o   North Jackson Youth Baseball was paid $65,000 in FY 2017 to rent baseball fields.  MCEC stated the amounts were a donation to the organization.  Auditor noted that the Programmatic Director for MCEC (SP) and the spouse of one of the principals at MCEC (JN) are currently on the Board of Directors of the baseball organization.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, the provision against using TANF funds for intramural student activities, and the unreasonable amount paid, these payments are questioned.

o P360 Performance Sports was contracted to allow four Jackson schools to use the baseball fields for practice and training. The schools listed in the contract are schools that operate in at-risk areas. However, based on inquiry with the vendor, these amounts also allowed for a specialty, private team (Mississippi Bombers) to use the field, thereby making at least a portion of the payments unallowable due to lack of ability to verify that the payments were for needy individuals. There was no allocation of payments to isolate the portion of the payment that would be allowable. Auditor was provided one contract for $125,000 for a six-month period in 2019; however, actual payments included $72,000 paid in FY 2018 and $146,750 in FY 2019.

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, the provision against using TANF funds for intramural student activities, and the unreasonable amount paid, these payments are questioned.

o Overtime Sports was paid $37,500 for a sponsorship of a college tournament in FY 2019.

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, and the regulation noted above that sponsorships are disallowed under federal regulations, these payments are questioned.

**Questioned costs for fiscal year 2017 – $65,000**
**Questioned costs for fiscal year 2018 – $1,172,000**
**Questioned costs for fiscal year 2019 – $279,100**

- FRC expended federal grant monies to fund multiple sports programs. FRC could not provide any documentation supporting the correlation of these sports programs to any of the four tenets of TANF, nor did FRC utilize any criteria to establish eligibility for these programs. Additionally, as detailed below, the auditor does not consider the costs of some of the programs reasonable or necessary to meet federal requirements.

o Metro Area Community Empowerment Foundation (MACE) was contracted for $75,000 for conference keynotes, wheelchair sports exhibitions, motivational speaking and community events. Actual payments of $10,000 were made in FY 2018.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, these payments are questioned.

o Bigger than Ball Foundation, Inc. was contracted to produce "Bigger than Ball Moments" by well-known coaches and to offer coaching clinics for a total of $62,500. Actual payments of $7,350 were made in FY 2018 and $4,439 were made in FY 2019 for a total of $11,789. Contracts and agreements for these payments did not offer any correlation to one of the TANF tenets or seek to verify that there was any eligibility or programmatic reason for these clinics.

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, these payments are questioned.

o Retired Pro Football Players Charitable Foundation, Inc. was contracted for $75,000 to hold three (3) football camps for youth. Actual payments of $44,625 were made in FY 2018. Contracts and agreements for these payments did not offer any correlation to one of the TANF tenets or seek to verify that there was any eligibility or programmatic reason for these clinics.

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, these payments are questioned.

o Northeast Mississippi Football Coaches Association was paid $30,000 in FY 2019 for a sponsorship of the NEMFCA All-Star game.

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, and the regulation noted above that sponsorships are disallowed under federal regulations, these payments are questioned.

**Questioned costs for fiscal year 2018 – $61,975**
**Questioned costs for fiscal year 2019 – $34,439**

*Total amount questioned in 2017 – $65,000*
*Total amount questioned in 2018 – $1,233,975*
*Total amount questioned in 2019 – $313,539*

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Payments Directed by Former Executive Director

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.318(c)*) states that no employee, officer or agent of a grantee may participate in the selection, award, or administration of a contract supported by a federal award if he or she has a real or apparent conflict of interest.  Conflicts of interest are defined as any instance when the officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated, has a financial or other interest in or a tangible personal benefit from a firm is considered for a contract supported by federal awards.

*The Code of Federal Regulations (2 cfr 200.53(b)*) states "Improper payment includes any payment to an ineligible party, any payment for an ineligible good or service, any duplicate payment, any payment for a good or service not received (except for such payments where authorized by law), any payment that does not account for credit for applicable discounts, and any payment where insufficient or lack of documentation prevents a reviewer from discerning whether a payment was proper."

Signed subgrant agreements between MDHS and the subgrantees state in *Section XXIX – Conflict of Interest* - "Subgrantee must ensure that there exists no direct or indirect conflict of interest in the performance of the Subgrant. Subgrantee must warrant that no part of federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts in exchange for acting as an officer, agent, employee, subcontractor or consultant to the Subgrantee in connection with any work contemplated or pertaining to the Subgrant."

*Section VI – Relationship of the Parties*, states "It is expressly understood and agreed that MDHS enters into this Subgrant with Subgrantee on a purchase of service basis and not on an employer-employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Subgrantee, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Subgrantee. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Subgrantee hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Subgrantee.

The *MDHS Subgrant/Contract Manual*, which subgrants must attest to have read and understood prior to receiving grant awards, states in Section 6, under the heading "Open and Free Competition" that "all procurement transactions shall be conducted in a manner that provides maximum open and free competition consistent with…applicable federal law.  Procurement procedures shall not restrict or eliminate competition…Examples of what is considered to be restrictive of

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

competition include, but are not limited to…noncompetitive contracts to consultants that are on retainer contracts…organizational conflicts of interest.

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted both MCEC and FRC often utilized the same contractors and awarded grants to common subgrantees.  In some instances, joint contracts were issued under the "Families First" name, and in other instances, contracts were issued by both entities for the same scope and time period.  Based on inquiry with the subgrantees and a review of documentation at MDHS, auditors determined that former Executive Director JD often directed MCEC and FRC to award contracts and grants to certain people or organizations.  Contracts to these individuals or organizations were not procured using any type of competitive procurement and were not done in accordance with regulations defined in *2 cfr Part 200*.  Additional findings related to the procurement of these contacts can be found in finding #2019 - 039.  Due to the known conflict of interest, and inability to determine if these contracts were reasonably priced due to lack of procurement and the lack of arms-length bargaining, these contracts and grants are questioned as described below.

- Priceless Ventures, LLC and Familiae Orientem, LLC – A joint contract between MCEC, FRC and Priceless Ventures (PV) was structured under the name of "Families First of Mississippi" from June 1, 2017 through September 30, 2017.  The scope of the contract included Priceless Ventures, LLC and its owner serving as "Leadership Outreach Coordinator" for the Families First Initiative cofounded by MCEC, FRC and MDHS.  The contract was for $250,000 and was to be paid evenly by MCEC and FRC.  Due to the overlapping scopes and time periods of all contracts made to PV by MCEC and FRC, auditor cannot determine which payments were made to satisfy specific contracts.  The total amount paid will be summarized below.

  MCEC awarded additional contracts to Priceless Ventures, LLC and its owner for leadership development and the administration of a self-help program called "Law of 16."    According to "participant workbooks" created by MDHS to help administer the program, the program is a "model that is intended to help you understand - at a greater level, yourself, your values, your significance, and your potential."  MCEC awarded a "leadership training" contract from October 1, 2018 to September 30, 2019 in the amount of $130,000 and a contract for the self-help program from September 1, 2017 to August 31, 2018 in the amount of $130,000.  In addition, MCEC paid for conferences and advertising to promote the self-help program to individuals and other state agencies.  Travel expenditures for the owner of PV were also paid by MCEC.  Travel costs included first class airfare, expensive meals, luxury hotels, and entertainment costs.  Conference and travel expenses are questioned in full in their respective sections in this finding.  Actual payments to Priceless

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Ventures for MCEC totaled $500,000 in FY 2018 and $199,500 in FY 2019.

FRC also awarded contracts to PV from May 15, 2018 to September 30, 2018 in the amount of $500,000. The scope of the contract included "leadership outreach" and Law of 16 programs. Additionally, PV was awarded a contract from May 22, 2018 through September 30, 2018 from SNAP funds for "emergency food assistance." According to inquiry with individuals at FRC, no work was performed on this contract, but payment of $497,987 (SNAP funds) was made in full to fulfill contract terms. FRC also reimbursed travel expenses related to these contracts and those amounts are questioned in full in its respective section of this finding. Actual payments to Priceless Ventures for FRC totaled $1,643,820 in FY 2018 and $104,167 in FY 2019.

FRC also contracted with Familiae Orientem, LLC to conduct strategic development on a program created by MCEC, FRC, and MDHS called the "RISE Program." The $1,000,000 contract was from June 25, 2018 through June 24, 2019, and the two payments of $350,000 in June 2018 and August 2018 on the contract were made to the owner of PV, who is also an owner of Familiae Orientem. According to inquiry with personnel at FRC, these payments were to cover a program designed by Executive Director JD and the owner of PV. JD directed these payments to be made before the program had been designed, and required staff from FRC, MCEC and MDHS to attend a "Legislative Launch" and "planning session" at the Westin Hotel in June 2018. The terms of the contract stated that Familiae would secure, at its sole expense, all personnel required to implement the agreement; however, based on documentation obtained from the planning session referenced above, the personnel designated to carry out the scope of the agreement were employees of FRC, MCEC and MDHS. Inquiry with MDHS supports FRC's claim that, shortly after program launch, JD claimed the program would be taken "in house" at MDHS and that FRC and MCEC would no longer be involved. According to personnel at MDHS, the project was later abandoned. Actual payments totaled $350,000 in FY 2018 and $350,000 in FY 2019.

   **Total amount paid by MCEC – $699,500**
   **Total amount paid by FRC - $2,447,987**

Above costs are questioned due to the direct involvement of MDHS personnel; thereby, violating the "Conflict of Interest" regulations in the *MDHS Subgrant Manual*. Additionally, auditor questions whether the costs are reasonable in the performance of the federal award, or whether the costs were made at arm's length bargaining. Based on documentation provided, auditor cannot verify that work defined in

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

the scopes of these projects was completed as MDHS did not properly monitor these grants or request documentation to support payments. Documentation obtained by auditor supports that no work was performed on portions of these contracts, even though payments were made in advance. Further, both FRC and MCEC contracted the same individual for the same services over the same time period, which indicate duplicative work charged to the federal grant. Finally, contract or supporting documentation does not define population served and whether it meets TANF eligibility criteria, nor can auditor find evidence of any direct or indirect correlation to the third or fourth tenets of TANF that do not require eligibility criteria.

**Questioned costs for fiscal year 2018 – $1,995,833**
**Questioned costs for fiscal year 2018 – $497,987 (SNAP)**
**Questioned costs for fiscal year 2019 – $653,667**

- Heart of David Ministries (HOD) – MCEC donated $25,000 to HOD in two separate transactions. These payments were coded as a "sponsorship" and "contribution" in the accounting records, and no contract or subgrant agreement was provided to auditors. One payment of $15,000 was made in FY 2018 and one payment of $10,000 was made in FY 2019. Auditor could find no invoice or justification for these payments, nor was auditor provided any subgrant or contract to support these payments as anything other than donations.

MDHS awarded subgrants to HOD Ministries in FY 2017, 2018, and 2019. HOD Ministries mission focuses on the personal development of young men, ages thirteen through nineteen. Programmatic material for the awards is similar in design to PV, both featuring the acronym "LYFE" or "Living Your Faith Extreme." HOD is considered a faith based organization under federal standards. Grants to faith-based organizations are allowed under TANF regulations; however, any contract or grant agreement must include conditions to implement restrictions on explicitly religious activities. Auditor could find no such conditions in the contracts or subgrantee agreements made to HOD. Additionally, these subgrants were made at the express direction of former Executive Director JD, and the son of the Executive Director of HOD was employed as a Deputy Administrator at MDHS when the initial contract to HOD was awarded.

The 2017 subgrant, from May 1, 2017 through April 30, 2018, was for $500,000; an additional subgrant, from May 1, 2017 through September 30, 2018, was for $1,500,000. The FY 2019 subgrant, from October 1, 2018 through December 31, 2019, was for $1,562,500. Actual payments were $271,349 in FY 2017; $900,000 in FY 2018 and $756,224 in FY 2019. *These costs are questioned in Finding 2019-032.*

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Above costs are questioned due to the direct involvement of MDHS personnel; thereby, violating the "Conflict of Interest" regulations in the *MDHS Subgrant Manual*. Additionally, auditor questions whether the costs are reasonable in the performance of the federal award, or whether the costs were made at arm's length bargaining. Finally, while subgrant includes a needs assessment with a loose correlation to TANF, agreement does not define population served and whether it meets TANF eligibility criteria. Agreement also fails to include required certifications from a faith-based organization.

**Questioned costs for fiscal year 2018 – $15,000**
**Questioned costs for fiscal year 2019 – $10,000**

- Lobaki Foundation – A joint contract between MCEC, FRC and the Lobaki Foundation (Lobaki) was structured under the name of "Families First, 2018 Mississippi" from September 1, 2018 through August 30, 2019. The scope of the contract included forming a virtual reality academy in which students would be taught how to create and build virtual reality experiences. The initial cost of the academy was $635,000 with payments to be split evenly between MCEC and FRC. However, the entire contract sum was paid in a lump sum check by FRC in September 2018.

  MCEC entered into an additional agreement with Lobaki alone to expand the initial contract for an additional $160,000. The entire contract sum was paid in a lump sum check by MCEC in January 2019.

  Auditors were not supplied any supporting documentation for the initial contract by MCEC when requested, and reached out to the Lobaki Foundation for information. According to Lobaki, the academy was only contracted for a single two-semester course and ended at the conclusion of those semesters. According to Lobaki, 60 students graduated the academy at a cost of $13,250 per student. There was no eligibility determination made by either FRC or MCEC if the students enrolled in the academy were considered TANF eligible.

  Auditors were presented with email correspondence between MDHS Deputy Executive Director of Programs (JB) and FRC in which FRC is presented with the scope for the Lobaki project. When members of FRC staff noted they had questions about the project, JB told FRC that he had spoken with Lobaki, and that there was no need to discuss the contract further. FRC was supplied a signed contract and pressed for a timeline by MDHS. Additionally, auditors were presented with an email from Executive Director JD informing Lobaki that he would

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

instruct "Families First" to wire transfer money to the Lobaki account, and apologized the payments had been stalled.

**Questioned costs for fiscal year 2019 – $795,000**

- Micah's Mission School, Inc. – A joint contract between MCEC, FRC and Micah's Mission was structured under the name of "Families First of Mississippi" from August 1, 2018 through July 31, 2019. The scope of the contract only included a description of the school as an "educational mission." There was no description on what the grant funds would be utilized, and no determination on the population that would benefit. The school is a private school funded by fundraisers and tuition. The initial contract was for $150,000, with FRC covering costs in the first six months and MCEC covering costs in the second six months of the contract. Actual payments for FY 2019 included $50,910 in from FRC and $26,667 from MCEC for a total of $77,577.

**Questioned costs for fiscal year 2019 – $77,577**

- Victory Sports Foundation – MCEC entered into a contract with Victory Sports Foundation from October 1, 2018 through September 30, 2019 to conduct three 12-week fitness "bootcamps." The contract amount was for $1,394,831 and included fitness programs in three separate counties. According to the supplied budget for the program, the contract fee was to pay for the staff/coaches of Victory Sports, a program design fee, equipment, onsite nurse, a $70,000 vehicle purchase, $20,000 trailer purchase, marketing and various other costs to administer the program. The materials provided did not indicate that any fees would be charged to participants in the program. However, review of documents received from Victory Sports indicated that participants in the fitness camps paid a fee to attend, and that no eligibility determination was made to verify participants were TANF eligible or needy. Additionally, the fitness program was offered to members of the Mississippi Legislature, other elected officials, and other political staffers for no charge. Auditor could see no evidence that participants of the program were aware that it was funded in part by federal grant monies. Actual payments included $1,309,183 in FY 2019.

**Questioned costs for fiscal year 2019 – $1,309,183**

- Fitness Program – FRC entered into a contract with an individual in order to assess and make recommendations concerning physical health and fitness components of Families Resource Centers of North Mississippi. The contract scope also included assessing and making recommendations for "growing feeding capacity in association with the Rise program" in conjunction with Familiae noted above. Auditor was not presented with a copy of the contract, but was provided the

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

scope of the contract. The scope was emailed to FRC from Executive Director JD in June 2018. Actual payments on the contract totaled one lump sum payment of $100,000 on June 26, 2018.

These costs are questioned due to the direct involvement of MDHS personnel; thereby, violating the "Conflict of Interest" regulations in the *MDHS Subgrant Manual*. Additionally, auditor questions whether the costs are reasonable in the performance of the federal award, or whether the costs were made at arm's length bargaining. Finally, contract or supporting documentation does not define population served and whether it meets TANF eligibility criteria, nor can auditor find evidence of any direct or indirect correlation to the third or fourth tenets of TANF that do not require eligibility criteria.

### Questioned costs for fiscal year 2018 - $100,000

- SBGI, LLC – SBGI was contracted by FRC from August 1, 2017 to July 31, 2018 to develop a "Center of Excellence" for Mississippi. The contract states that the Center will support and empower youth, whole families and veterans by aligning, optimizing and best leveraging existing programs, resources, initiatives and facilities to deliver the greatest outcomes and impact for individuals across Mississippi. The entire contracted amount of $250,000 was paid in one lump sum advance payment on August 28, 2017. Based on inquiry from FRC, this project was never completed. According to email correspondence from MDHS, the principal of SBGI was also contracted to perform services for Heart of David.

These costs are questioned due to the direct involvement of MDHS personnel; thereby, violating the "Conflict of Interest" regulations in the *MDHS Subgrant Manual*. Additionally, auditor questions whether the costs are reasonable in the performance of the federal award, or whether the costs were made at arm's length bargaining. Total contract fee was also paid in advance, and there is not supporting documentation to support that work was actually performed or completed on this project. FRC did not provide any documentation to support this payment other than the contract. Finally, contract or supporting documentation does not define population served and whether it meets TANF eligibility criteria, nor can auditor find evidence of any direct or indirect correlation to the third or fourth tenets of TANF that do not require eligibility criteria.

### Questioned costs for fiscal year 2018 - $250,000

- Restore2/Recover2 – MDHS entered into a contract with Recover2, LLC from December 10, 2018 to June 9, 2019 for opioid training for MDHS employees. Recover2 is not registered as a business with the Mississippi Secretary of State; however, Restore2 is a registered

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

business.  All payments on the contract were made to Restore2, but the contract was for Recover2.   Auditors concluded the contract contains a typographical error; however, it should be noted that contracts with businesses that are not properly registered, even if result of a typographical error, could not be considered legitimate contracts in the State of Mississippi.

The contract amount was for $48,000 and included 24 "sessions" of opioid training over the six-month period.  The entire contracted amount was paid from January 2019 through March 2019.  Documents provided to auditors and investigators at the Office of the State Auditor revealed that the opioid trainings did not actually occur, and in fact, the principal of Restore2 who supposedly conducted the trainings was in a luxury rehabilitation facility in Malibu, CA at the time of the contract – see additional questioned costs below related to the payment of these services by MCEC.  Evidence to support the payments on the contract (invoices, sign in sheets, etc.) was manufactured by individuals at MDHS.  These payments were made at the direction of Executive Director JD -  who visited the rehabilitation facility during the contract period, was aware the trainings did not take place, and was involved in a conspiracy to circumvent controls regarding these payments.

These costs are questioned due to the fraudulent nature of the contract and the documentation that was fabricated to justify the payments.  Personnel at MDHS willfully and deliberately circumvented existing controls in order to secure this contract and to assist in creating fraudulent documents to ensure payment of the contract.  It should be noted that other MDHS employees reported suspicions about this individual's contract to those charged with governance, who then alerted OSA to the possibility of fraud.  OSA's Investigative Division began an investigation immediately after the suspected fraud was disclosed.  On February 5, 2020, Special Agents from OSA arrested Executive Director JD, the owner and Director of MCEC (NN), the Assistant Executive Director of MCEC (ZN), the accountant for MCEC (AM), the owner of Restore2 (BD), and another former employee of MDHS in connection with payments made to Restore2 and other payments made by MCEC (those payments are reflected in the section "Personal Benefit" below).  Additionally, travel connected with these payments has been questioned under the section "Travel" and payments to the luxury rehabilitation center have been questioned below.

**$48,000 in costs are questioned in Finding 2019-032**

- Rise in Malibu – Rise in Malibu (Rise) is a luxury rehabilitation clinic located in Malibu, CA.  The cost of the rehabilitation is $40,000 monthly, which includes the cost of treatment, room, and basic needs.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

The owner of Restore2 (BD), who was a former employee of MDHS, and Executive Director JD conspired to send BD to the facility for a four- month treatment due to his addiction to narcotics.  While there, BD was under contract to conduct opioid addiction training classes to MDHS staff, as well as employed by MCEC.

Executive Director JD and MCEC also conspired to use TANF funds to pay for BD's stay at Rise.  Personnel from MCEC wired four payments to Rise over a five-month period (February – June) of $40,000 each.  MCEC coded this transaction to "curriculum" and named the facility "Rise-Malibu Training" in their financial records. After OSA began inquiring about the use of TANF funds in July 2019, the transactions were re-coded in the system to "consulting" and assigned "Bingo" (MCEC's private income source) as to the source of funds.  Regardless of the change in the system, TANF funds were used to fund the luxury rehabilitation center.

Due to the personal nature of these expenses, the lack of any correlation to TANF purpose or eligibility criteria, the lack of reasonableness and the fraudulent nature of these expenditures, the $160,000 paid to Rise is questioned.

Executive Director JD, BD, MCEC's Director (NN), and MCEC's Assistant Executive Director (ZN) have been indicted and charged with this alleged fraud and embezzlement.

**Questioned costs for fiscal year 2019 - $160,000**

*Total amount questioned in 2018 – $2,858,820*
*Total amount questioned in 2019 – $3,005,427*

Curriculum

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.445(a))* states costs of goods or services for personal use of the entity's employees are unallowable regardless of whether the cost is reported as taxable income of the employees.

The Office of Family Assistance produced *TANF-ACF-PI-2005-1 (Funding Childhood Education, School Readiness, Kindergarten, and Other Public Education Programs*, published on April 14, 2005, clarifies the use of funds for educational programs.  Per the guide, "public education is a State responsibility; therefore, States may not use Federal TANF for any educational activity that is a component of the State's system of free public schools.  By charging the Federal government for any part of these costs, the State would be passing on to the TANF

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

program the costs of the State's public education system…This prohibition applies regardless of the adequacy of funding for general public education from other sources."

Title XX of the *Social Security Act* establishes the Social Services Block Grant (SSBG).  Services funded by SSBG must be directed at one or more of five (5) broad statutory goals:

1) Achieving or maintaining economic self-support to prevent, reduce, or eliminate dependency;
2) Achieving or maintaining self-sufficiency
3) Preventing or remedying neglect, abuse, or exploitations of children and adults unable to protect their own interest or preserving, rehabilitating, or reuniting families;
4) Preventing or reducing inappropriate institutional care by providing for community based care, home-based care, or other forms of less intensive care; and
5) Securing referral or admission for institutional care when other forms of care are not appropriate.

The Office of Social Services Block Grant (SSBG) State Plan specifies that SSBG funds will be utilized by the MDHS Division of Aging and Adult Services and the MDHS Division of Youth Services.  The State Plan specifies that a person is eligible for SSBG funds only if they meet income eligibility criteria, and have an identifiable need, unless the services are mandated services of serving children in the custody and guardianship of the Department of Child Protective Services.

**Exceptions/Questioned Costs**: During testwork for activities allowed and allowable costs, the auditor noted the following questioned costs:

- ActiveEd, Inc. –   A joint Memorandum of Understanding (MOU) between MCEC, FRC and ActiveEd was structured under the name of "Families First of Mississippi" from July 1, 2018 through June 30, 2019.  The purpose of the MOU was to order a pilot program of kinesthetic learning using physical activity to teach Math, English/Language Arts, and Literacy standards from pre-kindergarten through second grade.  The pilot program was designed for schools or early childhood learning centers.   The initial contract was for $250,000, with FRC and MCEC equally dividing the cost of the program.  Actual payments for FY 2019 included one payment of $125,000 from MCEC in July 2018 and one payment of $125,000 from FRC in August 2018.

  Due to the inability to verify any stated correlation to TANF, supporting documentation about the program, and the regulation noted above that TANF money cannot supplant State's educational responsibilities, these payments are questioned.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Questioned costs for fiscal year 2019 - $250,000**

- Houghton Mifflin Harcourt – MCEC purchased $117,703 of "curriculum" from Houghton Mifflin Harcourt during fiscal year 2019. The funds were coded to "Curriculum Expense" in the general ledger, and the majority ($111,262) were paid with SSBG funds with the remaining $6,441 paid with TANF funds. MCEC's SSBG grant request specifies an expense of $200,000 for "Curriculum and Supplies"; however, a review of actual invoices indicated that the curriculum purchased was used for the private school associated with MCEC, and not for the community at large.

  Due to the inability to verify that the goods and services purchased were used to meet grant requirements, the lack of documentation to verify an identifiable need or income eligibility, and the suspicion that the goods and services were converted to personal use by MCEC, these costs are questioned.

  **Questioned costs for fiscal year 2019 – $111,262 (SSBG)**
  **Questioned costs for fiscal year 2019 – $6,441 (TANF)**

- Edmentum, Inc. – MCEC purchased $133,016 of "curriculum" from Edmentum during fiscal year 2019. The funds were coded to "Curriculum Expense" in the general ledger. Payments are for a digital curriculum and a "response to intervention" program for 1,500 students over a three-year time span. The payments are divided into 5 payments, the first and second payment each for $66,508. Only two payments were made as of June 30, 2019. Auditor could not verify that purchases were made for curriculum for the community at large and not the private school associated with MCEC.

  Due to the inability to verify that the goods and services purchased were used to meet grant requirements, the prohibition against supplanting State educational responsibilities with TANF funds, and the suspicion that the goods and services were converted to personal use by MCEC, these costs are questioned.

  **Questioned costs for fiscal year 2019 - $133,016**

  *Total amount questioned in 2019 – $500,719*

Donations/Gifts/Sponsorships

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*The Code of Federal Regulations (2 cfr 200.434(a))* states the costs of contributions and donations, including cash, property, and services from the grantee to other entities are unallowable.

*The Code of Federal Regulations (2 cfr 200.469)* states the costs of intramural activities, student publications, student clubs, and other student activities are unallowable, unless specifically provided in the Federal award.

*The Code of Federal Regulations (2 cfr 200.403(e))* states that in order for costs to be allowable under federal awards, they must be determined in accordance with generally accepted accounting principles (GAAP).

GAAP includes the concept of "substance over form." The substance over form concept means that the transactions recorded in the underlying financial records must reflect their economic substance rather than their legal form.

**Exceptions/Questioned Costs**: During testwork for activities allowed and allowable costs, the auditor noted the following questioned costs:

- University of Southern Mississippi Athletic Foundation - In October 2017, MCEC signed a "sublease" with the University of Southern Mississippi Athletic Foundation for $5,000,000 as "lease prepayments" for rental of a multi-purpose wellness center on the University's campus. The lease's term was for a five-year period from October 26, 2017 until July 31, 2022. At the time of the signing of the lease, the building had not yet been built, and the lease stated that the $5,000,000 was to fund certain additions, alterations and renovations to the new Wellness Center. The lease stated that MCEC would be permitted to use other University property in lieu of the Wellness Center until its construction was completed. The lease from the Athletic Foundation was then transferred to the University of Southern Mississippi (USM). The transfer of the lease was approved by the Institutes of Higher Learning (IHL) Board in their October 2017 Board Meeting. A review of the minutes of that Board Meeting state that the funding for the sublease between MCEC and the Athletic Foundation is from funding "via a Block Grant from the Mississippi Department of Human Services."

  The facility was completed in December 2019, with USM expected to begin to utilize the space in January 2020. Auditors inquired of USM officials if MCEC utilized other University property, as described in the lease. According to USM's records, MCEC utilized the Reed Green Coliseum one time for a Healthy Teens Rally on October 18, 2018. It is important to note that during the time of the "lease" to the Athletic Foundation, the Director of MCEC (NN) served as a Board Member to the Athletic Foundation.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

The $5,000,000 was paid to USM Athletic Foundation in two equal installments of $2,500,000 on November 6, 2017 and December 5, 2017.

When the lease from USM Athletic Foundation was viewed under scrutiny, auditors determined that the substance of the $5,000,000 payment to USM is a donation to the USM Athletic Foundation for the construction of the Wellness Center and not a lease of the property. The property was leased almost three years before its construction was completed; the rent was prepaid in order to build the space; any additional use of the property was limited to one occurrence in a three-year period; and the revenue did not appear to be classified as rental revenue on the USM Athletic Foundation form 990 (non-profit tax return).

**Questioned costs for fiscal year 2018 - $5,000,000**

- American Heart Association – MCEC funded various programs and initiatives of the American Heart Association through donations and sponsorships.  The American Heart Association did not sign subgrantee agreements and was not considered a contractor of MCEC. Therefore, no reporting on the use of the funds was requested or required.  Actual payments included $35,000 in FY 2017; $36,500 in FY 2018; and $24,000 in FY 2019 for a total of $95,500.  As donations and sponsorships are prohibited as an allowable cost, the payments are questioned.

    **Questioned costs for fiscal year 2017 - $35,000**
    **Questioned costs for fiscal year 2018 - $36,500**
    **Questioned costs for fiscal year 2019 - $24,000**

- The Library Foundation of Madison – MCEC donated $35,000 for a bookmobile/digital lab project in Madison County in June 2018. Supporting documentation for the transaction consists of a donor form wherein MCEC requested recognition on an engraved foundation stone in exchange for the donation.  As donations and sponsorships are prohibited as an allowable cost, the payments are questioned.

    **Questioned costs for fiscal year 2018 - $35,000**

- Fannin Fabrication Company/Mississippi State Highway Patrol (MS Hwy Patrol) – MCEC contracted and paid Fannin Fabrication Company $28,186 to build a "Rollover Simulator."  Total cost was paid in two equal installments of $14,093, one payment in FY 2018 and the second in FY 2019. The simulator was then donated to the MS Hwy Patrol.  Inventory records from the MS Hwy Patrol verify that the two simulators are owned by the Patrol, and that one was donated.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

As donations and sponsorships are prohibited as an allowable cost, the payments are questioned.

**Questioned costs for fiscal year 2018 - $14,093**
**Questioned costs for fiscal year 2019 - $14,093**

- Mississippi Military Family Relief Fund – MCEC donated $10,000 to the fund in FY 2019. The transaction is coded to "Benevolence" in the general ledger. The fund did not sign subgrantee agreements, and was not considered a contractor of MCEC. Therefore, no reporting on the use of the funds was requested or required. Actual payments included $10,000 in FY 2019. As donations and sponsorships are prohibited as an allowable cost, the payment is questioned.

**Questioned costs for fiscal year 2019 - $10,000**

- Financial records of MCEC show that on December 7, 2018 a $3,000 check was written to the bookkeeper of MCEC using TANF funds. The payee in the financial records is left blank, and the copy of the cashed check shows the payee as the bookkeeper. The check was coded to "Seminars and Continuing Education" in the general ledger. However, check stub contains hand written note that $3,000 cash was given to Executive Director JD. Auditor was unable to verify the purpose of the $3,000 payment; therefore, the amount is questioned.

**Questioned costs for fiscal year 2019 - $3,000**

- MCEC paid $38,737 in small donations/sponsorships to various Booster Clubs, races, foundations, student activity clubs, etc. during FY 2019. As donations and sponsorships are prohibited as allowable costs, these payments are questioned. Amounts paid over $1,000 are detailed below:
  - Speaker for Hattiesburg Rally $1,250
  - Murrah High School – Sound of Perfection Band - $1,000
  - Greater Pine Belt Community Foundation – Full time tutors - $13,200
  - Papa John's Pizza of South MS – Parade Float - $2,500
  - Canton Educational Foundation – $7,000
  - Junior League of Jackson – Touch A Truck - $2,500
  - National Guard Association of Mississippi – ½ of sponsorship - $2,500
  - National Strategic Planning and Analysis Research Center – sponsorship of Cybernetic City - $2,500

**Questioned costs for fiscal year 2019 - $38,737**

- FRC paid $16,680 in small donations/sponsorships to various Booster Clubs, pageants, student activity clubs during FY 2019. These

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

payments are classified as "sponsorships" in the general ledger.  As donations and sponsorships are prohibited as an allowable cost, these payments are questioned. Amounts paid over $1,000 are detailed below:

- o   Tupelo High School Cross Country Booster Club – timing chips and readers - $5,350
- o   Baldwyn Baseball – sponsorship - $5,000
- o   Mississippi Municipal League – sponsorship - $1,000
- o   Child Advocacy Center – sponsorship - $2,000
- o   Baldwyn High School Cheerleaders – sponsorship - $1,000
- o   Johnie E. Cooks Foundation Initiative – sponsorship - $1,000

**Questioned costs for fiscal year 2019 - $16,680**

*Total amount questioned in 2017 – $35,000*
*Total amount questioned in 2018 – $5,085,593*
*Total amount questioned in 2019 – $106,510*

Publications

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.400 (g)*) states that entities may not earn or keep any profit resulting from federal financial assistance, unless explicitly authorized by the terms and conditions of the award.

*The Child Care and Development Block Grant Act (CCDBG)* authorized CCDF funds to be spent to achieve one of the following goals:
1) Protect the health and safety of children in child care,
2) Promote continuity of access to subsidy for low-income families,
3) Better inform parents and the general public about the child care choices available to them, and
4) Improve the overall quality of early learning and afterschool programs.

Participants in the CCDF program and recipients of the benefits must meet defined eligibility criteria based on income and need.

**Exceptions/Questioned Costs**: During testwork for activities allowed and allowable costs, the auditor noted the following questioned costs:

- Bay View Funding/M&W Publishing (Bay View) – MCEC entered into a four-year commitment with Bay View to purchase copies of the book "Professional Grammar Simplified" in order to market and sell the book to organizations to whom MCEC was affiliated.  The books

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

were sold wholesale to MCEC, with the intent to resell for a profit. During the commitment, MCEC and M&W Publishing entered into a legal dispute. The dispute was settled in mediation, and MCEC returned any unsold publication inventory to M&W Publishing. Actual payments on the agreement totaled $905,000 in FY 2019.

Due to the unreasonable nature of the expenditure, the intent to profit from the sale of the book in violation of Program Income regulations, and the lack of any direct correlation to TANF, these funds are questioned. Additionally, any legal fees paid in relation to these questioned costs are also questioned. Legal fees were paid to two separate law firms (Bradley Arant and Watkins & Eager) in the amount of $10,212 in FY 2019.

**Questioned costs for fiscal year 2019 – $915,212**

- *Eli's Christmas* – MCEC purchased 2,600 copies of the children's book in January 2019 using funds from the Mississippi Community College Board (MCCB) grant. These funds were pass-through CCDF funds through MDHS. MDHS and MCCB had a Memorandum of Agreement (MOA) to establish an Early Childhood Academy (ECA) at participating community colleges. The purpose of the ECA was to focus on preparing practitioners and parents to ensure children are prepared for successful transition from Pre-K to K-12. The MOA specifies that the ECA will provide professional development, technical assistance and coaching for practitioners and assist with Resource and Referral (R&R) Network offices around the state. R&R offices serve to facilitate the referral of parents and providers, and to assist members of the public for purposes of referral to an appropriate agency/entity for resources. Additionally, the scope of the agreement between MCEC and MCCB states that the work is to provide coaching, training, professional development, etc. The scope does not include any reference to providing materials to eligible children.

  The author of the children's book is also related to the principal and owner of Restore2, LLC. Due to the relationship of Executive Director JD, the owner of Restore2 (BD) and the principals of MCEC, auditor cannot verify purchase was made at arm's length bargaining or in good faith.

  Additionally, the scope of the projects does not include providing books to children, nor do the agreements make any correlation to the eligibility requirements of CCDF. Actual payments for the book totaled $44,964 in FY 2019.

  **Questioned costs for fiscal year 2019 – $44,964 (CCDF)**

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*Total amount questioned in 2019 – $960,176*

Purchases of Real Property/Construction/Assets

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.311(c))* states that real property that is purchased using federal funds must be used for as long as it is needed for the original purpose, and that the entity must not dispose or encumber its title or other interests. Further, when property is to be disposed, the entity must obtain disposition instructions from the federal awarding entity or pass through entity, and must provide for one of the following: Entity may
   *1)*   Retain title after compensating the federal awarding agency,
   *2)*   Sell the property and compensate the federal awarding agency, or
   *3)*   Transfer title to the federal awarding agency or an approve third party.

*The Code of Federal Regulations (2 cfr 200.439 (b))* states, "The following rules of allowability must apply to equipment and other capital expenditures: (1) Capital expenditures for general purpose equipment, buildings, and land are unallowable as direct charges, except with the prior written approval of the Federal awarding agency or pass- through entity. (2) Capital expenditures for special purpose equipment are allowable as direct costs, provided that items with a unit cost of $5,000 or more have the prior written approval of the Federal awarding agency or pass-through entity. (3) Capital expenditures for improvements to land, buildings, or equipment which materially increase their value or useful life are unallowable as a direct cost except with the prior written approval of the Federal awarding agency, or pass-through entity."

*Decision of the Comptroller General of the United States, 42 Comp. Gen. 480 (1960)* reiterates that a State may not use TANF funds to construct or purchase buildings, or facilities or to purchase real estate.  Additionally, the guide "*Q&A: Use of Funds, TANF Program Policy Questions and Answers*" produced by the Office of Family Assistance states that this prohibition also applies to grantees and subrecipients including counties, nonprofit agencies, and contractors.

The *MDHS Subgrant/Contract Manual* states in *Section 7*, that "all property and assets purchased through MDHS subgrants shall be placed on inventory in accordance with the statutes of the State of Mississippi and the rules set forth in the State Property Officers Manual."

Additionally, the manual states that all equipment purchased with subgrant monies must be specifically authorized through the Cost Summary and Budget Narrative portions of the subgrant agreement, and that any deviation requires a formal modification of the subgrant.  The manual also states that any means of acquiring property shall be reviewed before any authorization by MDHS is given.

111

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Regarding property inventory, the manual details the following property inventory regulations:

Cameras, Televisions, Computers – Any item $250 or over should be reported to MDHS on an Inventory Control Sheet, listed on MDHS inventory, and marked with a "Property of MDHS Sticker"

Weapons, Two-Way Radios Equipment, Lawn Maintenance Equipment, Cellular Telephones, Chain Saws, Air Compressors, Welding Machines, Generators, Motorized Vehicles – Must be reported to MDHS on an Inventory Control Sheet, listed on MDHS inventory, and marked with a "Property of MDHS sticker" regardless of price.

All other items purchased for over $1,000 with a useful life of over one year - Must be reported to MDHS on an Inventory Control Sheet, listed on MDHS inventory, and marked with a "Property of MDHS sticker"

MDHS is responsible for conducting a periodic physical inventory of each subgrantee at least twice yearly, using the inventory control list submitted to MDHS. The manual also states that any property or equipment that is not being utilized or managed under the terms of the subgrant agreement and manual shall be recovered and redistributed. Lastly, the manual states that if a subgrant is terminated or not renewed, any equipment purchased under the subgrant with public funds or MDHS funds shall neither be transferred to another location nor remain at the present location under a new subgrant without prior written approval of the MDHS Executive Director, and that MDHS has the authority to recover the value of any missing property via demand on the head of the subgrantee agency, property officer or employee.

**Exceptions/Questioned Costs**: Auditor initially used sampling techniques to audit equipment purchased with grant funds; however, the inadequate level of record keeping and incomplete inventory logs required additional procedures. In addition, due to the high risk of fraud, waste, and abuse assigned to subgrantees based on initial testwork, further types of auditing methodology were used. The results below encompass questioned costs under each testing method.

During testwork for activities allowed and allowable costs, the auditor noted the following:

- MD Foundation – MCEC entered into an agreement with MD Foundation for a sum of $371,000 on January 1, 2018 for "Equine Assisted Learning" and "Equine Assisted Activities". The agreement does not have an expiration date and does not specify who the services will benefit, other than to state that individuals with mental or emotional disabilities benefit from equine training overall. On February 26, 2018, the owner of MD Foundation was paid $171,000. The transaction is classified as "Rent" in the underlying accounting records. Auditor was provided a general ledger by MCEC; however,

112

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

that showed this payment coded to "Contractual Services" indicating that MCEC edited the general ledgers before supplying them to auditors.  In both instances of recordkeeping, the payment was made from TANF funds.

On April 13, 2018, MD Foundation purchased a residence with acreage in Flora, MS for a purchase price of $855,000.  The loan amount for the purchase was for $684,000, $171,000 less than the purchase price.  A down payment of $169,096 was made on the residence.  Based on observation and inquiry, the residence appears to be the personal residence of the Director and Owner of MD Foundation.

MCEC paid an additional $200,000 directly to the bank that holds the note on the residence, and, on June 1, 2018, the residence was refinanced for a total of $484,895.  The check is coded to "Consulting" in the general ledger.  This payment was also made from TANF funds.

MCEC also guaranteed the residence through the bank with a six-year lease from April 1, 2018 through March 31, 2024.  The lease was for the property in Flora purchased by MD Foundation and included $684,000 in lease payments at $9,500 monthly.  The purpose of the lease was to operate a "multi use facility" at the residence.  According to information in the Guaranty, the MCEC Board of Directors approved the Guaranty at a Board Meeting held on April 13, 2018.  The Guaranty was signed by the Director of MCEC.  Auditors could find no record of a Board Meeting held on that date during a review of the Board Minutes of MCEC and found no record of the Board Members approving a Guaranty in any provided Minutes.  Additionally, MCEC later confirmed to auditor that no meeting was held on April 13, 2018. The Director of MCEC (NN) also personally guaranteed the loan of the residence.

When auditors inquired of MCEC about payments made to MD Foundation and any payments made on the property in Flora, personnel at MCEC did not provide consistent answers.  Initially, the Director of MCEC (NN) told auditors in November 2019 that MCEC had given MD Foundation a subgrant for equine learning, mentoring, and youth development activities, and that they had made only one payment of $171,000 to the foundation.  In March 2020, Auditors then inquired about payments to MD Foundation again and were told on March 27, 2020 that MD Foundation was paid $171,000 for equine learning.  They were also told MCEC had no involvement with the residence in Flora and that no payments were ever made on the $684,000 lease used to guarantee the property.  MCEC stated that the loan was to be modified in July 2018 to remove the guarantee.  On March 31, 2020, MCEC stated that they contracted MD Foundation in January 2018 for $371,000 for programmatic services and that a lease

113

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

was executed in February 2018 for $9,500 monthly payments and that MCEC paid $200,000 directly to the Bank for lease payments. MCEC stated that MD Foundation began programmatic services in April 2018, and that the lease terminated December 31, 2019.

Based on information provided over the course of the audit, MCEC asserts it paid $171,000 for equine learning services in February 2018 to be held on property that was not yet owned by MD Foundation. This payment was made in a lump sum advance, and services did not commence until April 2018. Additionally, MCEC paid $200,000 in lump sum, advance rental payments in order to lease the same property for use as a multi-use building. Based on fact patterns and documents reviewed, auditors believe that the initial payment of $171,000 was used by MD Foundation to secure the residence at the closing of the initial loan. MCEC and MD Foundation then refinanced the residence, and MCEC contributed another $200,000 to the purchase of the residence; thereby, using $371,000 of TANF funds to secure a personal, private residence for the Director and Owner of MD Foundation.

It should be noted that the Director and Owner of MD Foundation was also employed by MCEC from July 17, 2017 until September 30, 2019 at an ending annual salary of $130,000. MCEC stated that he was employed as a "community liaison" during this time. MCEC paid $198,846 in salary payments and fringe benefits during this time period. Refer to "Salaries" section of this finding for the amount questioned for these salary payments.

MD Foundation was also paid $3,100 in travel reimbursements in FY 2018 and payments of $2,700 for "loans" in FY 2019.

Due to the prohibition against using federal funds for personal use, the prohibition of purchasing real property with TANF funds, and the unreasonableness of these purchases, the payments to MD Foundation are questioned in full.

**Questioned costs for fiscal year 2018 – $374,100**
**Questioned costs for fiscal year 2019 – $2,700**

- MCEC paid a contractor $134,880 in FY 2019 to demolish and renovate space at the North State Families First location. Due to the prohibition of using TANF funds to renovate real property, these purchases are questioned.

**Questioned costs for fiscal year 2019 – $134,880**

114

STATE OF MISSISSIPPI
SCHEDULE OF FINDINGS AND QUESTIONED COSTS
PART 3 – Federal Award Findings and Questioned Costs (continued)

- Both MCEC and FRC purchased items that meet the thresholds in the MDHS Subgrantee Manual for inclusion on the "Physical Property Inventory" and did not report these items to MDHS, as required by subgrant requirements. These items included cell phones, televisions, equipment, etc. Since the items were never reported to MDHS, they were not listed on the Inventory Control Sheets and were not properly examined in a physical inventory of MDHS. Auditor attempted to examine physical property inventory at both locations. Inventory could not be verified at MCEC due to inadequate tracking and lack of identifiable information on assets and invoices, i.e. serial numbers. Property inventory was able to be verified at FRC due to adequate tracking and property listings.

- MCEC purchased three vehicles using MDHS grants funds –
  - 2018 Armada for $52,257 in October 2018 – While the vehicle is registered to MCEC, the address for the purchase of the tag is the residence of the Director of MCEC (NN) indicating personal use of the vehicle.
  - Big Country Silverado Chevrolet Truck for $59,840 in September 2017 – While the vehicle is registered to MCEC, the address for the purchase of the tag is the residence of Assistant Executive Director of MCEC (ZN) indicating personal use of the vehicle.
  - F250 Ford Truck for $54,221 in November 2018 – While the vehicle is registered to MCEC, the address for the purchase of the tag is the residence of Director of MCEC's son (JN), indicating personal use of the vehicle. This individual is not employed by MCEC.
  - MCEC also paid $6,584 in for maintenance contracts, repairs, and other costs associated with the vehicles in FY 2019.

  Through inquiry and observation, auditor determined these vehicles were treated as the primary vehicles for the Director of MCEC (NN), the Assistant Executive Director of MCEC (ZN) and the son of the Director of MCEC (JN). Due to the vehicles personal use, lack of any discernable allocation of the costs of the vehicles based on use, the reasonableness of purchase, and the lack of adherence to policies as described in the subgrant manual, these costs are questioned in full.

  **Questioned costs for fiscal year 2018 – $59,840**
  **Questioned costs for fiscal year 2019 – $113,062**

- Out of eight items of equipment purchases sampled at FRC, auditor noted:
  - Purchase of two vehicles, one for $50,415 and one for $27,749. The vehicles were purchased with entirely TANF funds. Auditor verified that vehicles were not used only for TANF purposes and that they were sometimes used for personal use.

115

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- o Purchase of $27,093 in computer equipment. The equipment was purchased with MDHS grant funds.
- o Purchase of networking equipment for a total of $8,055. The equipment was purchased with MDHS grant funds.
- o Purchase of an air conditioning unit for $2,798, which is classified as "real property" under the federal grant.

Due to improper allocation of costs and no appropriate underlying allocation methodology, and lack of adherence to the policies as described in the subgrant manual, the costs are questioned. Due to the auditor's inability to calculate proper allocation due to insufficient documentation, the cost is questioned in full.

**Questioned costs for fiscal year 2019 – $116,110**

- Out of 100 items of equipment purchases sampled at MCEC, auditor noted:
    - o Nine (9) items for a total of $2,334 in which MCEC could not provide documentation to support the expenditure.
    - o Six (6) items for a total of $924 in which auditor could not find any correlation to the objectives of the TANF program for the equipment purchase.
    - o Eighty-four (84) items for a total of $31,758 in which auditor could not determine item was used exclusively for the TANF program and/or what percentage of the items' use was appropriate, reasonable and necessary for the TANF program.

Due to lack of supporting documentation, improper allocation of costs and no appropriate underlying allocation methodology, and lack of adherence to the policies as described in the subgrant manual, the costs are questioned. Due to the auditor's inability to calculate proper allocation due to insufficient documentation, the cost is questioned in full.

**Questioned costs for fiscal year 2019 – $35,016**
***Total amount questioned in 2018 – $433,940***
***Total amount questioned in 2019 – $401,768***

Faith-Based Initiatives/Concerts

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (45 cfr 260.34(c))* states, "No Federal TANF or State MOE funds provided directly to participating organizations may be expended for inherently religious activities, such as worship, religious instruction, or

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

proselytization. If an organization conducts such activities, it must offer them separately, in time or location, from the programs or services for which it receives direct Federal TANF or State MOE funds under this part, and participation must be voluntary for the beneficiaries of those programs or services."

*The Code of Federal Regulations (2 cfr 200.438*) states, "Costs of entertainment, including amusement, diversion, and social activities and any associated costs are unallowable, except where specific costs that might otherwise be considered entertainment have a programmatic purpose and are authorized either in the approved budget for the Federal award or with prior written approval of the Federal awarding agency."

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted the following:

- Under the "Families First" initiative, both MCEC and FRC funded concerts of a faith-based, evangelical worship singer in FY 2018 and FY 2019.  Payments were made to the singer individually and the organization "Through The Fire Ministries".   The singer performed at rallies and performed concerts in churches in Mississippi.   Auditors did not have a copy of the contracts associated with the payments.  Actual payments included $1,050 paid in FY 2018 by FRC and $180,350 in FY 2019 ($85,400 paid by MCEC and $94,950 paid by FRC).

  MCEC also expended $3,783 in identifiable expenditures in conjunction with the concerts, including paying for meals, security, and an opening choir performance.

  Due to the prohibition against paying for entertainment costs of inherently religious activities such as worship, the lack of any correlation to TANF purpose, and the unreasonableness of the cost, these costs are questioned.

  **Questioned costs for fiscal year 2018 – $1,050**
  **Questioned costs for fiscal year 2019 – $184,133**

- MCEC contracted with Sonshine Leadership, LLC to develop faith-based coalitions.  One of the stated activities of the agreement was to "develop a prayer team for Mayors" and to receive and connect prayer requests to faith-based coalitions.  Due to lack of supporting documentation, auditor cannot verify that work performed under the contract could not be categorized as "inherently religious" and therefore, the costs are questioned.

  **Questioned costs for fiscal year 2019 – $61,826**

  *Total amount questioned in 2018 – $1,050*
  *Total amount questioned in 2019 – $245,959*

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Marketing/Branding/Advertising/Promotional Materials

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.438(b))* states, in part, "the only allowable advertising costs are those which are solely for…program outreach and other specific purposes necessary to meet the requirements of the federal award."

*The Code of Federal Regulations (2 cfr 200.438(d))* states, in part, "the only allowable public relations costs are costs specifically required by the federal award, costs of communicating with the public and press pertaining to specific activities or accomplishments which result from the performance of the federal award, and costs of conducting general liaison with news media and government public relations officers, to the extent that such activities are limited to communication and liaison necessary to keep the public informed on matters of public concern, such as notices of funding opportunities, financial matters, etc."

*The Code of Federal Regulations (2 cfr 200.438(e))* states, in part, "Unallowable advertising and public relations include the following: (1) All advertising and public relations costs other than as specified in paragraphs (b) and (d); (2) Costs of meetings, conventions, convocations, or other activities of the entity including costs of displays, demonstrations and exhibits; costs of meeting rooms, hospitality suites, and other special facilities used in conjunction with shows and other special events; and salaries and wages of employees engaged in setting up and displaying exhibits, making demonstrations and providing briefings. (3) Costs of promotional items and memorabilia, including models, gifts, and souvenirs; (4) Costs of advertising and public relations designed solely to promote the non-federal entity.

*The Code of Federal Regulations (2 cfr 200.422)* states, "Costs incurred by advisory councils or committees are unallowable unless authorized by statute, the Federal awarding agency or as an indirect cost where allocable to Federal awards."

The *MDHS Subgrant Agreement* states in Section 9, under the heading "Compliance with Laws, Rules and Regulations" that any advertisements, brochures, flyers or produces any other material, printed or otherwise, relating to, or promoting, the services which is provided through the subgrant, it shall acknowledge that MDHS provided funding for the services.

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted the following:

- Under the "Families First" initiative, MCEC and MDHS were provided branding, public relations, print media and advertising from the Cirlot Agency. Auditor was not provided a contract for these services, but was provided a "Families First for Mississippi Financial Update" from November 2019 that detailed the scope of work performed for MDHS, Family First Initiative and

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Families First Mississippi. The update stated that $1,199,310 had been billed for services, and was broken down as follows (Numbers below are copied verbatim from the invoice. Breakdown summary does not equal the total by category, and the amounts do not equal the amount billed. Errors in addition remain unchanged intentionally):

- Families First for MS – $292,718
  - Collateral $17,919
  - Fundraising $61,974
  - Public relations - $10,576
  - Strategic Planning - $63,489
  - Video Production - $63,698
  - Website - $75,064
- Family First Initiative – $298,310
  - Summit Materials and Planning - $124,114
  - Strategic Planning - $54,805
  - Pilot Programs - $100,884
  - Steering Committees - $10,751
  - Website - $7,756
- Mississippi Department of Human Services - $608,088
  - Video Production - $247,111
  - Strategic Planning - $42,732
  - Branding and Positioning - $169,626
  - Law of 16 Events - $113,037
  - Public Relations - $6,539
  - Analytics - $29,043

Actual payments made by MCEC for the services included $206,000 in FY 2017, $369,438 in FY 2018 and $1,152,470 in FY 2019 for a total of $1,727,908, which does not agree with the summary provided to auditors. Auditors could find no record of payments made to Cirlot by MDHS directly. Based on inquiry with MDHS personnel, MCEC requested reimbursement for expenditures paid on their behalf based on a verbal "promise to pay" from Executive Director JD. MDHS, under the subsequent Executive Director (CF), denied any reimbursement request. However, MCEC still used TANF funds to pay for the services.

Auditors, when possible with supporting documentation, viewed copies or video of advertising made in conjunction with this agreement. Auditors were not able to view all materials, however, due to lack of documentation. Auditors determined that promotional materials and advertising did not consistently abide by restrictions in the MDHS subgrant to include MDHS as a funding source, and did not consistently correlate advertisements to programmatic resources. Much of the advertising was designed to solely benefit MCEC and its nonprofit and not programs offered. Additionally, advertising was not appropriately allocated among different subgrants. Finally, some items charged by Cirlot are specifically prohibited in federal regulations (steering committees, promotional materials, fundraising) and should not have been paid by federal monies. Auditor also questions the

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

reasonableness of the cost of services.  Due to these reasons, the costs paid to Cirlot are questioned in full.

**Questioned costs for fiscal year 2017 – $206,000**
**Questioned costs for fiscal year 2018 – $369,438**
**Questioned costs for fiscal year 2019 – $1,152,470**

- MCEC entered into contractual agreements to advertise and sponsor NCAA college sporting events at Mississippi State University.  Invoices for payments made to IMG College, LLC/Learfield indicate that the advertisements were at college football, basketball, and baseball games.  In addition, advertising was also done for NCAA Final Four Championships and Bowl Games held out of state.  In at least one instance, TANF grant funds were used to purchase tickets to a college football game.  Total payments included $195,163 in FY 2018 and $121,393 in FY 2019 for a total of $316,556.

  Due to the unreasonableness of providing advertising for programs designed for the needy at college sporting events, lack of adherence to stipulations in the grant agreement, and the lack of any correlation to how the advertising benefited the programmatic nature of the TANF program, these costs are questioned.

  **Questioned costs for fiscal year 2018 – $195,163**
  **Questioned costs for fiscal year 2019 – $121,393**

- MCEC and FRC entered into contractual agreements to advertise with radio stations owned by Telesouth Communications.  Invoices for payments indicate that the advertisements were for promotional campaigns, fundraising, and programmatic functions.   The advertisements were sold in a "marketing package" whereas the price of the contract was billed in installments.  Due to the packaged nature of the invoices and advertising, auditors cannot determine which costs should be allocated to programmatic functions and which charges were for advertising that solely benefited the entity.

  Payments included $57,950 in FY 2017, $49,886 in FY 2018, and $220,560 in FY 2019 for a total of $328,396 from MCEC.

  Payments included $36,680 in FY 2017, $53,721 in FY 2018, and $213,521 in FY 2019 for a total of $303,922 from FRC.

  Due to the unreasonable cost of the advertising, lack of adherence to stipulations in the grant agreement, inability to allocate costs of allowable and unallowable payments, and the lack of any correlation to how the advertising benefited the programmatic nature of the TANF program, these costs are questioned.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Questioned costs for fiscal year 2017 – $94,630**
**Questioned costs for fiscal year 2018 – $103,607**
**Questioned costs for fiscal year 2019 – $434,081**

- Both MCEC and FRC utilized iPromoteU to provide promotional gifts and "swag" for conferences, booths, etc.  These items were often branded as "Family First" and failed to denote that funds used for the cost of the items were from MDHS, as required by the subgrant agreement.  Additionally, these items are prohibited as unallowable costs.  Payments were made primarily from TANF funds, but CCDF and SSBG funds were also utilized as noted below.

  Payments included $23,569 in FY 2017, $94,789 in FY 2018, and $49,613 in FY 2019 for a total of $167,971 from MCEC.

  Payments included $3,137 in FY 2017, $11,197 in FY 2018, and $3,842 in FY 2019 for a total of $18,176 from FRC.

  **Questioned costs for fiscal year 2017 – $26,706**
  **Questioned costs for fiscal year 2018 – $105,393**
  **Questioned costs for fiscal year 2018 – $593 (SSBG)**
  **Questioned costs for fiscal year 2019 – $52,455**
  **Questioned costs for fiscal year 2019 – $1,000 (CCDF)**

- MCEC purchased additional advertising, marketing and promotional materials in FY 2019.  Auditors sampled the remaining population of expenses classified as "Advertising" in the entities general ledgers.  Auditors examined the invoices of nine additional advertising charges.  When available, auditors viewed copies of the actual advertisements to determine what, if any, programmatic content was advertised.  Auditors found that MCEC did not properly identify MDHS as the source of the funds nor did the advertising have a correlation to the TANF program.  Sampled items totaled $13,090. Items are detailed below:
  - Clarion Ledger - $70 for digital ads
  - WONA radio station - $120 for ads
  - Ridgeland Chamber of Commerce - $40 for luncheon
  - Area Development Partnership - $250 for ad
  - House of Peace - $75 for pastor, minister, and leader conference
  - Busby Companies - $498 for billboards
  - WAPT - $12,037 for ads

  **Questioned costs for fiscal year 2019 – $13,090**

- FRC also had additional advertising expenditures; however, due to the inconsistency in how FRC accounting personnel coded expenses in the General Ledger, auditors could not perform a targeted sample of advertising

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

expenditures. Any advertising expenditures sampled in the general population are discussed in the Section "Other Auditing Results" of this finding.

*Total amount questioned in 2017 – $327,336*
*Total amount questioned in 2018 – $774,194*
*Total amount questioned in 2019 – $1,774,489*

Second Tier Subrecipients/Programmatic Subgrants

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.469)* states the costs incurred for intramural activities, student publications, student clubs, and other student activities, are unallowable, unless specifically provided for in the Federal award.

The Office of Family Assistance produced *TANF-ACF-PI-2005-1 (Funding Childhood Education, School Readiness, Kindergarten, and Other Public Education Programs,* published on April 14, 2005, clarifies the use of funds for educational programs. Per the guide, "public education is a State responsibility; therefore, States may not use Federal TANF for any educational activity that is a component of the State's system of free public schools. By charging the Federal government for any part of these costs, the State would be passing on to the TANF program the costs of the State's public education system…This prohibition applies regardless of the adequacy of funding for general public education from other sources."

The *MDHS Subgrant Agreement* states in Section 5, under the heading "Documentation Requirements" that "Source documents are required to support transactions entered into the subgrantees' record keeping system. The following is a list of the minimum documentation required for selected transaction types:

- Salaries & Fringe - Benefits Personnel files which include a job application or resume, IRS W-4 Form, State Tax withholding form, I-9 Form (if hired after May 1987), e-verify confirmation, date of hire, and current approved salary/wage. Time distribution/activity sheets are required when the employee's time is charged to more than one subgrant or activity. Time sheets and activity reports should reflect the actual hours worked and duties performed.

- Travel - An approved travel voucher showing that all travel expenses were incurred for the benefit of the subgrant; copies of supporting bills including out-of-state meal receipts, hotel bills, conference registration fee receipts, and conference agendas.

- Telephone - Complete telephone bills and long distance telephone logs that indicate the person calling, the person called, the date and

122

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

time of the call, the reason and purpose of the call, the number called, and the subgrant that benefitted from the telephone call.

- Equipment - Original vendor invoices, receiving reports, purchase orders, competitive quotes or proof of newspaper advertisements for bids (if applicable), property records, and authorization to purchase equipment, and any other documentation necessary for purchasing law conformity. All purchases of equipment must be made in accordance with state purchasing requirements.

- Commodities (Supplies) - Original vendor invoices, receiving reports, purchase orders, competitive quotes or proof of newspaper advertisements for bids (if applicable), and documentation the expenses were incurred for the benefit of the subgrant.

- Contractual Services - Original contracts for services charged to the subgrant, evidence of completion of contracts, billings for services, rental or lease agreements, competitive quotes or proof of newspaper advertisements for bids (if applicable), or documentation of fair market value.

- Subsidies, Loans & Grants - (Payments to/for clients) Client attendance records, documentation of services provided, including dates, times, names, and client signatures, or documentation to verify units of service provided.

- Other Direct Costs - Original vendor invoices, receiving reports, purchase orders, competitive quotes or proof of newspaper advertisements for bids (if applicable), and documentation the expenses were incurred for the benefit of the subgrant.

**Exceptions/Questioned Costs**:  Both MCEC and FRC awarded subgrants to "second tier subrecipients" during the grant period.  Auditor reviewed programmatic scopes, payment requests, and supporting documentation to determine if agreements were made in accordance with provisions of Uniform Grant Guidance, grant regulations and restrictions, the initial subaward from MDHS, and whether the documentation adhered with the MDHS Subgrantee Manual.  During this review, auditor found the majority of subgrantees of MCEC and FRC were not appropriately monitored, and that MCEC/FRC did not supply appropriate documentation for reimbursements or had inappropriate project narratives, scopes, etc.  Most of the subgrant "packets" examined did not contain any type of correlation to the federal award objectives, nor did they contain client attendance records or documentation of the services provided.  Many of the projects funded with appropriate scopes appeared to have performed work; however, documentation supporting that work was not sufficient for auditor to determine if it met the requirements to be allowable under the federal award.  Additionally, while some of the projects may have community value and be considered worthwhile endeavors, auditor could not determine, from information provided, if the project/subgrant was

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

a reasonable use of TANF, CCDF or SNAP resources, or if the program was limited to those defined as "needy" in both State or Federal regulations.  It should be reiterated that, due to MCEC and FRC failing to denote on grant agreements that monies supplied were funded from federal programs such as TANF, second tier subrecipients could have not been aware of program restrictions and regulations. Based on these criteria, auditor has included these as questioned costs.

- MCEC Subgrantee agreements did not contain scopes or projects, nor did they entail how the programs would benefit needy individuals, or the correlation to TANF.  In some instances, auditor was provided copies of grants/contracts for prior years and in some instances, auditors were only provided current year agreements.  While some payments below appear to exceed grant awards, auditors were only provided contracts for FY 2019, and it is possible FY 2018 agreements existed that allowed for additional monies to be spent. Contract dates also spanned multiple fiscal years; therefore, information regarding FY 2018 and FY 2019 are presented as questioned costs.

    o Belhaven University – Granted $250,000 for Leadership Development.  Actual payments in FY 2019 were $236,023.
    o Delta State University – Granted $700,002 over a two- year period. Scope unknown.  Actual payments in FY 2018 were $238,796; and $344,807 in FY 2019.
    o Friendship Connection – Granted $35,000.  Scope unknown. Actual payments totaled $35,000 in FY 2019.
    o Greenwood Community and Recreation Center – Granted $35,000. Scope unknown.  Actual payments in FY 2018 totaled $62,166; and $43,891 in FY 2019.
    o Gulf Coast Community Foundation – Granted $55,250.  Scope unknown.   Actual payments in FY 2018 totaled $82,167; and $36,883 in FY 2019.
    o Jackson County Civic Action Agency – Granted $75,000 for 'Youth development and mentoring'.  Actual payments in FY 2018 totaled $194,554; and $124,215 in FY 2019.
    o Juanita Sims Doty Foundation – Granted $1,000,000 over a two-year period.  Scope unknown.   Actual payments in FY 2018 totaled $688,864; and $368,291 in FY 2019.
    o Kid's Hub – Granted $72,464.  Scope unknown. Actual payments in FY 2018 totaled $41,120; and $45,309 in FY 2019.
    o Meridian Community College – Granted $100,000.  Scope unknown.  Actual payments in FY 2018 totaled $36,672; and $96,022 in FY 2019.
    o Mississippi Gulf Coast Community College – Granted $274,314 for 'Training for middle skill job opportunities'.  Actual payments in FY 2019 totaled $62,905.
    o Mississippi Offender Re-Entry Program – Granted monies to establish a re-entry program for the Oakley Training Facility.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Contract did not include an amount of funds granted. Actual payments for FY 2019 totaled $301,000.

o   Pearl River Community College – Granted $260,193 for 'Encourage work ready credentials or HSE diploma'. Actual payments for FY 2018 totaled $10,759; and $182,942 in FY 2019.

o   Phoenix Project – Granted $45,000. Scope unknown. Actual payments in FY 2018 totaled $195,696; and $73,821 in FY 2019.

o   Picayune School District – Granted $50,000. Scope unknown. Actual payments in FY 2018 totaled $131,005; and $97,014 in FY 2019.

o   Restoration Foundation – Granted $30,000 for addiction services. Actual payments for FY 2018 totaled $27,479; and $24,823 in FY 2019.

o   Soul City Hospitality - $200,000 subgrant to create a community garden and to educate youth about sustainable agriculture. Actual payments totaled $200,000 in FY 2019.

o   Tulane Missionary Baptist Church – Granted $25,000. Scope unknown. Actual payments in FY 2018 totaled $9,551; and $53,408 in FY 2019.

o   Voice of Calvary – Granted $42,000 for 'The Net Counseling and Mentoring' services. Actual payments totaled $7,128 in FY 2018 and $30,948 in FY 2019.

**Questioned costs for fiscal year 2018 – $1,725,957**
**Questioned costs for fiscal year 2019 – $2,357,302**

• FRC Subgrantee agreements did contain scopes and/or project descriptions; however, some items in project scopes did not comply with allowable cost provisions and those grants are questioned below.

In some instances, information provided by subrecipients details lists of participants in programs, including participant intake forms that contain information on eligibility; however, for some programs no conclusions were drawn on whether participants were eligible. Additionally, some intake forms detail wage information that makes participant ineligible for program. For those programs that did not draw conclusions on eligibility determinations and those that covered ineligible participants, the grants are also questioned below.

o   Autism Center of North Mississippi – Granted $250,000 to provide a variety of services to children with autism. Many of the services provided do not meet allowable cost guidelines. Actual payments totaled $7,472 in FY 2018; and $99,732 in FY 2019.

o   Baldwyn School District – Granted $577,163 for a variety of programs provided to children of the district. Many of the services provided do not meet allowable cost guidelines and services were not limited eligible participants. Actual payments totaled $158,574 in FY 2018; and $210,600 in FY 2019.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- o Children's Advocacy Center – Granted $579,180 to develop and increase child advocacy training studies at colleges and universities. Many of the services provided do not meet allowable cost guidelines and were not limited to eligible participants. Actual payments totaled $254,478 in FY 2018; and $48,913 in FY 2019.

- o Kelly Williams Ministries – Granted $75,000 to assist women re-entering the workforce after incarceration or addiction. Auditor could not determine if eligibility determinations were made for participants. Actual payments totaled $64,000 in FY 2019.

- o Mississippi State University – Three different subgrant agreements were provided to auditors; however, auditor could not discern based on supporting documentation from which of the three subgrants the payments were made; therefore, the total of all payments is presented. Actual payments totaled $595,482 in FY 2018; and $217,800 in FY 2019.
    - ▪ "Recruitment and Enrollment" – Granted $225,000 to recruit students into the Education programs at the university. Program does not meet allowable cost guidelines.
    - ▪ "Augmentative Communication" – Granted $150,188 to pay for the salaries of therapists. Program does not meet allowable cost guidelines.
    - ▪ "Dyslexia" – Granted $171,089 to pay for the salaries of therapists. Program does not meet allowable cost guidelines.

- o Nettleton School District – Granted $150,000 to pay for curriculum, equipment and supplies. Program does not meet allowable cost guidelines. Actual payments totaled $48,201 in FY 2018.

- o Prentiss County Library – Granted $144,800 to pay for the salaries of library personnel. Program does not meet allowable cost guidelines. Actual payments totaled $46,533 in FY 2018; and $93,067 in FY 2019.

- o Regional Rehabilitation Center - Granted $500,000 to pay for the salaries of therapists. Program does not meet allowable cost guidelines. Actual payments totaled $263,995 in FY 2018; and $175,019 in FY 2019.

- o Reviving Network – Granted $74,259. Scope only includes the requirement to report on grant's progress. Auditor is unable to determine if program meets allowable cost guidelines. Actual payments totaled $31,096 in FY 2018; and $18,325 in FY 2019.

- o Robinson Resource Center – Granted $60,000 to operate a community outreach center. Services provided are not limited to eligible participants. Actual payments totaled $8,835 in FY 2018; and $23,182 in FY 2019.

- o Southeast Mississippi Children's Advocacy Center – Granted $14,000 to develop and increase child advocacy training studies at colleges and universities. Many of the services provided do not

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

meet allowable cost guidelines and not limited to eligible participants. Actual payments totaled $20,625 in FY 2018; and $11,371 in FY 2019.

**Questioned costs for fiscal year 2018 – $1,435,291**
**Questioned costs for fiscal year 2019 – $962,009**

*Total amount questioned in 2018 – $3,161,248*
*Total amount questioned in 2019 – $3,319,311*

<u>Personal Benefit/Conversion to Private Use</u>

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.445 (a))* states that, "Costs of goods or services for personal use of the non-federal entity's employees are unallowable regardless of whether the cost is reported as taxable income to the employees."

**Exceptions/Questioned Costs**: During the course of the audit, auditors became aware that MCEC was under investigation for the misuse of state and federal monies. Allegations against MCEC included the conversion of assets derived from federal grants to personal use. Auditors examined the financial records of MCEC, and concurred with the conclusion that some federal grant monies had been converted to personal use. The Director (NN) and Assistant Executive (ZN) Director of MCEC have both been indicted on charges of fraud and embezzlement and have been arrested. Both pleaded non-guilty and are currently awaiting trial. Auditor noted the following instances of alleged conversion of assets to personal use:

- From a period of January 1, 2016 to June 30, 2019, MCEC transferred/paid a total of $6,513,393 in monies directly to the private business New Learning Resources, Inc. (NLR) which is owned and operated by the Director and Assistant Executive Director of MCEC. NLR operates in several different ways, including a website for online learning, New Learning Resource School Districts (NLRSD), and offers other educational services at the private school, New Summit School (NSS). A review of the transactions/transfers indicates that NLR and MCEC's finances were commingled and intertwined in such a manner that MCEC often paid invoices addressed to personnel at NLR and sent to NLR's physical address. Vice versa, some transactions indicate NLR paid for MCEC expenses and NLR was reimbursed for those charges. Auditor noted, however, that when NLR funds were used to pay for MCEC expenses, MCEC reimbursed NLR almost immediately, in many instances the same day. The balance for transactions paid by MCEC on behalf of NLR, however, continued to increase throughout the fiscal year. Some of the $6,513,393 was offset by

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

credits for amounts paid by NLR on behalf of MCEC; however, the legitimacy of the credits could not be determined.

MCEC utilized a variety of accounting transactions to allegedly conceal money transfers to NLR. As an example, general ledgers provided by MCEC to auditors and MCEC's underlying financial records do not agree in regards to transactions to NLR. In multiple instances the underlying financial records refer to the payee on the transfer/check as New Learning Resources; however, the general ledger provided to auditors show the same transactions with varying vendor names. For example, in one instance the financial records show a payment to NLR on 01/08/2019 for $1,125 for catering of Highway Patrol meals; however, the same entry on the general ledger provided to auditors shows the payee of this transaction to be "Robert's Catering." In fact, any payments to NLR other than a $700,000 grant payment had been artificially removed from the general ledger provided to auditors.

Additionally, there were numerous transactions in the general ledger provided to auditors that indicated that the payee on a check was American Express, showing the transaction to be a credit card charge; however, when auditors examined the actual bank statements of MCEC, the same transactions would be made out to NLR. Therefore, the American Express balance in the was overstated, and the amount paid to NLR was understated. The only discernable purpose of this deliberate mislabeling of transactions in the general ledger would be to conceal the number and amount of transactions flowing through from MCEC to NLR.

General journal transactions were used to transfer money and set up a "Due from NLR" in the accounting system. The balance in the "Due from NLR" account has a $1,085,217 balance as of June 30, 2019, indicating that MCEC utilized grant monies of a minimum of $1,085,217 to fund NLR. In December 2018 alone, MCEC funded NLR a total of $275,000 in transfers coded as "Due from NLR."

On November 30, 2018, MCEC recorded a $700,000 transfer of TANF funds to NLR. The amount is coded as a general journal reduction in the amount owed to MCEC. When auditors inquired about the transfer, MCEC personnel provided a signed grant agreement from MCEC to NLR. However, investigators were able to verify that the document had been falsified, was not in existence at the time of the transfer, and that proceeds did not benefit NLR in a grant/subgrant relationship. When added with the balance of the "Due from NLR" account, the actual amount of MCEC funds used to fund NLR increases to $1,785,217.

Auditors also reviewed invoices supplied by MCEC for fiscal year 2019, and were able to verify $73,514 of transactions that were paid using TANF Funds on behalf of NLR in addition to the amounts in the paragraph above. These costs included utilities, licenses, curriculum, etc.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Without examining the records of NLR, auditors cannot determine what fiscal year these charges stem from and what year the grant costs should be questioned for any balance prior to 2017. Additionally, auditor cannot verify that these are the only amounts converted to private use without a thorough review of the records of NLR and MCEC in tandem.

After analyzing the transfers and transactions in the ledger, auditor questioned the payments to NLR that were not offset by credits.

**Questioned costs for fiscal year 2018 – $473,622**
**Questioned costs for fiscal year 2019 – $1,326,267**

- The Director and Assistant Executive Director entered into a contract for $1,700,000 with the medical company, Prevacus, to purchase an investment in Prevacus and its affiliate PreSolMD. The company manufactures a brain concussion medicine. In exchange for the investment, Prevacus was to conduct clinical trials of the new medicine on children in Mississippi. The agreement was entered into by the Director (NN) and Assistant Executive Director of MCEC (ZN) in their personal capacity. An initial wire transfer of $500,000 was made on April 8, 2019 and a subsequent wire transfer of $250,000 was made on May 10, 2019. Original entries in the general ledger show that the payments were made with TANF funds; however, after State Auditor Investigators questioned the use of TANF funds in July 2019, the funding source was changed to "Bingo" in the accounting software. It should be noted that an additional $350,000 was paid in FY 2020.

**Questioned costs for fiscal year 2019 – $750,000**

- MCEC paid Magnolia Strategies, LLC, a company owned by the Director of MCEC's son, $250,000 in "consulting" fees in both FY 2018 and 2019. Auditors were not provided a copy of any contracts for these fees, and, therefore, cannot determine what, if any, services were actually performed. All three checks were originally paid with TANF funds and coded as such in the accounting system. On July 16, 2019, after MCEC was first questioned about the use of TANF funds by State Auditor Investigators, the audit trail shows that a check written to Magnolia Strategies was re-coded in the system as "Administrative" funds.

**Questioned costs for fiscal year 2018 – $250,000**
**Questioned costs for fiscal year 2019 – $250,000**

- Auditors reviewed invoices supplied by MCEC for fiscal year 2019, and were able to verify $4,387 of transactions that were paid using TANF Funds on behalf of Spectrum Academy. Spectrum Academy is also owned by the Director of MCEC's son. Additionally, $7,490 was paid in TANF funds for expenses of the Mississippi Dyslexia Center, which is also owned by

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

the Director of MCEC's son. No contracts or subgrants existed to justify these payments. Payments ranged from utility payments, advertising payments, licenses, meals, etc.

**Questioned costs for fiscal year 2019 – $11,877**

- Auditors were able to identify $118,022 in costs paid using TANF/CCDF funds for NSS in FY 2019. Of those funds, $70,228 were used to purchase kitchen equipment for the cafeteria of NSS, and $17,842 was used to purchase Apple Computer products for NSS. The remaining $29,952 was used to purchase various supplies, pay for utilities, purchase licenses, etc.

  Additionally, MCEC entered into contractual agreements with the University of Southern Mississippi (USM) to fund "externships" of students at the University through the School of Psychology. Externships allow individuals to study in a real-world work environment. According to press releases by USM and invoices supplied to auditor by MCEC, these externships were completed at NSS. Therefore, MCEC used TANF funds to pay for temporary workers at NSS. These invoices are billed to MCEC with the description "Spectrum I – Externships" and "Spectrum II". These costs were coded as "consulting" and charged to the TANF grant. Total costs paid under these grants includes $526,146 paid in FY 2018 and $56,131 in FY 2019.

  **Questioned costs for fiscal year 2018 – $526,146**
  **Questioned costs for fiscal year 2019 – $174,153**

- On February 22, 2017, the Assistant Executive Director of MCEC borrowed $28,898 against the balance of his 403(b) pension plan at American Funds. The loan repayment included semimonthly payments of $264. Upon review of general ledger, payments were made from the Assistant Director to repay the loan in the amount of $1,489 for FY 2017, $6,380 for FY 2018, and $6,343 in FY 2019. According to MCEC personnel, these payments were deducted from the Assistant Executive Director's gross pay; however, auditor determined that no deductions were made against his pay and that the charges were coded and charged to the TANF grant. It should be noted that another employee of MCEC had a loan against his 403(b) pension plan. His monthly payments were deducted from his gross pay, as required.

  **Questioned costs for fiscal year 2017 – $1,489**
  **Questioned costs for fiscal year 2018 – $6,380**
  **Questioned costs for fiscal year 2019 – $6,343**

*Total amount questioned in 2017 – $1,489*
*Total amount questioned in 2018 – $1,256,148*

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

*Total amount questioned in 2019 – $2,518,640*

Related Party Rent and Idle Facilities

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.446)* states that the cost of "idle facilities" is an unallowable cost. Idle facilities are defined as facilities that are completely unused and to the excess of the entity's current needs.

*The Code of Federal Regulations (2 cfr 200.465)* states that rental costs are allowable to the extent that the rates are reasonable in light of rental costs of comparable property, market conditions, alternatives available, and the condition of the property.

*The Code of Federal Regulations (2 cfr 200.465(c))* states that rental costs under "less than arm's length" leases are allowable only up the amount that is considered reasonable compared to similar property. It further defines a "less than arm's length" lease as one where the lessor and lessee are under "common control" such as a situation involving two companies owned by the same individual, or the two companies owned by immediate family members. Family members, for the purpose of this regulation, are defined as (1) Spouse, and parents thereof; (2) Children, and spouses, thereof; (3) Parents, and spouses thereof; (4) Siblings, and spouses thereof; (5) Grandparents and grandchildren, and spouses, thereof; (6) Domestic partner, and parents thereof; (7) Any individual related by blood or affinity whose close association with the employee is equivalent of a family relationship.

**Exceptions/Questioned Costs**: MCEC is owned and operated by the Director, and her son, the Assistant Executive Director. Together, they own Avalon Holdings, LLC (Avalon). The Director's other son owns and operates 204 Key, LLC (Key). Both Avalon and Key own properties that are utilized by MCEC as places of business. Avalon owns three separate buildings that are utilized by MCEC; Key owns one.

- Avalon owns the main building that is used as MCEC's headquarters. In this shared space is a dentist office rented to an independent third party, MCEC, and New Learning Resource Online (NLRO), which is also owned by the Director of MCEC and her family. During the audit, auditors noted that the rental payments to Avalon seemed excessive considering market conditions, size of the property, condition of the property, and location of the property. After a search of business listings by the Mississippi Secretary of State's Office, auditors confirmed that MCEC and Avalon were under common control, and, therefore, should only be able to charge "reasonable and comparable" rent for use of the building. Auditors requested a copy of the lease agreement, and were provided an unsigned agreement stating that monthly rent was $3,997. After requesting a signed

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

copy of the lease, auditors were provided a new lease agreement that stated the monthly rent to be $16,000 per month for "operating a retail boutique" and stated the size of the property was 12,500 square feet. MCEC finally provided a lease agreement amendment that stated that the monthly rental payments were $27,466 monthly.

Auditors were able to ascertain the square footage of MCEC's utilized space, the square footage of the independent third party's utilized space and the rent charged, and calculated a reasonable "per square foot" rent charge of $1.78 per square foot (monthly rent of $5,488 for 3,084 square feet of space for the independent third party). MCEC uses approximately 7,000 square feet, according to documents provided. These calculate to a reasonable, market value of rent to be $12,460 per month. Actual rental payments made to Avalon monthly for MCEC were $27,466 monthly, plus additional amounts paid on a sporadic basis. MCEC actually paid $357,061 in rental fees for FY 2019. Reasonable annual rent is calculated to be $149,520. $207,541, the portion of rent that is considered above market value, is questioned

Additionally, rent is charged for a building close in proximity to the headquarters of MCEC. When auditors inquired about the purpose of the rent payments, MCEC informed auditors that the space was utilized for office space and intake assessments for Families First. However, based on a physical walkthrough and inquiry with NSS personnel, auditor determined that the building is utilized by the 4th grade classes at NSS, and is the location of the "Spectrum Academy" location inside NSS. Both NSS and Spectrum Academy are privately owned organizations by the Director of MCEC and her family. Rental payments for the building were $9,868 monthly, or $118,416 annually. As these facilities were used for personal businesses of the Director of MCEC and her family and has no correlation to TANF, the cost of rent payments is an unallowable cost. Additional rent payments were made in the ledger with no explanation as to why. Actual payments of $128,294 are questioned.

Avalon also owns a property in Greenwood, MS, that is utilized by MCEC as a "Families First Resource Center." Auditors were provided with a lease agreement stating monthly rent would be $2,000 (or $24,000 annually), and would be increased no more than 3 percent for the next year. Based on the initial amount of the lease plus the 3 percent increase, monthly rent should be no more than $2,060, or $24,720 annually. MCEC paid rental fees at $7,500, or $90,000 annually. Additionally, extra rental payments were made on a sporadic basis. Actual payments for the space totaled $97,806., an overpayment of $73,086. Questioned costs include the difference in what the lease agreement allowed ($24,720) and actual payments.

Additional rent payments made to Avalon in the amount of $6,250 are also questioned as there is not a business purpose for the extra payments.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

### Questioned costs for fiscal year 2019 – $415,171

- MCEC paid monthly rental payments of $3,500 to Key for property located in Madison, MS. When a copy of the lease was requested by auditors, MCEC supplied a lease agreement for the property address between MCEC and Avalon Holdings, which is the incorrect lessor. The monthly amount of the lease on the agreement provided was $2,500, or $30,000 annually. Auditors inquired of the purpose of the rent payments, and were told that a "Families First Resource Center" was located at the address. Auditors did a physical walkthrough of the property and located no such center. The only property at the address was a Mississippi Dyslexia Center, which is also owned by the Assistant Executive Director of MCEC and the owner of Key. The Dyslexia Center is a fee-for-service therapy center and not related to TANF. Even though the agreement stated rent was $2,500 monthly, MCEC paid $3,500 monthly. Actual payments of $42,000 are questioned due to no valid TANF purpose.

### Questioned costs for fiscal year 2019 – $42,000

- MCEC also entered into a lease for property at the "City Centre" in Jackson owned by Hertz Jackson City Centre, LLC (Hertz) in FY 2019. MCEC paid a $500,000 deposit for the property, and signed a lease for monthly payments of $20,274. The location was to be a "virtual reality school" run by the Lobaki Foundation. However, the contract for the "vr school" ended in July 2019, and no additional use for the property was identified; therefore, the location sat idle for FY 2019. MCEC continued to charge the rent for the idle facilities to the TANF grant. Actual payments, including the deposit, totaled $669,237. Due to the restriction of idle facility charges, the total amount paid on the lease is questioned.

### Questioned costs for fiscal year 2019 – $669,237

*Total amount questioned in 2019 –$1,126,408*

<u>Travel for Specific Individuals</u>

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.446)* states "Travel costs are the expenses for transportation, lodging, subsistence, and related items incurred by employees who are in travel status on official business of the non-Federal entity. Such costs may be charged on an actual cost basis, on a per diem or mileage basis in lieu of actual costs incurred, or on a combination of the two, provided the method used is applied to an entire trip and not to selected days of the trip, and results in charges consistent with those normally allowed in like circumstances in the non-

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Federal entity's non-federally-funded activities and in accordance with non-Federal entity's written travel reimbursement policies."

*The Code of Federal Regulations (2 cfr 200.446(b))* states "Costs incurred by employees and officers for travel, including costs of lodging, other subsistence, and incidental expenses, must be considered reasonable and otherwise allowable only to the extent such costs do not exceed charges normally allowed by the non-Federal entity in its regular operations as the result of the non-Federal entity's written travel policy. In addition, if these costs are charged directly to the Federal award documentation must justify that: (1) Participation of the individual is necessary to the Federal award; and (2) The costs are reasonable and consistent with non-Federal entity's established travel policy."

*The Code of Federal Regulations (2 cfr 200.446(d))* states "Airfare costs in excess of the basic least expensive unrestricted accommodations class offered by commercial airlines are unallowable except when such accommodations would: (i) Require circuitous routing; (ii) Require travel during unreasonable hours; (iii) Excessively prolong travel; (iv) Result in additional costs that would offset the transportation savings; or (v) Offer accommodations not reasonably adequate for the traveler's medical needs. The non-Federal entity must justify and document these conditions on a case-by-case basis in order for the use of first-class or business- class airfare to be allowable in such cases."

**Exceptions/Questioned Costs**:  During the audit, auditors noted that certain individuals were reimbursed substantial travel costs when compared to other personnel.  Additionally, due to the instances of fraud, waste, and abuse at MDHS, MCEC and FRC, certain individuals were assigned higher risk with travel reimbursements than everyday personnel.  During testwork, the auditor noted the following questioned costs:

- Priceless Ventures, LLC travel – The owner and operator of Priceless Ventures (TD) was reimbursed for travel from MCEC.  The contracts with MCEC state that the contract price is all inclusive and do not detail policies for travel reimbursement.  Nevertheless, travel made by TD for these contracts was reimbursed and charged to the TANF grant.  A review of actual travel invoices showed that TD often flew first class, stayed in high priced hotel suites, and charged expensive meals for himself and others.  In one instance, $607 for the "Oxford Grillehouse" was charged to the TANF grant.  For fiscal year 2019, MCEC reimbursed $12,872 to TD for travel.  Due to the unreasonable cost of the expenses, the lack of correlation to TANF purpose, and the violation of restrictions on airfare, these charges are questioned.

  **Questioned costs for fiscal year 2019 – $12,872**

- BD travel – Aside from being the owner and operator of Restore2, LLC, BD was also employed by MCEC from July 1, 2018 to June 30, 2019.  During his employment there, BD also submitted requests for

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

reimbursement for travel. The travel reimbursement requests do not contain information to ascertain the relevance of the travel to TANF purposes. Additionally, a review of the actual travel invoices showed that BD often flew first class, stayed in high priced hotel suites, and charged expensive meals. During his employment, BD was reimbursed $31,808 of travel expenses. Due to the unreasonable cost of the expenses, the lack of correlation to TANF purpose, and the violation of restrictions on airfare, these charges are questioned.

**Questioned costs for fiscal year 2019 – $31,808**

- MCEC purchased a round trip, first class ticket for BD's wife to fly to Los Angeles, CA, with BD on April 21, 2019. Flight arrangements were made by Executive Director JD's Administrative Assistant and emailed to BD, with Executive Director copied on the email. During this time, BD was in addiction treatment in Malibu, CA at Rise in Malibu, as stated in the finding above. As there was no business purpose in the trip, BD's wife was not an employee of MCEC, and given the restrictions on airfare, these costs are questioned.

**Questioned costs for fiscal year 2019 – $1,614**

*Total amount questioned in 2019 –$46,294*

<u>Salaries</u>

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.445 (a))* states that, "Costs of goods or services for personal use of the non-federal entity's employees are unallowable regardless of whether the cost is reported as taxable income to the employees."

*The Code of Federal Regulations (2 cfr 200.53(b))* states "Improper payment includes any payment to an ineligible party, any payment for an ineligible good or service, any duplicate payment, any payment for a good or service not received (except for such payments where authorized by law), any payment that does not account for credit for applicable discounts, and any payment where insufficient or lack of documentation prevents a reviewer from discerning whether a payment was proper."

*The Code of Federal Regulations (2 cfr 200.404)* states "A cost is reasonable - if in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. The question of reasonableness is particularly important when the entity is predominately federally funded. In determining reasonableness

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

of a given cost, consideration must be given to: (a) Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the non-Federal entity or the proper and efficient performance of the Federal award. (b) The restraints or requirements imposed by such factors as: sound business practices; arm's-length bargaining; Federal, state, local, tribal, and other laws and regulations; and terms and conditions of the Federal award. (c) Market prices for comparable goods or services for the geographic area. (d) Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the non-Federal entity, its employees, where applicable its students or membership, the public at large, and the Federal Government. (e) Whether the non-Federal entity significantly deviates from its established practices and policies regarding the incurrence of costs, which may unjustifiably increase the Federal award's cost."

*The Code of Federal Regulations (2 cfr 200.405 (a)*) states "A cost is allocable to a particular Federal award or other cost objective if the goods or services involved are chargeable or assignable to that Federal award or cost objective in accordance with relative benefits received."

The *MDHS Subgrant/Contract Manual*, which subgrants must attest to have read and understood prior to receiving grant awards, states in Section 5, under the heading "Documentation Requirements" that the minimum documentation requirements for salaries are time sheets and activity reports which reflect the actual hours worked and duties performed. Time distribution/activity sheets are required when the employee's time is charged to more than one subgrant or activity.  This section also states under the heading "Cost Allocation/Indirect Costs", if MDHS subgrantee administers more than one subgrant at a time which results in costs that are shared among various subgrant programs and/or other funds such as local resources, the subgrantee must document the basis for allocating a portion of the shared costs to the MDHS subgrant and shall distribute the costs in a reasonable proportion to the benefits received.

**Exceptions/Questioned Costs:** In order to test the salaries paid at MCEC, auditors requested a list of employees and their salaries.  MCEC provided a list; however, the list did not contain job descriptions.  Auditors then requested for the job descriptions to be added to the list.  When auditors received the revised list with job descriptions, auditors compared the two lists and found that five employees on the first list were not on the second list, and some of the salary amounts changed. Two of the employees that were no longer listed were the daughters-in-law of the Director of MCEC (NN) – the Assistant Executive Director's (ZN) wife, and the wife of NN's other son, JN. Two of the other employees that were no longer listed were attorneys that also are employees at FRC, one of which was previously the Deputy Executive Director of MDHS under Executive Director JD and the other is the niece of the Executive Director of FRC.

Further review of the underlying accounting records indicated that both daughters-in-law were each paid $31,667 in gross earnings (for a total of $63,333 in FY 2018)

136

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

using TANF funds. This amount includes a check to each in the amount of $15,000 (gross) on September 29, 2017.

The two attorneys reference above received approximately $181,000 in FY 2018 and $394,000 in FY 2019 from FRC; and received approximately $203,000 in FY 2018 and $208,000 in FY 2019 from MCEC.

As discussed above, through the course of the audit, auditors became aware of the risk of TANF funds converted to personal use to fund private businesses owned by the Director of MCEC (NN), the Assistant Director of MCEC (ZN) and NN's son JN. Auditors determined that there were several employees on MCEC's payroll who were also listed as staff of New Summit School (NSS – owned by NN), Mississippi Dyslexia Center (owned by JN and ZN), and Spectrum Academy (owned by JN). The salaries of the employees identified were approximately $339,000 in FY 2017, $860,000 in FY 2018, and $944,000 in FY 2019.

Also, as discussed above, the principal of Restore2 (BD) was also an employee of MCEC. In addition to the payments that were made to the rehabilitation facility, and the contractual payments made to BD by MDHS, BD continued to be paid $83,000 in salary payments by MCEC during the time period that he was in rehabilitation at Rise In Malibu. BD's job description, as listed by MCEC, was "Trainer". The average salary of all of the other employees with the "Trainer" job description was approximately $28,000. However, BD was receiving an annual salary of $250,000. The total amount paid to BD was approximately $208,000 in FY 2018, and $250,000 in FY 2019.

The owner of MD Foundation (MD) discussed above was also an employee of MCEC. Initially, MCEC stated that MD was also a "trainer", although, MCEC later stated that he was a "community liaison". MD received an annual salary of $130,000. The amount paid to MD was approximately $104,000 in FY 2018 and $130,000 in FY 2019. MD was also an employee of FRC during the same period and received approximately $60,000 in FY 2018 and $59,000 in FY 2019.

Due to the widespread fraud, waste, and abuse already discussed, the fact that MCEC attempted to conceal who was paid with TANF funds by editing the employee listing provided to auditors, the familial relationships of some employees with the owners of MCEC, the lack of any discernable work performed to earn the salaries of some individuals, and the unreasonable amounts of certain salaries, these costs are specifically questioned.

In addition to these specific questioned costs, neither subrecipient had a reasonable, causal beneficial, underlying allocation methodology of the salaries to the multiple subgrants that they received. Nor did they have adequate supporting documentation to substantiate the allocations that were used. For this reason, we are questioning all of the salaries and wages paid as auditors cannot determine what a reasonable allocation would be based on the existing documentation.

***Total amount questioned in 2017 - $5,840,046***

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*Total amount questioned in 2018 - $13,202,040*
*Total amount questioned in 2019 - $15,296,505*

All Other Costs from MCEC Sampled

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

**Exceptions/Questioned Costs**: Auditors sampled and tested all other expense classes at MCEC for adherence to Uniform Grant Guidance allowability regulations. During testing, auditors noted that MCEC did not have an appropriate or auditable underlying methodology for allocating shared costs among multiple grants. Due to this lack of methodology, auditors could not verify the cost charged to the grant was reasonable or necessary. The items detailed below are questioned in addition to those items identified during a nomenclature review and detailed in the above paragraphs.

During testwork for allowable costs and activities allowed, auditors noted the following questioned costs:

- Awards, Banquets, and Events – Out of 12 items tested, auditors noted the following:
    - Three instances totaling $14,656 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.
    - Seven instances totaling $54,480 where cost were determined questionable based on the reasonableness to the TANF program.

**Questioned Cost for fiscal year 2019 - $69,136**

- Consulting – One item was questioned:
    - One item totaling $100 was questioned in which the reasonableness and allowability of an expenditure could not be determined due to the agency not providing sufficient documentation for the expenditure.

**Questioned Cost for fiscal year 2019 - $100**

- Contract Labor – Out of 194 items tested, auditors noted the following:
    - Seven items totaling $450 were questioned due to auditor being unable to determine the need for the expense to the TANF program due to insufficient details in supporting documentation.
    - Sixteen items totaling $853 where MCEC was unable to provide a contract or agreement for the services provided. Therefore, auditor was unable to determine the need or reasonableness to the TANF program.

138

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

  o   179 items totaling $70,415 where MCEC was unable to provide a
      contract or agreement that the tutoring services performed were for
      work related to TANF eligible individuals.

**Questioned Cost for fiscal year 2019 - $71,718**

- Curriculum – One item was questioned:
  o   One item totaling $15,750 was questioned in which the reasonableness
      and allowability of an expenditure could not be determined due to the
      agency not providing sufficient documentation for the expenditure.

**Questioned Cost for fiscal year 2019 - $15,750**

- Data Processing – Out of 5 items tested, auditors noted the following:
  o   Five items totaling $5,100 in which costs were questioned due to 100
      percent of the cost being charged to the TANF program. The
      subgrantee did not have a proper allocation plan and the auditor was
      unable to determine the percentage of the expense that is considered
      necessary and reasonable for the performance and administration of
      federal awards to the TANF program.
**Questioned Cost for fiscal year 2019 - $5,100**

- Dues and Subscriptions – Out of 5 items tested, auditors noted the following:
  o   Three items totaling $139 where the expense was questioned based on
      the reasonableness to promote the objectives of the TANF program.
  o   Two items totaling $355 where MCEC paid for expenses associated
      with a counselor licensure for an employee who was employed by
      New Summit School.

**Questioned Cost for fiscal year 2019 - $494**

- Equipment Rental – Out of 100 items tested, auditors noted the following:
  o   Nine items totaling $2,334 were questioned in which the
      reasonableness and allowability of an expenditure could not be
      determined due to the agency not providing sufficient documentation
      for the expenditure.
  o   Six items totaling $923 where the expense was questioned based on
      the reasonableness to promote the objectives of the TANF program.
  o   Eighty-four items totaling $31,759 where costs were questioned due
      to 100 percent of the cost being charged to the TANF program. The
      subgrantee did not have a proper allocation plan and the auditor was
      unable to determine the percentage of the expense that is considered
      necessary and reasonable for the performance and administration of
      federal awards to the TANF program.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Questioned Cost for fiscal year 2019 - $35,016**

- Janitorial – Out of 6 items tested, auditors noted the following:
  - Six items totaling $3,295 where costs were questioned due to 100 percent of the cost charged to the TANF program. The subgrantee did not have a proper allocation plan and the auditor was unable to determine the percentage of the expense that is considered necessary and reasonable for the performance and administration of federal awards to the TANF program.

**Questioned Cost for fiscal year 2019 - $3,295**

- Meetings – One item was questioned:
  - One item totaling $200 where the reasonableness of the expenditure to promote the objective of the TANF program could not be determined.

**Questioned Cost for fiscal year 2019 - $200**

- Postage and Delivery – Out of 9 items tested, auditors noted the following:
  - Three items totaling $2,005 where costs were questioned due to 100 percent of the cost being charged to the TANF program. The subgrantee did not have a proper allocation plan and the auditor was unable to determine the percentage of the expense that is considered necessary and reasonable for the performance and administration of federal awards to the TANF program.

**Questioned Cost for fiscal year 2019 - $2,005**

- Professional Fees – Out of 3 items tested, auditors noted the following:
  - One item totaling $5,500 where costs were questioned due to 100 percent of the cost charged to the TANF program. The subgrantee did not have a proper allocation plan, and the auditor was unable to determine the percentage of the expense that is considered necessary and reasonable for the performance and administration of federal awards to the TANF program.
  - Two items totaling $135 where MCEC paid for expenses associated with an employee who was employed by New Summit School. Due to this and MCEC not having a proper allocation plan, auditor is unable to determine the percentage of charges that should be charged to the TANF program.

**Questioned Cost for fiscal year 2019 - $5,635**

- Repairs and Building – Out of 4 items tested, auditors noted the following:

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

o Four items totaling $2,889 where the cost is unallowable as maintenance and repair cost. Per *2 cfr 200.452*, costs incurred for utilities, insurance, security, necessary maintenance, janitorial services, repair, or upkeep of buildings and equipment (including Federal property unless otherwise provided for) which neither add to the permanent value of the property nor appreciably prolong its intended life are only allowable if these costs keep the building/property in an efficient operating condition.

**Questioned Cost for fiscal year 2019 - $2,889**

- Repairs - Other – Out of 2 items tested, auditors noted the following:
  o Two items totaling $1,330 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.

**Questioned Cost for fiscal year 2019 - $1,330**

- Seminars and Continuing Education -  Out of 10 items tested, auditors noted the following:
  o Five items totaling $492 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.
  o One item totaling $150 where costs were determined questionable based on the reasonableness of the cost to promote the TANF program
  o Two items totaling $28,796 were questioned due to MCEC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to salaries being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award.  Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.

**Questioned Cost for fiscal year 2019 - $29,438**

- Repairs and Building – Out of 4 items tested, auditors noted the following:
  o One item totaling $1,106 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

### Questioned Cost for fiscal year 2019 - $1,106

- Supplies – Out of 17 items tested, auditors noted the following:
  - Three items totaling $705 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.
  - Five items totaling $339 where costs were determined questionable based on the reasonableness of the cost to promote the TANF program.
  - Nine items totaling $402 were questioned due to MCEC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award. Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.

### Questioned Cost for fiscal year 2019 - $1,446

- Telephone – While reviewing invoices, auditors noted the following:
  - MCEC is paying a portion of each employees' phone bill; however, the methodology to determine how much is paid per employee is not properly documented. The fringe benefit is applied to all employees regardless of need in regards to TANF purposes. Additionally, it was noted that MCEC is also paying 100 percent of the phone bill for employees that are either not employed by MCEC, do not work full time for MCEC, or work for New Summit School or New Learning Resource center part-time. Auditors also noted that the telephone invoices also indicate that MCEC is paying for iPhones and iPad devices for NN (iPhone, iPad, and data for each), ZN (iPhone, two iPads, and data for each), ZN's wife (iPhone and data), JN (iPhone and data), and JN's wife (iPhone and data). MCEC was also paying monthly installments on two phones and for the iPhone data for the owner of Priceless Ventures, TD.

    Invoices also show that some employees' are having their spouses and children's phones, service, and iPhone data paid for using TANF funds – including the IT Director of MCEC's (BB) own phone and data, his son's data, and his daughter's phone and data.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Invoices show that MCEC paid monthly on installments on at least 25 different iPhones and iPads for employees. These devices ranged from iPhone 8s to iPhone XS's, and from iPad minis to iPad Pros.

Additionally, Federal Regulation requires expenses to be allocated to the projects based on the proportional benefit, and auditors have no assurance the cost associated with this benefit is being applied properly. Due to these factors, all amounts paid for telephone expense for FY 2019 are questioned.

**Questioned Cost for fiscal year 2019 - $61,389**

- Telephone - Office – Out of 5 items tested, auditors noted the following:
  o Five items totaling $2,314 were questioned due to MCEC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to salaries being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award. Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.

**Questioned Cost for fiscal year 2019 - $2,314**

  o Travel - Mileage – Out of 7 items tested, auditors noted the following:
  o Two items totaling $1,000 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.
  o Five items totaling $675 where cost for the travel to the events, meetings, or trainings do not meet the needs or purpose of the TANF program.

**Questioned Cost for fiscal year 2019 - $1,675**

- Travel - Other – Out of 4 items tested, auditors noted the following:
  o One item totaling $229 was questioned due to the fact expense was to pay a speeding ticket incurred by the Director of MCEC (NN). Speeding tickets and/or fines and penalties are

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

              unreasonable, un-allocable, prohibited by state laws, and unallowable.

- o One item totaling $976 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.
- o Two items totaling $211 were questioned due to the travel costs are for individuals who are not employees of MCEC.

**Questioned Cost for fiscal year 2019 - $1,416**

- Utilities – Out of 97 items tested, auditors noted the following:
  - o One item totaling $52 where costs were determined questionable based on the reasonableness of the cost to promote the TANF program.
  - o One item totaling $93 was questioned due to funds being used to pay a fine/penalty for unreturned satellite equipment. Fines and penalties are unreasonable, un-allocable, prohibited by state laws, and unallowable.
  - o Ninety-five items totaling $17,830 were questioned due to MCEC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to salaries being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award.  Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.

**Questioned Cost for fiscal year 2019 - $17,975**

*Total amount questioned in 2019 –$329,427*

<u>All Other Costs from FRC Sampled</u>

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

**Exceptions/Questioned Costs**:  Auditors sampled and tested all other expense classes at FRC for adherence to Uniform Grant Guidance allowability regulations. During testing, auditors noted that FRC did not have an appropriate or auditable

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

underlying methodology for allocating shared costs among multiple grants. Due to this lack of methodology, auditors could not verify the cost charged to the grant was reasonable or necessary. The items detailed below are questioned in addition to those items identified during a nomenclature review and detailed in the above paragraphs.

During testwork for allowable costs and activities allowed, auditors noted the following questioned costs:

- Commodities – Out of 12 items tested, auditors noted the following:
  - Ten items totaling $5,834 were questionable due to FRC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to salaries being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award. Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.
  - One item totaling $222 where costs were determined questionable based on the reasonableness of the cost to promote the TANF program.
  - One item totaling $65 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.

**Questioned Cost for fiscal year 2019 - $6,121**

- Contractual – Out of 4 items, auditors noted the following:
  - Three items totaling $3,512 were questionable due to FRC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to salaries being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award. Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to improper or if it conformed to the limitations of *2 CFR part 200, subpart E*. Additionally, adequate documentation for two of the items supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.
  - One item totaling $2,667 where funds were used for promotional items which are unallowable according to *2 CFR 200.431*. Additionally,

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

adequate documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.

**Questioned Cost for fiscal year 2019 - $6,179**

- Equipment – Out of 8 items tested, auditors noted the following:
  o Eight items totaling $116,110 were questionable due to FRC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to the equipment being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award. Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to improper or if it conformed to the limitations of *2 CFR part 200, subpart E.*

**Questioned Cost for fiscal year 2019 - $116,110**

- Travel – Out of 12 items tested, auditors noted the following:
  o Two items totaling $4,605 were questionable due to FRC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to the travel being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award. Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.

**Questioned Cost for fiscal year 2019 - $4,605**

*Total amount questioned in 2019 –$133,015*

Due to the widespread fraud, waste, and abuse uncovered during the audit, and the lack of any appropriate underlying methodology for the allocation of shared costs in both MCEC and FRC, the overall lack of documentation to establish reasonableness and necessity of costs, the lack of integrity in documents obtained from MCEC due to known instances of forgery, misdirection, document modification, etc., the direct involvement of MDHS personnel in the fraud, waste, and abuse, and the likelihood of additional fraud, waste, and abuse existing in the

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

actions of these subrecipients, auditor cannot state, with reasonable assurances, the amount of grant costs for the TANF grant were used appropriately.

Known questioned costs, as detailed in the finding above:

**For fiscal year 2017: $6,333,044 (TANF)**
**For fiscal year 2018: $28,419,923 (TANF)**
**For fiscal year 2019: $31,155,361 (TANF)**

**For fiscal year 2018: $593 (SSBG)**
**For fiscal year 2019: $111,262(SSBG)**

**For fiscal year 2018: $497,987 (SNAP)**

**For fiscal year 2019: $139,564 (CCDF)**

Likely questioned costs include total amounts paid to MCEC and FRC for TANF, CCDF and SNAP awards less any amounts questioned in other allowable cost findings in this report. The total has been reduced by those questioned costs to ensure the same dollar is only questioned one time.

Chart below shows amounts actually paid to MCEC and FRC as of June 30, 2019. Amounts paid could be less than grant awards listed in the "Background" section of the finding due to timing differences in the State/Federal fiscal years.

| | Total Paid | Less Amount Questioned in Other Finding | Total Questioned |
|---|---|---|---|
| **2019** | | | |
| TANF | $26,517,614 | N/A | $26,517,614 |
| CCDF | $ 6,576,057 | $3,529,915 | $ 3,046,142 |
| SNAP | $ 1,144,953 | $684,598 | $     460,355 |
| **2018** | | | |
| TANF | $34,801,286 | N/A | $34,801,286 |
| SNAP | $     497,987 | N/A | $     497,987 |
| SSBG | $ 6,900,000 | N/A | $ 6,900,000 |
| **2017** | | | |
| TANF | $21,941,224 | N/A | $21,941,224 |
| **Total** | **$98,379,121** | **$4,214,513** | **$94,164,608** |

All information related to this audit finding has been referred to the Mississippi Office of the State Auditor Investigative Division, the United States Department of Justice, the Office of Inspector General for the United States Department of Health and Human Services, and the Federal Bureau of Investigation.

**Cause**          Executive Director JD circumvented internal controls set in place by MDHS in regards to procurement, monitoring, and other allowable costs controls in order to direct monies to certain subrecipients, who then directed federal monies to individuals associated with JD. Additionally, JD used his position as Director to

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

|  |  |
|---|---|
|  | convince employees at MDHS to collude with him in circumventing controls. MDHS, in turn, did not appropriately monitor or review expenditures at the subrecipient level to ensure adherence to allowable cost and activities allowed guidelines.  Personnel at MDHS are not properly trained or educated in regards to allowable cost provisions.   Lastly, personnel at MDHS either disregarded established policies and procedures, or were not aware policies and procedures existed. |
| **Effect** | Due to high risk of additional fraud, waste, and abuse other than what has been reported to authorities or detailed in this report, auditor questioned the entire grant award amounts to certain subrecipients.   Uniform Grant Guidance includes remedies for non-compliance with federal regulations, including, but not limited to, requesting a dollar for dollar reduction in the subsequent year's grant award for any money misappropriated or misspent under the Temporary Assistance for Needy Families Grant.  Additionally, the widespread fraud, waste, and abuse has led to public distrust of MDHS, and a loss of integrity in the public welfare system in the State of Mississippi. |
| **Recommendation** | We recommend the Mississippi Department of Human Services take swift and immediate action to re-instill trust in the public welfare system in Mississippi by doing the following actions: |

1) Pursue any legal remedies available against those that have contributed to the widespread fraud, waste, and abuse detailed in this report;
2) Pursue any legal remedies to seize property at MCEC and FRC that was purchased with federal monies in accordance with the policies of the *MDHS Subgrant Manual*;
3) Procure an independent certified public accounting firm to conduct a widespread forensic audit of MDHS to determine the extent of fraud, waste, and abuse in other programs, as well as the TANF program, and of MCEC and FRC to support any attestation made by MDHS of the allowability of costs, and report any suspected criminal activity to the Mississippi Office of the State Auditor;
4) Conduct internal investigations to determine the pervasiveness of the knowledge and involvement of former and current MDHS staff in the widespread fraud, waste, and abuse, and report any suspected criminal activity to the Mississippi Office of the State Auditor;
5) Strengthen existing controls to ensure non-compliance with federal regulations does not continue;
6) Procure adequate and appropriate training for all staff who are involved in any federal allowable costs and activities allowed monitoring;
7) Increase awareness in subrecipients of allowable cost and activities allowed regulations.

|  |  |
|---|---|
| **Views of Responsible Officials** | Management at the Mississippi Department of Human Services  concurs with this finding.  See additional comments in the Corrective Action Plan on page 345. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-031** | <u>Strengthen Controls to Ensure Compliance with Allowable Cost Requirements of the Supplemental Nutrition Assistance Program (SNAP).</u> |
| **CFDA Number** | 10.551 Supplemental Nutrition Assistance Program (SNAP)<br>10.561 State Administrative Matching Grants for the Supplemental Nutrition Assistance Program (SNAP) |
| **Federal Award No.** | 1283505 (2018 E&T 50%)<br>1293505 (2019 E&T 100%) |
| **Questioned Costs** | $684,598 |

**Criteria**
Per *MDHS' Subgrant/Agreement Manual Section 5*, "The accounting system of each MDHS subgrantee shall provide the monitors/auditors with adequate documentation to support the subgrantee's financial claims. Source documents are required to support transactions entered into the subgrantee's record keeping system. The following is a list of the minimum documentation required for selected transaction types: …Time sheets and activity reports which reflect the actual hours worked and duties performed. Time distribution/activity sheets are required when the employee's time is charged to more than one subgrant or activity. An approved travel voucher showing that all travel expenses were incurred for the benefit of the subgrant; copies of supporting bills including out of state meal receipts, hotel bills, conference registration fee receipts, and conference agendas."

Per the *Code of Federal Regulations, Title 45- Subtitle a- Subchapter A- Part 200.431*, "Pension Plan Costs. Pension plan costs which are incurred in accordance with the established policies of the non-Federal entity are allowable, provided that: (1) Such policies meet the test of reasonableness."

Per the *Code of Federal Regulations, Title 45-Subtitle A- Subchapter A- Part 200.404*, "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. The question of reasonableness is particularly important when the non-Federal entity is predominantly federally-funded. In determining reasonableness of a given cost, consideration must be given to: (a) Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the non-Federal entity or the proper and efficient performance of the Federal award….."

Per the *Code of Federal Regulations, Title 45-Subtitle A- Subchapter A- Part 200.405*, "A cost is allocable to a particular Federal award or other cost objective if the goods or services involved are chargeable or assignable to that Federal award or cost objective in accordance with relative benefits received. This standard is met if the cost: (1) Is incurred specifically for the Federal award..."

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Condition** | During testwork performed related to SNAP Activities Allowed and Allowable Costs, auditor noted 31 instances in which MDHS made reimbursement payments to Mississippi Community Education Center (MCEC) for salary, travel, fringe benefits and education related expenses for an agreement MCEC entered into with a KLLM Transport Services (KLLM) to provide training to SNAP Employment and Training (E&T) participants. Allowability of these activities or costs could not be determined due to the following: |

1.  MCEC did not provide timesheet information to support the allocation of salary percentages, nor did it provide supporting documentation relating to travel expenditures.  Information provided to auditors by MCEC and information provided to MDHS by MCEC did not agree in relation to salary and wages applied to the grant.
2.  The Fringe rate of 26.65 percent used by MCEC includes an unreasonable percentage of contributions to a 403(b) plan, including a profit sharing contribution for the Executive Director (NN) and Assistant Executive Director of MCEC (ZN).
3.  Fraud, waste, and abuse noted during review of MCEC that included both reimbursement and accounting recorded falsification.  MCEC initially submitted reimbursement for KLLM expenses at $8,000 per student cost. When advised that the $8,000 cost was too high, MCEC submitted new documentation at $4,000 and documentation for a new program for the exact amount of unallowed expenditures in the prior submission. Personnel from KLLM stated that this additional training never occurred.
4.  MCEC comingled federal and private funds, as well as lacked a proper cost allocation system.

**The total of the questioned costs amounts to $684,598.**

Due to the issues stated above, auditor could not determine if the costs associated with this subrecipient were allowable, allocable or reasonable to the SNAP program.  Additionally, due to inadequate internal controls regarding payments to subrecipients, MDHS erroneously advanced a payment in the amount of $2,615,774 to MCEC on the grant.  MCEC returned the payment; however, MCEC continued to submit payment requests on the grant.  These requests were paid using the contractual services line item of MDHS' budget rather than the "Amount Transferred to Subgrantee" account.  Therefore, $511,120 was paid to MCEC using the appropriate subgrant requests and accounts, and an additional $173,478 was reimbursed using contractual services.  Using the wrong accounts can result in an overpayment of the grant award.

As referenced in Finding 2019-030, the entire amount of SNAP grant funds paid to MCEC is questioned.  The questioned costs for this finding were deducted from the total to ensure that the same costs were not questioned twice.

| | |
|---|---|
| **Cause** | The Former Executive Director circumvented controls and disregarded policies and procedures related to activities allowable and allowable costs in relation to expenditures made for Mississippi Community Education Center. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

|  |  |
|---|---|
|  | Additionally, MDHS staff were either unaware or incompliant with their own policies and federal codes of regulations. |
| **Effect** | Failure to verify expenditures are allowable, appropriately pay expenditures out of federal or private funds, and allocate costs correctly can lead to federal funding being withdrawn or expenditures being paid with incorrect funds. This can also lead to fraud, waste, and abuse within an agency. |
| **Recommendation** | We recommend the Mississippi Department of Human Services strengthen control procedures in order to properly verify expenditures are allowable and appropriate. We also recommend that the agency appropriately pay expenditures out of the correct federal or private funds and allocate the funds correctly across all expenditures. |
| **Repeat Finding** | No. |
| **Statistically Valid** | The sample is considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Department of Human Services partially concurs with this finding.  See additional comments in the Corrective Action Plan on page 352 of this audit report and Auditor's Response on page 361. |

---

*Significant Deficiency*
*Immaterial Noncompliance*

|  |  |
|---|---|
| **2019-034** | <u>Strengthen Controls Over Review of Computations and Data for Allowable Cost Activity Used in the Manual Cost Allocation Process and Review of Indirect Costs Allocated to Federal Programs.</u> |
| **CFDA Number** | 10.551 Supplemental Nutrition Assistance Program<br>10.561 State Administrative Matching Grants for the Supplemental Nutrition Assistance Program (SNAP)<br>93.558 Temporary Assistance for Needy Families State Programs<br>93.658 Title IV-E Foster Care |
| **Federal Award** | 12-35-2841 – 19<br>G1602MSTANF<br>G1701MSTANF<br>G1801MSTANF<br>G1901MSTANF<br>G1801MSFOST<br>G1901MSFOST |
| **Questioned Costs** | $1,871 |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Criteria** | The *Internal Control - Integrated Framework* published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) specifies that a satisfactory control environment is only effective when there are adequate control activities in place. Good internal controls provide that the agency's statistical units are used in accordance with the approved Cost Allocation Plans and that the agency is updating statistical information used for cost allocation on a quarterly basis, and that a supervisory review/approval of charges are in place. |

Additionally, the *Code of Federal Regulations (2 cfr 200.62)* states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;
(a) Transactions are properly recorded and accounted for, in order to:
    (1) Permit the preparation of reliable financial statements and Federal reports;
    (2) Maintain accountability over assets; and
    (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;
(b) Transactions are executed in compliance with:
    (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and
    (2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and
(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

| | |
|---|---|
| **Condition** | During testwork performed over allowable activities and allowable cost requirements, auditor noted: |

- Three instances in which the reporting category charged on the manual cost allocation spreadsheet did not tie back to a reporting category listed on the crosswalk;

- One instance totaling $1,040 where the auditor noted a charge was for parking fees related to "Law of 16" conference. Auditors determined through the audit process that expenditures for "Law of 16" conferences are questionable. Based on this, auditor will question any indirect expenditures related to "Law of 16" conferences; and

- One instance in which the auditor could not verify proper approval for expenditures $831.

| | |
|---|---|
| **Cause** | Keying error made while entering reporting categories into manual spreadsheet and staff oversight of review and approval of expenditures. Also, staff responsible for the review and payment of expenditures were possibly unaware of the questionable nature of expenditures relating to "Law of 16". |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Effect** | Failure to implement proper control could result in over/under allocation funds as well as the allocation of funds to prohibited expenditures. |
| **Recommendation** | We recommend the Mississippi Department of Human Services strengthen controls over the review of computations and data used in the cost allocation process to ensure accurate distribution of costs to federal programs as well as strengthen controls over the review and approval of expenditures. |
| **Repeat Finding** | No. |
| **Statistically Valid** | The sample is considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Department of Human Services concurs with this finding.  See additional comments in the Corrective Action Plan on page 355 of this audit report. |

**PROCUREMENT, SUSPENSION, AND DEBARMENT**

*Significant Deficiency*

| | |
|---|---|
| **2019-040** | <u>Controls Should Be Strengthened Over Procurement of Subrecipients for SNAP.</u> |
| **CFDA Number** | 10.551 Supplemental Nutrition Assistance Program (SNAP) 10.561 State Administrative Matching Grants for the Supplemental Nutrition Assistance Program |
| **Federal Award No.** | 2018 SNAP E&T 50% 2019 SNAP E&T 100% 2019 USDA Outreach 2019 TEFAP |
| **Questioned Costs** | None. |
| **Criteria** | Per the *Code of Federal Regulations (45 cfr 200.331 (b))*, all pass-through entities must: … Evaluate each subrecipient's risk of noncompliance with Federal statutes, regulations, and the terms and conditions of the subaward… |
| | The *Integrated Framework published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)* specifies that a satisfactory control environment is only effective when there are adequate control activities in place. Effective control activities dictate agencies maintain written policies and procedures in maintaining a good control environment. |
| | Additionally, the *Code of Federal Regulations (2 cfr 200.303(a))*, states agencies should, "Establish and maintain effective internal control over the |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Federal award that provides reasonable assurance that the non-Federal entity is managing the federal awards in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award." Without written policies and procedures, the auditor is unable to substantiate non-written policies.

Furthermore, the *Code of Federal Regulations (45 cfr 200.62)* states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;
(a) Transactions are properly recorded and accounted for, in order to:
    (1) Permit the preparation of reliable financial statements and Federal reports;
    (2) Maintain accountability over assets; and
    (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;
(b) Transactions are executed in compliance with:
    (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and
    (2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and
(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**

When performing testwork related to SNAP Procurement, Suspension, and Debarment, auditors noted the following:

- Out of the eight items sampled, two were for Skills2Work partner assessments.

  Skills2Work is a workforce development project designed to leverage federal funds to help the State scale career and technical education programs so that they are more accessible to low-income families. Companies that want to become a partner in the program, and receive a reimbursement of up to 40 percent of the allowable program cost, must fill out an application, scope of services, budget narrative and estimate and apply at MDHS.

  MDHS stated that all Skills2Work industry "partners" are required to receive a partner assessment. These assessments are used to evaluate the partner's viability based on the program criteria and the ability to service those individuals who qualify for SNAP benefits.

  MDHS supplied auditors with a copy of the partner assessment template, but was unable to provide auditors with the actual assessments used to evaluate the partners for admission to the program. Auditors inquired if there were any written policies and procedures for the partner assessments, and were provided an additional copy of the partner assessment template and the *Subgrantee Manual* used for all MDHS subgrants. Auditors were able to find a brochure sent to partners about the program, and a toolkit template on the MDHS

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

website, but no other information was provided by MDHS. Auditor determined that all policies were verbal, and that there were not adequate controls over the partnership assessments.

- Out of eight items sampled, one contract was for MCEC and one contract was for FRC. Due to the direct involvement of former Executive Director JD, auditor not verify these contracts were entered into using arms-length bargaining.

- Out of eight items sampled, MDHS did not provide any supporting documentation for the procurement of the remaining four contracts; therefore, auditor cannot ascertain whether procurement is valid.

**Cause**

Inadequate procedures and a failure to follow other established policies by MDHS personnel. Policies for Skills2Work were verbal directives only, causing inconsistencies among staff.

**Effect**

Without proper policies, procedures, and documentation to support costs, ineligible participants could be admitted to the Skills2Work program; thereby, causing an unallowable cost.

**Recommendation**

We recommend Mississippi Department of Human Services strengthen the controls and prepare written policies and procedures over the procurement process of the Skills2Work program.

**Repeat Finding**

No.

**Statistically Valid**

The sample is considered statistically valid.

**View of Responsible Officials**

Management at the Mississippi Department of Human Services concurs with this finding. See additional comments in the Corrective Action Plan on page 357 of this audit report.

---

**SUBRECIPIENT MONITORING**

*Material Weakness*
*Material Noncompliance*

**2019-042**

Controls Should Be Strengthened over On-Site Monitoring for the Supplemental Nutrition Assistance Program (SNAP), Temporary Assistance for Needy Families (TANF), Child Care and Development Block Grant (CCDF), Low Income Home Energy Assistance Program (LIHEAP), and Social Services Block Grant (SSBG) Programs.

**CFDA Number**

10.551  Supplemental Nutrition Assistance Program

155

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

10.561 State Administrative Matching Grants for the Supplemental Nutrition Assistance Program (SNAP)
93.558 Temporary Assistance for Needy Families State Programs
93.667 Social Services Block Grant
93.575 Child Care and Development Block Grant
93.596 Child Care Mandatory and Matching Funds of the Child Care and Development Fund
93.568 Low Income Home Energy Assistance Program

**Federal Award No.**  G1701MSTANF 2017     SNAP – Letter of Credit
G1801MSTANF 2018     G1801MSSOSR 2018
G1801MSCCDF 2018     G18B1MSLIEA 2018

**Questioned Costs**  None.

**Criteria**  The terms and conditions of the grant agreements between the Mississippi Department of Human Services (MDHS) and the U.S. Department of Health and Human Services require MDHS to administer grants in compliance with the *Code of Federal Regulations (2 cfr 200)*.

The *Code of Federal Regulations (2 cfr 200.331)* requires MDHS to properly identify subaward requirements to subrecipients, evaluate the risk of noncompliance for each subrecipient, and monitor the activities of subrecipients as necessary to ensure that subawards are used for authorized purposes, complies with the terms and conditions of the subawards and achieves performance goals.

We evaluated MDHS's compliance with subrecipient monitoring requirements based on written policies and procedures designed by MDHS's Division of Program Integrity – Office of Monitoring (OM) to satisfy during-the-award monitoring requirements. OM procedures require an on-site monitoring review of each subgrantee contract at least once during the subgrant period. A tracking mechanism is used to ensure all subgrantee contracts are properly identified and monitored. Monitoring tools/checklists are used during each on-site monitoring review to provide guidance and to document a review was performed. The on-site monitoring workpapers are reviewed and approved by OM supervisory personnel prior to issuance of a written report, the Initial Report of Findings & Recommendations, which is used for communicating finding(s) and/or questioned costs to subgrantees. The written report should be issued within 30 working days from the date of the exit conference, which is normally held on the last day of the on-site review.

The *Code of Federal Regulations* (*2 cfr 200.328(a)*), states the non-Federal entity is responsible for oversight of the operations of the Federal award supported activities. The non-Federal entity must monitor its activities under Federal awards to assure compliance with applicable Federal requirements and performance expectations are being achieved. Monitoring by the non-Federal entity must cover each program, function or activity. See also § 200.331 Requirements for pass-through entities.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

The *Code of Federal Regulations* (*2 cfr 200.328(b)(2)*), states the non-Federal entity must submit performance reports using OMB-approved government-wide standard information collections when providing performance information. As appropriate in accordance with above mentioned information collections, these reports will contain, for each Federal award, brief information on the following unless other collections are approved by OMB:

(i) A comparison of actual accomplishments to the objectives of the Federal award established for the period. Where the accomplishments of the Federal award can be quantified, a computation of the cost (for example, related to units of accomplishment) may be required if that information will be useful. Where performance trend data and analysis would be informative to the Federal awarding agency program, the Federal awarding agency should include this as a performance reporting requirement.

(ii) The reasons why established goals were not met, if appropriate.

(iii) Additional pertinent information including, when appropriate, analysis and explanation of cost overruns or high unit costs.

The *Code of Federal Regulations* (*2 cfr 200.331(6)(b)*), states: Evaluate each subrecipient's risk of noncompliance with Federal statutes, regulations, and the terms and conditions of the subaward for purposes of determining the appropriate Subrecipient monitoring described in paragraph (e) of this section.

Additionally, the *Code of Federal Regulations (45 cfr 200.62),* states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;

(a) Transactions are properly recorded and accounted for, in order to:
    (1) Permit the preparation of reliable financial statements and Federal reports;
    (2) Maintain accountability over assets; and
    (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;

(b) Transactions are executed in compliance with:
    (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and
    (2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and

(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

Furthermore, The *Internal Control – Integrated Framework* published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) Manual specifies that a satisfactory control environment is only effective when there are adequate control activities in place.

**Condition**

During testwork performed on subrecipient on-site monitoring for 84 subgrant contracts during state fiscal year 2019, auditor noted the following exceptions:

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- During conversations with upper management of MDHS, auditor noted that prior Executive Director JD would circumvent controls of the monitoring process for certain subrecipients. Monitoring visits were called short and monitors were recalled to MDHS and reassigned if issues were found during monitor visits. This direct involvement of the former Executive Director and the disregard of controls resulted in a lack of integrity in the monitoring process. Monitoring reports could not be relied upon during testwork as auditors could not determine what, if any, appropriate monitoring actually occurred for subgrants. No other staff at MDHS reported to the Mississippi Office of the State Auditor that monitors were being recalled and controls were being circumvented by Executive Director JD. Additionally, testwork determined widespread fraud, waste, and abuse at two of the largest subrecipients of TANF funds. Monitoring reports for prior year grants did not indicate any questioned costs at these subrecipients, regardless of the subrecipients repeatedly participating in unallowable activities. Auditors noted substantial violations of the Subgrant Manual by both MCEC and FRC in regards to asset purchases, indirect costs, allowable costs, etc. These violations and the fraud, waste, and abuse uncovered during the audit verify that subrecipients were not properly monitored.

- Seven contracts, or 8 percent, in which corrective actions were not received from the subrecipient within 15 working days from the date the report was issued, or auditor could not verify corrective actions were received timely due to lack of audit trail.
  - Corrective Actions for one contract were received 21 days from the Initial Monitoring Report (IMR),
  - For six contracts, auditor could not verify corrective actions were necessary, or received timely, due to lack of audit trail;

- Eleven contracts, or 13 percent, in which the IMR was not issued within 60 working days from the date of the exit conference, or auditor could not determine when it was issued due to lack of audit trail.
  - IMRs were issued between 66 and 261 days late, with an average of 124 working days after the exit conference took place;

- Six contracts, or 7 percent, in which the IMR was not included in monitoring file; therefore, supervisory approval prior to issuance of the report to the subrecipient could not be verified;

- Six contracts, or 7 percent, in which we were unable to determine if questioned costs had been completely resolved as of the date of testwork;

- Six contracts, or 7 percent, in which the auditor could not verify monitoring took place during the contract period due to lack of documentation in monitoring file;

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- Twenty-five (25) contracts, or 30 percent, in which the Monitoring Supervisor Checklist was dated after the IMR letter, or was not included in the file, therefore Monitoring Supervisor Review Checklist approval prior to issuance of the IMR letter could not be verified;

- Five contracts, or 6 percent, in which the On-Site Monitoring review of the Subrecipient was not performed during the subgrant period;

- Three contracts, or 3 percent, in which the Subgrants were not monitored in federal FY 2018; and

In addition, the MDHS Office of Monitoring (OM) did not evaluate the risk of noncompliance of its subrecipients in order to perform monitoring procedures based upon identified risks, as is a requirement of Uniform Guidance.

| | |
|---|---|
| **Cause** | Staff were either unaware or did not follow identified policies and procedures for monitoring requirement.  Additionally, per documentation obtained by auditors, former Executive Director JD colluded with MDHS personnel to undermine the monitoring of subrecipients and circumvented controls in order to delay or stop monitoring of certain subrecipients. |
| **Effect** | MDHS programmatic funding divisions rely upon OM monitoring procedures to verify compliance with program regulations and to identify potential problem areas needing corrective action. Failure to properly monitor subreceipients in a timely manner could allow noncompliance with federal regulations to occur and go undetected, potentially resulting in questioned costs. |
| **Recommendation** | We recommend the Mississippi Department of Human Services' Division of Program Integrity – Office of Monitoring (OM) strengthen controls over subrecipient monitoring. OM should evaluate the risk of noncompliance of each subrecipient and perform monitoring procedures based upon identified risks. We also recommend the agency ensure subawards are monitored timely and that the "Report of Findings & Recommendations" prepared as a result of the on-site monitoring be issued in a timely manner to enable immediate corrective action procedures to be initiated.  We further recommend that the agency maintain all supporting monitoring tools, reports, and correspondence in the monitoring file. |
| **Repeat Finding** | Yes – 2018-046 in 2018; 2017-037 in 2017; 2016-027 in 2016; 2015-005 in 2015; 2014-017 in 2014; 2013-015 in 2013. |
| **Statistically Valid** | The sample is considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Department of Human Services concurs with this finding.  See additional comments in the Corrective Action Plan on page 358 of this audit report. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-043** | Strengthen Controls Over Subrecipient Monitoring to Ensure Compliance with OMB Uniform Guidance Auditing Requirements. |
| **CFDA Number** | 10.551  Supplemental Nutrition Assistance Program<br>10.561  State Administrative Matching Grants for the Supplemental Nutrition Assistance Program (SNAP)<br>93.558  Temporary Assistance for Needy Families State Programs<br>93.575  Child Care and Development Block Grant<br>93.596  Child Care Mandatory and Matching Funds of the Child Care and Development Fund<br>93.667  Social Services Block Grant<br>93.568  Low Income Home Energy Assistance Program |

**Federal Award No.**     G1801MSTANF 2018          G1801MSSOSR 2018
                          G1701MSCCDF 2017          G17B1MSLIEA 2017
                          G1801MSCCDF 2018          G18B1MSLIEA 2018
                          SNAP – Letter of Credit

**Questioned Costs**     None.

**Criteria**     The Office of Management and Budget (OMB) Uniform Guidance states the pass-through entity is responsible for (1) ensuring that subrecipients expending $750,000 or more in Federal awards during their fiscal year have met the audit requirements of OMB Uniform Guidance and that the required audits are completed within nine months of the end of the subrecipient's audit period; (2) issuing a management decision on findings within 6 months after receipt of the subrecipient's audit report; and (3) ensuring that the subrecipient takes timely and appropriate corrective action on all audit findings.  In cases of continued inability or unwillingness of a subrecipient to have the required audits, the pass-through entity shall take appropriate action using sanctions.

Additionally, the *Code of Federal Regulations (45 cfr 200.62),* states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;
(a) Transactions are properly recorded and accounted for, in order to:
   (1) Permit the preparation of reliable financial statements and Federal reports;
   (2) Maintain accountability over assets; and
   (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;
(b) Transactions are executed in compliance with:
   (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and

160

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

(2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and

(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**

During the audit of the Mississippi Department of Human Services (MDHS), auditor reviewed the Division of Program Integrity – Office of Monitoring (OM) audit files and Monitoring Tracking Document for MDHS Subgrantees for state fiscal year 2017. During our review, we noted the following weaknesses:

- Auditor noted the SFY 2017 Single Audit Tracking System utilized by the MDHS Office of Monitoring to track the status of OMB Guidance audits for DHS subrecipients does not include expenditures made by the sub-recipient nor does it include all sub-recipients who received federal funds from MDHS during FY 2017. The audit requirements of the *Code of Federal Regulations (2 cfr Part 200, subpart F)* are based on expenditures of Federal awards; therefore, subrecipients of MDHS could have expended Federal awards in excess of amounts that require a single audit that may have not been included on MDHS's tracking document. The agency was not able to provide an expenditure report to the auditors in order to ensure completeness of the monitoring files.

- Three instances in which the Office of Monitoring could not provide an OMB monitoring file for the sub-recipient; therefore, auditor could not determine compliance with OMB monitoring procedures;

- Nineteen (19) instances in which the Office of Monitoring failed to send out reminder letters within a timely manner. Reminder letters were mailed on February 6, 2019, on average 7.5 months after the due dates of audit reports; and

- Eighteen (18) instances where the OMB Uniform Guidance audit report for the subgrantee was not received by Office of Monitoring within nine months of the subgrantee's fiscal year end. Subgrantee audit reports were received on average 213 days after the nine-month deadline.

**Cause**

Staff were either unaware or did not follow identified policies and procedures for subrecipient monitoring related to Uniform Grant Guidance.

**Effect**

Failure to properly monitor subrecipients could allow noncompliance with federal regulations to occur and go undetected, potentially resulting in fraud, waste, and abuse within the agency.

**Recommendation**

We recommend the Mississippi Department of Human Services' Division of Program Integrity – Office of Monitoring (OM) strengthen controls over subrecipient monitoring for OMB Uniform Guidance audits to ensure recipients expending $750,000 or more in Federal funds during their fiscal year are

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

appropriately monitored and that the appropriate federal audit is obtained.  We further recommend that OM design a monitoring tool based on expenditures incurred by subrecipients to ensure all subrecipients are included on the tracking report and continue to follow-up with subgrantees in a timely to ensure compliance with audit requirements.

**Repeat Finding**          Yes – 2018-047 in 2018; 2017-038 in 2017; 2016-028 in 2016; 2015-009 in 2015; 2014-016 in 2014.

**Statistically Valid**     The sample is considered statistically valid.

**View of Responsible**
**Officials**               Management at the Mississippi Department of Human Services concurs with this finding.  See additional comments in the Corrective Action Plan on page 359 of this audit report.

## STATE OF MISSISSIPPI

## SCHEDULE OF FINDINGS AND QUESTIONED COSTS
## FOR THE YEAR ENDED JUNE 30, 2019

### PART 3 – FEDERAL AWARD FINDINGS AND QUESTIONED COSTS

### U.S. DEPARTMENT OF DEFENSE

| **Finding Number** | **Finding and Recommendation** |
|---|---|

**MILITARY DEPARTMENT**

**PROCUREMENT, SUSPENSION, AND DEBARMENT**

*Significant Deficiency*
*Immaterial Noncompliance*

| | |
|---|---|
| **2019-018** | Controls Should Be Strengthened to Ensure Agency Verifies Vendors are not Suspended or Debarred |
| **CFDA Number** | 12.400 – Military Construction, National Guard |
| **Federal Award No.** | W9127Q-16-2-2002 (2016)<br>W9127Q-16-2-2001 (2016)<br>W9127Q-13-2-2001 (2013)<br>W9127Q-18-2-2001 (2018) |
| **Questioned Costs** | N/A |
| **Repeat Finding** | No. |
| **Statistically Valid** | This sample is not considered statistically valid. |
| **Criteria** | *The Code of Federal Regulations (2 cfr 180.300)* requires when you enter into a covered transaction with another person at the next lower tier, you must verify that the person with whom you intend to do business is not excluded or disqualified. This can be completed by any of the following means:<br>(a) Checking SAM Exclusions; or<br>(b) Collecting a certification from that person; or<br>(c) Adding a clause or condition to the covered transaction with that person. |
| **Condition** | During testwork performed for procurement, suspension, and debarment over the Military Construction, National Guard program for the fiscal year 2019, auditor noted five out of nine vendors lacked a review of DUNs for suspension and debarment. |
| **Cause** | The State of Mississippi Military Department (Military) relied on internal recommendation produced by project managers, whom did not know the requirement for verification of DUNs number. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Effect** | Military could contract with vendors whom are suspended or debarred. Payments to suspended or debarred would be disallowed, requiring management to terminate contract midway.  Additionally, it could loss of federal funding for projects. |
| **Recommendation** | We recommend the Mississippi Military Department strengthen controls to ensure compliance with Procurement, Suspension, and Debarment. |
| **Views of Responsible Officials** | Management at the Mississippi Military Department concurs with this finding.  See additional comments in the Corrective Action Plan on page 377 of this audit report. |

---------------------------------------------------------------------------------

**REPORTING**

*Significant Deficiency*
*Immaterial Noncompliance*

| | |
|---|---|
| **2019-019** | <u>Controls Should Be Strengthened to Ensure Compliance with Federal Reporting Requirements.</u> |
| **CFDA Number** | 12.400 – Military Construction, National Guard |
| **Federal Award** | W9127Q-16-2-2002 (2016)<br>W9127Q-16-2-2001 (2016)<br>W9127Q-13-2-2001 (2013)<br>W9127Q-18-2-2001 (2018) |
| **Questioned Costs** | N/A |
| **Repeat Finding** | Yes; 2018-062 |
| **Statistically Valid** | This sample is not considered statistically valid. |
| **Criteria** | *National Guard Regulation (NGR) 5-1, Section 11-4* states "To process reimbursement payments, the grantee shall provide an OMB Standard Form (SF) 270 (Request for advance or reimbursement) with supporting documentation to the Cooperative Agreement Program Manager." |
| **Condition** | During inquiry performed for reporting requirements over the National Guard Military Construction Projects (NGCP) and the related Military Construction Cooperative Agreements for the fiscal year 2019, auditors noted that SF-270 forms were not being completed with reimbursement requests to draw down grant funds, as required by federal regulations. This same finding was issued during the fiscal year 2018 audit; however, due to the timing in which the finding was issued, it was not able to be corrected for the fiscal year 2019 audit. It is noted that the agency made needed corrections and began issuing the SF-270 in October 2019. |
| **Cause** | Personnel were either unaware or did not follow identified regulations for reporting related to Uniform Guidance. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Effect** | Failure to submit reports could result in reporting penalties and could impact funding determinations |
| **Recommendation** | We recommend the Mississippi Military Department implement controls over the preparation and submission of required federal reports. |
| **Views of Responsible Officials** | Management at the Mississippi Military Department concurs with this finding.  See additional comments in the Corrective Action Plan on page 377 of this audit report. |

(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

---

**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**FOR THE YEAR ENDED JUNE 30, 2019**

---

**PART 3 – FEDERAL AWARD FINDINGS AND QUESTIONED COSTS**

**U.S. DEPARTMENT OF EDUCATION**

| **Finding Number** | **Finding and Recommendation** |
|---|---|

**DEPARTMENT OF EDUCATION**

**SUBRECIPIENT MONITORING**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-026** | Controls Should Be Strengthened to Ensure Compliance with On-Site Subrecipient Monitoring Requirements. |
| **CFDA Number** | 84.010 Title I – Grants to Local Education Agencies<br>84.367 Title II – Supporting Effective Instruction State Grants |
| **Federal Award** | S010A160024 (Title I)<br>S010A170024 (Title I)<br>S367A160023 (Title II)<br>S367A170023 (Title II) |
| **Questioned Costs** | $475,688 |
| **Repeat Finding** | No. |
| **Statistically Valid** | The sample is considered statistically valid. |
| **Criteria** | The terms and conditions of the grant agreements between the Mississippi Department of Education (MDE) and the U.S. Department of Education require MDE to administer grants in compliance with the *Code of Federal Regulations (2 cfr Part 200* – Uniform Guidance). The *Code of Federal Regulations (2 cfr Part 200.331)* designates MDE, as a pass through entity, to properly identify subaward requirements to subrecipients, evaluate the risk of noncompliance for each subrecipient, and monitor the activities of subrecipients as necessary to ensure that subawards are used for authorized purposes, complies with the terms and conditions of the subawards and achieves performance goals. |

MDE's Office of Federal Programs Division of Compliance (OFP-DC) procedures require an on-site monitoring review of each subgrantee contract based on risk assessment level of moderate or high. A tracking mechanism is used to ensure all subgrantee contracts are properly identified and monitored. The OFP-DC written procedures state each monitoring visit will have a monitoring team leader who is responsible for completing the monitoring report and obtaining necessary

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

signatures for the monitoring instrument during the on-site monitoring visit. The monitoring instrument is designed to include all areas of compliance to be monitored. The written procedures further state the completed monitoring instrument will be signed by the Federal Programs Director, all district-level staff involved in the monitoring, and all members of the OFP-DC monitoring team prior to issuance of a written report with findings and/or questioned costs to the school district. OFP-DC written procedures require the school district to prepare a Corrective Action Plan (CAP) within 30 days of receipt of the monitoring report and require OFP-DC to follow up with the CAP to ensure it is accomplished within 12 months of the monitoring visit. The procedures further state the Fiscal Monitoring Report Cover Sheet included in the monitoring instrument packet to identify the status of the monitoring visit either *Closed* or *Pending Compliance with Approved Corrective Action Plan.* Finally, the written procedures state a potential condition of approval of the school district's annual funding application is that the status of the monitoring report must be either *Closed* or *Pending Compliance with Approved Corrective Action Plan.*

**Condition**   During testwork performed over MDE's on-site subrecipient monitoring of 16 out 147 school districts for school year 2017-2018, auditor noted the following exceptions:

- Seven instances, or 44%, in which the school district did not provide MDE with a CAP within 30 days of the monitoring report;
  - CAPs were received up to 161 days from the receipt of the monitoring report, with an average of 42 days passing between the monitoring report and the district's response in the instances noted;
- One instance, or 6%, in which no CAP was submitted to MDE;
- Eight instances, or 50%, in which no clearance letter was issued informing the school district the status of the monitoring report as *Closed* or *Pending Compliance with Approved Corrective Action Plan.* Follow up letters were sent to some of the districts, but 12 months has passed since the letters were sent and no clearance letters have been issued to finalize the monitoring reports. It should be noted that the OFP written procedures for monitoring school year 2019-2020, two school years after the school year tested, have been revised to state that follow up to CAPs is typically accomplished within 12 months but there are instances that will require a longer period based on feasibility of the corrective action or scheduling;
- Four instances, or 25%, in which the school districts have questioned costs totaling $475,688 not yet resolved or refunded after 12 months since the monitoring visit has passed. It should be noted that the OFP written procedures for monitoring school year 2019-2020 have been revised to state that follow up to CAPs is typically accomplished within 12 months but there are instances that will require a longer period.
- For all school districts tested, auditor noted the monitoring instrument and cover sheet were not consistently utilized. Some monitoring teams opted to use other documentation as an audit trail for preparation and supervisory approval of the monitoring visit. OFP-DC's written monitoring procedures state all members of the monitoring team, the school district personnel

168

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

involved and the Federal Programs Director will sign the completed monitoring instrument. It should be noted that the OFP written procedures for school year 2019-2020 have been revised to state that the monitoring instrument will be completed but signatures from the monitoring team, school district personnel and Federal Programs Director are not required.

**Cause**

Staff were either unaware or did not follow identified policies and procedures for subrecipient on-site monitoring requirements.

**Effect**

MDE programmatic funding divisions rely upon on-site monitoring procedures to verify compliance with program regulations and to identify potential problem areas needing corrective action. Failure to properly monitor subrecipients and ensure closure of the monitoring visits in a timely manner could allow noncompliance with federal regulations to occur and go undetected, potentially resulting in questioned costs.

**Recommendation**

We recommend the Mississippi Department of Education strengthen controls to ensure compliance with the agency's policies and procedures for on-site subrecipient monitoring.

**Views of Responsible Officials**

Management at the Mississippi Department of Education concurs with this finding. See additional comments in the Corrective Action Plan on page 341 of this audit report.

(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

---

**SCHEDULE OF FINDINGS AND QUESTIONED COSTS
FOR THE YEAR ENDED JUNE 30, 2019**

---

**PART 3 – FEDERAL AWARD FINDINGS AND QUESTIONED COSTS**

**U.S. DEPARTMENT OF TRANSPORTATION**

| **Finding Number** | **Finding and Recommendation** |
|---|---|

**DEPARTMENT OF TRANSPORTATION**

**SUBRECIPIENT MONITORING**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-020** | Controls Should Be Strengthened to Ensure Compliance with Subrecipient Monitoring Requirements. |
| **CFDA Number** | 20.205 – Highway Planning and Construction<br>20.219 – Recreational Trails Program |
| **Federal Award No.** | All Current Active Grants |
| **Questioned Costs** | N/A |
| **Repeat Finding** | Yes; 2018-010. |
| **Statistically Valid** | The sample is not considered statistically valid. |
| **Criteria** | *Code of Federal Regulations (2 cfr §200. 331 (f))* states all pass-through entities (PTE's) must verify that every subrecipient is audited as required by Subpart F - Audit Requirements when it is expected that the subrecipient's Federal awards expended during the fiscal year equaled or exceeded the threshold-a nonfederal entity that expends $750,000 or more during the non-Federal entity's fiscal year in Federal awards must have a single audit conducted-set forth in *§200.501 Audit requirements.*<br><br>*Code of Federal Regulations (2 cfr § 200.5 l 2(a)(J))* states the audit must be completed and the data collection form and reporting package must be submitted within the **earlier of** 30 calendar days after receipt of the auditor's report(s), **or** nine months after the end of the audit period. If the due date falls on a Saturday, Sunday, or Federal holiday, the reporting package is due the next business day.<br><br>*Code of Federal Regulations (2 cfr § 200.512(a)(2)(b))* states the Federal Audit Clearinghouse (FAC) is the repository of record for Subpart F – Audit Requirements reporting packages and the data collection form. All Federal agencies, pass-through entities and others interested in a reporting package and data collection form must obtain it by accessing the FAC. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

As required by the Mississippi Department of Transportation's (MOOT) Project Development Manual (PDM) for Local Public Agencies (LPA) Section 1.2, " ...the MOOT must ensure that the LPA meets the audit requirements of Subpart F of the uniform guidance ... The uniform guidance requires that if the LPA expends $750,000 or more in federal funds during its fiscal year, the LPA must have a single audit performed in accordance with the uniform guidance. If the LPA meets this requirement, a request for the submission of the audit report will be made by the MOOT. The due date of submission for the audit report to the MOOT is within the earlier of 30 days after receipt of the CPA's audit report or nine months after the end of the audit period (the LPA's fiscal year)."

**Condition**          MDOT is not verifying that every subrecipient that expends $750,000 or more in federal awards during the respective fiscal year is having a single audit or program specific audit performed. MDOT only monitors subrecipients in which they have paid $750,000 or more of CFDA 20.205 federal awards during the respective fiscal year.

MDOT is not adequately using the FAC to monitor and obtain report submission information on their subrecipient's.

**Cause**              MDOT has a difference in interpretation of the federal guideline. In addition, MDOT's Corrective Action Plan for prior year finding regarding Subrecipient Monitoring did not go into effect until July 1, 2019, which is subsequent to 2019 fiscal year. Due to the timing of MDOT's Corrective Action Plan, the prior year finding is noted as a repeat finding for 2019 fiscal year.

**Effect**             Subrecipients could be in noncompliance with *2 cfr § 200.501*, Audit requirements, and go undetected by MDOT.  In addition, MDOT could lose federal funding for not properly monitoring their Subrecipients. Without proper monitoring of their federal reports, subrecipients may participate in unallowable activities that goes undetected by MDOT, the grantor.

**Recommendation**     We recommend that the Mississippi Department of Transportation strengthen controls to ensure compliance with the Subrecipient Monitoring requirements.

**Views of Responsible**
**Officials**          Management at the Mississippi Department of Transportation concurs with this finding.  See additional comments in the Corrective Action Plan on page 363 of this audit report.

------------------------------------------------------------------------------------------

**SPECIAL TESTS & PROVISIONS – WAGE RATE**

*Material Weakness*
*Material Noncompliance*

**2019-021**          <u>Controls Should Be Strengthened to Ensure Compliance with Wage Rate Requirements.</u>

172

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **CFDA Number** | 20.205 – Highway Planning and Construction |
| | 20.219 – Recreational Trails Program |
| **Federal Award** | All Current Active Grants |
| **Questioned Costs** | N/A |
| **Repeat Finding** | No. |
| **Statistically Valid** | This sample is not considered statistically valid. |

**Criteria**

*Code of Federal Regulations (29 cfr § 3.3(b) Labor)* requires each contractor or subcontractor engaged in the construction, prosecution, completion, or repair of any public building or public work, or building or work financed in whole or in part by loans or grants from the United States, shall furnish each week a statement with respect to the wages paid each of its employees engaged on work covered by part 3 and part 5 of this title during the preceding weekly payroll period. This statement shall be executed by the contractor or subcontractor or by an authorized officer or employee of the contractor or subcontractor who supervises the payment of wages, and shall be on the back of Form WH 347, "Payroll (For Contractors Optional Use)" or on any form with identical wording.

*Code of Federal Regulations (29 cfr § 3.4(a) Labor)* requires each weekly statement required under §3 .3 shall be delivered by the contractor or subcontractor, within seven days after the regular payment date of the payroll period, to a representative of a Federal or State agency in charge at the site of the building or work, or, if there is no representative of a Federal or State agency at the site of the building or work, the statement shall be mailed by the contractor or subcontractor, within such time, to a Federal or State agency contracting for or financing the building or work.

Mississippi Department of Transportation's (MOOT) Contract Administration Rule 7401.01 states once work has begun on a contract, the contractor and/or subcontractor will be required to submit two copies of his/her weekly payroll forms, forms CAD-880 and CAD-881, on all Federal-Aid projects ... The Project Engineer has one week to check the payrolls and forward such to the Compliance Officer. The warrant will not be issued to the Contractor for payment of the monthly estimate if the required payroll reports have not been received.

**Condition**

MDOT is not requiring contractors or subcontractors to submit within seven days after the regular payment date of the payroll period a statement with respect to the wages paid to each of its employees engaged in federal projects.
In addition, MDOT's Project Engineers are not providing MDOT's Compliance Officer reviewed payroll statements in a timely manner to determine if monthly Contractor's Estimates have required payroll statement submitted.

During review of eighty payroll submissions, auditors identified the following:

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- Sixty-six instances in which payrolls were submitted to MDOT's Project Office after the seven-day submission requirement. The average delinquency for these instances noted was twenty-six days with nineteen instances being submitted after thirty days of noted payroll week ending date. The latest submission was noted to be 228 days after contractor's payroll week ending date.
- Nine instances in which the Project Engineer did not forward reviewed submitted payroll statements to the Compliance Officer within seven days. The average delinquency for these instances noted was twenty-nine days after the Project Engineer's review.
- MDOT did not delay the issuance of warrants issued to contractors or subcontractors that were noted to not be in compliance of the seven-day submission requirement.

**Cause**   MDOT's current standard practice of requiring payroll submissions to be current by the first week of monthly estimates allows contractor submissions to be later than the seven-day submission requirement.

**Effect**   Failure to review contractor or subcontractor submitted payroll forms timely may result in improper payment of wage rates, work performed, and/or abuse of federal funds.

**Recommendation**   We recommend Mississippi Department of Transportation strengthen controls to ensure compliance with federal wage rate requirements

**Views of Responsible Officials**   Management at the Mississippi Department of Transportation concurs with this finding.  See additional comments in the Corrective Action Plan on page 365 of this audit report.

---

**SPECIAL TESTS & PROVISIONS – QUALITY ASSURANCE PROGRAM**

*Significant Deficiency*

**2019-022**   <u>Controls Should Be Strengthened Over Special Test Requirements Related to the Quality Assurance Program.</u>

**CFDA Number**   20.205 – Highway Planning and Construction
20.219 – Recreational Trails Program

**Federal Award**   All Current Active Grants

**Questioned Costs**   N/A

**Repeat Finding**   No.

**Statistically Valid**   This sample is not considered statistically valid.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Criteria** | The *Code of Federal Regulations (23 cfr § 637.205(a) Quality assurance program)* requires each State Transportation Department shall develop a quality assurance program which will assure that the materials and workmanship incorporated into each Federal-aid highway construction project on the National Highway System are in conformity with the requirements of the approved plans and specifications, including approved changes. The program must meet the criteria in§ 637.207 and be approved by the Federal Highway Administration. |

Section 4.5, Reviewing and Authorizing Test Results, of the Mississippi Department of Transportation's (MOOT) SiteManager Manual states that the appropriate reviewer will review testing completed and select appropriate response in the status field and then select the "Authorize" option to lock the sample record. Authorization will lock the sample record, preventing any further modifications to the details outlined in the window.

The District Materials Engineer's Responsibilities' section of MOOT Construction Manual states the District Materials Engineer should also use the "Find Sample" report function in SiteManager to check for any outstanding unauthorized sample records on a project. All project samples should be authorized at project closing."

MDOT's sampling personnel are to follow the schedule set for sample size, frequency of sampling and the designation of responsibility for sampling and testing set by MDOT's S.O.P. No.: TMD-20-04-00-000.

**Condition**   MDOT is not properly authorizing Quality Assurance (QA) samples in SiteManager system utilized for the QA program. Proper authorization of the sample records is required to prevent further modifications to the details of the sample record. MDOT is not adequately performing the "Find Sample" report function in SiteManager to identify outstanding authorized sample records prior to project closing.

In addition, sampling personnel at MDOT were able to unduly alter the sampling rates for materials of QA sampled projects.

During review of fifty QA sample records, auditor identified the following:
- Four instances in which sample records were not properly authorized in SiteManager, resulting in an 8.0% error rate;
- One instance in which sampling rates for selected QA sample record was changed without proper authorization and not within satisfactory sampling rates. Altered sampling rate was noted to provide only half of required samples.

**Cause**   MDOT staff failed to follow the policies and procedures related to the authorization of sampling records in SiteManager. Additionally, controls were not operating sufficiently to prevent sampling personnel from unduly altering the number of required samples.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Effect** | If the sample is not authorized, the sample record details and results could be altered in SiteManager to the detriment of testing requirements. With regard to the alteration of the sample testing requirements, a sufficient number of samples may not be obtained and tested resulting in improper materials being used on federal projects. |
| **Recommendation** | We recommend the Mississippi Department of Transportation strengthen controls over their Quality Assurance program approval process. Further, we recommend MDOT strengthen controls to prevent, deter, and detect any unauthorized alteration of sample requirements. |
| **Views of Responsible Officials** | Management at the Mississippi Department of Transportation concurs with this finding.  See additional comments in the Corrective Action Plan on page 365 of this audit report. |

## STATE OF MISSISSIPPI

---

## SCHEDULE OF FINDINGS AND QUESTIONED COSTS
## FOR THE YEAR ENDED JUNE 30, 2019

---

## PART 3 – FEDERAL AWARD FINDINGS AND QUESTIONED COSTS

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Finding Number**     **Finding and Recommendation**

**DEPARTMENT OF HEALTH**

**SPECIAL TESTS AND PROVISIONS**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-029** | <u>Controls Should Be Strengthened to Ensure Compliance with Provider Health and Safety Standards Requirements.</u> |
| **CFDA Number(s)** | 93.796 – State Survey Certification of Health Care Providers and Suppliers (Title XIX) Medicaid |
| **Federal Award No.** | 1705MS50001   2017<br>1805MS50001   2018<br>1905MS50001   2019 |
| **Questioned Costs** | N/A |
| **Repeat Finding** | Yes; 2018-059 |
| **Statistically Valid** | The sample is considered statistically valid. |
| **Criteria** | The *Code of Federal Regulations* (42 CFR 488.308) requires the State Survey Agency to conduct a standard survey of each Skilled Nursing Facility (SNF) and Nursing Facility (NF) no later than 15 months after the last day of the previous standard survey and the statewide average interval between standard surveys of skilled nursing facilities and nursing facilities must be 12 months or less. The statewide average interval is computed at the end of each Federal fiscal year by comparing the last day of the most recent standard survey for each participating facility to the last day of each facility's previous standard survey. |
| | The *Code of Federal Regulations* (42 CFR 442.109) requires the State Survey Agency to conduct a survey of each Intermediate Care Facilities for Individuals with Intellectual Disability (ICF/IID) no later than 15 months after the last day of the previous survey and the statewide average interval between surveys must be 12 months or less. The statewide average interval is computed at the end of each Federal fiscal year by comparing the last day of the most recent survey for each participating facility to the last day of each facility's previous survey. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Condition** | During testwork performed over the provider health and safety standard requirements, auditor noted the following: |

- 109 of the 203 nursing facilities, or 54 percent, did not have a mandatory health and safety survey performed within 15 months after the last day of the previous survey.
- One of the 14 ICF/IID facilities, or 7 percent, did not have a mandatory health and safety survey performed within 15 months after the last day of the previous survey.
- The statewide average survey interval for nursing facilities was 15.9, which exceeds the 12-month statewide average survey interval requirement.
- The statewide average survey interval for ICF/IID facilities was 12.8, which exceeds the 12-month statewide average survey interval requirement.

| | |
|---|---|
| **Cause** | Loss of qualified surveyors at the State Survey Agency. |
| **Effect** | If surveys are not conducted timely, health and safety violations may go undetected. Failure to ensure the 12-month statewide average interval requirement is met could result in sanctions and impact funding determinations. |
| **Recommendation** | We recommend the Mississippi Division of Medicaid strengthen controls to ensure compliance with provider health and safety standards requirements. |
| **Views of Responsible Officials** | Management at the Mississippi Department of Health concurs with this finding. See additional comments in the Corrective Action Plan on page 343 of this audit report. |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

## DEPARTMENT OF HUMAN SERVICES

**ACTIVITIES ALLOWED/ALLOWABLE COSTS**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-030** | The Mississippi Department of Human Services Should Strengthen Controls to Ensure Compliance with Subrecipient Allowable Cost Activities. |
| **CFDA Number(s)** | 10.551 Supplemental Nutrition Assistance Program (SNAP)<br>10.561 State Administrative Matching Grants for the Supplemental Nutrition Assistance Program (SNAP)<br>93.558 Temporary Assistance for Needy Families (TANF)<br>93.575 Child Care and Development Block Grant (CCDF)<br>93.596 Child Care Mandatory and Matching Funds of the Child Care and Development Fund (CCDF)<br>93.667 Social Services Block Grant (SSBG) |

| **Federal Award** | 12-35-2841 (SNAP) | G1701MSTANF | G1701MSCCDF |
|---|---|---|---|
| | 2017IQ390345 | G1801MSTANF | G1801MSCCDF |
| | 2018IQ390345 | G1901MSTANF | G1901MSCCDF |
| | | G1702MSTANF | |

| | |
|---|---|
| **Questioned Costs** | $94,164,608.  See chart at the end of finding for detailed information. |
| **Repeat Finding** | No. |
| **Statistically Valid** | Varying types of sampling and testing techniques were used; some are considered statistically valid and some are not.  During the initial planning phase of the audit, auditor identified population as two separate and distinct groups – 1) Payments made by MDHS for services other than direct assistance to recipients 2) Payments made to first tier subgrantees.  However, due to increased fraud risk during the audit, transactions were subdivided into many different populations so that statistical projection of error rates could be utilized.  High risk populations were examined at 100 percent, moderate risk populations were sampled individually, and low risk items were grouped in one population to sample.  Additionally, after initial testing, it was determined that fraud risk was still at a high level and a nomenclature review over the populations was performed to pull out specific transactions as individually significant. |
| **Background** | Auditors were alerted to significant areas of fraud risk by the Governor of Mississippi on June 21, 2019.  An internal audit performed by staff of MDHS uncovered a possible fraudulent scheme involving a third party contractor in the TANF program and the Executive Director of MDHS at that time (JD).  Investigators from the OSA Investigative Division and financial auditors worked to piece together information about this scheme and subsequently indicted six individuals involved in a conspiracy to steal (by a variety of means) approximately |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

$4 million in TANF funds.  The initial investigation into the theft coincided with the fiscal year 2019 Single Audit.  Due to this known fraud, auditors considered many areas of grant expenditures to be high risk.  In order to properly account for and describe the significant areas of waste, fraud, and abuse that were uncovered during the subsequent investigation and audit, the finding format of this particular finding will vary.

**Criteria**

**Applicable Internal Controls**: *The Committee of Sponsoring Organizations of the Treadway Commission (COSO)* and *the United States Government Accountability Office (GAO) Green Book* dictates that in order for organizations to have effective internal control, the organization should have an effective control environment.  A component of an effective control environment is proper oversight ability, accountability and commitment to ethical values.

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.404)* states "A cost is reasonable - if in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost.  The question of reasonableness is particularly important when the entity is predominately federally funded.  In determining reasonableness of a given cost, consideration must be given to: (a) Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the non-Federal entity or the proper and efficient performance of the Federal award. (b) The restraints or requirements imposed by such factors as: sound business practices; arm's-length bargaining; Federal, state, local, tribal, and other laws and regulations; and terms and conditions of the Federal award. (c) Market prices for comparable goods or services for the geographic area. (d) Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the non-Federal entity, its employees, where applicable its students or membership, the public at large, and the Federal Government. (e) Whether the non-Federal entity significantly deviates from its established practices and policies regarding the incurrence of costs, which may unjustifiably increase the Federal award's cost."

*The Code of Federal Regulations (2 cfr 200.405 (a))* states "A cost is allocable to a particular Federal award or other cost objective if the goods or services involved are chargeable or assignable to that Federal award or cost objective in accordance with relative benefits received."

MDHS requires each subgrantee to attest by signature that they have read and understood the Subgrantee Manual issued by MDHS before payments on awards can be made.  Additionally, each subgrant administered by MDHS is governed by the standard Subgrantee Agreement which sets out specific regulations that govern the subgrant.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

The Office of Family Assistance, a Division of the Office of Administration for Children and Families and the grantor of TANF funds, states there are four tenets of the TANF program –

1) To provide assistance to needy families so that children can be cared for in their own homes or in the homes of relatives;
2) End the dependence of needy parents by promoting job preparation, work, and marriage;
3) Prevent and reduce the incidence of out-of-wedlock pregnancies; and
4) Encourage the formation and maintenance of two-parent families.

The Office of Family Assistance produced *Q&A: Use of Funds*, published on May 2, 2013, which clarifies the use of funds for "needy" families and is copied, verbatim, below:

**"Q1: May States help the non-needy with services that are consistent with TANF purpose one or two as long as those services fall outside the definition of assistance?"**

**"A1:** No. The first two statutory purposes (related to caring for children in their own homes and ending dependence) are expressly for the needy. Therefore, the statute envisions that States would serve only the needy when they are conducting activities or providing benefits that are reasonably calculated to accomplish TANF purpose one or two. This means that States would have to develop and apply criteria of financial need in these cases. However, States may use Federal TANF funds to help both the needy and the non-needy with benefits or services that are reasonably calculated to accomplish TANF purpose three or four (which relate to reducing out-of-wedlock pregnancies and the formation and maintenance of two-parent families). In serving the non-needy, States may use only segregated Federal TANF funds."

While states are allowed and encouraged to use creative mechanisms to accomplish the four main goals of TANF, the core purpose of the grant is to assist the needy. States are allowed, in their State Plan, to define the eligibility of needy per tenet and/or initiative. *The TANF State Plan*, as prepared by MDHS, states the following income limits/thresholds for determining the eligibility of individuals for each initiative:

- Intensive Youth Supervision Programs – To provide a diversionary, community based intensive supervision program for youth offenders. Individuals must be at or below 300 percent of the Federal Poverty Level.
- Child Care Enhancements – To end the dependence of needy parents on government benefits by promoting job preparation, work and marriage. Must be TANF participants, or low income families at risk of going onto TANF that are eligible for CCDF.
- Responsible Fatherhood Initiative – To encourage the formation and maintenance of two-parent families and prevent and reduce out-of-

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

wedlock pregnancies.  Financial eligibility determination is not required for this program.

- Post-Employment Assistance Programs – To end the dependence of needy parents on government benefits by promoting job preparation and work.  Families eligible for this program are not required to be TANF eligible, but must be at or below 200 percent of the Federal Poverty Level.
- TANF Prevention/Intervention – To develop projects in community-based settings to prevent and reduce at-risk behaviors among youth and their families to prevent or break the cycle of welfare dependence.  Financial eligibility determination is not required for this program.
- Healthy Choices, Brighter Future Initiative – To involve community, faith-based organizations, schools and families in the establishment of educational and training programs on youth leadership development and teen pregnancy prevention promoting abstinence.  Financial eligibility determination is not required for this program.

Additionally, based on the availability of funds, the following initiatives are outlined in the TANF State Plan:

- TANF Summer Enrichment Program – no eligibility criteria are defined.
- TANF Work Program - no eligibility criteria are defined.
- Crisis Intervention Program – Families are not required to be TANF eligible but must be below 150 percent of the Federal Poverty Level.
- Funds may be made available to Attorney General to implement programs that serve at risk youth.  No eligibility criteria are defined.
- TANF Funds may be used for temporary care of children in foster care.  Families eligible for this program are not required to be TANF eligible but must be below 300 percent of the Federal Poverty Level.
- Families First Resource Centers – Individuals must be at or below 300 percent of the Federal Poverty Level.
- TANF funds may be used to provide family preservation services to families with dependent children.  Families must be at or below 300 percent of the Federal Poverty Level.
- State Coalition of the Young Men's Christian Association (YMCA) for the purpose of developing and implementing statewide programs that serve the unmet needs of youth by way of Adolescent Offenders and Teen Leadership Programs.  Individuals eligible for this program are not required to be TANF eligible, but must be at or below 300 percent of the Federal Poverty Level.

The *MDHS Subgrant/Contract Manual* states in Section 5, under the heading "Financial Management – Accounting Procedures" that "Separate financial records shall be maintained for each subgrant. Separation serves record keeping requirements and also eliminates potential conflicts with the subgrantees' usual record keeping systems which may reflect a different fiscal year, or accounting by function or department rather than by subgrant or work activity. Each subgrantee shall maintain one set of accounting records for the entire subgrantee entity which shall separately identify the receipts and disbursements for each subgrant or other

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

source of funds. The subgrantee shall be able to isolate and trace every subgrant dollar from receipt to expenditure and have on file appropriate supporting documentation for each transaction.

Examples of documentation are vendor invoices, bills of lading, purchase orders, payment vouchers, payrolls, bank statements and reconciliations, documentation to verify that only eligible clients were served; employee activity sheets to verify activities performed and the actual hours worked for each activity/subgrant; and, cash receipt logs to verify all funds received and the actual date of receipt."

Due to the substantial amount of questioned costs found during the fiscal year 2019 audit, questioned costs are grouped by category/type of expenditure below. Each bulleted item below will also state the specific law, regulation or control that was violated.

**Condition**

During the audit of fiscal year 2019, auditors noted that MDHS Executive Leadership (specifically the former Executive Director, JD) participated in a widespread and pervasive conspiracy to circumvent internal controls, state law, and federal regulations in order to direct MDHS grant funds to certain individuals and groups. Executive Director JD purposefully and willfully disregarded federal and state procurement regulations in order to award a substantial portion of grant funds from the TANF program to two specific subgrantees. These two subgrantees were granted monies under the *Families First Resource Center* portion of the TANF State Plan, which requires verification of eligibility criteria, defined as income at or below 300 percent of the Federal Poverty Level.

Executive Director JD then instructed these two subgrantees - Mississippi Community Education Center (MCEC) and Family Resource Center of North Mississippi (FRC) - on which organizations and individuals to fund with third tier grants. During the audit, auditors asked both of the two subgrantees to provide any evidence or verification to support claims that MDHS approved transactions or instructed the subgrantees to fund certain projects. Both claimed that instructions were verbal and could not provide proof. Auditors were able to verify some transactions were approved by Executive Director JD and MDHS executive staff (both current and former) by performing a review of MDHS internal documents. It is important to note that the subgrantees signed and attested to the subgrantees' responsibility to ensure compliance with the regulations, policies, guidelines, and requirements imposed by the Federal grantor agency and MDHS. The subgrantees also signed and attested that the relationship between MDHS and the subgrantee is not one of an employer-employee relationship, and that there should not be relationship such as principal and agent; partners; joint ventures; or any other similar relationship between MDHS and the Subgrantee.

Additionally, Executive Director JD instructed MDHS staff to disregard federal regulations concerning monitoring and allowable costs to ensure that grant funds continued to flow to these subgrantees. Executive Director JD, upon accepting the position of Executive Director in January 2016, continued to fund these two subgrantees with large grants in fiscal years 2017, 2018 and 2019. JD expanded on

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

the existing grants with TANF and also began funding MCEC and FRC with additional awards generated from the CCDF, SNAP, MVAP, and TFAP federal programs.  Total amount funded to each of these two subgrantees referenced above is noted below:

| Initial Awards plus/less any Modifications | | |
|---|---|---|
| | MCEC | FRC |
| TANF 2019 | $19,422,992 | $7,500,000 |
| TANF 2018 | $18,843,072 | $17,620,170 |
| TANF 2017 | $1,000,000 | $12,971,208 |
| SNAP 2019 | $1,034,685 | N/A |
| SNAP 2018 | $2,615,774 | N/A |
| CCDF 2019 (From MS Community College Board by grant from MDHS)* | $2,268,381 | $2,177,483 |
| CCDF 2018 (From MDHS directly) | $3,484,592 | $500,000 |
| SSBG 2018 | $3,000,000 | $3,000,000 |
| SSBG 2017 | N/A | $900,000 |
| Other unaudited federal grants**2019 | N/A | $497,987 |
| Other unaudited federal grants**2018 | $30,000 | $527,987 |
| Other unaudited federal grants** 2017 | $30,000 | N/A |
| *MCEC and FRC are second tier subgrants from MS Community College Board | | |
| **MAVP and TFAP, included for informational purposes only. | | |

Both MCEC and FRC also awarded subgrants of federal monies to different programmatic groups (hereafter "second tier subgrants").  Additionally, MCEC and FRC expended federal grant funds on administrative expenses and contracts.  In order to opine on the allowable costs compliance requirement, and, due to MDHS' repeated material weakness and material noncompliance findings for Subrecipient Monitoring in prior years Single Audit Reports, auditors felt obligated to review programmatic and administrative expenditures at the first tier subgrantee level due to the materiality of the grant awards.

Audit work performed at MCEC and FRC determined that federal monies had been comingled with other sources of revenue – namely fundraising revenue.  Both entities utilized classification codes to identify the source of the income when paying vendors or coding expenses.  However, through inquiry and analysis, auditors were able to determine that MCEC used their "MDHS Grant Fund" bank account to pay all expenses of the nonprofit – whether the expenses were federal, state or private.  Additionally, when audit personnel asked for details about their record keeping, auditors were told that even though fundraising monies were deposited into the "MDHS Grant Fund" bank account, they were then transferred to their own bank accounts for proper record keeping, but all expenses were still made from the MDHS Grant Account; thereby using grant funds for all expenses whether federal, state or private.

Based on financial records of MCEC, MCEC did not maintain enough private, nongovernmental grant revenue to pay for the private expenditures made by the nonprofit (fundraising expenses, investments, profit sharing contributions, etc).  Moreover, auditors were able to determine that MCEC falsified requested

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

documents and general ledgers that were provided to the auditor. These falsified documents included contracts with artificial scopes to indicate possible adherence with TANF guidelines, forged signatures on contracts, general ledgers and expense reports with transactions removed, etc. Additionally, information provided to auditors often contradicted information that had been provided to MDHS. Finally, auditors noted that some transactions that were originally coded in the accounting software as "TANF expenditures" were changed to "Administrative expenditures" after staff from the Office of the State Auditor (OSA) inquired about TANF expenditures. Therefore, unless auditors could determine that private expenditures were paid for with 100 percent private funds, the expenditures were included in the nomenclature review of transactions.

FRC's financial records were found to be inconsistent in their treatment of different expenditures and the classification of those expenditures. Subgrant payments were coded to a variety of expense codes, and payees were coded as both vendors and "other names" in the financial records. In one instance, similar payments for a transaction were coded as "Consulting", "Contractual" and "Subsidies, Loans, and Grants". Based on information in the accounting records, FRC coded expenses based on preliminary budgetary figures and not based on actual cost categories.

The following exceptions were noted during the testwork of expenditures at the MDHS level and first tier subgrantee level. It should be noted that some recipients of funds from both MCEC and FRC were not aware that they were being awarded federal monies when granted contracts, grants, or awards. Neither MCEC or FRC provided the required federal information on any contract, grant, or award that stated the source of the funds, including the name of the Federal Program or the CFDA number. Without these required disclosures, auditors are unable to determine if contractors or second tier subgrantees of MCEC and FRC were aware of allowable cost criteria or restrictions.

All amounts questioned below are TANF funds unless otherwise noted. While this report is for fiscal year ended June 30, 2019, auditor determined that there were substantial questioned costs in prior fiscal years. When questioned costs were discovered in prior fiscal years, that information has also been included in this report for informational reasons.

<u>Personal Benefit Contracts/Related Party Contracts</u>

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.318(c))* states no employee, officer, or agent of a grantee may participate in the selection, award or administration of a contract supported by a federal award if he or she has a real or apparent conflict of interest. Conflicts of interest are defined as any instance when the officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated, has a financial or

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

other interest in or a tangible personal benefit from a firm is considered for a contract supported by federal awards.

*The Code of Federal Regulations (2 cfr 200.459(a))* states that, in order to be paid as a consultant, a person must possess a special skill, and not be considered an officer or employee of the entity.

Signed subgrant agreements between MDHS and the subgrantees state in *Section XXIX – Conflict of Interest* - "Subgrantee must ensure that there exists no direct or indirect conflict of interest in the performance of the Subgrant. Subgrantee must warrant that no part of federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts in exchange for acting as an officer, agent, employee, subcontractor or consultant to the Subgrantee in connection with any work contemplated or pertaining to the Subgrant."

In *Section VI – Relationship of the Parties*, it states, "It is expressly understood and agreed that MDHS enters into this Subgrant with Subgrantee on a purchase of service basis and not on an employer-employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Subgrantee, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Subgrantee. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Subgrantee hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Subgrantee."

The *MDHS Subgrant/Contract Manual*, which subgrants must attest to have read and understood prior to receiving grant awards, states in Section 6, under the heading "Open and Free Competition" that "all procurement transactions shall be conducted in a manner that provides maximum open and free competition consistent with…applicable federal law. Procurement procedures shall not restrict or eliminate competition…Examples of what is considered to be restrictive of competition include, but are not limited to…noncompetitive contracts to consultants that are on retainer contracts…organizational conflicts of interest."

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted the following violations regarding conflicts of interest:

- MCEC awarded contracts for services to members of Executive Director JD's immediate family, including a company owned by his brother-in-law and his nephew.

  o JD's brother-in-law was initially contracted for a business lease of property in the amount of $365,000. The property was located in Brookhaven, MS and was leased for a three-year period for a sum of $88,333 annually, with a $100,000 non-refundable security deposit. The effective date of the lease was upon "completion of

186

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

the building" indicating that the property was not available for use when the lease was signed (February 2, 2019). However, the lessor was paid three payments totaling $365,050 between February 5, 2019 and February 7, 2019.

On May 2, 2019, MCEC notified the lessor that they would be terminating the lease in 60 days from the date of the letter, and would request reimbursement of any unused rental payments and that those payments should be reimbursed on August 15 and September 15, 2019. Based on inquiry with MCEC personnel and a review of MCEC financial records, no repayment of any funds was ever made.

**Questioned costs in fiscal year 2019- $365,050**

o   JD's brother-in-law was contracted as the "Leadership Outreach Coordinator" for a sum of $150,000. The contract term was from June 1, 2018 to September 30, 2019. However, the total fee of the contract was paid in a lump sum on June 1, 2018.

**Questioned costs in fiscal year 2018 - $150,000**

o   JD's nephew was contracted to coordinate and create a Coding Academy and Website Design program in the amount of $139,500 for the period of February 1, 2019 to January 31, 2020. A lump sum payment in the amount of $139,500 was made on February 2, 2019. Additionally, travel in conjunction with the contract in the amount of $1,309 was reimbursed.

**Questioned costs in fiscal year 2019- $140,809**

o   JD's nephew was also employed by MCEC from July 16, 2018 through February 15, 2019 at a semimonthly salary of $5,000 (annualized to $120,000 annually). For the period of February 1st through 15th in 2019, he was both contracted and employed by MCEC for an overlapping period. Gross pay for the period totaled $67,769.23.

**Questioned costs in fiscal year 2019- $67,769**

•   FRC awarded contracts and employed the same individuals as MCEC above.

o   JD's brother-in-law was employed by FRC from July 1, 2018 to July 15, 2019. Gross pay for the period totaled $93,600. These funds were paid via the Early Childhood Academy grant funded by MDHS through the CCDF grant.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Questioned costs for fiscal year 2019 - $93,600 (CCDF)**

o   JD's nephew was also employed by FRC from October 17, 2017 through July 12, 2018.  Gross pay for the period totaled $55,625.  For the period of June 15th through July 12, 2018, he was both contracted and employed by FRC for an overlapping period.  Additionally, travel in conjunction with the contract in the amount of $14,368 was reimbursed.  While the amount of the contract was paid prior to fiscal year 2019, it is included in this report because it was discovered by auditors during the 2019 audit.

**Questioned costs in fiscal year 2018 - $63,975**
**Questioned costs in fiscal year 2019 - $6,018**

o   JD's nephew was contracted to coordinate and create a Coding Academy and Website Design program in the amount of $130,000 for the period of June 15, 2018 to June 14, 2019.  A lump sum payment in the amount of $130,000 was made on July 16, 2018.  Additionally, travel in conjunction with the contract in the amount of $14,278 was reimbursed.  The travel reimbursements are often from Mississippi to New Orleans and include mileage reimbursements, hotel stays, per diem reimbursement, in room dining in addition to per diem, etc.  The contract states that the contract amount should be inclusive of all fees necessary to complete the program; therefore, even if the initial contract was made at an arm's length bargaining arrangement, the travel would be questioned.  Based on inquiry with personnel at FRC, the travel was needed so that JD's nephew could obtain the necessary skills to teach the coding academy.

**Questioned costs in fiscal year 2019- $144,278**

•   MDHS also employed JD's nephew from September 16, 2016 to October 15, 2017 at varying salaries ranging from $36,177 to $45,000.  His ending salary, $45,000, was paid from TANF funds in fiscal year 2018.  Due to the intertwined and familial relationship, it is necessary to question the salary payments plus fringe.  Actual salary payments plus fringe included $50,173 in FY 2017 and $19,477 in FY 2018.

**Questioned costs in fiscal year 2017 - $50,173**
**Questioned costs in fiscal year 2018 - $19,477**

*Total amount paid to JD's brother-in-law – $608,650*
*Total amount paid to JD's nephew – $492,499*

*Total amount questioned in 2017 – $50,173*

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*Total amount questioned in 2018 – $233,452*
*Total amount questioned in 2019 – $723,924*
*Total amount questioned in 2019 – $93,600 (CCDF)*

Governmental Relations/Lobbyists

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.450)* states that the cost of certain influencing activities associated with obtaining grants, contracts, cooperative agreements, or loans is an unallowable cost.  Additionally, paragraph (c) puts additional restrictions on nonprofit organizations, such as MCEC and FRC.  Those restrictions include any costs to influence the outcome of any federal, state, or local election, referendum, initiative, or similar procedure through in-kind or cash contributions, endorsements, publicity, or similar activity is unallowable.  Any legislative liaison activity, including attendance at legislative sessions or committee hearings, gathering information regarding legislation, and analyzing the effects of legislation is also unallowable.

*The Code of Federal Regulations Title 45. Public Welfare (45 cfr 93.100(a))* states that no appropriated funds may be expended by the recipient of a Federal contract, grant, loan, or cooperative agreement to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any of the following covered Federal actions: the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

The *MDHS Subgrant/Contract Manual*, which subgrantees must attest to have read and understood prior to receiving grant awards, sets out and defines the regulations that subgrantrees and lower-tier subrecipients must follow, including the "*Restrictions on Lobbying – Common Rule (P.L 101-121, Section 319)."*

*Internal Revenue Service Publication 4221-PC (Revised 3-2018)* states "A public charity is not permitted to engage in substantial legislative activities (commonly known as lobbying).  An organization will be regarded as attempting to influence legislation if it contacts, or urges the public to contact, members or employees of a legislative body for purposes of proposing, supporting or opposing legislation, or advocates the adoption or rejection of legislation…. a 501(c)(3) organization may…risk losing its tax-exempt status and/or be liable for excise taxes."

**Exceptions/Questioned Costs**:  During testwork for activities allowed and allowable costs, the auditor noted the following violations regarding Governmental Relations/Lobbying:

- MCEC entered into multiple contractual agreements with consulting firms in order to maintain governmental revenue streams or to lobby on behalf of their organization, the Families First Initiative, or MDHS.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Based on a nomenclature review of the financial records, auditors were able to determine the following unallowable lobbying contracts:

o   AvantGarde Strategies was paid $21,000 in FY 2019, but no contract was provided to the auditor.

o   Inside Capital was paid $14,000 in FY 2017; $150,325 in FY 2018; and $154,000 in FY 2019 for a total of $318,325.  No contract was provided to the auditor.

o   Lucas Compton was contracted by MCEC for services including sustaining federal revenue streams and bipartisan advocacy.  The contract was for the period of October 1, 2017 through October 1, 2018.  Actual payments included $36,000 in FY 2018 and $36,000 in FY 2019 for a total of $72,000.

> **Questioned costs for fiscal year 2017 – $14,000**
> **Questioned costs for fiscal year 2018 – $186,325**
> **Questioned costs for fiscal year 2019 – $211,000**

•   FRC entered into a contractual agreement with Lucas Compton for $84,000 in fiscal year 2018.  Auditor did not have a copy of the contract to determine the performance period of the contract.

> **Questioned costs for fiscal year 2018 – $84,000**

*Total amount questioned in 2017 – $14,000*
*Total amount questioned in 2018 – $270,325*
*Total amount questioned in 2019 – $211,000*

Consulting

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.459(a))* states that costs of professional and consultant services rendered by persons who are members of a particular profession or possess a special skill, and who are not officers or employees of the non- Federal entity, are allowable, subject to paragraphs (b) and (c) when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Federal government.

*The Code of Federal Regulations (2 cfr 200.318(d))* states that the subgrantee must avoid acquisition of unnecessary or duplicative items.

Signed subgrant agreements between MDHS and the subgrantees state, in *Section XI "Agreements by Subgrantee" – A. General Responsibility*, that entities currently in a contractual relationship with MDHS to provide the same or similar services are not eligible to enter into a Contract/Subcontract with the Subgrantee.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted the following violations regarding consultants:

- MCEC entered into multiple contractual agreements with consulting firms on behalf of their organization, the Families First Initiative, or MDHS.  These consulting contracts were often for duplicative services for overlapping time periods and were for large sums of money.  Additionally, auditors could find no evidence that any type of procurement regulations were followed in securing these contracts.  Both MCEC and FRC indicated to auditors that former Executive Director JD instructed both subgrantees to enter into contracts with some of these individuals.  Due to the excessive fees paid for these contracts and the duplicative services, auditor considers these costs to be unreasonable, and therefore questioned.  Additionally, many of the expenses coded to "Consulting" in MCEC's general ledger do not appear to be for legitimate consulting services.  Those expenditures will be detailed in additional sections based on the actual purpose of the purchases. Based on a nomenclature review of the financial records and a detailed review of contracts, auditors were able to determine the following questioned costs (names of private individuals will not be used due to restrictions on personally identifiable information (PII)):

  o The Stephen Group was contracted to provide strategic organizational, process and management consulting services and provide Families First with project management support surrounding the concept of generational poverty.  The term of the contract was for the period of November 28, 2017 through November 27, 2018 with a renewal option for December 1, 2018 through December 1, 2019.  The initial contract was not to exceed $500,000 and was to be split between MCEC and FRC.  Actual payments on the contract included $74,157 in FY 2018 and $139,256 in FY 2019 for a total of $213,413.
  o Consultant 1 was contracted to perform services but no copy of the contract was made available to auditors.   Payments included $34,000 in FY 2018 and $6,000 in FY 2019 for a total of $40,000.
  o Consultant 2 was paid for consulting services regarding curriculum.  Payments included $97,500 in FY 2018.
  o NCC Ventures was contracted to plan and coordinate industry sector initiatives with small businesses, and to provide training regarding workforce development.   Contracted amount was $50,000.  Actual payments totaled $41,667 in FY 2018; $4,167 in FY 2019 for a total of $45,834
  o Institute of Project Management was contracted for services coded as consulting in the general ledger; however, no contract was provided to auditors.  Payments included $45,000 in FY 2018.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Questioned costs for fiscal year 2018 – $292,324**
**Questioned costs for fiscal year 2019 – $149,423**

- FRC entered into contractual agreements with the same consulting organizations as MCEC, as follows:

  o The Stephen Group was contracted to provide strategic organizational, process and management consulting services and provide Families First with project management support surrounding the concept of generational poverty. The term of the contract was for the period of November 28, 2017 through November 27, 2018 with a renewal option for December 1, 2018 through December 1, 2019. The initial contract was not to exceed $500,000 and was to be split between MCEC and FRC. Actual payments on the contract included $65,394 in FY 2018 and $142,053 in FY 2019 for a total of $207,447.

  o CG Consulting was contracted for $16,000 from August 2, 2018 to July 31, 2019. The scope of the project was for professional development plans, training, and evaluation plans. Actual payments of $8,000 were made in fiscal year 2019.

  o NCC Ventures was also contracted by FRC for workforce development training, but no contract was provided to auditors. Actual payments included $50,000 in FY 2018.

  **Questioned costs for fiscal year 2018 – $115,394**
  **Questioned costs for fiscal year 2019 – $150,053**

- MDHS also entered into a consulting contract with NCC Ventures during FY 2018 for a total of $72,900 from December 1, 2017 to May 31, 2018. The contract was paid out in equal installments of $12,150 from March 2018 to September 2018, which is four months after the contract end date. The entire contract amount of $72,900 was paid. This amount is questioned in Finding #2019-039.

  *Total amount questioned in 2018 – $407,718*
  *Total amount questioned in 2019 – $299,476*

Payments for Sports/Coaches/Sporting Celebrities

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.459(a))* states that costs of professional and consultant services rendered by persons who are members of a particular profession or possess a special skill, and who are not officers or employees of the non- Federal entity, are allowable, subject to paragraphs (b) and (c) when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Federal government.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*The Code of Federal Regulations (2 cfr 200.434(a))* states the costs of contributions and donations, including cash, property, and services from the grantee to other entities are unallowable.

*The Code of Federal Regulations (2 cfr 200.469)* states the costs incurred for intramural activities, student publications, student clubs, and other student activities, are unallowable, unless specifically provided for in the Federal award.

*The TANF State Plan* states TANF funds may be used to fund the expansion of the Families First Resource Centers. Through these centers, MDHS will advance the development, expansion and enhancement of a statewide network of community-based, prevention focused, parent resource centers that offer assistance to families. To encourage the formation and maintenance of two-parent families and reduce out of wedlock pregnancies the centers will:

- Provide early comprehensive support for parents;
- Promote the development of parenting skills;
- Promote the independence of families;
- Increase family stability;
- Improve family access to resources and opportunities for assistance;
- Focus on prevention of teenage pregnancy while supporting teen parents;
- Support the needs of families with children with disabilities; and,
- Provide a safe place for supervised children.

Families eligible for this program are not required to be TANF eligible, but must be at or below 300 percent of the Federal Poverty Level.

**Exceptions/Questioned Costs**:  During testwork for activities allowed and allowable costs, the auditor noted the following violations:

- MCEC expended federal grant monies to fund multiple sports programs. MCEC could not provide any documentation supporting the correlation of these sports programs to any of the four tenets of TANF, nor did MCEC utilize any criteria to establish eligibility for these programs. Additionally, as detailed below, the auditor does not consider the costs of some of the programs reasonable or necessary to meet federal requirements.

  o Favre Enterprises was contracted to appear at several events, record promotions, and provide autographs for marketing materials from July 1, 2017 through July 31, 2018. Additional contract information provided that the contract fee would be paid in installments and would include three (3) speaking engagements, one (1) radio spot and one (1) keynote address. There was no mention of the contract price in the contract supplied to auditors. When auditors requested further details on the performance of the

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

contract, specifically the dates of any speaking engagements, MCEC provided a list of dates and events that fulfilled the contract terms; however, upon a cursory review of those dates, auditors were able to determine that the individual contracted did not speak nor was he present for those events. Two payments were made to Favre Enterprises – one for $500,000 in December 2017 and one for $600,000 in June 2018.

Due to the inability to verify that any work was performed in order to fulfill the contract, and due to the unreasonable amount paid, the entire payment of $1,100,000 paid in FY 2018 is questioned.

o   Rick Rigsby Communications was paid $52,100 for motivational speaking in April 2019. No contract was provided to auditor; therefore, correlation to TANF cannot be verified.

o   Diamond Design and Construction was paid $42,750 in FY 2019 to convert and line Field 8 for the North Jackson Youth Baseball League. The field is located next to New Summit School, the school owned and operated by the Director of MCEC (NN). According to inquiry, Field 8 was often utilized as a baseball field for New Summit Academy.

Due to the inability to verify that this work was related to TANF, including no correlation to any tenet of TANF, and due to the risk that this payment was made for the personal use of those involved with MCEC, this payment is questioned.

o   North Jackson Youth Baseball was paid $65,000 in FY 2017 to rent baseball fields. MCEC stated the amounts were a donation to the organization. Auditor noted that the Programmatic Director for MCEC (SP) and the spouse of one of the principals at MCEC (JN) are currently on the Board of Directors of the baseball organization.

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, the provision against using TANF funds for intramural student activities, and the unreasonable amount paid, these payments are questioned.

o   P360 Performance Sports was contracted to allow four Jackson schools to use the baseball fields for practice and training. The schools listed in the contract are schools that operate in at-risk areas. However, based on inquiry with the vendor, these amounts also allowed for a specialty, private team (Mississippi Bombers) to use the field, thereby making at least a portion of the payments unallowable due to lack of ability to verify that the payments were for needy individuals. There was no allocation of payments to

194

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

isolate the portion of the payment that would be allowable.  Auditor was provided one contract for $125,000 for a six-month period in 2019; however, actual payments included $72,000 paid in FY 2018 and $146,750 in FY 2019.

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, the provision against using TANF funds for intramural student activities, and the unreasonable amount paid, these payments are questioned.

o   Overtime Sports was paid $37,500 for a sponsorship of a college tournament in FY 2019.

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, and the regulation noted above that sponsorships are disallowed under federal regulations, these payments are questioned.

**Questioned costs for fiscal year 2017 – $65,000**
**Questioned costs for fiscal year 2018 – $1,172,000**
**Questioned costs for fiscal year 2019 – $279,100**

- FRC expended federal grant monies to fund multiple sports programs. FRC could not provide any documentation supporting the correlation of these sports programs to any of the four tenets of TANF, nor did FRC utilize any criteria to establish eligibility for these programs. Additionally, as detailed below, the auditor does not consider the costs of some of the programs reasonable or necessary to meet federal requirements.

o   Metro Area Community Empowerment Foundation (MACE) was contracted for $75,000 for conference keynotes, wheelchair sports exhibitions, motivational speaking and community events.  Actual payments of $10,000 were made in FY 2018.

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, these payments are questioned.

o   Bigger than Ball Foundation, Inc. was contracted to produce "Bigger than Ball Moments" by well-known coaches and to offer coaching clinics for a total of $62,500.  Actual payments of $7,350 were made in FY 2018 and $4,439 were made in FY 2019 for a total of $11,789.  Contracts and agreements for these payments did not offer any correlation to one of the TANF tenets or seek to verify that there was any eligibility or programmatic reason for these clinics.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, these payments are questioned.

o   Retired Pro Football Players Charitable Foundation, Inc. was contracted for $75,000 to hold three (3) football camps for youth. Actual payments of $44,625 were made in FY 2018. Contracts and agreements for these payments did not offer any correlation to one of the TANF tenets or seek to verify that there was any eligibility or programmatic reason for these clinics.

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, these payments are questioned.

o   Northeast Mississippi Football Coaches Association was paid $30,000 in FY 2019 for a sponsorship of the NEMFCA All-Star game.

Due to the inability to verify any correlation to TANF, including a programmatic reason for the payments, and the regulation noted above that sponsorships are disallowed under federal regulations, these payments are questioned.

**Questioned costs for fiscal year 2018 – $61,975**
**Questioned costs for fiscal year 2019 – $34,439**

*Total amount questioned in 2017 – $65,000*
*Total amount questioned in 2018 – $1,233,975*
*Total amount questioned in 2019 – $313,539*

Payments Directed by Former Executive Director

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.318(c))* states that no employee, officer or agent of a grantee may participate in the selection, award, or administration of a contract supported by a federal award if he or she has a real or apparent conflict of interest.  Conflicts of interest are defined as any instance when the officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated, has a financial or other interest in or a tangible personal benefit from a firm is considered for a contract supported by federal awards.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*The Code of Federal Regulations (2 cfr 200.53(b))* states "Improper payment includes any payment to an ineligible party, any payment for an ineligible good or service, any duplicate payment, any payment for a good or service not received (except for such payments where authorized by law), any payment that does not account for credit for applicable discounts, and any payment where insufficient or lack of documentation prevents a reviewer from discerning whether a payment was proper."

Signed subgrant agreements between MDHS and the subgrantees state in *Section XXIX – Conflict of Interest* - "Subgrantee must ensure that there exists no direct or indirect conflict of interest in the performance of the Subgrant. Subgrantee must warrant that no part of federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts in exchange for acting as an officer, agent, employee, subcontractor or consultant to the Subgrantee in connection with any work contemplated or pertaining to the Subgrant."

*Section VI – Relationship of the Parties*, states "It is expressly understood and agreed that MDHS enters into this Subgrant with Subgrantee on a purchase of service basis and not on an employer-employee relationship basis. Nothing contained herein shall be deemed or construed by MDHS, the Subgrantee, or any third party as creating the relationship of principal and agent, partners, joint venturers, or any similar such relationship between MDHS and the Subgrantee. Neither the method of computation of fees or other charges, nor any other provision contained herein, nor any acts of MDHS or the Subgrantee hereunder, creates or shall be deemed to create a relationship other than the independent relationship of MDHS and the Subgrantee.

The *MDHS Subgrant/Contract Manual*, which subgrants must attest to have read and understood prior to receiving grant awards, states in Section 6, under the heading "Open and Free Competition" that "all procurement transactions shall be conducted in a manner that provides maximum open and free competition consistent with…applicable federal law.  Procurement procedures shall not restrict or eliminate competition…Examples of what is considered to be restrictive of competition include, but are not limited to…noncompetitive contracts to consultants that are on retainer contracts…organizational conflicts of interest.

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted both MCEC and FRC often utilized the same contractors and awarded grants to common subgrantees.  In some instances, joint contracts were issued under the "Families First" name, and in other instances, contracts were issued by both entities for the same scope and time period.  Based on inquiry with the subgrantees and a review of documentation at MDHS, auditors determined that former Executive Director JD often directed MCEC and FRC to award contracts and grants to certain people or organizations.  Contracts to these individuals or organizations were not procured using any type of competitive procurement and were not done in accordance with regulations defined in *2 cfr Part 200*. Additional findings related to the procurement of these contacts can be found in finding #2019 - 039.  Due to the known conflict of interest, and inability to

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

determine if these contracts were reasonably priced due to lack of procurement and the lack of arms-length bargaining, these contracts and grants are questioned as described below.

- Priceless Ventures, LLC and Familiae Orientem, LLC – A joint contract between MCEC, FRC and Priceless Ventures (PV) was structured under the name of "Families First of Mississippi" from June 1, 2017 through September 30, 2017. The scope of the contract included Priceless Ventures, LLC and its owner serving as "Leadership Outreach Coordinator" for the Families First Initiative cofounded by MCEC, FRC and MDHS. The contract was for $250,000 and was to be paid evenly by MCEC and FRC. Due to the overlapping scopes and time periods of all contracts made to PV by MCEC and FRC, auditor cannot determine which payments were made to satisfy specific contracts. The total amount paid will be summarized below.

  MCEC awarded additional contracts to Priceless Ventures, LLC and its owner for leadership development and the administration of a self-help program called "Law of 16." According to "participant workbooks" created by MDHS to help administer the program, the program is a "model that is intended to help you understand - at a greater level, yourself, your values, your significance, and your potential." MCEC awarded a "leadership training" contract from October 1, 2018 to September 30, 2019 in the amount of $130,000 and a contract for the self-help program from September 1, 2017 to August 31, 2018 in the amount of $130,000. In addition, MCEC paid for conferences and advertising to promote the self-help program to individuals and other state agencies. Travel expenditures for the owner of PV were also paid by MCEC. Travel costs included first class airfare, expensive meals, luxury hotels, and entertainment costs. Conference and travel expenses are questioned in full in their respective sections in this finding. Actual payments to Priceless Ventures for MCEC totaled $500,000 in FY 2018 and $199,500 in FY 2019.

  FRC also awarded contracts to PV from May 15, 2018 to September 30, 2018 in the amount of $500,000. The scope of the contract included "leadership outreach" and Law of 16 programs. Additionally, PV was awarded a contract from May 22, 2018 through September 30, 2018 from SNAP funds for "emergency food assistance." According to inquiry with individuals at FRC, no work was performed on this contract, but payment of $497,987 (SNAP funds) was made in full to fulfill contract terms. FRC also reimbursed travel expenses related to these contracts and those amounts are questioned in full in its respective section of this finding. Actual payments to Priceless Ventures for FRC totaled $1,643,820 in FY 2018 and $104,167 in FY 2019.

198

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

FRC also contracted with Familiae Orientem, LLC to conduct strategic development on a program created by MCEC, FRC, and MDHS called the "RISE Program."   The $1,000,000 contract was from June 25, 2018 through June 24, 2019, and the two payments of $350,000 in June 2018 and August 2018 on the contract were made to the owner of PV, who is also an owner of Familiae Orientem. According to inquiry with personnel at FRC, these payments were to cover a program designed by Executive Director JD and the owner of PV.  JD directed these payments to be made before the program had been designed, and required staff from FRC, MCEC and MDHS to attend a "Legislative Launch" and "planning session" at the Westin Hotel in June 2018.  The terms of the contract stated that Familiae would secure, at its sole expense, all personnel required to implement the agreement; however, based on documentation obtained from the planning session referenced above, the personnel designated to carry out the scope of the agreement were employees of FRC, MCEC and MDHS.  Inquiry with MDHS supports FRC's claim that, shortly after program launch, JD claimed the program would be taken "in house" at MDHS and that FRC and MCEC would no longer be involved. According to personnel at MDHS, the project was later abandoned. Actual payments totaled $350,000 in FY 2018 and $350,000 in FY 2019.

> **Total amount paid by MCEC – $699,500**
> **Total amount paid by FRC - $2,447,987**

Above costs are questioned due to the direct involvement of MDHS personnel; thereby, violating the "Conflict of Interest" regulations in the *MDHS Subgrant Manual*.  Additionally, auditor questions whether the costs are reasonable in the performance of the federal award, or whether the costs were made at arm's length bargaining.  Based on documentation provided, auditor cannot verify that work defined in the scopes of these projects was completed as MDHS did not properly monitor these grants or request documentation to support payments. Documentation obtained by auditor supports that no work was performed on portions of these contracts, even though payments were made in advance.  Further, both FRC and MCEC contracted the same individual for the same services over the same time period, which indicate duplicative work charged to the federal grant.  Finally, contract or supporting documentation does not define population served and whether it meets TANF eligibility criteria, nor can auditor find evidence of any direct or indirect correlation to the third or fourth tenets of TANF that do not require eligibility criteria.

**Questioned costs for fiscal year 2018 – $1,995,833**
**Questioned costs for fiscal year 2018 – $497,987 (SNAP)**
**Questioned costs for fiscal year 2019 – $653,667**

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- Heart of David Ministries (HOD) – MCEC donated $25,000 to HOD in two separate transactions. These payments were coded as a "sponsorship" and "contribution" in the accounting records, and no contract or subgrant agreement was provided to auditors. One payment of $15,000 was made in FY 2018 and one payment of $10,000 was made in FY 2019. Auditor could find no invoice or justification for these payments, nor was auditor provided any subgrant or contract to support these payments as anything other than donations.

MDHS awarded subgrants to HOD Ministries in FY 2017, 2018, and 2019. HOD Ministries mission focuses on the personal development of young men, ages thirteen through nineteen. Programmatic material for the awards is similar in design to PV, both featuring the acronym "LYFE" or "Living Your Faith Extreme." HOD is considered a faith based organization under federal standards. Grants to faith-based organizations are allowed under TANF regulations; however, any contract or grant agreement must include conditions to implement restrictions on explicitly religious activities. Auditor could find no such conditions in the contracts or subgrantee agreements made to HOD. Additionally, these subgrants were made at the express direction of former Executive Director JD, and the son of the Executive Director of HOD was employed as a Deputy Administrator at MDHS when the initial contract to HOD was awarded.

The 2017 subgrant, from May 1, 2017 through April 30, 2018, was for $500,000; an additional subgrant, from May 1, 2017 through September 30, 2018, was for $1,500,000. The FY 2019 subgrant, from October 1, 2018 through December 31, 2019, was for $1,562,500. Actual payments were $271,349 in FY 2017; $900,000 in FY 2018 and $756,224 in FY 2019. *These costs are questioned in Finding 2019-032.*

Above costs are questioned due to the direct involvement of MDHS personnel; thereby, violating the "Conflict of Interest" regulations in the *MDHS Subgrant Manual*. Additionally, auditor questions whether the costs are reasonable in the performance of the federal award, or whether the costs were made at arm's length bargaining. Finally, while subgrant includes a needs assessment with a loose correlation to TANF, agreement does not define population served and whether it meets TANF eligibility criteria. Agreement also fails to include required certifications from a faith-based organization.

**Questioned costs for fiscal year 2018 – $15,000**
**Questioned costs for fiscal year 2019 – $10,000**

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- Lobaki Foundation – A joint contract between MCEC, FRC and the Lobaki Foundation (Lobaki) was structured under the name of "Families First of Mississippi" from September 1, 2018 through August 30, 2019. The scope of the contract included forming a virtual reality academy in which students would be taught how to create and build virtual reality experiences. The initial cost of the academy was $635,000 with payments to be split evenly between MCEC and FRC. However, the entire contract sum was paid in a lump sum check by FRC in September 2018.

  MCEC entered into an additional agreement with Lobaki alone to expand the initial contract for an additional $160,000. The entire contract sum was paid in a lump sum check by MCEC in January 2019.

  Auditors were not supplied any supporting documentation for the initial contract by MCEC when requested, and reached out to the Lobaki Foundation for information. According to Lobaki, the academy was only contracted for a single two-semester course and ended at the conclusion of those semesters. According to Lobaki, 60 students graduated the academy at a cost of $13,250 per student. There was no eligibility determination made by either FRC or MCEC if the students enrolled in the academy were considered TANF eligible.

  Auditors were presented with email correspondence between MDHS Deputy Executive Director of Programs (JB) and FRC in which FRC is presented with the scope for the Lobaki project. When members of FRC staff noted they had questions about the project, JB told FRC that he had spoken with Lobaki, and that there was no need to discuss the contract further. FRC was supplied a signed contract and pressed for a timeline by MDHS. Additionally, auditors were presented with an email from Executive Director JD informing Lobaki that he would instruct "Families First" to wire transfer money to the Lobaki account, and apologized the payments had been stalled.

  **Questioned costs for fiscal year 2019 – $795,000**

- Micah's Mission School, Inc. – A joint contract between MCEC, FRC and Micah's Mission was structured under the name of "Families First of Mississippi" from August 1, 2018 through July 31, 2019. The scope of the contract only included a description of the school as an "educational mission." There was no description on what the grant funds would be utilized, and no determination on the population that would benefit. The school is a private school funded by fundraisers and tuition. The initial contract was for $150,000, with FRC covering costs in the first six months and MCEC covering costs in the second

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

six months of the contract.  Actual payments for FY 2019 included $50,910 in from FRC and $26,667 from MCEC for a total of $77,577.

**Questioned costs for fiscal year 2019 – $77,577**

- Victory Sports Foundation – MCEC entered into a contract with Victory Sports Foundation from October 1, 2018 through September 30, 2019 to conduct three 12-week fitness "bootcamps."  The contract amount was for $1,394,831 and included fitness programs in three separate counties.  According to the supplied budget for the program, the contract fee was to pay for the staff/coaches of Victory Sports, a program design fee, equipment, onsite nurse, a $70,000 vehicle purchase, $20,000 trailer purchase, marketing and various other costs to administer the program.  The materials provided did not indicate that any fees would be charged to participants in the program.  However, review of documents received from Victory Sports indicated that participants in the fitness camps paid a fee to attend, and that no eligibility determination was made to verify participants were TANF eligible or needy.   Additionally, the fitness program was offered to members of the Mississippi Legislature, other elected officials, and other political staffers for no charge.  Auditor could see no evidence that participants of the program were aware that it was funded in part by federal grant monies.  Actual payments included $1,309,183 in FY 2019.

**Questioned costs for fiscal year 2019 – $1,309,183**

- Fitness Program – FRC entered into a contract with an individual in order to assess and make recommendations concerning physical health and fitness components of Families Resource Centers of North Mississippi.  The contract scope also included assessing and making recommendations for "growing feeding capacity in association with the Rise program" in conjunction with Familiae noted above.  Auditor was not presented with a copy of the contract, but was provided the scope of the contract.  The scope was emailed to FRC from Executive Director JD in June 2018.  Actual payments on the contract totaled one lump sum payment of $100,000 on June 26, 2018.

  These costs are questioned due to the direct involvement of MDHS personnel; thereby, violating the "Conflict of Interest" regulations in the *MDHS Subgrant Manual*.  Additionally, auditor questions whether the costs are reasonable in the performance of the federal award, or whether the costs were made at arm's length bargaining.  Finally, contract or supporting documentation does not define population served and whether it meets TANF eligibility criteria, nor can auditor find evidence of any direct or indirect correlation to the third or fourth tenets of TANF that do not require eligibility criteria.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Questioned costs for fiscal year 2018 - $100,000**

- SBGI, LLC – SBGI was contracted by FRC from August 1, 2017 to July 31, 2018 to develop a "Center of Excellence" for Mississippi. The contract states that the Center will support and empower youth, whole families and veterans by aligning, optimizing and best leveraging existing programs, resources, initiatives and facilities to deliver the greatest outcomes and impact for individuals across Mississippi.  The entire contracted amount of $250,000 was paid in one lump sum advance payment on August 28, 2017.  Based on inquiry from FRC, this project was never completed.  According to email correspondence from MDHS, the principal of SBGI was also contracted to perform services for Heart of David.

These costs are questioned due to the direct involvement of MDHS personnel; thereby, violating the "Conflict of Interest" regulations in the *MDHS Subgrant Manual*.  Additionally, auditor questions whether the costs are reasonable in the performance of the federal award, or whether the costs were made at arm's length bargaining.  Total contract fee was also paid in advance, and there is not supporting documentation to support that work was actually performed or completed on this project.  FRC did not provide any documentation to support this payment other than the contract.  Finally, contract or supporting documentation does not define population served and whether it meets TANF eligibility criteria, nor can auditor find evidence of any direct or indirect correlation to the third or fourth tenets of TANF that do not require eligibility criteria.

**Questioned costs for fiscal year 2018 - $250,000**

- Restore2/Recover2 – MDHS entered into a contract with Recover2, LLC from December 10, 2018 to June 9, 2019 for opioid training for MDHS employees.  Recover2 is not registered as a business with the Mississippi Secretary of State; however, Restore2 is a registered business.  All payments on the contract were made to Restore2, but the contract was for Recover2.   Auditors concluded the contract contains a typographical error; however, it should be noted that contracts with businesses that are not properly registered, even if result of a typographical error, could not be considered legitimate contracts in the State of Mississippi.

The contract amount was for $48,000 and included 24 "sessions" of opioid training over the six-month period.  The entire contracted amount was paid from January 2019 through March 2019.  Documents provided to auditors and investigators at the Office of the State Auditor revealed that the opioid trainings did not actually occur, and in fact, the principal of Restore2 who supposedly conducted the trainings was in a luxury rehabilitation facility in Malibu, CA at the

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

time of the contract – see additional questioned costs below related to the payment of these services by MCEC. Evidence to support the payments on the contract (invoices, sign in sheets, etc.) was manufactured by individuals at MDHS. These payments were made at the direction of Executive Director JD - who visited the rehabilitation facility during the contract period, was aware the trainings did not take place, and was involved in a conspiracy to circumvent controls regarding these payments.

These costs are questioned due to the fraudulent nature of the contract and the documentation that was fabricated to justify the payments. Personnel at MDHS willfully and deliberately circumvented existing controls in order to secure this contract and to assist in creating fraudulent documents to ensure payment of the contract. It should be noted that other MDHS employees reported suspicions about this individual's contract to those charged with governance, who then alerted OSA to the possibility of fraud. OSA's Investigative Division began an investigation immediately after the suspected fraud was disclosed. On February 5, 2020, Special Agents from OSA arrested Executive Director JD, the owner and Director of MCEC (NN), the Assistant Executive Director of MCEC (ZN), the accountant for MCEC (AM), the owner of Restore2 (BD), and another former employee of MDHS in connection with payments made to Restore2 and other payments made by MCEC (those payments are reflected in the section "Personal Benefit" below). Additionally, travel connected with these payments has been questioned under the section "Travel" and payments to the luxury rehabilitation center have been questioned below.

**$48,000 in costs are questioned in Finding 2019-032**

- Rise in Malibu – Rise in Malibu (Rise) is a luxury rehabilitation clinic located in Malibu, CA. The cost of the rehabilitation is $40,000 monthly, which includes the cost of treatment, room, and basic needs. The owner of Restore2 (BD), who was a former employee of MDHS, and Executive Director JD conspired to send BD to the facility for a four- month treatment due to his addiction to narcotics. While there, BD was under contract to conduct opioid addiction training classes to MDHS staff, as well as employed by MCEC.

Executive Director JD and MCEC also conspired to use TANF funds to pay for BD's stay at Rise. Personnel from MCEC wired four payments to Rise over a five-month period (February – June) of $40,000 each. MCEC coded this transaction to "curriculum" and named the facility "Rise-Malibu Training" in their financial records. After OSA began inquiring about the use of TANF funds in July 2019, the transactions were re-coded in the system to "consulting" and assigned "Bingo" (MCEC's private income source) as to the source of

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

funds.  Regardless of the change in the system, TANF funds were used to fund the luxury rehabilitation center.

Due to the personal nature of these expenses, the lack of any correlation to TANF purpose or eligibility criteria, the lack of reasonableness and the fraudulent nature of these expenditures, the $160,000 paid to Rise is questioned.

Executive Director JD, BD, MCEC's Director (NN), and MCEC's Assistant Executive Director (ZN) have been indicted and charged with this alleged fraud and embezzlement.

**Questioned costs for fiscal year 2019 - $160,000**

*Total amount questioned in 2018 – $2,858,820*
*Total amount questioned in 2019 – $3,005,427*

Curriculum

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.445(a)*) states costs of goods or services for personal use of the entity's employees are unallowable regardless of whether the cost is reported as taxable income of the employees.

The Office of Family Assistance produced *TANF-ACF-PI-2005-1 (Funding Childhood Education, School Readiness, Kindergarten, and Other Public Education Programs*, published on April 14, 2005, clarifies the use of funds for educational programs.  Per the guide, "public education is a State responsibility; therefore, States may not use Federal TANF for any educational activity that is a component of the State's system of free public schools.  By charging the Federal government for any part of these costs, the State would be passing on to the TANF program the costs of the State's public education system…This prohibition applies regardless of the adequacy of funding for general public education from other sources."

Title XX of the *Social Security Act* establishes the Social Services Block Grant (SSBG).  Services funded by SSBG must be directed at one or more of five (5) broad statutory goals:

1) Achieving or maintaining economic self-support to prevent, reduce, or eliminate dependency;
2) Achieving or maintaining self-sufficiency
3) Preventing or remedying neglect, abuse, or exploitations of children and adults unable to protect their own interest or preserving, rehabilitating, or reuniting families;

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

4) Preventing or reducing inappropriate institutional care by providing for community based care, home-based care, or other forms of less intensive care; and

5) Securing referral or admission for institutional care when other forms of care are not appropriate.

The Office of Social Services Block Grant (SSBG) State Plan specifies that SSBG funds will be utilized by the MDHS Division of Aging and Adult Services and the MDHS Division of Youth Services. The State Plan specifies that a person is eligible for SSBG funds only if they meet income eligibility criteria, and have an identifiable need, unless the services are mandated services of serving children in the custody and guardianship of the Department of Child Protective Services.

**Exceptions/Questioned Costs**: During testwork for activities allowed and allowable costs, the auditor noted the following questioned costs:

- ActiveEd, Inc. –   A joint Memorandum of Understanding (MOU) between MCEC, FRC and ActiveEd was structured under the name of "Families First of Mississippi" from July 1, 2018 through June 30, 2019. The purpose of the MOU was to order a pilot program of kinesthetic learning using physical activity to teach Math, English/Language Arts, and Literacy standards from pre-kindergarten through second grade. The pilot program was designed for schools or early childhood learning centers. The initial contract was for $250,000, with FRC and MCEC equally dividing the cost of the program. Actual payments for FY 2019 included one payment of $125,000 from MCEC in July 2018 and one payment of $125,000 from FRC in August 2018.

  Due to the inability to verify any stated correlation to TANF, supporting documentation about the program, and the regulation noted above that TANF money cannot supplant State's educational responsibilities, these payments are questioned.

  **Questioned costs for fiscal year 2019 - $250,000**

- Houghton Mifflin Harcourt – MCEC purchased $117,703 of "curriculum" from Houghton Mifflin Harcourt during fiscal year 2019. The funds were coded to "Curriculum Expense" in the general ledger, and the majority ($111,262) were paid with SSBG funds with the remaining $6,441 paid with TANF funds. MCEC's SSBG grant request specifies an expense of $200,000 for "Curriculum and Supplies"; however, a review of actual invoices indicated that the curriculum purchased was used for the private school associated with MCEC, and not for the community at large.

  Due to the inability to verify that the goods and services purchased were used to meet grant requirements, the lack of documentation to

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

verify an identifiable need or income eligibility, and the suspicion that the goods and services were converted to personal use by MCEC, these costs are questioned.

**Questioned costs for fiscal year 2019 – $111,262 (SSBG)**
**Questioned costs for fiscal year 2019 – $6,441 (TANF)**

- Edmentum, Inc. – MCEC purchased $133,016 of "curriculum" from Edmentum during fiscal year 2019.  The funds were coded to "Curriculum Expense" in the general ledger.  Payments are for a digital curriculum and a "response to intervention" program for 1,500 students over a three-year time span.  The payments are divided into 5 payments, the first and second payment each for $66,508.  Only two payments were made as of June 30, 2019.  Auditor could not verify that purchases were made for curriculum for the community at large and not the private school associated with MCEC.

  Due to the inability to verify that the goods and services purchased were used to meet grant requirements, the prohibition against supplanting State educational responsibilities with TANF funds, and the suspicion that the goods and services were converted to personal use by MCEC, these costs are questioned.

  **Questioned costs for fiscal year 2019 - $133,016**

  *Total amount questioned in 2019 – $500,719*

Donations/Gifts/Sponsorships

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.434(a))* states the costs of contributions and donations, including cash, property, and services from the grantee to other entities are unallowable.

*The Code of Federal Regulations (2 cfr 200.469)* states the costs of intramural activities, student publications, student clubs, and other student activities are unallowable, unless specifically provided in the Federal award.

*The Code of Federal Regulations (2 cfr 200.403(e))* states that in order for costs to be allowable under federal awards, they must be determined in accordance with generally accepted accounting principles (GAAP).

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

GAAP includes the concept of "substance over form." The substance over form concept means that the transactions recorded in the underlying financial records must reflect their economic substance rather than their legal form.

**Exceptions/Questioned Costs**: During testwork for activities allowed and allowable costs, the auditor noted the following questioned costs:

- University of Southern Mississippi Athletic Foundation - In October 2017, MCEC signed a "sublease" with the University of Southern Mississippi Athletic Foundation for $5,000,000 as "lease prepayments" for rental of a multi-purpose wellness center on the University's campus. The lease's term was for a five-year period from October 26, 2017 until July 31, 2022. At the time of the signing of the lease, the building had not yet been built, and the lease stated that the $5,000,000 was to fund certain additions, alterations and renovations to the new Wellness Center. The lease stated that MCEC would be permitted to use other University property in lieu of the Wellness Center until its construction was completed. The lease from the Athletic Foundation was then transferred to the University of Southern Mississippi (USM). The transfer of the lease was approved by the Institutes of Higher Learning (IHL) Board in their October 2017 Board Meeting. A review of the minutes of that Board Meeting state that the funding for the sublease between MCEC and the Athletic Foundation is from funding "via a Block Grant from the Mississippi Department of Human Services."

  The facility was completed in December 2019, with USM expected to begin to utilize the space in January 2020. Auditors inquired of USM officials if MCEC utilized other University property, as described in the lease. According to USM's records, MCEC utilized the Reed Green Coliseum one time for a Healthy Teens Rally on October 18, 2018. It is important to note that during the time of the "lease" to the Athletic Foundation, the Director of MCEC (NN) served as a Board Member to the Athletic Foundation.

  The $5,000,000 was paid to USM Athletic Foundation in two equal installments of $2,500,000 on November 6, 2017 and December 5, 2017.

  When the lease from USM Athletic Foundation was viewed under scrutiny, auditors determined that the substance of the $5,000,000 payment to USM is a donation to the USM Athletic Foundation for the construction of the Wellness Center and not a lease of the property. The property was leased almost three years before its construction was completed; the rent was prepaid in order to build the space; any additional use of the property was limited to one occurrence in a three-year period; and the revenue did not appear to be classified as rental

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

revenue on the USM Athletic Foundation form 990 (non-profit tax return).

**Questioned costs for fiscal year 2018 - $5,000,000**

- American Heart Association – MCEC funded various programs and initiatives of the American Heart Association through donations and sponsorships.   The American Heart Association did not sign subgrantee agreements and was not considered a contractor of MCEC. Therefore, no reporting on the use of the funds was requested or required.  Actual payments included $35,000 in FY 2017; $36,500 in FY 2018; and $24,000 in FY 2019 for a total of $95,500.  As donations and sponsorships are prohibited as an allowable cost, the payments are questioned.

  **Questioned costs for fiscal year 2017 - $35,000**
  **Questioned costs for fiscal year 2018 - $36,500**
  **Questioned costs for fiscal year 2019 - $24,000**

- The Library Foundation of Madison – MCEC donated $35,000 for a bookmobile/digital lab project in Madison County in June 2018. Supporting documentation for the transaction consists of a donor form wherein MCEC requested recognition on an engraved foundation stone in exchange for the donation.  As donations and sponsorships are prohibited as an allowable cost, the payments are questioned.

  **Questioned costs for fiscal year 2018 - $35,000**

- Fannin Fabrication Company/Mississippi State Highway Patrol (MS Hwy Patrol) – MCEC contracted and paid Fannin Fabrication Company $28,186 to build a "Rollover Simulator."  Total cost was paid in two equal installments of $14,093, one payment in FY 2018 and the second in FY 2019. The simulator was then donated to the MS Hwy Patrol.  Inventory records from the MS Hwy Patrol verify that the two simulators are owned by the Patrol, and that one was donated. As donations and sponsorships are prohibited as an allowable cost, the payments are questioned.

  **Questioned costs for fiscal year 2018 - $14,093**
  **Questioned costs for fiscal year 2019 - $14,093**

- Mississippi Military Family Relief Fund – MCEC donated $10,000 to the fund in FY 2019. The transaction is coded to "Benevolence" in the general ledger.  The fund did not sign subgrantee agreements, and was not considered a contractor of MCEC.  Therefore, no reporting on the use of the funds was requested or required.  Actual payments included $10,000 in FY 2019.  As donations and sponsorships are prohibited as an allowable cost, the payment is questioned.

STATE OF MISSISSIPPI
SCHEDULE OF FINDINGS AND QUESTIONED COSTS
PART 3 – Federal Award Findings and Questioned Costs (continued)

**Questioned costs for fiscal year 2019 - $10,000**

- Financial records of MCEC show that on December 7, 2018 a $3,000 check was written to the bookkeeper of MCEC using TANF funds. The payee in the financial records is left blank, and the copy of the cashed check shows the payee as the bookkeeper.  The check was coded to "Seminars and Continuing Education" in the general ledger. However, check stub contains hand written note that $3,000 cash was given to Executive Director JD.  Auditor was unable to verify the purpose of the $3,000 payment; therefore, the amount is questioned.

**Questioned costs for fiscal year 2019 - $3,000**

- MCEC paid $38,737 in small donations/sponsorships to various Booster Clubs, races, foundations, student activity clubs, etc. during FY 2019.  As donations and sponsorships are prohibited as allowable costs, these payments are questioned.  Amounts paid over $1,000 are detailed below:
  o Speaker for Hattiesburg Rally $1,250
  o Murrah High School – Sound of Perfection Band - $1,000
  o Greater Pine Belt Community Foundation – Full time tutors - $13,200
  o Papa John's Pizza of South MS – Parade Float - $2,500
  o Canton Educational Foundation – $7,000
  o Junior League of Jackson – Touch A Truck - $2,500
  o National Guard Association of Mississippi – ½ of sponsorship - $2,500
  o National Strategic Planning and Analysis Research Center – sponsorship of Cybernetic City - $2,500

**Questioned costs for fiscal year 2019 - $38,737**

- FRC paid $16,680 in small donations/sponsorships to various Booster Clubs, pageants, student activity clubs during FY 2019.  These payments are classified as "sponsorships" in the general ledger.  As donations and sponsorships are prohibited as an allowable cost, these payments are questioned. Amounts paid over $1,000 are detailed below:
  o Tupelo High School Cross Country Booster Club – timing chips and readers - $5,350
  o Baldwyn Baseball – sponsorship - $5,000
  o Mississippi Municipal League – sponsorship - $1,000
  o Child Advocacy Center – sponsorship - $2,000
  o Baldwyn High School Cheerleaders – sponsorship - $1,000
  o Johnie E. Cooks Foundation Initiative – sponsorship - $1,000

**Questioned costs for fiscal year 2019 - $16,680**

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*Total amount questioned in 2017 – $35,000*
*Total amount questioned in 2018 – $5,085,593*
*Total amount questioned in 2019 – $106,510*

Publications

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.400 (g)*) states that entities may not earn or keep any profit resulting from federal financial assistance, unless explicitly authorized by the terms and conditions of the award.

*The Child Care and Development Block Grant Act (CCDBG)* authorized CCDF funds to be spent to achieve one of the following goals:
1) Protect the health and safety of children in child care,
2) Promote continuity of access to subsidy for low-income families,
3) Better inform parents and the general public about the child care choices available to them, and
4) Improve the overall quality of early learning and afterschool programs.

Participants in the CCDF program and recipients of the benefits must meet defined eligibility criteria based on income and need.

**Exceptions/Questioned Costs**: During testwork for activities allowed and allowable costs, the auditor noted the following questioned costs:

- Bay View Funding/M&W Publishing (Bay View) – MCEC entered into a four-year commitment with Bay View to purchase copies of the book "Professional Grammar Simplified" in order to market and sell the book to organizations to whom MCEC was affiliated. The books were sold wholesale to MCEC, with the intent to resell for a profit. During the commitment, MCEC and M&W Publishing entered into a legal dispute. The dispute was settled in mediation, and MCEC returned any unsold publication inventory to M&W Publishing. Actual payments on the agreement totaled $905,000 in FY 2019.

  Due to the unreasonable nature of the expenditure, the intent to profit from the sale of the book in violation of Program Income regulations, and the lack of any direct correlation to TANF, these funds are questioned. Additionally, any legal fees paid in relation to these questioned costs are also questioned. Legal fees were paid to two separate law firms (Bradley Arant and Watkins & Eager) in the amount of $10,212 in FY 2019.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Questioned costs for fiscal year 2019 – $915,212**

- *Eli's Christmas* – MCEC purchased 2,600 copies of the children's book in January 2019 using funds from the Mississippi Community College Board (MCCB) grant. These funds were pass-through CCDF funds through MDHS. MDHS and MCCB had a Memorandum of Agreement (MOA) to establish an Early Childhood Academy (ECA) at participating community colleges. The purpose of the ECA was to focus on preparing practitioners and parents to ensure children are prepared for successful transition from Pre-K to K-12. The MOA specifies that the ECA will provide professional development, technical assistance and coaching for practitioners and assist with Resource and Referral (R&R) Network offices around the state. R&R offices serve to facilitate the referral of parents and providers, and to assist members of the public for purposes of referral to an appropriate agency/entity for resources. Additionally, the scope of the agreement between MCEC and MCCB states that the work is to provide coaching, training, professional development, etc. The scope does not include any reference to providing materials to eligible children.

   The author of the children's book is also related to the principal and owner of Restore2, LLC. Due to the relationship of Executive Director JD, the owner of Restore2 (BD) and the principals of MCEC, auditor cannot verify purchase was made at arm's length bargaining or in good faith.

   Additionally, the scope of the projects does not include providing books to children, nor do the agreements make any correlation to the eligibility requirements of CCDF. Actual payments for the book totaled $44,964 in FY 2019.

**Questioned costs for fiscal year 2019 – $44,964 (CCDF)**

*Total amount questioned in 2019 – $960,176*

Purchases of Real Property/Construction/Assets

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.311(c))* states that real property that is purchased using federal funds must be used for as long as it is needed for the original purpose, and that the entity must not dispose or encumber its title or other interests. Further, when property is to be disposed, the entity must obtain disposition

212

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

instructions from the federal awarding entity or pass through entity, and must provide for one of the following: Entity may

*1)* Retain title after compensating the federal awarding agency,
*2)* Sell the property and compensate the federal awarding agency, or
*3)* Transfer title to the federal awarding agency or an approve third party.

*The Code of Federal Regulations (2 cfr 200.439 (b))* states, "The following rules of allowability must apply to equipment and other capital expenditures: (1) Capital expenditures for general purpose equipment, buildings, and land are unallowable as direct charges, except with the prior written approval of the Federal awarding agency or pass- through entity. (2) Capital expenditures for special purpose equipment are allowable as direct costs, provided that items with a unit cost of $5,000 or more have the prior written approval of the Federal awarding agency or pass-through entity. (3) Capital expenditures for improvements to land, buildings, or equipment which materially increase their value or useful life are unallowable as a direct cost except with the prior written approval of the Federal awarding agency, or pass-through entity."

*Decision of the Comptroller General of the United States, 42 Comp. Gen. 480 (1960)* reiterates that a State may not use TANF funds to construct or purchase buildings, or facilities or to purchase real estate. Additionally, the guide "*Q&A: Use of Funds, TANF Program Policy Questions and Answers*" produced by the Office of Family Assistance states that this prohibition also applies to grantees and subrecipients including counties, nonprofit agencies, and contractors.

The *MDHS Subgrant/Contract Manual* states in *Section 7*, that "all property and assets purchased through MDHS subgrants shall be placed on inventory in accordance with the statutes of the State of Mississippi and the rules set forth in the State Property Officers Manual."

Additionally, the manual states that all equipment purchased with subgrant monies must be specifically authorized through the Cost Summary and Budget Narrative portions of the subgrant agreement, and that any deviation requires a formal modification of the subgrant. The manual also states that any means of acquiring property shall be reviewed before any authorization by MDHS is given.

Regarding property inventory, the manual details the following property inventory regulations:

<u>Cameras, Televisions, Computers</u> – Any item $250 or over should be reported to MDHS on an Inventory Control Sheet, listed on MDHS inventory, and marked with a "Property of MDHS Sticker"

<u>Weapons, Two-Way Radios Equipment, Lawn Maintenance Equipment, Cellular Telephones, Chain Saws, Air Compressors, Welding Machines, Generators, Motorized Vehicles</u> – Must be reported to MDHS on an Inventory Control Sheet, listed on MDHS inventory, and marked with a "Property of MDHS sticker" regardless of price.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

<u>All other items purchased for over $1,000 with a useful life of over one year</u> -  Must be reported to MDHS on an Inventory Control Sheet, listed on MDHS inventory, and marked with a "Property of MDHS sticker"

MDHS is responsible for conducting a periodic physical inventory of each subgrantee at least twice yearly, using the inventory control list submitted to MDHS.  The manual also states that any property or equipment that is not being utilized or managed under the terms of the subgrant agreement and manual shall be recovered and redistributed.  Lastly, the manual states that if a subgrant is terminated or not renewed, any equipment purchased under the subgrant with public funds or MDHS funds shall neither be transferred to another location nor remain at the present location under a new subgrant without prior written approval of the MDHS Executive Director, and that MDHS has the authority to recover the value of any missing property via demand on the head of the subgrantee agency, property officer or employee.

**Exceptions/Questioned Costs**: Auditor initially used sampling techniques to audit equipment purchased with grant funds; however, the inadequate level of record keeping and incomplete inventory logs required additional procedures.  In addition, due to the high risk of fraud, waste, and abuse assigned to subgrantees based on initial testwork, further types of auditing methodology were used.  The results below encompass questioned costs under each testing method.

During testwork for activities allowed and allowable costs, the auditor noted the following:

- MD Foundation – MCEC entered into an agreement with MD Foundation for a sum of $371,000 on January 1, 2018 for "Equine Assisted Learning" and "Equine Assisted Activities".  The agreement does not have an expiration date and does not specify who the services will benefit, other than to state that individuals with mental or emotional disabilities benefit from equine training overall.   On February 26, 2018, the owner of MD Foundation was paid $171,000.  The transaction is classified as "Rent" in the underlying accounting records.  Auditor was provided a general ledger by MCEC; however, that showed this payment coded to "Contractual Services" indicating that MCEC edited the general ledgers before supplying them to auditors.  In both instances of recordkeeping, the payment was made from TANF funds.

  On April 13, 2018, MD Foundation purchased a residence with acreage in Flora, MS for a purchase price of $855,000.  The loan amount for the purchase was for $684,000, $171,000 less than the purchase price.  A down payment of $169,096 was made on the residence.  Based on observation and inquiry, the residence appears to be the personal residence of the Director and Owner of MD Foundation.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

MCEC paid an additional $200,000 directly to the bank that holds the note on the residence, and, on June 1, 2018, the residence was refinanced for a total of $484,895. The check is coded to "Consulting" in the general ledger. This payment was also made from TANF funds.

MCEC also guaranteed the residence through the bank with a six-year lease from April 1, 2018 through March 31, 2024. The lease was for the property in Flora purchased by MD Foundation and included $684,000 in lease payments at $9,500 monthly. The purpose of the lease was to operate a "multi use facility" at the residence. According to information in the Guaranty, the MCEC Board of Directors approved the Guaranty at a Board Meeting held on April 13, 2018. The Guaranty was signed by the Director of MCEC. Auditors could find no record of a Board Meeting held on that date during a review of the Board Minutes of MCEC and found no record of the Board Members approving a Guaranty in any provided Minutes. Additionally, MCEC later confirmed to auditor that no meeting was held on April 13, 2018. The Director of MCEC (NN) also personally guaranteed the loan of the residence.

When auditors inquired of MCEC about payments made to MD Foundation and any payments made on the property in Flora, personnel at MCEC did not provide consistent answers. Initially, the Director of MCEC (NN) told auditors in November 2019 that MCEC had given MD Foundation a subgrant for equine learning, mentoring, and youth development activities, and that they had made only one payment of $171,000 to the foundation. In March 2020, Auditors then inquired about payments to MD Foundation again and were told on March 27, 2020 that MD Foundation was paid $171,000 for equine learning. They were also told MCEC had no involvement with the residence in Flora and that no payments were ever made on the $684,000 lease used to guarantee the property. MCEC stated that the loan was to be modified in July 2018 to remove the guarantee. On March 31, 2020, MCEC stated that they contracted MD Foundation in January 2018 for $371,000 for programmatic services and that a lease was executed in February 2018 for $9,500 monthly payments and that MCEC paid $200,000 directly to the Bank for lease payments. MCEC stated that MD Foundation began programmatic services in April 2018, and that the lease terminated December 31, 2019.

Based on information provided over the course of the audit, MCEC asserts it paid $171,000 for equine learning services in February 2018 to be held on property that was not yet owned by MD Foundation. This payment was made in a lump sum advance, and services did not commence until April 2018. Additionally, MCEC paid $200,000 in lump sum, advance rental payments in order to lease the same property for use as a multi-use building. Based on fact patterns and documents

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

reviewed, auditors believe that the initial payment of $171,000 was used by MD Foundation to secure the residence at the closing of the initial loan. MCEC and MD Foundation then refinanced the residence, and MCEC contributed another $200,000 to the purchase of the residence; thereby, using $371,000 of TANF funds to secure a personal, private residence for the Director and Owner of MD Foundation.

It should be noted that the Director and Owner of MD Foundation was also employed by MCEC from July 17, 2017 until September 30, 2019 at an ending annual salary of $130,000. MCEC stated that he was employed as a "community liaison" during this time. MCEC paid $198,846 in salary payments and fringe benefits during this time period. Refer to "Salaries" section of this finding for the amount questioned for these salary payments.

MD Foundation was also paid $3,100 in travel reimbursements in FY 2018 and payments of $2,700 for "loans" in FY 2019.

Due to the prohibition against using federal funds for personal use, the prohibition of purchasing real property with TANF funds, and the unreasonableness of these purchases, the payments to MD Foundation are questioned in full.

**Questioned costs for fiscal year 2018 – $374,100**
**Questioned costs for fiscal year 2019 – $2,700**

- MCEC paid a contractor $134,880 in FY 2019 to demolish and renovate space at the North State Families First location. Due to the prohibition of using TANF funds to renovate real property, these purchases are questioned.

  **Questioned costs for fiscal year 2019 – $134,880**

- Both MCEC and FRC purchased items that meet the thresholds in the MDHS Subgrantee Manual for inclusion on the "Physical Property Inventory" and did not report these items to MDHS, as required by subgrant requirements. These items included cell phones, televisions, equipment, etc. Since the items were never reported to MDHS, they were not listed on the Inventory Control Sheets and were not properly examined in a physical inventory of MDHS. Auditor attempted to examine physical property inventory at both locations. Inventory could not be verified at MCEC due to inadequate tracking and lack of identifiable information on assets and invoices, i.e. serial numbers. Property inventory was able to be verified at FRC due to adequate tracking and property listings.

STATE OF MISSISSIPPI
SCHEDULE OF FINDINGS AND QUESTIONED COSTS
PART 3 – Federal Award Findings and Questioned Costs (continued)

- MCEC purchased three vehicles using MDHS grants funds –
  - 2018 Armada for $52,257 in October 2018 – While the vehicle is registered to MCEC, the address for the purchase of the tag is the residence of the Director of MCEC (NN) indicating personal use of the vehicle.
  - Big Country Silverado Chevrolet Truck for $59,840 in September 2017 – While the vehicle is registered to MCEC, the address for the purchase of the tag is the residence of Assistant Executive Director of MCEC (ZN) indicating personal use of the vehicle.
  - F250 Ford Truck for $54,221 in November 2018 – While the vehicle is registered to MCEC, the address for the purchase of the tag is the residence of Director of MCEC's son (JN), indicating personal use of the vehicle.  This individual is not employed by MCEC.
  - MCEC also paid $6,584 in for maintenance contracts, repairs, and other costs associated with the vehicles in FY 2019.

  Through inquiry and observation, auditor determined these vehicles were treated as the primary vehicles for the Director of MCEC (NN), the Assistant Executive Director of MCEC (ZN) and the son of the Director of MCEC (JN).  Due to the vehicles personal use, lack of any discernable allocation of the costs of the vehicles based on use, the reasonableness of purchase, and the lack of adherence to policies as described in the subgrant manual, these costs are questioned in full.

  **Questioned costs for fiscal year 2018 – $59,840**
  **Questioned costs for fiscal year 2019 – $113,062**

- Out of eight items of equipment purchases sampled at FRC, auditor noted:
  - Purchase of two vehicles, one for $50,415 and one for $27,749.  The vehicles were purchased with entirely TANF funds.  Auditor verified that vehicles were not used only for TANF purposes and that they were sometimes used for personal use.
  - Purchase of $27,093 in computer equipment.  The equipment was purchased with MDHS grant funds.
  - Purchase of networking equipment for a total of $8,055.  The equipment was purchased with MDHS grant funds.
  - Purchase of an air conditioning unit for $2,798, which is classified as "real property" under the federal grant.

  Due to improper allocation of costs and no appropriate underlying allocation methodology, and lack of adherence to the policies as described in the subgrant manual, the costs are questioned.  Due to the auditor's inability to calculate proper allocation due to insufficient documentation, the cost is questioned in full.

  **Questioned costs for fiscal year 2019 – $116,110**

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- Out of 100 items of equipment purchases sampled at MCEC, auditor noted:
  - Nine (9) items for a total of $2,334 in which MCEC could not provide documentation to support the expenditure.
  - Six (6) items for a total of $924 in which auditor could not find any correlation to the objectives of the TANF program for the equipment purchase.
  - Eighty-four (84) items for a total of $31,758 in which auditor could not determine item was used exclusively for the TANF program and/or what percentage of the items' use was appropriate, reasonable and necessary for the TANF program.

Due to lack of supporting documentation, improper allocation of costs and no appropriate underlying allocation methodology, and lack of adherence to the policies as described in the subgrant manual, the costs are questioned. Due to the auditor's inability to calculate proper allocation due to insufficient documentation, the cost is questioned in full.

**Questioned costs for fiscal year 2019 – $35,016**

*Total amount questioned in 2018 – $433,940*
*Total amount questioned in 2019 – $401,768*

Faith-Based Initiatives/Concerts

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (45 cfr 260.34(c))* states, "No Federal TANF or State MOE funds provided directly to participating organizations may be expended for inherently religious activities, such as worship, religious instruction, or proselytization. If an organization conducts such activities, it must offer them separately, in time or location, from the programs or services for which it receives direct Federal TANF or State MOE funds under this part, and participation must be voluntary for the beneficiaries of those programs or services."

*The Code of Federal Regulations (2 cfr 200.438)* states, "Costs of entertainment, including amusement, diversion, and social activities and any associated costs are unallowable, except where specific costs that might otherwise be considered entertainment have a programmatic purpose and are authorized either in the approved budget for the Federal award or with prior written approval of the Federal awarding agency."

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted the following:

- Under the "Families First" initiative, both MCEC and FRC funded concerts of a faith-based, evangelical worship singer in FY 2018 and FY 2019.  Payments were made to the singer individually and the organization "Through The Fire Ministries".   The singer performed at rallies and performed concerts in churches in Mississippi.   Auditors did not have a copy of the contracts associated with the payments.  Actual payments included $1,050 paid in FY 2018 by FRC and $180,350 in FY 2019 ($85,400 paid by MCEC and $94,950 paid by FRC).

  MCEC also expended $3,783 in identifiable expenditures in conjunction with the concerts, including paying for meals, security, and an opening choir performance.

  Due to the prohibition against paying for entertainment costs of inherently religious activities such as worship, the lack of any correlation to TANF purpose, and the unreasonableness of the cost, these costs are questioned.

  **Questioned costs for fiscal year 2018 – $1,050**
  **Questioned costs for fiscal year 2019 – $184,133**

- MCEC contracted with Sonshine Leadership, LLC to develop faith-based coalitions.  One of the stated activities of the agreement was to "develop a prayer team for Mayors" and to receive and connect prayer requests to faith-based coalitions.  Due to lack of supporting documentation, auditor cannot verify that work performed under the contract could not be categorized as "inherently religious" and therefore, the costs are questioned.

  **Questioned costs for fiscal year 2019 – $61,826**

  *Total amount questioned in 2018 – $1,050*
  *Total amount questioned in 2019 – $245,959*

Marketing/Branding/Advertising/Promotional Materials

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.438(b)*) states, in part, "the only allowable advertising costs are those which are solely for…program outreach and other specific purposes necessary to meet the requirements of the federal award."

*The Code of Federal Regulations (2 cfr 200.438(d)*) states, in part, "the only allowable public relations costs are costs specifically required by the federal award,

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

costs of communicating with the public and press pertaining to specific activities or accomplishments which result from the performance of the federal award, and costs of conducting general liaison with news media and government public relations officers, to the extent that such activities are limited to communication and liaison necessary to keep the public informed on matters of public concern, such as notices of funding opportunities, financial matters, etc."

*The Code of Federal Regulations (2 cfr 200.438(e))* states, in part, "Unallowable advertising and public relations costs include the following: (1) All advertising and public relations costs other than as specified in paragraphs (b) and (d); (2) Costs of meetings, conventions, convocations, or other activities of the entity including costs of displays, demonstrations and exhibits; costs of meeting rooms, hospitality suites, and other special facilities used in conjunction with shows and other special events; and salaries and wages of employees engaged in setting up and displaying exhibits, making demonstrations and providing briefings. (3) Costs of promotional items and memorabilia, including models, gifts, and souvenirs; (4) Costs of advertising and public relations designed solely to promote the non-federal entity.

*The Code of Federal Regulations (2 cfr 200.422)* states, "Costs incurred by advisory councils or committees are unallowable unless authorized by statute, the Federal awarding agency or as an indirect cost where allocable to Federal awards."

The *MDHS Subgrant Agreement* states in Section 9, under the heading "Compliance with Laws, Rules and Regulations" that any advertisements, brochures, flyers or produces any other material, printed or otherwise, relating to, or promoting, the services which is provided through the subgrant, it shall acknowledge that MDHS provided funding for the services.

**Exceptions/Questioned Costs**:   During testwork for activities allowed and allowable costs, the auditor noted the following:

- Under the "Families First" initiative, MCEC and MDHS were provided branding, public relations, print media and advertising from the Cirlot Agency. Auditor was not provided a contract for these services, but was provided a "Families First for Mississippi Financial Update" from November 2019 that detailed the scope of work performed for MDHS, Family First Initiative and Families First Mississippi.  The update stated that $1,199,310 had been billed for services, and was broken down as follows (Numbers below are copied verbatim from the invoice.  Breakdown summary does not equal the total by category, and the amounts do not equal the amount billed.  Errors in addition remain unchanged intentionally):
  - Families First for MS – $292,718
    - Collateral $17,919
    - Fundraising $61,974
    - Public relations - $10,576
    - Strategic Planning - $63,489
    - Video Production - $63,698
    - Website - $75,064

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- o Family First Initiative – $298,310
  - Summit Materials and Planning - $124,114
  - Strategic Planning - $54,805
  - Pilot Programs - $100,884
  - Steering Committees - $10,751
  - Website - $7,756
- o Mississippi Department of Human Services - $608,088
  - Video Production - $247,111
  - Strategic Planning - $42,732
  - Branding and Positioning - $169,626
  - Law of 16 Events - $113,037
  - Public Relations - $6,539
  - Analytics - $29,043

Actual payments made by MCEC for the services included $206,000 in FY 2017, $369,438 in FY 2018 and $1,152,470 in FY 2019 for a total of $1,727,908, which does not agree with the summary provided to auditors. Auditors could find no record of payments made to Cirlot by MDHS directly. Based on inquiry with MDHS personnel, MCEC requested reimbursement for expenditures paid on their behalf based on a verbal "promise to pay" from Executive Director JD. MDHS, under the subsequent Executive Director (CF), denied any reimbursement request. However, MCEC still used TANF funds to pay for the services.

Auditors, when possible with supporting documentation, viewed copies or video of advertising made in conjunction with this agreement. Auditors were not able to view all materials, however, due to lack of documentation. Auditors determined that promotional materials and advertising did not consistently abide by restrictions in the MDHS subgrant to include MDHS as a funding source, and did not consistently correlate advertisements to programmatic resources. Much of the advertising was designed to solely benefit MCEC and its nonprofit and not programs offered. Additionally, advertising was not appropriately allocated among different subgrants. Finally, some items charged by Cirlot are specifically prohibited in federal regulations (steering committees, promotional materials, fundraising) and should not have been paid by federal monies. Auditor also questions the reasonableness of the cost of services. Due to these reasons, the costs paid to Cirlot are questioned in full.

**Questioned costs for fiscal year 2017 – $206,000**
**Questioned costs for fiscal year 2018 – $369,438**
**Questioned costs for fiscal year 2019 – $1,152,470**

- MCEC entered into contractual agreements to advertise and sponsor NCAA college sporting events at Mississippi State University. Invoices for payments made to IMG College, LLC/Learfield indicate that the advertisements were at college football, basketball, and baseball games. In addition, advertising was

STATE OF MISSISSIPPI
SCHEDULE OF FINDINGS AND QUESTIONED COSTS
PART 3 – Federal Award Findings and Questioned Costs (continued)

also done for NCAA Final Four Championships and Bowl Games held out of state. In at least one instance, TANF grant funds were used to purchase tickets to a college football game. Total payments included $195,163 in FY 2018 and $121,393 in FY 2019 for a total of $316,556.

Due to the unreasonableness of providing advertising for programs designed for the needy at college sporting events, lack of adherence to stipulations in the grant agreement, and the lack of any correlation to how the advertising benefited the programmatic nature of the TANF program, these costs are questioned.

**Questioned costs for fiscal year 2018 – $195,163**
**Questioned costs for fiscal year 2019 – $121,393**

- MCEC and FRC entered into contractual agreements to advertise with radio stations owned by Telesouth Communications. Invoices for payments indicate that the advertisements were for promotional campaigns, fundraising, and programmatic functions. The advertisements were sold in a "marketing package" whereas the price of the contract was billed in installments. Due to the packaged nature of the invoices and advertising, auditors cannot determine which costs should be allocated to programmatic functions and which charges were for advertising that solely benefited the entity.

  Payments included $57,950 in FY 2017, $49,886 in FY 2018, and $220,560 in FY 2019 for a total of $328,396 from MCEC.

  Payments included $36,680 in FY 2017, $53,721 in FY 2018, and $213,521 in FY 2019 for a total of $303,922 from FRC.

  Due to the unreasonable cost of the advertising, lack of adherence to stipulations in the grant agreement, inability to allocate costs of allowable and unallowable payments, and the lack of any correlation to how the advertising benefited the programmatic nature of the TANF program, these costs are questioned.

  **Questioned costs for fiscal year 2017 – $94,630**
  **Questioned costs for fiscal year 2018 – $103,607**
  **Questioned costs for fiscal year 2019 – $434,081**

- Both MCEC and FRC utilized iPromoteU to provide promotional gifts and "swag" for conferences, booths, etc. These items were often branded as "Family First" and failed to denote that funds used for the cost of the items were from MDHS, as required by the subgrant agreement. Additionally, these items are prohibited as unallowable costs. Payments were made primarily from TANF funds, but CCDF and SSBG funds were also utilized as noted below.

222

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Payments included $23,569 in FY 2017, $94,789 in FY 2018, and $49,613 in FY 2019 for a total of $167,971 from MCEC.

Payments included $3,137 in FY 2017, $11,197 in FY 2018, and $3,842 in FY 2019 for a total of $18,176 from FRC.

**Questioned costs for fiscal year 2017 – $26,706**
**Questioned costs for fiscal year 2018 – $105,393**
**Questioned costs for fiscal year 2018 – $593 (SSBG)**
**Questioned costs for fiscal year 2019 – $52,455**
**Questioned costs for fiscal year 2019 – $1,000 (CCDF)**

- MCEC purchased additional advertising, marketing and promotional materials in FY 2019.  Auditors sampled the remaining population of expenses classified as "Advertising" in the entities general ledgers.  Auditors examined the invoices of nine additional advertising charges.  When available, auditors viewed copies of the actual advertisements to determine what, if any, programmatic content was advertised.  Auditors found that MCEC did not properly identify MDHS as the source of the funds nor did the advertising have a correlation to the TANF program.  Sampled items totaled $13,090. Items are detailed below:
  - Clarion Ledger - $70 for digital ads
  - WONA radio station - $120 for ads
  - Ridgeland Chamber of Commerce - $40 for luncheon
  - Area Development Partnership - $250 for ad
  - House of Peace - $75 for pastor, minister, and leader conference
  - Busby Companies - $498 for billboards
  - WAPT - $12,037 for ads

**Questioned costs for fiscal year 2019 – $13,090**

- FRC also had additional advertising expenditures; however, due to the inconsistency in how FRC accounting personnel coded expenses in the General Ledger, auditors could not perform a targeted sample of advertising expenditures.  Any advertising expenditures sampled in the general population are discussed in the Section "Other Auditing Results" of this finding.

*Total amount questioned in 2017 – $327,336*
*Total amount questioned in 2018 – $774,194*
*Total amount questioned in 2019 – $1,774,489*

Second Tier Subrecipients/Programmatic Subgrants

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*The Code of Federal Regulations (2 cfr 200.469)* states the costs incurred for intramural activities, student publications, student clubs, and other student activities, are unallowable, unless specifically provided for in the Federal award.

The Office of Family Assistance produced *TANF-ACF-PI-2005-1 (Funding Childhood Education, School Readiness, Kindergarten, and Other Public Education Programs,* published on April 14, 2005, clarifies the use of funds for educational programs. Per the guide, "public education is a State responsibility; therefore, States may not use Federal TANF for any educational activity that is a component of the State's system of free public schools. By charging the Federal government for any part of these costs, the State would be passing on to the TANF program the costs of the State's public education system…This prohibition applies regardless of the adequacy of funding for general public education from other sources."

The *MDHS Subgrant Agreement* states in Section 5, under the heading "Documentation Requirements" that "Source documents are required to support transactions entered into the subgrantees' record keeping system. The following is a list of the minimum documentation required for selected transaction types:

- Salaries & Fringe - Benefits Personnel files which include a job application or resume, IRS W-4 Form, State Tax withholding form, I-9 Form (if hired after May 1987), e-verify confirmation, date of hire, and current approved salary/wage. Time distribution/activity sheets are required when the employee's time is charged to more than one subgrant or activity. Time sheets and activity reports should reflect the actual hours worked and duties performed.

- Travel - An approved travel voucher showing that all travel expenses were incurred for the benefit of the subgrant; copies of supporting bills including out-of-state meal receipts, hotel bills, conference registration fee receipts, and conference agendas.

- Telephone - Complete telephone bills and long distance telephone logs that indicate the person calling, the person called, the date and time of the call, the reason and purpose of the call, the number called, and the subgrant that benefitted from the telephone call.

- Equipment - Original vendor invoices, receiving reports, purchase orders, competitive quotes or proof of newspaper advertisements for bids (if applicable), property records, and authorization to purchase equipment, and any other documentation necessary for purchasing law conformity. All purchases of equipment must be made in accordance with state purchasing requirements.

- Commodities (Supplies) - Original vendor invoices, receiving reports, purchase orders, competitive quotes or proof of newspaper

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

advertisements for bids (if applicable), and documentation the expenses were incurred for the benefit of the subgrant.

- Contractual Services - Original contracts for services charged to the subgrant, evidence of completion of contracts, billings for services, rental or lease agreements, competitive quotes or proof of newspaper advertisements for bids (if applicable), or documentation of fair market value.

- Subsidies, Loans & Grants - (Payments to/for clients) Client attendance records, documentation of services provided, including dates, times, names, and client signatures, or documentation to verify units of service provided.

- Other Direct Costs - Original vendor invoices, receiving reports, purchase orders, competitive quotes or proof of newspaper advertisements for bids (if applicable), and documentation the expenses were incurred for the benefit of the subgrant.

**Exceptions/Questioned Costs**:  Both MCEC and FRC awarded subgrants to "second tier subrecipients" during the grant period.  Auditor reviewed programmatic scopes, payment requests, and supporting documentation to determine if agreements were made in accordance with provisions of Uniform Grant Guidance, grant regulations and restrictions, the initial subaward from MDHS, and whether the documentation adhered with the MDHS Subgrantee Manual.  During this review, auditor found the majority of subgrantees of MCEC and FRC were not appropriately monitored, and that MCEC/FRC did not supply appropriate documentation for reimbursements or had inappropriate project narratives, scopes, etc.  Most of the subgrant "packets" examined did not contain any type of correlation to the federal award objectives, nor did they contain client attendance records or documentation of the services provided.  Many of the projects funded with appropriate scopes appeared to have performed work; however, documentation supporting that work was not sufficient for auditor to determine if it met the requirements to be allowable under the federal award.  Additionally, while some of the projects may have community value and be considered worthwhile endeavors, auditor could not determine, from information provided, if the project/subgrant was a reasonable use of TANF, CCDF or SNAP resources, or if the program was limited to those defined as "needy" in both State or Federal regulations.  It should be reiterated that, due to MCEC and FRC failing to denote on grant agreements that monies supplied were funded from federal programs such as TANF, second tier subrecipients could have not been aware of program restrictions and regulations.  Based on these criteria, auditor has included these as questioned costs.

- MCEC Subgrantee agreements did not contain scopes or projects, nor did they entail how the programs would benefit needy individuals, or the correlation to TANF.  In some instances, auditor was provided copies of grants/contracts for prior years and in some instances, auditors were only provided current year agreements.  While some payments below appear to

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

exceed grant awards, auditors were only provided contracts for FY 2019, and it is possible FY 2018 agreements existed that allowed for additional monies to be spent. Contract dates also spanned multiple fiscal years; therefore, information regarding FY 2018 and FY 2019 are presented as questioned costs.

- o   Belhaven University – Granted $250,000 for Leadership Development.  Actual payments in FY 2019 were $236,023.
- o   Delta State University – Granted $700,002 over a two- year period. Scope unknown.  Actual payments in FY 2018 were $238,796; and $344,807 in FY 2019.
- o   Friendship Connection – Granted $35,000.   Scope unknown. Actual payments totaled $35,000 in FY 2019.
- o   Greenwood Community and Recreation Center – Granted $35,000. Scope unknown.  Actual payments in FY 2018 totaled $62,166; and $43,891 in FY 2019.
- o   Gulf Coast Community Foundation – Granted $55,250.  Scope unknown.    Actual payments in FY 2018 totaled $82,167; and $36,883 in FY 2019.
- o   Jackson County Civic Action Agency – Granted $75,000 for 'Youth development and mentoring'. Actual payments in FY 2018 totaled $194,554; and $124,215 in FY 2019.
- o   Juanita Sims Doty Foundation – Granted $1,000,000 over a two-year period. Scope unknown.    Actual payments in FY 2018 totaled $688,864; and $368,291 in FY 2019.
- o   Kid's Hub – Granted $72,464.  Scope unknown. Actual payments in FY 2018 totaled $41,120; and $45,309 in FY 2019.
- o   Meridian Community College – Granted $100,000.   Scope unknown.   Actual payments in FY 2018 totaled $36,672; and $96,022 in FY 2019.
- o   Mississippi Gulf Coast Community College – Granted $274,314 for 'Training for middle skill job opportunities'.  Actual payments in FY 2019 totaled $62,905.
- o   Mississippi Offender Re-Entry Program – Granted monies to establish a re-entry program for the Oakley Training Facility. Contract did not include an amount of funds granted. Actual payments for FY 2019 totaled $301,000.
- o   Pearl River Community College – Granted $260,193 for 'Encourage work ready credentials or HSE diploma'.  Actual payments for FY 2018 totaled $10,759; and $182,942 in FY 2019.
- o   Phoenix Project – Granted $45,000.  Scope unknown.   Actual payments in FY 2018 totaled $195,696; and $73,821 in FY 2019.
- o   Picayune School District – Granted $50,000.  Scope unknown. Actual payments in FY 2018 totaled $131,005; and $97,014 in FY 2019.
- o   Restoration Foundation – Granted $30,000 for addiction services. Actual payments for FY 2018 totaled $27,479; and $24,823 in FY 2019.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

     o   Soul City Hospitality - $200,000 subgrant to create a community garden and to educate youth about sustainable agriculture.  Actual payments totaled $200,000 in FY 2019.

     o   Tulane Missionary Baptist Church – Granted $25,000.  Scope unknown.  Actual payments in FY 2018 totaled $9,551; and $53,408 in FY 2019.

     o   Voice of Calvary – Granted $42,000 for 'The Net Counseling and Mentoring' services.  Actual payments totaled $7,128 in FY 2018 and $30,948 in FY 2019.

**Questioned costs for fiscal year 2018 – $1,725,957**
**Questioned costs for fiscal year 2019 – $2,357,302**

- FRC Subgrantee agreements did contain scopes and/or project descriptions; however, some items in project scopes did not comply with allowable cost provisions and those grants are questioned below.

  In some instances, information provided by subrecipients details lists of participants in programs, including participant intake forms that contain information on eligibility; however, for some programs no conclusions were drawn on whether participants were eligible.  Additionally, some intake forms detail wage information that makes participant ineligible for program.  For those programs that did not draw conclusions on eligibility determinations and those that covered ineligible participants, the grants are also questioned below.

       o   Autism Center of North Mississippi – Granted $250,000 to provide a variety of services to children with autism.  Many of the services provided do not meet allowable cost guidelines. Actual payments totaled $7,472 in FY 2018; and $99,732 in FY 2019.

       o   Baldwyn School District – Granted $577,163 for a variety of programs provided to children of the district.  Many of the services provided do not meet allowable cost guidelines and services were not limited eligible participants. Actual payments totaled $158,574 in FY 2018; and $210,600 in FY 2019.

       o   Children's Advocacy Center – Granted $579,180 to develop and increase child advocacy training studies at colleges and universities.  Many of the services provided do not meet allowable cost guidelines and were not limited to eligible participants.  Actual payments totaled $254,478 in FY 2018; and $48,913 in FY 2019.

       o   Kelly Williams Ministries – Granted $75,000 to assist women re-entering the workforce after incarceration or addiction.  Auditor could not determine if eligibility determinations were made for participants.  Actual payments totaled $64,000 in FY 2019.

       o   Mississippi State University – Three different subgrant agreements were provided to auditors; however, auditor could not discern based on supporting documentation from which of the three subgrants the payments were made; therefore, the total of all

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

payments is presented.  Actual payments totaled $595,482 in FY 2018; and $217,800 in FY 2019.

- ▪ "Recruitment and Enrollment" – Granted $225,000 to recruit students into the Education programs at the university.  Program does not meet allowable cost guidelines.
- ▪ "Augmentative Communication" – Granted $150,188 to pay for the salaries of therapists.  Program does not meet allowable cost guidelines.
- ▪ "Dyslexia" – Granted $171,089 to pay for the salaries of therapists.  Program does not meet allowable cost guidelines.

- o Nettleton School District – Granted $150,000 to pay for curriculum, equipment and supplies.  Program does not meet allowable cost guidelines.  Actual payments totaled $48,201 in FY 2018.
- o Prentiss County Library – Granted $144,800 to pay for the salaries of library personnel.  Program does not meet allowable cost guidelines.  Actual payments totaled $46,533 in FY 2018; and $93,067 in FY 2019.
- o Regional Rehabilitation Center - Granted $500,000 to pay for the salaries of therapists.  Program does not meet allowable cost guidelines.  Actual payments totaled $263,995 in FY 2018; and $175,019 in FY 2019.
- o Reviving Network – Granted $74,259.  Scope only includes the requirement to report on grant's progress.  Auditor is unable to determine if program meets allowable cost guidelines.  Actual payments totaled $31,096 in FY 2018; and $18,325 in FY 2019.
- o Robinson Resource Center – Granted $60,000 to operate a community outreach center.  Services provided are not limited to eligible participants.  Actual payments totaled $8,835 in FY 2018; and $23,182 in FY 2019.
- o Southeast Mississippi Children's Advocacy Center – Granted $14,000 to develop and increase child advocacy training studies at colleges and universities.  Many of the services provided do not meet allowable cost guidelines and not limited to eligible participants.  Actual payments totaled $20,625 in FY 2018; and $11,371 in FY 2019.

**Questioned costs for fiscal year 2018 – $1,435,291**
**Questioned costs for fiscal year 2019 – $962,009**

*Total amount questioned in 2018 – $3,161,248*
*Total amount questioned in 2019 – $3,319,311*

Personal Benefit/Conversion to Private Use

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.445 (a))* states that, "Costs of goods or services for personal use of the non-federal entity's employees are unallowable regardless of whether the cost is reported as taxable income to the employees."

**Exceptions/Questioned Costs**:  During the course of the audit, auditors became aware that MCEC was under investigation for the misuse of state and federal monies.  Allegations against MCEC included the conversion of assets derived from federal grants to personal use.  Auditors examined the financial records of MCEC, and concurred with the conclusion that some federal grant monies had been converted to personal use.  The Director (NN) and Assistant Executive (ZN) Director of MCEC have both been indicted on charges of fraud and embezzlement and have been arrested.  Both pleaded non-guilty and are currently awaiting trial.  Auditor noted the following instances of alleged conversion of assets to personal use:

- From a period of January 1, 2016 to June 30, 2019, MCEC transferred/paid a total of $6,513,393 in monies directly to the private business New Learning Resources, Inc. (NLR) which is owned and operated by the Director and Assistant Executive Director of MCEC.  NLR operates in several different ways, including a website for online learning, New Learning Resource School Districts (NLRSD), and offers other educational services at the private school, New Summit School (NSS).  A review of the transactions/transfers indicates that NLR and MCEC's finances were commingled and intertwined in such a manner that MCEC often paid invoices addressed to personnel at NLR and sent to NLR's physical address.  Vice versa, some transactions indicate NLR paid for MCEC expenses and NLR was reimbursed for those charges.  Auditor noted, however, that when NLR funds were used to pay for MCEC expenses, MCEC reimbursed NLR almost immediately, in many instances the same day.  The balance for transactions paid by MCEC on behalf of NLR, however, continued to increase throughout the fiscal year.  Some of the $6,513,393 was offset by credits for amounts paid by NLR on behalf of MCEC; however, the legitimacy of the credits could not be determined.

  MCEC utilized a variety of accounting transactions to allegedly conceal money transfers to NLR.  As an example, general ledgers provided by MCEC to auditors and MCEC's underlying financial records do not agree in regards to transactions to NLR. In multiple instances the underlying financial records refer to the payee on the transfer/check as New Learning Resources; however, the general ledger provided to auditors show the same transactions with varying vendor names.  For example, in one instance the financial records show a payment to NLR on 01/08/2019 for $1,125 for catering of Highway Patrol meals; however, the same entry on the general ledger provided to auditors shows the payee of this transaction to be

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

"Robert's Catering." In fact, any payments to NLR other than a $700,000 grant payment had been artificially removed from the general ledger provided to auditors.

Additionally, there were numerous transactions in the general ledger provided to auditors that indicated that the payee on a check was American Express, showing the transaction to be a credit card charge; however, when auditors examined the actual bank statements of MCEC, the same transactions would be made out to NLR. Therefore, the American Express balance in the was overstated, and the amount paid to NLR was understated. The only discernable purpose of this deliberate mislabeling of transactions in the general ledger would be to conceal the number and amount of transactions flowing through from MCEC to NLR.

General journal transactions were used to transfer money and set up a "Due from NLR" in the accounting system. The balance in the "Due from NLR" account has a $1,085,217 balance as of June 30, 2019, indicating that MCEC utilized grant monies of a minimum of $1,085,217 to fund NLR. In December 2018 alone, MCEC funded NLR a total of $275,000 in transfers coded as "Due from NLR."

On November 30, 2018, MCEC recorded a $700,000 transfer of TANF funds to NLR. The amount is coded as a general journal reduction in the amount owed to MCEC. When auditors inquired about the transfer, MCEC personnel provided a signed grant agreement from MCEC to NLR. However, investigators were able to verify that the document had been falsified, was not in existence at the time of the transfer, and that proceeds did not benefit NLR in a grant/subgrant relationship. When added with the balance of the "Due from NLR" account, the actual amount of MCEC funds used to fund NLR increases to $1,785,217.

Auditors also reviewed invoices supplied by MCEC for fiscal year 2019, and were able to verify $73,514 of transactions that were paid using TANF Funds on behalf of NLR in addition to the amounts in the paragraph above. These costs included utilities, licenses, curriculum, etc.

Without examining the records of NLR, auditors cannot determine what fiscal year these charges stem from and what year the grant costs should be questioned for any balance prior to 2017. Additionally, auditor cannot verify that these are the only amounts converted to private use without a thorough review of the records of NLR and MCEC in tandem.

After analyzing the transfers and transactions in the ledger, auditor questioned the payments to NLR that were not offset by credits.

**Questioned costs for fiscal year 2018 – $473,622**
**Questioned costs for fiscal year 2019 – $1,326,267**

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- The Director and Assistant Executive Director entered into a contract for $1,700,000 with the medical company, Prevacus, to purchase an investment in Prevacus and its affiliate PreSolMD. The company manufactures a brain concussion medicine. In exchange for the investment, Prevacus was to conduct clinical trials of the new medicine on children in Mississippi. The agreement was entered into by the Director (NN) and Assistant Executive Director of MCEC (ZN) in their personal capacity. An initial wire transfer of $500,000 was made on April 8, 2019 and a subsequent wire transfer of $250,000 was made on May 10, 2019. Original entries in the general ledger show that the payments were made with TANF funds; however, after State Auditor Investigators questioned the use of TANF funds in July 2019, the funding source was changed to "Bingo" in the accounting software. It should be noted that an additional $350,000 was paid in FY 2020.

   **Questioned costs for fiscal year 2019 – $750,000**

- MCEC paid Magnolia Strategies, LLC, a company owned by the Director of MCEC's son, $250,000 in "consulting" fees in both FY 2018 and 2019. Auditors were not provided a copy of any contracts for these fees, and, therefore, cannot determine what, if any, services were actually performed. All three checks were originally paid with TANF funds and coded as such in the accounting system. On July 16, 2019, after MCEC was first questioned about the use of TANF funds by State Auditor Investigators, the audit trail shows that a check written to Magnolia Strategies was re-coded in the system as "Administrative" funds.

   **Questioned costs for fiscal year 2018 – $250,000**
   **Questioned costs for fiscal year 2019 – $250,000**

- Auditors reviewed invoices supplied by MCEC for fiscal year 2019, and were able to verify $4,387 of transactions that were paid using TANF Funds on behalf of Spectrum Academy. Spectrum Academy is also owned by the Director of MCEC's son. Additionally, $7,490 was paid in TANF funds for expenses of the Mississippi Dyslexia Center, which is also owned by the Director of MCEC's son. No contracts or subgrants existed to justify these payments. Payments ranged from utility payments, advertising payments, licenses, meals, etc.

   **Questioned costs for fiscal year 2019 – $11,877**

- Auditors were able to identify $118,022 in costs paid using TANF/CCDF funds for NSS in FY 2019. Of those funds, $70,228 were used to purchase kitchen equipment for the cafeteria of NSS, and $17,842 was used to purchase Apple Computer products for NSS. The remaining $29,952 was used to purchase various supplies, pay for utilities, purchase licenses, etc.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Additionally, MCEC entered into contractual agreements with the University of Southern Mississippi (USM) to fund "externships" of students at the University through the School of Psychology. Externships allow individuals to study in a real-world work environment. According to press releases by USM and invoices supplied to auditor by MCEC, these externships were completed at NSS. Therefore, MCEC used TANF funds to pay for temporary workers at NSS. These invoices are billed to MCEC with the description "Spectrum I – Externships" and "Spectrum II". These costs were coded as "consulting" and charged to the TANF grant. Total costs paid under these grants includes $526,146 paid in FY 2018 and $56,131 in FY 2019.

**Questioned costs for fiscal year 2018 – $526,146**
**Questioned costs for fiscal year 2019 – $174,153**

- On February 22, 2017, the Assistant Executive Director of MCEC borrowed $28,898 against the balance of his 403(b) pension plan at American Funds. The loan repayment included semimonthly payments of $264. Upon review of general ledger, payments were made from the Assistant Director to repay the loan in the amount of $1,489 for FY 2017, $6,380 for FY 2018, and $6,343 in FY 2019. According to MCEC personnel, these payments were deducted from the Assistant Executive Director's gross pay; however, auditor determined that no deductions were made against his pay and that the charges were coded and charged to the TANF grant. It should be noted that another employee of MCEC had a loan against his 403(b) pension plan. His monthly payments were deducted from his gross pay, as required.

**Questioned costs for fiscal year 2017 – $1,489**
**Questioned costs for fiscal year 2018 – $6,380**
**Questioned costs for fiscal year 2019 – $6,343**

*Total amount questioned in 2017 – $1,489*
*Total amount questioned in 2018 – $1,256,148*
*Total amount questioned in 2019 – $2,518,640*

Related Party Rent and Idle Facilities

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.446)* states that the cost of "idle facilities" is an unallowable cost. Idle facilities are defined as facilities that are completely unused and to the excess of the entity's current needs.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

*The Code of Federal Regulations (2 cfr 200.465)* states that rental costs are allowable to the extent that the rates are reasonable in light of rental costs of comparable property, market conditions, alternatives available, and the condition of the property.

*The Code of Federal Regulations (2 cfr 200.465(c))* states that rental costs under "less than arm's length" leases are allowable only up the amount that is considered reasonable compared to similar property. It further defines a "less than arm's length" lease as one where the lessor and lessee are under "common control" such as a situation involving two companies owned by the same individual, or the two companies owned by immediate family members. Family members, for the purpose of this regulation, are defined as (1) Spouse, and parents thereof; (2) Children, and spouses, thereof; (3) Parents, and spouses thereof; (4) Siblings, and spouses thereof; (5) Grandparents and grandchildren, and spouses, thereof; (6) Domestic partner, and parents thereof; (7) Any individual related by blood or affinity whose close association with the employee is equivalent of a family relationship.

**Exceptions/Questioned Costs**: MCEC is owned and operated by the Director, and her son, the Assistant Executive Director. Together, they own Avalon Holdings, LLC (Avalon). The Director's other son owns and operates 204 Key, LLC (Key). Both Avalon and Key own properties that are utilized by MCEC as places of business. Avalon owns three separate buildings that are utilized by MCEC; Key owns one.

- Avalon owns the main building that is used as MCEC's headquarters. In this shared space is a dentist office rented to an independent third party, MCEC, and New Learning Resource Online (NLRO), which is also owned by the Director of MCEC and her family. During the audit, auditors noted that the rental payments to Avalon seemed excessive considering market conditions, size of the property, condition of the property, and location of the property. After a search of business listings by the Mississippi Secretary of State's Office, auditors confirmed that MCEC and Avalon were under common control, and, therefore, should only be able to charge "reasonable and comparable" rent for use of the building. Auditors requested a copy of the lease agreement, and were provided an unsigned agreement stating that monthly rent was $3,997. After requesting a signed copy of the lease, auditors were provided a new lease agreement that stated the monthly rent to be $16,000 per month for "operating a retail boutique" and stated the size of the property was 12,500 square feet. MCEC finally provided a lease agreement amendment that stated that the monthly rental payments were $27,466 monthly.

  Auditors were able to ascertain the square footage of MCEC's utilized space, the square footage of the independent third party's utilized space and the rent charged, and calculated a reasonable "per square foot" rent charge of $1.78 per square foot (monthly rent of $5,488 for 3,084 square feet of space for the independent third party). MCEC uses approximately 7,000 square feet, according to documents provided. These calculate to a

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

reasonable, market value of rent to be $12,460 per month.  Actual rental payments made to Avalon monthly for MCEC were $27,466 monthly, plus additional amounts paid on a sporadic basis.  MCEC actually paid $357,061 in rental fees for FY 2019.  Reasonable annual rent is calculated to be $149,520. $207,541, the portion of rent that is considered above market value, is questioned

Additionally, rent is charged for a building close in proximity to the headquarters of MCEC.  When auditors inquired about the purpose of the rent payments, MCEC informed auditors that the space was utilized for office space and intake assessments for Families First.  However, based on a physical walkthrough and inquiry with NSS personnel, auditor determined that the building is utilized by the 4th grade classes at NSS, and is the location of the "Spectrum Academy" location inside NSS.  Both NSS and Spectrum Academy are privately owned organizations by the Director of MCEC and her family. Rental payments for the building were $9,868 monthly, or $118,416 annually.  As these facilities were used for personal businesses of the Director of MCEC and her family and has no correlation to TANF, the cost of rent payments is an unallowable cost.  Additional rent payments were made in the ledger with no explanation as to why.  Actual payments of $128,294 are questioned.

Avalon also owns a property in Greenwood, MS, that is utilized by MCEC as a "Families First Resource Center."  Auditors were provided with a lease agreement stating monthly rent would be $2,000 (or $24,000 annually), and would be increased no more than 3 percent for the next year. Based on the initial amount of the lease plus the 3 percent increase, monthly rent should be no more than $2,060, or $24,720 annually.  MCEC paid rental fees at $7,500, or $90,000 annually.  Additionally, extra rental payments were made on a sporadic basis.  Actual payments for the space totaled $97,806., an overpayment of $73,086. Questioned costs include the difference in what the lease agreement allowed ($24,720) and actual payments.

Additional rent payments made to Avalon in the amount of $6,250 are also questioned as there is not a business purpose for the extra payments.

**Questioned costs for fiscal year 2019 – $415,171**

- MCEC paid monthly rental payments of $3,500 to Key for property located in Madison, MS.  When a copy of the lease was requested by auditors, MCEC supplied a lease agreement for the property address between MCEC and Avalon Holdings, which is the incorrect lessor.  The monthly amount of the lease on the agreement provided was $2,500, or $30,000 annually.  Auditors inquired of the purpose of the rent payments, and were told that a "Families First Resource Center" was located at the address.  Auditors did a physical walkthrough of the property and located no such center.  The only property at the address was a Mississippi Dyslexia Center, which is also owned by the Assistant Executive Director of MCEC and the owner of

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Key.  The Dyslexia Center is a fee-for-service therapy center and not related to TANF.  Even though the agreement stated rent was $2,500 monthly, MCEC paid $3,500 monthly.  Actual payments of $42,000 are questioned due to no valid TANF purpose.

**Questioned costs for fiscal year 2019 – $42,000**

- MCEC also entered into a lease for property at the "City Centre" in Jackson owned by Hertz Jackson City Centre, LLC (Hertz) in FY 2019.  MCEC paid a $500,000 deposit for the property, and signed a lease for monthly payments of $20,274.  The location was to be a "virtual reality school" run by the Lobaki Foundation.  However, the contract for the "vr school" ended in July 2019, and no additional use for the property was identified; therefore, the location sat idle for FY 2019.  MCEC continued to charge the rent for the idle facilities to the TANF grant.  Actual payments, including the deposit, totaled $669,237.  Due to the restriction of idle facility charges, the total amount paid on the lease is questioned.

**Questioned costs for fiscal year 2019 – $669,237**

*Total amount questioned in 2019 –$1,126,408*

Travel for Specific Individuals

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.446)* states "Travel costs are the expenses for transportation, lodging, subsistence, and related items incurred by employees who are in travel status on official business of the non-Federal entity.  Such costs may be charged on an actual cost basis, on a per diem or mileage basis in lieu of actual costs incurred, or on a combination of the two, provided the method used is applied to an entire trip and not to selected days of the trip, and results in charges consistent with those normally allowed in like circumstances in the non-Federal entity's non-federally-funded activities and in accordance with non-Federal entity's written travel reimbursement policies."

*The Code of Federal Regulations (2 cfr 200.446(b))* states "Costs incurred by employees and officers for travel, including costs of lodging, other subsistence, and incidental expenses, must be considered reasonable and otherwise allowable only to the extent such costs do not exceed charges normally allowed by the non-Federal entity in its regular operations as the result of the non-Federal entity's written travel policy. In addition, if these costs are charged directly to the Federal award documentation must justify that: (1) Participation of the individual is necessary to the Federal award; and (2) The costs are reasonable and consistent with non-Federal entity's established travel policy."

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*The Code of Federal Regulations (2 cfr 200.446(d))* states "Airfare costs in excess of the basic least expensive unrestricted accommodations class offered by commercial airlines are unallowable except when such accommodations would: (i) Require circuitous routing; (ii) Require travel during unreasonable hours; (iii) Excessively prolong travel; (iv) Result in additional costs that would offset the transportation savings; or (v) Offer accommodations not reasonably adequate for the traveler's medical needs. The non-Federal entity must justify and document these conditions on a case-by-case basis in order for the use of first-class or business- class airfare to be allowable in such cases."

**Exceptions/Questioned Costs**:  During the audit, auditors noted that certain individuals were reimbursed substantial travel costs when compared to other personnel.  Additionally, due to the instances of fraud, waste, and abuse at MDHS, MCEC and FRC, certain individuals were assigned higher risk with travel reimbursements than everyday personnel.  During testwork, the auditor noted the following questioned costs:

- Priceless Ventures, LLC travel – The owner and operator of Priceless Ventures (TD) was reimbursed for travel from MCEC.  The contracts with MCEC state that the contract price is all inclusive and do not detail policies for travel reimbursement.  Nevertheless, travel made by TD for these contracts was reimbursed and charged to the TANF grant.  A review of actual travel invoices showed that TD often flew first class, stayed in high priced hotel suites, and charged expensive meals for himself and others.  In one instance, $607 for the "Oxford Grillehouse" was charged to the TANF grant.  For fiscal year 2019, MCEC reimbursed $12,872 to TD for travel.  Due to the unreasonable cost of the expenses, the lack of correlation to TANF purpose, and the violation of restrictions on airfare, these charges are questioned.

    **Questioned costs for fiscal year 2019 – $12,872**

- BD travel – Aside from being the owner and operator of Restore2, LLC, BD was also employed by MCEC from July 1, 2018 to June 30, 2019.  During his employment there, BD also submitted requests for reimbursement for travel.  The travel reimbursement requests do not contain information to ascertain the relevance of the travel to TANF purposes.  Additionally, a review of the actual travel invoices showed that BD often flew first class, stayed in high priced hotel suites, and charged expensive meals.  During his employment, BD was reimbursed $31,808 of travel expenses.  Due to the unreasonable cost of the expenses, the lack of correlation to TANF purpose, and the violation of restrictions on airfare, these charges are questioned.

    **Questioned costs for fiscal year 2019 – $31,808**

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- MCEC purchased a round trip, first class ticket for BD's wife to fly to Los Angeles, CA, with BD on April 21, 2019.  Flight arrangements were made by Executive Director JD's Administrative Assistant and emailed to BD, with Executive Director copied on the email.  During this time, BD was in addiction treatment in Malibu, CA at Rise in Malibu, as stated in the finding above.  As there was no business purpose in the trip, BD's wife was not an employee of MCEC, and given the restrictions on airfare, these costs are questioned.

**Questioned costs for fiscal year 2019 – $1,614**
***Total amount questioned in 2019 –$46,294***

<u>Salaries</u>

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403*) states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

*The Code of Federal Regulations (2 cfr 200.445 (a))* states that, "Costs of goods or services for personal use of the non-federal entity's employees are unallowable regardless of whether the cost is reported as taxable income to the employees."

*The Code of Federal Regulations  (2 cfr 200.53(b)*) states "Improper payment includes any payment to an ineligible party, any payment for an ineligible good or service, any duplicate payment, any payment for a good or service not received (except for such payments where authorized by law), any payment that does not account for credit for applicable discounts, and any payment where insufficient or lack of documentation prevents a reviewer from discerning whether a payment was proper."

*The Code of Federal Regulations (2 cfr 200.404)* states "A cost is reasonable - if in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost.  The question of reasonableness is particularly important when the entity is predominately federally funded.  In determining reasonableness of a given cost, consideration must be given to: (a) Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the non-Federal entity or the proper and efficient performance of the Federal award. (b) The restraints or requirements imposed by such factors as: sound business practices; arm's-length bargaining; Federal, state, local, tribal, and other laws and regulations; and terms and conditions of the Federal award. (c) Market prices for comparable goods or services for the geographic area. (d) Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the non-Federal entity, its employees, where applicable its students or membership, the public at large, and the Federal Government. (e) Whether the non-Federal entity significantly deviates from its established practices and policies regarding the incurrence of costs, which may unjustifiably increase the Federal award's cost."

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

*The Code of Federal Regulations (2 cfr 200.405 (a)*) states "A cost is allocable to a particular Federal award or other cost objective if the goods or services involved are chargeable or assignable to that Federal award or cost objective in accordance with relative benefits received."

The *MDHS Subgrant/Contract Manual*, which subgrants must attest to have read and understood prior to receiving grant awards, states in Section 5, under the heading "Documentation Requirements" that the minimum documentation requirements for salaries are time sheets and activity reports which reflect the actual hours worked and duties performed. Time distribution/activity sheets are required when the employee's time is charged to more than one subgrant or activity.  This section also states under the heading "Cost Allocation/Indirect Costs", if MDHS subgrantee administers more than one subgrant at a time which results in costs that are shared among various subgrant programs and/or other funds such as local resources, the subgrantee must document the basis for allocating a portion of the shared costs to the MDHS subgrant and shall distribute the costs in a reasonable proportion to the benefits received.

**Exceptions/Questioned Costs:** In order to test the salaries paid at MCEC, auditors requested a list of employees and their salaries.  MCEC provided a list; however, the list did not contain job descriptions.  Auditors then requested for the job descriptions to be added to the list.  When auditors received the revised list with job descriptions, auditors compared the two lists and found that five employees on the first list were not on the second list, and some of the salary amounts changed. Two of the employees that were no longer listed were the daughters-in-law of the Director of MCEC (NN) – the Assistant Executive Director's (ZN) wife, and the wife of NN's other son, JN. Two of the other employees that were no longer listed were attorneys that also are employees at FRC, one of which was previously the Deputy Executive Director of MDHS under Executive Director JD and the other is the niece of the Executive Director of FRC.

Further review of the underlying accounting records indicated that both daughters-in-law were each paid $31,667 in gross earnings (for a total of $63,333 in FY 2018) using TANF funds.  This amount includes a check to each in the amount of $15,000 (gross) on September 29, 2017.

The two attorneys reference above received approximately $181,000 in FY 2018 and $394,000 in FY 2019 from FRC; and received approximately $203,000 in FY 2018 and $208,000 in FY 2019 from MCEC.

As discussed above, through the course of the audit, auditors became aware of the risk of TANF funds converted to personal use to fund private businesses owned by the Director of MCEC (NN), the Assistant Director of MCEC (ZN) and NN's son JN. Auditors determined that there were several employees on MCEC's payroll who were also listed as staff of New Summit School (NSS – owned by NN), Mississippi Dyslexia Center (owned by JN and ZN), and Spectrum Academy

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

(owned by JN). The salaries of the employees identified were approximately $339,000 in FY 2017, $860,000 in FY 2018, and $944,000 in FY 2019.

Also, as discussed above, the principal of Restore2 (BD) was also an employee of MCEC. In addition to the payments that were made to the rehabilitation facility, and the contractual payments made to BD by MDHS, BD continued to be paid $83,000 in salary payments by MCEC during the time period that he was in rehabilitation at Rise In Malibu. BD's job description, as listed by MCEC, was "Trainer". The average salary of all of the other employees with the "Trainer" job description was approximately $28,000. However, BD was receiving an annual salary of $250,000. The total amount paid to BD was approximately $208,000 in FY 2018, and $250,000 in FY 2019.

The owner of MD Foundation (MD) discussed above was also an employee of MCEC. Initially, MCEC stated that MD was also a "trainer", although, MCEC later stated that he was a "community liaison". MD received an annual salary of $130,000. The amount paid to MD was approximately $104,000 in FY 2018 and $130,000 in FY 2019. MD was also an employee of FRC during the same period and received approximately $60,000 in FY 2018 and $59,000 in FY 2019.

Due to the widespread fraud, waste, and abuse already discussed, the fact that MCEC attempted to conceal who was paid with TANF funds by editing the employee listing provided to auditors, the familial relationships of some employees with the owners of MCEC, the lack of any discernable work performed to earn the salaries of some individuals, and the unreasonable amounts of certain salaries, these costs are specifically questioned.

In addition to these specific questioned costs, neither subrecipient had a reasonable, causal beneficial, underlying allocation methodology of the salaries to the multiple subgrants that they received. Nor did they have adequate supporting documentation to substantiate the allocations that were used. For this reason, we are questioning all of the salaries and wages paid as auditors cannot determine what a reasonable allocation would be based on the existing documentation.

*Total amount questioned in 2017 - $5,840,046*
*Total amount questioned in 2018 - $13,202,040*
*Total amount questioned in 2019 - $15,296,505*

<u>All Other Costs from MCEC Sampled</u>

**Laws and Regulations**: *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

**Exceptions/Questioned Costs**: Auditors sampled and tested all other expense classes at MCEC for adherence to Uniform Grant Guidance allowability regulations. During testing, auditors noted that MCEC did not have an appropriate or auditable underlying methodology for allocating shared costs among multiple

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

grants.  Due to this lack of methodology, auditors could not verify the cost charged to the grant was reasonable or necessary. The items detailed below are questioned in addition to those items identified during a nomenclature review and detailed in the above paragraphs.

During testwork for allowable costs and activities allowed, auditors noted the following questioned costs:

- Awards, Banquets, and Events – Out of 12 items tested, auditors noted the following:
  - Three instances totaling $14,656 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.
  - Seven instances totaling $54,480 where cost were determined questionable based on the reasonableness to the TANF program.

  **Questioned Cost for fiscal year 2019 - $69,136**

- Consulting – One item was questioned:
  - One item totaling $100 was questioned in which the reasonableness and allowability of an expenditure could not be determined due to the agency not providing sufficient documentation for the expenditure.

  **Questioned Cost for fiscal year 2019 - $100**

- Contract Labor – Out of 194 items tested, auditors noted the following:
  - Seven items totaling $450 were questioned due to auditor being unable to determine the need for the expense to the TANF program due to insufficient details in supporting documentation.
  - Sixteen items totaling $853 where MCEC was unable to provide a contract or agreement for the services provided. Therefore, auditor was unable to determine the need or reasonableness to the TANF program.
  - 179 items totaling $70,415 where MCEC was unable to provide a contract or agreement that the tutoring services performed were for work related to TANF eligible individuals.

  **Questioned Cost for fiscal year 2019 - $71,718**

- Curriculum – One item was questioned:
  - One item totaling $15,750 was questioned in which the reasonableness and allowability of an expenditure could not be determined due to the agency not providing sufficient documentation for the expenditure.

  **Questioned Cost for fiscal year 2019 - $15,750**

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- Data Processing – Out of 5 items tested, auditors noted the following:
  - Five items totaling $5,100 in which costs were questioned due to 100 percent of the cost being charged to the TANF program. The subgrantee did not have a proper allocation plan and the auditor was unable to determine the percentage of the expense that is considered necessary and reasonable for the performance and administration of federal awards to the TANF program.

**Questioned Cost for fiscal year 2019 - $5,100**

- Dues and Subscriptions – Out of 5 items tested, auditors noted the following:
  - Three items totaling $139 where the expense was questioned based on the reasonableness to promote the objectives of the TANF program.
  - Two items totaling $355 where MCEC paid for expenses associated with a counselor licensure for an employee who was employed by New Summit School.

**Questioned Cost for fiscal year 2019 - $494**

- Equipment Rental – Out of 100 items tested, auditors noted the following:
  - Nine items totaling $2,334 were questioned in which the reasonableness and allowability of an expenditure could not be determined due to the agency not providing sufficient documentation for the expenditure.
  - Six items totaling $923 where the expense was questioned based on the reasonableness to promote the objectives of the TANF program.
  - Eighty-four items totaling $31,759 where costs were questioned due to 100 percent of the cost being charged to the TANF program. The subgrantee did not have a proper allocation plan and the auditor was unable to determine the percentage of the expense that is considered necessary and reasonable for the performance and administration of federal awards to the TANF program.

**Questioned Cost for fiscal year 2019 - $35,016**

- Janitorial – Out of 6 items tested, auditors noted the following:
  - Six items totaling $3,295 where costs were questioned due to 100 percent of the cost charged to the TANF program. The subgrantee did not have a proper allocation plan and the auditor was unable to determine the percentage of the expense that is considered necessary and reasonable for the performance and administration of federal awards to the TANF program.

**Questioned Cost for fiscal year 2019 - $3,295**

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- Meetings – One item was questioned:
  - One item totaling $200 where the reasonableness of the expenditure to promote the objective of the TANF program could not be determined.

### Questioned Cost for fiscal year 2019 - $200

- Postage and Delivery – Out of 9 items tested, auditors noted the following:
  - Three items totaling $2,005 where costs were questioned due to 100 percent of the cost being charged to the TANF program. The subgrantee did not have a proper allocation plan and the auditor was unable to determine the percentage of the expense that is considered necessary and reasonable for the performance and administration of federal awards to the TANF program.

### Questioned Cost for fiscal year 2019 - $2,005

- Professional Fees – Out of 3 items tested, auditors noted the following:
  - One item totaling $5,500 where costs were questioned due to 100 percent of the cost charged to the TANF program. The subgrantee did not have a proper allocation plan, and the auditor was unable to determine the percentage of the expense that is considered necessary and reasonable for the performance and administration of federal awards to the TANF program.
  - Two items totaling $135 where MCEC paid for expenses associated with an employee who was employed by New Summit School. Due to this and MCEC not having a proper allocation plan, auditor is unable to determine the percentage of charges that should be charged to the TANF program.

### Questioned Cost for fiscal year 2019 - $5,635

- Repairs and Building – Out of 4 items tested, auditors noted the following:
  - Four items totaling $2,889 where the cost is unallowable as maintenance and repair cost. Per *2 cfr 200.452*, costs incurred for utilities, insurance, security, necessary maintenance, janitorial services, repair, or upkeep of buildings and equipment (including Federal property unless otherwise provided for) which neither add to the permanent value of the property nor appreciably prolong its intended life are only allowable if these costs keep the building/property in an efficient operating condition.

### Questioned Cost for fiscal year 2019 - $2,889

- Repairs - Other – Out of 2 items tested, auditors noted the following:

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

o   Two items totaling $1,330 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.

**Questioned Cost for fiscal year 2019 - $1,330**

- Seminars and Continuing Education -  Out of 10 items tested, auditors noted the following:
    o   Five items totaling $492 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.
    o   One item totaling $150 where costs were determined questionable based on the reasonableness of the cost to promote the TANF program
    o   Two items totaling $28,796 were questioned due to MCEC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to salaries being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award.  Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.

**Questioned Cost for fiscal year 2019 - $29,438**

- Repairs and Building – Out of 4 items tested, auditors noted the following:
    o   One item totaling $1,106 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.

**Questioned Cost for fiscal year 2019 - $1,106**

- Supplies – Out of 17 items tested, auditors noted the following:
    o   Three items totaling $705 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.
    o   Five items totaling $339 where costs were determined questionable based on the reasonableness of the cost to promote the TANF program.
    o   Nine items totaling $402 were questioned due to MCEC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award.   Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.

**Questioned Cost for fiscal year 2019 - $1,446**

- Telephone – While reviewing invoices, auditors noted the following:
  o MCEC is paying a portion of each employees' phone bill; however, the methodology to determine how much is paid per employee is not properly documented. The fringe benefit is applied to all employees regardless of need in regards to TANF purposes. Additionally, it was noted that MCEC is also paying 100 percent of the phone bill for employees that are either not employed by MCEC, do not work full time for MCEC, or work for New Summit School or New Learning Resource center part-time.   Auditors also noted that the telephone invoices also indicate that MCEC is paying for iPhones and iPad devices for NN (iPhone, iPad, and data for each), ZN (iPhone, two iPads, and data for each), ZN's wife (iPhone and data), JN (iPhone and data), and JN's wife (iPhone and data).   MCEC was also paying monthly installments on two phones and for the iPhone data for the owner of Priceless Ventures, TD.

    Invoices also show that some employees' are having their spouses and children's phones, service, and iPhone data paid for using TANF funds – including the IT Director of MCEC's (BB) own phone and data, his son's data, and his daughter's phone and data. Invoices show that MCEC paid monthly on installments on at least 25 different iPhones and iPads for employees.   These devices ranged from iPhone 8s to iPhone XS's, and from iPad minis to iPad Pros.

    Additionally, Federal Regulation requires expenses to be allocated to the projects based on the proportional benefit, and auditors have no assurance the cost associated with this benefit is being applied properly.   Due to these factors, all amounts paid for telephone expense for FY 2019 are questioned.

    **Questioned Cost for fiscal year 2019 - $61,389**

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- Telephone - Office – Out of 5 items tested, auditors noted the following:
  - Five items totaling $2,314 were questioned due to MCEC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to salaries being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award.  Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.

    **Questioned Cost for fiscal year 2019 - $2,314**

  - Travel - Mileage – Out of 7 items tested, auditors noted the following:
    - Two items totaling $1,000 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.
    - Five items totaling $675 where cost for the travel to the events, meetings, or trainings do not meet the needs or purpose of the TANF program.

    **Questioned Cost for fiscal year 2019 - $1,675**

- Travel - Other – Out of 4 items tested, auditors noted the following:
  - One item totaling $229 was questioned due to the fact expense was to pay a speeding ticket incurred by the Director of MCEC (NN). Speeding tickets and/or fines and penalties are unreasonable, un-allocable, prohibited by state laws, and unallowable.
  - One item totaling $976 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.
  - Two items totaling $211 were questioned due to the travel costs are for individuals who are not employees of MCEC.

    **Questioned Cost for fiscal year 2019 - $1,416**

- Utilities – Out of 97 items tested, auditors noted the following:

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- o One item totaling $52 where costs were determined questionable based on the reasonableness of the cost to promote the TANF program.
- o One item totaling $93 was questioned due to funds being used to pay a fine/penalty for unreturned satellite equipment. Fines and penalties are unreasonable, un-allocable, prohibited by state laws, and unallowable.
- o Ninety-five items totaling $17,830 were questioned due to MCEC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to salaries being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award.   Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.

**Questioned Cost for fiscal year 2019 - $17,975**

*Total amount questioned in 2019 –$329,427*

<u>All Other Costs from FRC Sampled</u>

**Laws and Regulations**:  *The Code of Federal Regulations (2 cfr 200.403)* states that, in order to be allowable under federal guidelines, costs must be necessary and reasonable, and adequately documented.

**Exceptions/Questioned Costs**:  Auditors sampled and tested all other expense classes at FRC for adherence to Uniform Grant Guidance allowability regulations. During testing, auditors noted that FRC did not have an appropriate or auditable underlying methodology for allocating shared costs among multiple grants.  Due to this lack of methodology, auditors could not verify the cost charged to the grant was reasonable or necessary. The items detailed below are questioned in addition to those items identified during a nomenclature review and detailed in the above paragraphs.

During testwork for allowable costs and activities allowed, auditors noted the following questioned costs:

- • Commodities – Out of 12 items tested, auditors noted the following:
  - o Ten items totaling $5,834 were questionable due to FRC not having a proper cost allocation plan.  Auditor could not determine the percentage

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to salaries being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award.  Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.

o   One item totaling $222 where costs were determined questionable based on the reasonableness of the cost to promote the TANF program.

o   One item totaling $65 where documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.

**Questioned Cost for fiscal year 2019 - $6,121**

• Contractual – Out of 4 items, auditors noted the following:

o   Three items totaling $3,512 were questionable due to FRC not having a proper cost allocation plan.   Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to salaries being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award.  Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to improper or if it conformed to the limitations of *2 CFR part 200, subpart E*. Additionally, adequate documentation for two of the items supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.

o   One item totaling $2,667 where funds were used for promotional items which are unallowable according to *2 CFR 200.431*. Additionally, adequate documentation supporting the cost could not be provided; therefore, auditor could not determine if cost was allowable.

**Questioned Cost for fiscal year 2019 - $6,179**

• Equipment – Out of 8 items tested, auditors noted the following:

o   Eight items totaling $116,110 were questionable due to FRC not having a proper cost allocation plan.   Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to the equipment being a shared cost across multiple

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award. Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to improper or if it conformed to the limitations of *2 CFR part 200, subpart E.*

**Questioned Cost for fiscal year 2019 - $116,110**

- Travel – Out of 12 items tested, auditors noted the following:
  - Two items totaling $4,605 were questionable due to FRC not having a proper cost allocation plan. Auditor could not determine the percentage of the expenditure that would be considered necessary and reasonable for the performance and administration of Federal awards. 100 percent of the expenditure should not be charged directly to the TANF grant due to the travel being a shared cost across multiple grants. Auditor also noted that due to the nature of expenditure reporting and record keeping, auditor could not determine if the cost was recorded to the correct reporting category, or used to meet the matching requirements of any other federal award. Additionally, auditor could not determine if the cost was consistent with policies, regulations, and procedures that apply uniformly to both federal awards and other activities.

**Questioned Cost for fiscal year 2019 - $4,605**

*Total amount questioned in 2019 –$133,015*

Due to the widespread fraud, waste, and abuse uncovered during the audit, and the lack of any appropriate underlying methodology for the allocation of shared costs in both MCEC and FRC, the overall lack of documentation to establish reasonableness and necessity of costs, the lack of integrity in documents obtained from MCEC due to known instances of forgery, misdirection, document modification, etc., the direct involvement of MDHS personnel in the fraud, waste, and abuse, and the likelihood of additional fraud, waste, and abuse existing in the actions of these subrecipients, auditor cannot state, with reasonable assurances, the amount of grant costs for the TANF grant were used appropriately.

Known questioned costs, as detailed in the finding above:

**For fiscal year 2017: $6,333,044 (TANF)**
**For fiscal year 2018: $28,419,923 (TANF)**
**For fiscal year 2019: $31,155,361 (TANF)**

**For fiscal year 2018: $593 (SSBG)**
**For fiscal year 2019: $111,262(SSBG)**

**For fiscal year 2018: $497,987 (SNAP)**

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

**For fiscal year 2019: $139,564 (CCDF)**

Likely questioned costs include total amounts paid to MCEC and FRC for TANF, CCDF and SNAP awards less any amounts questioned in other allowable cost findings in this report. The total has been reduced by those questioned costs to ensure the same dollar is only questioned one time.

Chart below shows amounts actually paid to MCEC and FRC as of June 30, 2019. Amounts paid could be less than grant awards listed in the "Background" section of the finding due to timing differences in the State/Federal fiscal years.

|  | Total Paid | Less Amount Questioned in Other Finding | Total Questioned |
|---|---|---|---|
| **2019** |  |  |  |
| TANF | $26,517,614 | N/A | $26,517,614 |
| CCDF | $ 6,576,057 | $3,529,915 | $ 3,046,142 |
| SNAP | $ 1,144,953 | $684,598 | $    460,355 |
| **2018** |  |  |  |
| TANF | $34,801,286 | N/A | $34,801,286 |
| SNAP | $    497,987 | N/A | $    497,987 |
| SSBG | $ 6,900,000 | N/A | $ 6,900,000 |
| **2017** |  |  |  |
| TANF | $21,941,224 | N/A | $21,941,224 |
| **Total** | **$98,379,121** | **$4,214,513** | **$94,164,608** |

All information related to this audit finding has been referred to the Mississippi Office of the State Auditor Investigative Division, the United States Department of Justice, the Office of Inspector General for the United States Department of Health and Human Services, and the Federal Bureau of Investigation.

**Cause**

Executive Director JD circumvented internal controls set in place by MDHS in regards to procurement, monitoring, and other allowable costs controls in order to direct monies to certain subrecipients, who then directed federal monies to individuals associated with JD. Additionally, JD used his position as Director to convince employees at MDHS to collude with him in circumventing controls. MDHS, in turn, did not appropriately monitor or review expenditures at the subrecipient level to ensure adherence to allowable cost and activities allowed guidelines. Personnel at MDHS are not properly trained or educated in regards to allowable cost provisions. Lastly, personnel at MDHS either disregarded established policies and procedures, or were not aware policies and procedures existed.

**Effect**

Due to high risk of additional fraud, waste, and abuse other than what has been reported to authorities or detailed in this report, auditor questioned the entire grant award amounts to certain subrecipients. Uniform Grant Guidance includes remedies for non-compliance with federal regulations, including, but not limited to, requesting a dollar for dollar reduction in the subsequent year's grant award for any money misappropriated or misspent under the Temporary Assistance for Needy

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

|  |  |
|---|---|
|  | Families Grant.  Additionally, the widespread fraud, waste, and abuse has led to public distrust of MDHS, and a loss of integrity in the public welfare system in the State of Mississippi. |
| **Recommendation** | We recommend the Mississippi Department of Human Services take swift and immediate action to re-instill trust in the public welfare system in Mississippi by doing the following actions: |

1) Pursue any legal remedies available against those that have contributed to the widespread fraud, waste, and abuse detailed in this report;

2) Pursue any legal remedies to seize property at MCEC and FRC that was purchased with federal monies in accordance with the policies of the *MDHS Subgrant Manual*;

3) Procure an independent certified public accounting firm to conduct a widespread forensic audit of MDHS to determine the extent of fraud, waste, and abuse in other programs, as well as the TANF program, and of MCEC and FRC to support any attestation made by MDHS of the allowability of costs, and report any suspected criminal activity to the Mississippi Office of the State Auditor;

4) Conduct internal investigations to determine the pervasiveness of the knowledge and involvement of former and current MDHS staff in the widespread fraud, waste, and abuse, and report any suspected criminal activity to the Mississippi Office of the State Auditor;

5) Strengthen existing controls to ensure non-compliance with federal regulations does not continue;

6) Procure adequate and appropriate training for all staff who are involved in any federal allowable costs and activities allowed monitoring;

7) Increase awareness in subrecipients of allowable cost and activities allowed regulations.

**Views of Responsible**
**Officials**          Management at the Mississippi Department of Human Services concurs with this finding.  See additional comments in the Corrective Action Plan on page 345.

---

*Material Weakness*
*Material Noncompliance*

| **2019-032** | Controls Should Be Strengthened to Ensure Compliance with Allowable Cost Requirements of the TANF Program. |
|---|---|
| **CFDA Number** | 93.558   Temporary Assistance for Needy Families State Programs |
| **Federal Award No.** | G1701MSTANF 2017<br>G1801MSTANF 2018<br>G1901MSTANF 2019 |
| **Questioned Costs** | $2,374,752 |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

**Criteria**

Per the *Code of Federal Regulations (2 cfr 200.437(a)-(b))*, "(a) Costs incurred in accordance with the non-Federal entity's documented policies for the improvement of working conditions, employer-employee relations, employee health, and employee performance are allowable. (b) Such costs will be equitably apportioned to all activities of the non-Federal entity."

Per the *Code of Federal Regulations (2 cfr 200.404)*, "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. The question of reasonableness is particularly important when the non-Federal entity is predominantly federally-funded. In determining reasonableness of a given cost, consideration must be given to: … (b) The restraints or requirements imposed by such factors as: sound business practices; arm's-length bargaining; Federal, state, local, tribal, and other laws and regulations; and terms and conditions of the Federal award…. (d) Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the non-Federal entity, its employees, where applicable its students or membership, the public at large, and the Federal Government."

Per the *Code of Federal Regulations (2 cfr 200.210)*, "A Federal award must include the following information: … Federal Award Performance Goals. The Federal awarding agency must include in the Federal award an indication of the timing and scope of expected performance by the non-Federal entity as related to the outcomes intended to be achieved by the program. In some instances, (e.g., discretionary research awards), this may be limited to the requirement to submit technical performance reports (to be evaluated in accordance with Federal awarding agency policy). Where appropriate, the Federal award may include specific performance goals, indicators, milestones, or expected outcomes (such as outputs, or services performed or public impacts of any of these) with an expected timeline for accomplishment. Reporting requirements must be clearly articulated such that, where appropriate, performance during the execution of the Federal award has a standard against which non-Federal entity performance can be measured. The Federal awarding agency may include program-specific requirements, as applicable. These requirements should be aligned with agency strategic goals, strategic objectives, or performance goals that are relevant to the program."

Additionally, the *Code of Federal Regulations (2 cfr 200.62)* States that a non-federal entity must have internal control over compliance designed to provide reasonable assurance that;
 (a) Transactions are properly recorded and accounted for, in order to:
    (1) Permit the preparation of reliable financial statements and Federal reports;
    (2) Maintain accountability over assets; and
    (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

(b) Transactions are executed in compliance with:

(1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and

(2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and

(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**

During testwork performed for the Allowable Costs/Cost Principle requirements of the TANF program during fiscal year 2019, auditors noted the following exceptions:

- One instance totaling $11,034 in which auditor determined that expenditures for hotel rooms were associated with a "Law of 16 Conference." The Law of 16 Conference is a self-help course for employee morale; therefore, costs should have been equitably apportioned to all activities of the entity, and not solely the TANF program. All costs associated with the "Law of 16" conference hotel rooms are questioned;

- Questioned costs of $388,145 relating to known expenditures made for "Law of 16" conferences held by MDHS for MDHS personnel. "Law of 16" conferences were held by Priceless Ventures, LLC. Priceless Ventures had a contract with MCEC and FRC, subgrantees of MDHS, to supply these services. The contract states that it is Priceless Ventures' responsibility to pay for all costs associated with the conferences with the contracted sum. As those contracts with MCEC and FRC were paid with TANF grant money, MDHS was effectively charging the same expense against the TANF grant twice. Additionally, things like entertainment and branded items are against allowable cost regulations. Therefore, all costs associated with the for "Law of 16" conferences are questioned;

- Questioned cost of $1,927,573 relating to known expenditures made for Heart of David (HOD). The HOD grant lacked any discernable performance metrics and had an inadequate scope of services. HOD also represented itself as a faith-based organization; however, no certifications existed to certify the faith-based restriction of conducting inherently religious activities with federal monies. Additionally, entering into a subgrant agreement with HOD created a conflict of interest due to the personal relationship between an officer of HOD and the prior Executive Director JD of MDHS. See Finding 2019-030 for more information.

- Questioned cost of $48,000 for payments made to Restore2/Recover2. These payments were made for opioid training that was allegedly never conducted. Executive Director JD and the principal of Restore2 (BD) conspired to fraudulently create invoices, sign in sheets, etc. to justify payment of expenses when BD was out of state in a luxury rehabilitation facility. See Finding 2019-030 for more information.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

**Total questioned costs - $2,374,752**

| | |
|---|---|
| **Cause** | Staff were either unaware or did not follow policies and procedures related to Activities Allowed and Allowable Costs of TANF funds. The former Executive Director JD circumvented controls and disregarded policies and procedures related to activities allowed and allowable costs in relation to expenditures made for Mississippi Community Education Center, Family Resource Center of Northeast Mississippi, Law of 16, Heart of David, and Restore2, LLC. |
| **Effect** | Failure to verify expenditures are allowable, appropriately pay expenditures out of federal or private funds, and allocate costs correctly can lead to federal funding being withdrawn or expenditures being paid with incorrect funds. This can also lead to fraud, waste, and abuse within an agency. |
| **Recommendation** | We recommend the Mississippi Department of Human Services strengthen control procedures in order to properly verify expenditures are allowable and appropriate. We also recommend that the agency appropriately pay expenditures out of the correct federal or private funds and allocate the funds correctly across all expenditures. |
| **Repeat Finding** | No. |
| **Statistically Valid** | The sample is considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Department of Human Services partially concurs with this finding.  See additional comments in the Corrective Action Plan on page 352 of this audit report and Auditor's Response on page 361. |

----------------------------------------------------------------------------------

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-033** | Controls Should Be Strengthened to Ensure Compliance with Allowable Cost Requirements of the CCDF Cluster. |
| **CFDA Number** | 93.575  Child Care and Development Block Grant<br>93.596  Child Care Mandatory and Matching Funds of the Child Care and Development Fund |
| **Federal Award** | 1701MSCCDF 2017<br>1801MSCCDF 2018<br>1901MSCCDD 2019 |
| **Questioned Costs** | $3,532,466 |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Criteria** | The *Code of Federal Regulations (45 cfr 98)* regulates expenditures of funds under the Child Care and Development Block Grant (CCDF), including the identification of allowable costs for CCDF expended through the child care certificate program. The Mississippi Department of Human Services' Division of Early Childhood Care and Development (DECCD) has published the *Mississippi Child Care Payment Program Policy Manual,* based on the CCDF State Plan, which incorporates applicable federal regulations and establishes allowable costs for child care certificate payments under the CCDF program. Specifically, Section 103.02 of this manual addresses co-payment fees and Section 104.04 addresses child care certificate rates. Therefore, eligible school-aged children should be issued certificates that state both full-time and part-time rates eligibility so that the provider can record the proper attendance each day (full-time when school is not in session or part-time when school is in session). |

Per the *MDHS Subgrant/Agreement Manual*, which subgrantees must attest to have read and understood prior to receiving grant awards, states in Section 5, "The accounting system of each MDHS subgrantee shall provide the monitors/auditors with adequate documentation to support the subgrantee's financial claims. Source documents are required to support transactions entered into the subgrantee's record keeping system. The following is a list of the minimum documentation required for selected transaction types: …Time sheets and activity reports which reflect the actual hours worked and duties performed. Time distribution/activity sheets are required when the employee's time is charged to more than one subgrant or activity. An approved travel voucher showing that all travel expenses were incurred for the benefit of the subgrant; copies of supporting bills including out of state meal receipts, hotel bills, conference registration fee receipts, and conference agendas."

Per the *Code of Federal Regulations (2 cfr 200.431)*, pension plan costs which are incurred in accordance with the established policies of the non-Federal entity are allowable, provided that: (1) Such policies meet the test of reasonableness.

Per the *Code of Federal Regulations (2 cfr 200.404)*, a cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. The question of reasonableness is particularly important when the non-Federal entity is predominantly federally-funded. In determining reasonableness of a given cost, consideration must be given to: (a) Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the non-Federal entity or the proper and efficient performance of the Federal award…

Per the *Code of Federal Regulations (2 cfr 200.405)*, a cost is allocable to a particular Federal award or other cost objective if the goods or services involved are chargeable or assignable to that Federal award or cost objective in accordance with relative benefits received. This standard is met if the cost: (1) Is incurred specifically for the Federal award…

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Additionally, the *Code of Federal Regulations (2 CFR 200.62)* states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;

(a) Transactions are properly recorded and accounted for, in order to:

    (1) Permit the preparation of reliable financial statements and Federal reports;

    (2) Maintain accountability over assets; and

    (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;

(b) Transactions are executed in compliance with:

    (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and

    (2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and

(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**

In performing allowable cost testwork related to certificate rates and co-pays during fiscal year 2019, auditor noted the following:

- Seven instances out of 120 tested, or 5.8 percent, in which school-aged children were issued a child care certificate that provided both full-time and part-time attendance rates, but the provider recorded, and was paid, only full-time rates during months school was in session. These seven instances resulted in known questioned costs of $1,981 out of total fiscal year school-aged certificate payments of $24,462,523 and projected questioned costs of $751,243;

- One instance out of 120 tested, or 1.2 percent, in which the family was deemed ineligible due to income being higher than 85 percent of average income for the state. This resulted in a questioned cost of $570 out of total certificate payments of $86,239,928 and projected questioned costs of $283,363; and

- Seventeen instances in which allowability of activities or cost could not be determined. The total of the questioned costs amounts to $3,529,915. Auditor noted during the review of the subecipients MCEC and FRC, that the subrecipients comingled federal and private funds, as well as did not have a proper cost allocation system. Due to these issues, auditor could not determine if the costs associated with these sub-recipients were allocable to the CCDF program or reasonable.

**This resulted in known questioned cost of $3,532,466.**

As referenced in Finding 2019-030, the entire amount of CCDF grant funds paid to MCEC is questioned. The questioned costs for this finding were deducted from that total to ensure that the same costs were not questioned twice.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Cause** | Staff were either unware or did not follow identified policies and procedures over allowable cost requirements. |
| **Effect** | Failure of DECCD to properly provide for the payment of part-time rates on the certificates for school-aged children, ensure child care certificates are active prior to payment, ensure the proper rate is used based on the age of the child, and to prevent duplicate child care certificates can result in improper payments to child care providers, questioned costs and the possible recoupment of funds by the federal granting agency. |
| **Recommendation** | We recommend the Mississippi Department of Human Services' Division of Early Childhood Care and Development ensure compliance with the allowable costs requirements of the Child Care and Development Block Grant by strengthening control procedures to ensure child care certificate rates and co-pays are assigned and providers paid in accordance with the requirements set forth in the *Code of Federal Regulations* and the *Mississippi Child Care Payment Program Policy Manual.* |
| **Repeat Finding** | Yes; 2018-049 in 2018; OTH-03 in 2017 |
| **Statistically Valid** | The sample is considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Department of Human Services partially concurs with this finding.  See additional comments in the Corrective Action Plan on page 352 of this audit report and Auditor's Response on page 362. |

*Significant Deficiency*
*Immaterial Noncompliance*

| | |
|---|---|
| **2019-034** | Strengthen Controls Over Review of Computations and Data for Allowable Cost Activity Used in the Manual Cost Allocation Process and Review of Indirect Costs Allocated to Federal Programs. |
| **CFDA Number** | 10.551 Supplemental Nutrition Assistance Program<br>93.558 Temporary Assistance for Needy Families State Programs<br>93.658 Title IV-E Foster Care |
| **Federal Award** | 12-35-2841 – 19<br>G1602MSTANF<br>G1701MSTANF<br>G1801MSTANF<br>G1901MSTANF<br>G1801MSFOST<br>G1901MSFOST |
| **Questioned Costs** | $1,871 |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Criteria** | The *Internal Control - Integrated Framework* published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) specifies that a satisfactory control environment is only effective when there are adequate control activities in place. Good internal controls provide that the agency's statistical units are used in accordance with the approved Cost Allocation Plans and that the agency is updating statistical information used for cost allocation on a quarterly basis, and that a supervisory review/approval of charges are in place. |

Additionally, the *Code of Federal Regulations (2 cfr 200.62)* states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;

(a) Transactions are properly recorded and accounted for, in order to:
   (1) Permit the preparation of reliable financial statements and Federal reports;
   (2) Maintain accountability over assets; and
   (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;
(b) Transactions are executed in compliance with:
   (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and
   (2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and
(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**  During testwork performed over allowable activities and allowable cost requirements, auditor noted:

- Three instances in which the reporting category charged on the manual cost allocation spreadsheet did not tie back to a reporting category listed on the crosswalk;

- One instance totaling $1,040 where the auditor noted a charge was for parking fees related to "Law of 16" conference. Auditors determined through the audit process that expenditures for "Law of 16" conferences are questionable. Based on this, auditor will question any indirect expenditures related to "Law of 16" conferences; and

- One instance in which the auditor could not verify proper approval for expenditures $831.

**Cause**  Keying error made while entering reporting categories into manual spreadsheet and staff oversight of review and approval of expenditures. Also, staff responsible for the review and payment of expenditures were possibly unaware of the questionable nature of expenditures relating to "Law of 16".

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Effect** | Failure to implement proper control could result in over/under allocation funds as well as the allocation of funds to prohibited expenditures. |
| **Recommendation** | We recommend the Mississippi Department of Human Services strengthen controls over the review of computations and data used in the cost allocation process to ensure accurate distribution of costs to federal programs as well as strengthen controls over the review and approval of expenditures. |
| **Repeat Finding** | No. |
| **Statistically Valid** | The sample is considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Department of Human Services concurs with this finding.  See additional comments in the Corrective Action Plan on page 355 of this audit report. |

---

**CASH MANAGEMENT**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-035** | <u>Controls Should Be Strengthened to Ensure Compliance with Cash Management Requirements of the TANF program.</u> |
| **CFDA Number** | 93.558  Temporary Assistance for Needy Families State Programs |
| **Federal Award No.** | G1701MSTANF 2017<br>G1801MSTANF 2018<br>G1901MSTANF 2019 |
| **Questioned Costs** | None. |
| **Criteria** | The *Code of Federal Regulations (2 cfr 200.514(C)(4))* states, "When internal control over some or all of the compliance requirements for a major program are likely to be ineffective in preventing or detecting noncompliance, the planning and performing of testing described in paragraph (c)(3) of this section are not required for those compliance requirements. However, the auditor must report a significant deficiency or material weakness in accordance with § 200.516 Audit findings, assess the related control risk at the maximum, and consider whether additional compliance tests are required because of ineffective internal control." |
| | Additionally, the *Code of Federal Regulations* (*2 cfr 200.305(b)*) states that payment methods must minimize the time elapsing between the transfer of funds from the United States Treasury or the pass-through entity and the disbursement by the non-Federal entity. Advance payments are allowed provided the non- |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Federal entity maintains or demonstrates the willingness to maintain both written procedures that minimize the time elapsing between the transfer of funds and disbursement by the non-Federal entity, and financial management systems that meet the standards for fund control and accountability as established in this part. Advance payments to a non-Federal entity must be limited to the minimum amounts needed and be timed to be in accordance with the actual, immediate cash requirements of the non-Federal entity in carrying out the purpose of the approved program or project. The timing and amount of advance payments must be as close as is administratively feasible to the actual disbursements by the non-Federal entity for direct program or project costs and the proportionate share of any allowable indirect costs. Reimbursement is the preferred method when these advance payment requirements cannot be met.

Furthermore, the *Code of Federal Regulations (2 cfr 200.62)*, states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;
(a) Transactions are properly recorded and accounted for, in order to:
    (1) Permit the preparation of reliable financial statements and Federal reports;
    (2) Maintain accountability over assets; and
    (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;
(b) Transactions are executed in compliance with:
    (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and
    (2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and
(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**

During the audit of the Mississippi Department of Human Services (MDHS) subrecipients MCEC and FRC, auditor noted:

- Subrecipients MCEC and FRC were advanced large sums of monies at the beginning of each grant period.

  MDHS informed auditors in meetings held on October 1, 2019 and February 5, 2020 that that they were not able to get sufficient information from MCEC or FRC throughout the grant period. Considering this failure to receive information, and overall lack of controls in regards to the activities allowed and allowable cost provisions of the federal grant, MDHS should have evaluated the appropriateness of large cash advances to the two subrecipients.

  A review of the underlying accounting records at MCEC and FRC indicated that both subrecipients requested advance payments before expenditures had

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

been encumbered; thereby building large cash reserves to fund other grants and private operations. Both entities are funded by primarily federal grants.

MCEC maintained an average monthly cash balance of approximately $4 million in FY 2017, $4.5 million in FY 2018, and $5 million in FY 2019.

FRC maintained an average monthly cash balance of approximately $2 million in FY 2017, $2 million in FY 2018, and $2.5 million in FY 2019.

These cash management practices are in direct violation of federal regulations and the *Cash Management Improvement Act* entered into between the State of Mississippi and the federal government.

| | |
|---|---|
| **Cause** | Staff were either unaware or did not follow identified policies and procedures for areas that impact the cash management requirements related to Uniform Guidance. |
| **Effect** | Failure to verify expenditures are allowable, appropriately pay expenditures out of federal or private funds, and allocate costs correctly can lead to federal funding being withdrawn or expenditures being paid with incorrect funds. This can also lead to fraud, waste, and abuse within an agency. |
| **Recommendation** | We recommend the Mississippi Department of Human Services strengthen controls in order ensure federal funds are drawn down in accordance with the *Cash Management Information Act* and are designed to minimize the time elapsing between the transfer of funds from the United States Treasury and to the disbursement of funds. |
| **Repeat Finding** | No. |
| **Statistically Valid** | This sample is not considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Department of Human Services concurs with this finding.  See additional comments in the Corrective Action Plan on page 355 of this audit report. |

**ELIGIBILITY**

*Significant Deficiency*
*Immaterial Noncompliance*

| | |
|---|---|
| **2019-036** | <u>Controls Should Be Strengthened to Ensure Compliance with Eligibility and Benefit Payment Requirements of the CCDF Cluster.</u> |
| **CFDA Number** | 93.575 - Child Care and Development Block Grant<br>93.596 - Child Care Mandatory and Matching Funds of the Child Care and Development Fund |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Federal Award** | 1701MSCCDF 2017 |
| | 1801MSCCDF 2018 |
| | 1901MSCCDD 2019 |
| | |
| **Questioned Costs** | $2,030 |

**Criteria**    The *Code of Federal Regulations (45 cfr Part 98.20)* sets forth the eligibility requirements for a child to receive child care services. The *Code of Federal Regulations (45 cfr Part 98.50)* further states how the Child Care and Development Block Grant (CCDF) funds should be expended for issuance of child care certificates. The Mississippi Department of Human Services' Division of Early Childhood Care and Development (DECCD) has published the *Mississippi Child Care Payment Program Policy Manual*, based on the CCDF State Plan, which incorporates applicable federal regulations and establishes eligibility criteria to receive child care certificate payments under the CCDF program. Specifically, Chapter 1 of this manual addresses family and child eligibility requirements, including the requirement that an eligible child be less than 13 years of age, or 18 if the eligible child has special needs.

Additionally, the *Code of Federal Regulations (2 cfr 200.62)*, states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;
(a) Transactions are properly recorded and accounted for, in order to:
  (1) Permit the preparation of reliable financial statements and Federal reports;
  (2) Maintain accountability over assets; and
  (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;
(b) Transactions are executed in compliance with:
  (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and
  (2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and
(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**    Based on eligibility testwork in regards to the CCDF program, out of 120 child care certificate payments made during fiscal year 2019, auditor noted the following exceptions:

- Five instances in which the certificate file did not contain a certified and complete Child Care Payment Program application or redetermination form as applicable for certificate tested;

- Five instances in which it could not be verified that the child either resides with a parent who is receiving TANF, working, or attending a job-

261

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

training/education program or is a FC/PS/HHM referral due to lack of sufficient supporting documentation;

- Five instances in which it could not be verified that the child resides with a family whose income does not exceed 85 percent of the State median income level due to lack of sufficient supporting documentation;

- 14 instances in which certificate copay amounts could either not be verified due to lack of sufficient supporting documentation or were incorrectly computed; and

- One instance of ineligibility due to incorrect amount of income being entered into CCPS.

**This resulted in known questioned costs of $2,030 and a projected questioned cost of $78,967.**

| | |
|---|---|
| **Cause** | Staff were either unaware or did not follow identified policies and procedures for CCDF eligibility determinations. |
| **Effect** | Failure to ensure a child care certificate applications are complete and accurate could result improper payments to a child care provider representing questioned costs and the possible recoupment of funds by the federal granting agency. |
| **Recommendation** | We recommend the Mississippi Department of Human Services' Division of Early Childhood Care and Development ensure compliance with the eligibility costs requirements of the Child Care and Development Block Grant.  We also recommend strengthening control procedures to ensure child care certificate rates and copays are assigned in accordance with rules and regulations. |
| **Repeat Finding** | Yes – 2018-048 in 2018; 2017-035 in 2017; 2016-025 in 2016; 2015-002 in 2015; 2014-010 in 2014. |
| **Statistically Valid** | The sample is considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Department of Human Services concurs with this finding.  See additional comments in the Corrective Action Plan on page 355 of this audit report. |

**MATCHING, LEVEL OF EFFORT, EARMARKING**

*Significant Deficiency*
*Immaterial Noncompliance*

**2019-037**          <u>Controls Should Be Strengthened to Ensure Compliance with Matching Requirements of the CCDF Cluster.</u>

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **CFDA Number** | 93.575  Child Care and Development Block Grant |
| | 93.596 Child Care Mandatory and Matching Funds of the Child Care and Development Fund |
| **Federal Award** | 1601MSCCDF 2016 |
| | 1701MSCCDF 2017 |
| | 1801MSCCDF 2018 |
| | 1901MSCCDD 2019 |
| **Questioned Costs** | None. |

**Criteria**  Per the *Code of Federal Regulations (2 cfr 200 Appendix XI, Compliance Supplement)*, In-Kind contributions should be valued in accordance with *2 cfr sections 200.306, 200.434 and 200.414* along with the terms and conditions of the award.

Additionally, the *Code of Federal Regulations (2 cfr 200.62),* states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;
(a) Transactions are properly recorded and accounted for, in order to:
    (1) Permit the preparation of reliable financial statements and Federal reports;
    (2) Maintain accountability over assets; and
    (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;
(b) Transactions are executed in compliance with:
    (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and
    (2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and
(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**  Based on matching testwork for the CCDF program, auditors noted that the MDHS was not able to provide monthly reporting worksheets of in-kind donations. Additionally, MDHS does not require subrecipients to attach supporting documentation for in-kind expenditures. Due to the lack of supporting documentation, the auditor was unable to verify the values placed of those in-kind contributions are in accordance with Uniform Grant Guidance.

**Cause**  The Mississippi Department of Human Services does not require sub-recipients to submit supporting documentation for in-kind contributions.

**Effect**  Failure to require sub-recipients to submit supporting documentation regarding their claims for in-kind contributions could result in the improper valuation of in-

263

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

|  |  |
|---|---|
|  | kind contributions, inaccurate reporting of those in-kind contributions on the quarterly AFC-696 reports, and improper matching of federal funds. |
| **Recommendation** | We recommend the Mississippi Department of Human Services require subrecipients to provide supporting documentation, such as a listing of contributions and the method of the valuation of those contributions, for in-kind contributions claimed by the Mississippi Department of Human Services on its quarterly AFC-696 reports. |
| **Repeat Finding** | No. |
| **Statistically Valid** | The sample is considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Department of Human Services concurs with this finding.  See additional comments in the Corrective Action Plan on page 356 of this audit report. |

## PERIOD OF PERFORMANCE

*Significant Deficiency*
*Immaterial Noncompliance*

| | |
|---|---|
| **2019-038** | <u>Controls Should Be Strengthened to Ensure Compliance with the Period of Performance for the CCDF Program.</u> |
| **CFDA Number** | 93.575 - Child Care and Development Block Grant<br>93.596 - Child Care Mandatory and Matching Funds of the Child Care and Development Fund |
| **Federal Award** | 1701MSCCDF 2017<br>1801MSCCDF 2018<br>1901MSCCDD 2019 |
| **Questioned Costs** | $46,264 |
| **Criteria** | The *Code of Federal Regulations (45 cfr 98.60*), requires both the Federal and non-Federal share of the Matching Fund shall be obligated in the fiscal year in which the funds are granted and liquidated no later than the end of the succeeding fiscal year.<br><br>The *Code of Federal Regulations (2 cfr 200.62)*, states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;<br>(a) Transactions are properly recorded and accounted for, in order to:<br>　　　(1) Permit the preparation of reliable financial statements and Federal reports; |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

(2) Maintain accountability over assets; and

(3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;

(b) Transactions are executed in compliance with:

(1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and

(2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and

(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**       During testwork performed over Period of Performance requirements, auditor noted two instances in which the liquidation of funds totaling $46,264 did not occur within the Period of Performance of the federal grants.

**Cause**       Subrecipient close-out reports were not submitted timely.

**Effect**       Expenditures were made to a federal award/grant beyond the period of performance, resulting in questioned costs.

**Recommendation**       We recommend the Mississippi Department of Human Services strengthen controls over the grant close-out process to ensure liquidations are performed during the grant period.

**Repeat Finding**       No.

**Statistically Valid**       The sample is considered statistically valid.

**View of Responsible**
**Officials**       Management at the Mississippi Department of Human Services concurs with this finding. See additional comments in the Corrective Action Plan on page 356 of this audit report.

---

**PROCUREMENT, SUSPENSION, AND DEBARMENT**

*Material Weakness*
*Material Noncompliance*

**2019-039**       Strengthen Controls Over Procurement Policies and Awarding Subgrants for the TANF program.

**CFDA Number**       93.558   Temporary Assistance for Needy Families State Programs

**Federal Award No.**       G1901MSTANF 2019

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

**Questioned Costs**      $72,000

**Criteria**      Per the *Code of Federal Regulations (45 cfr 200.331(b))*, all pass-through entities must: … Evaluate each subrecipient's risk of noncompliance with Federal statutes, regulations, and the terms and conditions of the subaward…

Per the *Code of Federal Regulations (45 cfr 200.319(a))*, All procurement transactions must be conducted in a manner providing full and open competition consistent with the standards of this section. In order to ensure objective contractor performance and eliminate unfair competitive advantage, contractors that develop or draft specifications, requirements, statements of work, or invitations for bids or requests for proposals must be excluded from competing for such procurements. Some of the situations considered to be restrictive of competition include but are not limited to: … (5) Organizational conflicts of interest.

Per the *Code of Federal Regulations (45 cfr 200.320(b))*, procurement by small purchase procedures. Small purchase procedures are those relatively simple and informal procurement methods for securing services, supplies, or other property that do not cost more than the Simplified Acquisition Threshold. If small purchase procedures are used, price or rate quotations must be obtained from an adequate number of qualified sources." Additionally, per *Chapter 3 Section 205.02 of the State of Mississippi Procurement Manual* that was in effect during the time period these contracts were awarded, "Insofar as it is practical for small purchases of services greater than $50,000 and not exceeding $75,000, no less than three (3) sources shall be solicited to submit written responses that are recorded and placed in the procurement file… If this method is used, award shall be made to the vendor offering the lowest and best bid or proposal. In the event three written responses are not obtained, the agency shall include a memo to the procurement file explaining why this was not accomplished.

Per the *Code of Federal Regulations (45 cfr 200.404)*, a cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. The question of reasonableness is particularly important when the non-Federal entity is predominantly federally-funded. In determining reasonableness of a given cost, consideration must be given to: …(b) The restraints or requirements imposed by such factors as: sound business practices; arm's-length bargaining; Federal, state, local, tribal, and other laws and regulations; and terms and conditions of the Federal award.

Additionally, per the *Code of Federal Regulations (45 cfr 200.62)*, states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;
(a) Transactions are properly recorded and accounted for, in order to:
    (1) Permit the preparation of reliable financial statements and Federal reports;

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

(2) Maintain accountability over assets; and

(3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;

(b) Transactions are executed in compliance with:

(1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and

(2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and

(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**     During testwork performed for the Procurement, Suspension, and Debarment requirements of the TANF program during fiscal year 2019, auditor noted the following:

For Procurement, Suspension and Debarment relating to subawards:

- Through discussions with MDHS upper management, auditor became aware of the prior Executive Director JD's direct involvement in the TANF subaward process. Executive Director JD, at his sole discretion, awarded subrecipients without following any type of competitive RFP process. Policies in place at the time these awards were granted stated that a scoring process would be utilized to ensure fair and equitable awards were distributed. The policies were disregarded.

- Agency did not perform risk assessments of subawards as noted in Finding 2019-030. Due to this failure to perform risk assessments, MDHS did not have any objective basis to evaluate the performance of subrecipients from prior grant years to ensure compliance with federal regulations.

For Procurement, Suspension and Debarment relating to Contractual Services:

- Two instances in which auditor noted the agreement was not secured in a manner that provided full and open competition. Throughout the audit process, the auditor determined that MDHS entered into agreements with contractors that had personal relationships with the former Executive Director, and/or did not engage in proper procurement processes (refer to Finding 2019-030). Based on this information, any costs associated with these contracts would be unreasonable. See details regarding two instances below:

  o Auditor noted a personal relationship between the former Executive Director JD and the president of NCC Ventures. Executive Director JD also hired an immediate family member of the president of NCC Ventures to work in MDHS' Executive office during the contract period.

     Additionally, MDHS only sent out three invitations/solicitations to bid, and only NCC Ventures responded to the solicitation. The contract's

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

scope included "studying and measuring how well the public workforce system is meeting employer needs" and "engaging employers on behalf of MDHS client to assist in improving opportunity and outcomes in the workforce." Federal procurement regulations require that a "reasonable number" of bids be evaluated. The remaining two businesses were not located in Mississippi and were not registered with the Mississippi Secretary of State's Office. When auditors inquired of personnel at the other two businesses solicited as to why they did not respond to the solicitation, one informed auditor that his expertise was in construction management and had nothing to do with the project scope of workforce development.

**Total amount paid on the contract of $72,000 is questioned.**

o   Auditor noted a personal relationship between prior Executive Director JD and an officer of Restore2, LLC (BD). BD was a former employee of MDHS. Contract for $48,000 was executed by Restore2 and MDHS for opioid training sessions. Based on information uncovered during an investigation of these payments due to fraud, waste, and abuse, auditors noted that work on this contract was not performed as stated in supporting documentation and that the purpose and need of the contract was fabricated by former Executive Director JD.

**Cause**

Staff were not aware or did not follow policies and procedures over the procurement of contractual services. Additionally, procurement procedures were not adequately performed in order to ensure open and free competition.

**Effect**

Failure to abide by procurement guidelines of both federal and state regulatory authorities could result in inappropriate contracts and payments, which could result in a clawback of federal monies. Additionally, disregarding policies and controls could lead to fraud, waste, and abuse.

**Recommendation**

We recommend the Mississippi Department of Human Services strengthen controls to ensure compliance with state and federal regulations over the procurement of contracts. Additionally, we recommend the Mississippi Department of Human Services establish updated grant award policies in regards to their responsibility as a federal grant pass through.

**Repeat Finding**

No.

**Statistically Valid**

The sample is considered statistically valid.

**View of Responsible Officials**

Management at the Mississippi Department of Human Services concurs with this finding. See additional comments in the Corrective Action Plan on page 357 of this audit report.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

**REPORTING**

*Significant Deficiency*

| | |
|---|---|
| **2019-041** | <u>Controls Should Be Strengthened over the Submission of Required Federal Reports for the TANF Program.</u> |
| **CFDA Number** | 93.558   Temporary Assistance for Needy Families State Programs |
| **Federal Award No.** | G1701MSTANF 2017<br>G1801MSTANF 2018<br>G1801MSTANF 2019 |
| **Questioned Costs** | None. |

**Criteria**  The *Code of Federal Regulations (45 cfr 265.3),* requires a "TANF Data Report" (ACF-199) for the Temporary Assistance to Needy Families (TANF) program to be completed and submitted in accordance with instructions provided by the Administration for Children and Families (ACF).  Those instructions require States to submit quarterly reports for each open fiscal year of grant funds until all funds are expended; therefore, States will likely submit separate forms for multiple grant award years simultaneously.  These reports are due and must be submitted 45 days after the end of each quarter.

Additionally, the *Code of Federal Regulations (45 cfr 200.62),* states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;
(a) Transactions are properly recorded and accounted for, in order to:
  (1) Permit the preparation of reliable financial statements and Federal reports;
  (2) Maintain accountability over assets; and
  (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;
(b) Transactions are executed in compliance with:
  (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and
  (2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and
(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**  During testwork performed for TANF reporting for FY 2019, auditor noted the following:

- Data required to be submitted for the T-199 report, QE December 31, 2018 was not submitted within 45 days after the end of the reporting period. Data was submitted 144 days late; and

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- Data required to be submitted for the T-199 report, QE June 30, 2019 was not submitted within 45 days after the end of the reporting period. Data was submitted 6 days late.

| | |
|---|---|
| **Cause** | Staff were either unaware or did not follow policies and procedures related to federal reporting requirements. |
| **Effect** | Failure to timely review and submit reports could result in reporting penalties and could impact funding determinations. |
| **Recommendation** | We recommend Mississippi Department of Human Services strengthen the controls over the preparation, review and timely submission of required performance and financial reports prior to submission to the Department of Health and Human Services. |
| **Repeat Finding** | No. |
| **Statistically Valid** | The sample is considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Department of Human Services partially concurs with this finding.  See additional comments in the Corrective Action Plan on page 358 of this audit report and Auditor's Response on page 362. |

**SUBRECIPIENT MONITORING**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-042** | Controls Should Be Strengthened over On-Site Monitoring for the Supplemental Nutrition Assistance Program (SNAP), Temporary Assistance for Needy Families (TANF), Child Care and Development Block Grant (CCDF), Low Income Home Energy Assistance Program (LIHEAP), and Social Services Block Grant (SSBG) Programs. |
| **CFDA Number** | 10.551  Supplemental Nutrition Assistance Program<br>93.558  Temporary Assistance for Needy Families State Programs<br>93.667  Social Services Block Grant<br>93.575  Child Care and Development Block Grant<br>93.596  Child Care Mandatory and Matching Funds of the Child Care and Development Fund<br>93.568  Low Income Home Energy Assistance Program |
| **Federal Award No.** | G1701MSTANF 2017        SNAP – Letter of Credit<br>G1801MSTANF 2018        G1801MSSOSR 2018<br>G1801MSCCDF 2018         G18B1MSLIEA 2018 |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

**Questioned Costs**  None.

**Criteria**  The terms and conditions of the grant agreements between the Mississippi Department of Human Services (MDHS) and the U.S. Department of Health and Human Services require MDHS to administer grants in compliance with the *Code of Federal Regulations (2 cfr 200).*

The *Code of Federal Regulations (2 cfr 200.331)* requires MDHS to properly identify subaward requirements to subrecipients, evaluate the risk of noncompliance for each subrecipient, and monitor the activities of subrecipients as necessary to ensure that subawards are used for authorized purposes, complies with the terms and conditions of the subawards and achieves performance goals.

We evaluated MDHS's compliance with subrecipient monitoring requirements based on written policies and procedures designed by MDHS's Division of Program Integrity – Office of Monitoring (OM) to satisfy during-the-award monitoring requirements. OM procedures require an on-site monitoring review of each subgrantee contract at least once during the subgrant period. A tracking mechanism is used to ensure all subgrantee contracts are properly identified and monitored. Monitoring tools/checklists are used during each on-site monitoring review to provide guidance and to document a review was performed. The on-site monitoring workpapers are reviewed and approved by OM supervisory personnel prior to issuance of a written report, the Initial Report of Findings & Recommendations, which is used for communicating finding(s) and/or questioned costs to subgrantees. The written report should be issued within 30 working days from the date of the exit conference, which is normally held on the last day of the on-site review.

The *Code of Federal Regulations* (*2 cfr 200.328(a)*), states the non-Federal entity is responsible for oversight of the operations of the Federal award supported activities. The non-Federal entity must monitor its activities under Federal awards to assure compliance with applicable Federal requirements and performance expectations are being achieved. Monitoring by the non-Federal entity must cover each program, function or activity. See also § 200.331 Requirements for pass-through entities.

The *Code of Federal Regulations* (*2 cfr 200.328(b)(2)*), states the non-Federal entity must submit performance reports using OMB-approved government-wide standard information collections when providing performance information. As appropriate in accordance with above mentioned information collections, these reports will contain, for each Federal award, brief information on the following unless other collections are approved by OMB:
(i) A comparison of actual accomplishments to the objectives of the Federal award established for the period. Where the accomplishments of the Federal award can be quantified, a computation of the cost (for example, related to units of accomplishment) may be required if that information will be useful. Where performance trend data and analysis would be informative to the Federal awarding

271

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

agency program, the Federal awarding agency should include this as a performance reporting requirement.

(ii) The reasons why established goals were not met, if appropriate.

(iii) Additional pertinent information including, when appropriate, analysis and explanation of cost overruns or high unit costs.

The *Code of Federal Regulations* (*2 cfr 200.331(6)(b)*), states: Evaluate each subrecipient's risk of noncompliance with Federal statutes, regulations, and the terms and conditions of the subaward for purposes of determining the appropriate Subrecipient monitoring described in paragraph (e) of this section.

Additionally, the *Code of Federal Regulations (45 cfr 200.62),* states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;

(a) Transactions are properly recorded and accounted for, in order to:

    (1) Permit the preparation of reliable financial statements and Federal reports;

    (2) Maintain accountability over assets; and

    (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;

(b) Transactions are executed in compliance with:

    (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and

    (2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and

(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

Furthermore, The *Internal Control – Integrated Framework* published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) Manual specifies that a satisfactory control environment is only effective when there are adequate control activities in place.

**Condition**

During testwork performed on subrecipient on-site monitoring for 84 subgrant contracts during state fiscal year 2019, auditor noted the following exceptions:

- During conversations with upper management of MDHS, auditor noted that prior Executive Director JD would circumvent controls of the monitoring process for certain subrecipients. Monitoring visits were called short and monitors were recalled to MDHS and reassigned if issues were found during monitor visits. This direct involvement of the former Executive Director and the disregard of controls resulted in a lack of integrity in the monitoring process. Monitoring reports could not be relied upon during testwork as auditors could not determine what, if any, appropriate monitoring actually occurred for subgrants. No other staff at MDHS reported to the Mississippi Office of the State Auditor that monitors were being recalled and controls were being circumvented by Executive Director JD. Additionally, testwork

272

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

determined widespread fraud, waste, and abuse at two of the largest subrecipients of TANF funds. Monitoring reports for prior year grants did not indicate any questioned costs at these subrecipients, regardless of the subrecipients repeatedly participating in unallowable activities. Auditors noted substantial violations of the Subgrant Manual by both MCEC and FRC in regards to asset purchases, indirect costs, allowable costs, etc. These violations and the fraud, waste, and abuse uncovered during the audit verify that subrecipients were not properly monitored.

- Seven contracts, or 8 percent, in which corrective actions were not received from the subrecipient within 15 working days from the date the report was issued, or auditor could not verify corrective actions were received timely due to lack of audit trail.
  - o Corrective Actions for one contract were received 21 days from the Initial Monitoring Report (IMR),
  - o For six contracts, auditor could not verify corrective actions were necessary, or received timely, due to lack of audit trail;

- Eleven contracts, or 13 percent, in which the IMR was not issued within 60 working days from the date of the exit conference, or auditor could not determine when it was issued due to lack of audit trail.
  - o IMRs were issued between 66 and 261 days late, with an average of 124 working days after the exit conference took place;

- Six contracts, or 7 percent, in which the IMR was not included in monitoring file; therefore, supervisory approval prior to issuance of the report to the subrecipient could not be verified;

- Six contracts, or 7 percent, in which we were unable to determine if questioned costs had been completely resolved as of the date of testwork;

- Six contracts, or 7 percent, in which the auditor could not verify monitoring took place during the contract period due to lack of documentation in monitoring file;

- Twenty-five (25) contracts, or 30 percent, in which the Monitoring Supervisor Checklist was dated after the IMR letter, or was not included in the file, therefore Monitoring Supervisor Review Checklist approval prior to issuance of the IMR letter could not be verified;

- Five contracts, or 6 percent, in which the On-Site Monitoring review of the Subrecipient was not performed during the subgrant period;

- Three contracts, or 3 percent, in which the Subgrants were not monitored in federal FY 2018; and

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

In addition, the MDHS Office of Monitoring (OM) did not evaluate the risk of noncompliance of its subrecipients in order to perform monitoring procedures based upon identified risks, as is a requirement of Uniform Guidance.

**Cause**

Staff were either unaware or did not follow identified policies and procedures for monitoring requirement.  Additionally, per documentation obtained by auditors, former Executive Director JD colluded with MDHS personnel to undermine the monitoring of subrecipients and circumvented controls in order to delay or stop monitoring of certain subrecipients.

**Effect**

MDHS programmatic funding divisions rely upon OM monitoring procedures to verify compliance with program regulations and to identify potential problem areas needing corrective action. Failure to properly monitor subreceipients in a timely manner could allow noncompliance with federal regulations to occur and go undetected, potentially resulting in questioned costs.

**Recommendation**

We recommend the Mississippi Department of Human Services' Division of Program Integrity – Office of Monitoring (OM) strengthen controls over subrecipient monitoring. OM should evaluate the risk of noncompliance of each subrecipient and perform monitoring procedures based upon identified risks. We also recommend the agency ensure subawards are monitored timely and that the "Report of Findings & Recommendations" prepared as a result of the on-site monitoring be issued in a timely manner to enable immediate corrective action procedures to be initiated.  We further recommend that the agency maintain all supporting monitoring tools, reports, and correspondence in the monitoring file.

**Repeat Finding**

Yes – 2018-046 in 2018; 2017-037 in 2017; 2016-027 in 2016; 2015-005 in 2015; 2014-017 in 2014; 2013-015 in 2013.

**Statistically Valid**

The sample is considered statistically valid.

**View of Responsible Officials**

Management at the Mississippi Department of Human Services concurs with this finding.  See additional comments in the Corrective Action Plan on page 358 of this audit report.

--------------------------------------------------------------------------------

*Material Weakness*
*Material Noncompliance*

**2019-043**

Strengthen Controls Over Subrecipient Monitoring to Ensure Compliance with OMB Uniform Guidance Auditing Requirements.

**CFDA Number**

10.551  Supplemental Nutrition Assistance Program
93.558  Temporary Assistance for Needy Families State Programs
93.575  Child Care and Development Block Grant

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

|  |  |
|---|---|
|  | 93.596 Child Care Mandatory and Matching Funds of the Child Care and Development Fund |
|  | 93.667 Social Services Block Grant |
|  | 93.568 Low Income Home Energy Assistance Program |

**Federal Award No.**   G1801MSTANF 2018    G1801MSSOSR 2018
G1701MSCCDF 2017    G17B1MSLIEA 2017
G1801MSCCDF 2018    G18B1MSLIEA 2018
SNAP – Letter of Credit

**Questioned Costs**   None

**Criteria**   The Office of Management and Budget (OMB) Uniform Guidance states the pass-through entity is responsible for (1) ensuring that subrecipients expending $750,000 or more in Federal awards during their fiscal year have met the audit requirements of OMB Uniform Guidance and that the required audits are completed within nine months of the end of the subrecipient's audit period; (2) issuing a management decision on findings within 6 months after receipt of the subrecipient's audit report; and (3) ensuring that the subrecipient takes timely and appropriate corrective action on all audit findings.  In cases of continued inability or unwillingness of a subrecipient to have the required audits, the pass-through entity shall take appropriate action using sanctions.

Additionally, the *Code of Federal Regulations (45 cfr 200.62),* states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;
(a) Transactions are properly recorded and accounted for, in order to:
    (1) Permit the preparation of reliable financial statements and Federal reports;
    (2) Maintain accountability over assets; and
    (3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;
(b) Transactions are executed in compliance with:
    (1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and
    (2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and
(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition.

**Condition**   During the audit of the Mississippi Department of Human Services (MDHS), auditor reviewed the Division of Program Integrity – Office of Monitoring (OM) audit files and Monitoring Tracking Document for MDHS Subgrantees for state fiscal year 2017. During our review, we noted the following weaknesses:

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

- Auditor noted the SFY 2017 Single Audit Tracking System utilized by the MDHS Office of Monitoring to track the status of OMB Uniform Guidance audits for DHS subrecipients does not include expenditures made by the sub-recipient nor does it include all sub-recipients who received federal funds from MDHS during FY 2017. The audit requirements of the *Code of Federal Regulations (2 cfr Part 200, subpart F)* are based on expenditures of Federal awards; therefore, subrecipients of MDHS could have expended Federal awards in excess of amounts that require a single audit that may have not been included on MDHS's tracking document. The agency was not able to provide an expenditure report to the auditors in order to ensure completeness of the monitoring files.

- Three instances in which the Office of Monitoring could not provide an OMB monitoring file for the sub-recipient; therefore, auditor could not determine compliance with OMB monitoring procedures;

- Nineteen (19) instances in which the Office of Monitoring failed to send out reminder letters within a timely manner. Reminder letters were mailed on February 6, 2019, on average 7.5 months after the due dates of audit reports; and

- Eighteen (18) instances where the OMB Uniform Guidance audit report for the subgrantee was not received by Office of Monitoring within nine months of the subgrantee's fiscal year end. Subgrantee audit reports were received on average 213 days after the nine-month deadline.

**Cause**         Staff were either unaware or did not follow identified policies and procedures for subrecipient monitoring related to Uniform Grant Guidance.

**Effect**         Failure to properly monitor subrecipients could allow noncompliance with federal regulations to occur and go undetected, potentially resulting in fraud, waste, and abuse within the agency.

**Recommendation**         We recommend the Mississippi Department of Human Services' Division of Program Integrity – Office of Monitoring (OM) strengthen controls over subrecipient monitoring for OMB Uniform Guidance audits to ensure recipients expending $750,000 or more in Federal funds during their fiscal year are appropriately monitored and that the appropriate federal audit is obtained. We further recommend that OM design a monitoring tool based on expenditures incurred by subrecipients to ensure all subrecipients are included on the tracking report and continue to follow-up with subgrantees in a timely to ensure compliance with audit requirements.

**Repeat Finding**         Yes – 2018-047 in 2018; 2017-038 in 2017; 2016-028 in 2016; 2015-009 in 2015; 2014-016 in 2014.

**Statistically Valid**         The sample is considered statistically valid.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **View of Responsible Officials** | Management at the Mississippi Department of Human Services concurs with this finding.  See additional comments in the Corrective Action Plan on page 359 of this audit report. |

## SPECIAL TESTS AND PROVISIONS

*Significant Deficiency*

| | |
|---|---|
| **2019-044** | <u>Controls Should Be Strengthened over the Review of Foster Care Maintenance Payment Rates and the Calculation of Foster Care Maintenance Payments.</u> |
| **CFDA Number** | 93.658- Foster Care Title IV-E |
| **Federal Award No.** | G1801MSFOST  2018<br>G1901MSFOST  2019 |
| **Questioned Costs** | None. |
| **Criteria** | *Internal Control – Integrated Framework* published by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) specifies that a satisfactory control environment is only effective when there are adequate control activities in place. Effective control activities dictate that the agency perform a multi-level review of the rates being entered into Mississippi Automated Child Welfare System (MACWIS), as well as at least annual tests over MACWIS to ensure the system is properly calculating Foster Care Maintenance payments.<br><br>Additionally, the *Code of Federal Regulations (45 cfr 200.62),* states that a non-Federal entity must have internal control over compliance designed to provide reasonable assurance that;<br>(a) Transactions are properly recorded and accounted for, in order to:<br>　(1) Permit the preparation of reliable financial statements and Federal reports;<br>　(2) Maintain accountability over assets; and<br>　(3) Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;<br>(b) Transactions are executed in compliance with:<br>　(1) Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and<br>　(2) Any other Federal statutes and regulations that are identified in the Compliance Supplement; and<br>(c) Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition. |
| **Condition** | During testwork performed related to Foster Care Special Tests and Provisions, auditor noted that proper controls are not in place to ensure the accuracy of |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

payment rates within the MACWIS system, nor are controls in place to ensure the accuracy of payment calculations.

**Cause**

Staff is unaware of the importance of an internal control structure.

**Effect**

Failure to implement proper internal controls could result in inaccurate payment rates and payment calculations.

**Recommendation**

We recommend the Mississippi Department of Human Services strengthen controls over the review of payment rates being entered into MACWIS, as well as perform tests over the accuracy of payment calculations within MACWIS.

**Repeat Finding**

No.

**Statistically Valid**

Sample is considered statistically valid.

**View of Responsible Officials**

Management at the Mississippi Department of Human Services concurs with this finding.  See additional comments in the Corrective Action Plan on page 359 of this audit report.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

**DIVISION OF MEDICAID**

**ELIGIBILITY**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-027** | <u>Controls Should Be Strengthened to Ensure Compliance with Eligibility Requirements of the Medical Assistance Program and the Children's Health Insurance Program (CHIP).</u> |

**CFDA Number(s)**   93.767 – Children's Health Insurance Program (CHIP)
93.775 – State Medicaid Fraud Control Unit
93.777 – State Survey and Certification of Health Care Providers and Suppliers
　　　　　(Title XVIII) Medicare
93.778 – Medical Assistance Program (Medicaid; Title XIX)

**Federal Award No.**   1805MS5021　　2018　　　1905MS5021　　2019
1805MS5ADM　2018　　　1905MS5ADM 2019
1805MS5MAP　2018　　　1905MS5MAP　2019
1805MSIMPL　　2018　　　1905MSIMPL　2019
1805MSINCT　　2018　　　1905MSINCT　2019

**Questioned Costs**   $23,628

**Criteria**   The *Code of Federal Regulations* (42 CFR Part 435.949(b)) states, "To the extent that information related to eligibility for Medicaid is available through the electronic service established by the Secretary, States must obtain the information through such service, subject to the requirements in subpart C of part 433 of this chapter, except as provided for in §435.945(k) of this subpart."

*CMCS Informational Bulletin: MAGI-Based Eligibility Verification Plans* states, "To the extent that information related to Medicaid or CHIP eligibility is available through the electronic data services hub established by the Secretary, states must obtain the information through this data services hub. Subject to Secretarial approval and the conditions described in §435.945(k) and 457.380(i), states can obtain information through a mechanism other than the data services hub."

The *Mississippi Division of Medicaid (MAGI) based Eligibility Verification Plan* states, "Income information from the federal data services Hub is available first and serves as the primary data source."

The *Mississippi Division of Medicaid Eligibility Policy and Procedures Manual* Section 201.03.04A requires the use of the individual's most recent tax return to verify income for individuals considered self-employed, a shareholder in an S Corporation, a partner in a business or one who has income from a partnership, LLP, LLC or S Corporation.

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Condition** | During testwork performed over eligibility requirements for the Medical Assistance Program and the Children's Health Insurance Program (CHIP) as of June 30, 2019, auditor tested 180 Modified Adjusted Gross Income (MAGI) recipients. The sample selection was proportioned equally (60 each) in three categories; Fee for Service (FFS), Managed Care, and Children's Health Insurance Program (CHIP) and noted the following: |

- Mississippi Division of Medicaid (MDOM) did not use federal tax and/or state tax data to verify income, including self-employment income, out-of-state income, and various unearned income.

- In 18 instances of the 180 MAGI recipients, or 10 percent, self-employment income was reported on the 2018 Mississippi tax return and not on the application. Of the 18 instances, the following was noted:

  o <u>Managed Care</u> – of the 60 recipients sampled 12, or 20 percent, reported self-employment income on their 2018 Mississippi income tax return and did not include the self-employment on their application. Four instances, or 6.67 percent, in which the total income per the 2018 Mississippi tax return exceeded the applicable income limit for the recipient's category of eligibility.

    Due to MDOM's failure to verify self-employment income on the applicant's 2018 tax return, MDOM was not aware income exceeded eligibility limits, and did not request any additional information that might have explained why income was not self-reported; therefore, auditor could not determine with certainty that individuals are, in fact, ineligible. However, information that MDOM used at the time of the eligibility determination did not support eligibility.

    The fiscal year capitation payments for these four recipients that would not have been eligible to receive the benefits totaled approximately $23,628. Based on the error rate calculated using the capitation payments of our sample, the projected amount of capitation payments made to ineligible recipients would be approximately $64,488,951.

  o <u>CHIP</u> – of the 60 recipients sampled six, or 10 percent, reported self-employment income on their 2018 Mississippi income tax return and did not include the self-employment on their application.

| | |
|---|---|
| **Cause** | MDOM did not have policies in place to verify certain types of income on applicant's tax returns, as required for eligibility determinations. |
| **Effect** | As noted in the *Mississippi Division of Medicaid Eligibility Policy and Procedures Manual*, the electronic data sources utilized by MDOM cannot verify self-employment income, income from partnerships or S Corporations, rental income, |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

|  |  |
|---|---|
|  | or farm income. Without the use of federal tax and/or state tax data, the agency cannot determine if self-attested income is complete and accurate. Failure to properly verify income and maintain complete case records could result in ineligible applicants being deemed eligible resulting in questioned costs and the possible recoupment of funds by the federal granting agency. |
| **Recommendation** | We recommend the Mississippi Division of Medicaid strengthen controls related to income verification to ensure compliance with eligibility requirements. |
| **Repeat Finding** | No. |
| **Statistically Valid** | The sample is considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Division of Medicaid partially concurs with this finding.  See additional comments in the Corrective Action Plan on page 367 of this audit report and Auditor's Response on page 371. |

---

**SECIAL TEST & PROVISIONS**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-028** | Controls Should Be Strengthened to Ensure Compliance with Automatic Data Processing (ADP) Risk Analysis and System Security Review Requirements. |
| **CFDA Number(s)** | 93.775 – State Medicaid Fraud Control Unit<br>93.777 – State Survey and Certification of Health Care Providers and Suppliers (Title XVIII) Medicare<br>93.778 – Medical Assistance Program (Medicaid; Title XIX) |
| **Federal Award No.** | 1805MS5ADM  2018    1905MS5ADM 2019<br>1805MS5MAP  2018    1905MS5MAP 2019<br>1805MSIMPL   2018    1905MSIMPL  2019<br>1805MSINCT   2018    1905MSINCT  2019 |
| **Questioned Costs** | None. |
| **Criteria** | The *Code of Federal Regulations* (45 CFR 95.621) states, "State agencies must establish and maintain a program for conducting periodic risk analyses to ensure that appropriate, cost effective safeguards are incorporated into new and existing systems. State agencies must perform risk analyses whenever significant system changes occur. State agencies shall review the ADP system security of installations involved in the administration of HHS programs on a biennial basis. At a minimum, the reviews shall include an evaluation of physical and data security operating procedures, and personnel practices. …The State agency shall maintain reports of |

281

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

their biennial ADP system security reviews, together with pertinent supporting documentation, for HHS on-site review."

The Mississippi Division of Medicaid (MDOM)'s Risk Analysis Policy states, "In the case of ADP systems involved in the administration of Health and Human Services (HHS) programs, MDOM will follow the MARS-E 2.0 Risk Assessment (RA-3) Control which requires the Administering Entities (AEs) to conduct, document, annually review, and disseminate a Risk Assessment of the security and privacy of the systems, and review the Service Organization Control (SOC) reports annually or whenever provided by fiscal agent."

| | |
|---|---|
| **Condition** | The Mississippi Division of Medicaid (MDOM) is not in compliance with *45 CFR 95.621* and its own Risk Analysis Policy; each requires a Risk Analysis Report be produced every 2 years. MDOM provided no evidence of a biennial risk analysis of all ADP Systems involved in the administration of HHS programs. The agency did submit a risk analysis for Mod MEDS, a subsystem of Medicaid Management Information System (MMIS) in compliance with MARS-E v.2 Security and Privacy Controls framework; however, a risk analysis was not performed on the MMIS. |
| **Cause** | Due to the loss of personnel, the agency has not implemented the corrective action plan for the prior year finding. |
| **Effect** | Failure to properly establish and maintain a process for conducting periodic risk analyses could result in the compromise of the confidentiality, integrity and reliability of the data associated with HHS programs. |
| **Recommendation** | We recommend Mississippi Division of Medicaid strengthen internal controls to ensure compliance with the Automatic Data Processing (ADP) risk analysis and system security review requirements. |
| **Repeat Finding** | Yes – 2018-060 in 2018; 2017-034 in 2017; and 2016-033 in 2016 |
| **Statistically Valid** | The sample is not considered statistically valid. |
| **View of Responsible Officials** | Management at the Mississippi Division of Medicaid concurs with this finding.  See additional comments in the Corrective Action Plan on page 369 of this audit report. |

--------------------------------------------------------------------------------

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-029** | Controls Should Be Strengthened to Ensure Compliance with Provider Health and Safety Standards Requirements. |
| **CFDA Number(s)** | 93.796 – State Survey Certification of Health Care Providers and Suppliers (Title XIX) Medicaid |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Federal Award No.** | 1705MS50001  2017 |
| | 1805MS50001  2018 |
| | 1905MS50001  2019 |

**Questioned Costs**   None.

**Criteria**   The *Code of Federal Regulations* (42 CFR 488.308) requires the State Survey Agency to conduct a standard survey of each Skilled Nursing Facility (SNF) and Nursing Facility (NF) no later than 15 months after the last day of the previous standard survey and the statewide average interval between standard surveys of skilled nursing facilities and nursing facilities must be 12 months or less. The statewide average interval is computed at the end of each Federal fiscal year by comparing the last day of the most recent standard survey for each participating facility to the last day of each facility's previous standard survey.

The *Code of Federal Regulations* (42 CFR 442.109) requires the State Survey Agency to conduct a survey of each Intermediate Care Facilities for Individuals with Intellectual Disability (ICF/IID) no later than 15 months after the last day of the previous survey and the statewide average interval between surveys must be 12 months or less. The statewide average interval is computed at the end of each Federal fiscal year by comparing the last day of the most recent survey for each participating facility to the last day of each facility's previous survey.

**Condition**   During testwork performed over the provider health and safety standard requirements, auditor noted the following:
- 109 of the 203 nursing facilities, or 54 percent, did not have a mandatory health and safety survey performed within 15 months after the last day of the previous survey.
- One of the 14 ICF/IID facilities, or 7 percent, did not have a mandatory health and safety survey performed within 15 months after the last day of the previous survey.
- The statewide average survey interval for nursing facilities was 15.9, which exceeds the 12-month statewide average survey interval requirement.
- The statewide average survey interval for ICF/IID facilities was 12.8, which exceeds the 12-month statewide average survey interval requirement.

**Cause**   Loss of qualified surveyors at the State Survey Agency.

**Effect**   If surveys are not conducted timely, health and safety violations may go undetected. Failure to ensure the 12-month statewide average interval requirement is met could result in sanctions and impact funding determinations.

**Recommendation**   We recommend the Mississippi Division of Medicaid strengthen controls to ensure compliance with provider health and safety standards requirements.

**Repeat Finding**   Yes; 2018-059

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

**Statistically Valid**    This sample is considered statistically valid.

**Views of Responsible**
**Officials**              Management at the Mississippi Division of Medicaid concurs with this finding. See additional comments in the Corrective Action Plan on page 370 of this audit report.

---

## STATE OF MISSISSIPPI

---

## SCHEDULE OF FINDINGS AND QUESTIONED COSTS
## FOR THE YEAR ENDED JUNE 30, 2019

---

### PART 3 – FEDERAL AWARD FINDINGS AND QUESTIONED COSTS

### U.S. DEPARTMENT OF HOMELAND SECURITY

| **Finding Number** | **Finding and Recommendation** |
|---|---|

**EMERGENCY MANAGEMENT**

**ALLOWABLE COST/ACTIVITIES ALLOWED**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-023** | <u>Controls Should Be Strengthened to Ensure Federal Costs Are Properly Reviewed, Approved and Eligible Prior to Reimbursement.</u> |
| **CFDA Number** | 97.039 – Hazard Mitigation Grant Program |
| **Federal Award** | DR-MS-1604 |
| **Questioned Costs** | $173,077 |
| **Repeat Finding** | No. |
| **Statistically Valid** | The sample is considered statistically valid. |
| **Criteria** | The *Code of Federal Regulations (2 cfr 200.403(c))* states allowable costs must be consistent with policies and procedures that apply uniformly to both federally-financed and other activities of the non-Federal entity. |
| | The federally approved MEMA Hazard Mitigation State Administrative Plan states that the Hazard Mitigation Officer will review reimbursement requests and submit a payment recommendation to the Governor Authorized Representative (GAR) at the agency. The GAR reviews and approves or denies the request. If the request is approved, the GAR forwards the request to MEMA's Accounting Division (Office of Support Services) for preparation of payment documents. |
| **Condition** | Based on testwork performed over 50 payment transactions for the Hazard Mitigation Grant Program (HMGP), auditor noted two improper payments that were not approved by MEMA management as detailed below: |

- A reimbursement payment for the Kids Campaign project under the 1604 Katrina Disaster Grant was approved for $719,260 by MEMA executive management but the agency paid $852,301 - $133,041 more than approved. Of the difference, $12,396 was deemed ineligible by the Hazard Mitigation

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

Officer in the program division at MEMA prior to the Accounting Director finalizing the transaction in MAGIC, the state accounting system.

- A reimbursement payment for the Adult Campaign project under the 1604 Katrina Disaster Grant was approved for $530,436 by MEMA executive management but the agency paid $570,472 - $40,036 more than approved. Of the difference, $14,527 was deemed ineligible by the Hazard Mitigation Officer in the program division at MEMA prior to the Accounting Director finalizing the transaction in MAGIC.

In both instances, the Accounting Director circumvented controls by recalculating the reimbursements for these two awareness projects after the amounts were calculated and approved by the Mitigation Division and approved by Executive Management at the agency. It should be noted the Accounting Director at the time is no longer employed by the agency.

| | |
|---|---|
| **Cause** | The Accounting Director overrode controls in place to process transactions without proper review and approval. |
| **Effect** | Monies reimbursed as ineligible will be deemed unallowable costs and may result in the loss of funding to the state, as well as the requirement of the state to reimburse federal funds. |
| **Recommendation** | We recommend the Mississippi Emergency Management Agency strengthen controls to ensure federal costs are eligible and are properly reviewed and approved prior to reimbursement. |
| **Views of Responsible Officials** | Management at the Mississippi Emergency Management Agency concurs with this finding.  See additional comments in the Corrective Action Plan on page 373 of this audit report. |

**CASH MANAGEMENT**

*Material Weakness*
*Material Noncompliance*

| | |
|---|---|
| **2019-024** | Controls Should be Strengthened to Ensure Compliance with Federal Revenue Draw Requirements. |
| **CFDA Number** | 97.039 – Hazard Mitigation Grant Program |
| **Federal Award** | DR-MS-1604<br>DR-MS-4175 |
| **Questioned Costs** | N/A |
| **Repeat Finding** | Yes; 2018-054 |

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

| | |
|---|---|
| **Statistically Valid** | The sample is not statistically valid. |
| **Criteria** | The *Code of Federal Regulations (31 cfr 205.33)* requires the State to minimize time between the drawdown of Federal funds and the disbursement for Federal program purposes. The timing and amount of funds transferred must be as close as administratively feasible to a State's actual cash outlay. |
| | Section 22.40.10 of the *Mississippi Agency Accounting Policies and Procedures* (MAAPP) manual lists the major provisions of the Cash Management Improvement Act (CMIA), including that State and Federal agencies must minimize the time elapsing between the transfers of Federal funds to States. The MAAPP manual defines reimbursable funding as Federal funds requested based on actual amounts already paid by the State for Federal program purposes. |
| **Condition** | During test work performed over federal revenue draws for the Hazard Mitigation Grant Program (HMGP), auditor noted $1,192,787 in administrative costs for Disaster Grant 1604 Katrina and $55,440 in administrative costs for Disaster Grant 4175 Severe Storms, for a total of $1,248,227, incurred during the year were not drawn down timely nor accrued to fiscal year 2019. In addition, $22,163 of administrative costs for Disaster Grant 4175 is unrecoverable since the federal grant is closed. |
| **Cause** | Staff did not follow identified policies and procedures over cash management. The agency does not have adequate procedures in place to ensure administrative costs are reimbursed in a timely manner. |
| **Effect** | Delayed requests of federal funds may result in a liability for the federal government and could be disallowed in the future due to draw limits. Additionally, untimely deposit of funds to the state treasury may result in the loss of investment earnings. The agency lost $22,163 in administrative cost reimbursements due to not requesting the funds before closing the federal grant. |
| **Recommendation** | We recommend the Mississippi Emergency Management Agency strengthen controls to ensure compliance with cash management requirements. |
| **Views of Responsible Officials** | Management at the Mississippi Emergency Management Agency concurs with this finding.  See additional comments in the Corrective Action Plan on page 374 of this audit report. |

**SUBRECIPIENT MONITORING**

*Material Weakness*
*Material Noncompliance*

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

---

| | |
|---|---|
| **2019-025** | <u>Controls Should be Strengthened to Ensure Compliance over Subrecipient Monitoring Requirements</u> |
| **CFDA Number** | 97.039 – Hazard Mitigation Grant Program |
| **Federal Award** | DR-MS-1604            DR-MS-1916<br>DR-MS-4175            DR-MS-4268<br>DR-MS-4248            DR-MS-4295 |
| **Questioned Costs** | N/A |
| **Repeat Finding** | Yes; 2018-055 |
| **Statistically Valid** | The sample is not considered statistically valid. |

**Criteria**

*Code of Federal Regulations (2 cfr §200.331(f))* states all pass-through entities must verify that every subrecipient is audited as required by Subpart F – Audit Requirements when it is expected that the subrecipient's Federal awards expended during the respective fiscal year equaled or exceeded the threshold set forth in §200.501.

*Code of Federal Regulations* (2 *cfr 200.501*) states that a non-Federal entity that expends $750,000 or more during the non-Federal entity's fiscal year in Federal awards must have a single or program-specific audit.

**Condition**

During the audit of the Mississippi Emergency Management Agency (MEMA), auditor reviewed the agency's process for monitoring their subrecipients' audit requirements. Based on inquiry with agency management and review of the agency's incomplete tracking log, MEMA did not ensure subrecipients were audited as required by federal regulations nor did the agency review audit reports received from subrecipients to ensure compliance with audit requirements in the *Code of Federal Regulations (2 cfr 200 Subpart F)* during state fiscal year 2019. The agency's tracking log for subrecipients' fiscal year 2017 audit reports was incomplete, listing a total of 26 subrecipients with 23 audit reports received and 3 subrecipients with no audit report received. The audit reports received were not reviewed and cleared nor was correspondence made with subrecipients that had not submitted an audit report.

**Cause**

The agency has not yet implemented corrective action for the prior year finding over subrecipient monitoring.

**Effect**

Failure to properly monitor subrecipients could allow noncompliance with federal regulations to occur and go undetected, potentially resulting in questioned costs.

**Recommendation**

We recommend the Mississippi Emergency Management Agency strengthen controls over subrecipient monitoring to ensure recipients expending $750,000 or more in Federal funds during their fiscal year are appropriately monitored and an

**STATE OF MISSISSIPPI**
**SCHEDULE OF FINDINGS AND QUESTIONED COSTS**
**PART 3 – Federal Award Findings and Questioned Costs (continued)**

|  |  |
|---|---|
|  | audit is obtained. In addition, we recommend internal policies and procedures be implemented over the audit tool used to monitor subrecipients to ensure completeness of subrecipients requiring an audit. |
| **Views of Responsible Officials** | Management at the Mississippi Emergency Management Agency concurs with this finding.  See additional comments in the Corrective Action Plan on page 374 of this audit report. |

(This page left blank intentionally.)

# II. SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS



(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

---

**SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS**
**FOR THE YEAR ENDED JUNE 30, 2019**

---

**Instructions to Management**

Each state grantee agency included in the prior year Single Audit Report for the State of Mississippi prepared a summary schedule of prior federal audit findings as required by *OMB Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards 2 CFR 200, Section 5.11*.  In order to provide a systematic approach for reporting, agencies were asked to follow the format listed below.

For each prior year federal audit finding, the agency should include the following: (1) finding identification including finding number, finding heading, *Catalog of Federal Domestic Assistance* (CFDA) number and program name, (2) current status, and (3) planned corrective action, if required.  These items are discussed below:

(1)    Each finding number, finding heading, CFDA number and program name should be listed in the same sequence as presented in the prior year Single Audit Report.

(2)    The current status should be identified with one of the following terms:

        a.    "Fully Corrected" - All corrective action has been taken.

        b.    "Partially Corrected" - Some, but not all, corrective action has been taken.

        c.    "Not Corrected" - Corrective action has not been taken.

        d.    "Not Valid" - Finding is no longer valid and does not warrant further action.

(3)    Corrective action should be noted for findings that are not identified as "Fully Corrected."

        a.    When audit findings are "Partially Corrected" or "Not Corrected," describe the planned corrective action as well as any partial corrective action taken.

        b.    When audit findings are "Not Valid," describe the reasons the findings are no longer considered valid or do not warrant further action.

(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

---

**SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS**
**FOR THE YEAR ENDED JUNE 30, 2019**

---

### INDEX LISTED BY FINDING NUMBER

| FINDING NUMBER | STATE GRANTEE AGENCY NAME | PAGE NUMBER |
|---|---|---|
| 2018-001[i] | Education | 297 |
| 2018-010 | Transportation | 311 |
| 2018-045 | Human Services | 301 |
| 2018-046 | Human Services | 301 |
| 2018-047 | Human Services | 302 |
| 2018-048 | Human Services | 302 |
| 2018-049 | Human Services | 302 |
| 2018-050 | Human Services | 302 |
| 2018-051 | Human Services | 303 |
| 2018-052 | Human Services | 303 |
| 2018-053 | Human Services | 303 |
| 2018-054 | Emergency Management | 315 |
| 2018-055 | Emergency Management | 315 |
| 2018-056 | Emergency Management | 315 |
| 2018-057 | Transportation | 311 |
| 2018-058 | Medicaid | 313 |
| 2018-059[i] | Health | 299 |

**STATE OF MISSISSIPPI**

---

**SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS**
**FOR THE YEAR ENDED JUNE 30, 2019**

---

**INDEX LISTED BY FINDING NUMBER - Continued**

| | | |
|---|---|---|
| 2018-059 | Medicaid | 313 |
| 2018-060 | Medicaid | 313 |
| 2018-061 | Mental Health | 305 |
| 2018-062 | Military | 307 |
| 2018-063 | Military | 307 |

*i  The agency responded to findings that were not required to be reported in the current year report.  Only the findings required to be disclosed by the Uniform Grant Guidance are included in the indices.

**STATE OF MISSISSIPPI**

---

**SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS**
**FOR THE YEAR ENDED JUNE 30, 2019**

---

**INDEX LISTED BY STATE GRANTEE AGENCY**

| FINDING NUMBER | STATE GRANTEE AGENCY NAME | PAGE NUMBER |
|---|---|---|
| 2016-042 | Education | 297 |
| 2018-001 | Education | 297 |
| 2017-026 | Health | 299 |
| 2018-059 | Health | 299 |
| 2018-045 | Human Services | 301 |
| 2018-046 | Human Services | 301 |
| 2018-047 | Human Services | 302 |
| 2018-048 | Human Services | 302 |
| 2018-049 | Human Services | 302 |
| 2018-050 | Human Services | 302 |
| 2018-051 | Human Services | 303 |
| 2018-052 | Human Services | 303 |
| 2018-053 | Human Services | 303 |
| 2018-061 | Mental Health | 305 |
| 2018-062 | Military | 307 |
| 2018-063 | Military | 307 |
| 2017-023 | Rehabilitation | 309 |
| 2018-010 | Transportation | 311 |
| 2018-057 | Transportation | 311 |

**STATE OF MISSISSIPPI**

---

**SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS**
**FOR THE YEAR ENDED JUNE 30, 2019**

---

**INDEX LISTED BY STATE GRANTEE AGENCY - Continued**

| FINDING NUMBER | STATE GRANTEE AGENCY NAME | PAGE NUMBER |
|---|---|---|
| 2018-058 | Medicaid | 313 |
| 2018-059 | Medicaid | 313 |
| 2018-060 | Medicaid | 313 |
| 2018-054 | Emergency Management | 315 |
| 2018-055 | Emergency Management | 315 |
| 2018-056 | Emergency Management | 315 |



# MISSISSIPPI DEPARTMENT OF EDUCATION

Carey M. Wright, Ed.D.
*State Superintendent of Education*

## SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS
For the Year Ended June 30, 2019

2016-042    <u>Internal Controls over reporting should be strengthened to ensure that supporting documentation is maintained in accordance with federal and state retention policies.</u>

CFDA #84.287    21st Century Community Learning Centers

FULLY CORRECTED


2018-0001    <u>Procedures Over Issuing Subrecipient Program Review Letter Should Be Strengthened to Ensure</u>
<u>that the Letters Are Issued Within the 30-Day Program Requirement</u>

CFDA 10.553, 10.555, 10.556, 10.559    Child Nutrition Cluster

FULLY CORRECTED


Signed: _____

State Superintendent of Education

Date: ____2/27/20____

(This page left blank intentionally.)



**MISSISSIPPI STATE DEPARTMENT OF HEALTH**

SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS
For the Year Ended June 30, 2019

2017-026    <u>Controls Should be Strengthened to Ensure Compliance with Application Monitoring and Oversight of Time Study Policies and Procedures</u>

      10.557      WIC Special Supplemental Nutrition Program for Women, Infants, and Children

      93.074      Hospital Preparedness Program (HPP) and Public Health Emergency Preparedness (PHEP) Aligned Cooperative Agreements

      FULLY CORRECTED

2018-059    <u>Controls Should Be Strengthened to Ensure Compliance with Provider Health and Safety Standards Requirements</u>

      93.777      State Survey Certification of Health Care Providers and Suppliers (Title XVIII) Medicare

      FULLY CORRECTED

Signed: *Sharon Dowdy*
       934EA9B32F8A490
Sharon Dowdy, CPA, CFE, CPM
Chief Administrative Officer / Chief Financial Officer

Date: 2/21/2020 | 8:03 AM CST

Signed: *Thomas Dobbs*
       A525016E91BF427
Thomas E. Dobbs III, M.D., M.P.H.
State Health Officer

Date: 2/21/2020 | 8:44 AM CST

(This page left blank intentionally.)



**STATE OF MISSISSIPPI**
**Tate Reeves, Governor**
**DEPARTMENT OF HUMAN SERVICES**
**Jacob Black**
**Interim Executive Director**

Shad White, State Auditor
Office of the State Auditor
State of Mississippi
P.O. Box 956
Jackson, Mississippi 39205-0956

January 15, 2020

Dear Mr. White:

Enclosed for your review is the agency's updated response and status of corrective action plans to the prior year audit for the state fiscal year ending on June 30, 2018.

SUMMARY SCHEDULE OF PRIOR SINGLE AUDIT FINDINGS:

**2018-045**       **Controls Should Be Strengthened to Ensure Compliance with Eligibility and Benefit Payment Requirements of the Temporary Assistance for Needy Families (TANF) Program.**

CFDA Number       93.558 - Temporary Assistance for Needy Families State Programs

MDHS Response:    FULLY CORRECTED.  Please see attached all relevant training materials.

**2018-046**       **Controls Should Be Strengthened over On-Site Monitoring for the Supplemental Nutrition Assistance Program (SNAP), Temporary Assistance for Needy Families (TANF), Child Care and Development Block Grant (CCDF), Low Income Home Energy Assistance Program (LIHEAP), and Social Services Block Grant (SSBG) Programs.**

CFDA Number       10.551  - Supplemental Nutrition Assistance Program
                  93.558  - Temporary Assistance for Needy Families State Programs
                  93.667  - Social Services Block Grant
                  93.575  - Child Care and Development Block Grant
                  93.596  - Child Care Mandatory and Matching Funds of the Child Care and Development Fund
                  93.568  - Low Income Home Energy Assistance Program

MDHS Response:    FULLY CORRECTED.  Please see attached all relevant training materials.

**2018-047**

**Controls Should Be Strengthened over Sub Recipient Monitoring of OMB Uniform Guidance Audits for the Supplemental Nutrition Assistance Program (SNAP), Child Care and Development Block Grant (CCDF), Temporary Assistance for Needy Families (TANF), Social Services Block Grant (SSBG) and Low Income Home Energy Assistance (LIHEAP) Programs.**

CFDA Number

10.551  - Supplemental Nutrition Assistance Program
93.558  - Temporary Assistance for Needy Families State Programs
93.667  - Social Services Block Grant
93.575  - Child Care and Development Block Grant
93.596  - Child Care Mandatory and Matching Funds of the Child Care and Development Fund
93.568  - Low Income Home Energy Assistance Program

MDHS Response:

FULLY CORRECTED.  Please see attached all relevant training materials.

**2018-048**

**Controls Should Be Strengthened to Ensure Compliance with Eligibility and Benefit Payment Requirements of the Child Care and Development Block Grant (CCDF) Cluster.**

CFDA Number:

93.575 - Child Care and Development Block Grant
93.596 - Child Care Mandatory and Matching Funds of the Child Care and Development Fund

MDHS Response:

FULLY CORRECTED.  Please see attached all training documents and newly created documents.

**2018-049**

**Controls Should Be Strengthened to Ensure Compliance with Allowable Cost Requirements of the Child Care and development Block Grant (CCDF) Cluster.**

CFDA Number:

93.575 - Child Care and Development Block Grant
93.596 - Child Care Mandatory and Matching Funds of the Child Care and Development Fund

MDHS Response:

FULLY CORRECTED.

**2018-050**

**Controls Should Be Strengthened over the Submission of Required Federal Reports for the Child Care and Development Block Grant (CCDF), Supplemental Nutrition Assistance Program (SNAP), and Temporary Assistance for Needy Families (TANF) Programs.**

CFDA Number

10.551  - Supplemental Nutrition Assistance Program
93.558  - Temporary Assistance for Needy Families State Programs
93.575  - Child Care and Development Block Grant
93.596  - Child Care Mandatory and Matching Funds of the Child Care and Development Fund

MDHS Response:

FULLY CORRECTED.

**2018-051**  **Controls Should Be Strengthened to Ensure Compliance with Earmarking and Minimum Targeted Funds Requirements.**

CFDA Number:   93.575 - Child Care and Development Block Grant
93.596 - Child Care Mandatory and Matching Funds of the Child Care and Development Fund

MDHS Response:   FULLY CORRECTED, as the revised report was submitted to Administration of Children and Families (ACF).

**2018-052**  **Controls Should Be Strengthened over Compliance with Health and Safety Requirements of the Child Care and Development Fund (CCDF) Cluster.**

CFDA Number:   93.575 - Child Care and Development Block Grant
93.596 - Child Care Mandatory and Matching Funds of the Child Care and Development Fund

MDHS Response:   FULLY CORRECTED.

**2018-053**  **Controls Should Be Strengthened over 20 Percent Exemption and Five Year Time Limit.**

CFDA Number   93.558  - Temporary Assistance for Needy Families State Programs

MDHS Response:   FULLY CORRECTED.

We appreciate the courtesy and professionalism demonstrated by Emily Mathis and her field staff throughout the audit. Should you have any questions regarding our updated responses or corrective action plan, please do not hesitate to contact Hadley Eisenberger, Inspector General, at 601-359-4939.

Respectfully,

*Jacob A. Black*

Jacob Black, Interim Executive Director

JB: HE

Cc:   David Barton
Hadley Gable Eisenberger

303                                                         Page 3 of **3**

(This page left blank intentionally.)

# DEPARTMENT OF MENTAL HEALTH
## State of Mississippi

239 North Lamar Street
1101 Robert E. Lee Building
Jackson, Mississippi 39201



(601) 359-1288
FAX (601) 359-6295
TDD (601) 359-6230

Diana S. Mikula - Executive Director

February 21, 2020

Mr. Shad White, State Auditor
Office of the State Auditor
State of Mississippi
PO Box 956
Jackson, MS 39205-0956

## SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS
### For the Year Ended June 30, 2019

Dear Mr. White:

The following information is submitted in accordance with Uniform Guidance, Section 200.511.

2018-061    Controls Should Be Strengthened to Ensure Compliance with Independent Peer Review
Requirements

CFDA# 93.959 Block Grants for Prevention and Treatment of Substance Abuse

FULLY CORRECTED

The Department of Mental of Health, through the Bureau of Alcohol and Drug Services,
has developed and implemented a peer review process. This process is in place, is
ongoing, and provides an independent peer review to assess at least 5% of the certified
providers funded with Substance Abuse Block Grant (SABG) funds annually. Utilizing a
standardized assessment tool, the evaluation assesses the effectiveness of the treatment
provided and allows for targeted and comprehensive training to enhance service delivery
and outcomes.

There is no further planned corrective action necessary.

Signed: _____
Diana S. Mikula, Executive Director

Date: _____

(This page left blank intentionally.)



# STATE OF MISSISSIPPI
# MILITARY DEPARTMENT



THE ADJUTANT GENERAL'S OFFICE
POST OFFICE BOX 5027
JACKSON, MISSSISSIPPI 39296-5027

## SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS
### For the Year Ended June 30, 2018

1) 2018-062, "Controls Should be Strengthened to Ensure Compliance with Federal Reporting Requirements."
2) CFDA Number 12.400, Military Construction, National Guard
3) Not Corrected
4) This finding was reported in May of 2019, giving the agency no time to correct the deficiency during FY2019. The current year audit only covered the period FY2019, therefore the corrections were not noted during the current year audit. Effective 1 October 2019, we revised the 12.400 Grant Management process to include the issuance of a Standard Form 270 when requesting reimbursement for expenditures related to military construction grants.

1) 2018-063, "Controls Should Be Strengthened to Ensure Compliance with Cash Management Requirements."
2) CFDA Number 12.400, Military Construction, National Guard
3) Fully Corrected

Amos P. Parker, BG
Director, State Resources, MS National Guard
14 February 2020

(This page left blank intentionally.)



**State of Mississippi**
**DEPARTMENT OF REHABILITATION SERVICES**

## SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS
For the Year Ended June 30, 2018

2017-023    Agency Should Ensure Compliance with Medical Licensure Verification

CFDA # 96.001     Social Security- Disability Insurance (DI)
CFDA # 96.006     Supplemental Security Income (SSI)

FULLY CORRECTED

Chris Howard, Executive Director

2/18/2020

Date

(This page left blank intentionally.)



**Melinda L. McGrath**
Executive Director

*P. O. Box 1850*
*Jackson, MS 39215-1850*
*Telephone (601) 359-7249*
*FAX (601) 359-7050*
*GoMDOT.com*

**Brian D. Ratliff**
Deputy Executive Director/Chief Engineer
**Lisa M. Hancock**
Deputy Executive Director/Administration
**Willie Huff**
Director, Office of Enforcement
**Charles R. Carr**
Director, Office of Intermodal Planning

# SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS
### For the year ended June 30, 2019

2018-010   <u>Controls Should Be Strengthened to Ensure Compliance with Subrecipient Monitoring Requirements.</u>

CFDA # 20.205   Highway Planning and Construction
CFDA # 20.219   Recreational Trail Program **(The cited finding is not applicable to this program)**

NOT CORRECTED

The cited finding was reported to MDOT on May 29, 2019.  IAD's reviews of the LPAs' FY 2017 audit reports had been completed in April of 2019.  The corrective action plan for the year ended June 30, 2018 was effective beginning July 1, 2019.

2018-057   <u>Controls Should Be Strengthened over the Quality Assurance Program</u>

CFDA # 20.205   Highway Planning and Construction
CFDA # 20.219   Recreational Trail Program **(The cited finding is not applicable to this program)**

FULLY CORRECTED

Signed: *Melinda L. McGrath*
Melinda L. McGrath, PE
Executive Director

Date: *01, 31, 2020*

*Transportation: The Driving Force of a Strong Economy*

(This page left blank intentionally.)

OFFICE OF THE GOVERNOR

Walter Sillers Building  |  550 High Street, Suite 1000  |  Jackson, Mississippi 39201



MISSISSIPPI DIVISION OF
**MEDICAID**

## SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS
### For the Year Ended June 30, 2019

2018-058    Agency Should Strengthen Controls Over Period of Performance
Requirements.

93.778        Medical Assistance Program (Medicaid: Title XIX)

FULLY CORRECTED

2018-059    Agency Should Strengthen Controls to Ensure Compliance with Provider
Health and Safety Standard Requirements.

93.796        State Survey and Certification of Health Care Providers and
Suppliers (Title XVIII Medicare)

FULLY CORRECTED

2018-060    Agency Should Strengthen Controls to Ensure Compliance with ADP Risk
Analysis and System Security Review Requirements.

93.778        Medical Assistance Program (Medicaid: Title XIX) State Survey

NOT CORRECTED

While DOM was targeting to award and onboard a managed security services
vendor by the end of calendar year 2019, this was delayed due to the loss of
both our Procurement Resource and Security Officer.  We have hired another
Procurement Resource who has drafted a Managed Security Services
Statement of Work (SOW).  This will be reviewed and modified as necessary
by our new Security Officer, who is scheduled to start work at DOM mid-
March 2020.

Based on our understanding of the procurement approach, DOM is targeting
to award and onboard a managed security services vendor by October 2020.

The Mississippi Division of Medicaid (DOM) acknowledges the need to strengthen internal controls to ensure compliance with the ADP risk analysis and system security review requirements.  Further, DOM acknowledges that Service Organization Control (SOC) reports are not sufficient to meet the ADP Risk Analysis requirement.

Signed: _Drew Snyder_

Drew L. Snyder
Executive Director

Date: _2/21/20_



# State of Mississippi

**TATE REEVES**
Governor

## MISSISSIPPI EMERGENCY MANAGEMENT AGENCY

GREGORY S. MICHEL
EXECUTIVE DIRECTOR

### SUMMARY SCHEDULE OF PRIOR FEDERAL AUDIT FINDINGS
For the Year Ended June 30, 2019

2018-054    Controls Should Be Strengthened to Ensure Compliance with Federal Revenue Draw Requirements

      97.039    Hazard Mitigation Grant Program

      PARTIALLY CORRECTED

      Guidelines have been set requiring the programmatic offices to provide all back up and supporting data when draw requests are submitted to Support Services. Draws are not currently being made on a regular basis. Procedure is being created for Hazard Mitigation draws and will be implemented.

2018-055    Controls Should Be Strengthened to Ensure Compliance over Subrecipient Monitoring of OMB Uniform Guidance Audits

      97.039    Hazard Mitigation Grant Program

      NOT CORRECTED

      Due partially to the timing of the audit and reporting deadlines, we were aware that this would be a repeat finding. Work has already been done for correction for the 2020 FY audit. Procedures have been written and signed by the Executive Director as of January 2020. The payment list for the 2020 fiscal year is prepared and will continually be monitored going forward.

2018-056    Controls Should Be Strengthened to Ensure Compliance with Federal Reporting Requirements

      97.039    Hazard Mitigation Grant Program

      FULLY CORRECTED

Signed: _____
      Gregory S. Michel, Executive Director

Date: 2/27/2020

(This page left blank intentionally.)

# III. MANAGEMENT RESPONSES AND CORRECTIVE ACTION PLANS



(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

**MANAGEMENT RESPONSES AND CORRECTIVE ACTION PLANS**
**FOR THE YEAR ENDED JUNE 30, 2019**
**Instructions to Management**

In order to provide a systematic approach for agencies to respond to audit findings, the management of each agency was requested to follow the instructions listed below in preparation of the formal response to single audit findings and the corrective action plan.

For each AUDIT FINDING, the agency should include the following:   (1) *Catalog of Federal Domestic Assistance* (CFDA) number and program name, (2) type of compliance requirement, (3) audit finding number and finding heading, (4) response, and (5) corrective action plan.  These items are discussed below:

1. Each CFDA number and program name should be listed in the same sequence presented in the management letter.  The entire finding is not required to be repeated.

2. Each type of compliance requirement should be listed in the same sequence as presented in the management letter.

3. Each audit finding number and finding heading should be listed separately in the same sequence as presented in the management letter.  The entire finding is not required to be repeated.

4. Responses of the agency to audit findings should be included directly below each audit finding heading.  For each response, the agency should state whether they concur or do not concur with the individual finding and recommendation and the reasons why.

5. After an audit finding heading has been listed along with the corresponding agency response, the plan for corrective action should be listed using the following format:

   a. Specific steps to be taken to correct situation.

   b. Name(s) of the contact person(s) responsible for corrective action.

   c. Anticipated completion date for corrective action.

   d. Specific reasons why corrective action is not necessary, if applicable.

OMB Uniform Guidance, Section 200.521 requires audit findings to be resolved between federal agencies and audited agencies within six months after the receipt of the single audit report by the federal government. Audited agencies should maintain permanent files on all correspondence with the federal government during the audit resolution process.  Federal agencies may ask for additional information pertaining to audit findings.

On the following pages, we have compiled the formal response to the findings and recommendations and the corrective action plan of each agency's management.

(This page left blank intentionally.)



# MISSISSIPPI DEPARTMENT OF EDUCATION

Carey M. Wright, Ed.D.
*State Superintendent of Education*

### FINANCIAL AUDIT FINDINGS

Shad White, State Auditor                                    December 31, 2019
Office of the State Auditor
State of Mississippi
P. O. Box 956
Jackson, MS  39205-0956

Dear Mr. White:

In accordance with your correspondence dated December 17, 2019, the Mississippi Department
of Education (MDE) is providing the following response and corrective action plan for the
financial audit finding for the fiscal year ending June 30, 2019.

AUDIT FINDING:

**2019-010**      Controls Should Be Strengthened over MAGIC Segregation of Duties, Business
                 Role Assignments and Quarterly Security Certification Process

Response:  The agency concurs with this finding.

Corrective Action Plan:

A. Specific steps to be taken to correct the situation.

   All instances noted have been reviewed and corrected.  The MAGIC Security Contact will
   meet with the Director of Accounting each quarter to review current role assignments in order
   to ensure that these violations do not occur again.

B. Name of the contact person responsible for corrective action.

   Tamala Matthews, MAGIC Security Contact

C. Anticipated completion date for correction action.

   Immediately

POST OFFICE BOX 771 • JACKSON, MISSISSIPPI 39205 • (601) 359-3512 • FAX (601) 359-3242

If you have any questions, please contact Mr. John Kraman at 601-359-3487.

Sincerely,

Carey M. Wright, Ed.D.
State Superintendent of Education

**STATE OF MISSISSIPPI**
GOVERNOR TATE REEVES

**DEPARTMENT OF FINANCE AND ADMINISTRATION**

February 11, 2020

## FINANCIAL AUDIT FINDINGS

Shad White, State Auditor
Office of the State Auditor
State of Mississippi
P. O. Box 956
Jackson, MS 39205-0956

Dear Mr. White:

In reference to your letter dated December 20, 2019, we submit the following responses and corrective action plans to the financial audit findings for the Department of Finance and Administration (DFA) for the fiscal year ended June 30, 2019.

## AUDIT FINDINGS:

**MATERIAL WEAKNESS**

| Finding Number | Finding Description |
|---|---|
| **2019-014** | Strengthen Controls Over the Change Logs of the Statewide Payroll and Human Resource System. |
| **Response:** | We acknowledge the finding. |

Turning on the Natural Security logs would require a major upgrade to SPAHRS and would introduce functionality that has never been utilized. This would be a major change with high risks to consider. DFA/MMRS is in the process of planning the HR/Payroll implementation of MAGIC and does not

Page **1** of **5**

POST OFFICE BOX 267 • JACKSON, MISSISSIPPI 39205 • TEL (601) 359-3402 • FAX (601) 359-2405

want to take on the risk of doing a major change to SPAHRS at this time.

The quarterly security verification/reconciliation process requires agencies to verify/reconcile all SPAHRS security access for their agency. This verification includes new and updated SPAHRS Security requests. Additionally, when forms are received by DFA/MMRS, the forms are reviewed to make sure a signature was obtained providing a record of agency acknowledgement that the access requested is appropriate. The requested updates are made in SPAHRS and the forms are electronically signed and filed in SharePoint. The MMRS Security Supervisor verifies that the security acknowledgement forms are signed by the agency security contact and all documentation is accurate.

**Corrective Action:**

A. DFA is beginning the MAGIC Phase II Implementation.

B. Michael Gonzalez is the contact person for this corrective action.

C. The anticipated completion date of Phase II is July 1, 2022.

D. N/A

**2019-015**

Require Chief Fiscal Officers of State Agencies to Hold Minimum Accounting Qualifications and Attend Mandatory Training

**Response:**

We acknowledge this finding.

The Department of Finance and Administration (DFA) is the primary agency responsible for state government financial and administrative operations, and we fully accept and embrace the magnitude of that responsibility. However, while DFA is the executive branch control agency over governmental accounting and financial reporting, and in particular, the completion of the annual comprehensive annual financial report, we rely heavily on the cooperation and

Page **2** of **5**

input of every other state agency to successfully accomplish that task.

We acknowledge that Section 7-7-3 of Miss. Code Ann. (1972) requires DFA to conduct training seminars on a regular basis to ensure that agencies have access to persons proficient in the correct use of the state accounting system. Before implementation of the new statewide system and since that time, we have provided class training, one-on-one personalized training and detailed assistance via the call center to agency personnel to help them understand the processes required for daily workflow. We have training material, work instructions and job aids available on the internet that are easily accessible. While we have clearly stated that these training sessions are necessary, we continue to have agencies that do not attend.

The finding specifically calls into question the lack of qualifications and skill requirements of agency accounting personnel, and specifically mentions the lack of qualified personnel serving as Chief Fiscal Officers. While we have the responsibility to provide systems to facilitate the financial reporting and operations of the state and to provide training to employees that use these systems, we do not have the oversight of the hiring or selection of agency employees. Hiring of qualified employees is the responsibility of each state agency head.

**Corrective Action Plan**

A.  The audit finding recommendation is for DFA to implement mandatory training sessions for accounting personnel and chief fiscal officers. DFA will continue to provide training opportunities for accounting personnel and chief fiscal officers, and will pursue and provide additional training as funding allows.

B.  The contact person responsible for this corrective action is Steven McDevitt.

C.  The corrective action will be implemented during fiscal year 2020.

Page **3** of **5**

D.  N/A

| Finding Number | Finding Description |
|---|---|
| **2019-016** | <u>The Department of Finance and Administration should strengthen controls over the vendor master file and issuance of payments to One Time Vendors to ensure compliance with Internal Revenue Service Regulations.</u> |

**Response:**    We acknowledge this finding.

To do business with the State of Mississippi, either the agency or the vendor enters the vendor's information into a portal on the DFA website and then the agency releases that information into MAGIC. The vendor is imported into MAGIC in a blocked status. The Vendor Master Data Team unblocks the vendor upon receipt of the W9. The W9 is reviewed for completeness, attached to the vendor file in MAGIC, and the vendor is unblocked.

Each agency has been assigned their own one-time vendor number. Some agencies have multiple one-time vendor numbers for different purposes. It is the responsibility of the executive leadership and fiscal management of each agency to use these one-time vendor numbers in an appropriate manner in accordance with the rules and regulations set by DFA.

**Corrective Action Plan**    A. The audit finding recommendation is for DFA to strengthen policies over the use of the one-time vendor code and conduct a regular review of the vendor master file to ensure complete and accurate vendor information has been entered. DFA does not pre-audit payments under $1,000.00, therefore DFA has no control over the agencies' use of the one-time vendor code for payments under $1,000.00. DFA currently conducts post-audit reviews of those payments under $1,000.00, and notifies the agencies of any violations that are noted.

Corrective Action: DFA will implement periodic

Page **4** of **5**

reviews of the vendor master data to test that a W9 is attached to the vendor file in MAGIC.

B. The contact person responsible for this corrective action is Steven McDevitt.

C. The corrective action will be implemented during fiscal year 2020.

D. N/A

Sincerely,

Liz Welch
Interim Executive Director

Page **5** of **5**

(This page left blank intentionally.)

DocuSign Envelope ID: 05BF509D-57BD-4F86-B52B-79186C596A85



**STATE OF MISSISSIPPI**
**Phil Bryant, Governor**
**DEPARTMENT OF HUMAN SERVICES**
**Christopher Freeze**
**Executive Director**

Shad White, State Auditor
Office of the State Auditor
State of Mississippi
P.O. Box 956
Jackson, Mississippi 39205-0956

January 14, 2020

Dear Mr. White:

Enclosed for your review is the agency's official response and correlating corrective action plans to the financial audit finding in the "Financial Audit Management Report" as outlined in the Mississippi Department of Human Services financial audit performed for the Fiscal Year 2019.

FINANCIAL AUDIT FINDINGS

| | |
|---|---|
| **2019-012** | **Controls Should Be Strengthened to Ensure Management's "Tone at the Top" Does Not Allow for the Circumventing of Policies, Procedures, State Law, and/or Federal Regulations.** |

MDHS Response:     MDHS agrees that controls should be strengthened to ensure a "Tone at the Top" style does not allow for circumventing policies, procedures, State Law and/or Federal regulations.

Corrective Action Plan: MDHS is in agreement that during the audit period, the prior Executive Director and a few supervisors under the prior Executive Director's direction did not exhibit appropriate "tone at the top" leadership. We agree the culture created and promulgated by the prior Executive Director led to Temporary Assistance of Needy Families (TANF) monies being unilaterally and arbitrarily distributed without proper oversight or review. In order to maintain this posture, the prior Executive Director terminated or retaliated against employees which furthered the problems.

However, senior members of the Executive Management team were also responsible for bringing the prior Executive Director's actions to light in June 2019. Since the prior Executive Director's actions had been on-going during his tenure, had the senior members of the team not brought his actions to light, the probability was high the waste and abuse of funds would not have been discovered during routine audits or reviews. The MDHS Executive Leadership currently in place has worked closely with OSA on this matter in order to ensure a complete and thorough examination.

After the prior Executive Director left MDHS employment, a new Executive Director was appointed and leadership changes were made to address the "tone at the top" culture as well as the effective and efficient use of state and federal funds. Specifically, MDHS no longer employs the select individuals implicated in this matter, has released and awarded Request for Proposals concerning the TANF block grant, and has revised the subgrant manual to ensure additional measures of internal controls are in place to prevent such from occurring in the future. All of these actions have increased the transparency and accountability at MDHS.

Additionally, the TANF state plan, which governs all program expenditures as approved by the Administration for Children and Families and was the controlling document during State Fiscal Year 2019 did not require a competitive procurement be conducted. Further, the TANF state plan encouraged the use of subgrantees in the administration of TANF dollars and service of MDHS clients in need of assistance.

The TANF State Plan is currently under revision as part of the State's Workforce Innovation Opportunity Act State Plan, in which TANF is a core partner, and a procurement process is being written into the new state plan that will be submitted in March of 2020. The state plan will incorporate the lessons learned as part of the prior Executive Director's inappropriate activities.

**2019-013**            **Controls Should Be Strengthened over MAGIC Segregation of Duties, Business Role Assignments and Quarterly Security Certification Process.**

MDHS Response:        MDHS is in agreement that it should strengthen its' policies and procedures to ensure that duties and business role assignments in MAGIC are segregated.

Corrective Action Plan: MDHS currently reviews the role assignments quarterly to ensure segregation of duties and has made significance progress over prior year's audit findings. Additionally, MDHS reviews employees that are no longer associated with the agency. MDHS will also notate individuals that have multiple roles and explain the rationale for same.

We appreciate the courtesy and professionalism demonstrated by Emily Mathis and her field staff throughout the audit.  Should you have any questions regarding our responses or corrective action plan, please do not hesitate to contact Hadley Eisenberger, Inspector General, at 601-359-4939.

Respectfully,

Christopher Freeze, Executive Director

CF: HE

pc:     Jacob Black
        David Barton
        Hadley Gable Eisenberger

328



**STATE OF MISSISSIPPI**
TATE REEVES, GOVERNOR
**DEPARTMENT OF PUBLIC SAFETY**
**MISSISSIPPI HIGHWAY SAFETY PATROL**

## FINANCIAL AUDIT FINDINGS

Shad White, State Auditor
Office of the State Auditor
State of Mississippi
P. O. Box 956
Jackson, MS  39205-0956

Dear Mr. White:

In response to the financial audit findings for the period ending June 30, 2019, the Mississippi Department of Public Safety is providing the following corrective action plan.

AUDIT FINDING(S):

**2019-011** - Two vehicles were originally accounted for and recorded utilizing a purchase order in a separate fund of the Department.  An additional erroneous journal entry was made to fund 2271100000 to also record the assets.

Response:  Concur

Corrective Action Plan:

A. Management has addressed internal accounting procedures with accounting staff. Additionally, an enhanced review process has been implemented to ensure all records are properly recorded.

B. Mark Valentine

C. Plan will be followed during next GAAP package reporting period.

D. N/A

Sincerely,

Chris Gillard, Colonel
Director, MHSP
Assistant Commissioner, DPS

(This page left blank intentionally.)



# State of Mississippi

**TATE REEVES**
Governor

## MISSISSIPPI DEVELOPMENT AUTHORITY

February 26, 2020

FINANCIAL AUDIT FINDINGS

Shad White, State Auditor
Office of the State Auditor
State of Mississippi
P. O. Box 956
Jackson, MS  39205-0956

Dear Mr. White:

The Mississippi Development Authority ("MDA") has received a financial audit finding for the fiscal year 2019 audit.  MDA's response to the finding is below:

AUDIT FINDINGS:

2019-017    CORRECTION OF AN ERROR- LOAN RECEIVABLES

The prior year financial statements reported loan receivables for funds 3341R00000, 5341W00000, 634AE00000, 634RZ00000, and 634KE00000 based on modified accrual instead of full accrual.  As a result, the total fund balance at July 1, 2018 was understated by $183,546,047. The following is a summary of the restated beginning fund balance for funds 3341R00000, 5341W00000, 634AE00000, 634RZ00000, and 634KE00000.

| | Fund 3341R00000 | Fund 5341W00000 | Fund 634AE00000 | Fund 634RZ00000 | Fund 634KE00000 |
|---|---|---|---|---|---|
| Fund Balances, Beginning of Year | 4,413,379.00 | (32,790,708.00) | 44,702,079.00 | 1,558,069.00 | 20,253,126.00 |
| Prior Period adjustment | 67,931,950.00 | 3,992,959.00 | 60,367,800.00 | 7,074,061.00 | 44,179,277.00 |
| Restated Fund Balances, Beginning of Year | 72,345,329.00 | (28,797,749.00) | 105,069,879.00 | 8,632,130.00 | 64,432,403.00 |

Response:

MDA concurs that the loan receivables for the aforementioned funds were reported incorrectly on the Financial statements of Revenue, Expenditures and changes in Fund Balance prepared by Carr, Riggs, & Ingram and the error was not discovered by the Accounting staff at the time of the review of the Audit report.

Corrective Action Plan:

To correct this issue, the MDA has implemented additional reviews by the Grants Supervisor to help ensure that the Statements of Revenues, Expenditures and Changes in Fund Balance of General Funds selected for Audit are stated correctly in the future. The understatement of revenue at July 1, 2018 was corrected during the 2019 Audit. Supervisor and Division Director Staff ensured that the revenues reported during the current grants were true and correct and free for error.


_____          2/26/20
Brian Daniel, Accounting & Finance Director          Date:

_____          2/26/2020
Michael J. McGrevey, Interim Executive Director          Date

POST OFFICE BOX 849 · JACKSON, MISSISSIPPI 39205-0849
TELEPHONE (601) 359-3449 · FAX (601) 359-2832 · www.mississippi.org

332



**FINANCIAL AUDIT FINDINGS**
**or**
**OTHER AUDIT FINDINGS**
**or**
**COMPLIANCE REVIEW FINDINGS**

Shad White, State Auditor                                          November 7, 2019
Office of the State Auditor
State of Mississippi
P.O. Box 956
Jackson, MS 39205-0956

Dear Mr. White,

Below is a summary of the MPIC responses to the 6/30/19 FY audit findings.

**AUDIT FINDINGS:**

**2019-1          Controls Related to Segregation of Duties Should Be Strengthened**

Response:  MPIC is made aware of certain deficiencies in internal control resulting from a lack of segregation of duties.

Corrective Action Plan:

A. Specific steps to be taken to correct the situation – Certain functions in the payroll, accounts receivable and accounts payable roles have been split so as to ensure that multiple individuals are responsible for all of the duties each role entails; This will ensure that checks and balances in place to protect our assets and minimize errors.
B. Name(s) of the contact person(s) responsible for corrective action-Brenda Morgan, Controller and Bradley Lum, CEO
C. Anticipated completion date for corrective action: 10/30/2019 **COMPLETED**

**2019-2          Controls Related to Maintenance of Source Documents Should Be Strengthened**

Response:  A financial reporting system requires an appropriate review function to ensure that all relevant information is processed correctly and appropriately assimilated into the financial reporting process.

Corrective Action Plan:

A. Specific steps to be taken to correct the situation – The accounting department is enforcing stronger controls to make sure every receipt and expense report has the proper set of

documentation attached. We have a new process implemented whereby a clerk is assigned to our recipes and expense report before it is checked by our purchasing clerk. After the purchasing clerk has reviewed for accuracy, the documentation is then sent to our controller for final monthly sign-off. If the employee doesn't adhere to the rules, then they will be written up.

B. Name(s) of the contact person(s) responsible for corrective action-Brenda Morgan, Controller and Bradley Lum, CEO

C. Anticipated completion date for corrective action: 10/31/2019 **COMPLETED**

### 2019-03       <u>Controls Over Inventory Controls Should Be Strengthened</u>

Response: MPIC is aware that the inventory controls should be strengthened to make sure no misstatements are not made, and inventory is accurately stated.

Corrective Action Plan:

A. Specific steps to be taken to correct the situation – We have scheduled training to fully implement the inventory software (Fishbowl Inventory) that is currently in place. Each shop has established a month-end reconciling system in which they send accounting daily inventory tracking tickets that tie back to a master spreadsheet. Accounting will start matching these tracking tickets against customer sales orders that get billed.

B. Name(s) of the contact person(s) responsible for corrective action-Brenda Morgan, Controller and Bradley Lum, CEO

C. Anticipated completion date for corrective action: 12/31/2019 **IN PROCESS**

### 2019-4       <u>Controls Related to Property Control System Should Be Strengthened</u>

Response: MPIC is aware that there are certain changes that need to be made to the property control system.

Corrective Action Plan:

A. Specific steps to be taken to correct the situation – The Controller will work with the current year auditor to make sure that the fixed asset schedules reconcile to the audit schedules and tie to beginning balances on the balance sheet without any errors. The Controller will also make sure a better process is in place of recording additions and deletions of fixed assets;

B. Name(s) of the contact person(s) responsible for corrective action-Brenda Morgan, Controller and Bradley Lum, CEO

C. Anticipated completion date for corrective action: 3/31/2020 **IN PROCESS**

### 2019-05       <u>Controls Related to Pension and Postemployment Benefit Liability Controls Should Be Strengthened</u>

42

Response: MPIC was not aware that the internal accounting department was tasked with preparing the Pension and Postemployment benefits calculations internally. Going forward, they are going to learn how to prepare the schedule and adjustments, so the external audit firm does not have to prepare.

Corrective Action Plan:

A. Specific steps to be taken to correct the situation – The accounting department will take the steps to learn how to prepare and calculate the allocation entry for pension and post-employment benefits without the assistance of the CPA audit firm.

B. Name(s) of the contact person(s) responsible for corrective action-Brenda Morgan, Controller and Bradley Lum, CEO

C. Anticipated completion date for corrective action: 6/30/2020

### 2019-06    Controls Related to Reconciliations, Review and Close-out Process for Financial Reporting Should Be Strengthened

Response: MPIC is aware that controls related to reconciliations, review and close-out process for financial reporting should be strengthened and working on a plan to do so.

Corrective Action Plan:

A. Specific steps have been taken to correct the situation – An outside firm has been hired to assist the controller with reviewing the month-end books which will serve as a second set of eyes for due diligence. The Controller has delegated some of her duties to others so that the system of checks and balances are effectively adhered to before the books are closed every month.

B. Name(s) of the contact person(s) responsible for corrective action-Brenda Morgan, Controller and Bradley Lum, CEO

C. Anticipated completion date for corrective action: 10/1/2019 **COMPLETED**

### 2019-07    Controls Related to Information Technology General Controls (ITGC) Should Be Strengthened

Response: MPIC is aware that certain ITGC controls need to be put in place and working on a plan to do so.

Corrective Action Plan:

A. Specific steps to be taken to correct the situation – A contract is going to be put in place for Blakeney Data Solutions that lists terms of what services the third-party provider is going to offer MPIC. Also, Blakeney Data Solutions will help implement a cloud-based backup process. This will eliminate the backup tape system that is currently in place.

B. Name(s) of the contact person(s) responsible for corrective action- Bradley Lum, CEO

C. Anticipated completion date for corrective action: 12/31/2019 **IN PROCESS**

43

Bradley Lum, CEO

Brenda Morgan, Controller

44



MISSISSIPPI STATE DEPARTMENT OF HEALTH

FINANCIAL AUDIT FINDINGS

December 5, 2019

Honorable Shad White, State Auditor
Office of the State Auditor
State of Mississippi
P. O. Box 956
Jackson, MS  39205-0956

Dear Mr. White:

We have reviewed the audit finding below in reference to the Drinking Water Systems Improvements Revolving Loan Fund 2019 fiscal year audit.  Listed below is our individual response and plan for corrective action:

Audit Finding:

2019-008        Management is responsible for establishing and maintaining effective internal control over financial reporting, including the basic financial statements and related notes to the financial statements.

Response:        The agency concurs with this finding.

Corrective Action:        The GAAP submission deadline was August 16, 2019 and the invoices were not submitted to Finance in sufficient time to be included in the accrual entry.  The invoices were submitted to Finance for processing either two days before the deadline or seven days after the deadline.   In addition, after the lapse period ended (August 31st), the Department of Finance and Administration would not allow us to process additional accrual entries since the Treasury funds were being audited.  The agency will continue to evaluate the general ledger account in the year-end process and make adjustments as allowed.

Name of contact person responsible for corrective action: Sharon Dowdy

Anticipated completion date of corrective action: June 30, 2020

Should you have any questions regarding our response or corrective action plan, please feel free to contact Sharon Dowdy, 601-576-7359.

Sincerely,

Thomas Dobbs

Thomas E. Dobbs III, M.D., M.P.H.
State Health Officer

570 East Woodrow Wilson   ●   Post Office Box 1700   ●   Jackson, MS 39215-1700
601-576-8090   ●   1-866-HLTHY4U   ●   www.HealthyMS.com

*Equal Opportunity in Employment/Services*
337

(This page left blank intentionally.)



**OFFICE OF THE STATE TREASURER**
**LYNN FITCH**
TREASURER

## FINANCIAL AUDIT FINDINGS

January 8, 2020

The Honorable Shad White, State Auditor
Office of the State Auditor
State of Mississippi
P. O. Box 956
Jackson, MS 39205-0956

Dear Mr. White:

In accordance with your correspondence dated December 18, 2019, the Office of the State Treasurer (OST) is providing the following response for the financial audit finding for the fiscal year ended June 30, 2019.

AUDIT FINDINGS:

**2019-009      Strengthen Controls to Ensure Reports Issued Are Correct for End User**

Response:       We acknowledge this finding and will strengthen controls with the Department of Financial Administration (DFA) to ensure any information delivered for financial reporting purposes is finalized, or if not, will be noted as preliminary until finalized reports are available.

Corrective Action Plan:

A.              OST has strengthened controls to ensure reports issued are correct for end user. Any requests from DFA for fiscal year reporting purposes will be delivered and noted as preliminary, unless already determined as final for OST fiscal year end reporting.  Once OST has completed fiscal year reporting and finalized reports, any reports requiring revisions will be delivered as final to DFA.

B.              Justin Smith – Director of Investments, Cash Management, & Collateral

C.          July 1, 2020

D.          N/A


Sincerely


Lynn Fitch
Treasurer
State of Mississippi



# MISSISSIPPI DEPARTMENT OF EDUCATION

Carey M. Wright, Ed.D.
*State Superintendent of Education*

### SINGLE AUDIT FINDINGS

March 23, 2020

Shad White, State Auditor
Office of the State Auditor
State of Mississippi
P. O. Box 956
Jackson, MS 39205-0956

Dear Mr. White:

The Mississippi Department of Education (MDE) is providing the following response and corrective action plan for the singe audit finding for the fiscal year ending June 30, 2019.

AUDIT FINDINGS:

84.010 Title I – Grants to Local Education Agencies
84.367 Title II – Supporting Effective Instruction State Grants

Subrecipient Monitoring

2019-026    Controls Should Be Strengthened to Ensure Compliance with On-Site Subrecipient Monitoring Requirements

Response:

The MDE concurs with the audit finding; however, the agency has continued to work with subrecipients in an effort to resolve the questioned cost amount as noted in the report. A part of this resolution has included LEAs submitting documentation to mitigate the questioned cost amount. This is a continuous review in order to determine the final questioned cost amount, which will also include an on-site follow-up visit.

Corrective Action Plan:

A.   The MDE will continue to strengthen the subrecipient monitoring process and protocol to ensure compliance with the agency's policies and procedures. This will include standard operations for corrective action and questioned cost.
B.   Quentin Ransburg, Executive Director of Federal Programs
C.   June 30, 2021

Signed

Carey M. Wright, Ed.D
State Superintendent

(This page left blank intentionally.)

**MISSISSIPPI STATE DEPARTMENT OF HEALTH**

<u>SINGLE AUDIT FINDINGS</u>

April 20, 2020

Honorable Shad White, State Auditor
Office of the State Auditor
State of Mississippi
P. O. Box 956
Jackson, MS  39205-0956

Dear Mr. White:

We have reviewed the audit finding below in reference to the Mississippi State Department of Health 2019 fiscal year audit.  Listed below is our individual response and plan for corrective action:

Audit Finding:

| | |
|---|---|
| 2019-029 | Controls Should Be Strengthened to Ensure Compliance with Provider Health and Safety Standards Requirements |
| CFDA Number: | 93.777 – State Survey Certification of Health Care Providers and Suppliers (Title XVIII) Medicare |
| Requirement: | Special Test and Provisions – Provider Health and Safety Standards |
| Response: | The agency concurs with this finding. |
| Corrective Action: | Managing survey workload in SFY 2019 was directly related to lack of fully staffed survey teams.  Staffing levels have increased since state fiscal year 2019 and the issues with surveys should now be resolved. |
| | Name of contact person responsible for corrective action: Frances Fair |
| | Anticipated completion date of corrective action:  March 2020 |

Should you have any questions regarding our response or corrective action plan, please feel free to contact Sharon Dowdy, 601-576-7359.

Sincerely,

DocuSigned by:

*Thomas Dobbs*

A525016E91BE427

Thomas E. Dobbs III, M.D., M.P.H.
State Health Officer

(This page left blank intentionally.)



**STATE OF MISSISSIPPI**
**Tate Reeves, Governor**
**DEPARTMENT OF HUMAN SERVICES**
**Robert G. Anderson**
**Executive Director**

## SINGLE AUDIT FINDINGS

April 29, 2020

Shad White, State Auditor
State of Mississippi
Office of the State Auditor
P.O. Box 956
Jackson, MS  39205

Dear Mr. White:

Thank you for providing the Single Audit Findings for the Mississippi Department of Human Services ("MDHS") for our review and response, which we received on April 22, 2020.  These 100-plus pages represent months of hard work by the Office of the State Auditor and will be essential in helping MDHS carry out its mission to serve the most needy and vulnerable among us. Importantly, as executive director, I want to personally thank you and your team for the diligent work on behalf of the State as we move together to continue to improve our systems and processes and to implement measures to correct issues identified from previous years.

Your detailed recommendations and findings are helpful.  We have begun to work through the information provided and prepare these responses for MDHS and it is clear that we will not be able to respond fully in the short period of time permitted by your deadline of April 29, 2020.  As your office is no doubt working with a limited staff to provide core essential operations due to the COVID-19 pandemic – as evidenced by the fact that we received these findings via Zoom video meeting – MDHS is likewise working with limited essential staff.  Moreover, many of our staff are working remotely at this time and still others necessary to respond to the Single Audit findings are fully engaged in the critical work of ensuring relief is distributed to the most vulnerable in Mississippi during this pandemic.

Despite the unique circumstances, we have tried to provide the most complete response possible. We may supplement this response in the days ahead even though these responses may not be included in the version of the Single Audit Findings that will be placed on the State Auditor's website.

**2019-030**   The Mississippi Department of Human Services Should Strengthen Controls to Ensure Compliance with Subrecipient Allowable Cost Activities.

**Response:** MDHS **concurs** that it should strengthen controls to ensure compliance with subrecipient allowable cost activities of SNAP, CCDF, TANF and SSBG programs. Former Executive Director JD circumvented internal controls set in place by MDHS regarding procurement, monitoring, and other allowable costs controls to direct monies to certain subrecipients, who then directed federal monies to individuals associated with JD. Additionally, JD acted in an *ultra vires* manner and used his position as Executive Director to convince employees at MDHS to collude with him in circumventing controls. JD intentionally abused his position. As a result, MDHS employees charged with monitoring subrecipients/subgrantees failed to do so appropriately and also failed to review expenditures at the subrecipient level to ensure that costs were allowed and that activities held followed federal guidelines. Lastly, MDHS concurs that some personnel at MDHS either disregarded established policies and procedures or were not aware policies and procedures existed and unwittingly assisted JD in his scheme.

At the conclusion of FY2019, swift and immediate action was taken by MDHS to expose the intentional fraudulent scheme perpetrated by JD and some MDHS personnel, to prevent future intentional fraudulent behavior, and to restore trust in the public welfare system in Mississippi. Numerous actions were taken before June 2019 and additional measures have been implemented since then to address the deficiencies outlined in the Single Audit Findings, to prevent fraud and instill trust.

On or about June 21, 2019, Deputy Executive Director JB reported evidence of fraud and intentional misconduct to then Governor, PB's Chief of Staff. MDHS understands that the Governor's Office reported the same to the Office of the State Auditor, after which a criminal investigation ensued. That criminal investigation, and this expanded single audit covering multiple years, are the direct products of the initial report made by MDHS personnel to the Governor's Office.

Additionally, MDHS concurs with the recommendations of the OSA specifically as follows and incorporates those recommendations as the foundation for the MDHS Corrective Action Plan (CAP) related to this finding:
1) Pursue any legal remedies available against those that have contributed to the widespread fraud, waste and abuse detailed in this report;
   a. MDHS has partnered with the OSA criminal investigation since it was initiated in late June 2019 based on MDHS's self-report to the Governor's Office. MDHS has at all times cooperated fully by continuing to conduct an internal investigation and sharing all findings from that internal investigation with the OSA criminal investigators and continues to do so to the present date. The OSA criminal investigation has resulted in six indictments, including an indictment of former MDHS Executive Director, JD, and MDHS has been assured by the State Auditor and his staff that additional indictments are forthcoming. As cooperative partners in the OSA criminal investigation, it would be inappropriate for MDHS to initiate additional collateral criminal proceedings. Instead, MDHS supports the OSA criminal investigation through the full and continuing disclosure of all evidence as it is found. This demonstrates a united front for

the State of Mississippi as it prosecutes all intentional wrongdoing by former Executive Director JD and others involved in the scheme.

MDHS has and will continue to cooperate fully with the parallel federal investigation and the ongoing state criminal investigation.

b. Responsible Party: Executive Director Robert G. Anderson

c. Anticipated completion date: Pursuit was initiated in June 2019, completion date is impossible to determine at this time.

2) Pursue any legal remedies to seize property at MCEC and FRC that was purchased with federal monies in accordance with the policies of the *MDHS Subgrant Manual;*

   a. The MDHS has suspended usual and customary closeout procedures for all 2019 subgrants with MCEC and FRC. Instead, MDHS has pursued an administrative closeout while our partners at the OSA completed the single audit and continued the aforementioned ongoing criminal investigation. In December 2019, prior to the criminal indictment of six conspirators, then MDHS Executive Director CF and General Counsel AS met with the OSA to inquire, among other matters, about the extent and nature of the findings related to MCEC and FRC to determine if the agency should proceed with issuing additional subgrants to each entity. At that time, MDHS learned for the first time that the extent and nature of misconduct by some MCEC principals was serious and egregious enough to warrant suspension of all funding to that entity. Future funding was immediately suspended awaiting finalization of the single audit and criminal investigations. At that time, the OSA was completing the MCEC audit, and had not yet begun to inspect FRC. MDHS suspended funding to FRC at that time based on concerns raised by OSA about the practices of former Executive Director JD.

   MCEC: In early 2020, MDHS gave MCEC notice that all leases would be terminated, that all real property must be vacated by no later than March 31, 2020, and that all property, equipment, commodities, and any items purchased with MDHS grant monies must be returned to 750 North State Street. MDHS began to work with some MCEC personnel to inventory and secure all property at 750 North State Street. MDHS became aware, as a result of this OSA single audit report on April 22, 2020, of additional property allegedly purchased with federal grant funds. The alleged property was not reported on inventory lists produced by MCEC; MDHS is evaluating all legal options to pursue the additional property, including but not limited to a civil suit seeking assistance from the Mississippi Attorney General, FBI, and HHS-OIG.

   b. Responsible Party: General Counsel Andrea Sanders

   c. Anticipated completion date: Given the COVID-19 pandemic, it is impossible for MDHS to project a completion date for legal remedies at this time.

3) Procure an independent certified public accounting firm to conduct a widespread forensic audit of MDHS to determine the extent of fraud, waste and abuse in any other programs, as well as the TANF program, and of MCEC and FRC to support any attestation made by MDHS of the allowability of costs, and report any suspected criminal activity to the Mississippi Office of the State Auditor;

a. MDHS has begun the procurement process to conduct a widespread forensic audit spanning 1/1/16 through 12/31/19 as recommended by the OSA. On or about April 30, 2020, MDHS will send a Request for Information (RFI) to four nationally recognized Certified Public Accounting Firms with extensive experience in government fraud, waste and abuse auditing. Responses to the RFI are due thirty (30) days from the release date. Once the responses are received, a firm will be selected based on experience, capacity, and proposed cost. MDHS anticipates that the OSA will serve as a third party to the contract as a continuation of the ongoing cooperation between MDHS and OSA, and as an additional measure of transparency in the audit process. The RFI contemplates a 9-12 month timeframe for completion of the audit. Additionally, while the RFI limits the initial audit to TANF subgrants, it contains a provision to expand the audit into additional funding streams based on the findings and recommendations of the selected audit firm.

MDHS plans to share the findings as appropriate with federal oversight partners, the OSA, the Governor of the State of Mississippi, and any criminal prosecutorial authority as indicated. Additionally, MDHS plans to use all findings to continue to evaluate and strengthen the effectiveness of internal controls, and agency policies and procedures.

b. Responsible Party: Executive Director Robert G. Anderson

c. Anticipated completion date: Given that the RFI process has just begun and no forensic audit firm will be selected for at least another 30 days, it is impossible to project a completion date at this time.

4) Conduct internal investigations to determine how much former and current MDHS staff knew of and participated in the widespread fraud, waste and abuse, and report any suspected criminal activity to the Mississippi Office of the State Auditor;

a. The MDHS Office of Inspector General (OIG) initiated an internal investigation in the Spring of 2019. As indicated previously, the results of that investigation were reported by MDHS personnel to the Office of the Governor of Mississippi, and ultimately led to the current OSA criminal investigation. Since that time, the MDHS OIG and members of the Executive Management Team have continued to investigate and report information as it is found to the OSA.

The following key personnel changes have resulted from that investigation and the expanded investigation by the OSA:

1. On or about June 21, 2019, Governor PB suspended then Executive Director JD. JD's absence from the building allowed personnel at MDHS greater access to records, computers, and other electronic devices, all of which were secured, and immediately remitted to OSA investigators. Additionally, OSA investigators were given full access to MDHS email, accounts, internal records and correspondence. In early July 2019, JD announced his retirement effective July 31, 2019.

2. On August 1, 2019, CF, a retired FBI Special Agent in Charge, was named MDHS Executive Director. CF conducted his own internal investigation, and interviewed all Division Directors, Executive Director's Office personnel, and Executive Management Team. CF assembled a new Executive Management Team, including existing Deputy Executive Director of Program, moved the Inspector General to

Deputy Executive Director of Administration, appointed a new Inspector General, and created new positions of General Counsel and Special Assistant to the ED to assist with continued internal investigations. From July to September 2019, numerous personnel left the agency.

3. Governor TR was inaugurated January 14, 2020. Governor TR was briefed on the status of the ongoing investigation by the OSA and existing MDHS Executive Management Team.

4. March 4, 2020, RA was appointed as MDHS Executive Director by Governor TR, effective on March 16, 2020. RA was selected because of his extensive experience as a federal prosecutor and as a program integrity professional with extensive experience involving white collar crime, embezzlement, and public fraud, waste and abuse.

5. ED RA contracted with two retired investigators, one of them a former IRS CID agent and one a former investigator for a District Attorney's Office, to conduct an internal personnel investigation which includes, but is not limited to interviews of all Division Directors, Executive Management Team members, and other identified staff. That investigation is ongoing. All investigative reports will be made directly to ED RA. Expansion of the investigation will be at his discretion, and final reports will instruct all personnel decisions. ED RA will personally conduct interviews with all Executive Management Staff after the internal investigators make a final report. ED RA reviews all emails of internal staff if the internal investigation uncovers questionable actions taken by MDHS employees.

6. ED RA has completely redesigned the MDHS Executive Organizational Chart making the following changes:

   i. Created for the first time, an Office of Compliance, staffed with a Director with more than 20 years of experience in government compliance; a Policy Director; a senior attorney serving as the Civil Rights and Privacy Officer, and other support personnel.

   ii. Divided the responsibility of the Deputy Director of Programs into two positions to give each Director no more than three programs to administer, allowing for increased oversight and greater accountability of each program.

   iii. Additional changes may be made based on the completion of the internal investigation, internal interviews, e-mail review and observation of staff.

b. Responsible Party – Executive Director Robert G. Anderson

c. Anticipated completion date – completion of internal investigation set for May 15, 2020.

5) Strengthen existing controls to ensure full compliance with federal regulations;

MDHS concurs with this recommendation, and has taken or plans to take numerous measures to strengthen internal controls. This single audit was expanded to include FY2017 and FY 2018, therefore MDHS includes measures taken during or after the same timeframe. The measures include the following:

Creation of Office of Inspector General:

a. The Office of Inspector General (OIG) was created at the insistence of MDHS Deputy Executive Directors in response to concerns about irregularities in the contracting process, subrecipient award process, and claims payment directives coming from the Executive Director or his designees. OIG consolidated Program Integrity, Internal Audit, Quality Control, Monitoring, Administrative Appeals, and Investigations functions, and placed them under one Deputy Executive Director. Previously the functions had been separated and did not communicate with each other regularly, making it difficult to identify and respond to irregularities as they occurred. Once established, the OIG made key personnel changes, and revised processes within all functions.
b. Responsible Party: Deputy Executive Director David Barton
c. Completion Date:  August 2018

Internal Investigation Prior to JD's Departure:

a. Covert Internal Investigation initiated by OIG with cooperation of the Deputy Executive Director of Programs, the CFO, Senior Attorneys assigned to the Executive Deputy Directors, and others. The investigation culminated in evidence that was reported to the Governor in June 2019.
b. Responsible Party: Deputy Executive Directors David Barton and Jacob Black
c. Completion Date: June 2019

Ongoing Investigations:

a. Internal Investigation continued by OIG with cooperation of the Deputy Executive Director of Programs, the Deputy Executive Director of Administration, the CFO, Senior Attorneys assigned to the Executive Deputy Directors, and others. After departure of former Executive Director JD, these individuals acquired access to documents previously not available. Once referred to OSA investigators, all supplemental documents discovered were produced that contained volumes of documentary, electronic, video, and accounting evidence. More recently, these documents have been provided to the OSA single audit team. MDHS continues to provide any evidence as discovered.
b. Responsible Party: Deputy Executive Director David Barton and Inspector General Hadley Eisenberger
c. Anticipated completion date: This is an ongoing process and it is not possible to project a precise completion date at this time.

Strengthened Internal Controls:

    a. MDHS provided the following trainings to MDHS employees with most occurring after former Executive Director JD was no longer associated with MDHS: initial purchasing process training, follow-up purchasing process training, subgrantee training for TANF subgrants, procurement training for division directors, budget training, fact sheet training, internal Budgets and Accounting training that included DFA training with the contract, payroll, accounts payable and account receivable units, internal audit training on identifying and conducting risk assessments for the division directors and other trainings. Additionally, MDHS has strengthened procedures concerning tracking of procurement requests, invoices, travel costs, and bank reconciliations. MDHS also published an Internal Audit Plan for 2020, which will be conducted on an annual basis. Please also see responses to 2019-030 (6) and 2019-030 (7) below for additional corrective actions implemented in relation to this recommendation.

    b. Responsible Party: Executive Director Robert G. Anderson

    c. Anticipated completion date: This is an ongoing process as the specified trainings will occur on a more frequent cycle.

6) Procure adequate and appropriate training for all staff who monitor any federal allowable costs and activities;

    a. Effective May 1, 2020, MDHS will establish an Office of Compliance, which will have both an internal compliance function and an external compliance function. Part of the role of the new Office of Compliance will be to educate subrecipients of allowable costs and activities allowed by them under existing state and federal regulations. The Office of Compliance will work in tandem with OIG and will ultimately assume responsibility for the quality control functions involving both SNAP and TANF and the monitoring functions involving subrecipients in those programs while OIG focuses on internal audits, investigations and administrative hearings. Please also see responses to 2019-030 (5) and 2019-030 (7) for additional corrective actions implemented in relation to this recommendation.

    b. Responsible Party: Executive Director Robert G. Anderson and Chief Compliance Officer Sandra Griffith

    c. Anticipated completion date: May 1, 2020

7) Increase awareness in subrecipients of allowable cost and activities allowed regulations.

    a. Complete Revision of the Subgrant Manual that includes MDHS approval of lower-tiered subrecipients, allow sixty-day cash advance with cost reimbursement thereafter only after submission of monthly general ledgers. Internal risk assessment will be performed on all subgrants. Competitive procurement procedures will be used for TANF subgrants and MDHS will provide technical assistance for subgrants, with subgrantee attendance at annual training performed by MDHS or partners required.

b. Responsible Party:  Inspector General Hadley Eisenberger
c. Completion date: January 2020

**2019-031**  Strengthen Controls to Ensure Compliance with Allowable Cost Requirements of the Supplemental Nutrition Assistance Program (SNAP).

**Response:**  MDHS **partially concurs** with the finding.  The Agency concurs with the finding as it relates to the administrative costs of MCEC staff.  While the administrative costs of these staff were approved by FNS in the SNAP Employment and Training (E&T) State Plan, MCEC failed to keep required documents to support the allocation of the administrative costs of these employees.

The Agency does not concur with the questioned training costs paid per eligible student for training by KLLM in accordance with the agency's SNAP E&T State Plan.  MDHS staff served onsite at KLLM to determine SNAP eligibility for students in need of supplemental nutrition assistance and SNAP E&T eligibility for interested SNAP recipients.  MDHS also determined eligibility for reimbursement based on SNAP E&T participation.  MDHS then notified MCEC of students who were eligible to be included on the monthly billing roster.  The agency only reimbursed for eligible SNAP recipients participating in the E&T in accordance with the agency's SNAP E&T State Plan.

The total number of SNAP E&T participants trained by KLLM equaled 160 and this number multiplied by the federally approved reimbursement rate equals $671,872.99.

Corrective Action Plan:

a. For corrective steps related to proper monitoring of subrecipients such as MCEC, please refer to the agency's response to Finding 2019-030 above.  Also, MHDS has terminated the SNAP E&T agreement with MCEC effective February 10, 2020.
b. Responsible Party:  Work Force Development Director Sandra Giddy
c. Anticipated completion date:  The removal of MCEC as a subrecipient was effective February 10, 2020; other ongoing corrective measures and anticipated completion dates appear in the agency's response to Finding 2019-030 above and are incorporated herein.

**2019-032**  Controls Should Be Strengthened to Ensure Compliance with Allowable Cost Requirements of the TANF Program.

**Response:**  MDHS **partially concurs** with the Law of 16 finding, **partially concurs** with the Heart of David finding, and **concurs** with the Restore2/Recover2 finding.

Corrective Action Plan: Law of 16

a. MDHS did not agree with Law of 16 content or the actual training in general; however, hotel room costs are allowable and those costs were properly apportioned across the

Agency cost pool. MDHS does agree Law of 16 conference costs should have only been paid once against the TANF grant. MDHS also agrees that entertainment and branded items are not allowable costs. MDHS will implement training for MDHS staff and MDHS subgrantees regarding allowable TANF cost activities.

b. Responsible Party: CFO Bridgette Bell
c. Anticipated completion date: Please refer to MDHS response to 2019-030 above on all measures already taken by MDHS and all future corrective actions.

Corrective Action Plan: Heart of David (HOD)

a. MDHS does concur that the HOD subgrant lacked performance metrics. MDHS partially concurs that the HOD scope was inadequate. MDHS does concur that HOD did not provide certification of the restriction on conducting religious activities with federal monies. MDHS does concur that conflict of interest may exist due to prior Executive Director JD's personal relationship with an officer of HOD. MDHS updated its Subgrant Manual and subgrant process to address the above issues. MDHS will identify any faith-based organization during the award process and provide guidance on required documentation to ensure each subgrantee's certification of the restriction against conducting religious activities with federal monies. MDHS recovered ended its relationship with HOD on December 31, 2019, and has no other subgrant agreements with HOD. MDHS recovered property purchased by HOD through its MDHS subgrants at an estimated value of $39,000.

b. Responsible Party: CFO Bridgette Bell will be the point of contact on this CAP.
c. Completion Date: Please refer to MDHS response to 2019-030 above on all measures already taken by MDHS and all future corrective actions.

Corrective Action Plan: Restore2/Recover2

a. MDHS concurs with the Restore2/Recover2 finding. MDHS notes that "Recover2" was a typographical/clerical error that has been corrected. Since September 2019, MDHS implemented a requirement that procurement and contracting requests for personal services contracts be electronically submitted through a single point of entry (SPE) via SmartForm link. Through that requirement, any requests submitted through the SmartForm must be initiated only from the appropriate MDHS programmatic or administrative division level. Only properly submitted requests are received through this SPE originating from appropriate MDHS programmatic or administration divisions, then requests are processed for procurement. MDHS Executive Management level staff may not submit procurement and contracting requests for personal services contracts through this SPE.

In March 2019, MDHS provided training to MDHS Division Directors regarding State procurement laws and regulations as well as MDHS internal procurement processes. MDHS procurement staff have completed the Certified Mississippi Purchasing Agent training offered by the Mississippi Department of Finance & Administration's Office of Personal Service Contract Review Board (OPSCRB). MDHS plans to have all procurement staff trained and certified through this program by December 31, 2020, or as soon as practicably possible based on the OPSCRB training schedule.

b. Responsible Party: CFO Bridgette Bell

c. Completion Date: Please also refer to MDHS response to 2019-030 above on all measures already taken by MDHS and all future corrective actions for anticipated completion date.

**2019-033**   Controls Should be Strengthened to Ensure Compliance with Allowable Cost Requirements of the CCDF Cluster.

**Response:** MDHS **partially concurs** that controls should be strengthened to ensure compliance with eligibility and benefit payment requirements of the CCDF Cluster.

Corrective Action Plan: Eligibility Determination

    a. DECCD worked with MDHS OIG to establish a dedicated team of three staff reviewers and one supervisor who currently conducts 150 monthly case reviews as part of the standard operating procedure that commenced in September of 2018. Also in September of 2018, the OIG quality control team began holding monthly meetings with childcare supervisors to discuss staff errors, missing documentation, and any improper payments. The OIG quality control team worked with DECCD to develop an additional quality control review focusing on a provider review procedure that focuses on monitoring provider attendance records and copayments. This process involves OIG monitors going onsite to a provider's location to review attendance and copayment records. The monitoring procedures and the technology needed to support the monitoring process were fully implemented in December 2019. The monitoring was initiated and this process is currently being reviewed to determine how the process can be further scaled to expand the monitoring of providers. As a result of these steps including adding additional staff and developing new procedures to our quality control program, the payment error rate has decreased from 36.43% in FFY 2014, to 27.7% in FFY 2017 to 5.61% for FFY 2019, which is well below the allowable federal error rate of 10%. The steady decline in payment error rates indicates that the quality control program has made vast improvements and will continue to do so in the future.

    b. Responsible Party: Division Director of DECCD, Kristi McHale

    c. Anticipated completion date: The corrective action plan has already been implemented and will continue moving forward.

Corrective Action Plan: Subgrant Questioned Costs

    a. MDHS concurs that internal controls should be strengthened to ensure the expenditures charged under the grant are allowable and supported. DECCD has already taken corrective action by hiring Mary Littles, DECCD Director of Finance. She is specifically responsible for reviewing submitted claims forms and supporting documentation to ensure compliance.

    b. Responsible Party: Division Director of DECCD, Kristi McHale

    c. Anticipated completion date: This corrective action is already completed. Please also refer to MDHS response to 2019-030 for all measures already taken by MDHS and all future corrective actions.

**2019-034**  Strengthen Controls Over Review of Computations and Data for Allowable Cost Activity Used in the Manual Cost Allocation Process and Review of Indirect Costs Allocated to Federal Programs.

**Response:** MDHS **concurs** that controls need to be strengthened over review of computations and data for allowable cost activity used in the manual cost allocation process and review of indirect costs allocated to federal program.

Corrective Action Plan:

a.  MDHS is currently implementing new procedures to include automated cost allocation. Currently, those procedures are in the test phase.
b.  Responsible Party: CFO Bridgette Bell
c.  Anticipated completion date: October 1, 2020. Please also refer to MDHS response in 2019-030 on all measures already taken by MDHS and all future corrective actions.


**2019-035**  Controls Should Be Strengthened to Ensure Compliance with Cash Management Requirements of the TANF Program.

**Response:** MDHS **concurs** that controls should be strengthened to ensure compliance with cash management requirements of the TANF program.

Corrective Action Plan:

a.  Please refer to MDHS response in 2019-030 on all measures already taken by MDHS and all future corrective actions.
b.  Responsible Party: CFO Bridgette Bell
c.  Anticipated completion date: This is an ongoing process and it is not possible to project a precise completion date at this time.


**2019-036**  Controls Should Be Strengthened to Ensure Compliance with Eligibility and Benefit Payment Requirements of the CCDF Cluster.

**Response:** MDHS **concurs** that controls should be strengthened to ensure compliance with eligibility requirements of the CCDF Cluster.

Corrective Action Plan:

a.  The Division of Early Childhood Care and Development (DECCD) worked with the MDHS OIG to establish a dedicated team of three staff reviewers and one supervisor who currently conduct 150 monthly case reviews as part of the standard operating procedure that commenced in September 2018.  Also in September 2018, the OIG

quality control team began holding monthly meetings with childcare supervisors to discuss staff errors, missing documentation and any improper payments. The OIG quality control team worked with DECCD to develop an additional quality control review process focusing on a provider review procedure that requires monitoring provider attendance records and copayments. This process involves OIG monitoring personnel going onsite to a provider's location to review attendance and copayment records. The monitoring procedures and the technology needed to support the monitoring process were fully implemented in December 2019. The monitoring was initiated and this process is currently being reviewed to determine how the process can be further scaled to expand the monitoring of providers. As a result of these steps, including adding additional staff and developing new procedures to our quality control program, the payment error rate has decreased from 36.43% in FFY 2014, to 27.7% in FFY 2017 to 5.61% for FFY 2019, which is well below the allowable federal error rate of 10%. The steady decline in payment error rates indicates that the quality control program has made vast improvements and will continue to do so in the future.

b. Responsible Party: Division Director of DECCD, Kristi McHale
c. Anticipated completion date: The corrective action plan has already been implemented and will continue in place moving forward.

**2019-037:**  Controls Should Be Strengthened to Ensure Compliance with the Matching Requirements of the CCDF Cluster.

**Response:** MDHS **concurs** that controls should be strengthened to ensure compliance with the matching requirements of the CCDF Cluster.

Corrective Action Plan:

a. The CCDF Cluster enters into subgrant agreements, also called slot agreements under an RFP issued in 2015. The agreements require a 25% match, which may be met by an in-kind match. DECCD will request supporting documentation from the current slot providers. The slot agreements will expire on August 31, 2020 and the program does not intend to issue new slot programs at this time.
b. Responsible Party: Division Director of DECCD, Kristi McHale, and CFO Bridgette Bell
c. Anticipated completion date: October 1, 2020. Please also refer to MDHS response in 2019-030 on all measures already taken by MDHS and all future corrective actions.

**2019-038**  Controls Should Be Strengthened to Ensure Compliance with the Period of Performance for the CCDF program.

**Response:** MDHS **concurs** that controls should be strengthened to ensure compliance with the period of performance for the CCDF program.

Corrective Action Plan:

    a. Correspondence will be sent to all subgrants that fit this category that new procedures will be implemented concerning subgrantee closeouts to be submitted in a shorter timeframe for the agency to adequately meet liquidation period.

    b. Responsible Party: Division Director of DECCD, Kristi McHale, and CFO Bridgette Bell

    c. Anticipated completion date: October 1, 2020. Please also refer to MDHS response in 2019-030 on all measures already taken by MDHS and all future corrective actions.

## 2019-039    Strengthen Controls Over Procurement Policies and Awarding Subgrants for the TANF Program.

**Response:** MDHS **concurs** that it needs to strengthen controls over procurement policies and awarding subgrants for the TANF program.

Corrective Action Plan:

    a. Since September 2019, MDHS implemented a requirement that procurement and contracting requests for personal services contracts be electronically submitted through a single point of entry (SPE) via SmartForm link. Through that requirement, any requests submitted through the SmartForm must be initiated only from the appropriate MDHS programmatic or administrative division level. Only properly submitted requests sent through this SPE originating from appropriate MDHS programmatic or administrative divisions are processed for procurement. MDHS Executive level staff may not submit procurement and contracting requests for personal services contracts through this SPE.

    In March 2019, MDHS provided training to MDHS Division Directors regarding State procurement laws and regulations as well as MDHS internal procurement processes. MDHS procurement staff have completed the Certified Mississippi Purchasing Agent training offered by the Mississippi Department of Finance & Administration's Office of Personal Service Contract Review Board (OPSCRB). MDHS plans to have all procurement staff trained and certified through this program by December 31, 2020 or as soon as practicably possible based on the OPSCRB training schedule.

    b. Responsible Party: CFO Bridgette Bell

    c. Anticipated completion date: December 31, 2020. Please also refer to MDHS response in 2019-030 on all measures already taken by MDHS and all future corrective actions.

## 2019-040    Controls Should Be Strengthened Over Procurement of Subrecipients for SNAP.

**Response:** MDHS **concurs** with the finding due to information recently brought to the attention of the agency after the management response was completed and agrees with the need for written policies related to the assessment of Skills2Work partners.

Corrective Action Plan:

    a. The agency will prepare written policies and procedures for the procurement process for the Skills2Work program.
    b. Responsible Party:  Work Force Development Director, Sandra Giddy
    c. Anticipated completion date:  October 1, 2020.  Please refer to MDHS response to 2019-30 above on all measures already taken by MDHS and all future corrections action.

**2019-041**    <u>Controls Should Be Strengthened over the Submission of Required Federal Reports for the TANF Program.</u>

**Response:**  MDHS **partially concurs** that controls should be strengthened over the submission of required federal reports for the TANF program.

Corrective Action Plan:

    a. MDHS disagrees that the submission of the T-199 report, QE on December 31, 2018, was done so untimely. MDHS submitted said report by the due date; however, ACF failed to respond to the submission of the report until July 2019. At that time, ACF notified the agency that ACF failed to have all required data needed for submission. Thus, at that time MDHS amended the original submission. Supporting documentation was provided in the management response regarding this finding.

       MDHS does agree that the T-199 report, QE on June 30, 2019 was provided six (6) days late due to an employee responsible for submitting the data file excused from work due to jury duty. Upon his return, said report was submitted. New procedures have been established to ensure multiple employees know the process.
    b. Responsible Party: Economic Assistance Division Director, Mark Williamson, and Chief Information Officer, Mark Allen
    c. Anticipated completion date: June 30, 2020

**2019-042**    <u>Controls Should be Strengthened over On-Site Monitoring for SNAP, TANF, CCDF, LIHEAP, and SSBG Programs.</u>

**Response:**  MDHS **concurs** that controls should be strengthened over On-Site monitoring for SNAP, TANF, CCDF, LIHEAP, and SSBG Programs.

Corrective Action Plan:

    a. Please refer to MDHS response in 2019-030 on all measures already taken by MDHS and all future corrective actions.
    b. Responsible Party: Chief Compliance Officer, Sandra Griffith, and Inspector General, Hadley Eisenberger
    c. Anticipated completion date: May 1, 2021, along with measures in response to 2019-30.

**2019-043**     Strengthen Controls Over Subrecipient Monitoring to Ensure Compliance with OMB Uniform Guidance Auditing Requirements.

**Response:**  MDHS **concurs** that it needs strengthen controls over subrecipient monitoring to ensure compliance with OMB Uniform Guidance auditing requirements.

Corrective Action Plan:

a. Please refer to MDHS response in 2019-030 on all measures already taken by MDHS and all future corrective actions.
b. Responsible Party: Chief Compliance Officer, Sandra Griffith, and Inspector General, Hadley Eisenberger
c. Anticipated completion date: May 1, 2021. Please refer to MDHS response to 2019-30 above on all measures already taken by MDHS and all future corrections action.

**2019-044**     Controls Should Be Strengthened over the Review of Foster Care Maintenance Payment Rates and the Calculation of Foster Care Maintenance Payments.

**Response:**  On behalf of CPS, MDHS **concurs** that controls should be strengthened over the review of foster care maintenance payment rates and the calculation of foster care maintenance payments.

Corrective Action Plan:

a. In addition to the individual case reviews in place, MDCPS will put a secondary review in place to ensure a multi-level review of the rates being entered into MACWIS. Additionally, MDCPS will put at least an annual test of MACWIS in place to ensure the system is processing payments correctly.  This test will include a review of sample payments to ensure payments were calculated correctly by the system.
b. Responsible Party:  MDCPS, Kris Jones
c. Anticipated completion date:  October 1, 2020

Although this has been a tedious and lengthy undertaking, we appreciate the cooperative process and attention to detail demonstrated during the audit work conducted by Stephanie Palmertree and other field staff throughout the audit.  As noted earlier, these findings and the corrective actions set forth herein will be critical to the Mississippi Department of Human Services' efforts to regain control of internal operations and restore trust in the agency's mission of providing crucial assistance to Mississippi's most vulnerable population.

Sincerely,

*Robert G. Anderson*

Robert G. Anderson
Executive Director
RGA: mm

(This page left blank intentionally.)



**STATE OF MISSISSIPPI**
**OFFICE OF THE STATE AUDITOR**
**SHAD WHITE**
**STATE AUDITOR**

**Auditor's note to the Corrective Action Plan from Mississippi Department of Human Services (MDHS) Management**

**Activities Allowed/Allowable Costs - *Material Weakness/Material Noncompliance***

**2019 – 031**     **Strengthen Controls to Ensure Compliance with Allowable Cost Requirements of the Supplemental Nutrition Assistance Program (SNAP)**

During the course of the audit, no documentation to support MDHS' assertions regarding the eligibility of participants was provided to auditors.  However, audit finding questions the amount paid to MCEC due to known fraud, waste, and abuse; fabricated documentation; and unreasonableness of cost allocations, not due to ineligibility of participants in the program.  In that regard, MDHS concurred with the finding.

When MDHS Management was first notified of this finding, the only supporting information available was copies of payment requests made by MCEC that auditor was able to verify did not agree to the underlying accounting records.  Audit finding questions the amount paid to MCEC due to known fraud, waste, and abuse; fabricated documentation; and unreasonableness of cost allocations.

**Activities Allowed/Allowable Costs - *Material Weakness/Material Noncompliance***

**2019 – 032**     **Controls Should Be Strengthened to Ensure Compliance with Allowable Cost Requirements of the TANF Program.**

Auditor agrees that hotel rooms are an allowable expense in the typical performance of an award; however, auditor questioned the reasonableness and necessity of the "Law of 16" Conferences, and the improper allocation treatment of an employee morale expense.  As the conferences themselves were unreasonable and unnecessary for the performance of the award, any expense associated is also considered unreasonable and unnecessary.  Therefore, the hotel room charges are questioned costs.

The scope of the Heart of David (HOD) awards lacked any specific actions to be taken by HOD staff, the anticipated audience for the project, and was void of any correlation to how the project would benefit individuals eligible for or receiving TANF benefits. Auditor does not believe the scope to be adequate.

**Activities Allowed/Allowable Costs - *Material Weakness/Material Noncompliance***

**2019 – 033**     **Controls Should Be Strengthened to Ensure Compliance with Allowable Cost Requirements of the CCDF Cluster.**

The majority of the questioned costs in this finding relate specifically to MCEC and FRC and the known fraud, waste, and abuse perpetrated by the subrecipients.  As stated in the finding, the entities commingled funds and were unable to provide sufficient documentation to support that expenses incurred were made in the performance of the award.  MDHS concurred with these questioned costs in the Corrective Action Report.  The remaining known questioned costs is minimal; however, the projected questioned costs on the allowability of CCDF payments to recipients exceeds $1,000,000.  While the error rate has improved since 2014, and is below the allowable federal error rate, the projected (likely) questioned costs is still significant and material.

**Reporting – *Significant Deficiency***

**2019 –041**     **Strengthen Controls to Ensure Compliance with Allowable Cost Requirements of the Supplemental Nutrition Assistance Program (SNAP)**

By MDHS' own admission in the Corrective Action Plan, ACF notified MDHS that the initial submission was not complete; therefore, controls in place at MDHS to ensure timely **and complete** submissions of required data failed and should be reviewed with scrutiny to determine how the required data was omitted.

**Melinda L. McGrath**
Executive Director

*P. O. Box 1850*
*Jackson, MS 39215-1850*
*Telephone (601) 359-7249*
*FAX (601) 359-7050*
*GoMDOT.com*



**Brian D. Ratliff**
Deputy Executive Director/Chief Engineer
**Lisa M. Hancock**
Deputy Executive Director/Administration
**Willie Huff**
Director, Office of Enforcement
**Charles R. Carr**
Director, Office of Intermodal Planning

## SINGLE AUDIT FINDINGS

March 26, 2020

Shad White, State Auditor
Office of the State Auditor
State of Mississippi
P.O. Box 956
Jackson, MS 39205-0956

Dear Mr. White:

We have received the Single Audit Management Report and the following details our response to the Audit Findings for fiscal year 2019:

**AUDIT FINDINGS:**

**CFDA**
**Number**          **20.205 – Highway Planning and Construction**

**Compliance**
**Requirement  Subrecipient Monitoring**

**2019-020**       **Controls Should Be Strengthened to Ensure Compliance with Subrecipient Monitoring Requirements**

**Response:**     We concur that we were collecting audit reports only from those subrecipients meeting the threshold requirement of $750,000 when expending US DOT dollars under CFDA number 20.205 designated as pass-through funds of the Mississippi Department of Transportation (MDOT).    MDOT acknowledges it is the subrecipients' responsibility to submit the single audit report package directly to the federal audit clearinghouse (FAC) within the submission provisions of Subpart F of the uniform grant guidance and has implemented appropriate measures to monitor compliance of all subrecipients' meeting the threshold requirement of $750,000 when expending any federal dollars.

It is important to note that in addition to the collection of audit reports, MDOT performs numerous monitoring internal controls throughout a subrecipients' federal award lifecycle to reduce the risk of waste, fraud and abuse.   These controls include pre-award and post-award (including audit and close-out) and are outlined in the Project Development Manual (PDM) for Local Public Agencies (LPA), which has been approved by the Mississippi Division of the Federal Highway Administration.   These controls are applied to all LPA subrecipients,

*Transportation: The Driving Force of a Strong Economy*

Shad White, State Auditor
Single Audit Finding
Page **2** of **4**

regardless if a single audit report is required. We believe these controls adequately and effectively monitor the administration of federal funds.

**Corrective Action Plan:**

A. In July 2019, the Director of Internal Audit implemented procedures, detailed below, to address the finding. The instances of non-verification occurred prior to July 2019. Therefore, no additional corrective action is needed.

MDOT developed Single Audit Certification letters to monitor the LPA audit reports for the year ended September 30, 2018. These hardcopy letters were mailed manually to the LPA who have completed and returned to MDOT.

To monitor LPA audit reports for the year ended September 30, 2019 and forward, MDOT has developed an electronic Single Audit Certification letter. The electronic version will address both aspects of the finding by requiring an acknowledgment from the LPA on whether or not a single audit is required based on their incurred federal expenditures. If a single audit is required, the certification letter will indicate that support showing the audit has been accepted by the federal audit clearinghouse (FAC) within the earlier of 30 days after receipt of the CPA's audit report or nine months after the end of the audit period (LPA's fiscal year) should be attached. The subaward agreement documents and the Project Development Manual will be revised accordingly.

MDOT has worked closely with the Federal Highway Administration (FHWA) division office to develop this certification letter.

B. Emily Harrington, CPA – Deputy Director of Internal Audit and Lee Frederick, PE – State LPA Engineer

C. For LPA audit reports for the year ended September 30, 2018, the corrective action plan has been implemented and the monitoring process has been completed.

For LPA audit reports for the year ended September 30, 2019 and forward, we expect the electronic certification letter to be implemented no later than June 30, 2020, pending FHWA approval. The revisions to the subaward documents and the LPA Project Development Manual will be completed by June 30, 2020.

MDOT has also implemented a new procedure as part of our LPA pre-award risk assessment which verifies that a single audit reporting package submitted with an LPA's application packet has been accepted by the FAC, if applicable.

Shad White, State Auditor
Single Audit Finding
Page **3** of **4**

**CFDA
Number**      **20.205 – Highway Planning and Construction**

**Compliance
Requirement Special Test & Provisions – Wage Rate**

**2019-021**     <u>**Controls Should Be Strengthened to Ensure Compliance with Wage Rate
Requirements**</u>

**Response:**    MDOT concurs with this finding.

**Corrective Action Plan:**

      A. Contract Administration will strengthen its controls to ensure that Section 110
of the Mississippi Standard Specification for Road and Bridge Construction
(2017) is being followed by MDOT Project Engineers. In addition, Contract
Administration will evaluate payroll submittals for each estimate received
prior to processing an estimate for payment. If a payroll is missing, as defined
in Section 110, Contract Administration staff will return the estimate to the
Project Engineer with information outlining what payrolls are missing. The
Project Engineer is responsible for holding the estimate payment and
communicating the delinquent payroll information to the contractor. Contract
Administration will not process an estimate for payment with delinquent
payrolls.

      B. Paul Campbell, Compliance Officer

      C. February 3, 2020

**CFDA
Number**      **20.205 – Highway Planning and Construction**

**Compliance
Requirement Special Test & Provisions – Quality Assurance Program**

**2019-022**     <u>**Controls Should Be Strengthened Over Special Test Requirements Related to
the Quality Assurance Program**</u>

**Response:**    MDOT concurs with this finding.

**Corrective Action Plan:**

      A. The proper procedures to verify all samples are authorized have been re-
emphasized with District Materials and Materials Division staff. Certificate of
Materials and Tests will not be issued until all samples are authorized.

Shad White, State Auditor
Single Audit Finding
Page **4** of **4**

District personnel involved with improperly adjusting sampling frequencies have been contacted and informed of proper procedures. Materials Division staff has been trained on how to check if sampling frequencies have been altered. This additional check will be incorporated into Materials Division's job closing checklist.

B. Alan Kegley, Deputy Director of Materials

C. April 1, 2020

Sincerely,

Melinda L. McGrath, PE
Executive Director

MLM: trb

cc:     Lisa Hancock, CPA - Deputy Executive Director/Administration
        Brian Ratliff, PE - Deputy Executive Director/Chief Engineer

OFFICE OF THE GOVERNOR

Walter Sillers Building  |  550 High Street, Suite 1000  |  Jackson, Mississippi 39201



MISSISSIPPI DIVISION OF
**MEDICAID**

## **SINGLE AUDIT FINDINGS**

The Honorable Shad White                                                          April 29, 2020
Mississippi Office of the State Auditor
P. O. Box 956
Jackson, MS  39205-0956

Dear Mr. White:

We have reviewed the single audit findings below in reference to our fiscal year 2019 audit.  Listed below are our individual responses and plans for corrective action:

**AUDIT FINDING:**

CFDA Number  93.767 – Children's Health Insurance Program (CHIP)
                    93.778 – Medical Assistance Program (Medicaid; Title XIX)

Compliance Requirement:  Eligibility

2019-027     Controls Should Be Strengthened to Ensure Compliance with Eligibility Requirements
             of the Medical Assistance Program and the Children's Health Insurance Program
             (CHIP).

**Response:**
The Division of Medicaid (DOM) does not fully concur with the audit finding.  Using tax data more extensively would help inform eligibility decisions, and a more complete picture of each Medicaid applicant's past financial condition could help advance DOM's ongoing effort to ensure everyone receiving benefits is actually eligible for them.

But DOM does not believe the State Auditor's (OSA's) testing supports a finding of a material weakness in internal control during the audit period. Of the 180 samples reviewed, 176 of them – or approximately 98% – did not identify self-employment income on a 2018 income tax return that could have elevated income above the eligibility threshold. And in the four outlier cases, the 2018 tax return data would not have impacted the recipient's Medicaid eligibility during State Fiscal Year 2019.

Eligibility determinations for three of the four questioned recipients were completed on September 24, 2018; September 25, 2018; and January 25, 2019. An eligibility determination for the fourth recipient was ongoing during the June 2019 sample month. The 2018 tax return covers the period of January 1, 2018 to December 31, 2018. The IRS began processing 2018 tax returns on January 28, 2019.[1] As such, 2018 tax return data would not have been available to DOM for the State Fiscal Year 2019 eligibility determinations for three of the four recipients. The fourth recipient, a low-income

---
[1] https://www.irs.gov/newsroom/irs-confirms-tax-filing-season-to-begin-january-28

Division of Medicaid Response Letter to Office of the State Auditor
April 29, 2020
Page 2

parent caretaker in category of eligibility 075, may have been pregnant during the sample month. If DOM had access to that recipient's 2018 state tax return, and if the mandatory follow-up with that recipient confirmed the recipient's income now exceeded the 27% federal poverty level threshold for a low-income parent caretaker, then the recipient almost certainly would have remained Medicaid-eligible. This recipient would have transitioned from category of eligibility 075 to category of eligibility 088, the eligibility category for pregnant women earning up to 185% of the federal poverty level. Transitioning the recipient from the low-income parent caretaker category of eligibility to the pregnant woman category of eligibility would have cost the state an additional $100 per month in capitation payments to the recipient's coordinated care organization. Alternatively, if the recipient was not pregnant during the determination period, the recipient still likely would have been eligible for transitional medical assistance, an extended Medicaid eligibility category mandated by Section 1925 of the Social Security Act.

The OSA's management letter asserted that "[t]he fiscal year capitation payments for these four recipients that would not have been eligible to receive the benefits totaled approximately $23,628." But the use of tax data only indicates that further information should have been requested from the recipient. This information was not requested from the recipient for review, so the OSA does not know the recipients were actually ineligible.

Given the inapplicability of the 2018 tax returns and the fact that the OSA review did not determine that any recipient was actually ineligible, a report of any known questioned costs in State Fiscal Year 2019 appears to be unwarranted. But if there are known questioned costs, and if it is reasonable to report known questioned costs that fall below the $25,000 reporting threshold in 2 CFR § 200.516, then those known questioned costs should have been reduced to under $2,000. Known questioned costs should have been limited to the sample month rather than being annualized, particularly given that at least one of the four recipients at issue was not enrolled in Medicaid for all twelve months of the State Fiscal Year 2019 audit period.

Furthermore, the extrapolation of known costs for the four questioned recipients is overinflated. DOM believes the OSA projection is inflated by at least 110%. The member months for the SSI disabled, foster care, disabled child living at home, and other non-MAGI categories of eligibility should be excluded since the entire sample consists of MAGI cases. Additionally, the $80 per member per month (PMPM) allowance to the monthly capitation rate for hospital supplemental payments should be excluded. The supplemental payment add-on is not enrollment-based and would be redistributed to the capitation payments of remaining eligible recipients if a recipient lost Medicaid eligibility. Applying the OSA's existing extrapolation methodology to the adjusted MAGI-only member months and an adjusted blended PMPM reduces the projection substantially.

The OSA management letter indicates that without federal tax and/or state tax data, the agency cannot determine if self-attested income is complete and accurate. But with tax data, the agency cannot necessarily determine income eligibility conclusively. Because of its nature as a prior year reporting of income, tax records cannot and do not provide a complete and accurate picture of income for Medicaid eligibility determinations, nor do these records ensure an appropriate eligibility determination. The circumstances for the applicant may have changed in many ways since the end of the prior calendar year. The tax data may indicate other income, but that simply means that DOM would ask the applicant for further information which would then be used for the final eligibility determination. The presence of self-employment or any other income on a prior year tax return exceeding the applicable income limit does ***not*** mean the applicant is ineligible. Financial

Division of Medicaid Response Letter to Office of the State Auditor
April 29, 2020
Page 3

eligibility is based on current monthly household income and family size with reasonably predictable changes considered in future income and/or family size. This certainly does not mean that tax data should be ignored or its value minimized. Tax data may not be a panacea, but it is a potentially helpful tool.

**Corrective Action Plan:**

A. In April 2020, the DOM entered into a contract amendment with its fiscal agent to include use of the Federal Data Services Hub for asset and income data. The system modifications may be completed as early as December 29, 2020. Proper use of this data will be incorporated into the *Mississippi Division of Medicaid Eligibility Policy and Procedures Manual*.

B. Janis Bond

C. As early as December 29, 2020

**AUDIT FINDING:**

CFDA Number – 93.778 – Medical Assistance Program (Medicaid: Title XIX)

Compliance Requirement – Special Test & Provisions

2019-028     Controls Should be Strengthened to Ensure Compliance with ADP Risk Analysis and System Security Review Requirements.

**Response:** The Mississippi Division of Medicaid (DOM) acknowledges the need to strengthen internal controls to ensure compliance with the ADP risk analysis and system security review requirements. Further, DOM acknowledges that Service Organization Control (SOC) reports are not sufficient to meet the ADP Risk Analysis requirement.

**Corrective Action Plan**

A. Because DOM lacks sufficient resources with the appropriate skill sets to establish and maintain a program for conducting periodic risk analyses, we are actively pursuing the procurement of managed security services. DOM will procure managed security services through Information Technology Services' Managed Service Provider, Knowledge Services, dba GuideSoft. The managed security services vendor will assist DOM in strengthening controls necessary to achieve and maintain compliance with ADP risk analysis and system security review requirements.

While DOM was targeting to award and onboard a managed security services vendor by the end of calendar year 2019, this was delayed due to the unfortunate deaths of our Procurement Resource and subsequently our Security Officer. We have hired another Procurement Resource who has drafted a Managed Security Services Statement of Work.

Division of Medicaid Response Letter to Office of the State Auditor
April 29, 2020
Page 4

We will be extending an offer of employment to our selected Security Officer candidate within the next two weeks.

We are planning to have our new Security Officer begin work at DOM as soon as possible, which we anticipate will be mid-to-late June 2020. The new Security Officer will review the Managed Security Services Statement of Work and assist IT procurement with the necessary modifications to finalize the procurement document. We understand that time is of the essence and will work diligently to pull these timeframes in wherever possible.

B. iTECH Procurement Staff (Patti Igrens, Grant Banks) and iTECH Technical and Oversight Staff (Brad Estess, new Security Officer, Sheila Kearney)

C. DOM is targeting to award and onboard a managed security services vendor by the end of calendar year 2020.


**AUDIT FINDING:**

CFDA Number – 93.796 – State Survey and Certification of Health Care Providers and
                    Suppliers (Title XIX) Medicaid

Compliance Requirement:  Special Test & Provisions

2019-029    <u>Controls Should be Strengthened to Ensure Compliance with Provider Health and Safety Standards Requirements.</u>

**Response:**  The Mississippi Division of Medicaid (DOM) does concur with this finding. The Long-Term Care (LTC) facilities did not have the mandatory health and safety survey performed within the required 15 months of the survey period.

**Corrective Action Plan:**

A. Mississippi State Department of Health will provide to DOM a "Health Care Provider and Suppliers-State Survey Certification" form on a monthly basis.

B. LaShunda Woods

C. July 1, 2019


Sincerely,

Drew L. Snyder
Executive Director



**STATE OF MISSISSIPPI**
**OFFICE OF THE STATE AUDITOR**
**SHAD WHITE**
**STATE AUDITOR**

**Auditor's note to the Corrective Action Plan from Mississippi Division of Medicaid (MDOM) Management**

**Division of Medicaid – Eligibility - *Material Weakness/Material Noncompliance***

<u>**2019 – 027**</u>     **Controls Should Be Strengthened to Ensure Compliance with Eligibility Requirements of the Medical Assistance Program and the Children's Health Insurance Program**

*Material Weakness Determination*
MDOM's Corrective Action Plan does not consider the implications of not verifying "self-attested" income data when determining eligibility of Medicaid recipients.  While auditor found only four recipients with income that exceeded modified adjusted gross income (MAGI) limits, auditor verified that MDOM did not have a process in place to verify any self-employment income reported in the initial application or redetermination phase that was in accordance with their State Plan.  Out of 180 individuals tested by auditor, 18 (or ten percent) did not report any self-employment income to MDOM but reported it on his or her 2018 tax return.  While these individuals are potentially eligible, MDOM was completely unaware that the self-attested income on the application was incorrect.

Additionally, the Medicaid State Plan requires the verification of all income for MAGI-based eligibility determinations, and MDOM's *Eligibility Policy and Procedure Manual (Section 201.03.04a)* requires the use of an individual's most recent tax return to verify self-employment income.  This section further states, if tax returns are not filed, not available, or if there is a change in income anticipated for the current tax year, refer to Chapter 200, Net Earnings from Self-Employment at 200.09.08, for policy on estimating net earnings from self-employment.  The MDOM's State Plan does not allow for accepting self-attested income.  Therefore, if an applicant indicates zero for self-employment income, the amount of zero must be verified like any other income amount.  Auditor considered MDOM's lack of compliance with the Medicaid State Plan, MDOM's own policies and procedures, and the ten percent error rate as factors when determining the magnitude of MDOM's noncompliance.  The definition of a material weakness in internal control over compliance is a deficiency, or combination of deficiencies, in internal control over compliance, such that there is a **reasonable possibility** that material noncompliance with a type of compliance requirement of a federal program will not be prevented, or detected and corrected on a timely basis.  As the ten percent error rate suggests, it was not only reasonably possible that noncompliance occurred, it was verified by auditors that noncompliance occurred.

*Eligibility Determinations*
While OSA acknowledges that the self-employment income reported on the 2018 income tax returns does not, in and of itself, make the four sited recipients ineligible, it does indicate that they had self-employment income during the year of eligibility determination that was, potentially, not accurately reported on their application. Furthermore, MDOM did not perform any procedures to verify that the self-employment income reported on the applications was accurate.  As MDOM stated in the Corrective Action Plan, personnel at MDOM still are unaware if the four individuals are in fact eligible for assistance.  MDOM provided some "possible" scenarios that would make the individuals eligible, but, due to the lack of compliance with stated policies and procedures, MDOM cannot say with any certainty that the payments are allowable, which is the reason the payments are considered questioned costs.
As explained to MDOM by auditors during the audit, the audit procedures performed were not intended to prove whether all Medicaid recipients were either eligible or ineligible, but to verify that MDOM followed policies when

making eligibility determinations.  In these four instances specifically, auditor was able to demonstrate that MDOM did not have enough information to make an eligibility determination.  Auditor concurs that OSA is not able to know the recipients were actually ineligible; conversely, MDOM is not able to know the recipients are actually eligible due to their own failed compliance with policies.  Eligibility for these individuals is, at best, questionable, which is why the payments made are questioned costs.  Auditor also concurs that 2018 tax returns may not have been available at the time of three of the four eligibility determinations; however, MDOM could have used the most recent tax return available, which would have been the 2017 tax return.  Auditor was able to verify that three of the four individuals had self-employment income on the 2017 returns as well, thereby negating MDOM's argument regarding the use of the 2018 returns.  For the fourth beneficiary, the June 2019 eligibility determination was a redetermination of a previous eligibility determination.  The individual's 2017 tax return reflected self-employment income that was not reported to MDOM at the time of the initial eligibility determination.  This income would have made the individual ineligible for Medicaid.  Additionally, for the redetermination in 2019, the 2018 tax return would have been the most recent tax return filed, and, therefore, should have been used to make an eligibility redetermination. For this beneficiary, the MDOM gives examples of why this individual may have been eligible even with including the self-employment income; however, they used inconclusive words such as, "may have been pregnant" and "likely would have been eligible", thus signifying again that MDOM themselves are unaware if the beneficiary is actually eligible.   In fact, auditors were able to verify that the individual's eligibility case file contained no indication that she was pregnant, negating MDOM's argument.

*Questioned Costs/Projected Costs*

MDOM does not appear to understand the concept of "Questioned Costs", as evidenced by their response in the Corrective Action Plan.  Questioned costs, by definition in the *Code of Federal Regulations Part 200.84,* are any costs that, at the time of audit, are not supported by adequate documentation.  It is entirely possible that a cost questioned by the auditor would be allowable under federal review; however, if the documentation does not exist or does not support the cost, auditors are required by governmental auditing standards to question it.  As stated above, MDOM did not have enough information at the time of audit to support the eligibility determinations made by MDOM personnel.  In regards to the extrapolation of the error rate, auditors are required to report to the awarding agency (the Department of Health and Human Services) known **and likely** questioned costs.  By sampling and testing, auditor was able to identify $23,628 in known questioned costs.  Using statistical projection, based on a confidence rate of 95 percent, auditor can confidently report likely questioned costs exceeding $64 million dollars.  In order to report these projected costs confidently, auditor used varying statistical analysis to project the error.  MDOM specifically mentions certain types of eligibility that should be excluded from the population that is extrapolated and that only MAGI eligible participants should be included in that population.  It is important to note that auditor did exclude those specific types, and that the population used was only MAGI eligible participants, negating MDOM's argument that the projection is overinflated.  Moreover, the $64 million is actually the **most conservative extrapolation** of questioned costs.  In fact, likely questioned costs could fall somewhere between $64 million and $144 million.  While those amounts do sound extreme, the projection is based on actual numbers and is statistically accurate and valid.

*Tax Return Data Overall*

Auditor is not in a position to decide or to weigh the validity of using tax return data in eligibility determinations.  That decision is left in the hands of the Federal entities responsible for granting MDOM awards, and MDOM themselves when they established the Medicaid State Plan and the Eligibility manual.   The federal Department of Health and Human Services requested auditors redetermine eligibility using tax return data for 2019 fiscal year audits.   Auditors have followed all requirements to test MDOM's procedures and compliance, including the requirement to use tax return data to redetermine eligibility.  Because MDOM cannot, in fact, show that they followed their policy and procedures to verify the self-employment income and have admitted through their response that they themselves are not certain that they are in fact eligible recipients, we maintain our position that a material weakness and material noncompliance exists with significant potential questioned costs.



# State of Mississippi

**TATE REEVES**
Governor

## MISSISSIPPI EMERGENCY MANAGEMENT AGENCY

GREGORY S. MICHEL
EXECUTIVE DIRECTOR

Single Audit Findings

April 22, 2020

Honorable Shad White, State Auditor
Office of the State Auditor
State of Mississippi
Attn: Jason Ashley
P. O. Box 956
Jackson, MS  39205-0856

Dear Mr. White:

We have reviewed the audit findings below in reference to the Mississippi Emergency Management Agency 2019 fiscal year audit. Listed below is our individual response and plan for corrective action:

**Findings:**

**ALLOWABLE COST/ACTIVITIES ALLOWED**

| | |
|---|---|
| **2019-023** | Controls Should be Strengthened to Ensure Federal Costs are Properly Reviewed, Approved and Eligible Prior to Reimbursement |
| **CFDA Number** | 97.039 – Hazard Mitigation Grant Program |
| **Federal Award No.** | DR-MS-1604 |
| **Federal Agency** | U. S. Department of Homeland Security |
| **Pass-through Entity** | N/A |
| **Questioned Costs** | $173,077 |

**Response:**          Concur

**Corrective Action Plan:**

This was an isolated incident that happened due to an employee that circumvented the proper procedures.  This employee is no longer employed with the Agency.  The

POST OFFICE BOX 5644 • PEARL, MISSISSIPPI 39288-5644 • PHONE: 601-933-MEMA
EMERGENCY 1-800-222-6362 (24 HOUR)
TDD 1-800-445-6362

373

Honorable Shad White, State Auditor
April 22, 2020
Page 2

Mississippi Emergency Management Agency has two levels of approvals for financial transactions. The Agency intends to implement an internal audit process that will assist in finding these instances.

## CASH MANAGEMENT

**2019-024**     Controls Should Be Strengthened to Ensure Compliance with Federal Revenue Draw Requirements.
**CFDA Number**    97.039 – Hazard Mitigation Grant Program
**Federal Award No.** DR-MS-1604; DR-MS-4175
**Federal Agency**   U.S Department of Homeland Security
**Pass Through Entity** N/A
**Questioned Costs**  None

**Response:**       Concur

**Corrective Action Plan:**
Draws for administrative costs will be processed quarterly. A breakdown detailing the calculation must be submitted each month by the programmatic office. Support Services Grants will provide a rollup of all Administrative expenses paid for the quarter to the programmatic office for review. After review, the Programmatic office will submit the reimbursement amount for approval of the amount by FEMA. After FEMA approval, the Programmatic office will submit the expense reimbursement through the proper chain of command for approval of draw. Finally, Support Services will notify the Programmatic office of receipt of the request and upon completion of the draw.

## SUBRECIPIENT MONITORING

**2019-025**     Controls Should be Strengthened to Ensure Compliance over Subrecipient Monitoring of OMB Uniform Guidance Audits.
**CFDA Number**    97.039 – Hazard Mitigation Grant Program
**Federal Award No.** DR-MS-1604          DR-MS-1916
                      DR-MS-4175          DR-MS-4268
                      DR-MS-4248          DR-MS-4295
**Federal Agency**   U.S Department of Homeland Security
**Pass Through Entity** N/A
**Questioned Costs**  None

**Response:**       Concur

Honorable Shad White, State Auditor
April 22, 2020
Page 3

**Corrective Action Plan:**

The Mississippi Emergency Management Agency is currently in the process of implementing new procedures and processes for compliance with the *Code of Federal Regulations* 2 CFR 200 Subpart F, audit requirements. The Agency is building a stronger reporting and monitoring system for Single Audits.

New Policies and Procedures have been written for Single Audits and will be monitored by the Office of Support Services. Support Services will work with all offices within the Agency to ensure the correct data is captured and will review all documents that are sent out addressing Single Audit requirements.

Our Agency intends to implement changes in all areas within the Agency that are affected by the findings of this audit. We would like to express our thanks for the courtesy and professionalism demonstrated by Thomas Wirt and his field staff while conducting the audit. Should you have any questions regarding our response, corrective action or need further information, please do not hesitate to contact Crystal Thompson, Director, Office of Support Services at 601-933-6603.

Respectfully,

Gregory S. Michel
Executive Director

(This page left blank intentionally.)



# STATE OF MISSISSIPPI
# MILITARY DEPARTMENT



THE ADJUTANT GENERAL'S OFFICE
POST OFFICE BOX 5027
JACKSON, MISSSISSIPPI 39296-5027

30 March 2020

Shad White, State Auditor
Office of the State Auditor
State of Mississippi
P.O. Box 956
Jackson, MS 39205-0956

Mr. White:

This letter addresses the corrective actions taken regarding the single audit finding for the
Mississippi Military Department for Fiscal Year 2019.

Finding 2019-018: CFDA Number 12.400 – Military Construction, National Guard. "Controls
should be strengthened to ensure agency verifies vendors are not suspended or debarred."

This finding involves a failure to verify the status of contractors on the SAMs.gov website, and
to effectively document that the status was verified prior to the contract being awarded.

Corrective Action: Effective immediately, all contractors receiving federal funds through CFDA
Number 12.400 are being verified as "Active" in the SAMs.gov website prior to be awarding a
contract.

Finding 2019-019: CFDA Number 12.400 – Military Construction, National Guard. "Controls
Should Be Strengthened to Ensure Compliance with Federal Reporting Requirements".

This finding centers around the requirement of NGR 5-1, Section 11-4 to request federal
reimbursement utilizing OMB Standard Form (SF) 270. This is a recurring finding, resulting
from the timing of last year's audit which occurred in May 2019. Upon receipt of this finding,
we immediately coordinated with our federal partners to implement a resolution. Unfortunately,
state FY 2019 was closed prior to implementation, and this year's audit did not demonstrate that
the issue had been corrected.

Corrective Action: Effective 1 October 2019, all 12.400 invoices were submitted to our federal
partners using Standard Form 270 in accordance with National Guard Regulation (NGR) 5-1.

The contact person responsible for corrective action is LTC(R) Wayne Carpenter, Director of the Fiscal Division, Mississippi Military Department.  601-313-6220, wcarpenter@mil.ms.gov.

Amos P. Parker, Jr.
Brigadier General, MSARNG
Assistant Adjutant General - Army

# IV. INDICES



(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

**INDEX OF FINANCIAL STATEMENT FINDINGS AND RESPONSES**
**FOR THE YEAR ENDED JUNE 30, 2019**

**FINANCIAL STATEMENT FINDINGS AND RECOMMENDATIONS (by finding number)**

| FINDING NUMBER | PAGE NUMBER | STATE GRANTEE AGENCY NAME |
|---|---|---|
| 2019-001 | 69 | MS Prison Industries |
| 2019-002 | 69 | MS Prison Industries |
| 2019-003 | 70 | MS Prison Industries |
| 2019-004 | 70 | MS Prison Industries |
| 2019-005 | 71 | MS Prison Industries |
| 2019-006 | 72 | MS Prison Industries |
| 2019-007 | 72 | MS Prison Industries |
| 2019-008 | 57 | Department of Health |
| 2019-009 | 67 | Office of State Treasurer |
| 2019-010 | 51 | Department of Education |
| 2019-011 | 63 | Department of Public Safety |
| 2019-012 | 59 | Department of Human Services |
| 2019-013 | 60 | Department of Human Services |
| 2019-014 | 53 | Department of Finance and Administration |
| 2019-015 | 53 | Department of Finance and Administration |
| 2019-016 | 55 | Department of Finance and Administration |
| 2019-017 | 65 | Development Authority |

**MANAGEMENT RESPONSES AND CORRECTIVE ACTION PLANS (by State Agency)**

Department of Finance and Administration:  Page 321
Department of Health:  Page 337
Department of Human Services:  Page 327
Department of Public Safety: Page 329
MS Prison Industry:  Page 333
Office of the Treasurer: Page 339
Department of Education: Page 319
Development Authority: Page 331

(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

**INDEX OF FEDERAL AWARD FINDINGS AND QUESTIONED COSTS**
**LISTED BY FEDERAL DEPARTMENT**
**FOR THE YEAR ENDED JUNE 30, 2019**

1.  U.S. Department of Agriculture:  Page 77
2.  U.S. Department of Commerce:  None
3.  U.S. Department of Defense:  Page 163
4.  U.S. Department of Housing and Urban Development:  None
5.  U.S. Department of the Interior:  None
6.  U.S. Department of Justice:  None
7.  U.S. Department of Labor:  None
8.  U.S. Department of Transportation:  Page 171
9.  U.S. Department of Treasury:  None
10. Appalachian Regional Commission:  None
11. General Services Administration:  None
12. National Foundation on the Arts and Humanities:  None
13. Small Business Administration:  None
14. U.S. Department of Veterans Affairs:  None
15. Environmental Protection Agency:  None
16. U.S. Department of Energy:  None
17. U.S. Department of Education:  Page 167
18. Gulf Coast Ecosystem Restoration Council: None
19. Election Assistance Commission:  None
20. U.S. Department of Health and Human Services:  Page 177
21. Corporation for National and Community Service: None
22. Executive Office of the President:  None
23. Social Security Administration:  None
24. Department of Homeland Security:  Page 285

(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

---

**INDEX OF FEDERAL AWARD FINDINGS AND QUESTIONED COSTS**
**LISTED BY STATE GRANTEE AGENCY**
**FOR THE YEAR ENDED JUNE 30, 2019**

---

1. Agriculture and Commerce:   None
2. Animal Health:  None
3. Archives and History:  None
4. Arts Commission: None
5. Attorney General:  None
6. Board for Community and Junior Colleges:  None
7. Education:  Page 167
8. Emergency Management:  Page 285
9. Employment Security:  None
10. Environmental Quality:  None
11. Finance and Administration:  None
12. Forestry Commission:  None
13. Governor's Office:  None
14. Health:  Page 177
15. Human Services:  Page 77
16. Insurance:  None
17. Library Commission:  None
18. Marine Resources:  None
19. Medicaid:  Page 279
20. Mental Health:  None
21. Military Department: 163
22. Mississippi Development Authority:  None
23. Oil and Gas Board:  None
24. Pharmacy: None
25. Public Safety:  None
26. Public Service Commission:  None
27. Rehabilitation Services:  None
28. Secretary of State: None
29. Soil and Water Conservation Commission:  None
30. Supreme Court:  None
31. Transportation:  Page 171
32. Treasury:  None
33. Veterans Affairs Board:  None
34. Wildlife, Fisheries and Parks:  None

***Note:  If findings and recommendations related to and agency appear on more than one page in a  sequence, only the first page is indicated in the above reference.***

(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

---

**INDEX OF FEDERAL AWARD FINDINGS AND QUESTIONED COSTS
LISTED BY FINDING NUMBER
FOR THE YEAR ENDED JUNE 30, 2019**

---

| FINDING NUMBER | PAGE NUMBER | STATE GRANTEE AGENCY NAME |
|---|---|---|
| 2019-018 | 163 | Military Department |
| 2019-019 | 164 | Military Department |
| 2019-020 | 171 | Department of Transportation |
| 2019-021 | 172 | Department of Transportation |
| 2019-022 | 174 | Department of Transportation |
| 2019-023 | 285 | Emergency Management |
| 2019-024 | 286 | Emergency Management |
| 2019-025 | 288 | Emergency Management |
| 2019-026 | 167 | Department of Education |
| 2019-027 | 279 | Division of Medicaid |
| 2019-028 | 281 | Division of Medicaid |
| 2019-029 | 177,282 | Department of Health; Division of Medicaid |
| 2019-030 | 77,179 | Department of Human Services |
| 2019-031 | 149 | Department of Human Services |
| 2019-032 | 250 | Department of Human Services |
| 2019-033 | 253 | Department of Human Services |
| 2019-034 | 151,256 | Department of Human Services |
| 2019-035 | 258 | Department of Human Services |
| 2019-036 | 260 | Department of Human Services |
| 2019-037 | 262 | Department of Human Services |
| 2019-038 | 264 | Department of Human Services |
| 2019-039 | 265 | Department of Human Services |
| 2019-040 | 153 | Department of Human Services |
| 2019-041 | 269 | Department of Human Services |
| 2019-042 | 155,270 | Department of Human Services |
| 2019-043 | 160,274 | Department of Human Services |
| 2019-044 | 277 | Department of Human Services |

(This page left blank intentionally.)

**STATE OF MISSISSIPPI**

**INDEX OF MANAGEMENT RESPONSES TO FEDERAL AWARD FINDINGS
AND CORRECTIVE ACTION PLANS
LISTED BY STATE GRANTEE AGENCY
FOR THE YEAR ENDED JUNE 30, 2019**

1. Agriculture and Commerce:   None
2. Animal Health:  None
3. Archives and History:  None
4. Arts Commission: None
5. Attorney General:  None
6. Board for Community and Junior Colleges:  None
7. Education:  Page 341
8. Emergency Management:  Page 373
9. Employment Security:  None
10. Environmental Quality:  None
11. Finance and Administration:  None
12. Forestry Commission:  None
13. Governor's Office:  None
14. Health:  Page 343
15. Human Services:  Page 345
16. Insurance:  None
17. Library Commission:  None
18. Marine Resources:  None
19. Medicaid:  Page 367
20. Mental Health:  None
21. Military Department: Page 377
22. Mississippi Development Authority:  None
23. Oil and Gas Board:  None
24. Pharmacy: None
25. Public Safety:  None
26. Public Service Commission:  None
27. Rehabilitation Services:  None
28. Secretary of State: None
29. Soil and Water Conservation Commission:  None
30. Supreme Court:  None
31. Transportation:  Page 363
32. Treasury:  None
33. Veterans Affairs Board:  None
34. Wildlife, Fisheries and Parks:  None

(This page left blank intentionally.)

# V. ACKNOWLEDGMENTS



(This page left blank intentionally.)

## ACKNOWLEDGMENTS

**REPORT PREPARED BY:**

**Shad White, State Auditor**
**Patrick S. Dendy, CPA, Deputy State Auditor**
**Stephanie C. Palmertree, CPA, CGMA, Director, Financial and Compliance Audit Division**
**Jason K. Ashley, Deputy Director, Financial and Compliance Audit Division**
**Michael Torres, CPA, Director, Agency Audit Section**
**Thomas Wirt, CPA, Senior Manager, Agency Audit Section**

Many thanks to the following managers, supervisors and field staff of the Office of the State Auditor for their efforts in gathering information contained in this Single Audit Report:

**Managers**

    Jeremy Ashley, CFE
    Ashley Jolly, CPA
    Angela Mire, CPA
    John T. Newell, CPA

**Supervisors**

    Richard Aultman, CPA
    Brianna Dang
    Alan Jarrett
    Emily Mathis
    Lisa Meade, CPA
    Clayton Southerland, CPA
    Vincent Steiner

**Field Staff**

| | |
|---|---|
| Virginia Anderson | Buck Jenkins, CPA |
| John Brandon, CPA | Shavonda Lott |
| Allen Case, CPA | Dana McMorris |
| LaSabre Charleston | Jeremy Miller, CPA |
| Phillip Chu, CPA | Lee Pittman, CPA |
| Nicole Collins | Veronica Ratliff |
| Alisa Evans | Elevia Tate |
| Levi Hill | Na Venator, CPA |
| Kari Horn | Michael Walker, CPA, CFE |

**Information Systems Staff**
    LaDonna Johnson, CISA

We would also like to thank staff members of the Office of Financial Reporting, Department of Finance and Administration for their assistance through compilation of the Schedule of Expenditures of Federal Awards.

Special thanks to the Administrative Staff of the Office of the State Auditor who tirelessly support us during our audits.

(This page left blank intentionally.)



**Office of the State Auditor**
**Post Office Box 956**
**Jackson, Mississippi  39205-0956**
**www.osa.state.ms.us**