## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
## FIRST JUDICIAL DISTRICT

**MISSISSIPPI DEPARTMENT**
**OF HUMAN SERVICES**                                                    **PLAINTIFF**

**vs.**                                                    **CAUSE NO. 22-cv-286-EFP**

**MISSISSIPPI COMMUNITY**
**EDUCATION CENTER, INC.,** *et al.*                              **DEFENDANTS**

**and**

**MISSISSIPPI COMMUNITY**
**EDUCATION CENTER, INC.**                              **COUNTER-PLAINTIFF**

**vs.**

**MISSISSIPPI DEPARTMENT**
**OF HUMAN SERVICES**                              **COUNTER-DEFENDANT**

---

### RESPONSE IN OPPOSITION TO MCEC'S MOTION TO COMPEL THE
### HONORABLE PHIL BRYANT TO PRODUCE DOCUMENTS RESPONSIVE TO
### SUBPOENA DUCES TECUM

---

William M. Quin II (MS Bar No. 10834)
W. Thomas McCraney, III (MS Bar No. 10171)
**MᴄCʀᴀɴᴇʏ Mᴏɴᴛᴀɢɴᴇᴛ Qᴜɪɴ & Nᴏʙʟᴇ PLLC**
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone:      601-707-5725
Facsimile:       601-510-2939
Email:            wquin@mmqnlaw.com
                     tmccraney@mmqnlaw.com

**Counsel for Non-Party Respondent,**
**the Honorable Phil Bryant, the 64ᵗʰ**
**Governor of the State of Mississippi**

**Exhibit J, Part 1**

### TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

PROCEDURAL BACKGROUND ........................................................................................2

    I. The claims and defenses in the MDHS lawsuit ............................................................2

    II. MCEC subpoenaed Governor Bryant for documents relating to the
    USM Volleyball Center ....................................................................................................3

    III. Governor Bryant objected to the subpoena but offered to produce documents subject to
    the entry of a protective order .........................................................................................4

        A. The subpoena seeks documents that are protected by the deliberative process
        privilege ...................................................................................................................5

        B. The subpoena seeks documents that are protected by the chief executive
        communications privilege ........................................................................................5

        C. The entry of a protective order would be consistent with the *Suppression Order*
        entered in related criminal proceedings ...................................................................6

        D. The subpoena exceeds the scope of permissible discovery .................................8

        E. The subpoena is a "fishing expedition" designed to distract attention from New's
        criminal conduct .....................................................................................................8

FACTUAL BACKGROUND .................................................................................................9

    I. Favre asked Governor Bryant in mid-2017 to assist him in raising private donations and
    corporate sponsorships for the USM Volleyball Center ..............................................9

    II. Meanwhile, unbeknownst to Governor Bryant, New and Favre were pursuing MDHS
    funds for the USM Volleyball Center ..........................................................................10

    III. Favre asked New if the media might discover MCEC's payments to him ...................12

    IV. Without Governor Bryant's involvement, the Attorney General's Office and the IHL
    approved the use of MDHS funds for the USM Volleyball Center project ..................12

    V. Favre received his first payment from MCEC in late-December 2017 ..........................17

    VI. Favre asked Governor Bryant in May 2018 to assist him in finding someone to build
    lockers for the USM Volleyball Center .......................................................................17

    VII. Favre and New hoped Governor Bryant could raise a substantial amount of money in a
    private fundraiser ..........................................................................................................18

VIII. Governor Bryant did not attend or participate in the meeting at Favre's home ...........19

IX. Ben Napier assisted with locker construction for the USM Volleyball Center at Governor Bryant's request .......................................................................................................................20

X. Favre asked Davis for additional public funds ...................................................................20

XI. Governor Bryant accepted Davis' resignation and alerted the state auditor to potential fraud ...........................................................................................................................................22

XII. Governor Bryant first learned MDHS was involved with the USM Volleyball Center project in July 2019 ...................................................................................................................23

XIII. Governor Bryant contacted Chris Freeze about replacing Davis as MDHS Director ..25

XIV. Governor Bryant told Favre that MDHS funding of the USM Volleyball Center project must be approved by the state auditor .....................................................................................25

XV. Governor Bryant explained to Favre the reasons why the state auditor must approve the use of MDHS funds for the USM Volleyball Center project .....................................................28

XVI. Favre continued to push for MDHS funding for the USM Volleyball Center ..............30

XVII. Undeterred, Favre continued to press Governor Bryant for assistance ........................36

XVIII. The "bottom line" is that Favre personally guaranteed the USM Volleyball Center project and it was "time for him to pay up" ...........................................................................42

XIX. Favre returned the $1.1 million that MCEC paid him for promotional services despite contending he performed services for MCEC ........................................................................46

XX. New and Davis pleaded guilty to violating federal and state criminal laws ....................47

ARGUMENT ............................................................................................................................48

I. The subpoena should be quashed ..........................................................................................48

A. MCEC cannot overcome Governor Bryant's privilege claims ................................48

1. The deliberative process privilege .......................................................................48

2. The chief executive communications privilege ....................................................50

B. The subpoena exceeds the proper scope of discovery ............................................56

II. Alternatively, the court should enter a protective order .........................................57

III. The court should award monetary sanctions to Governor Bryant ......................................58

CONCLUSION ................................................................................................................................61

## **TABLE OF AUTHORITIES**

## **CASE LAW**

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) ............................................................... 5, 48, 49

*Nero v. Hyland*, 386 A.2d 846 (N.J. 1978) ..............................................................................5

*Hamilton v. Verdow*, 414 A.2d 914 (Md. 1980) .......................................................................5

*Doe v. Alaska Superior Court*, 721 P.2d 617 (Alaska 1986) ...................................................5

*Capital Information Group v. State*, 923 P.2d 29 (Alaska 1996) .............................................5

*Killington, Ltd. v. Lash*, 572 A.2d 1368 (Vt. 1990) ................................................................5

*New England Coalition for Energy Efficiency & the Environment v. Office of the Governor*, 670 A.2d 815 (Vt. 1995) ............................................................................................................................5, 6

*Guy v. Judicial Nominating Committee*, 659 A.2d 777 (Del. 1995) ........................................6

*Times Mirror Co. v. Super. Ct.*, 813 P.2d 240 (Cal. 1991) ......................................................6

*Taylor v. Worrell Enter., Inc.*, 409 S.E.2d 136 (Va. 1991) ......................................................6

*Courier-Journal v. Jones*, 895 S..2d 6 (Ky. Ct. App. 1995) ...................................................6

*New Mexico v. First Judicial District Court of New Mexico*, 629 P.2d 330 (N.M. 1981) ..................................6

*State ex rel. Dann v. Taft*, 848 N.E.2d 472 (Ohio 2006) .........................................6, 53, 54, 55

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) .............................................................. 6, 48, 49

*Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367 (2004) ...................... 6, 52, 53

*State v. New*, Nos. 20-0-052, 20-0-53 (Hinds Cty. Cir. Ct.)..................................................6, 57

*McCoy v. Yazoo City*, 2014 U.S. Dist. LEXIS 177646 (S.D. Miss. Dec. 29, 2014) ...................................7

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) .......................... 48, 49

*Morgan v. United States*, 304 U.S. 1 (1938) ..........................................................................49

*Kaiser Aluminum & Chemical Corp. v. United States*, 157 F. Supp. 939 (Ct. Cl. 1958) ..............................49

*Carl Zeiss Stiftung v. V.E.V. Carl Zeiss*, 40 F.R.D. 318 (D.D.C. 1996) ........................................49

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ...............................................................49

*City of Colo. Springs v. White*, 967 P.2d 1042 (Colo. 1998) ..................................................49

*United States v. Nixon*, 418 U.S. 683 (1974) ...........................................48, 51, 52, 53, 54, 55

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) .............................................................50

*Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) ...................................... 51, 52

*Flechas v. Pitts*, 138 So. 3d 907 (Miss. 2014) ...............................................................56

*Century 21 Deep South Properties, Ltd. v. Corson*, 612 So. 2d 359 (Miss. 1992) ........................60

*Baptist Health v. BancorpSouth Ins. Services, Inc.*, 270 F.R.D. 268 (N.D. Miss. 2010) .................60

*Liberty Mut. Ins. Co. v. Tedford*, No. 3:07-cv-73-A-A, 2008 WL 1930573 (N.D. Miss. May 1, 2008) .....60

## STATUTES & RULES

Miss. R. Civ. P. 45(d)(2)(B) ...................................................................................4

Miss. R. Civ. P. 26(b)(1) ...................................................................................8, 56

Miss. R. Civ. P. 45(d)(2)(C) ................................................................................48

Miss. R. Civ. P. 26(d)(1) ...................................................................................48

Miss. R. Civ. P. 26(d)(2) ...................................................................................48

Miss. R. Civ. P. 45(f) ...................................................................................48, 58

Miss. R. Civ. P. 26(d)(4) ...............................................................................48, 58

Pub. L. No. 93-526, 88 Stat. 1696 (codified as amended at 44 U.S.C. § 2107 Note (2000)) ..............52

Pub. L. No. 92-463, 86 Stat. 770 (codified as amended at 5 U.S.C. app. §§ 1-16 (2000)) ..................52

Miss. R. Civ. P. 45(e)(2)(A) ................................................................................55

Miss. R. Civ. P. 26(d)(1)(E) ................................................................................58

Miss. R. Civ. P. 37(a)(4) ...................................................................................58

## SECONDARY SOURCE

RUSSELL L. WEAVER & JAMES T.R. JONES, *The Deliberative Process Privilege*,
54 Mo. L. Rev. 279 (1989) ....................................................................................... 49, 50

## OTHER SOURCES

https://southernmiss.com/news/2016/8/24/Fan_Feature_Nancy_New.aspx ................................. 12

http://www.research.olemiss.edu/agenda/bios/GordonCannon.pdf ........................................... 12

https://www.shieldsgoodson.com/about ................................................................................ 13

https://www.dailyleader.com/2022/05/27/auditor-issues-civil-demand-on-former-dhs-deputy-director-black/ ............................................................................................................................. 13

https://upstatespartans.com/staff-directory/daniel-feig/100 .................................................... 13

https://sm2media.com/17598/news/southern-miss-announces-new-facility/ ................................ 16

https://www.mississippifreepress.org/27465/in-depth-how-brett-favre-secured-6-million-in-welfare-funds-for-a-volleyball-stadium .................................................................... 17, 19, 41, 46

https://mississippitoday.org/2022/09/13/phil-bryant-brett-favre-welfare/. ............................... 17, 59

https://mississippitoday.org/2022/04/04/phil-bryant-brett-favre-welfare-scandal-payout/ ............. 19

https://mississippitoday.org/2022/04/06/brett-favre-used-fame-favors-welfare-dollars/ ................ 20

## EXHIBITS

Mississippi Secretary of State report & filing ..................................................................... Exhibit 1

7/27/2022, emails b/w Quin & Bufkin ................................................................................ Exhibit 2

8/26/2022, letter from Quin to Bufkin ................................................................................ Exhibit 3

4/20/2017, text messages b/w Bryant & Favre ..................................................................... Exhibit 4

7/21/2017, text messages b/w Bryant & Favre ..................................................................... Exhibit 5

7/22/2017, text messages b/w Bryant & Favre w/ attachment ............................................... Exhibit 6

10/19/2017, Minutes of the Board of Trustees of State Institutions of Higher Learning ....... Exhibit 7

11/2/2017, Amended and Restated Lease b/w University of Southern Mississippi &
University of Southern Mississippi Athletic Foundation, Inc. .............................................. Exhibit 8

5/9/2018, text messages b/w Bryant & Favre ..................................................................Exhibit 9

5/18/2018, text messages b/w Bryant & Favre ..............................................................Exhibit 10

1/21/2019, text messages b/w Bryant & Favre ..............................................................Exhibit 11

7/16/2019, text messages b/w Bryant & Favre ..............................................................Exhibit 12

7/16/2019, text messages b/w Bryant & New .................................................................Exhibit 13

7/18/2019, text messages b/w Bryant & Staff Attorney .................................................Exhibit 14

7/18/2019, text messages b/w Bryant & Favre ..............................................................Exhibit 15

7/19/2019, text messages b/w Bryant & Freeze .............................................................Exhibit 16

7/22/2019, text messages b/w Bryant & Staff Attorney .................................................Exhibit 17

7/22/2019, text messages b/w Bryant & Staff Attorney .................................................Exhibit 18

7/22/2019, text messages b/w Bryant & Favre ..............................................................Exhibit 19

7/25/2019, text messages b/w Bryant & Freeze .............................................................Exhibit 20

7/25/2019, 7/28/2019, text messages b/w Bryant & Favre .............................................Exhibit 21

8/2/2019, text messages b/w Bryant & Favre ................................................................Exhibit 22

8/5/2019, text messages b/w Bryant & Favre ................................................................Exhibit 23

8/5/2019, text messages b/w Bryant & Staff Attorney w/ attachment ............................Exhibit 24

8/8/2019, 8/14/2019, text messages b/w Bryant & Favre ...............................................Exhibit 25

8/16/2019, text messages b/w Bryant & Favre ..............................................................Exhibit 26

8/17/2019, text messages b/w Bryant & Favre w/ attachment ........................................Exhibit 27

8/17/2019, 8/19/2019, text messages b/w Bryant & Favre w/ attachment .......................Exhibit 28

8/21/2019, text messages b/w Bryant & Freeze .............................................................Exhibit 29

8/23/2019, text messages b/w Bryant & Favre ..............................................................Exhibit 30

8/24/2019, text messages b/w Bryant & Favre ..............................................................Exhibit 31

9/4/2019, 9/6/2019, text messages b/w Bryant & Favre .................................................Exhibit 32

9/6/2019, text messages b/w Bryant & Staff Attorney...............................................Exhibit 33

10/13/2019, 10/22/2019, text messages b/w Bryant & Favre.....................................Exhibit 34

11/5/2019, text messages b/w Bryant & Favre..........................................................Exhibit 35

11/11/2019, text messages b/w Bryant & Freeze.......................................................Exhibit 36

11/11/2019, text messages b/w Bryant & Favre ........................................................Exhibit 37

12/12/2019, text messages b/w Bryant & Favre ........................................................Exhibit 38

1/26/2020, text messages b/w Bryant & Favre..........................................................Exhibit 39

1/27/2020, text messages b/w Bryant & Favre..........................................................Exhibit 40

1/27/2020, text messages b/w Bryant & Bennett.......................................................Exhibit 41

2/6/2020, text messages b/w Bryant & Favre ...........................................................Exhibit 42

State of Mississippi, Single Audit Report for Year Ending June 30, 2019,
Mississippi Office of the State Auditor Shad White (excerpts)...................................Exhibit 43

*United States v. Nancy W. New*, No. 3:21-cr-00028-CWR-FKB (S.D. Miss.),
Plea Agreement (Apr. 19, 2022)..............................................................................Exhibit 44

*State of Mississippi v. Nancy New*, No. 25CI1:22-cr-00002 (Hinds Cty. Cir Ct.),
Petition to Enter Plea of Guilty (Apr. 22, 2022) .......................................................Exhibit 45

10/9/2017, Memorandum from Ganucheau to Pearce................................................Exhibit 46

*State of Mississippi v. John Davis*, No. 22-0-238(1-20) (Hinds Cty. Cir Ct.),
Order of Nolle Prosequi .........................................................................................Exhibit 47

1/9/2020, text messages b/w Bryant & New ............................................................Exhibit 48

**NOW INTO COURT**, by and through undersigned counsel, comes the Honorable Phil Bryant and responds to the motion to compel him to produce documents responsive to a subpoena duces tecum served by Mississippi Community Education Center, Inc. ("MCEC") [Doc. 131], as follows:

## **INTRODUCTION**

On May 9, 2022, the Mississippi Department of Human Services ("MDHS") filed this action against several defendants, including MCEC and its President and Founder, Nancy New [Doc. 2].[1] In its complaint, MDHS seeks to recover funds diverted from the Temporary Assistance for Needy Families ("TANF") program. Certain transactions at issue are also the subject of ongoing criminal investigations and prosecutions. New and former-MDHS Director John Davis have pleaded guilty to federal and state crimes.

According to MDHS, one of the diversions of TANF funds involved MCEC's payment of $1.1 million to National Football League Hall of Fame quarterback Brett Favre for promotional services [Doc. 2 at 49-50]. Favre voluntarily repaid this money, claiming he did not know the $1.1 million payment was made with TANF funds. MDHS does not contend the $1.1 million payment was related to the construction of a women's volleyball facility at the University of Southern Mississippi ("USM Volleyball Center"). Similarly, MDHS does not seek to recoup $5 million of TANF funds that MCEC paid to sublease the USM Volleyball Center from the University of Southern Mississippi Athletic Foundation ("USM Athletic Foundation"), nor does it allege wrongdoing associated with this expenditure. This is likely because the Board of Trustees of the State Institutions of Higher Learning ("IHL Board") approved the project after it was recommended by Special Assistant Attorney General Stephanie Ganucheau.

---

[1] Co-Defendant Nancy New incorporated MCEC as a non-profit corporation on June 9, 1992. New identified herself as the "President & Founder" of MCEC in Articles of Amendment filed with the Mississippi Secretary of State on February 26, 1993. *See*, Exhibit 1.

MCEC served a subpoena on former-Governor Phil Bryant on July 25, 2022, seeking documents related to the USM Volleyball Center. Governor Bryant objected to subpoena, claiming the documents are privileged and outside the bounds of permissible discovery. MCEC subsequently filed the present motion. The motion does not establish a particularized need for the documents. In fact, the motion does not address the privileges invoked by Governor Bryant in any way.

MCEC did not attempt to meet-and-confer with Governor Bryant in advance of filing the present motion. Instead, MCEC went to the press – an action that flies in the face of the *Suppression Order* pending in related criminal cases. This motion was brought in bad faith and solely to annoy, embarrass, and oppress Governor Bryant because he refused to turn a blind eye to the crimes perpetrated by New and Davis. This court should recognize MCEC's improper motive and award substantial sanctions, including attorneys' fees, to Governor Bryant.

## PROCEDURAL BACKGROUND

### I. The claims and defenses in the MDHS lawsuit.

MDHS' complaint seeks to recover "over $20 million in public funds diverted" from the TANF program and "squandered by and for" MCEC and its co-defendants "for their enrichment and other private purposes incompatible with the TANF statutes of the United States, with the TANF statutes of Mississippi, and with the alleviation of poverty." [Doc. 2 at 2]. As to the $1.1 million paid to Favre, the complaint alleges:

137. Defendant Brett Favre and an entity he owned and controlled, Defendant Favre Enterprises, Inc., entered a contract with Defendant MCEC beginning July 1, 2017, purportedly for services by Favre through the date of July 31, 2018. That contract, on its face, required that Brett Favre speak at three different public events, and one "keynote address," and that Favre sign autographs at events promoting MCEC itself. Neither Brett Favre, nor anyone on behalf of Favre Enterprises, Inc., ever performed any such speaking or autograph "services." Certainly, no services were performed by Favre that had anything to do with the pursuit of lawful TANF purposes.

138. Nevertheless, and without regard to whether Favre was performing any service of any kind to anyone for MCEC, MCEC paid Favre Enterprises, Inc., with TANF

funds, a total of $1,100,000, through a payment to Favre Enterprises of $500,000 in December of 2017 and a further payment of $600,000 in June of 2018.

[Doc. 2 at 49-50]. In short, MDHS claims MCEC hired Favre to perform promotional services, Favre did not perform the services, and MCEC paid him $1.1 million anyway. MDHS ***does not*** claim the $1.1 million payment to Favre was intended to fund the USM Volleyball Center construction project.

MCEC answered the complaint on July 11, 2022 [Doc. 70]. MCEC addressed the above allegations as follows:

> 137.     MCEC admits that it was instructed by MDHS, acting through the MDHS Executives, to provide funds to Brett Favre. MCEC contracted with Favre Enterprises, Inc. for $1,100,000 for Favre to speak publicly and make radio or television advertisements in support of MDHS's Families First initiative. Marketing and other outreach activities to increase public awareness of benefits and services are permissible grant, including TANF, expenditures. For example, the TANF State Plan contemplates "an aggressive public service campaign including billboards and radio and television announcements" to "promote abstinence, reduce the teen and out-of-wedlock births, and develop teen leadership throughout the State by working with public and private organizations, schools, churches and interested groups." MDHS State Plan (Oct. 1, 204 – Dec. 31, 2017), p. 11. Favre provided services pursuant to this contract. MCEC is without knowledge or information sufficient to form a belief as to the truth of the remaining averments. Therefore, they are denied.

> 138.     MCEC is without knowledge or information sufficient to form a belief as to the truth of the averments. Therefore, they are denied.

[Doc. 70 at 23]. MCEC's defense is that Favre performed promotional services and the $1.1 million payment was a permissible TANF expenditure. MCEC's answer does not mention the USM Volleyball Center project or any connection between it and the $1.1 million payment to Favre.

## II. MCEC subpoenaed Governor Bryant for documents relating to the USM Volleyball Center.

The circuit clerk issued a subpoena duces tecum to Governor Bryant on July 25, 2022, at the request of MCEC [Doc. 93]. Even though no claim or defense has been asserted in this action regarding the USM Volleyball Center, MCEC's subpoena requests production of the following documents:

> 1.     All Documents including, without limitation, Documents reflecting

communications between you and any person concerning the USM Volleyball Center.

2.  All Documents including, without limitation, Documents reflecting communications between you and any person or entity concerning funding for the USM Volleyball Center.

3.  All Documents [] including, without limitation, Documents reflecting communications between you and any person intended to further efforts to secure funding from MDHS for the USM Volleyball Center.

[Doc. 93 at 6]. Counsel for MCEC and Governor Bryant agreed to extend the due date for a response

to the subpoena to August 26, 2022.[2]

### III. Governor Bryant objected to the subpoena but offered to produce documents subject to the entry of a protective order.

Governor Bryant provided MCEC with written objections to the subpoena pursuant to Miss.

R. Civ. P. 45(d)(2)(B) on August 26, 2022 ("Objection").[3] The Objection summarizes Governor

Bryant's position as follows:

> Mississippi Rule of Civil Procedure 45(d)(2)(B) provides in pertinent part that, "[t]he person to whom the subpoena is directed may . . . serve upon the party serving the subpoena written objections to inspection or copying any and all of the designated materials. . .. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the material except pursuant to an order of the court from which the subpoena was issued." My client objects to producing certain documents requested by the subpoena on the basis of attorney-client privilege and the work product doctrine. My client is willing to produce other documents requested by the subpoena subject to the entry of a protective order that preserves other applicable privileges and prevents the disclosure of said documents or their contents to non-parties.
>
> I have previously raised with you the issue of producing documents responsive to the subpoena following the entry of a protective order. You refused to agree to any form of a protective order and acknowledged that we may serve objections to the subpoena. What follows is a brief discussion of applicable privileges, reasons why a protective order should be entered, and a brief analysis of additional issues raised by the subpoena.

*Id.* at 1. In addition to asserting the attorney-client privilege, the Objection raises a pair of privileges

---

[2] Exhibit 2.

[3] Exhibit 3.

that may be properly invoked by state executive officers. These are the deliberative process privilege and the chief executive communications privilege.

## A. The subpoena seeks documents that are protected by the deliberative process privilege.

The Objection states as follows regarding the deliberative process privilege:

> While the Mississippi Supreme Court has not addressed the deliberative process privilege, we are confident the Court would recognize the privilege exists under Mississippi law if confronted with the issue. The deliberative process privilege refers to "the common sense-common law principle that not all public business can be transacted completely in the open, that public officials are entitled to the private advice of their subordinates and to confer among themselves freely and frankly, without fear of disclosure, otherwise the advice received, and the exchange of views may not be as frank and honest as the public good requires." *Soucie v. David*, 448 F.2d 1067, 1080-81 (D.C. Cir. 1971) (Wilkey, J., concurring).

*Id.* at 1-2. The Objection continues, "Some of the documents sought by the subpoena are protected by the deliberative process privilege. My client is ***willing to produce these documents*** with the entry of a protective order that preserves the privilege and prevents disclosure of said documents and their contents to non-parties, so long as said documents are not otherwise protected by the attorney-client privilege or work product doctrine. Such an arrangement would preserve the privileged nature of the documents and would prevent them from being misused for media attention or some other illegitimate reason while simultaneously allowing the parties to utilize the documents within the confines of this case as allowed by the Mississippi Rules of Civil Procedure and Mississippi Rules of Evidence." *Id.* at 2 (emphasis added).

## B. The subpoena seeks documents that are protected by the chief executive communications privilege.

The Objection discusses the chief executive communications privilege as follows:

> The Mississippi Supreme Court has not addressed the chief executive communications privilege. We believe the Court would also recognize this privilege under Mississippi law, just as courts in many other states have done when confronted with the issue. *See*, e.g., *Nero v. Hyland*, 386 A.2d 846 (N.J. 1978); *Hamilton v. Verdow*, 414 A.2d 914 (Md. 1980); *Doe v. Alaska Superior Court*, 721 P.2d 617 (Alaska 1986); *Capital Information Group v. State*, 923 P.2d 29, 33 (Alaska 1996); *Killington, Ltd. v. Lash*, 572 A.2d 1368 (Vt. 1990); *New England Coalition for Energy Efficiency & the Environment v. Office of the Governor*, 670

5

A.2d 815 (Vt. 1995); *Guy v. Judicial Nominating Committee*, 659 A.2d 777 (Del. 1995); *Times Mirror Co. v. Super. Ct.*, 813 P.2d 240 (Cal. 1991); *Taylor v. Worrell Enter., Inc.*, 409 S.E.2d 136 (Va. 1991); *Courier-Journal v. Jones*, 895 S..2d 6 (Ky. Ct. App. 1995); *New Mexico v. First Judicial District Court of New Mexico*, 629 P.2d 330 (N.M. 1981); *State ex rel. Dann v. Taft*, 848 N.E.2d 472, 476 (Ohio 2006).

The executive privilege is broader in scope than the deliberative process privilege. It "applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones." *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997). The United States Supreme Court has held that the "need for information for use in civil cases, while far from negligible, does not share the urgency or significance" of criminal subpoena requests. *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367, 384 (2004). Additionally, the Court explained that "our precedent provides no support for the proposition that the Executive Branch 'shall bear the burden' of invoking executive privilege with sufficient specificity and of making particularized objections." *Id.* at 388. Instead, such specificity would only be required after the party seeking disclosure has "satisfied his burden of showing the propriety of his requests." *Id.*

*Id.* The Objection explains that "[a]ll responsive documents within my client's care, custody, or control are protected by the executive privilege. A strict application of the law would require you to provide the court with sufficient reasons why the executive privilege should not apply, or in the event it does apply, why the documents should be nonetheless produced and pursuant to what terms and conditions. Again, notwithstanding this privilege and the threshold showing you are required to make, my client is willing to produce said documents following the entry of a carefully-crafted protective order." *Id.*

## C. The entry of a protective order would be consistent with the *Suppression Order* entered in related criminal proceedings.

The Objection observes that a protective order would further the purposes of a *Suppression Order* this court previously entered in related criminal proceedings. *State v. New*, Nos. 20-0-052, 20-0-053 (Hinds Cty. Cir. Ct.). The Objection explained:

On November 16, 2020, Circuit Court Judge Faye Peterson entered a *Suppression Order* [Doc. 17] in the above-referenced criminal cases. The order states that, "[t]he Court, in an effort to ensure that the State and [Nancy New] . . . <u>receive a fair and impartial trial</u> in the Circuit Court of Hinds County, Mississippi and having admonished the parties concerning an article published November 14, 2020 that directly relates to this cause, hereby enters a Suppression Order <u>limiting pre-trial publicity</u> until the

completion of the trial or disposition without trial." (emphasis added). The court ordered "that all attorneys, their representatives, parties, witnesses, law enforcement officers and court personnel are prohibited from discussing or commenting on any aspects of this case with the media until such time as it has concluded[.]"

The above-referenced civil action is also pending in Hinds County Circuit Court before Judge Peterson. As you pointed out in the *Motion to Stay Discovery or, Alternatively, for Protective Order* [Doc. 71] in the civil action, "MDHS's Complaint involves the same issues present in the ongoing criminal proceedings and investigation. They do not merely overlap, but, as in *McCoy* [*v. Yazoo City*, 2014 U.S. Dist. LEXIS 177646, at *3 (S.D. Miss. Dec. 29, 2014)], the issues are 'seemingly identical.'" A protective order would prevent the same individuals from releasing documents and information in the civil action that the *Suppression Order* prevents in the criminal cases. Moreover, a protective order would accomplish the same end as the *Suppression Order* accomplishes in the criminal cases – namely, preserving the integrity of court proceedings.

*Id.* at 3. The Objection continues:

My client agrees with Judge Peterson. The allegations levied against your client should be tried in a court of law, not in the media. Evidence, and especially privileged materials, should not be utilized to unduly influence public opinion and to bias potential jurors. In a court of law, parties and witnesses have a right to respond to unfounded or misguided allegations before an impartial judge and jury. This is not always true with the media. Media members sometimes carry biases and unfounded and unfair opinions that impact their work. Instead of impartially seeking the truth about a given matter, the media member sometimes seeks to reinforce her already-existing beliefs, however unfounded they may be. Some publications limit or disallow this sort of journalism. Unfortunately, others do not. This can result in an echo-chamber of confirmation bias that unduly influences court proceedings and biases potential jurors against one party or another. I am sure you do not want such a situation to arise for your client.

*Id.* In light of these legitimate concerns, Governor Bryant offered "to produce the requested documents with a protective order in place that: (1) ensures the integrity of the court proceedings in the civil action and its related criminal actions, (2) does not unduly prejudice the rights of the defendants in the civil action and its related criminal actions, (3) respects the privacy and other similar rights of non-party respondents, and (4) preserves the privileged nature of documents and information." *Id.*

**D. The subpoena exceeds the scope of permissible discovery.**

Governor Bryant also objected to the subpoena because it seeks documents that are outside

the proper scope of discovery. The Objection explains:

> Mississippi Rule of Civil Procedure 26(b)(1) provides in pertinent part that, "Parties
> may obtain discovery regarding any matter, not privileged, which is relevant to the
> issues raised by the claims or defenses of any party." The rule also recognizes that, "It
> is not ground for objection that the information sought will be inadmissible at the trial
> if the information sought appears reasonably calculated to lead to the discovery of
> admissible evidence." Thus, for your subpoena to be enforceable, you must show that
> the subpoena seeks documents that are: (1) relevant to the issues raised by the claims
> or defenses of a party and (2) reasonably calculated to lead to the discovery of
> admissible evidence.

*Id.* at 3-4. The Objection observes that, "[t]he Complaint in the civil action [Doc. 2] does not address

the USM Volleyball Center. No defendant has alleged an affirmative defense that addresses the USM

Volleyball Center. It strains credibility to contend documents or information relating to a matter that

is not at issue in the civil action is reasonably calculated to lead to the discovery of admissible evidence.

Accordingly, the documents sought by your subpoena are not discoverable." *Id.* at 4. Nonetheless,

Governor Bryant offered to produce the requested documents subject to the entry of a protective

order.

**E. The subpoena is a "fishing expedition" designed to distract attention from New's
criminal conduct.**

Finally, the Objection summarizes Governor Bryant's position regarding the subpoena as

follows:

> In sum, my client has several valid objections to the subpoena, many of which would
> render it wholly unenforceable. ***It appears that your client is attempting to distract
> from her alleged wrongdoing by involving a former Governor of this state in a
> fishing expedition that has no relation to the claims brought by MDHS.***
> Nonetheless, my client is willing to produce the overwhelming majority of the
> documents you seek if all attorneys, their representatives, parties, witnesses, law
> enforcement officers, and court personnel (*i.e.*, all of the same persons bound by the
> *Suppression Order* in the criminal actions) are subject to a protective order that protects
> the integrity of this legal proceeding, preserves applicable privileges, and ensures this
> civil action and its related criminal actions are tried in a court of law.

*Id.* (emphasis added). MCEC's counsel did not respond to the Objection and made no effort to meet-and-confer to resolve the dispute or to craft a mutually agreeable protective order. Instead, MCEC filed the present motion and attached numerous text messages to create a media frenzy that distracts from New's felonious conduct.

## FACTUAL BACKGROUND

MCEC's motion says nothing about the merits of Governor Bryant's objections and does not address his offer to produce documents subject to the entry of a protective order. The failure to address these matters speaks volumes. MCEC knows Governor Bryant's position is legally sound and consistent with previous pronouncements of this court in related criminal proceedings. MCEC's primary intention with the present motion is not to seek legitimate discovery, but rather to create a media circus. The purpose of this response is to set the record straight regarding Governor Bryant's knowledge of and involvement with the USM Volleyball Center project, to argue in favor of fair and reasonable discovery limitations, and to seek an award of substantial sanctions against MCEC and any other responsible interests for their bad faith abuse of the subpoena power.

### I. Favre asked Governor Bryant in mid-2017 to assist him in raising private donations and corporate sponsorships for the USM Volleyball Center.

Governor Bryant first learned Favre was attempting to raise money for the construction of the USM Volleyball Center on April 20, 2017. A text message from Favre to Bryant reads:

> Hey governor[,] this [is] [B]rett Favre. Poncho and I are flying to [C]huck Scianna's golf tournament now and I asked him to pass your number. Deanna and I are building a volleyball facility on campus and I need your influence somehow to get donations and or sponsorships. Obviously Southern has no money so I'm hustling to get it raised. We want to start this summer and finish in a year or less. I met Cspire about sponsoring and they are thinking it over and I'm trying others as well. Think about it and if you are in [Hattiesburg] again and want to swing by [my] place you[']r[e] certainly welcome or poncho and I can see you. Thanks in advance for all you do

Governor Bryant responded a few hours later, "Of course I am all in on the [v]olleyball facility. Y'all have fun and next week come see me. We will have that thing built before you know it. One

thing I know how to do is raise money [thumbs up emoji]."[4] Over two months later, on July 21, 2017, Favre texted the following to Governor Bryant:

> Not sure how we [] can help get this facility built for Vball. But you are the governor and [,] on our side [,] and that's a good thing. Actually [,] a great thing.

> Governor Bryant responded, "We can do that. Just get me some numbers and I'll find a way.

Maybe USM or the Coach can call me and we'll get on it." Favre replied that he would "have [J]on Gilbert[,] the new [athletic director][,] give you everything you need."[5] On the following day, Favre forwarded the "[l]atest plans" for the facility to Governor Bryant and once again explained, "I'm trying to get sponsors, donations etc... if we can find a contractor that would say hey rather than give you money I'll build for free!! Maybe you [k]now of someone[?] [thumbs up emoji]." Governor Bryant told Favre that he was "all over it."[6]

It is important to note that, in these early text messages, Favre never mentioned the use of public funds, much less the use of TANF funds for the construction of the facility. At this time, the discussions between Favre and Governor Bryant were focused on private donations and corporate sponsorships.

## II. Meanwhile, unbeknownst to Governor Bryant, New and Favre were pursuing MDHS funds for the USM Volleyball Center.

It appears New and Davis discussed using MDHS funds to pay for the construction of the USM Volleyball Center in advance of a July 24, 2017, meeting with USM officials. Favre seemed surprised in a text message to New following the meeting. The message reads, "Nancy[,] thank you again!!! John mentioned 4 million and [I was] not sure if I heard him right. Very big deal and [I] can't

---

[4] Exhibit 4. Governor Bryant has attempted to correct typographical and grammatical errors within quoted text messages for the sake of the reader.

[5] Exhibit 5.

[6] Exhibit 6.

thank you enough ☺." [Doc. 131-3]. Governor Bryant had no knowledge of or involvement in this meeting, nor did he have knowledge of or involvement with Davis' $4 million commitment.

A few days later, Favre suggested to New in a text message that he could perform "a few radio spots" for MCEC. New liked the idea and said MCEC could make a "first phase" payment to Favre of $500,000. The contract would renew in September 2017. Favre explained that he would donate or direct the payments to USM for the construction of the volleyball facility [Docs. 131-4, 131-5]. The texts attached to the motion to compel read:

> **Favre:** Also[,] I want to help you and was thinking a PSA is [an] option that could be done quick and easy to put together ☺
>
> **Favre:** Ok. I could record a few radio spots here initially[,] I'm sure right here. [We could s]ee how it is received and whatever compensation could go to USM
>
> **New:** 4 million dollars ☺☺☺. Just kidding. The first phase could be $500,000 and after Sept. we can renew. This is a good approach. What do you think?
>
> **Favre:** Was just thinking that here is the way to do it!!
>
> **New:** Exactly. Ok, Zach [New, Nancy's son] can get you a MOA or you may have one that you would rather use. Either way we can get this done.
>
> **Favre:** Excuse my football intelligence[,] but what is [a] MOA? [frowny face emoji]
>
> **New:** Working agreement, no big deal. We will send you one and you can adjust
>
> **Favre:** My biggest concern is time commitment so [if] we can manage that I'm good
>
> **New:** Please do not worry about your time commitment. We can only imagine how may directions you are pulled. Just a few things here and there, spread out, will be plenty.
>
> **Favre:** Ok great

Whatever arrangement MCEC and Favre ultimately reached, if any, the point remains the same: Governor Bryant was not involved in crafting the arrangement, and he had no knowledge of its existence. Clearly, the concept of passing through funds to USM was not Governor Bryant's idea.

**III. Favre asked New if the media might discover MCEC's payments to him.**

On August 2, 2017, Favre sent a text message to New that reads, "John said you guys have a big meeting Monday with [the] university. Hope we hit a homerun. Looks as though the facility is gonna [sic] be more than we thought which is always the case." [Doc. 131-6]. In a follow-up text, Favre expressed uneasiness to New about their arrangement being leaked to the press:

> **Favre:** If you were to pay me is there anyway [sic] the media can find out where it came from and how much?

> **New:** No, we never have had that information publicized. I understand you being uneasy about that though. Let's see what happens on Monday with the conversation with some of the folks at Southern. Maybe it will click with them. Hopefully.

> **Favre:** Ok thanks

[Doc. 131-7]. Once again, Governor Bryant is not included in any of the messages between New[7] and Favre and had no contemporaneous knowledge of their discussions.

New informed Favre on August 4, 2017, that she had "just got off the phone with Phil Bryant! He is on board with us! We will get this done!" *Id.* New did not tell Governor Bryant that she and Davis had arranged to contribute $4 million in TANF funds to the project. She simply explained that she was helping Favre gain university approval of the project and it appeared the university would ultimately approve it. Just as he had indicated to Favre, Bryant told New that he would assist them in raising private donations and corporate sponsorships to help fund the project.

**IV. Without Governor Bryant's involvement, the Attorney General's Office and the IHL approved the use of MDHS funds for the USM Volleyball Center project.**

On August 10, 2017, Dr. Gordon Cannon[8] notified New that the university president and general counsel had decided to proceed with the USM Volleyball Center project. New delivered the

---

[7] New had a personal interest in securing new athletic facilities for USM. She is an alumnus of USM and has sat on multiple university boards of directors, including the board of the USM Athletic Foundation. *See,* https://southernmiss.com/news/2016/8/24/Fan_Feature_Nancy_New.aspx.

[8] Cannon serves as the T.W. Bennett Distinguished Professor in the Sciences and Vice-Provost for Research at USM. *See,* http://www.research.olemiss.edu/agenda/bios/GordonCannon.pdf.

news to Favre that same day [Doc. 131-8]. Cannon provided additional information to New nine days

later. New and Favre exchanged the following text messages on August 19, 2017:

> **New:** Morning. I got a call yesterday from Gordon Cannon that their meetings went well on accepting the money, etc. Next Wed. there is another meeting with [the] MDHS attorney and USM to make sure all the wording is good before it goes to IHL. Still keeping my fingers crossed. I still think it will happen.
>
> **Favre:** Thanks Nancy. [USM Athletic Director] Jon Gilbert said the same thing yesterday. [praying hands emoji]

[Doc. 131-9]. Dr. Cannon supplied further inside information to New on August 23, 2017, which New

passed along to Favre. New told Favre that Cannon had concluded a meeting with Garrig Shields[9]

and Jacob Black[10] and "everything [is] a go. Daniel Feig[11] will be in touch with you or Zack [New] to

ask for a draft lease. Our target date for having everything complete for board approval is Sept[.] 22.

I know this is a short time line but that would get us approval [before] October which would not delay

bidding the project as currently scheduled." [Doc. 131-10].

---

[9] Shields was "General Counsel to the Executive Director's Office of MDHS before transitioning to serve MDHS agency wide as a Special Assistant Attorney General." *See*, https://www.shieldsgoodson.com/about.

[10] The state auditor served "a civil demand for $3,648,557.60 on former Deputy Director of the Mississippi Department of Human Services (DHS) Jacob Black. The demand requires misspent Temporary Assistance for Needy Families (commonly called 'welfare') money. Black was served with this demand based on audit findings from the Office of the State Auditor and new findings released in April 2022 by an independent CPA firm reviewing DHS spending. The audits found Black assisted a vendor, NCC Ventures, in violating procurement procedures. NCC Ventures has already been issued a demand by the Auditor for work that was not completed and has been sued by the State of Mississippi. Black's demand is also based on his role assisting the flow of welfare money to the Mississippi Community Education Center—a non-profit owned by Nancy and Zach New—and the Autism Center of North Mississippi. Nancy and Zach New have already been charged and pleaded guilty to state and federal charges in the largest public fraud scheme in Mississippi's history." *See*, https://www.dailyleader.com/2022/05/27/auditor-issues-civil-demand-on-former-dhs-deputy-director-black/.

[11] Feig currently is the Director of Athletics/Vice Chancellor for Intercollegiate Athletics at USC Upstate. Feig previously served as "Executive Associate Athletic Director [at USM], assisting with the day-to-day management and administration of all aspects of the Department of Intercollegiate Athletics. Among his broad responsibilities, Feig directly supervised several administrative units within the department, including the athletic compliance office, athletic academic services, the athletic training office, the strength and conditioning program, the drug testing program, and the graduate assistantship program. As a former practicing attorney, Feig also served as the Athletic Department's contract administrator and liaison to the University's General Counsel." *See*, https://upstatespartans.com/staff-directory/daniel-feig/100.

The IHL Board approved a lease agreement between USM and the USM Athletic Foundation

on October 19, 2017. The board minutes[12] state:

> **USM –** Approved the Amended and Restated Lease with the University of Southern
> Mississippi Athletic Foundation (Foundation/Lessee). The premises involve
> approximately two acres of land known as the Payne Center parking lot located at 101
> MK Turk Circle, Hattiesburg, MS 39406. The premises also include portions of the
> Reed Green Coliseum located adjacent to the proposed construction in the Payne
> Center parking lot. During the term of the Lease, the Foundation will construct a
> Wellness Center of approximately thirty thousand square feet in accordance with plans
> and specifications as approved by USM. The premises shall also include certain other
> underutilized athletic space as agreed upon by the parties hereto. *The Foundation
> intends to sublease the premises to a third party for prepaid rent in order to
> allow the Foundation to perform the construction to the premises.* The purpose
> of the Lease Agreement is to provide the Foundation the right to utilize the premises
> as needed and agreed upon by the parties, including the right to construct and
> lease/sublease a new Wellness Center and/or other athletics related space, including
> but not limited to the Reed Green Coliseum. All construction of the facilities by the
> Foundation shall be in accordance with plans and specifications as approved by USM.
> The term of the Lease shall commence subsequent to IHL Board approval and full
> execution of the Lease and shall expire on July 31, 2022. The contract amount shall be
> $1.00 cash in hand. This lease and subsequent sublease are being funded through the
> lease of athletic department facilities by the Mississippi Community Education Center
> (MCEC), a 50l(c)3 organization designed to provide schools, communities and families
> with educational services and training programs in South Mississippi. *MCEC will use
> the subject facilities to support their programming efforts for South
> Mississippi. MCEC's funding for this project is via a Block Grant from the
> Mississippi Department of Human Services. The funding from MCEC shall be
> prepaid rent to the Foundation in the amount of Five Million Dollars
> ($5,000,000) for the leasing of certain USM athletic facilities including but not
> limited to the to be constructed Wellness Center*, Reed Green Coliseum and
> additional athletic space as agreed upon by USM and the Foundation. The agreement,
> *which was reviewed and approved by the Attorney General's Office prior to the
> Board's approval of this item*, is on file in the Board Office.

Special Assistant Attorney General Stephanie L. Ganucheau reviewed the lease agreement and

recommended that the IHL Board approve it. The October 9, 2017, memorandum she drafted to Dr.

John Pearce, Associate Commissioner of Finance and Administration,[13] plainly reads:

---

[12] Exhibit 7 (emphasis added).

[13] Exhibit 46.

# MEMORANDUM

TO:        Dr. John Pearce, Associate Commissioner of Finance and
           Administration

FROM:      Stephanie L. Ganucheau, Special Assistant Attorney General

DATE:      October 9, 2017

RE:        USM Amended and Restated Lease with USM Athletic Foundation

Pursuant to your request, I have reviewed the proposed Amended and Restated Lease between the University of Southern Mississippi (USM) and the University of Southern Mississippi Athletic Foundation, for the construction of a wellness center and utilization of other under-utilized athletic space, and would make the following recommendation:

**Recommendation: I recommend the attached letter for IHL Board approval.**

Please let me know if you have any questions.

cc:        Leigh Patterson
           Van Gillespie

New notified Favre that the IHL Board approved the lease arrangement. The text message

exchange between them on October 19, 2017, reads:

**New:** It's a go. All approved by IHL!

**Favre:** Finally[,] and thanks Nancy. I hope it's enough now. Jon [Gilbert] said 500k has to go to renovations for reed green and another 500 to maintenances fund

**Favre:** See ya [sic] next week ☺

**New:** We will still [do a] fundraiser, etc. we will get the rest. Also, I thought Jon let you know but we had to postpone the 25th due to Dr. Bennett's request but I will get us another date.

**Favre:** Ok ☺

**New:** Also, in the next few days could I send you a draft proposal to do a couple of psa[]s, etc. for Families First[?]

**Favre:** K good

15

[Doc. 131-11]. Gilbert announced the construction of the new facility on that same day. Southern

Miss Student Media reported his announcement on October 24, 2017, as follows:[14]

> "On behalf of the university, the Department of Athletics, and as a community member, I am proud and honored to announce this facility," Gilbert said. "It is certain to be a point of pride, as it stands to serve our student-athletes, our student body and community constituents for years to come."

> The Wellness Center, the current name the facility will go by, is intended to be 26,000 to 28,000 square feet and is to be located along West Fourth Street by the Payne Center. The facility is planned to hold one thousand people and will be the new home for the Golden Eagles' volleyball team. Planning to host community and student events, the center will have a weight room, volleyball court, training room, locker rooms and classrooms.

> Currently, Reed Green Coliseum is home to the men and women's basketball team, the volleyball team and hosts numerous study body events. The construction of the Wellness Center will ease the burden on the aging Reed Green facility.

> The Wellness Center will be funded through private donations and by the Mississippi Community Education Center. The architectural firm of Wier Boerner Allin of Jackson was chosen to design the new facility.

> Wier Boerner Allin designed Mississippi State's new baseball stadium that is currently under construction and new softball stadium. The firm also designed Millsaps' new softball and tennis facility, along with the Mississippi Coliseum in Jackson and Ed's Burgers in Hattiesburg.

> *Much more is still in development such as the cost and the design of the Wellness Center. However, once the funding is secured and cost of construction is finalized, the construction itself is projected to take 12 to 15 months.*

The USM Athletic Foundation signed the lease on October 26, 2017. The university signed

the lease on November 2, 2017.[15] On that same day, New and Favre discussed obtaining Governor

Bryant's assistance in a private fundraiser for the facility. The text message exchange reads:

> **New:** I saw the Gov last night. We will still plan the fundraiser as well[.] [W]e can get another date from him that works with your time, too. Surely, Southern folks won't say to postpone it again. At any rate[,] it's all going to work out.

> **Favre:** I['m] ready [thumbs up emoji]

---

[14] *See,* https://sm2media.com/17598/news/southern-miss-announces-new-facility/ (emphasis in original).

[15] Exhibit 8 at 14.

[Doc. 131-12]. The USM Athletic Foundation "received the first installment of $2,500,000 in TANF funds on Nov. 6, 2017, followed by a second payment for the same amount on Dec. 5, 2017."[16] The insinuation by New and certain members of the press that Governor Bryant "worked. . . to channel"[17] these payments of TANF funds is completely unsupported and absolutely false.

### V. Favre received his first payment from MCEC in late-December 2017.

Favre Enterprises, Inc. received a $500,000.00 payment from MCEC in late-December 2017.[18] Governor Bryant had no knowledge of or involvement with this payment. Favre thanked New for the payment in a December 27, 2017, text message and the following exchange ensued:[19]

**Favre:** Nancy[,] Santa came today and dropped some money off ☺ ☺ thank you my goodness thank you. We need to setup the promo for you soon. You[']r[e] way to[o] kind

**New:** Yes, he did. He felt you had been pretty good this year! After these holidays let's get our calendars together on a few activities, etc. [P]lease know if we asked you to do something and you can't, it is ok. We will get it all worked out.

**New:** How is the building coming along and Beach Volleyball? Is it the way you had hoped?

**Favre:** Well[,] it's more of when they will start it. Now it's February they are saying [thumbs down emoji]

### VI. Favre asked Governor Bryant in May 2018 to assist him in finding someone to build lockers for the USM Volleyball Center.

Favre sent the following message to Governor Bryant on May 9, 2018:

Governor[,] this Brett. I'm still trying to save money on [the] Vball facility. We have visitor and [h]ome lockers yet to build and Warren Hood is donating any lumber. [It would be helpful] [i]f someone would build them on [their] spare time. Poncho mentioned the prison industry possibly as a builder. The architects can provide all specs

---

[16] *See*, https://www.mississippifreepress.org/27465/in-depth-how-brett-favre-secured-6-million-in-welfare-funds-for-a-volleyball-stadium.

[17] *See*, https://mississippitoday.org/2022/09/13/phil-bryant-brett-favre-welfare/.

[18] *Id.*

[19] Doc. 131-13.

Governor Bryant said he would "get on it".[20] Nine days later, on May 18, 2018, Governor Bryant asked Favre for an address to which the governor could send a personal donation for the volleyball project. Favre provided the address and payment instructions. Governor Bryant responded with the following message:

> Ok. I got Chuck Davis in Laurel ready to come down and get on the Lockers. He is a cabinet builder and does all the work for Ben Napier on their T.V. [show] HOME TOWN. Chuck can be reached at [REDACTED]. If someone will give him a call[,] he will get on it and I will pay for the work [thumbs up emoji]. If you have time to meet him there one day[,] I bet we would get a really good price. I am also going to reach out to Ponch and see if we can't get a fundraiser in Hattiesburg put together [thumbs up emoji].[21]

Governor Bryant and Favre did not discuss the use of public funds for this project.

## VII. Favre and New hoped Governor Bryant could raise a substantial amount of money in a private fundraiser.

Favre notified New on March 28, 2018, that the construction bids for the facility were much higher than anticipated. Favre had been confident that construction costs would be fully covered by the $5 million payment and other money "we have saved." New reminded Favre that they could still have a fundraiser "at the Governor's mansion." And, according to New, "if we need to, we will roll up our sleeves and get the rest." The text message exchange is as follows:

> **Favre:** Nancy[,] I wanted to update you on [the] facility. The bids all are in and shockingly the lowest is 6.9. The architects were confident it would come in lower than what we have saved. Really frustrating. Jon [Gilbert] said he wanted to go back to [the] lowest bid[der] and talk to them about getting it down to 5.9. I'll keep you updated.
>
> **New:** Wow, that is disturbing. Lordy, all this time and now to find this out. Well, let's see what the lowest bid comes back with and then if we need to, we will roll up our sleeves and get the rest. We can still have the fundraiser at the Governor's mansion, too. We can use Phil's business list that he offered earlier. I will be thinking and hopefully there will be something in the new budget for Families First to offer. But that's not [un]til July. I will be thinking on other things. Thanks for letting me know.

[Doc. 131-14]. One or more private donors had already been enlisted to pay for a separate beach

---

[20] Exhibit 9.

[21] Exhibit 10.

volleyball complex at USM. The Mississippi Free Press implied in a recent report that Favre may have utilized part of the $1.1 million paid to him by MCEC for promotional services to pay for the beach volleyball complex. The September 16, 2022, article reads:

> In June 2018, MCEC transferred a second TANF payment to Favre Enterprises in the amount of $600,000. That same month, WDAM reported that the beach volleyball project would consist of three new outdoor courts constructed just south of the upcoming stadium and that it would cost $250,000 with a June 2019 completion date. The story said the beach volleyball project was "funded through private donations," but did not name the apparent donors.[22]

Governor Bryant had no knowledge of or involvement with the beach volleyball project.

**VIII. Governor Bryant did not attend or participate in the meeting at Favre's home.**

In its motion, MCEC references a Microsoft Outlook calendar appointment dated January 1, 2019, from Davis to Ted DiBiase that contains the following description: "This meeting was requested by Brett Favre and the Governor to discuss the Education Research Program that addresses brain injury caused by concussions. They also want to discuss the new facility at USM." [Doc. 131-15]. Mississippi Today reporter Anna Wolfe correctly reported on April, 4, 2022, that Governor Bryant did not attend or participate in this meeting:

> In a calendar entry obtained by Mississippi Today, Davis wrote that the governor and Favre requested the meeting, which was originally to take place at New's office. But due to bad weather preventing a flight from Hattiesburg to Jackson, texts show, Davis and New drove to the football player's south Mississippi mansion instead.[23]

Despite what Davis's calendar entry says, Governor Bryant did not request the meeting, did not attend the meeting, did not participate in the meeting, and has no knowledge of what was discussed.

---

[22] *See*, https://www.mississippifreepress.org/27465/in-depth-how-brett-favre-secured-6-million-in-welfare-funds-for-a-volleyball-stadium.

[23] *See*, https://mississippitoday.org/2022/04/04/phil-bryant-brett-favre-welfare-scandal-payout/.

**IX. Ben Napier assisted with locker construction for the USM Volleyball Center at Governor Bryant's request.**

On January 12, 2019, Governor Bryant made the following post on Twitter: "Don't forget the Season 3 premiere of Home Town, with Mississippians Ben and Erin Napier, comes on Monday night at 8:00 p.m. We are proud of them for showcasing our great state on a nation[al] scale." Bryant sent a link to his tweet to Favre and asked, "Please retweet. Ben helped us with the lockers for the Volleyball Complex. He and Erin's show in Laurel is doing great. Thanks brother." Favre responded, "You bet."[24]

**X. Favre asked Davis for additional public funds.**

In her reporting, Wolfe stated that Favre approached Davis for additional MDHS funding of the volleyball project on March 18, 2019.[25] Wolfe wrote:

> Around the same time, Favre was getting nervous about holding the bag for more than $1 million that the Southern Miss Athletic Foundation needed to build the new volleyball facility Favre promoted.
>
> "Hey brother Deanna and [I] still owe 1.1 million on Vball," Favre texted Davis, referring to his wife, Deanna Favre. "Any chance you and Nancy can help with that? They don't need it at the moment."

Wolfe's story continued:

> "Good to hear from you. Let me see what we can do," Davis responded. ["]We certainly want to see the Vball project come together. I'll get back with you tomorrow."[26]

Favre exchanged the following messages with New on May 15 and 16, 2019:

> **Favre:** Nancy[,] I asked the college for an update on what is owed as of today and it's 1,070,000. It's not due right now. And we almost have the final plans for beach. They look great. Of course[,] you can help out again. And regardless I owe you big time. ☺
>
> **New:** Hey Brett. That amount is not too bad. We will see what we can do hopefully after July 1. I can't wait to hear about the plans for the beach. Keep me posted.

---

[24] Exhibit 11.

[25] *See,* https://mississippitoday.org/2022/04/06/brett-favre-used-fame-favors-welfare-dollars/.

[26] *Id.*

[Doc. 131-16]. Favre subsequently mentioned in a text to one of his business partners, "I still owe 1.2 for the Vball complex on campus and not sure if Nancy and John can keep covering for me."[27]

Favre claimed his debt grew from $1.07 million to $1.2 million to $1.8 million by May 30, 2019. Favre again reached out to New about his debt on May 30, 2019. New explained to Favre that she and Davis "were on board" with satisfying Favre's debt with TANF funds. The exchange reads:

> **Favre:** Nancy[,] are you still confident you can cover the 1.8 and that number will probably be less as we get closer[?]
>
> **New:** Morning. In a meeting with John Davis now. He said we will cover much of [it] but [it] may have to be in a couple of payments. We are on board!

[Doc. 131-17]. Favre's debt had apparently grown to $1.95 million by June 26, 2019. He explained to New, "Nancy as of today the number is 1.95 mill for everything. It's not due and if anything[,] that number will go down[,] but not up. Deanna and I keep chipping away also. Thank you as always." New and Favre then engaged in the following exchange:

> **New:** Hey there. Steadily working on this and hope to have some relief after the first of July. I am feeling good about getting some of it knocked down and then more should be available soon after.
>
> **New:** Is this amount on the facility or beach volleyball?
>
> **Favre:** Total

[Doc. 131-18]. Favre explained in a text message to a business partner in July 2019, "Here is my dilemma which isn't your concern. Nancy has been awesome to me and has paid 4.5 million for a 7 million facility. And she said it was all gonna [sic] be taken care of until this morning. Suddenly she said I don't think I can do anymore. So now I am looking at a big pay out."[28] At this time, Governor Bryant had no knowledge of Favre's "dilemma" or the efforts to utilize public funds to cover his Favre's debt.

---

[27] *Id.*

[28] *Id.*

**XI. Governor Bryant accepted Davis' resignation and alerted the state auditor to potential fraud.**

Meanwhile, misuse of MDHS funds came to light in June 2019. Davis resigned several weeks later. Austin Smith is MCEC's co-defendant in this suit and Davis' nephew. Smith explained the circumstances surrounding his uncle's resignation in his answer to the complaint as follows:

> Shortly before John Davis resigned as director of DHS, John Davis explained to family members that Governor Bryant had told him (John Davis) that he (John Davis) was going to "f***ing jail." John Davis told family members, including Austin Smith, that Brett DiBiase had received a check at John Davis' mailbox, and Governor Bryant apparently believed this check was a kickback. John Davis stated that Brett DiBiase was getting a divorce and wanted to hide his income from his wife. This was the reason the check was sent to John Davis' mailbox. John Davis indicated that Jacob Black, John Davis' second in command, had informed Governor Bryant about the check going to Davis' mailbox. Governor Bryant then reported the matter to the State auditor, and this report from Governor Bryant to the State auditor formed the basis of the State auditor's claim that Governor Bryant was the "whistleblower" responsible for the investigation into the fraud occurring at the Department of Human Services.

[Doc. 58 at 12-13]. New was obviously concerned about Davis' resignation and that an ensuing investigation by the state auditor might also uncover her criminal acts. On July 2, 2019, New texted Governor Bryant, "Governor, may I please meet with you for a few minutes this morning? It truly is important and I do appreciate any time you may have to give me. Thank you. Nancy New." Bryant responded, "I can see you at 8:30 at the Sillers Office." [Doc. 131-19].

Governor Bryant explained to New in the meeting that he had received distressing information concerning the handling of MDHS funds. Bryant told New that he had turned the matter over to the state auditor for review. Bryant and New did not discuss the USM Volleyball Center or any past or future funding of the project.

In a text to Favre dated July 16, 2019, New expressed her concern about recent events and their impact on her ability to cover Favre's debt on the USM Volleyball Center project:

**Favre:** Nancy if I can help you in any way[,] you know I will. Please know that

**New:** Thanks Brett. That means a lot to me. I am ok, just politics and people. We are trying to stay above all the foolishness and we will. Too much good stuff to get done.

*I am concerned though that I may not be able to assist you in Aug. as we had planned.* I will continue to work on that though. I am not sitting still! Hope all is well with you.

**Favre:** Oh goodness. Even if it's a little later? The due date

**New:** Will continue to work on it for sure [two thumbs up emojis]

**Favre:** I can try and delay as long as possible if you think that would help. The beach is at least 6 months away from any payment

**New:** Do that and that will give me time to work some other angles for us [thumbs up emoji]

**Favre:** About to see Governor Bryant. Anything I can say to him that could help?

**New:** Let him know how much we work together on youth development, sports programs that instill leadership and future work skills

[Doc. 131-20] (emphasis added).

### XII. Governor Bryant first learned MDHS was involved with the USM Volleyball Center project in July 2019.

Governor Bryant first learned that MDHS was involved with funding the USM Volleyball Center project in a text message he received from Favre on July 16, 2019.[29] This was nearly two years after the IHL Board approved the $5 million lease payment. Favre's message to the governor reads:

I'm on [my] way and I'm sure I won't have time [or] privacy enough to speak about this so I want you to know how much I love Nancy New and John Davis. What they have done for me and Southern Miss is amazing. Her family's first is incredible and she cares. We were planning to do workshops and youth clinics in the new Vball facility with her families first kids. And also[,] I paid for 3/4 of Vball facility and the rest was a joint project with her and John which was saving me 1.8 million. *I was informed today that she may not be able to fund her part. I and we need your help very badly* Governor and sorry to even bring this up.

It is apparent from the bolded portion of the above text that, after being told by New that additional MDHS funding was doubtful, Favre began a campaign to aggressively lobby the governor to help him cover the debt on the USM Volleyball Center. Although Governor Bryant had no reason

---

[29] Exhibit 12.

to question Favre concerning construction costs and payment commitments at the time, we now know Favre's message was inaccurate. Specifically, Favre had not paid three-quarters of the construction costs for the facility, and MDHS's financial commitment to the project was obviously more than $1.8 million.

Moreover, based on the content and tenor of Favre's text message, it is also apparent that Governor Bryant did not know what had previously transpired between New, Davis, and Favre regarding the funding of the USM Volleyball Center. If, as MCEC and certain press members have insinuated, Governor Bryant was directing the funding for the project, why did Favre provide him a synopsis of the project's funding history? And why did Favre provide details of the funding history to the governor? Regardless of the answer to these questions, the record is clear that USM and its attorneys, the IHL Board, and the state attorney general's office all approved a $5 million payment of TANF funds from MCEC to construct the facility without Governor Bryant's involvement.

Referring to Davis' resignation, Governor Bryant told Favre, "I will handle that . . . long story but had to make a change. But I will call Nancy and see what it will take [thumbs up emoji]."[30] Favre copied that text message and forwarded it to New [Doc. 131-21]. Bryant and New engaged in the following exchange forty-five minutes later:

> **Bryant:** Just left Brett Favre. Can we help him with his project[?] We should meet soon to see how I can make sure we keep your projects on course.
>
> **New:** I would really appreciate having the opportunity to follow through with all the good things we are working on, especially projects like Brett's and Tim Bennett's. I can make myself available when you have time. I would really appreciate a little of your time soon.
>
> **Bryant:** I can do 4pm on Thursday.
>
> **New:** Thank you. I can be there.
>
> **Bryant:** [thumbs up emoji] at the Mansion.

---

[30] *Id.*

24

**New:** Ok. Thank you.[31]

New immediately informed Favre that she had scheduled a meeting with the governor. Her message reads, "I am meeting with the Gov. at 4 on Thursday. He wants me to continue to help you and us get our project done. I feel good about that." Favre replied, "I love John [Davis] so much. And you too ☺." [Doc. 131-23].

Governor Bryant and one of his staff attorneys[32] met with New on July 18, 2019.[33] Bryant explained that he supported the USM Volleyball Center project, but MDHS must comply with federal and state laws. Bryant further explained that the state auditor's investigation of MDHS may provide clarity on the matter. Favre thanked the governor for meeting with New. Governor Bryant responded, "Working with her. Lots of challenges but we will do our best."[34]

**XIII. Governor Bryant contacted Chris Freeze about replacing Davis as MDHS Director.**

Governor Bryant contacted Chris Freeze about assuming the role as MDHS Director on July 19, 2019. After exchanging pleasantries about Freeze's recent retirement from the FBI, Governor Bryant told Freeze that he "[m]ay give you a call later. Have a[n] Agency Director position open at Dept. of Human Services that needs a compassionate leader. ☺" Freeze said he was "[h]appy to talk about it" and the two scheduled a time to speak later that day.[35]

**XIV. Governor Bryant told Favre that MDHS funding of the USM Volleyball Center project must be approved by the state auditor.**

Three days later, on July 22, 2019, Governor Bryant asked a staff attorney to "***check with Nancy New and see what the contract with Southern Miss is all about***. Brett is asking for info

---

[31] Exhibit 13. Part of this exchange can also be found at Doc. 131-22.

[32] Governor Bryant has redacted all identifying references to staff attorneys in order to preserve the confidentiality of the attorney. Several attorneys were members of Governor Bryant's staff. Governor Bryant does not waive attorney-client privilege regarding the identity of the attorneys referenced and quoted herein.

[33] Exhibit 14.

[34] Exhibit 15.

[35] Exhibit 16.

on the proposed funding." The attorney responded, "Yes sir."[36] Later that day, the attorney provided the governor with findings reached by the state auditor and updated the governor on a recent discussion the attorney had with New. The text message exchange between the attorney and Governor Bryant is as follows:

**Staff Attorney:** FYI, auditor's findings from [his] year long [sic] audit.

**Staff Attorney:** The Department of Human Services (DHS) was the subject of several significant findings in the report. The report notes that DHS

- Did not certify whether multiple childcare centers met health and safety standards

- Did not monitor recipients of several grants to determine whether grant money was spent in accordance with the law

- Did not compile basic, required documents, like a comprehensive list of grant recipients

- Did not follow federal reporting guidelines, submitting some federal paperwork nearly two years late

- Did not follow all legal requirements for ensuring beneficiaries of large programs like Supplemental Nutrition Assistance Program (SNAP), Temporary Assistant for Needy Families (TANF), and Child Care and Development Fund (CCDF) were actually eligible for the programs

- And did not or could not ensure childcare centers receiving CCDF funds accurately counted children in the centers.

Several of these DHS findings have been repeatedly identified by the Auditor's office since 2014 with no corrective action completed.

**Bryant:** Saw that... was there a response from DHS?

**Staff Attorney:** *I talked to Nancy. She said the program at usm is a health and fitness program. The contract is with usm to rent buildings to put on this program. Brett volunteers his time. Nancy is getting a one pager.*

**Staff Attorney:** Not yet. We think dhs needs to respond.

**Bryant:** They should and explain why this was not corrected since 2014. *Can we get*

---

[36] Exhibit 17 (emphasis added).

26

*[the] Auditor to tell [us] if the USM Contract is proper?*

**Staff Attorney:** I can certainly ask them.

**Bryant:** *If it [is] proper then we should move ahead since they are planning it to happen.* Has Nancy heard any further from [the] Auditor since Friday?

**Staff Attorney:** I don't think so but the auditor's office said they couldn't say they were done with Nancy yet. They think the John Davis, [DiBiase] investigation will take another month or so to wrap up. They haven't found any additional info since what they reported 4 weeks ago.

**Staff Attorney:** 3 weeks ago*

**Bryant:** [thumb up emoji][37]

To be clear, the above exchange is protected by the attorney-client privilege. A former governor of this state should not be forced to publicly divulge attorney-client communications to confront and disprove unfounded allegations that an admitted felon has levied against him in the press through the guise of a legitimate subpoena. That is precisely what New, using MCEC as a conduit, has done in causing a frivolous subpoena to issue in order to create a media circus that was calculated to embarrass and harass Governor Bryant. The implication that Governor Bryant did anything improper concerning the USM Volleyball Center is an outright lie. While Governor Bryant supported the project, he consistently told Favre and New that project funding would need to be vetted through proper channels, including the state auditor, and follow legal requirements.

Following the discussion with his staff attorney, Governor Bryant explained to Favre, "[t]he State Auditor is reviewing all the Contracts at DHS which [f]und [] Families First. Hope we get legal clearance soon. Don't want to get anyone in trouble for improper expenditures. Should know soon." Favre continued to press the matter:

**Favre:** Ok. As far as families first and facilities goes[,] I think we can do so much together. It would be beneficial for both.

**Bryant:** Hope we get clearance.

---

[37] Exhibit 18 (emphasis added).

**Favre:** So do I. Thanks. What's your gut tell you will happen? I have to come up with a lot of money if this doesn't get clearance

**Bryant:** It's the State Auditor that will give the approval. Has to have legal authority. I will check today. []

**Favre:** Governor[,] I know you are doing all possible and I appreciate your help tremendously [3 thumbs up emojis][. I]f I need to do anything to help make this all work please let me know.

**Bryant:** Will do... we are checking today. Thanks for caring.

**Favre:** Your welcome.[38]

### XV. Governor Bryant explained to Favre the reasons why the state auditor must approve the use of MDHS funds for the USM Volleyball Center project.

Chris Freeze became MDHS Director on or about July 25, 2019.[39] Favre texted New that afternoon and asked, "You think I should send the Governor a message?" New responded, "It wouldn't hurt. I sent the proposal to Whitney, his legal person [,] the same day I copied you in. I think he has been gone some this week but today he did announce John Davis' replacement from somewhere, maybe he is back in Jackson. Maybe he hasn't had a chance to talk to Whitney but we need to get his approval soon[er rather] than later. I know he is in town tomorrow according to his calendar." [Doc. 131-24]. Following through on New's suggestion, Favre texted Governor Bryant the following:

**Favre:** Hey Governor[,] I know you[']r[e] busy but I hope you can take a look at Nancy[']s proposal when you have time. By the way[,] I do follow you on Twitter ☺ [thumbs up emoji]

**Bryant:** [thumbs up emoji] just back in town. Met with new Director today. It will take time to get the Auditors Report. Working on it...

**Favre:** That's all I can ask[.] [T]hank you

---

[38] Exhibit 19.

[39] Exhibit 20.

**Bryant:** [thumbs up emoji] Keep the Faith[40]

Favre copied the first of the two texts from Bryant and sent it to New. She responded, "Hmm. Not sure what to make of that but maybe whatever he is waiting on will be done soon. He has so much to deal with all the time. I think the new Director will be good to work with, too. He is a retired FBI Director. I look forward to getting to know him. I hope to meet with him in the next few days." Favre replied, "He said for us to keep the faith also ☺" [Doc. 131-24].

Three days later, on July 28, 2019, Favre expanded his request for MDHS funding to include funding for a new indoor practice facility for the USM football team. Favre's text to Governor Bryant reads:

> **Favre:** Sorry to bother you but Friday I picked up Deion Sanders and his son who is going to be a junior in high school and plays QB. He has at least 30 offers thus far including us. Deion and I have been great friends since 91' and have great respect for each other. We have a great opportunity to get this kid but with 2 years remaining before he can sign we have many hurdles to jump and much opposition especially in the resource department. As I suspected Deion's son asked where the indoor facility was and I said [we] don't have one but [we] are hoping to break ground in less than 2 years. Now that will not happen without your help/commitment!!! I know we have the Vball to complete first and I'm asking a lot with that and I believe 100% that if you can get this done Nancy will reach and help many and in the recruiting war [a new indoor practice facility] will give USM['s football program] instant credibility and [USM football will] become relevant again.[41]

Governor Bryant explained to Favre that the use of DHS funds is "tightly controlled." His detailed text message in response to Favre reads:

> **Bryant:** *Nancy has some limited control over Federal Funds in the form of Grants for Children and adults in the Low [-] Income Community. Use of these funds [is] tightly controlled. Any improper use could result in violation of Federal Law. Auditors are currently reviewing the use of these funds by Families First. As soon as the Audit is complete [,] we will know if the project at USM is a proper expenditure. Neither I nor Nancy can make this decision. She must have approval from DHS and the State Auditor. As soon as we get approval we can move forward. Without that approval any expenditure could be illegal and Nancy and USM could be made to repay the Federal Government any and all funds spent. That's why we are waiting [until] it is approved. I am*

---

[40] Exhibit 21.

[41] *Id.*

*Sorry it takes so long. Hope we can get there soon. Will let you know [w]hen I do. Thanks for helping.*[42]

Governor Bryant clearly explained to Favre that New did not have unfettered discretion over public funds. Bryant explained that New's expenditures must comply with federal and state laws, and her expenditures were currently being reviewed by the state auditor. The governor further explained that neither he nor New could direct funds to the volleyball project without prior clearance from the state auditor and the new MDHS director. This communication once again illustrates that the narrative advanced by MCEC in its motion is completely unfounded, as are the recent press reports that ran with it.

**XVI. Favre continued to push for MDHS funding for the USM Volleyball Center project.**

On August 2, 2019, Favre inquired of New, "Any word? Met the new Director yet?" New responded, "Not yet, but I have asked for one ASAP. Yesterday was his first day so I am in hopes to get to see him at least by Monday. I am very anxious to get in there and talk with him. The Gov wants me to[], so I am counting on his push, too." [Doc. 131-25].

Favre sent a text message to Governor Bryant later that day that reads, "Nancy just told me you are getting her and the new Director together ASAP. Thanks as always." Governor Bryant responded that he "[w]ill make it happen [thumbs up emoji]."[43]

Favre asked the governor on August 5, 2019, if there was "[a]ny word yet on [m]ine and Nancy[']s project?" Governor Bryant told Favre that he would "check . . . [a]gain."[44] Later that day, Governor Bryant asked a staff attorney, "[d]id we get a plan from Nancy New about a Project [with] Southern Miss and Families First?" The attorney supplied Bryant with a copy of New's proposal.[45]

---

[42] *Id* (emphasis added).

[43] Exhibit 22.

[44] Exhibit 23.

[45] Exhibit 24.

The proposal reads:

| | |
|---|---|
| **To:** | **Governor Phil Bryant** |
| **From:** | **Dr. Nancy New, Mississippi Community Education Center**<br>**Brett Favre** |
| **Re:** | **The Dewey Phillip Bryant Center for Excellence at the University of Southern Mississippi (The proposed name was intended to be a surprise honor to the Governor. Due to the urgency in getting this secured, we felt it appropriate to share.)** |

**Project Name: The Dewey Phillip Bryant Center for Excellence at the University of Southern Mississippi focusing on Obesity, Bullying Prevention and Personal Development Project Summary**

The **Mississippi Community Education Center ("MCEC"),** the **Mississippi Department of Human Services ("MDHS"),** the **University of Southern Mississippi Athletic Foundation ("USM")** and **Brett Favre**, Mississippi native and member of the National Football League Hall of Fame, by and through the Families First for Mississippi services, have engaged in a collaborative partnership aimed at providing evidence-based and research-based resources and initiatives to individuals, families and communities throughout Mississippi. Specifically, the partnership provides support and resources for individuals and families through provision of healthy living and nutrition (with a primary focus on childhood obesity and family nutrition), health choices; as well as, bullying awareness and prevention education. Additionally, resources and support are provided in areas of leadership development, job readiness training, personal and financial stability and a variety of other skills-based resources and trainings.

**Programs & Initiatives**

This initiative provides numerous programs and resources which enable a wide network of support designed to impact and stabilize the whole family. These programs include, but are not limited to, the following:

1. Healthy living and nutrition with primary focus on obesity.
2. Impacts and effects of bullying awareness and prevention.
3. Positive youth development.
4. Soft skills, job readiness and workforce training.
5. Personal financial literacy.
6. Personal wellness, fitness and nutrition.
7. Leadership development training.

**Who will benefit?**

This collaboration has an immediate positive impact on individuals and

families throughout Mississippi. There is a direct positive impact for the University of Southern Mississippi and surrounding areas. The Dewey Phillip Bryant Center for Excellence will serve as a model program that could easily be expanded to each of the Institutions of Higher Education and Community College campuses, thereby facilitating accessibility of these resources, programs and supports in communities statewide.

### Project Needs & Logistics

It is estimated that **$1.5 to $2.0 million ($1,500,000.00 - $2,000,000.00)** is needed to adequately fund this project. These funds will be deposited in and maintained by the **University of Southern Mississippi Athletic Foundation** and designed specifically for the Dewey Phillip Bryant Center of Excellence at the University of Southern Mississippi. This commitment will help to ensure that this isn't just a project or program, rather it is a sustainable process that provides a perpetual direct and meaningful impact on youth and families for many years to come.

MCEC has over thirty (30) years of experience in providing services and resources; not only in Mississippi, but across the United States and in other countries. Brett Favre has a vast professional and personal network which provides resources and expertise from individuals with varied backgrounds and experiences. Together, this team of professionals will continue to implement and provide programs and resources which will have a profound and direct long-lasting impact.

### Conclusion

This collaboration will provide a long-lasting repository for resources and professional support for the people of Mississippi. MCEC will provide resources and support in areas in which the organization has cultivated expertise for over three decades. Brett Favre has committed to relying on his vast network of friends and fellow professionals in providing training and education across a broad spectrum of areas. The requested funding will allow this partnership to conduct training and forge additional partnerships in a wide variety of educational and professional areas. Most importantly, said funding will provide a mechanism to continue and expand these meaningful and much needed resources to move Mississippi positively in obesity, bullying related suicides, and bridging the soft-skills gap. The Dewey Phillip Bryant Center for Excellence on the campus of University of Southern Mississippi will serve as a model program in the country and a catalyst for sustainable, systemic change.

As the proposal makes crystal clear, the naming of the facility did not originate with Governor Bryant. Rather, this was a desperate ploy by New to curry favor. It did not have the intended effect.

On August 8, 2019, New and Favre discussed MCEC's proposal for another $1.5 to $2 million in funding. The exchange reads:

**New:** Gov. texted and said y'all are meeting on the proposal I gave him. Call or text if you need my help! We are going to get this done!!!

**Favre:** We met in regards to an issue poncho was needing resolved and he only had 15 minutes but he did say at the end that he will get this done with you!!!

**Favre:** He sure came across as sincere and believable

**New:** He said something about project managers. We will need those, too. We have to make this all about teaching, education, obesity prevention, exercise, etc. and we can pay a lease or facilities' use.

**Favre:** Should I forward this to him as well?

**New:** Sure[,] that is fine.

[Doc. 131-27]. Later that day, Governor Bryant asked Favre if "the Funding from Nancy [is] planned for bricks and mortar? Her application is not very clear what the money will be used for?"[46] Favre forwarded the messages New sent to him earlier in the day and added a few of his own comments:

No brick and mortar. We can use funds for that. But we can pay for Lease expenses, curriculum for several programs that will be taught there on youth development programs and activities, health, nutrition classes, Obesity prevention programs. We will need staffing part time and a couple full time possibly. Much more but this will help.

She said we can't use for brick and mortar.

He said something about project managers. We will need those, too. this all about teaching, education, obesity prevention, exercise, etc. and we can pay a lease or facilities' use.

Program monies, facilities fees, education, entrepreneurship Every penny spent will be used wisely and accountable.

Also from Nancy[47]

Two days later, on August 10, 2019, New nervously inquired once more of Favre. The exchange reads:

**New:** What did the Gov say to you about our proposal? I know the new director knows about it because I brought it up to him. He asked if that was the one that the Gov's name was to go on the bld??? I said yes but honestly[,] I couldn't read why he asked that about his name. Keep that quiet right now. Lots of politics[,] I think.

**Favre:** The only the thing Phil said was the questions I relayed to you but Phil is

---

[46] Exhibit 25.

[47] *Id.*

33

adamant it will get done. Of course[,] he is a politician so I'm a little uneasy

**New:** Yep, I totally agree. I hope he will stay steady and help us get it done.

**Favre:** I'll keep asking weekly

[Doc. 131-28]. On August 14, 2019, Favre notified Governor Bryant, "Now that the facility is almost done[,] I expect to start payment. I know you[']re] on it and Thanks."[48] Governor Bryant responded, "Nancy has to provide the proper documentation to MDHS. It's all up to her to get the paperwork in and then I can help."[49] Favre forwarded the governor's message to New. The resulting exchange between New and Favre is as follows:

> **New:** Wow, I have given the proper information to several people several times. [big eyes emoji] Even the new director mention[ed] this proposal to me the other day so I know they have seen it. But I will definitely submit it again today. When we get this done and you and I have a few minutes to visit, I will share a couple of my real thoughts with you on some folks! [two smiley faces with teeth emojis] But in the meanwhile I am sending this proposal again and will keep pushing. Thanks so much.

> **Favre:** Do you want me to say anything back to Governor?

> **Favre:** He said to me just a second ago that he has seen it but hint hint that you need to reword it to get it accepted.

> **New:** Reword?? Wonder what he means. I am making a call now to get a little more information from someone on the inside and will get back with you. Just let him know that it was submitted but I am reworking it today.

[Doc. 131-28]. Favre's characterization of the governor's message is far from accurate. Governor Bryant plainly stated that he could not determine whether the funding supplied by MCEC would be used for brick-and-mortar construction costs. Later that day, the following exchange between Governor Bryant and Favre occurred:

> **Favre:** Nancy said she would re-send. But she said the new director has seen and looked it over. If you are saying she needs to reword and resubmit I'll tell her.

> **Bryant:** I would do that if I were her.

---

[48] *Id.*

[49] *Id.*

>**Favre:** Ok. I'll tell her. Any other advice is welcomed since want to get this accomplished. Thanks Governor[.] She said she would redo but sure would like some insight for guidance if possible
>
>**Bryant:** [thumbs up emoji]
>
>**Favre:** Please let me know if I can tell Nancy anything that can help get this done.[50]

Favre reached out to the governor once again on August 16, 2019. The text message exchange reads:

>**Favre:** Nancy has reached out to a few folks for some intel but they haven't returned her calls so she is rewording/redesigning the proposal to submit this morning. Again Gov[,] any advice I can pass on would help
>
>**Bryant:** That's all I know to tell her. Hopefully she can put more details in the proposal. Like how many times the facility will be used and how many child[ren] will be served and for what specific purpose.[51]

Favre sent an amended proposal to the governor later that day. Favre asked Governor Bryant if the amended proposal looked "sufficient enough."[52] Governor Bryant responded, "We will see soon. I would have listed the number of people proposed to be reached by the program and the number of employees necessary to achieve these goals."[53]

New followed up with Favre, "Confidential; Do you get the impression that the governor will help us?" Favre responded, "I really feel like he is trying to figure out a way to get it done without actually saying it" [Doc. 131-28]. Turns out, Favre was wrong. Governor Bryant and newly-appointed MDHS Director Chris Freeze engaged in the following exchange on August 17, 2019:

>**Bryant:** *Brett Farve is blowing me up over that proposal Nancy New submitted for the Center at Southern Miss. I have told him it would be reviewed just like all other proposed projects.* Brett needs more to do in his life just now [thumbs up emoji]. I really do think he believes in the project.
>
>**Freeze:** *Yes, Nancy is blowing me up, too. Unless there is additional information you would like MDHS to consider, I'm not inclined to approve at*

---

[50] *Id.*

[51] Exhibit 26.

[52] *Id.* Favre submitted additional amended proposals to Governor Bryant at 10:38 a.m. and 4:41 p.m. The funding request in the proposals increased the range to $1.8-$2 million. *See*, Exhibits 27-28.

[53] Exhibit 26.

*this time. I don't think now is the time to give them $2 million.* We have reviewed and think there might be other ways to accomplish their goals than by creating a center at USM. Brett could be a part of those if he wanted. If you would like to talk so I can further explain, I would be happy to call at your convenience, sir.

**Bryant:** *As always[,] I am not going to interfere. You [have] got a better understanding than I do of these projects. I think Brett was told it was going to get done by the previous Director. One of the reasons that he is the former Director.*[54]

### XVII. Undeterred, Favre continued to press Governor Bryant for assistance.

Having personally guaranteed payment for the USM Volleyball Center, Favre continued to press Governor Bryant for meetings and assistance. Favre and Bryant engaged in the following exchange on August 23, 2019:

**Favre:** Nancy and I will come meet with you and [the] new director if you think that will help.

**Bryant:** Can't hurt [thumbs up emoji]

**Favre:** Ok. [Is] Monday morning ok?

**Bryant:** [thumbs up emoji]

**Favre:** 8:30?

**Bryant:** I am gone all next week... have Nancy get with Bethany and schedule something for us all…

**Favre:** Ok. Obviously[,] I or we need you [to] help us big time with this.

**Bryant:** Understand[55]

Favre told Governor Bryant on the following day that he would soon owe over $1 million on the project if the state did not offer additional funding. The message between Favre and the governor is as follows:

**Favre:** Governor[,] the indoor volleyball facility could be completed any day now and I'm sure the university will be calling for the remaining 1,048,000. I can try to buy some time. You[']r[e] our starting QB and we can only go as far as you take us.

---

[54] Exhibit 29 (emphasis added).

[55] Exhibit 30.

> **Bryant:** *I got called into this game late.* Headed to Taiwan today at 4:30. Let's get a meeting with Director Freeze as soon as I return. Not sure who made the deal for a million dollars. Nancy needs to work with Bethany to arrange a meeting.
>
> **Favre:** Not to put pressure on you but if anyone can make this work you can. Have a great trip and see you after.
>
> **Bryant:** Nancy has already called and we will get that meeting set [thumbs up emoji][56]

Governor Bryant, Director Freeze, New, and Favre met on September 4, 2019, to discuss the request for an additional $1.8 to $2 million for programs at the USM Volleyball Center. Favre and Bryant engaged in the following text message exchange after the meeting:

> **Favre:** Thank you for having us. We obviously need your help big time and time is working against us. And we feel that your name is the perfect choice for this facility and we are not taking No for an answer! You are a Southern Miss Alumni, and folks need to know you are also a supporter of the University.
>
> **Bryant:** We are going to get there. This was a great meeting. ***But we have to follow the law.*** I am to[o] old for Federal Prison. [smiley face, sunglasses emoji]
>
> **Favre:** So[,] you think we will get [i]t at least?
>
> **Bryant:** I hope so . . . it's [] about Nancy and her play book...
>
> **Favre:** You tell me what I should relay to her and I'll do it
>
> **Bryant:** We will see. It's not going to happen [until] November.
>
> **Favre:** Ok. Before someone goes out of office I hope
>
> **Bryant:** [thumbs up emoji][57]

Two days later, Governor Bryant and a staff attorney discussed New and her request for additional funding. It is apparent that Bryant suspected New had violated the law in her operation of MCEC. The text message exchange reads:

> **Bryant:** I can call you. If it's about the Grant or DHS Funding there isn't much I can do. Until Audit has [completed] its work I am staying out of all decisions that the agency will make. It would be best to meet with [a staff attorney] at this time. Thanks.

---

[56] Exhibit 31 (emphasis added).

[57] Exhibit 32 (emphasis added).

**Bryant:** To Nancy New. She wants to meet again. Don't think that's a good idea. Keep this response as a record.

**Staff Attorney:** Yes sir. She's relentless.

**Bryant:** Nancy is worrying. She know[s] what they were doing was wrong.

**Staff Attorney:** 100%. She should be worried.

**Bryant:** Isn't about the audit or DHS at all. Actually, it's about me but that's ok, I understand. I am sorry to bother you especially on a Friday. Have a nice weekend. It's going to be a hot one [New's response to Bryant that he copied and sent to the staff attorney].

**Bryant:** Nancy's reply []<sup>58</sup>

The meeting never occurred. However, it is likely that New wanted to discuss a letter she received from Freeze earlier that day [131-31]. Freeze's letter communicated that certain MCEC expenditure requests had been allowed and others had been disallowed. Importantly, none of the expenditure requests were related to the USM Volleyball Center. The letter plainly indicates that Freeze will not rubber stamp his predecessor's requests, particularly when they run afoul of state and federal law. It is likely that Freeze's correspondence added to New's anxiety.

Shortly after becoming MDHS director, Freeze instituted a bidding process for TANF subgrants. Governor Bryant explained to Favre on September 16, 2019, that Freeze could not ignore the bid process to cover Favre's debt. The message exchange between Favre and Governor Bryant reads:

**Favre:** Governor[,] this [is] my last message I promise. I know you said nothing will be done before thanksgiving and I understand, but the completion of the facility is any day now and then I am to pay the remainder of [the] amount. If you think I should move forward on my own and pay it then that's fine but if I should politely ask for a few more months then I'm sure Charlie Finnegan would allow that. The university has [no] money nor would I expect them to help. We really can help not only the university with this but a lot of other folks as well. Thank you

**Bryant:** *I wo[u]ld ask for an extension. The Bid process the Director talked*

---

<sup>58</sup> Exhibit 33. The second to last text message from Bryant was New's reply to Bryant. He accidentally typed a question mark after "reply" in the following text.

*about is state law. To override or not obey the law would be a potentially
criminal offense. Neither one of us want an investigation by the Auditor. I
promise you, there is nothing more I can do except follow the law...*

**Favre:** I'll ask for an extension. Thank you

**Bryant:** [thumbs up emoji][59]

On October 13, 2019, Favre asked Governor Bryant if he had "gotten any good vibes yet for

our funding?" Bryant did not immediately respond. Nine days later, Governor Bryant and Favre

exchanged the following messages:

**Bryant:** I am meeting with [the] Director of MDHS this week to see where we are in
the grant request. We may have to go to the Legislature in January and get language in
a Funding bill. I also know how to make that play [football emoji]. Keep the faith.
[thumbs up emoji]

**Favre:** Governor[,] you would help me out tremendously if you can get it done. [It]
[s]ure will make it easier on me. Thank you

**Bryant:** On it . . .[60]

As any fair reader can see, Governor Bryant told Favre that he was awaiting a final decision

from Freeze regarding MCEC's request for additional funding for programs at the volleyball facility.

Bryant further explained that, should the request for MDHS funds be denied, he may be able to lobby

the legislature to add the funding in an appropriations bill. He did not commit TANF funds to the

construction of the facility.

Favre once again approached Governor Bryant about state funding for the volleyball facility

on November 5, 2019. The text message exchange reads:

**Favre:** I know you said wait [un]til November and dang time flies so I know it's
Election Day and you are probably busy[,] but while we know who our Governor is
presently[,] not to mention arguably the most popular and influential[,] I want to stay
on your radar. If our guy wins[,] I'll feel better about things [,] but if the other guy
wins[,] I feel like Nancy and I can forget our vision for Southern Miss.

**Bryant:** That's one reason I have been pushing Tate so hard. He has to win. Then we

---

[59] Exhibit 32 (emphasis added).

[60] Exhibit 34.

[can] set up a meeting on [the] Wellness Center at USM.

**Favre:** Ok. What's your gut telling you?

**Bryant:** We will win... you should text him and just say good [l]uck today [thumbs up emoji][61]

Favre asked Governor Bryant once again on November 11, 2019, "Think you will get the wellness center project done?"[62] Governor Bryant forwarded that message to Freeze and the following text message exchange ensued:

**Bryant:** Think you will get the wellness center project done? Brett

**Bryant:** Brett Favre keeps asking about the project. I told him a number of times it would be January before we would know anything. Apparently[,] he was assured by Nancy it would be funded.

**Freeze:** The proposals are due November 15. The committee will begin their work the following Monday. Results and notifications are expected by Dec 13th.

**Bryant:** Can I send that to Brett?

**Freeze:** Yes. That's public information.

**Freeze:** Should I ask how strongly you feel about the project?

**Bryant:** I am a supporter and think it can be a big help to a lot of people...

**Freeze:** Ok.

**Bryant:** Thanks[63]

Governor Bryant responded to Favre's message after communicating with Freeze. The text message exchange between Favre and Bryant reads:

**Bryant:** Will depend on the Grants in January and if we can get the Ms. Legislature to help . . . Lot of moving parts just now. *Nancy should have been more careful in giving any assurance that the project would be approved. One of the reasons John Davis is gone is because of this type of issue.* We will keep working on it...

---

[61] Exhibit 35.

[62] Exhibit 36.

[63] *Id.*

> **Bryant:** The proposals are due November 15. The committee will begin their work the following Monday. Results and notifications are expected by Dec 13th.
>
> **Favre:** I sure hope this gets cleared. Thanks Governor
>
> **Bryant:** Pushing hard
>
> **Favre:** I know and I really appreciate it very much
>
> **Bryant:** [thumbs up emoji][64]

A month later, on December 12, 2019, Favre once again requested the governor's assistance. The text message exchange is as follows:

> **Favre:** Hey Gov[,] I think you[']r[e] meeting with Nancy tomorrow. This [money] will be used for state programs as well as help USM[,] but w/ a director in place good things will happen and [t]he [u]niversity is all in as well. I know you[']r[e] doing all you can and we appreciate you very much.
>
> **Bryant:** Thanks Brett. We are working on it for sure. Will know [m]ore when I meet with Nancy.[65]

The Mississippi Free Press interviewed Chris Freeze in conjunction with a recently-released article addressing the matters arising from the present motion. The article reports:

> In an interview on Friday, Sept. 16, 2022, Freeze told the Mississippi Free Press that MDHS officials "felt like we had an obligation because the (previous) executive director (Davis) had verbally approved" some of New's requests. But he was working to implement new controls at MDHS that had been sorely lacking under Davis, who often made verbal agreements without accompanying paperwork. Part of that process included implementing an RFP process, which would require entities like New's to make formal proposals for funding.
>
> By the end of the year, New had submitted an RFP, Freeze said. "Our independent team reviewed it along with everybody else's, and I funded the programs that we thought were appropriate under TANF guidelines. … In Nancy's case, they got less than half of what they had requested." He said he did not recall her final RFP including funding for the volleyball stadium or USM-related money, but that his senior team was not involved in the review "so as to maintain integrity of the RFP."[66]

---

[64] Exhibit 37 (emphasis added).

[65] Exhibit 38.

[66] *See*, https://www.mississippifreepress.org/27465/in-depth-how-brett-favre-secured-6-million-in-welfare-funds-for-a-volleyball-stadium.

Governor Bryant asked New on December 18, 2019, "Did y'all get any [o]f the new programs from DHS?" New responded, "Yes, we did. From all the craziness going on, we had been made to believe we were not getting refunded. But we did. 'Someone' was definitely pulling for us behind the scenes. Thank you." Bryant responded, "☺" [Doc. 131-32]. Director Freeze addressed this exchange in his interview with the Mississippi Free Press. Freeze explained that "if New thought 'somebody was looking out for her, it had nothing to do with the governor talking to me . . . The governor can send smiley faces back, but within two weeks he said don't fund her and don't fund Christi Webb at the Family Resource Center.'"[67]

Freeze did as Governor Bryant instructed, which is why New sent the following desperate text to Governor Bryant on January 9, 2020 – six days before he would leave office:

> Thought I would just text instead of you having to call. I can imagine how busy you are today and I sincerely hate to bother you with this but there is no one at DHS to ask. We were recently told that our new contracts, effective Jan. 1 from DHS had been pulled back and no money would be dispersed. I don't have to know the reasoning behind that necessarily, but more importantly, my coworkers are trying to keep the family services going and in fact, they don't know that they are very close to losing their own jobs. Unfortunately, we are going to have to stop all of our services funded by DHS as we have exhausted all monies just trying to hold on. I will need to have my leadership lay off around 60-73 people. Also, we will need to start closing our families first centers across the state by next week. DHS already owes my organization a huge amount of reimbursement from the previous contract. I can't borrow any more money to hold on. So in saying all of this, would you check on the status of those contracts under my name (MCEC) being executed with some operational monies soon? Thank you so very much. N. New[68]

Governor Bryant responded, "Let me see what I can find out…," but he already knew the answer. Bryant had instructed Freeze to cease further funding of MCEC.

## XVIII. The "bottom line" was that Favre personally guaranteed the USM Volleyball Center project and it was "time for him to pay up."

Changing course, and after Governor Bryant had left office, Favre sought Bryant's assistance

---

[67] *Id.*

[68] Exhibit 48.

in obtaining a legislative appropriation to cover his personal debt. The text message exchange between

Favre and Bryant on January 26, 2020, reads:

> **Favre:** Governor[,] can you think of anyone or any other way of getting funding for the remainder of Vball?

> **Bryant:** Maybe we can talk Monday and I can get more info. and look for some funding. The Auditor continues his investigation into spending at the Department of Human Services. May need to go visit LT GOV Hoseman and Gov. Reeves.

> **Favre:** I [j]ust paid 350k which leaves the total around 1.6 and I am giving another 200k next week. How can Tate and Delbert help you think?

> **Bryant:** They [j]ust have to find a budget and put money into it. I have probably gotten USM $40 million in funding the last 8 yrs. Sen. Briggs Hopson is Senate Appropriations Chair. That's Coach Hop[']s brother...

> **Favre:** Wow. I just sent Tate a message. Should I do the same with Briggs and Delbert

> **Bryant:** I would. I will call them also...

> **Favre:** Ok.

> Brett, you aren't bothering me at all and please always feel free to reach out to me anytime. I will help any way I can. I will be glad to set something up with Tate. Tell me kind of what the plan in place for funding is/was. Did Gov Bryant mention maybe trying to get it as part of a bond bill for [the] University? Admittedly, I'm not the expert on some of this stuff but I will certainly do everything I can to get all the right minds together and formulate a plan to sort it out.

> From [REDACTED]

> I told him I would ask

> **Bryant:** It's complicated to do Bonds unless it[']s brick and mortar and the University puts it in its list of priorities for Bonds.

> **Bryant:** They could put $1.5 in a Bond Bill without a problem.

> **Favre:** Bond Bill is what you recommend?

> **Bryant:** Is it brick and mortar?

> **Favre:** Good question I'll find out. Do we want it not to be? I think it's more the finishing cosmetic type work. 5.5 has already been paid.

> **Bryant:** We want it to be one time construction cost not ongoing expenses.

**Favre:** We can certainly do that

**Bryant:** [thumbs up emoji]

**Favre:** So[,] do I need to have the university do something first?

**Bryant:** Let me talk to [USM President] Rodney [Bennett]...

**Favre:** Ok[.] Thanks Governor

**Favre:** [eagle emoji] I know you already know this[,] but I need you big time on this. And it sounds like if you can't then it will not get done. So[,] thanks again

**Bryant:** On it...

**Favre:** Gov.[,] I will be out of town Thursday through Sunday so if we need to meet with the powers that be before then please let me know

**Bryant:** Will know more tomorrow

**Favre:** Ok thank you[69]

On the following day, Favre told Governor Bryant that he had spoken "with Tate and he said he would get with his team on a plan. I'm sure with you in his ear that would help tremendously." Governor Bryant replied, "Good deal... will make that happen [thumbs up emoji]." Favre thanked the governor and said, "I can['t] focus on anything else with this looming."[70] Governor Bryant replied, "I understand."[71]

On January 27, 2020, Governor Bryant sent a text message to USM President Rodney Bennett. The governor explained, "Brett keeps asking to help him fund the Volleyball Facility. I want to help but wanted to see your position before I go [to] the Lt[. ] Governor." The following exchange ensued:

**Bennett:** Governor!!! It's so good to hear from you – we miss you! I haven't forgotten about the project for you at USM – I made a personnel change which I believed slowed our momentum a bit but it's definitely on the radar and a project we want to do. *I've*

---

[69] Exhibit 39.

[70] The "can" in this message is likely a typographical error. Given the context, it seems likely that Favre meant "can't".

[71] Exhibit 40.

*asked Brett not to do the things he's doing to seek funding from state agencies and the legislature for the volleyball facility. As you know, IHL has a process of how we request and get approval for projects and what he's doing is outside those guidelines. I will see, for the "umpteenth time" if we can get him to stand down. The bottom line is he personally guaranteed the project, and on his word and handshake we proceeded. It's time for him to pay up – it really is just that simple.*

**Bryant:** *That's was my thoughts. Maybe he wants the State to pay off his promises. Like all of us I like Brett. He is a legend but he has to understand what a pledge means. I have tried many time[s] to explain that to him.*

**Bennett:** Indeed!! I will be in contact regarding the project in the library for you.

**Bryant:** Thanks. That will be quite an honor from my University [thumbs up and eagle emojis][72]

Governor Bryant's final text messages with Favre concerning the volleyball facility are dated February 6 and 7, 2020. Favre asked, "Governor have you spoken to Tate? He said he was gonna [sic] get with his team and figure something out." Governor Bryant forwarded Favre a link to an article published in www.mspolicy.org titled, "Largest public embezzlement scheme in Mississippi history uncovered," and explained, "This has been the problem. Not sure what funding will be available in the future." The remaining messages read as follows:

**Favre:** Yeah[,] I'm well aware of it. I think the angle Tate is looking at is a bond bill according to [REDACTED]. You think that has a chance?

**Bryant:** Bonds can sure be used for Brick and mortar...

**Favre:** Anything I can do?

**Bryant:** May want to meet with Tate when you can...

**Favre:** I did and he said he would get with his team

**Bryant:** Then just have to wait [until] a bond bill is drafted and hope you make the list [thumbs up emoji]

**Favre:** Ok[73]

---

[72] Exhibit 41 (emphasis added).

[73] Exhibit 42.

### XIX. Favre returned the $1.1 million that MCEC paid him for promotional services despite contending he performed services for MCEC.

On April 30, 2020, the state auditor released his 2019 Single Audit Report of the State of Mississippi. The report revealed MCEC had paid Favre a total of $1.1 million in TANF funds between 2017 and 2018. The audit said MCEC contracted with Favre "to appear at several events, record promotions, and provide autographs for marketing materials."[74] The audit report continued, "Due to the inability to verify that any work was performed in order to fulfill the contract, and due to the unreasonable amount paid, the entire payment of $1,100,000 paid in FY 2018 is questioned."[75] Favre responded to the report with a series of tweets on May 6, 2020. Favre stated:

> My agent is often approached by different products and brands for me to appear in one way or another. This request was no different, and I did numerous ads for Families First. I have never received monies for obligations I didn't meet. To reiterate Auditors White's statement, I was unaware that the money being dispersed was paid for out of funds not intended for that purpose, and because of that I am refunding the full amount back to Mississippi.
>
> I have spent my entire career helping children through Favre 4 Hope donating nearly $10 million to underserved and underprivileged children in Mississippi and Wisconsin. It has brought a ton of joy to my life, and I would certainly never do anything to take away from the children I have fought to help! I love Mississippi and I would never knowingly do anything to take away from those that need it most.[76]

Favre repaid $500,000 in 2020 and $600,000 in October 2021. Favre continues to dispute that he owes $228,000 in interest and continues to dispute the auditor's claim that he did not perform promotional services for MCEC. Interestingly, Favre's position mirrors the position MCEC has taken in its answer to the complaint in this action. Governor Bryant does not contend or imply that Favre violated applicable laws or that he did not perform promotional services for MCEC.

---

[74] Exhibit 43 at 92, 193-94.

[75] *Id.*

[76] *See*, https://www.mississippifreepress.org/27465/in-depth-how-brett-favre-secured-6-million-in-welfare-funds-for-a-volleyball-stadium.

46

**XX. New and Davis pleaded guilty to violating federal and state criminal laws.**

On April 20, 2022, New pleaded guilty to violating "Title 18, United States Code, Section 1957 for Monetary Transactions with the Proceeds of a Specified Unlawful Activity, that is, wire fraud."[77] Two days later, she pleaded "guilty to the charges of: Bribery of a Public Official (four counts), 2 Fraud Against the Government (two counts), and 6 Wire Fraud (five counts), RICO" in this court.[78] New's guilty plea sets forth a laundry list of corrupt acts that were calculated to enrich her at the expense of this state's most vulnerable population. MCEC's $5 million expenditure of TANF funds for the construction of the USM Volleyball Center is not addressed in the indictment or in her plea.

This court entered an *Order of Nolle Prosequi* in *State of Mississippi v. John Davis*, No. 22-0-238(1-20) (Hinds Cty., Cir. Ct.) on September 21, 2022.[79] The order explains that –

> [t]he State and Defense have announced that a global plea resolution has been reached between the State, the federal authorities and the Defendant, John Davis, whereby the Defendant, John Davis has agreed to fully cooperate, including providing truthful testimony at trial, with the State and all federal authorities in the prosecution of any and all additional criminally charged defendants, in State or Federal Court, for the criminal misuse of Federal TANF grant funds, State of Mississippi Funds, Mississippi Community of Education Center funds or any other funds available to or through the Mississippi Department of Human Services during his tenure as the Executive Director of the Mississippi Department of Human Services. The State and the Defense have advised the Court that pursuant to the global plea resolution, all parties have agreed that the Defendant, John Davis will serve all of his incarcerated time in the custody of the Federal Bureau of Prisons.

Regarding the federal charges, Davis pleaded guilty on September 22, 2022, to "the felony crimes of Conspiracy and Theft from Programs Receiving Federal Funds, in violation of 18 U.S.C. 371 and 18 U.S.C. 666. Davis also pleaded guilty in this court "to five counts of Conspiracy and thirteen counts of Fraud Against the Government, in violation of Section 97-1-1 and 97-7-10 of the

---

[77] Exhibit 44.

[78] Exhibit 45.

[79] Exhibit 47.

Mississippi Code Ann." *Id.* As with New, MCEC's $5 million expenditure of TANF funds for the construction of the USM Volleyball Center is not addressed in the indictment or in Davis' plea.

## ARGUMENT

Miss. R. Civ. P. 45(d)(2)(C) grants circuit courts the authority to "quash or modify" subpoenas that are "unreasonable or oppressive." Governor Bryant respectfully requests that this court quash the subpoena at issue. In the alternative, pursuant to Rule 26(d)(1) and (2), Governor Bryant requests the entry of a protective order that would preserve the privileges at issue and protect the integrity of these proceedings. Finally, Governor Bryant requests that this court sanction MCEC pursuant to Rules 45(f) and 26(d)(4) for exercising the subpoena power in bad faith and to unreasonably annoy, embarrass, and oppress Governor Bryant.

### I. The subpoena should be quashed.

### A. MCEC cannot overcome Governor Bryant's privilege claims.

### 1. The deliberative process privilege

The deliberative process privilege is the most oft-cited form of executive privilege. *In re Sealed Case*, 121 F.3d at 737. The rationale of this privilege is that certain executive communications are "so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). The United States Supreme Court has explained that "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process." *United States v. Nixon*, 418 U.S. 683, 705 (1974). In its most basic form, the deliberative process privilege refers to –

> the common sense-common law principle that not all public business can be transacted completely in the open, that public officials are entitled to the private advice of their subordinates and to confer among themselves freely and frankly, without fear of disclosure, otherwise the advice received and the exchange of views may not be as frank and honest as the public good requires.

*Soucie v. David*, 448 F.2d 1067, 1080-81 (D.C. Cir. 1971) (Wilkey, J., concurring).

The "major impact of the deliberative process privilege has been on the day-to-day functioning of . . . government[s]." RUSSELL L. WEAVER & JAMES T.R. JONES, *The Deliberative Process Privilege*, 54 Mo. L. Rev. 279, 283 & n.24 (1989). The Supreme Court recognized in 1938 that it "was not the function of the court to probe the mental processes" of government officials, specifically the Secretary of Agriculture. *Morgan v. United States*, 304 U.S. 1, 18 (1938). The Court of Claims incorporated this principle into the deliberative process privilege twenty years later. *Kaiser Aluminum & Chemical Corp. v. United States*, 157 F. Supp. 939, 946 (Ct. Cl. 1958) (citing *Morgan*, 304 U.S. at 18).

The deliberative process privilege allows government officials to "withhold documents and other materials that would reveal 'advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Sealed Case*, 121 F.3d at 737 (quoting *Carl Zeiss Stiftung v. V.E.V. Carl Zeiss*, 40 F.R.D. 318, 324 (D.D.C. 1996)). Courts have established two substantive requirements that must be satisfied before the privilege presumptively attaches to a document. *Id.* First, the document must be pre-decisional, meaning it was created before the end of the deliberative process. WEAVER & JONES at 290. Second, the document must be deliberative, meaning it reflects the "give-and-take of the consultative process." *Coastal States Gas Corp.*, 617 F.2d at 866. This second prong requires that the material be "'a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters.'" WEAVER & JONES at 296. Accordingly, facts are not privileged, unless they are "so inextricably intertwined with the deliberative sections of documents that [their] disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d at 737.[80]

---

[80] Federal courts typically require the individual claiming the privilege to establish his claim by utilizing the *Vaughn* Index. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). The *Vaughn* Index provides an itemized and detailed summary of each document cross-referenced to the relevant parts of the government's justifications for the privilege. *Id.* at 826-27; *City of Colo. Springs v. White*, 967 P.2d 1042, 1053 (Colo. 1998). A proper index includes a description of the author, recipient, and subject matter of the documents in question. WEAVER & JONES at 301-02. Additionally, the index must include an explanation of why the document is privileged,

## 2. The chief executive communications privilege

Although the two privileges "are closely affiliated," the chief executive communications privilege is broader in scope than the deliberative process privilege. *Id.* at 745. The chief executive communications privilege "applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones." *Id.*

The District of Columbia Circuit Court of Appeals was the first court to address the chief executive communications privilege. *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973). In *Sirica*, the grand jury investigating the Watergate break-in ordered President Nixon to produce nine tapes for *in camera* review. *Id.* at 704. President Nixon refused, claiming executive privilege. *Id.* at 704-05. In upholding the district court's subpoena for these tapes, the court of appeals recognized a preliminary version of the chief executive communications privilege. *Id.* at 704, 717. Noting the strong public interest in protecting "the confidentiality of conversations that take place in the President's performance of his official duties" and "the effectiveness of the executive decision-making process," the court attached a presumptive privilege to presidential communications. *Id.* However, it determined the chief executive communications privilege was qualified, indicating it could be overcome by a sufficient showing of need. *Id.* Using this balancing test, the court struck down President Nixon's claim of privilege because the information sought was relevant and necessary to the ongoing Watergate investigations. *Id.* at 719-20.

---

including the role it played in the deliberative process. *Id.* at 302. Finally, if the document contains non-redactable information, "the index should state the existence of that material and explain why it is not segregable." *Id.* at 303.

Governor Bryant did not supply a *Vaughn* Index to MCEC because the documents at issue are also protected by the executive communications privilege. As explained *infra*, MCEC bears the burden of establishing the discoverability of documents protected by the executive communications privilege.

A year later, the United States Supreme Court addressed executive privilege in *United States v. Nixon*. In *Nixon*, the special prosecutor appointed by the Attorney General to conduct the Watergate investigations issued a subpoena for additional tapes possessed by President Nixon. 418 U.S. at 688. The tapes were to be used as evidence in criminal prosecutions against seven governmental officials linked to the Watergate break-in. *Id.* at 687. In response to the subpoena, President Nixon filed a motion to quash based on claims of executive privilege. *Id.* at 688.

In a unanimous opinion, the Court recognized a "presumptive privilege for Presidential communications" grounded in the constitutional doctrine of separation of powers. *Id.* at 708. Due to the President's unique role in the government, the privilege was necessary for the –

> protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decision-making. A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.

*Id.* at 708. The Court's rationale implies that the executive communications privilege is broader than the deliberative process privilege, and encompasses it. Therefore, at a minimum, it protects the deliberative and mental processes of the President.

The Court did, however, reject President Nixon's contention that the privilege was absolute. *Id.* at 706. It held that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege." *Id.* Instead, the Court recognized the presumptive privilege attached to presidential communications can be overcome by a demonstration of need. *Id.* at 713. In this case, President Nixon's general assertions of executive privilege yielded to the "demonstrated, specific need for evidence in a pending criminal trial." *Id.* at 713-14.

The Supreme Court's next foray into the chief executive communications privilege occurred in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977). Upon enactment of the Presidential

Recordings and Materials Preservation Act (PRMPA),[81] many materials – including the Watergate tapes – were transferred from the Nixon administration to the General Services. *Id.* at 433-34. President Nixon challenged the constitutionality of the PRMPA, claiming the statute impinged on the chief executive communications privilege. *Id.* at 439-40.

The Court first distinguished between sitting and former presidents, holding the privilege is given less weight when asserted by the latter. *Id.* at 448. Next, the Court quoted *United States v. Nixon* to limit the privilege to "communications 'in performance of [a President's] responsibilities,' 'of his office,' and made 'in the process of shaping policies and making decisions.'" *Id.* at 449 (citations omitted) (quoting *Nixon*, 418 U.S. at 708, 711, 713 (alteration in original)). As the Court explained, there was only minor interference with the confidentiality of presidential communications when the material was screened by archivists. *Id.* at 451-54. Because such screening had been accomplished without problems for earlier Presidents, the court viewed the interference as insubstantial and justified by the public interests underlying the PRMPA. *Id.* at 452-53.

More recently, the chief executive communications privilege arose in *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367 (2004). In *Cheney*, two organizations filed a civil lawsuit alleging an energy task force chaired by Vice President Richard Cheney violated the Federal Advisory Committee Act (FACA). *Id.* at 373; Pub. L. No. 92-463, 86 Stat. 770 (codified as amended at 5 U.S.C. app. §§ 1-16 (2000)). The two organizations obtained discovery orders against Vice President Cheney and other high-ranking executive officials requiring the production of information relating to the structure and membership of the task force. *Id.* at 375. Although the district court mentioned the possible applicability of the chief executive communications privilege, Vice President Cheney did not raise the issue while petitioning for a writ of mandamus to abate enforcement of the discovery order. *Id.* at 375-77.

---

[81] Pub. L. No. 93-526, 88 Stat. 1696 (codified as amended at 44 U.S.C. § 2107 Note (2000)).

In a divided opinion, the Court of Appeals dismissed Vice President Cheney's petition for a writ. *Id.* at 376. Despite its recognition that the discovery orders were overly broad, the Court of Appeals justified dismissal based upon the availability of alternative remedies. *Id.* at 376-77. The alternative remedies included an assertion of the chief executive communications privilege with the requisite specificity. *Id.* at 376.

The Supreme Court reversed the Court of Appeals and denied Vice President Cheney's writ of mandamus. *Id.* at 378. The Court distinguished the facts before it from those in *Nixon*. Focusing on the nature of lawsuits in which the allegedly privileged materials are needed, the Court held that the *"need for information for use in civil cases, while far from negligible, does not share the urgency or significance of the criminal subpoena requests in* **Nixon***." Id.* at 384 (emphasis added). In essence, the Court held that the need for disclosure is much weaker in civil lawsuits, thereby making it more difficult to overcome an assertion of the chief executive communications privilege.

Additionally, the Court expounded on its holding in *Nixon*. Distinguishing between the narrow subpoena in *Nixon* and the plaintiffs' broad discovery requests, the Court opined that "our precedent provides no support for the proposition that the Executive Branch 'shall bear the burden' of invoking executive privilege with sufficient specificity and of making particularized objections." *Id.* at 388. Instead, such specificity would only be required after the party seeking disclosure has "satisfied his burden of showing the propriety of his requests." *Id.* In *Nixon*, the special prosecutor met this burden. *Id.* Here, the plaintiffs "discovery requests [were] anything but appropriate." *Id.*

As discussed in the Objection to MCEC's subpoena, numerous state courts have recognized the executive communications privilege. The most recent state to recognize the privilege is Ohio. *State ex rel. Dann v. Taft*, 848 N.E.2d 472 (Ohio 2006). In the spring of 2005, the Ohio media shed light on mismanaged investments made by the Ohio Bureau of Worker's Compensation (BWC) that resulted in state losses of over $200 million. *Id.* at 476. Seeking to obtain information regarding Governor Bob

Taft's knowledge of these investments, State Senator Mark Dann submitted public records requests to the governor. *Id.* Senator Dann requested weekly memoranda and reports from BWC officials to the Office of the Governor. *Id.* Although Governor Taft produced a number of these documents, he withheld a significant number on the grounds of executive privilege. *Id.* As a result, Senator Dann instituted a mandamus action in the Ohio Supreme Court to compel production of the requested documents. *Id.* Before ruling on the parties' discovery motions, the Ohio Supreme Court asked the parties to brief the issue of whether the "Governor of Ohio may claim an executive privilege to prevent disclosure of documents provided to the Governor by staff members or other executive-branch officials." *Id.* at 477.

Opening its opinion with an historical examination of executive privilege, the Ohio Supreme Court recognized its development at both the federal and state level. *Id.* at 479-82. At the federal level, the Court noted the evolution of two separate and independent forms of executive privilege: the deliberative process privilege and the chief executive communications privilege. *Id.* at 479-81. The Court, however, touched only briefly on the deliberative process privilege because the Governor disclaimed any reliance on it. *Id.* at 480. Instead, the Court focused on the chief executive communications privilege. *Id.*

In conjunction with its discussion of the chief executive communications privilege, the Court placed heavy reliance on the United States Supreme Court's decision in *Nixon.* Quoting the *Nixon* opinion at great length, the Court used the same rationale in applying the presidential communications privilege to the "chief executive official of a state." *Id.* at 481. The Court further noted that several other states had applied some form of executive privilege to the chief executive officers of their states. *Id.* at 481-82.

The Court grounded its holding in the doctrine of separation of powers. This doctrine mandates that each branch of government be allowed to carry out its constitutional responsibilities

without interference from the other branches. *Id.* at 484. The executive communications privilege is designed to protect the governor's independence.

Ohio's version of executive privilege parallels the qualified privilege recognized in *Nixon*. The Court established a three-step process for determining when the privilege attaches. First, the governor must formally assert the privilege. *Id.* at 485. To do so, the governor must state that "he or she has reviewed the requested materials" and concluded that they fall within the scope of the privilege. *Id.* at 485-86. Second, once a formal assertion of the privilege has been made, the requested materials are presumed to be privileged. *Id.* at 485. This presumption, in favor of non-disclosure, shifts the burden to the party seeking disclosure to "demonstrate a particularized need for disclosure of the material deemed confidential by the governor." *Id.* Third, and only after the first two prongs have been satisfied, the Court will hold an *in-camera* hearing to review the requested documents and determine whether the privilege applies. *Id.* at 485. If the hearing establishes that the "communications to the governor were, in fact, made for the purpose of fostering informed and sound deliberations, policymaking, and decision-making," the Court will "balance the requester's need for disclosure against the public's interest in ensuring informed and unhindered gubernatorial decision making." *Id.* at 485. Materials will be disclosed only when the balancing test weighs in favor of the public interest. *Id.*

In the case at bar, Governor Bryant's Objection plainly states that "[a]ll responsive documents within [his] care, custody, or control are protected by the executive privilege." This assertion is consistent with Miss. R. Civ. P. 45(e)(2)(A)'s requirement that a privilege claim "shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim." The Objection shifted the burden to MCEC to demonstrate a "particularized need" for the subpoenaed documents.

Miss. R. Civ. P. 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the issues raised by the claims or defenses of any party." MDHS claims MCEC hired Favre to perform promotional services, claims Favre did not perform the services, and claims MCEC paid him $1.1 million anyway. MCEC's defense is that Favre performed promotional services and the $1.1 million payment was a permissible TANF expenditure. The complaint does not allege any connection between the USM Volleyball Center project, the $1.1 million payment to Favre, and Governor Bryant. And MCEC has not offered a defense that connects the USM Volleyball Center project and the payment to Favre to Governor Bryant. That assertion is only found in the motion to compel, and it has been wholly refuted in this filing. Accordingly, MCEC has failed to demonstrate a particularized need sufficient to overcome Governor Bryant's assertion of the chief executive communications privilege. The subpoena should be quashed and Governor Bryant should not be compelled to produce additional privileged materials.

**B. The subpoena exceeds the proper scope of discovery.**

Miss. R. Civ. P. 26(b)(1) provides in pertinent part that, "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the issues raised by the claims or defenses of any party." The rule also recognizes that, "It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Thus, MCEC must show the subpoena seeks documents that are: (1) relevant to the issues raised by the claims or defenses of a party and (2) reasonably calculated to lead to the discovery of admissible evidence. *Flechas v. Pitts*, 138 So. 3d 907, 910 (Miss. 2014) (noting that to obtain a subpoena duces tecum, the requesting party must show the information is relevant so that the witness is not subjected to unnecessary or irrelevant production).

The complaint does not address the USM Volleyball Center. MCEC has not alleged a defense that addresses the USM Volleyball Center. No party in this action has credibly alleged Governor

Bryant knew of the $1.1 million payment to Favre, nor has any party credibly alleged Bryant caused

public funds to be expended on the USM Volleyball Center project. Governor Bryant has refuted the

bald assertions made in the motion to compel with an overwhelming degree of specificity and proof.

It strains credibility to contend documents or information relating to a matter that is not at issue in

this case is reasonably calculated to lead to the discovery of admissible evidence. Accordingly, the

documents sought by the subpoena fall outside the proper scope of discovery.

## II. Alternatively, the court should enter a protective order.

Should the court determine the subpoenaed documents are discoverable, it should enter a

protective order that shields the documents from public consumption. There are three reasons why

this is so. First, this court entered a *Suppression Order* [Doc. 17] in *State v. New*, Nos. 20-0-052, 20-0-053

(Hinds Cty. Cir. Ct.) on November 16, 2020. The order states that, "[t]he Court, in an effort to ensure

that the State and [Nancy New] . . . receive a fair and impartial trial in the Circuit Court of Hinds

County, Mississippi and having admonished the parties concerning an article published November 14,

2020 that directly relates to this cause, hereby enters a Suppression Order limiting pre-trial publicity

until the completion of the trial or disposition without trial." The court ordered "that all attorneys,

their representatives, parties, witnesses, law enforcement officers and court personnel are prohibited

from discussing or commenting on any aspects of this case with the media until such time as it has

concluded[.]" The allegations in this action and the criminal cases, according to New, are "seemingly

identical." [Doc. 71 at 5]. A protective order would prevent the same individuals from releasing

documents and information in this action that the *Suppression Order* prevents in the criminal cases.

Moreover, a protective order would accomplish one of the same ends that the *Suppression Order*

accomplishes in the criminal cases – namely, preserving the integrity of court proceedings.

Second, the subpoenaed documents are privileged. The only way this court can preserve the

privileges and allow discovery of the documents is by entering a well-tailored protective order. The

Rules of Civil Procedure certainly contemplate such. Miss. R. Civ. P. 26(d)(1)(E) (court may order "that discovery be conducted with no one present except persons designated by the court" and any other order "which justice requires to protect a party or person from. . . oppression, or undue burden").

Third, the court should enter a protective order to preserve the integrity of these proceedings. The baseless accusations levied by MCEC against Governor Bryant are extremely serious. Governor Bryant never should have been forced to defend himself with the use of privileged documents in a public filing. He did so because the media frenzy that has ensued since MCEC filed its motion has been unfounded and unfair. Parties, and especially non-party subpoena respondents, should not be faced with this Hobson's choice. Accordingly, should the court determine the subpoenaed documents are discoverable, it should enter a protective order that ensures the integrity of this court's proceedings in this action and its related criminal actions, that does not unduly prejudice the rights of the defendants in the civil action and its related criminal actions, that respects the privacy and other similar rights of non-party respondents, and that preserves the privileged nature of documents and information.

### III. The court should award monetary sanctions to Governor Bryant.

Miss. R. Civ. P. 45(f) provides in pertinent part as follows:

> On motion of a party or of the person upon whom a subpoena for the production of books, papers, documents, electronically stored information, or tangible things is served and upon a showing that the subpoena power is being exercised in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the party or the person upon whom the subpoena is served, the court in which the action is pending shall order that the subpoena be quashed and may enter such further orders as justice may require to curb abuses of the powers granted under this rule. To this end, the court may impose an appropriate sanction.

Additionally, Miss. R. Civ. P. 26(d)(4) provides that "Rule 37(a)(4) applies to the award of expenses incurred in relation" to a motion for a protective order. Rule 37(a)(4) provides in pertinent part:

If the motion is granted, the court shall, after opportunity for hearing, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

Governor Bryant properly invoked the attorney-client privilege, deliberative process privilege, and the chief executive communications privilege in his Objection to the subpoena. Despite this Objection, Governor Bryant offered to accommodate MCEC's request with the entry of a well-tailored protective order. This was a substantial and highly-reasonable concession, considering the subpoena seeks documents which fall well outside the bounds of permissible discovery.

Instead of contesting the privileges or the way they were invoked, and without attempting to meet-and-confer with Governor Bryant to resolve this discovery dispute, MCEC filed the present motion and attached numerous text messages that are devoid of context. The motion does not address the privileges invoked by Governor Bryant, but MCEC's statement to Anna Wolfe of Mississippi Today does. MCEC's counsel told Wolfe, "We do not believe a protective order shielding the Governor's documents from public view, and thus limiting our ability to use them in open court or public pleadings in support of our defenses, is appropriate."[82]

This comment is meritless media bait. Counsel well-knows that a protective order does not impede the legitimate use of covered documents in court proceedings. Covered documents are filed under seal or in a redacted fashion. In the event covered documents are ultimately used in open court, they are provided to the parties, witnesses, judge, and jury and are entered into evidence. The primary outside interest from whom privileged documents are shielded is the press – and that is the point. In a court of law, Governor Bryant has the right to respond to unfounded or misguided allegations before an impartial court. This is not true with the media. Media members sometimes carry biases and

---

[82] *See*, https://mississippitoday.org/2022/09/13/phil-bryant-brett-favre-welfare/.

unfounded and unfair opinions that impact their work. Instead of impartially seeking the truth, the media member sometimes seeks to reinforce her already-existing beliefs, however unfounded they may be. This can result in a social media echo-chamber of confirmation bias that unduly influences court proceedings and biases potential jurors against parties and/or witnesses. And this influence threatens the integrity of this court's proceedings.

MCEC served a subpoena and filed this motion to force the governor to make a choice. Either preserve his rightfully-invoked privileges, seek a protective order, and risk damaging to his reputation by allowing false accusations to go unchallenged, or reveal privileged communications to the public in order to defend himself. Governor Bryant has chosen the latter course of action and, in doing so, he makes it clear that he only waives privileges attaching to the documents that are exhibits to this filing. Governor Bryant's privilege waiver is limited to this extent and this extent only. *Century 21 Deep South Properties, Ltd. v. Corson*, 612 So. 2d 359, 375 (Miss. 1992) ("The attorney-client privilege can be waived for limited purposes."); *Baptist Health v. BancorpSouth Ins. Services, Inc.*, 270 F.R.D. 268, 274 n.2 (N.D. Miss. 2010); *Liberty Mut. Ins. Co. v. Tedford*, No. 3:07-cv-73-A-A, 2008 WL 1930573, *2 n.2 (N.D. Miss. May 1, 2008).

MCEC has transparently used the subpoena power in a bad faith effort to annoy, embarrass, and oppress Governor Bryant. Accordingly, this court should award sanctions to Governor Bryant, including the attorneys' fees incurred in the preparation, filing, and argument associated with this response.

**<u>CONCLUSION</u>**

This court should deny MCEC's motion to compel. The documents sought by the subpoena are privileged and outside the bounds of permissible discovery. MCEC has undertaken no effort to establish a particularized need for the documents, which is telling considering the detailed Objection that Governor Bryant made to the subpoena in advance of this motion.

MCEC did not attempt to meet-and-confer with Governor Bryant in advance of filing the present motion. Instead, MCEC went to the press – an action that flies in the face of the *Suppression Order* pending in related criminal cases. This motion was brought in bad faith and solely to annoy, embarrass, and oppress Governor Bryant because he refused to turn a blind eye to the crimes perpetrated by New and Davis. This court should recognize MCEC's improper motives and award substantial sanctions, including attorneys' fees, to Governor Bryant.

Respectfully submitted, on this the 23rd day of September, 2022.

By:     /s/ *William M. Quin II*
William M. Quin II (MS Bar # 10834)
W. Thomas McCraney, III (MS Bar # 10171)
**MCCRANEY MONTAGNET QUIN & NOBLE PLLC**
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone:      601-707-5725
Facsimile:      601-510-2939
Email:          wquin@mmqnlaw.com
                tmccraney@mmqnlaw.com

**Attorneys for Non-Party Respondent, the Honorable Phil Bryant, the 64th Governor of the State of Mississippi**

## CERTIFICATE OF SERVICE

I, William M. Quin II, do hereby certify that the foregoing pleading was filed electronically through the Court's CM/ECF system and served electronically on all parties enlisted to receive service electronically.

This the 23rd day of September, 2022.

/s/ *William M. Quin II*
William M. Quin II

# EXHIBIT 1

9/16/22, 9:47 AM

Case 2:23-cv-00045-KS-MTP   Document 16-10   Filed 04/28/23   Page 72 of 220
Case: 25CI1:22-cv-00286-EFP   Document #: 140-1   Filed: 09/23/2022   Page 2 of 6



# Michael Watson
## SECRETARY OF STATE

This is not an official certificate of good standing.

### Name History

| Name | Name Type |
|------|-----------|
| MISSISSIPPI COMMUNITY EDUCATION CENTER | Legal |

### Business Information

| | |
|--|--|
| **Business Type:** | Non Profit Corporation |
| **Business ID:** | 595204 |
| **Status:** | Good Standing |
| **Effective Date:** | 06/22/1992 |
| **State of Incorporation:** | Mississippi |
| **Principal Office Address:** | 5360 I-55 N<br>JACKSON, MS 39211 |

### Registered Agent

### Officers & Directors

| Name | Title |
|------|-------|
| NANCY NEW<br>5360 I-55 N<br>JACKSON, MS 39211 | Incorporator |

1/1

280900

# STATE OF MISSISSIPPI

### SECRETARY OF STATE
### DICK MOLPUS

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
*                                                                                    *
*                                                                                    *
*             Mississippi Corporation Information System                             *
*                                                                                    *
*    Corporation Name                                                                *
*    COMMUNITY EDUCATION DEVELOPMENT SERVICE CENTER                                  *
*                                                                                    *
*                                                                                    *
*    Corp ID: 0582157                                                                *
*                                                                                    *
*    Filed:    06/22/1982 At 9:00 a.m.                                               *
*                                                                                    *
*                                                                                    *
*                                                                                    *
*                                         Dick Molpus                                *
*                                         Secretary of State                         *
*                                                                                    *
*                                                                                    *
*    Filing Fee Receipt:    $50.00                                                   *
*                                                                                    *
*                                         Secretary of State                         *
*                                         P. O. Box 136                              *
*                                         Jackson, MS 39205                          *
*                                         (601) 359-1350                             *
*                                                                                    *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

401 MISSISSIPPI STREET · P. O. BOX 136 · JACKSON, MS 39205
TELEPHONE (601) 354-1350

# ARTICLES OF INCORPORATION
### (Attach conformed copy.)

☐ PROFIT   ☐ NONPROFIT
(Mark Appropriate Box)

280900

RECEIVED

The undersigned persons, pursuant to Section 79-4-2.02 (if a profit corporation) or Section 79-11-137 (if a nonprofit corporation) of the Mississippi Code of 1972, hereby execute the following document and set forth:

1. The name of the corporation is

JUN -8 1992          JUN -9 1992

Community Education Development Service Center, JACKSON, MS.
SECRETARY OF STATE    SECRETARY OF STATE
JACKSON, MS.

2. Domicile address is    5360    I-55 North,
STREET

FILED
JUN 22 1992
Dick Molpus
SECRETARY
OF STATE

Jackson, MS  39211
CITY/STATE/COUNTY/ZIP

3. FOR NON-PROFITS ONLY· The period of duration is _____ years or _____ x _____ perpetual.

4. (a) The number (and classes, if any) of shares the corporation is authorized to issue is (are) as follows (THIS IS FOR PROFIT ONLY):

| Class(es) | No. of Shares Authorized |
|-----------|--------------------------|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

4. (b) If more than one (1) class of shares is authorized, the preferences, limitations, and relative rights of each class are as follows:

5. The street address of its initial registered office is

5360  I-55 North
STREET

Jackson, MS  39211
CITY/STATE/ZIP

and the name of its initial registered agent at such address is

Nancy New
Community  Education  Development  Service  Center

6. The name and complete address of each incorporator is as follows (PLEASE TYPE OR PRINT):

Nancy New
1946 Aztec Drive,  Jackson,  MS  39211
NAME/STREET ADDRESS/CITY/STATE/ZIP

7. Other provisions: _____

Nancy New

INCORPORATORS (SIGNATURES)

O-2

# ARTICLES OF AMENDMENT

(Attach conformed copy.)

☐ PROFIT   ☒ NONPROFIT

(Mark appropriate box)

289809

RECEIVED

FEB 26 1993

SECRETARY OF STATE
JACKSON, MS.

The undersigned corporation, pursuant to Section 79-4-10.06 (if a profit corporation) or Section 79-11-305 (if a nonprofit corporation) of the Mississippi Code of 1972, hereby executes the following document and sets forth:

1. The name of the corporation is: __Community Education Development Service Center__

2. Set forth the text of each admendment adopted. (Attach page.)

3. If a profit amendment provides for an exchange, reclassification, or cancellation of issued shares, set forth the provisions for implementing the amendment if they are not contained in the amendment itself. (Attach page.)

4. The amendment(s) was (were) adopted __January 25, 1993__
   DATE(S)

## FOR PROFIT CORPORATION

(a) adopted by ☐ the incorporators ☐ directors without shareholder action and shareholder action was not required. (Check appropriate box.)

## FOR NONPROFIT CORPORATION

(b) adopted by ☐ board of directors ☒ incorporators without member action and member action was not required. (Check appropriate box.)

## FOR PROFIT CORPORATIONS

5. If the amendment was approved by shareholders:
   (a) The designation, number of outstanding shares, number of votes entitled to be cast by each voting group entitled to vote separately on the amendment, and the number of votes of each voting group indisputably represented at the meeting was:

| Designation | No. outstanding shares | No. of votes entitled to be cast | No. of votes indisputably represented |
|---|---|---|---|
| | | | |

(b) Either the total number of votes cast for and against the amendment by each voting group entitled to vote separately on the amendment was:

| Voting group | Total no. of votes cast FOR | Total no. of votes cast AGAINST |
|---|---|---|
| | | |

or the total number of undisputed votes cast for the amendment by each voting group was:

| Voting group | Total no. of undisputed votes cast FOR the plan |
|---|---|
| | |

and the number cast for the amendment by each voting group was sufficient for approval by that voting group.

TIME 8:45 A.M.

Amount Received: $5.00

Filed: 2/26/93

Secretary of State
State of Mississippi

## FOR NONPROFIT CORPORATIONS

6. If the amendment was approved by the members:
   (a) The designation, number of memberships outstanding, number of votes entitled to be cast by each class entitled to vote separately on the amendment, and the number of votes of each class indisputably represented at the meeting was:

| Designation | No. memberships outstanding | No. of votes entitled to be cast | No. of votes indisputably represented |
|---|---|---|---|
| | | | |

(b) Either
   (i) the total number of votes cast for and against the amendment by each class entitled to vote separately on the amendment was:

| Voting class | Total no. of votes cast FOR the amendment | Total no. of votes cast AGAINST the amendment |
|---|---|---|
| | | |

or
   (ii) the total number of undisputed votes cast for the amendment by each class was:

| Voting group | Total no. of undisputed votes cast FOR the amendment |
|---|---|
| | |

and the number cast for the amendment by each class was sufficient for approval by that voting group.

BY __Nancy New, President & Founder__          __Nancy New__
   PRINTED NAME/CORPORATE TITLE                    SIGNATURE

C-3

I.   The Corporate named on the attached Articles of Amendment is amended to change the name to **Mississippi Community Education Center**.

II.  The purposes are amended to include the following:

A.   The purposes for which the corporation is organized are exclusively religious, charitable, scientific, literary and educational within the meaning of Section 501(C)3 of the Internal Revenue Code of 1986 or the corresponding provision of any future U.S. Internal Revenue law.

B.   Notwithstanding any other provision of these articles, this organization shall not carry on any activities not permitted to be carried on by an organization exempt from federal income tax under Section 501(C)3 of the Internal Revenue Code of 1986 or the corresponding provision of any future U.S. Internal Revenue law.

C.   In the event of dissolution, the residual assets of the organization will be turned over to one or more organizations which themselves are exempt as organizations described in Sections 501(C)3 and 170(C)2 of the Internal Revenue Code of 1986 or corresponding sections of any prior or future Internal Revenue Code, of the federal, state, or local government for exclusive public purpose.

# EXHIBIT 2

## Billy Quin

| | |
|---|---|
| **From:** | Gary Bufkin <tgb@carrollbufkin.com> |
| **Sent:** | Wednesday, July 27, 2022 3:28 PM |
| **To:** | Billy Quin |
| **Cc:** | Gary Bufkin |
| **Subject:** | RE: Phil Bryant |

Billy,

This will confirm the agreed extension of time to respond to the subpoena issued to Governor Bryant. The response date now is August 26, 2022.

Best,

Gerry

Thomas G. Bufkin
**CARROLL BUFKIN, PLLC**
1076 Highland Colony Parkway
600 Concourse, Suite 125
Ridgeland, Mississippi 39157
(601) 982-5011
www.carrollbufkin.com

 THE NATIONAL ACADEMY OF
**DISTINGUISHED NEUTRALS**

LEGAL NOTICE: This e-mail is from a law firm and may contain confidential and/or legally privileged information. This e-mail is intended solely for the use of the individual(s) to whom it is addressed. If you have received this e-mail in error, please notify the sender by reply e-mail, delete the e-mail from your computer and do not copy or disclose it to anyone else. Any disclosure, copying, distribution, reliance or use of the contents or information received in error is strictly prohibited. Neither this e-mail message nor its attachment(s) may be construed as establishing an attorney-client relationship, constituting an electronic signature or providing consent to contract electronically, unless expressly so stated by an authorized Carroll Bufkin attorney in the body of this e-mail or an attachment.

CIRCULAR 230 DISCLOSURE: Pursuant to Treasury guidelines, any federal tax advice contained in this communication, or any attachment, does not constitute a formal tax opinion. Accordingly, any federal tax advice contained in this communication, or any attachment, is not intended or written to be used, and cannot be used, by you or any other recipient for the purpose of avoiding penalties that may be asserted by the Internal Revenue Service.

CARROLL BUFKIN, PLLC
ATTORNEYS

**From:** Billy Quin <wquin@mmqnlaw.com>
**Sent:** Wednesday, July 27, 2022 1:10 PM
**To:** Gary Bufkin <tgb@carrollbufkin.com>
**Subject:** RE: Phil Bryant

I have an initial attorney phone conference on a federal court case at 2:00. How about 3:00?

William M. Quin II

 MᶜCRANEY | MONTAGNET
QUIN | NOBLE
ATTORNEYS AT LAW | PLLC

602 Steed Rd., Ste. 200
Ridgeland, MS 39157
601.707.5725 (reception)
601.863.0603 (direct)
769.226.1000 (mobile)
www.mmqnlaw.com

The foregoing electronic message contains information from the law firm of McCraney Montagnet Quin & Noble, PLLC.
The contents of this e-mail are confidential, privileged and/or covered by the Electronic Communications Privacy Act,
18 U.S.C. §§ 2510-2521.  The information is intended for the use of the individual or entity to whom the message is addressed.
If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this message
is prohibited.  If you have received this electronic message in error, please notify McCraney Montagnet Quin & Noble, PLLC
immediately at 601.707.5725.

**From:** Gary Bufkin <tgb@carrollbufkin.com>
**Sent:** Wednesday, July 27, 2022 12:27 PM
**To:** Billy Quin <wquin@mmqnlaw.com>
**Cc:** Gary Bufkin <tgb@carrollbufkin.com>
**Subject:** RE: Phil Bryant

Hey, Billy. Sorry I missed your call. How does around 2 work for you?

Thomas G. Bufkin

CARROLL BUFKIN, PLLC
1076 Highland Colony Parkway
600 Concourse, Suite 125
Ridgeland, Mississippi 39157
(601) 982-5011
www.carrollbufkin.com

THE NATIONAL ACADEMY OF
DISTINGUISHED NEUTRALS

LEGAL NOTICE: This e-mail is from a law firm and may contain confidential and/or legally privileged information. This e-mail is
intended solely for the use of the individual(s) to whom it is addressed. If you have received this e-mail in error, please notify the sender
by reply e-mail, delete the e-mail from your computer and do not copy or disclose it to anyone else. Any disclosure, copying, distribution,
reliance or use of the contents or information received in error is strictly prohibited. Neither this e-mail message nor its attachment(s)
may be construed as establishing an attorney-client relationship, constituting an electronic signature or providing consent to contract
electronically, unless expressly so stated by an authorized Carroll Bufkin attorney in the body of this e-mail or an attachment.

CIRCULAR 230 DISCLOSURE: Pursuant to Treasury guidelines, any federal tax advice contained in this communication, or any
attachment, does not constitute a formal tax opinion. Accordingly, any federal tax advice contained in this communication, or any
attachment, is not intended or written to be used, and cannot be used, by you or any other recipient for the purpose of avoiding penalties
that may be asserted by the Internal Revenue Service.

**CARROLL BUFKIN, PLLC**
**ATTORNEYS**

**From:** Billy Quin <wquin@mmqnlaw.com>
**Sent:** Wednesday, July 27, 2022 10:53 AM
**To:** Gary Bufkin <tgb@carrollbufkin.com>
**Subject:** Phil Bryant

Gerry:

Tad and I have been retained to represent Phil Bryant. We just tried to call you about the subpoena you recently had issued. Give me a call.


William M. Quin II



602 Steed Rd., Ste. 200
Ridgeland, MS 39157
601.707.5725 (reception)
601.863.0603 (direct)
769.226.1000 (mobile)
www.mmqnlaw.com

---

The foregoing electronic message contains information from the law firm of McCraney Montagnet Quin & Noble, PLLC. The contents of this e-mail are confidential, privileged and/or covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. The information is intended for the use of the individual or entity to whom the message is addressed. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this electronic message in error, please notify McCraney Montagnet Quin & Noble, PLLC immediately at 601.707.5725.

---

EXHIBIT 3



**MCCRANEY | MONTAGNET | QUINN | NOBLE**
A T T O R N E Y S   A T   L A W   |   P L L C

August 26, 2022

**VIA ELECTRONIC MAIL**

T. Gerry Bufkin, Esq.
Carroll Bufkin, PLLC
1076 Highland Colony Parkway
600 Concourse, Suite 125
Ridgeland, Mississippi 39157
gcb@carrollbufkin.com

Re.:    *Mississippi Dep't of Human Services v. Mississippi Community Education Center, Inc., et al.*
        No. 25CI1:22-cv-00286-EFP (Cir. Ct., Hinds Cty., MS);
        Subpoena Duces Tecum served upon the Honorable Phil Bryant

Dear Gerry:

As you are aware, my firm and I have been retained by the Honorable Phil Bryant to represent his interests regarding the subpoena duces tecum your recently served him in the above-referenced action. You and I agreed to extend the due date for an objection or response to the subpoena to Friday, August 26, 2022. Please consider this correspondence to be my client's objection.

Mississippi Rule of Civil Procedure 45(d)(2)(B) provides in pertinent part that, "[t]he person to whom the subpoena is directed may . . . serve upon the party serving the subpoena written objections to inspection or copying any and all of the designated materials. . . . If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the material except pursuant to an order of the court from which the subpoena was issued." My client objects to producing certain documents requested by the subpoena on the basis of attorney-client privilege and the work product doctrine. My client is willing to produce other documents requested by the subpoena subject to the entry of a protective order that preserves other applicable privileges and prevents the disclosure of said documents or their contents to non-parties.

I have previously raised with you the issue of producing documents responsive to the subpoena following the entry of a protective order. You refused to agree to any form of a protective order and acknowledged that we may serve objections to the subpoena. What follows is a brief discussion of applicable privileges, reasons why a protective order should be entered, and a brief analysis of additional issues raised by the subpoena.

**I.       Deliberative Process Privilege**

While the Mississippi Supreme Court has not addressed the deliberative process privilege, we are confident the Court would recognize the privilege exists under Mississippi law if confronted with the issue. The deliberative process privilege refers to "the common sense-common law principle that

T. Gerry Bufkin, Esq.
August 26, 2022
Page 2

not all public business can be transacted completely in the open, that public officials are entitled to the private advice of their subordinates and to confer among themselves freely and frankly, without fear of disclosure, otherwise the advice received, and the exchange of views may not be as frank and honest as the public good requires." *Soucie v. David*, 448 F.2d 1067, 1080-81 (D.C. Cir. 1971) (Wilkey, J., concurring).

Some of the documents sought by the subpoena are protected by the deliberative process privilege. My client is willing to produce these documents with the entry of a protective order that preserves the privilege and prevents disclosure of said documents and their contents to non-parties, so long as said documents are not otherwise protected by the attorney-client privilege or work product doctrine. Such an arrangement would preserve the privileged nature of the documents and would prevent them from being misused for media attention or some other illegitimate reason while simultaneously allowing the parties to utilize the documents within the confines of this case as allowed by the Mississippi Rules of Civil Procedure and Mississippi Rules of Evidence.

II.     Chief Executive Communications Privilege

The Mississippi Supreme Court has not addressed the chief executive communications privilege. We believe the Court would also recognize this privilege under Mississippi law, just as courts in many other states have done when confronted with the issue. *See, e.g.*, *Nero v. Hyland*, 386 A.2d 846 (N.J. 1978); *Hamilton v. Verdow*, 414 A.2d 914 (Md. 1980); *Doe v. Alaska Superior Court*, 721 P.2d 617 (Alaska 1986); *Capital Information Group v. State*, 923 P.2d 29, 33 (Alaska 1996); *Killington, Ltd. v. Lash*, 572 A.2d 1368 (Vt. 1990); *New England Coalition for Energy Efficiency & the Environment v. Office of the Governor*, 670 A.2d 815 (Vt. 1995); *Guy v. Judicial Nominating Committee*, 659 A.2d 777 (Del. 1995); *Times Mirror Co. v. Super. Ct.*, 813 P.2d 240 (Cal. 1991); *Taylor v. Worrell Enter., Inc.*, 409 S.E.2d 136 (Va. 1991); *Courier-Journal v. Jones*, 895 S.2d 6 (Ky. Ct. App. 1995); *New Mexico v. First Judicial District Court of New Mexico*, 629 P.2d 330 (N.M. 1981); *State ex rel. Dann v. Taft*, 848 N.E.2d 472, 476 (Ohio 2006).

The executive privilege is broader in scope than the deliberative process privilege. It "applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones." *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997). The United States Supreme Court has held that the "need for information for use in civil cases, while far from negligible, does not share the urgency or significance" of criminal subpoena requests. *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367, 384 (2004). Additionally, the Court explained that "our precedent provides no support for the proposition that the Executive Branch 'shall bear the burden' of invoking executive privilege with sufficient specificity and of making particularized objections." *Id.* at 388. Instead, such specificity would only be required after the party seeking disclosure has "satisfied his burden of showing the propriety of his requests." *Id.*

All responsive documents within my client's care, custody, or control are protected by the executive privilege. A strict application of the law would require you to provide the court with sufficient reasons why the executive privilege should not apply, or in the event it does apply, why the documents should be nonetheless produced and pursuant to what terms and conditions. Again, notwithstanding this privilege and the threshold showing you are required to make, my client is willing to produce said documents following the entry of a carefully-crafted protective order.

T. Gerry Bufkin, Esq.
August 26, 2022
Page 3

## III.    *State v. New*, Nos. 20-0-052, 20-0-053 (Cir. Ct., Hinds Cty., MS)

On November 16, 2020, Circuit Court Judge Faye Peterson entered a *Suppression Order* [Doc. 17] in the above-referenced criminal cases. The order states that, "[t]he Court, in an effort to ensure that the State and [Nancy New] . . . receive a fair and impartial trial in the Circuit Court of Hinds County, Mississippi and having admonished the parties concerning an article published November 14, 2020 that directly relates to this cause, hereby enters a Suppression Order limiting pre-trial publicity until the completion of the trial or disposition without trial." (emphasis added). The court ordered "that all attorneys, their representatives, parties, witnesses, law enforcement officers and court personnel are prohibited from discussing or commenting on any aspects of this case with the media until such time as it has concluded[.]"

The above-referenced civil action is also pending in Hinds County Circuit Court before Judge Peterson. As you pointed out in the *Motion to Stay Discovery or, Alternatively, for Protective Order* [Doc. 71] in the civil action, "MDHS's Complaint involves the same issues present in the ongoing criminal proceedings and investigation. They do not merely overlap, but, as in *McCoy [v. Yazoo City*, 2014 U.S. Dist. LEXIS 177646, at *3 (S.D. Miss. Dec. 29, 2014)], the issues are 'seemingly identical.'" A protective order would prevent the same individuals from releasing documents and information in the civil action that the *Suppression Order* prevents in the criminal cases. Moreover, a protective order would accomplish the same end as the *Suppression Order* accomplishes in the criminal cases – namely, preserving the integrity of court proceedings.

My client agrees with Judge Peterson. The allegations levied against your client should be tried in a court of law, not in the media. Evidence, and especially privileged materials, should not be utilized to unduly influence public opinion and to bias potential jurors. In a court of law, parties and witnesses have a right to respond to unfounded or misguided allegations before an impartial judge and jury. This is not always true with the media. Media members sometimes carry biases and unfounded and unfair opinions that impact their work. Instead of impartially seeking the truth about a given matter, the media member sometimes seeks to reinforce her already-existing beliefs, however unfounded they may be. Some publications limit or disallow this sort of journalism. Unfortunately, others do not. This can result in an echo-chamber of confirmation bias that unduly influences court proceedings and biases potential jurors against one party or another. I am sure you do not want such a situation to arise for your client. Accordingly, my client is willing to produce the requested documents with a protective order in place that: (1) ensures the integrity of the court proceedings in the civil action and its related criminal actions, (2) does not unduly prejudice the rights of the defendants in the civil action and its related criminal actions, (3) respects the privacy and other similar rights of non-party respondents, and (4) preserves the privileged nature of documents and information.

## IV.    Scope of Discovery

Mississippi Rule of Civil Procedure 26(b)(1) provides in pertinent part that, "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the issues raised by the claims or defenses of any party." The rule also recognizes that, "It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Thus, for your subpoena to be enforceable, you must show that the subpoena seeks documents that are: (1) relevant to the issues raised by the

T. Gerry Bufkin, Esq.
August 26, 2022
Page 4

claims or defenses of a party and (2) reasonably calculated to lead to the discovery of admissible evidence.

Your subpoena requests the following:

1. All Documents including, without limitation, Documents reflecting communications between you and any person or entity concerning the USM Volleyball Center.

2. All Documents including, without limitation, Documents reflecting communications between you and any person or entity concerning funding for the USM Volleyball Center.

3. All Documents, including, without limitation, Documents reflecting communications between you and any person intended to further efforts to secure funding from MDHS for the USM Volleyball Center.

The Complaint in the civil action [Doc. 2] does not address the USM Volleyball Center. No defendant has alleged an affirmative defense that addresses the USM Volleyball Center. It strains credibility to contend documents or information relating to a matter that is not at issue in the civil action is reasonably calculated to lead to the discovery of admissible evidence. Accordingly, the documents sought by your subpoena are not discoverable.

In sum, my client has several valid objections to the subpoena, many of which would render it wholly unenforceable. It appears that your client is attempting to distract from her alleged wrongdoing by involving a former Governor of this state in a fishing expedition that has no relation to the claims brought by MDHS. Nonetheless, my client is willing to produce the overwhelming majority of the documents you seek if all attorneys, their representatives, parties, witnesses, law enforcement officers, and court personnel (i.e., all of the same persons bound by the *Suppression Order* in the criminal actions) are subject to a protective order that protects the integrity of this legal proceeding, preserves applicable privileges, and ensures this civil action and its related criminal actions are tried in a court of law.

Sincerely,

MCCRANEY MONTAGNET QUIN & NOBLE, PLLC

William M. Quin II

WMQ/cgh

EXHIBIT 4

No SIM   11:21 AM   61%

BF
Brett

iMessage
Apr 20, 2017, 5:55 PM

Hey governor this brett Favre. Poncho and I are flying to chuck Scianna's golf tournament now and I asked him to pass your number. Deanna and I are building a volleyball facility on campus and I need your influence some-

iMessage

No SIM

11:22 AM

61%

Brett

BF

your influence some-
how to get donations
and or sponsorships.
Obviously Southern
has no money so I'm
hustling to get it
raised. We want to
start this summer
and finish in a year or
less. I met Cspire
about sponsoring
and they are thinking
it over and I'm trying
others as well. Think
about it and if you are

iMessage

No SIM   11:22 AM   61%

Brett
BF

about it and if you are in Hburg again and want to swing by place your certainly welcome or poncho and I can come see you. Thanks in advance for all you do

Apr 20, 2017, 8:45 PM

Just got home from Cuba. So I had no cell. Of course I am all in on the Volleyball

iMessage





No SIM

11:22 AM

60%

Brett

BF

...in on the volleyball facility. Y'all have fun and next week come see me. We will have that thing built before you know it. One thing I know how to do is raise money 👋

Thanks

Apr 24, 2017, 10:19 AM

Should be fun.

iMessage



No SIM   11:22 AM   60%

Brett

Apr 24, 2017, 10:19 AM

Governor poncho and I can come in the morning if your not to busy. And I don't want to waste your time believe me.

Turkey hunting in the AM Tuesday in North Ms. I can do lunch Wednesday.

iMessage

EXHIBIT 5







No SIM

11:24 AM

58%

Brett

But you are the governor and on our side and that's a good thing. Actually a great thing

We can do that. Just get me some numbers and I'll find a way. Maybe USM or the Coach can call me and we'll get on it.



EXHIBIT 6

No SIM 📶    11:24 AM    58% 🔋

Brett ›    BF

Jul 22, 2017, 12:00 PM

2917 USM Vol...

Latest plans. I'm try-ing to get sponsors, donations etc.... if we can find a contractor that would say hey rather than give you money I'll build for free!! Maybe





# NEW WOMEN'S VOLLEYBALL ARENA

SCHEMATIC DESIGN
21 JUL 2017

UNIVERSITY OF SOUTHERN MISSISSIPPI
HATTIESBURG MS

WBA #: 2917



2727 OLD CANTON ROAD  |  SUITE 200  |  JACKSON, MISSISSIPPI 39216  |  P:601.321.9107  |  F:601.321.9108  |  WWW.WBAARCHITECTURE.COM



NEW WOMEN'S
VOLLEYBALL
ARENA

UNIVERSITY OF SOUTHERN
MISSISSIPPI

HATTIESBURG, MS

WIER BOERNER ALLIN
ARCHITECTURE

LS1.0
CODE COMPLIANCE
DATA



WIER BOERNER ALLIN
ARCHITECTURE

NEW WOMEN'S
VOLLEYBALL
ARENA
UNIVERSITY OF SOUTHERN
MISSISSIPPI

HATTIESBURG MS

21 JUL 2017
SCHEMATIC DESIGN
WBA #: 2917

REVISIONS

A0.1
EXTERIOR RENDERING







WIER BOERNER ALLIN
ARCHITECTURE

NEW WOMEN'S
VOLLEYBALL
ARENA
UNIVERSITY OF SOUTHERN
MISSISSIPPI
HATTIESBURG MS

21 JUL 2017
SCHEMATIC DESIGN
WBA #: 2017

REVISIONS

A1.2
SECOND FLOOR PLAN





# EXHIBIT 7

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

**BE IT REMEMBERED**, That the Mississippi Board of Trustees of State Institutions of Higher Learning of the State of Mississippi met in a regular session at the Board Office in Jackson, Mississippi, at 9:00 a.m., and pursuant to notice in writing mailed by certified letter with return receipt requested on November 22, 2016, to each and every member of said Board, said date being at least five days prior to this October 19, 2017 meeting.  At the above-named place there were present the following members to wit: Mr. Tom Duff, Dr. Ford Dye, Mr. Shane Hooper, Ms. Ann H. Lamar, Dr. Alfred E. McNair, Jr., Mr. Chip Morgan, Mr. Hal Parker, Mr. Alan Perry, Ms. Christine Pickering, Dr. Douglas Rouse, Mr. C.D. Smith and Dr. J. Walt Starr.  The meeting was called to order by C.D. Smith, President.  Trustee Chip Morgan introduced Dr. Al Rankins, President of Alcorn State University, to give the prayer.

## INTRODUCTION OF GUESTS

- President C.D. Smith welcomed the Student Government Association Officers: Patrick Herbert, SGA President at Alcorn State University; Ashley Griffin, SGA President at Delta State University; Tyler McMurray, SGA President at Mississippi State University; Kamberlin King, SGA President at Mississippi Valley State University; Dion Kevin, SGA President of the University of Mississippi; Edgar Meyer, SGA President of the University of Mississippi Medical Center; Cameron Cloud, SGA President at the University of Southern Mississippi; and McKenna Stone, SGA Vice President at the University of Southern Mississippi.

## APPROVAL OF THE MINUTES

On motion by Trustee Pickering, seconded by Trustee Perry, all Trustees legally present and participating voted unanimously to approve the Minutes of the Board meeting held on September 21, 2017.

## CONSENT AGENDAS

On motion by Trustee Rouse, seconded by Trustee McNair, all Trustees legally present and participating voted unanimously to approve the following Consent Agendas.

**ACADEMIC AFFAIRS**
1. **SYSTEM** – Approved the following new academic programs:
   a. **ASU** - Bachelor of Science in Athletic Training degree (CIP 51.0913)
   b. **ASU** – Master of Arts in History degree (CIP 54.0101)
   c. **UM** – Bachelor of Science in Economics degree (CIP 13.1401)
   d. **UM** – Master of Science in Hospitality Management degree (CIP 52.0910)
   e. **UM** – Master of Science in Integrated Marketing Communication degree (CIP 09.0900)
   f. **UM** – Master of Accountancy and Data Analytics degree (CIP 52.0399)
   g. **UM** – Master of Taxation and Data Analytics degree (CIP 52.1601)
2. **SYSTEM** – Approved the following new academic unit: **UM** – Center for Graphene Research and Innovation.

1

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

3. **SYSTEM** – Approved the following academic unit modification: **UMMC** – Rename the Biochemistry Department to the Department of Cell and Molecular Biology.
4. **SYSTEM** – Approved the following academic program modifications:
   a. **UMMC** – Rename the Master of Science in Population Health the Master of Science in Population Health Science.
   b. **UMMC** – Rename the Doctorate of Philosophy in Population Health the Doctorate of Philosophy in Population Health Science.
   c. **UMMC** – Rename the Doctorate of Philosophy in Biochemistry the Doctorate of Philosophy in Cell and Molecular Biology.
   d. **MUW** – Consolidate the Master of Education in Reading Literacy, the Master of Education in Gifted Studies, and the Master of Education in Education leadership degrees into the Master of Education in Education degree. (CIP 13.0101).

**FINANCE**
5. **MSU** – Approved the request for the MSU Extension Agricultural Communications to enter into a five-year copier lease agreement with Canon Solutions America for IMAGEPRESS C8000VP Digital Press Set, Prisma Direct, and Prisma Prepare, with annual recurring maintenance and support plus training on the IMAGEPRESS C8000VP Digital Press Set, Prisma Direct, Prisma Prepare and Oce 115vp.  MSU is also seeking approval from the Mississippi Department of Information Technology Services (IT related contract over $250,000) and the Public Procurement Review Board (state contract over $500,000).  The contract will not be signed until approval is received from each of these bodies.  This rental is needed in order to increase and better integrate production capabilities to meet current and expanding needs for printing to support Extension personnel, programs, and outreach to clientele.  The C8000vp will replace two Oce 110 VeroPrint copiers that are reaching the end of their lease.  Prisma Prepare will replace a current version that is reaching the end of its lease. Prisma Direct will manage printing equipment and Prisma Prepare software.  The contract will begin when the documentation is approved and continue for 60 months.  There will be a monthly charge of $7,507.51 paid upon receipt of invoice.  There will be additional payments for professional services at a state contract rate of $200 per hour.  The total cost is $485,450.60.  In addition, MSU will pay "click" charges as set forth in the State Contract.  It is unknown exactly how many copies will be made over the five-year contract but it is estimated that there will be additional charges of up to $306,000, giving a total anticipate expenditure of around $791,450.60.  The total cost of this contract will be paid with Agricultural Communications Print Shop Service Center funds.  The agreement, which was reviewed and approved by the IHL Associate Commissioner of Legal Affairs prior to the Board's approval of this item, is on file in the Board Office.
6. **MSU** – Approved the request to enter into a contract with Diversified Elevator Service & Equipment Co., Inc. to continue daily operation and maintenance on the 135 elevators on MSU's Starkville campus.  The contract will run for five years starting January 1, 2018 and expiring on December 31, 2022.  The contract amount is $25,655.00 per month or $1.6 million over 5 years.  Funds are available from MSU General Funds.  The agreement, which was reviewed and approved by the IHL Associate Commissioner of Legal Affairs prior to the Board's approval of this item, is on file in the Board Office.
7. **MSU** – Approved the request to amend the contract between MSU's Office of Nutrition Education (ONE) and Frontier Strategies, LLC, for the purposes of making a no additional cost technical

2

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

change in the contract between the production budget and the placement budget. The original agreement provides for the design, production and implementation of an advertising and communications plan with key messages targeting SNAP-Ed recipients in the State of Mississippi promoting healthy eating, shopping and cooking choices to increase awareness and encourage healthy lifestyles. The original contract term is July 6, 2017 to September 30, 2017. The term of Amendment #1 is October 1,2017 to September 30, 2018. The agreement may be renewed for a period of one (1) year upon agreement of both parties in writing. The total contract amount is $1,750,000. Payment will be issued on a monthly basis upon receipt of invoices based on actual services rendered. The contract and addendum are funded by a subgrant between the Mississippi Department of Human Services (MDHS) and Mississippi State University and the Office of Nutrition Education. The funding source for the subgrant is the United States Department of Agriculture (USDA). The funding for this agreement was approved by the USDA in May 2017 and the subgrant between MSU and MDHS was signed on July 5, 2017. The agreement, which was reviewed and approved by the IHL Associate Commissioner of Legal Affairs prior to the Board's approval of this item, is on file in the Board Office.

8. **MSU** – Approved the request to enter into a three-year lease of a 5,409.1-square foot building and 1.2-acre parcel of land on Singing River Island, MS for the purpose of Unmanned Aircraft Systems (UAS) operations with the Department of Homeland Security. In accordance with Board Policy 707.03 Approval for Prepayment for Goods or Services, the Board approved the request to pay the quarterly rent in advance as is common in this industry. The agreement is for three years beginning October 1, 2017, and ending September 30, 2020. The contract may be renewed for up to five consecutive one-year periods upon written agreement of both parties. The Lessee will pay rent quarterly, in advance, in the amount of $8,523.88, totaling $34,095.52 annually. The rent is calculated as $5.00 per square foot for the building and $5,875 per acre for the ground lease ($5.00 x 5,409.1 square feet; $5,875 x 1.20 acres). The total rent amount for the 3-year lease totals $102,286.50. The lease will be funded under Task Order 03 of contract W56HZV-17-C-0095 between MSU and the US Army's Tank Automotive Research, Development and Engineering Center. The agreement, which was reviewed and approved by the IHL Associate Commissioner of Legal Affairs prior to the Board's approval of this item, is on file in the Board Office.

9. **MSU** – Approved the request to enter into a contract with STM Charters, Inc. for 9 round trip flights for the Men's Basketball team during the winter of 2017-18 season. In accordance with Board Policy 707.03 Approval for Prepayment for Goods or Services, the Board approved the request to pay prior to the flights as is common in this industry. The contract shall commence on the date the contract is signed by both parties and terminate on the date of the last flight as set forth in the agreement. The total of all charters will be $354,206 to be paid with Athletic funds. The agreement, which was reviewed and approved by the IHL Associate Commissioner of Legal Affairs prior to the Board's approval of this item, is on file in the Board Office.

10. **MSU** – Approved the request to enter into a contract with STM Charters, Inc. for 8 round trip flights for the Women's Basketball team during the winter of 2017-18 season. In accordance with Board Policy 707.03 Approval for Prepayment for Goods or Services, the Board approved the request to pay prior to the flights as is common in this industry. The contract shall commence on the date the contract is signed by both parties and terminate on the date of the last flight as set forth in the agreement. The total of all charters will be $296,895 to be paid with Athletic funds. The agreement, which was reviewed and approved by the IHL Associate Commissioner of Legal Affairs prior to the Board's approval of this item, is on file in the Board Office.

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

11. **UM** – Approved the request to enter into a contract with CodeLynx, Inc. to standardize pricing for software, hardware, and migration services as requested by the ID Center. The scope of work will be to migrate the ID Center's current video management system (Qognify) to Avigilon Control Center (ACC). This includes the current cameras, both analog and digital. CodeLynx is to provide takeover licensing for the current 665 licenses, any hardware required for the migration, product training, and any additional licenses needed for future use. This contract includes a non-solicitation clause that is in effect during the contract and for the twelve months following unless one party has the prior written approval of the other party; this clause also extends to any subcontract resulting from this contract. This contract will be for a period of one year from the start date of the signed contract with an option to renew each year up to an additional four years pending mutual agreement by both parties. The Board approved the full five years. The contract amount is estimated at a total of $458,056.80. The initial migration and licensing cost for the first year will total $208,221.60. The remaining $249,835.20 will be spent on estimated future licenses for years 2-5. The total estimated cost of the video surveillance system project is $612,888.75, which includes this agreement for the migration, hardware, and software licenses estimated at $458,056.80 and the sister agreement with ESSC, Inc. for the installation of security cameras estimated at $154,831.95. Funds for this contract will come from self-generated funds. The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

12. **UM** – Approved the request from the Office of the Provost and Research and Sponsored Programs to amend an existing contract with Parker Executive Search to include four additional national searches for key leadership positions. UM is seeking professional assistance to fill four positions: Dean of the Graduate School, Dean of the School of Applied Sciences, Assistant Vice Chancellor for Research and Sponsored Programs, and Director of the Center for Educational Research and Evaluation. The existing contract commenced upon signing by the University, and will continue until successful completion of the Scope of Work as modified by the addition of these four searches. This modification will add $270,000 for the professional services to the original contract, plus direct expenses (capped at 10% or $27,000), plus actual costs for advertising, background investigations, interviews, and committee and candidate travel expenses. The estimated total for this modification is $350,000. The funding source for this contract will be educational and general funds. The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

13. **UM** – Approved the request to enter into a contract with STM Charters, Inc. for passenger charter air transportation and related services for the 2017/2018 men's basketball season to be provided by Elite Aviation. In accordance with Board Policy 707.03 Approval for Prepayment for Goods or Services, the Board approved the request to pay prior to the flights as is common in this industry. The contract will begin on October 20, 2017 and end on February 27, 2018. The contract amount is $443,200 which is billed in two installments. The funding source for this contract is the Athletics Department Operating Funds. The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

14. **UMMC** – Approved the request to enter into a new Solid Waste Services Agreement (Agreement) with BFI Waste Services, LLC d/b/a Republic Services of Jackson (Republic) to provide solid waste removal, disposal, and recycling services at all UMMC locations in the Jackson area and Lexington, Mississippi, as well as potential future services in Grenada, Mississippi. The term of the Agreement is for five (5) years, beginning December 1, 2017, and ending November 30, 2022.

4

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

The estimated cost of the contract is $2,720,595.20 for the five (5) year term.  A breakdown of the cost is included in the bound *October 19, 2017 Board Working File.*  The contract will be funded by general funds.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

15. **UMMC** – Approved the request to amend its Agreement No. 18863, Bioplex® 2200 System Rental Agreement Plan (Agreement) with Bio-Rad Laboratories, Inc. (Bio-Rad) for the rental of a Bio-Plex 2200 System, Evolis Microplate Processor, and related equipment, as well as the purchase of consumables and service for the systems.  The Bio-Plex and Evolis system are utilized to provide diagnostic laboratory testing, including testing for Rubella, Lupus, Measles, Mumps, Varicella, and Herpes Simplex Virus.  Additionally, the Evolis system is an open-channel testing equipment that can run assays from manufacturers other than Bio-Rad as needed.  The amendment will reduce UMMC's commitment to purchase certain tests, reduce the costs for tests, add new tests and assays currently performed on other platforms at UMMC or sent to outside reference laboratories, provide additional training of the Evolis system, and clarify the Agreement start date. The term of the original Agreement is one (1) year with four (4) automatic one (1) year renewals. The start date of the Agreement was upon the "go-live date," which was the date that the equipment was installed, calibrated, and tested sufficiently for operation in accordance with federal regulations.  UMMC originally anticipated the go-live date to be October 1, 2014; however, the actual go-live date was July 1, 2015.  The amendment does not change the term of the Agreement, but it clarifies the start date as July 1, 2015.  The expiration date of the amended Agreement will be June 30, 2020.  The original Agreement amount was estimated to be $1,906,923.56.  Upon amendment, the total amount of the Agreement will decrease to $1,506,055.13.  The agreement will be funded by hospital patient revenue.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

16. **UMMC** – Approved the request to enter into a Vizient Letter of Commitment agreement with Cardinal Health 200, LLC to access discount rate tiers and to participate in an agreement for freight management services.  The purpose of this Agreement is to provide UMMC access to nationally negotiated shipping/freight pricing, the ability to deal directly with the shipping/freight companies, and complete visibility and transparency for UMMC's incoming shipping/freight charges.  The term of this agreement will be forty-nine (49) months, beginning on November 1, 2017, and ending conterminously with the Vizient Agreement on November 30, 2021.  The estimated freight cost to be paid to Cardinal under the Agreement is $4,173,455.66, based on UMMC's historical shipping costs.  UMMC estimates approximately $1,937,632.64 in savings through the utilization of this program.  The agreement will be funded by hospital patient revenues.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

17. **UMMC** – Approved an amendment to its current software license and service agreement with Corepoint Health, LLC in order to purchase additional integration/interface engine licenses, service and support to be used by UMMC and its Epic Community Connect (ECC) client, the Mississippi Department of Health (MDH).  The original agreement provides the software license and support services for the enterprise integration/interface engine that allows for the integration of clinical and business systems at UMMC.  The amendment will begin November 1, 2017, and end conterminously with the existing agreement on October 31, 2020.  The total term of the amended agreement remains four (4) years, beginning November 1, 2016, and ending October 31,

5

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

2020.  The estimated cost of the amendment is $168,400. The total estimated cost of the amended agreement is $371,700.  This amendment will be funded by MDH. The original agreement is funded by patient revenues.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

18. **UMMC** – Approved the request to enter into a Locally Negotiated Agreement with Covidien Sales LLC to purchase vessel sealing, electrosurgery, smoke evacuation, ultrasonic cutting, and hardware products at discounted rates.  These devices are basic and advanced hardware and associated products used primarily in the Operating Room to control bleeding, sealing, and cutting blood vessels during minor to extensive procedures.  The term of the Agreement is three (3) years, beginning December 1, 2017, and continuing until November 30, 2020, which includes the initial one (1) year term and two (2) automatic one (1) year renewal terms.  The estimated amount of the Agreement over the three (3) year term is $3,286,053.47.  UMMC based its calculation on historical purchases, plus ten percent (10%) volume growth each year of the Agreement.  The agreement will be funded by hospital patient revenues.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

19. **UMMC** – Approved Amendment 16 to its current license and support agreement with Epic Systems Corporation to add the Remote Monitoring Module onto UMMC's current program property listing.  This module will provide UMMC the ability to oversee an individual patient or a specific patient population from a remote location, which acts as a safety net to detect patient health deterioration earlier.  The term of Amendment 16 will begin on or about November 1, 2017, and is coterminous with the current Epic License and Support Agreement which remains in effect in perpetuity regarding the licenses, and it is also coterminous regarding maintenance coverage which ends August 22, 2019.  There is no new associated cost for Amendment Sixteen (16), as the fees are included in the Audio/Video Integration Module that was previously approved under Amendment Four (4).  The total estimated approved cost for the Epic agreement remains $67,359,789.01.  The amendment cost will be funded by hospital patient revenue.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

20. **UMMC** – Approved Amendment 17 to its current license and support agreement with Epic Systems Corporation to add the program property license for enhanced analytics and data warehousing, specifically by changing the Caboodle Data Warehouse licensing to a subscription basis, adding the Healthy Planet Enhanced Data Analytics module, adding ten (10) Predictive Analytics Models to UMMC's current program property list, and changing the definition of Interface Unit to allow for expansion of UMMC's interface license to cover the addition of Epic standard data connectors.  The Caboodle Data Warehouse is an architecture for combing Epic and non-Epic data in a single, unified data model for reporting purposes.  The Healthy Planet Enhanced Data Analytics will allow non-UMMC patient data to be brought into the Healthy Planet Module or Caboodle Warehouse Module.  The Predictive Analytics Models will allow UMMC the ability to embed real-time predictive analytics directly into users' workflows.  The term of amendment 17 will begin on or about November 1, 2017, and is coterminous with the current Epic License and Support Agreement which remains in effect in perpetuity in regard to the licenses, and it is also coterminous regarding maintenance coverage which ends August 22, 2019.  There is no new associated cost for Amendment Seventeen (17).  The total estimated approved cost for the Epic agreement remains $67,359,789.01.  The amendment cost will be funded by hospital patient

**MINUTES OF THE BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER LEARNING
October 19, 2017**

revenue.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

21. **UMMC** – Approved the request to enter into a Lease Agreement with Golden Triangle Regional Airport Authority (Authority) for the lease of hangar space for use by UMMC medical helicopter personnel and adjacent ground space for the placement of a modular office facility.  The Lease Agreement will allow UMMC to continue to operate AirCare 3 from Golden Triangle Regional Airport, which is used for transporting critical care patients to UMMC or other designated receiving facilities for treatment.  Pursuant to IHL policy 707.03 Approval of Prepayment for Goods or Services, the Board approved the request to prepay the lease amount on the first day of each month.  The term of the Lease Agreement is nine (9) years, beginning April 1, 2018, and ending March 31, 2027.  The total cost of the Lease Agreement over the nine (9) year term is $324,000.00. The monthly rent of $3,000 includes hangar space, non-exclusive access to public parking, access to utilities, and signage. The agreement will be funded by hospital patient revenue. The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

22. **UMMC** – Approved the request to amend its agreement with Hologic (MA), LLC formerly known as Hologic Limited Partnership (Hologic) to reduce the commitment amount of ThinPrep pap reagents, as well as exchange existing equipment for new equipment at no additional cost.  The purpose of the Agreement is to provide for the usage and maintenance of Papanicolaou anatomic preparation (pap) testing equipment and related testing supplies. In addition, Hologic will provide the ThinPrep Imaging System, a device that uses computer imaging technology to assist in primary cervical cancer screening.  In return for the use and maintenance of the equipment, UMMC commits to purchase a minimum amount of ThinPrep pap reagents.  The term of the amendment will begin November 1, 2017 and is coterminous with the original agreement which ends November 30, 2019.  The total estimated cost of the amended Agreement over five (5) years is $2,136,876.06.  The original Agreement cost was $2,276,511.70.  With the reduction in committed purchases of ThinPrep pap reagents, UMMC expects to save approximately $139,635.64 in the final two (2) years of the amended Agreement.  The agreement will be funded by hospital patient revenues.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

23. **UMMC** – Approved Amendment 2 to its current Master Services Agreement with Press Ganey Associates, Inc. to replace the Physician Quality Reporting System (PQRS) Consumer Assessment Healthcare Providers & Systems (CAHPS) Regulatory Survey with Merit-Based Incentive Payment System (MIPS) CAHPS Regulatory Survey.  The term of amendment 2 will begin November 1, 2017, and is coterminous with the original agreement.  The original agreement is for a period of five (5) years, beginning October 1, 2015, and continuing until September 30, 2020. There is no cost associated with Amendment 2. The total estimated cost of the contract over five (5) years remains $2,599,643.81.  The contract will be funded by hospital patient revenue.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

24. **UMMC** – Approved Amendment 3 to its current Master Services Agreement with Press Ganey Associates, Inc. to add the Neonatal Intensive Care Unit (NICU) eSurvey Blend methodology to UMMC's existing survey services and to add the Outpatient and Ambulatory Surgery (OAS) Regulatory CAHPS Wave 2 surveys to UMMC's current Ambulatory Surgery eSurvey Blend services.  The current Pediatric Inpatient Survey is not applicable to the NICU setting.  NICU-

7

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

specific surveys will provide more meaningful data to physicians and staff within the NICU. The OAS CAHPS collects information about patients' experiences of care in hospital outpatient departments and ambulatory surgery centers. This survey will be required by CMS in the near future. Early adoption of the OAS CAHPS survey can help improve performance and put UMMC in a stronger position to succeed when CMS mandates implementation. The term of amendment 3 will begin November 1, 2017, and is coterminous with the original agreement. The original agreement is for a period of five (5) years, beginning October 1, 2015, and continuing until September 30, 2020. Amendment 3 adds an annual cost of $1,500 for the addition of the NICU eSurvey Blend methodology. However, UMMC's original calculations of the estimated agreement cost include enough funds to cover this additional cost. Therefore, the total estimated cost of the amended agreement over five (5) years remains $2,599,643.81. The contract will be funded by hospital patient revenue. The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

25. **UMMC** – Approved the request to enter into an agreement with SG-2, LLC for the Market*Edge* product and consulting services for benchmarking data and analytic capabilities to assist UMMC in its strategic planning for future growth and to improve quality of care provided to its patients. In accordance with Board Policy 707.03 Approval of Prepayment for Goods or Services, the Board approved the request to make annual prepayments for service. SG-2's Market*Edge* product and consulting services provide integrated data, analytic tools, implementation support, and advisory services to significantly enhance its provider service and marketplace planning and performance analysis capabilities. The term of this agreement is three (3) years beginning on or about November 1, 2017, and ending October 31, 2020. The estimated cost of this agreement over the three (3) year term is $925,000. A breakdown of costs is included in the bound *October 19, 2017 Board Working File*. The agreement will be funded by hospital patient revenues. The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

26. **UMMC** – Approved the request to amend its Management Agreement with SP Plus Corporation formerly known as Central Parking of Mississippi LLC, to extend the agreement for one (1) year for continued parking staffing and management services for Parking Garages A and B, Parking Lots 17, 21, and the Pavilion Parking Lot on UMMC's main campus. The Second Amendment also lowers UMMC's monthly cost for the services provided. The amended Management Agreement has an initial term of three (3) years with the option to renew for two (2) consecutive one (1) year terms. The full (5) five-year term currently is effective from November 1, 2012, to October 31, 2017. The Second Amendment will extend the Management Agreement through October 31, 2018. The original agreement and First Amendment had a total estimated cost of $2,685,536.09 for the five (5) year term. Beginning in Year 2 of the original agreement, UMMC's cost increased each year in an amount equal to the percentage increase in the Consumer Price Index for All Urban Consumers (CPI-U), U.S. City Average, as released by the U.S. Labor Department, Bureau of Labor Statistics. The Second Amendment will lower the monthly cost to $39,250 per month, or $471,000 for the term extension. The new total cost of the amended agreement is $3,156,536.09. The agreement will be funded by general funds. The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

27. **UMMC** – Approved the request to enter into an End User Agreement (Agreement) with Stryker Sustainability Solutions, Inc. (Stryker) for consulting and reprocessing services for medical

**MINUTES OF THE BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER LEARNING
October 19, 2017**

devices labeled as single use devices. Reprocessing services include cleaning, sharpening, functional testing, sterile packaging, sterilization, and high-level disinfection for the medical devices, and reprocessing allows the devices to be resold and used for multiple uses. The cost of reprocessed devices is discounted greatly from the original price as a new item. The consulting and reprocessing services also include disposal of devices that cannot be reprocessed, at no additional cost. Through this Agreement, UMMC expects to achieve a significant savings through reduced purchase pricing of reprocessed medical devices and a reduction in costs associated with the handling and disposal of contaminated medical waste. The term of the Agreement is two (2) years and six (6) months, beginning November 1, 2017, and continuing through April 30, 2020, which is coterminous with Stryker's agreement with Vizient. The estimated total cost of the agreement over the two (2) year and six (6) month term is $849,134.52, including shipping costs. The estimated total cost is based upon historical spend on new medical devices used in the Perioperative Services, Procedural, and Patient Care hospital departments, as discounted at the reprocessing rate. The discounted pricing for purchase of reprocessed medical devices will be based upon the percentage of reprocessed devices purchased annually for each device category. The typical market purchase percentage of reprocessed devices ranges from 60% to 80%. This is due to clinical need for OEM support for certain devices, as well as the ongoing need to purchase new devices, as used devices may be damaged or have reached their end of life and cannot be reprocessed again. However, for calculation of the total potential cost of this Agreement, UMMC assumed it would purchase up to 100% of reprocessed medical devices for the Perioperative Services, Procedural, and Patient Care hospital departments. At a 60% purchase level, the Agreement would allow UMMC to recognize estimated potential savings of $1,184,558.22 over the term of the Agreement. This agreement will be funded by hospital patient revenue. The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

28. **USM** – Approved the Amended and Restated Lease with the University of Southern Mississippi Athletic Foundation (Foundation/Lessee). The premises involve approximately two acres of land known as the Payne Center parking lot located at 101 MK Turk Circle, Hattiesburg, MS 39406. The premises also include portions of the Reed Green Coliseum located adjacent to the proposed construction in the Payne Center parking lot. During the term of the Lease, the Foundation will construct a Wellness Center of approximately thirty thousand square feet in accordance with plans and specifications as approved by USM. The premises shall also include certain other under-utilized athletic space as agreed upon by the parties hereto. The Foundation intends to sublease the premises to a third party for prepaid rent in order to allow the Foundation to perform the construction to the premises. The purpose of the Lease Agreement is to provide the Foundation the right to utilize the premises as needed and agreed upon by the parties, including the right to construct and lease/sublease a new Wellness Center and/or other athletics related space, including but not limited to the Reed Green Coliseum. All construction of the facilities by the Foundation shall be in accordance with plans and specifications as approved by USM. The term of the Lease shall commence subsequent to IHL Board approval and full execution of the Lease and shall expire on July 31, 2022. The contract amount shall be $1.00 cash in hand. This lease and subsequent sublease are being funded through the lease of athletic department facilities by the Mississippi Community Education Center (MCEC), a SOl(c)3 organization designed to provide schools, communities and families with educational services and training programs in South Mississippi. MCEC will use the subject facilities to support their programming efforts for South Mississippi.

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

MCEC's funding for this project is via a Block Grant from the Mississippi Department of Human Services. The funding from MCEC shall be prepaid rent to the Foundation in the amount of Five Million Dollars ($5,000,000) for the leasing of certain USM athletic facilities including but not limited to the to be constructed Wellness Center, Reed Green Coliseum and additional athletic space as agreed upon by USM and the Foundation.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

29. **USM** – Approved the Reimbursable Space Act Agreement between The National Aeronautics and Space Administration John H. Stennis Space Center (NASA) and the Mississippi Board of Trustees of State Institutions of Higher Learning for the Center of Higher Learning and Related University Activities (IHL).  Under this Agreement, NASA provides space for IHL through the Center of Higher Learning (CHL) in order to facilitate the continued education of the NASA workforce.  This Agreement further addresses the terms and conditions for non-academic activities which the IHL has authorized, pursuant to approval by NASA.  The purpose of this Agreement is to define the relationship between NASA and CHL for the continued provision of academic and non-academic programs through the CHL at the John H. Stennis Space Center (SSC).  Such programs, conducted by the CHL and associated institutions, are designed to meet the present and future higher education needs of SSC employees and persons from surrounding communities. The Stennis Space Center Policy Board on Higher Education is an advisory body appointed by the NASA / Stennis Center Director to provide broad oversight to CHL.  The SSC Policy Board approves all new academic degree programs offered at the SSC by the CHL and their associated institutions; the list of proposed program offerings in Appendix A of this Agreement reflects previously-approved degree programs by the Policy Board.  This agreement is a precursor to a Host-Tenant Agreement and Use Permit Agreement that will stipulate specifics as to pricing and space usage.  This Agreement will be effective upon the date of the latest party's signature and will expire five years from said date or until the completion of all obligations of the parties, whichever comes first. In accordance with the terms of the Agreement, IHL shall reimburse NASA an estimated cost totaling up to approximately $3,575,875 for NASA to carry out its responsibilities over the five-year term of the Agreement.  This estimated total cost is based on the historical costs for the last five years of the Agreement and reflects expenditures by both the CHL and the USM Division of Marine Science.  These expenditures are for floor space, utilities, badging and security, telecommunications and other costs associated with being a tenant at the SSC.  A table of historical costs for the last five years is included in the bound *October 19, 2017 Board Working File.*  This agreement will be funded by State of Mississippi Appropriations for Center of Higher Learning, Education and general funds for the Department of Marine Science.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

30. **ASU – Exhibit 1** represents the approval of the Mississippi Information Technology Services (MS-ITS) Board to acquire Ellucian Technical Currency Services for Licensed Software for Alcorn State University (ASU).   The Attorney General's staff assigned to the MS-ITS reviewed this amendment prior to its execution. The supplement to the Master Agreement for software and services is between Ellucian Company, L.P. and MS-ITS behalf of ASU.  **(See Exhibit 1.)**

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

**REAL ESTATE**

31. **UMMC** – Approved the initiation of **IHL 209-561, Campus HVAC Upgrades FY 18,** and the appointment of Engineering Resource Group, Inc. as the design professional. This project will replace the air handler serving the existing main operating rooms and the aging rooftop units on the Pavilion building. The proposed project budget is $2,750,000. Funds are available from UMMC Shared Services Administration (SSA) – Building Improvement Funds ($2,750,000).

32. **UMMC** – Approved the initiation of **IHL 209-562, Re-Roof Pavilion,** and the appointment of Dean & Dean Architects as the design professional. This project will replace the failing and deteriorating roof on the Pavilion. The proposed project budget is $1.6 million. Funds are available from UMMC Shared Services Administration (SSA) Funds ($1,600,000).

33. **JSU** – Approved the request to increase the budget for **GS 103-286, Stewart Hall Renovations,** from $200,000 to $602,739.56, for an increase of $402,739.56. The Board also approved the request to add SB 2851, Laws of 2013, and 2014 JSU Funds to the project as funding sources to allow for the project budget increase. This is the first budget increase request made for this project by the university. The increase will to allow the continuation of the project through the construction document phase. Stewart Hall is currently vacant and unusable as a residential facility due to the deteriorated condition of interior finishes and mechanical systems. This is a 37,033 gross square foot (GSF) five (5) story brick facility with 90 rooms designed for a total of 180 student beds. The university is pre-planning a comprehensive renovation which will include envelope restoration, substantial reconfiguration, interior upgrades, ADA compliance issues, asbestos abatement, as well as, major renovations of the mechanical, electrical, plumbing, and life safety systems. The facility will be repurposed to be a state-of-the-art residential hall. Funds are available from SB 2906, Laws of 2015 ($200,000); SB 2851, Laws of 2013/JSU ($128,023.97); SB 2851, Laws of 2013/IHL-CEF ($31,545.29); and 2014 JSU Discretionary Funds ($243,170.30).

34. **UMMC** – Approved the request to sole source the HVAC controls portion of **GS 109-223, Clinical Research Unit.** The Request for Qualifications method was used to select the Foil Wyatt Architects as design professional. The university determined that it would benefit to extend the existing Johnson Controls System as a sole source to insure the operational integrity of the existing building system. The estimated value of the existing Johnson Controls EMCS is approximately $1,500,000. The probable cost of the project EMCS modifications is $135,000 which is a 9.0% modification. According to IHL and Bureau of Building EMCS procurement protocol for existing systems, the EMCS can and should be procured by single source procurement since the portion of the work related to the new renovation is less than 25% of the existing system as long as approval is obtained prior to bidding. The total project budget is $7.5 million. Funds are available from UMMC SSA – Building Improvement Funds ($7,500,000).

35. **USM** – Approved the purchase of property located at 3403 Pearl Street in Hattiesburg, MS from Roderick T. Wells and Dorothy Wells in the amount of $126,000. The property borders university property and is critical to the long-range plans of the university due to its location to campus. Upon acquisition, the university intends to demolish the existing structure and grass the lot so that it can be used for future parking and/or expansion. The university received two independent property appraisals in the amounts of $137,000 and $120,000. The purchase price is $126,000 which is below the average of the property's two appraised values. The closing shall be held at a location mutually agreeable to the parties on or before November 17, 2017 or upon such earlier or later date and time per agreement by the parties. A Phase I Environmental Site Assessment (ESA) has been

**MINUTES OF THE BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER LEARNING
October 19, 2017**

conducted on the property.  Based on site available information, no recognized environmental conditions are evident at the subject property.  A copy of the property description and all legal documentation are on file with the IHL Office of Real Estate and Facilities.  The Attorney General's Office has reviewed and approved this item.

## LEGAL

36. **ASU** – Approved the contract with Ware │ Immigration, to provide services necessary in preparing labor certification documents on behalf of ASU for its employees who seek permanent residence status and related immigration matters.  The contract term is one year beginning October 1, 2017. The fee schedule is as outlined below with a maximum amount payable of $20,000.  The Attorney General's Office has approved this request.

**Schedule of Legal Fees for Academia**

Nonimmigrant Petitions and Processes
| | |
|---|---|
| H-1B petition | $1500.00 |
| H-1B extension or amendment petitions | $1000.00 |
| | |
| TN petition or border/consulate processing | $1500.00 |
| TN extension petition | $1000.00 |
| | |
| E-3 petition or consular processing | $1500.00 |
| E-3 extension petition | $1000.00 |
| | |
| O-1 petition | $4000.00 |
| O-1 extension or amendment petition | $1500.00 |

Change of status or extension of status for dependents (I-539) no additional charge
| | |
|---|---|
| J-1 waiver (IGA or hardship) | $6,000.00 |
| J-1 waiver (Conrad) | $6,000.00 |

Permanent Residence Process with Labor Certification: Faculty
| | |
|---|---|
| $2000.00 | Special Handling labor certification |
| | *$2500.00 if position must be readvertised* |
| $1500.00 | Additional fee if audited. |
| $2500.00 | Immigrant petition |
| $1500.00 | Adjustment of status and related applications (I-765, I-131, etc.) for employee, if handled together with I 140 |
| $2000.00 | "Standalone" adjustment of status and related applications |
| $750.00 | Adjustment of status and related applications, each spouse or child, if together with principal application and I 140 |
| $1000.00 | "Standalone" adjustment of status and related, each spouse or child |

Permanent Residence Process with Labor Certification: Non-Faculty
| | |
|---|---|
| $4000.00 | Labor certification |
| ($500-$1500.00 | Additional fee if audited) |
| ($2500.00 | Additional fee if subject to supervised recruitment) |
| $2500.00 | Immigrant petition |
| $2000.00 | Adjustment of status and related applications (I-765, I-131, etc.) for employee |
| $2500.00 | Standalone AOS and related applications |
| $750.00 | Adjustment of status and related applications, each spouse or child |
| $1000.00 | Standalone AOS for each spouse or child |

12

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

Permanent Residence Process:  Outstanding Professors and Researchers
$6000.00          Immigrant petition
$1500.00          Adjustment of status and related applications for employee
$2000.00          Standalone AOS and related
$750.00           Adjustment of status and related applications, each spouse or child
$1000.00          Standalone dependent AOS and related

Permanent Residence Process:  National Interest Waiver
$6000.00          Immigrant petition
$1500.00          Adjustment of status and related applications by employee
$2000.00          Standalone AOS and related
$750.00           Adjustment of status and related applications each spouse or child
$1000.00          Standalone AOS and related, dependents

Employment Authorization and Advance Parole Renewal
$500 Employment Authorization Renewal per individual
$500 Advance Parole Renewal per individual

General Legal Advice and Unusual Matters Which Fall Outside This Fee Schedule
Such matters will be billed at our hourly rates:
David Ware $350 per hour billed.
WI Partners $350 per hour billed.
Associate Attorneys: $250 per hour billed.
Paralegals: $175 per hour billed.

37. **MSU** – Approved the request to modify a contract with Butler Snow LLP, to provide services necessary in the practice areas of intellectual property and commercial matters; this representation does not and is not intended to include any representation by law firm for or on behalf of the University as bond counsel or in any related role in connection with any financing transaction undertaken by or for the University, including other matters which may concern advice in connection with indebtedness of the University. The initial contract entered into on October 17, 2013 was modified by Modifications 1-3, each extending the term for one year, with the current term expiring October 16, 2017. Modification #4 will extend the term of the contract for an additional year or through October 16, 2018. Blended hourly rate for all attorneys is increased from $240 per hour to $295 per hour. Rate for legal assistants shall remain at $95 per hour. Total amount payable during the extension period shall not exceed $75,000. All other provisions of the Agreement for Legal Services dated October 17, 2013 shall remain in effect. The Modification has been approved by the Office of the Attorney General.

38. **MSU** – Approved the request to modify a contract with the firm of Valauskas Corder, LLC located at 150 South Wacker Drive, Suite 620, Chicago, IL 60606, as outside counsel for the provision of services necessary in assisting the University with various patent applications, identification and forensic analysis of intellectual property, prosecution of patent applications, trademark registration applications, copyright registration applications, preparing and negotiating agreements and other related intellectual property and commercialization issues. The initial contract entered into on November 17, 2011 was modified by Modifications 1-5, each Modification extending contract terms for one (1) year. Modification #6 will extend the term until November 16, 2018. Current attorneys providing services are Charles Valauskas, Allison Corder, and Paul K. Judd. All other provisions of the Agreement for Legal Services dated November 17, 2011, shall remain in effect,

13

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

with hourly rates ranging from $225-$425, and total amount payable under this extension shall not exceed $100,000. This Modification has been approved by the Office of the Attorney General.

39. **MSU** – Approved the request to enter into a contract with The Winfield Law Firm, P.A. as outside counsel to provide legal services necessary in assisting the University in the areas of higher education law, employment law, real estate matters, compliance, and other local matters, at an hourly rate of $165.00. The contract will be effective November 1, 2017, for an initial term of one (1) year. The total amount payable during the contract shall not exceed $50,000. This request has been approved by the Office of the Attorney General.

**PERSONNEL REPORT**

40. _EMPLOYMENT_

**Jackson State University**
- Steven Smith, Interim Vice President for Enrollment Management, Institutional Research & Assessment; salary of $24,900 for 3 months; effective September 5, 2017 – November 30, 2017

**Mississippi University for Women**
- Rita C. Hinton; _rehired retiree_; reemployment position: Emerita Professor of Philosophy; salary of $29,155 per annum, pro rata; E&G Funds; reemployment period: August 21, 2017 – December 18, 2017

**Mississippi Valley State University**
- Chresteen Seals; _rehired retiree_; reemployment position:  Site Coordinator at Coahoma Community College; salary of $20,000 per annum, pro rata; E & G Funds; reemployment period: July 1, 2017 - April 30, 2018

41. _CHANGE OF STATUS_

**University of Mississippi**
- Noel Wilkin; _from_ Interim Provost and Executive Vice Chancellor for Academic Affairs, Professor of Pharmacy Administration and Research Professor in the Research Institute of Pharmaceutical Sciences; salary of $290,000 pro annum, pro rata; E&G Funds; _to_ Provost and Executive Vice Chancellor of Academic Affairs, Professor of Pharmacy Administration and Research Professor in the Research Institute of Pharmaceutical Sciences; Ph.D.; salary of $385,000 per annum, pro rata; E&G Funds; 12-month contract; effective September 22, 2017

42. _SABBATICAL_

**Jackson State University**
- Mukesh Kumar; Associate Professor and Interim Program Director, Urban Planning-PHD; salary of $69,904, this will be an unpaid leave; effective September 1, 2017 – May 31, 2018

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

43. *__EMERITUS STATUS__*

   **University of Southern Mississippi**
   - William W. Powell, Associate Professor Emeritus of TESOL & French; effective July 1, 2017

**ADMINISTRATION/POLICY**

44. **ASU** – Approved the university's mission statement as follows:
   Alcorn State University, a Historically Black College and University, is a comprehensive land-grant institution that celebrates a rich heritage with a diverse student and faculty population. The University emphasizes intellectual development and lifelong learning through the integration of diverse pedagogies, applied and basic research, cultural and professional programs, public service and outreach, while providing access to globally competitive academic and research programs. Alcorn strives to prepare graduates to be well-rounded future leaders of high character and to be successful in the global marketplace of the 21st century.

45. **DSU** – Approved the revisions to the university's mission statement as follows:
   As a regional Carnegie Master's I university located in Cleveland, Mississippi, Delta State University serves as an educational and cultural center for the Mississippi Delta, emphasizing service to the Northern Delta and contiguous counties and its campus centers in Clarksdale and Greenville in traditional and distance education formats. The University offers undergraduate, graduate and continuing education programs of study leading to baccalaureate and master's degrees in the Colleges of Arts and Sciences, Business and Aviation, Education and Human Sciences, and the School of Nursing, as well as the Educational Specialist degree and Doctorates in Education and Nursing Practice. Emphasis is placed on excellence in instruction, followed by service and research, in the creation of a community of scholars. With special attention to small classes, a friendly environment, and a broad liberal arts foundation, the University encourages significant student-faculty interactions. Delta State provides programs and services that promote intellectual, cultural, ethical, physical, and social development. Students from different cultural, socioeconomic, and ethnic backgrounds will develop the ability to respect and evaluate the thoughts of value others; to develop, assess, and express their own thoughts effectively; and, to use the techniques of research and performance associated with their disciplines.

46. **JSU** – Approved the university's mission statement as follows:
   The university produces technologically advanced, diverse, ethical, global leaders who think critically, address societal problems, and compete effectively.

47. **MSU** – Approved the university's mission statement as follows:
   Mississippi State University is a public, land-grant university whose mission is to provide access and opportunity to students from all sectors of the state's diverse population, as well as from other states and countries, and to offer excellent programs of teaching, research, and service.

   Enhancing its historic strengths in agriculture, natural resources, engineering, mathematics, and natural and physical sciences, Mississippi State offers a comprehensive range of undergraduate and graduate programs; these include architecture, the fine arts, business, education, the humanities, the social and behavioral sciences, and veterinary medicine.

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

The university embraces its role as a major contributor to the economic development of the state through targeted research and the transfer of ideas and technology to the public, supported by faculty and staff relationships with industry, community organizations, and government entities.

Building on its land-grant tradition, Mississippi State strategically extends its resources and expertise throughout the entire state for the benefit of Mississippi's citizens, offering access for working and place-bound adult learners through its Meridian Campus, Extension, and distance learning programs.

Mississippi State is committed to its tradition of instilling among its students and alumni ideals of diversity, citizenship, leadership, and service.

48. **MUW** – Approved the revisions to the university's mission statement as follows:
Mississippi University for Women (MUW), a public institution since 1884, provides high-quality undergraduate and graduate education for women and men in a variety of liberal arts and professional programs, while maintaining its historic commitment to academic and leadership development for women. MUW emphasizes a personalized learning environment in all of its educational programs, which are offered through the College of Arts, ~~and~~ Sciences, and Education, College of Business and Professional Studies, ~~College of Education and Human Sciences,~~ and College of Nursing and Health Sciences ~~Speech-Language Pathology~~. MUW delivers selected programs and courses through distance education formats to provide educational opportunities throughout Mississippi and the United States, while addressing the unique educational and public service needs of northeast Mississippi and adjoining counties in northwest Alabama. MUW supports research, scholarship, and creativity to enhance faculty development and student learning and to advance knowledge in the disciplines offered by the university.

49. **MVSU** – Approved the university's mission statement as follows:
Mississippi Valley State University, as a Carnegie Classified Master's University, provides comprehensive undergraduate and graduate programs in education, the arts and sciences, and professional studies. The University is driven by its commitment to excellence in teaching, learning, service, and research--a commitment resulting in a learner-centered environment that prepares critical thinkers, exceptional communicators, and service-oriented, engaged, and productive citizens. MVSU is fundamentally committed to positively impacting the quality of life and creating extraordinary educational opportunities for the Mississippi Delta and beyond.

50. **UM & UMMC** – Approved the revisions to the UM and UMMC vision and mission statements as follows:
**Vision Statement**
~~As a great American public university,~~ The University of Mississippi ~~will lead and excel by engaging minds, transforming lives, and serving others.~~ aspires to be a preeminent public international research university and a leading force for innovation and opportunity in Mississippi, the United States, and the world.

**Mission Statement**
As Mississippi's flagship university and academic medical center, the University of Mississippi transforms lives, communities, and the world by providing opportunities for the people of Mississippi and beyond through excellence in learning, discovery, healthcare, and engagement.

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

| Oxford & Regional Campus Mission | Medical Center Campus Mission |
|---|---|
| The mission of the University of Mississippi ~~mission~~ is to create, evaluate, share, and apply knowledge in a free, open, and inclusive environment of intellectual inquiry. Building upon a distinguished foundation in the liberal arts, the state's ~~oldest~~ first comprehensive university serves the people of Mississippi and the world through a breadth of academic, research, ~~and~~ professional, and service programs. The University of Mississippi provides an academic experience that emphasizes critical thinking; ~~encourages intellectual depth and creativity;~~ promotes research and creative achievement to advance society; uses its expertise to engage and transform communities; challenges and inspires a diverse community of undergraduate, graduate, and professional students; ~~provides~~ offers enriching opportunities outside the classroom; supports lifelong learning; and develops a sense of global responsibility. | The mission of the University of Mississippi Medical Center is to improve the health and well-being of patients and the community through excellent training for health care professionals, engagement in innovative research, and the delivery of state-of-the-art health care. |

51. **USM** – Approved the university's mission statement as follows:
The University of Southern Mississippi is a community of engaged citizens, operating as a public, student-centered, doctoral-granting research university serving Mississippi, the nation, and the world. The University is dedicated to scholarship and learning, integrating students at all levels in the creation and application of knowledge through excellence in teaching, research, creative activities, outreach, and service.  The University nurtures student success by providing distinctive and competitive educational programs embedded in a welcoming environment, preparing a diverse student population to embark on meaningful life endeavors.


# ACADEMIC AFFAIRS
### Presented by Trustee Tom Duff, Chair

On motion by Trustee Duff, seconded by Trustee Parker, all Trustees legally present and participating voted unanimously to approve agenda item #1 as submitted on the Academic Affairs Agenda.

1. **SYSTEM** – Approved the following recommended actions based on the Academic Program Productivity Reviews:
    a. **Continue with stipulation** the following 20 academic programs (subject to additional review by the IHL Office of Academic and Student Affairs for two years to assess progress toward future productivity):
    ASU – Bachelor of Arts in Sociology (CIP 45.1101)
    ASU – Bachelor of Science in Computer Science (CIP 11.0101)
    ASU – Bachelor of Science in Robotics and Automation Technology (CIP 15.0405)
    DSU – Master of Science in Community Development (CIP 44.0201)
    JSU – Bachelor of Science in Mathematics Education (CIP 13.1311)
    JSU – Master of Education in Elementary Education (CIP 13.1202)
    JSU – Master of Education in Secondary Education (CIP 13.1205)
    JSU – Master of Science in Environmental Science (CIP 30.103)
    JSU – Masters in Science and Mathematics Teaching (CIP 13.9999)
    MUW – Bachelor of Arts in Music – (CIP 50.0901)

17

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

        MVSU – Bachelor of Science in Computer Science (CIP 11.0101)
        MVSU – Bachelor of Science in Elementary Education (CIP 13.1202)
        MVSU – Bachelor of Arts in Art (CIP 50.0101)
        USM – Bachelor of Science in Electronics Engineering Technology (CIP 15.0303)
        USM – Bachelor of Arts in Philosophy (CIP 38.0101)
        USM – Master of Science in Polymer Science and Engineering (CIP 14.3201)
        USM – Master of Science in Forensics (CIP 43.0106)
        USM – Doctorate in Kinesiology (CIP 31.0505)
        USM – Doctorate in Criminal Justice (CIP 43.0104)
        USM – Doctorate in Geography (CIP 45.0701)

    b. **Delete** - DSU – Bachelor of Arts in Political Science (CIP 45.1001).

## FINANCE AGENDA
### Presented by Trustee Christy Pickering, Chair

Trustee Pickering removed agenda item #1 for further review. On motion by Trustee Pickering, seconded by Trustee McNair, all Trustees legally present and participating voted unanimously to approve agenda item #1 as submitted on the Finance Agenda. On motion by Trustee Pickering, seconded by Trustee McNair, all Trustees legally present and participating voted unanimously to approve agenda item #2. On motion by Trustee Pickering, seconded by Trustee McNair, all Trustees legally present and participating voted unanimously to approve agenda item #3. On motion by Trustee Pickering, seconded by Trustee Duff, all Trustees legally present and participating voted unanimously to approve agenda item #4. On motion by Trustee Pickering, seconded by Trustee Hooper, all Trustees legally present and participating voted unanimously to approve agenda item #5.

1. **SYSTEM** – Request approval for first reading of the revisions to Board Policy 906 Educational Building Corporations. **(See Exhibit 2.) (THIS ITEM WAS REMOVED FROM THE AGENDA FOR FURTHER REVIEW.)**

2. **UMMC** – Approved the request to enter into a Customer Agreement with CareFusion Solutions, LLC to purchase dedicated and non-dedicated intravenous (IV) disposable sets, including pump sets, gravity sets, extension sets, connectors, secondary sets, and accessories at a discount in exchange for a commitment to purchase at least $1,000,000 per year and 90% of UMMC's total need for IV disposable sets. UMMC currently owns 1,996 CareFusion IV pumps that require use of dedicated CareFusion IV disposable sets due to compatibility. By combining the dedicated sets and non-dedicated sets under this agreement, UMMC qualifies for a higher discount on the products. The term of the agreement is for five (5) years – November 1, 2017 through October 31, 2022. The total estimated cost for the five (5) year contract term is $8,738,381.30. Beginning in Year 2, UMMC has calculated an annual increase of five and one-half percent (5.5%) for potential price increases and volume growth each year of the agreement. The agreement will be funded by patient revenue. The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

3. **UMMC** – Approved Amendment 2 to its agreement with Crothall Healthcare, Inc. to add Statement of Work #4 to the agreement, which includes services for the remainder of UMMC's facilities in Jackson, including its academic, research, and service department facilities. The original contract term for the master agreement is for five (5) years beginning November 1, 2015.

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

The Second Amendment will be effective November 1, 2017, with services commencing on or about December 1, 2017. The Second Amendment's expiration will coincide with the original agreement on October 31, 2020. The total cost of Statement of Work #4 is $11,821,604.85, including all potential and variable costs. UMMC will pay semi-monthly fixed costs for housekeeping services. Beginning in Year 2, annual prices will increase by CPI or three percent (3%), whichever is less. Should UMMC terminate Statement of Work #4 prior to its expiration, UMMC will pay the unamortized balance for Crothall's opening expenses, and UMMC will have the option to pay the unamortized balance for any equipment purchases made by Crothall. If Crothall's costs to perform the services increases by more than fifteen percent (15%), UMMC and Crothall will renegotiate a new rate, and UMMC will present the amendment to the IHL Board with a request for the increase at that time. A breakdown of costs is available in the bound *October 19, 2017 Board Working File.* This agreement will be funded by general funds. The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

4. **UMMC** – Approved the request to initiate the bond process for up to $91 million for the Medical Center Educational Building Corporation for the purpose of expanding Children's of Mississippi, including a new tower with expanded neonatal intensive care unit (NICU), pediatric intensive care unit (PICU), new pediatric imaging center, new dedicated surgical suites, related infrastructure, outpatient clinics, clinics and parking garage. It should be noted that the original request was for bonds up to $132 million. After discussion within the Health Affairs Committee on October 18, 2017, the request was revised to $91 million with the understanding that should additional money be needed the University of Mississippi would loan the money to UMMC internally. The expansion will also include a new lobby with critical infrastructure (food/chapel/gift shop) and dedicated patient elevators. The building will double the size of pediatric clinical space at the Medical Center to meet existing and future patient needs. The Board approved the payment of costs of issuance, sale and delivery of the bonds and other necessary bond documents and the financial advisor's report provided by Hilltop Securities. The Board approved the following professionals: Hilltop Securities as financial advisor; Butler Snow LLP as bond counsel; and JP Morgan, Morgan Stanley, and Raymond James as underwriters. Bond counsel has agreed to donate its fee up to $250,000 to the Children's of Mississippi Expansion project. The expansion is needed to provide approximately 340,000 square feet of additional space to provide NICU, PICU, surgery, clinic and outpatient clinics and dedicated pediatric imaging space for its pediatric patients. Long-term and intermediate term fixed rate bonds will be issued with maturities up to thirty (30) years. UMMC is expecting to issue up to a maximum of $91,000,000 par value in tax-exempt, fixed rate bonds. Proceeds from the bond issue will support the project fund, capitalized interest, costs of issuance and the underwriter's discount. Based on the Financial Advisor's report dated September 21, 2017, the proposed debt amortization will have an annual debt payment as follows: FY 2019–2042 is $4,883,325; and FY 2043-2047 is $18,145,000. Funds are available from Patient Revenues, Development Funds.

5. **UMMC** – Approved the request to enter into a Service Agreement with ThyssenKrupp Elevator Corporation (ThyssenKrupp) to provide elevator maintenance service for 125 elevators located on UMMC's main campus and new Belhaven facility, as well as facilities located in Lexington and Grenada, MS. The term of the Agreement is for five (5) years from November 1, 2017, through October 31, 2022. The total estimated cost of the Agreement over the five (5) year term is $3,602,804.87. Any price increases under the Agreement, including increased fuel costs and

**MINUTES OF THE BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER LEARNING
October 19, 2017**

elevator examiner rate charges, are capped at three and one-half percent (3.5%) increase per year and subject to approval by UMMC.  The agreement will be funded by general funds.  The agreement, which was reviewed and approved by the Attorney General's Office prior to the Board's approval of this item, is on file in the Board Office.

## LEGAL AGENDA
### Presented by Trustee Alan Perry, Chair

Trustee Perry moved agenda items #1 and #2 to the Executive Session Agenda for consideration.
1. **MVSU** – Request to settle the IHL Self-Insured Workers' Compensation Program Claim No. 55-8703-1. **(THIS ITEM WAS MOVED TO EXECUTIVE SESSION.)**
2. **UMMC** – Request to settle Tort Claim number 3133.  **(THIS ITEM WAS MOVED TO EXECUTIVE SESSION.)**

## INFORMATION AGENDA
### Presented by Commissioner Glenn F. Boyce

**FINANCE**
1. **SYSTEM** - In accordance with the *Jake Ayers, Jr., et al. and United States of America v Ronnie Musgrove, Governor, State of Mississippi, et al.* Settlement (aka: *Ayers* Settlement Agreement), the IHL Board, through its counsel, shall provide to lead counsel for the private plaintiffs and counsel for the United States an annual disclosure report reflecting specified line-item information. This document is due October 1 of each year and has been presented to the Court.  Each member of the IHL Board is being provided a copy of the 2017 *Ayers* Accountability Manual as required by the *Ayers* Settlement Agreement.  A copy is on file at the Board Office.

**REAL ESTATE**
2. **SYSTEM** – The Board received the Real Estate items that were approved by the Board staff subsequent to the August 17, 2017 Board meeting in accordance with Board Policy 904 Board Approval.  **(See Exhibit 3.)**

**LEGAL**
3. **SYSTEM** – The Board received a report of the payment of legal fees to outside counsel.  **(See Exhibit 4.)**

**ADMINISTRATION/POLICY**
4. **SYSTEM** – The following items have been approved by the Commissioner on behalf of the Board and are available for inspection at the Board Office.
    a. **ASU** - In accordance with Board Policy 707.01 Land, Property, and Service Contracts, "The Commissioner is authorized and empowered to approve non-oil, gas and mineral leases in an amount equal to or less than $100,000."  On October 4, 2017, Commissioner Glenn F. Boyce approved the proposed Motor Vehicle License to Use Agreement

**MINUTES OF THE BOARD OF TRUSTEES OF
STATE INSTITUTIONS OF HIGHER LEARNING
October 19, 2017**

between the university and Toyota Motor Sales, U.S.A., Inc. for the use of a Toyota Rav4 vehicle by the ASU Athletic Department as part of a partnership between the SWAC and Toyota. The IHL Associate Commissioner for Legal Affairs has reviewed and approved the contract document.

b. **MSU** – In accordance with Board Policy 707.01 Land, Property, and Service Contracts, "The Commissioner is authorized and empowered to approve non-oil, gas and mineral leases in an amount equal to or less than $100,000." On October 4, 2017, Commissioner Glenn F. Boyce approved the Lease Agreement addendum #2 between the university and the MSU Research and Technology Corporation (MSU-RTC) for 352 square feet of office space located in the MSU-RTC Incubator Building in Starkville, MS. This is the 2nd renewal of an existing Lease that began on October 1, 2016, at an annual cost of $5,280. All provisions of the agreement remain unchanged. The IHL Associate Commissioner for Legal Affairs has reviewed and approved the contract documents.

# ANNOUNCEMENTS

- Commissioner Glenn Boyce noted that each trustee received a draft copy of the 2015-2016 Education Achievement Council (EAC) Report Card for each of the Mississippi public universities. These reports are required by law and will be provided to the EAC for approval next week.
- President C.D. Smith announced that the next scheduled Board meeting will be November 16, 2017 at the Board Office.
- President Smith invited the university presidents to report on current activities on their campuses.
- Trustee Walt Starr reported that Mr. David Buford, IHL Director of Risk Management, recently conducted a thorough review and assessment of each of the Mississippi public university's procedures related to sexual assault complaints and whether counseling services are available for those involved in incidents. Mr. Buford was able to conduct a thorough review without contacting university staff because ample information was readily available through the internet. Students will likely use this method to educate themselves, in addition to what they remember from orientation and related past trainings. No two universities had the exact same policy, but it is apparent that all are following pertinent Title IX regulatory guidance. Trustee Starr thanked all eight universities for proactively working to prevent incidents, to educate the campus population, and to create safe environments for students.
- Chancellor Jeff Vitter introduced Dr. Noel Wilkin who was recently promoted to Provost and Executive Vice Chancellor of Academic Affairs, Professor of Pharmacy Administration and Research Professor in the Research Institute of Pharmaceutical Sciences.
- President Smith thanked the students representing the student government associations at the universities who took time from their busy schedules to participate in the Board meeting.

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

## ACADEMIC AFFAIRS
## COMMITTEE REPORT
Wednesday, October 18, 2017

The meeting was called to order by Chairman Tom Duff at approximately 1:30 p.m.  The following items were discussed.

1. On motion by Trustee Hooper, seconded by Trustee Dye, with Trustees Pickering and Smith absent and not voting, all Trustees legally present and participating voted unanimously to approve the authorization to plan an Executive Master of Science in Population Health Management degree program (CIP 51.2208) at the University of Mississippi Medical Center.

2. On motion by Trustee Rouse, seconded by Trustee Dye, with Trustees Pickering and Smith absent and not voting, all Trustees legally present and participating voted unanimously to approve the authorization to plan a Bachelor of Science in Health Sciences degree program (CIP 51.9999) at the University of Southern Mississippi.

3. By consensus, the Committee adjourned at approximately 1:50 p.m.

The following Committee members attended the meeting: Mr. Tom Duff (Chair), Dr. Ford Dye, Mr. Shane Hooper, Ms. Ann Lamar, Dr. Alfred McNair, Mr. Chip Morgan, Mr. Hal Parker, Mr. Alan Perry, Dr. Doug Rouse, and Dr. Walt Starr.  Ms. Christy Pickering and Mr. C.D. Smith were absent.

## HEALTH AFFAIRS
## COMMITTEE REPORT
Wednesday, October 18, 2017

The meeting was called to order by Chairman Ford Dye at approximately2:00 p.m.  The following items were discussed.

1. The Committee discussed the request by the University of Mississippi Medical Center to initiate the bond process for up to $132 million for Medical Center Educational Building Corporation for the purpose of expanding Children's of Mississippi, including a new tower with expanded neonatal intensive care unit (NICU), pediatric intensive care unit (PICU), new pediatric imaging center, new dedicated surgical suites, related infrastructure, outpatient clinics, clinics, and parking garage. **No action was taken.**

2. **By consensus, the Committee recessed at 4:00 p.m.**  The following Committee members were present for the first half of the meeting: Dr. Ford Dye (Chair), Mr. Tom Duff, Mr. Shane Hooper, Ms. Ann Lamar, Dr. Alfred McNair, Mr. Chip Morgan, Mr. Hal Parker, Mr. Alan Perry, Ms. Christy Pickering, Dr. Doug Rouse, and Dr. Walt Starr.  Mr. C. D.  Smith was absent.

3. **Chairman Ford Dye reconvened the meeting at approximately 4:30 p.m.**  The following Committee members were present for the remainder of the meeting: Dr. Ford Dye (Chair), Mr. Tom Duff, Mr. Shane Hooper (by phone), Ms. Ann Lamar, Dr. Alfred McNair, Mr. Chip Morgan, Mr. Hal Parker, Mr. Alan Perry, Ms. Christy Pickering, Dr. Doug Rouse, Mr. C.D. Smith, and Dr. Walt Starr.

4. The Committee continued its discussion of the bond issuance for the UMMC expansion of Children's of Mississippi.  **No action was taken.**

5. By consensus, the Committee adjourned at approximately 4:50 p.m.

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

## MISSISSIPPI VALLEY STATE UNIVERSITY
## BOARD SEARCH COMMITTEE REPORT
Wednesday, October 18, 2017

The meeting was called to order by Chairman Shane Hooper at approximately 4:55 p.m.  The following item was discussed.

1. Executive Session
   On motion by Trustee Perry, all Trustees legally present and participating voted unanimously to close the meeting to determine whether to declare an Executive Session.  On motion by Trustee Dye, seconded by Trustee Rouse, all Trustees legally present and participating voted unanimously **to enter into Executive Session** for the reason reported to the public and stated in these minutes, as follows:  Discussion of a personnel matter at Mississippi Valley State University.
   **During Executive Session, the following matters was discussed:**
   The Committee discussed a personnel matter at Mississippi Valley State University.  **No action was taken.**
   On motion by Trustee Perry, seconded by Trustee Parker, all trustees legally present and participating voted unanimously to return to open session.
2. On motion by Trustee Smith, seconded by Trustee Perry, with Trustee Starr absent and not voting, all Trustees legally present and participating voted unanimously to adjourn the meeting.

The following Committee members attended the meeting:  Mr. Shane Hooper (Chair), Mr. Tom Duff, Dr. Ford Dye, Ms. Ann Lamar, Dr. Alfred McNair, Mr. Chip Morgan, Mr. Hal Parker, Mr. Alan Perry, Ms. Christy Pickering, Dr. Doug Rouse, Mr. C.D. Smith, and Dr. Walt Starr.

## EXECUTIVE SESSION

On motion by Trustee Hooper, seconded by Trustee Perry, all Trustees legally present and participating voted unanimously to close the meeting to determine whether to declare an Executive Session.  On motion by Trustee Hooper, seconded by Trustee Perry, with Trustees Dye and Morgan absent and not voting, all Trustees legally present and participating voted unanimously **to enter into Executive Session** for the reasons reported to the public and stated in these minutes, as follows:

Discussion of two state university litigation matters and one state university personnel matter.

**During Executive Session, the following matters were discussed and/or voted upon:**

On motion by Trustee Hooper, seconded by Trustee Pickering, with Trustee Dye absent and not voting, all Trustees legally present and participating voted unanimously to approve the settlement of Tort Claim No. 3133, styled as *Steve Wright vs. UMMC, et al.*, as recommended by counsel.

### MINUTES OF THE BOARD OF TRUSTEES OF
### STATE INSTITUTIONS OF HIGHER LEARNING
**October 19, 2017**

On motion by Trustee Hooper, seconded by Trustee McNair, with Trustee Dye absent and not voting, all Trustees legally present and participating voted unanimously to approve the settlement of IHL Self Insured Workers' Compensation Claim No. 55-8703-1, styled as *Anthony McClung vs. MVSU, et al.,* as recommended by counsel.

On motion by Trustee Hooper, seconded by Trustee Pickering, with Trustee Dye absent and not voting, all Trustees legally present and participating voted unanimously to approve to utilize the expedited process as listed in the Board Policy 201.0509 Institutional Executive Officer/Commissioner of Higher Education Search Process and to waive any parts of such policy that are not consistent with the action taken by this Board, and to name Dr. Jerryl Briggs as president of Mississippi Valley State University with a state salary of $215,000 with a possible foundation supplement up to $10,000, and to provide reimbursement of up to $1,000 for moving expenses, effective October 19, 2017.

**On motion by Trustee Pickering, seconded by Trustee McNair, with Trustee Dye absent and not voting, all Trustees legally present and participating voted unanimously to return to Open Session.**

### ADJOURNMENT

There being no further business to come before the Board, on motion by Trustee Pickering, seconded by Trustee Perry, with Trustee Dye absent and not voting, all Trustees legally present and participating voted unanimously to adjourn the meeting.

_____

President, Board of Trustees of State Institutions of Higher Learning

_____

Commissioner, Board of Trustees of State Institutions of Higher Learning

24

**MINUTES OF THE BOARD OF TRUSTEES OF**
**STATE INSTITUTIONS OF HIGHER LEARNING**
**October 19, 2017**

## EXHIBITS

| | |
|---|---|
| Exhibit 1 | Approval of MS-ITS to acquire Ellucian Technical Currency Services for Licensed Software for ASU. |
| Exhibit 2 | Request approval for first reading of the following revisions to Board Policy 906 Educational Building Corporations. |
| Exhibit 3 | Real Estate items that were approved by the IHL Board staff subsequent to the August 17, 2017 Board meeting. |
| Exhibit 4 | Report of the payment of legal fees to outside counsel. |

25

**ITS CONTRACT ACCEPTANCE**
**Project Number 43900**
**For Renewal of Banner License**

TO:

| |
|---|
| Felicia Harried |
| ASU |

RETURN TO:

| |
|---|
| Paula Conn |
| Dept. of Information Technology Services |
| 3771 Eastwood Drive |
| Jackson, MS 39211 |
| Phone: 601-432-8046 |
| Fax: 601-713-6380 |

DATE SENT:  August 31, 2017                    RETURN BY:  September 14, 2017

**INSTRUCTIONS:**
Please review the attached contract forwarded to you by the ITS staff.  **If any material changes are needed to this contract, please mark all changes needed on the document and return to ITS for changes.  You will be sent a revised copy to review before you sign this Contract Acceptance form.**  Otherwise, please select one of the options below and return this form to the address above.

Please initial the appropriate line to indicate the contract has been reviewed & is accepted by your agency/institution and that all reviews by your agency attorney and management are complete:

_ARJ_ without changes

_____ with the following corrections to format or syntax:  (attach additional pages if needed)

| Page Number | Correction Needed: |
|---|---|
| | |
| | |
| | |

Please list all names/titles, if any, who will sign this contract on behalf of your agency:
_ARJ_ None; we accept the signature of the ITS Executive Director on our behalf

_____ Please add a signature line for the following person(s) from our agency:

| Name | Title |
|---|---|
| | |
| | |
| | |

**CONTRACT DELIVERY (SELECT ONE):**

_____ Send contracts to vendor via overnight delivery and bill our agency/institution.

_ARJ_ Send contracts to vendor via regular United States Postal Service mail.

_Alfred Rankins Jr_    _9/14/2017_        Alcorn State University
AUTHORIZED SIGNATURE / DATE                AGENCY / INSTITUTION
My signature above indicates that my agency/institution is a full party to the above-referenced contract, with or without the signature of the agency executive on the body of the contract.  My agency executive understands and agrees that: (1) by virtue of Section 25-53-21 of the Mississippi Code Annotated, as amended, the Executive Director of ITS is the purchasing and contracting agent for the State of Mississippi in the negotiation and execution of all contracts for the acquisition of information technology equipment, software and services, and, as contracting agent, must be a party to any amendments, change orders, or termination actions for the life of this contract; (2) ITS as contracting agent is not responsible or liable for the performance or non-performance of any of agency's contractual obligations, financial or otherwise, for this contract; and (3) my agency/institution is responsible for day-to-day management of the project and contract and all business decisions pertaining thereto and must initiate any actions regarding payments, changes in scope, early termination, and invocation of any penalties defined herein, providing appropriate notification to ITS when required.

Date Revised: 9/14/2017

EXHIBIT 1

Case 2:23-cv-00045-KS-MTP   Document 16-10   Filed 04/28/23   Page 135 of 220
Case: 1:22-cv-00286-EFP   Document #: 140-7   Filed: 09/23/2022   Page 28 of 54

October 19, 2017

**PROJECT NUMBER 43900**
**SUPPLEMENT TO**
**MASTER SOFTWARE LICENSE AND SERVICE AGREEMENT**
**BETWEEN**
**ELLUCIAN COMPANY L.P.**
**(SUCCESSOR BY ASSIGNMENT TO SUNGARD HIGHER EDUCATION INC.**
**AND ALSO FORMERLY KNOWN AS SUNGARD SCT, INC. AND**
**SCT SOFTWARE & RESOURCE MANAGEMENT CORP)**
**AND**
**MISSISSIPPI DEPARTMENT OF INFORMATION TECHNOLOGY SERVICES**
**AS CONTRACTING AGENT FOR**
**ALCORN STATE UNIVERSITY**

This document (hereinafter referred to as "Supplement") shall serve as a Supplement to the original Master Software License and Service Agreement (hereinafter referred to as "Master Agreement") executed on May 21, 1998, between Ellucian Company L.P., formerly known as "SunGard SCT, Inc." and SCT Software & Resource Management Corporation, and "SunGard" (hereinafter referred to as "Licensor" and/or "Ellucian"), and Mississippi Department of Information Technology Services (hereinafter referred to as "ITS"), as contracting agent for the agencies and institutions of the State of Mississippi. It is understood by the parties that ITS is executing this Supplement on behalf of Alcorn State University (hereinafter referred to as "Licensee"). ITS and Licensee are sometimes collectively referred to herein as "State."

**WHEREAS,** the Licensee desires to acquire the Technical Currency Services as specified herein;

**NOW THEREFORE,** in consideration of the mutual understandings, promises, consideration and agreements set forth, the parties hereto agree as follows:

1)      This Supplement will become effective on the date it is signed by all parties ("Effective Date") and will continue in effect until October 31, 2024 unless terminated pursuant to Article 14 of the Master Agreement. Licensor agrees to provide the Technical Currency Services in accordance with Article 32 of the Master Agreement.

2)      Licensor agrees to provide Licensee with Technical Currency Services for the Licensed Software identified in the Licensee Order Form, which is attached hereto as Exhibit A and incorporated herein by reference, and at the fees and for the periods set forth therein.

3)      Licensor represents and warrants that it will ensure its compliance with the Mississippi Employment Protection Act, Section 71-11-1, et seq. of the Mississippi Code Annotated (Supp2008), and will register and participate in the status verification system for all newly hired employees. The term "employee" as used herein means any person that is hired to perform work within the State of Mississippi. As used herein, "status verification system" means the Illegal Immigration Reform and Immigration Responsibility Act of 1996 that is operated by the United States Department of Homeland Security, also known as the E-Verify Program, or any other successor electronic verification system replacing the E-Verify Program. Licensor agrees to maintain records of such compliance and, upon request of the State, to provide a copy of each such verification to the State. Licensor further represents and warrants that any person assigned to perform services hereunder meets the employment eligibility requirements of all immigration laws of the State of Mississippi. Licensor understands and agrees that any breach of these warranties may subject Licensor to the following: (a) termination of this Supplement and ineligibility for any state or public contract in

Ellucian Company L.P.-ASU-43900-2911-Aug2017-Master Supplement to Software License & Service

Mississippi for up to three (3) years, with notice of such cancellation/termination being made public, or (b) the loss of any license, permit, certification or other document granted to Licensor by an agency, department or governmental entity for the right to do business in Mississippi for up to one (1) year, or (c) both. In the event of such termination/cancellation, Licensor would also be liable for any additional costs incurred by the State due to contract cancellation or loss of license or permit.

4)   The parties understand and agree that all terms and conditions set forth in the Master Agreement are incorporated herein by reference and that this acquisition is subject to and controlled by the terms and conditions set forth in the Master Agreement.

5)   All other provisions in the underlying Master Agreement shall remain unchanged.

For the faithful performance of the terms of this Supplement, the parties have caused this Supplement to be executed by their undersigned representatives.

**State of Mississippi, Department of Information Technology Services, on behalf of Alcorn State University**

Ellucian Company L.P.

By:_____
        Authorized Signature

By:_____
        Authorized Signature

Printed Name: Craig P. Orgeron, Ph.D.

Printed Name:_____

Title: Executive Director

Title:_____

Date: _____

Date:_____

October 19, 2017

EXHIBIT A
MISSISSIPPI LICENSE ORDER FORM
TECHNICAL CURRENCY SERVICES

Licensee: Alcorn State University ("Licensee")
Delivery Address: 1000 ASU Drive, Alcorn State, MS 39096

Licensee is hereby obtaining Technical Currency Services for the Licensed Software listed below pursuant to the Master Software License and Services Agreement between Ellucian and ITS as Contracting Agent for the Agencies and Institutions of the State of Mississippi dated May 21, 1998 (the "Master Agreement"). The fees due hereunder shall be in addition to any fees due under any prior Order Form, Amendment or Agreement entered into between Ellucian and either ITS or the Board of Trustees of the Mississippi Institutions of Higher Learning.

TABLE 1: Technical Currency Services (Maintenance):
Technical Currency Year Begins/Ends: November 1/October 31
Technical Currency Expiration Date: October 31, 2024

| Time Period: | November 1, 2017 to October 31, 2018 | November 1, 2018 to October 31, 2019 | November 1, 2019 to October 31, 2020 | November 1, 2020 to October 31, 2021 | November 1, 2021 to October 31, 2022 | November 1, 2022 to October 31, 2023 | November 1, 2023 to October 31, 2024 |
|---|---|---|---|---|---|---|---|
| **Maintenance Paid in Arrears** | | | | | | | |
| Banner Advancement | $19,156.00 | $19,922.00 | $20,719.00 | $21,548.00 | $22,410.00 | $23,306.00 | $24,239.00 |
| Banner Advancement Self-Service | $4,355.00 | $4,529.00 | $4,710.00 | $4,898.00 | $5,094.00 | $5,298.00 | $5,510.00 |
| Banner Document Management Integration Component | $2,584.00 | $2,687.00 | $2,795.00 | $2,907.00 | $3,023.00 | $3,144.00 | $3,270.00 |
| Banner Employee Self-Service | $10,684.00 | $11,111.00 | $11,556.00 | $12,018.00 | $12,499.00 | $12,999.00 | $13,519.00 |
| Banner Faculty and Advisor Self-Service | $7,123.00 | $7,408.00 | $7,704.00 | $8,013.00 | $8,333.00 | $8,666.00 | $9,013.00 |
| Banner Finance | $29,610.00 | $30,795.00 | $32,027.00 | $33,308.00 | $34,640.00 | $36,026.00 | $37,467.00 |
| Banner Finance Self-Service | $2,379.00 | $2,474.00 | $2,573.00 | $2,676.00 | $2,783.00 | $2,894.00 | $3,010.00 |
| Banner Financial Aid | $22,642.00 | $23,548.00 | $24,490.00 | $25,470.00 | $26,488.00 | $27,548.00 | $28,650.00 |
| Banner Financial Aid Self-Service | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Ellucian Company L.P.-ASU-43900-2911-Aug2017-Master Supplement to Software License & Service

# EXHIBIT 1

October 19, 2017

| Time Period: | November 1, 2017 to October 31, 2018 | November 1, 2018 to October 31, 2019 | November 1, 2019 to October 31, 2020 | November 1, 2020 to October 31, 2021 | November 1, 2021 to October 31, 2022 | November 1, 2022 to October 31, 2023 | November 1, 2023 to October 31, 2024 |
|---|---|---|---|---|---|---|---|
| Banner Human Resources | $19,155.00 | $19,922.00 | $20,719.00 | $21,548.00 | $22,410.00 | $23,306.00 | $24,239.00 |
| Banner Student | $31,310.00 | $32,563.00 | $33,865.00 | $35,220.00 | $36,629.00 | $38,094.00 | $39,618.00 |
| Banner Student Self-Service | $8,914.00 | $9,270.00 | $9,641.00 | $10,027.00 | $10,428.00 | $10,845.00 | $11,279.00 |
| Voice Response EPOS | $5,826.00 | $6,059.00 | $6,301.00 | $6,553.00 | $6,815.00 | $7,088.00 | $7,371.00 |
| Banner Workflow | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| IM Need Analysis | $2,823.00 | $2,936.00 | $3,054.00 | $3,176.00 | $3,303.00 | $3,435.00 | $3,572.00 |
| FM Need Analysis | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Banner Document Management Suite: | | | | | | | |
| ApplicationXtender Desktop | $7,870.00 | $8,185.00 | $8,512.00 | $8,853.00 | $9,207.00 | $9,575.00 | $9,958.00 |
| ApplicationXtender Test Bundle | $1,192.00 | $1,240.00 | $1,289.00 | $1,341.00 | $1,394.00 | $1,450.00 | $1,508.00 |
| ApplicationXtender Web Access .NET | $4,473.00 | $4,652.00 | $4,838.00 | $5,031.00 | $5,232.00 | $5,442.00 | $5,659.00 |
| DiskXtender Windows File System Manager Server | $1,357.00 | $1,412.00 | $1,468.00 | $1,527.00 | $1,588.00 | $1,651.00 | $1,718.00 |
| TouchNet Payment Gateway[1] | $6,046.00 | $6,288.00 | $6,539.00 | $6,801.00 | $7,073.00 | $7,356.00 | $7,650.00 |
| TouchNet Webcheck[1] | $3,318.00 | $3,450.00 | $3,588.00 | $3,732.00 | $3,881.00 | $4,036.00 | $4,198.00 |
| Oracle: | | | | | | | |
| Internet App Server Enterprise Edition | $16,957.00 | $17,635.00 | $18,340.00 | $19,074.00 | $19,837.00 | $20,630.00 | $21,456.00 |
| Internet Developer Suite | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Programmer | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Relational Database System | $29,170.00 | $30,337.00 | $31,550.00 | $32,812.00 | $34,125.00 | $35,490.00 | $36,909.00 |
| Grand Total: | $236,945.00 | $246,423.00 | $256,278.00 | $266,533.00 | $277,192.00 | $288,279.00 | $299,813.00 |
| | | | | | | Total Maintenance Cost: | $1,871,463.00 |

NOTES TO TABLE 1:
[1] Indicates the Component System is owned by a third party.

Page 4 of 5

Ellucian Company L.P.-ASU-43900-2911-Aug2017-Master Supplement to Software License & Service

EXHIBIT 1

Case 2:23-cv-00045-KS-MTP   Document 16-10   Filed 04/28/23   Page 139 of 220
October 19, 2017
Case: 23-01-22-cv-00286-EFP   Document #: 140-7   Filed: 09/23/2022   Page 32 of 54

NOTES:

The hours during which Maintenance will be provided for each Component System, the targeted response times for certain defined categories of Maintenance calls for each Component System, and other details and procedures (collectively, the "Maintenance Standards") relating to the provision of Maintenance for each Component System are described in the applicable Maintenance Standards stated below.

The Technical Currency (Maintenance) amounts specified in Table 1 above will be reflected by Ellucian in annual invoices in arrears. Licensee will make payment for invoices in accordance with the terms of Article 10 of the Master Agreement and penalties for late payments shall be calculated in accordance with the terms of Article 10.2 of the Master Agreement. Following the Expiration Date of the final Technical Currency Year (i.e. October 31, 2024), Technical Currency Services may be extended upon mutual written agreement of the parties, in the form of an amendment to this Supplement signed by an authorized representative of each party hereto.

Notwithstanding anything in the Master Agreement to the contrary, except in the case of: (a) a termination for cause as described in Article 14.1 or 14.2 of the Master Agreement, or (b) as the result of mutual written agreement of the parties as described in Article 14.3, or (c) a lack of appropriation of funds as described in Article 27 of the Master Agreement, the Technical Currency Term as it applies to each Baseline Component System listed in Table 1 above is for the period beginning on the Commencement Date (i.e. November 1, 2017) and shall continue, and remain in full force and effect, until the Expiration Date of the final Technical Currency Year, in accordance with its terms.


Advantage Level Maintenance Standards

I.   Defined Terms:

"**Notification**" means a communication to Ellucian's ActionLine by means of: (i) Ellucian's Customer Support Center; (ii) the placement of a telephone call; or (iii) the sending of an e-mail, in each case, in accordance with Ellucian's then-current policies and procedures for submitting such communications.

"**Priority One Call**" means a Notification that Licensee believes that a Documented Defect has caused: (i) a full failure (i.e., "crash") of its computer system; (ii) a full failure of the Licensed Software; or (iii) a failure of its computer system or the Licensed Software which, in either case, prevents Licensee from performing data processing which is critical to Licensee's operations on the day on which the alleged Documented Defect is reported.

"**Priority Two Call**" means a Notification that Licensee believes that a Documented Defect has caused a partial failure of Licensee's computer system or the Licensed Software which significantly hinders its ability to perform data processing which is critical to Licensee's operations on the day on which the alleged Documented Defect is reported.

**EXHIBIT 1**

October 19, 2017

"Priority Three Call" means a Notification that Licensee believes that a Documented Defect has caused an intermittent failure of, or problem with, its computer system or the Licensed Software that causes a significant delay in Licensee's ability to perform data processing on the day on which the alleged Documented Defect is reported, but where the processing is <u>not</u> critical to Licensee's operations.

"Priority Four Call" means a Notification that Licensee believes that a Documented Defect has caused a problem with its computer system or the Licensed Software that does not significantly affect critical processing.

II.   Hours During Which Which Ellucian's "ActionLine" Telephone Support Will be Available to Licensee in Connection with the Provision of Maintenance: Five (5) days per week, Monday through Friday, excluding United States holidays and Ellucian-observed holidays, from 8:00 AM to 8:00 PM (Central US Time).

III.  Targeted Response Times: With respect to Ellucian's Maintenance obligations, Ellucian will respond to Notifications from Licensee relating to the Baseline Component Systems identified in this Supplement in accordance with the following guidelines, with the time period to be measured beginning with Ellucian's receipt of the Notification:

Priority One Calls –two (2) hours or less.
Priority Two Calls – four (4) hours or less.
Priority Three Calls – twenty-four (24) hours or less.
Priority Four Calls – seventy-two (72) hours or less.

Notes: For purposes of these targets, a "response" will mean an initial contact from an Ellucian representative to Licensee to begin evaluation of the problem reported under one of the categories of calls identified above; (2) As a prerequisite to Ellucian's obligation to respond to Licensee, Licensee must follow the policies and procedures of Ellucian's ActionLine (such as the dialing of a particular phone number, the categorization of a particular problem, etc.) when submitting its Notification.

# EXHIBIT 2

October 19, 2017

## SYSTEM – REQUEST FOR APPROVAL FOR FIRST READING OF REVISIONS TO BOARD POLICY 906 – EDUCATIONAL BUILDING CORPORATIONS

### 906 – EDUCATIONAL BUILDING CORPORATIONS

Authority, Miss. Code Ann., Sections 37-101-61 and 37-101-63 (1972), as amended, grants the state institutions of higher learning the authority to form nonprofit corporations for the purpose of acquiring, or maintaining, equipping, improving or constructing facilities for use by the institution. These educational building corporations are granted the authority to issue bonds or other forms of debt obligations (if required for the type of debt to be issued) for the construction and renovation of facilities.

~~Financial Advisor. Prior to Board consideration of an institution's request to issue debt of the educational building corporation for the construction, maintenance, equipping, acquisition, and renovation of facilities or to refinance outstanding debt, Board staff, in conjunction with institutional staff, must select a financial advisor(s) to represent the interests of the Board, the educational building corporation and the institution. The financial advisor(s) shall meet such qualifications and perform such services as may be prescribed by the institution, the Board or its staff.~~

<u>Financial Advisor. Prior to Board consideration of an institution's request to issue debt of the educational building corporation for the construction, maintenance, equipping, acquisition, and renovation of facilities or to refinance outstanding debt, the Commissioner shall designate a financial advisor(s) to advise the Board with respect to the likely impacts and the prudency of the proposed transaction.   The Financial Adviser will provide advice to the Board -- which is independent of the advice provided by the institution or the educational building corporation - as to the anticipated effect of the proposed transaction on the institution and the entire IHL system.  The Commissioner will not approve use of a financial adviser with respect to a transaction if the proposed advisor has or has had substantial other relationships with the institution to the extent that would cause its judgment or independence to be questioned by a disinterested observer.  The financial advisor(s) shall meet such qualifications and perform such services as may be prescribed by the Board, and the Board will periodically approve a list of possible firms to provide those services from which the Commissioner may select when the necessity arises.</u>

Payment to the financial advisor(s) shall be made by the institution, or the institution's educational building corporation, without regard for whether the Board approves the construction or renovation or whether the institution or educational building corporation constructs the project, or in the case of refinancing, whether the debt is refinanced.

Financing Projects. Prior to Board consideration of an institution's request to issue debt of the educational building corporation for the construction, maintenance, equipping, acquisition or renovation of facilities, the financial advisor must provide the Board with an independent

# EXHIBIT 2

October 19, 2017

analysis of the institution's financial condition, to verify that proposed revenue stream(s) are sufficient to repay the debt service and to recommend the project's viability. If the educational building corporation will issue commercial paper, the financial advisor shall also calculate an opinion of the breakeven interest rate to long term bonds to justify the use of commercial paper. The institution shall submit the report of the financial advisor(s) and the request for a project initiation to the Board for approval. The request must state the institution's intent, justify the need for the project and give an estimate of the total construction budget. The request must also include naming the design professionals, bond counsel and senior underwriter(s) selected by the board of the educational building corporation.

Following the Board's approval of the project initiation, the institution shall return to the Board at a subsequent meeting and present a resolution for Board approval granting permission for issuing bonds or other forms of debt obligations for the specific project. In no case shall the educational building corporation issue bonds or other forms of debt obligations without specific approval of the debt obligations from the Board for specific projects.

Refinancing or Defeasing of Outstanding Debt. Outstanding debt of the educational building corporation may be refinanced in accordance with the provisions of this policy. Prior to Board consideration of an institution's request to issue debt of the educational building corporation to refinance outstanding debt of the institution or the educational building corporation, the financial advisor must provide the Board with an independent analysis showing potential net present value (NPV) savings based on current market conditions. The institution's request must include naming the bond counsel and senior underwriter(s) selected by the board of the educational building corporation. After consideration of the financial advisor's analysis and other factors that the Board deems material, the Board may approve the issuance of debt by the educational building corporation, in the discretion of the authorized representatives of the educational building corporation to refinance outstanding debt of the institution or the educational building corporation, which authorization may be conditioned on the specific level of NPV savings being achieved. Refinancing or defeasing of debt does not require a subsequent meeting of the Board of Trustees provided the financial advisor has provided a report demonstrating adequate net present value savings and the bond resolution and form of bond documents have been presented to and approved by the Board.

Review and Approval of Documents. In connection with the issuance of debt for any purpose, the institution shall present a resolution for Board approval granting permission for issuing bonds or other forms of debt obligations and for approval of the following documents to which the Board will be a party: the lease, the ground lease, the preliminary official statement (if required for the type of debt to be issued), and the continuing disclosure agreement (if required for the type of debt to be issued). The resolution shall also authorize representatives of the Board to execute such documents. Prior to the approval of the resolution by the Board, the educational

# EXHIBIT 2

October 19, 2017

building corporation shall submit to the Board staff, for informational purposes only, the form of any documents that are to be entered into by the educational building corporation in connection with the issuance of bonds or other debt, but to which the Board is not a party.

Method of Sale. Unless the Board approves otherwise, obligations shall be offered and sold through a competitive sale process or, alternatively, on a negotiated basis to an underwriter, in the case of bonds, or a dealer, in the case of commercial paper.

Selection of Financial Institution Participants. Any selection of a financial institution to serve as trustee under a trust indenture, as escrow agent under an escrow agreement, or as a lender to an educational building corporation, either directly or through the purchase of obligations of the educational building corporation, shall be made by the educational building corporation in its sole discretion and shall not be subject to approval by the Board.

Continuing Disclosure Obligations. Securities and Exchange Commission Rule 15c2-12 generally provides that an underwriter cannot sell governmental bonds unless an "obligated person" with respect to the bonds enters into a "Continuing Disclosure Agreement" (CDA) agrees to submit annually audited financial statements of the obligated person and other information as set forth in the CDA and notices of specified material events. With respect to the issuance of bonds by educational building corporations, the Board is an "obligated person" and the CDA will typically require audited financial statements and operating data for the entire IHL system to be submitted annually, rather than information on individual institutions. The material events specified in the CDA also typically relate to the entire IHL system.

To facilitate uniformity, efficiency and timeliness in complying with the requirements of Rule 15c2-12 relating to bonds issued by an educational building corporation, the Board, rather than the educational building corporation, will enter into the CDA and undertake to provide the annual disclosures and material event notices. The Board will hire an independent agent to assist with compliance with its obligations under CDA(s), as well as, compliance by educational building corporations under CDA(s) entered into by educational building corporations prior to the adoption of this policy upon approval by the Board. The Board, and/or its dissemination agent, will also sign up for the EMMA tickler system reminders.

# EXHIBIT 3

October 19, 2017

**SYSTEM:  REAL ESTATE ITEMS APPROVED SUBSEQUENT TO THE AUGUST 17, 2017 BOARD MEETING SUBMISSION DEADLINE**

**NOTE:  THE FOLLOWING ITEMS WERE APPROVED BY THE BOARD'S REAL ESTATE AND FACILITIES STAFF ACCORDING TO BOARD POLICY §904 (A) BOARD APPROVAL.**

**Change Order Approval Note:  No change orders approved by Board staff, as reflected within any of the following informational agenda items, increase the Board approved total project budget. The total project budget as approved by the Board provides for a contingency fund, which allows for an increase in the construction budget of between five and ten percent. Any increase in the total project budget caused by a change order, would require Board approval and could not be approved by Board staff until the budget increase is approved by the Board.**


## ALCORN STATE UNIVERSITY

1.  **ASU- GS 101-297 – Technology Classroom Building**
    NOTE: This is a Bureau of Building project
    **Approval Request #1:  Contract Documents**
    Board staff approved Contract Documents as submitted by Allred Architectural Group
    Approval Status & Date:  APPROVED, August 29, 2017
    **Approval Request #2:  Advertise**
    Board staff approved request to advertise for receipt of bids.
    Approval Status & Date:  APPROVED, August 29, 2017
    Project Initiation Date:  June 20, 2013
    Design Professional:  Allred Architectural Group
    General Contractor:  TBD
    Total Project Budget:  $16,500,000.00

2.  **ASU- IHL 201-252 – Morris-Boykin Renovation**
    **Approval Request #1:  Contract Documents**
    Board staff approved Contract Documents as submitted by Durrell Design Group
    Approval Status & Date:  APPROVED, August 14, 2017
    **Approval Request #2:  Advertise**
    Board staff approved request to advertise for receipt of bids.
    Approval Status & Date:  APPROVED, August 14, 2017
    Project Initiation Date:  August 8, 2016
    Design Professional:  Durrell Design Group
    General Contractor:  TBD
    Total Project Budget:  $1,777,500.35

# EXHIBIT 3

October 19, 2017

3. **ASU- IHL 201-255 – Water Treatment Facility Improvements**
   **Approval Request #1 (INTERIM):**  In accordance with Board Policy §904 (B) Board
   Approval, *Interim Chair Approval* was granted by Mr. Hal Parker, Chair of the Real
   Estate and Facilities Committee on August 24, 2017 to approve the initiation and
   appointment of the design professional for the Water Treatment Facility Improvements
   project.
   Approval Status & Date:  APPROVED, August 24, 2017
   Project Initiation Date:  February 18, 2016
   Design Professional:  M & G Enterprises, Inc., d/b/a Engineering Service
   General Contractor:  TBD
   Total Project Budget:  $3,311,592.00

## DELTA STATE UNIVERSITY

4. **DSU– GS 102-260 – Zeigel Hall Renovation**
   **NOTE: This is a Bureau of Building project**
   **Approval Request #1:  Change Order #1**
   Board staff approved Change Order #1 in the amount of $250,141.80 and one hundred
   sixteen (116) additional days to the contract of Roy Collins Construction Co., Inc.
   Approval is requested from the Bureau of Building, Grounds, and Real Property
   Management.
   Approval Status & Date:  APPROVED, August 11, 2017
   Change Order Description:  Change Order #1 includes the following items:  removal of
   existing trees; provide separate chill water valves from the existing campus loop;
   relocation of fiber optics; installation of a valve into the main gas line and tie into the
   main gas line directly and replacement of the existing gas valve; removal of asbestos
   containing concealed glue dots; cost associated with proposal for energy management &
   controls system to be deducted from the controls allowance; block the wall demo; new
   wall construction; and one hundred sixteen (116) days to the contract..
   Change Order Justification:  These changes were due to latent job site conditions; and
   additional days for work as indicated herein.
   Total Project Change Orders and Amount:  One (1) change order for a total amount of
   $250,141.80.
   Project Initiation Date:  October 16, 2014
   Design Professional:  Architecture South, Inc.
   General Contractor:  Roy Collins Construction Co., Inc.
   Total Project Budget:  $6,292,500.00

5. **DSU– GS 102-262 – Young Maulding Renovations**
   **NOTE: This is a Bureau of Building project**
   **Approval Request #1:  Award of Construction Contract**
   Board staff approved the Award of Contract in the amount of $8,095,000.00 to the
   apparent low bidder, Diversified Construction Services, Inc.
   Approval Status & Date:  APPROVED, July 18, 2017

# EXHIBIT 3

October 19, 2017

Project Initiation Date:  October 16, 2014
Design Professional:  Burris/Wagnon Architects, P.A.
General Contractor:  Diversified Construction Services, Inc.
Total Project Budget:  $9,180,791.00

## JACKSON STATE UNIVERSITY

6. **JSU– GS 103-286 – Stewart Renovation Preplan**
   **NOTE: This is a Bureau of Building project**
   **Approval Request #1:  Approval of Schematic Design Documents**
   Board staff approved the Schematic Design Documents as submitted by Foil Wyatt
   Architects & Planners, PLLC.
   Approval Status & Date:  APPROVED, August 21, 2017
   **Approval Request #2:  Design Development Documents**
   Board staff approved the Design Development Documents as submitted by Foil Wyatt
   Architects & Planners, PLLC.
   Approval Status & Date:  APPROVED, August 21, 2017
   Project Initiation Date:  November 17, 2016
   Design Professional:  Foil Wyatt Architects & Planners, PLLC
   General Contractor:  TBD
   Phased Project Budget:  $200,000.00

## MISSISSIPPI STATE UNIVERSITY

7. **MSU– GS 105-351 – YMCA Renovation**
   **NOTE: This is a Bureau of Building project**
   **Approval Request #1:  Change Order #2**
   Board staff approved Change Order #2 in the amount of $171,879.54 and eleven (11)
   additional days to the contract of Gregory Construction Services, Inc.
   Approval Status & Date:  APPROVED, August 25, 2017
   Change Order Description:  Change Order #2 includes the following items:  roof
   investigation; asbestos abatement; electrical modifications; interior finish modifications;
   and eleven (11) days to the contract.
   Change Order Justification:  These changes were due to latent job site conditions; and
   additional days for work as indicated herein.
   **Approval Request #2:  Change Order #3**
   Board staff approved Change Order #3 in the amount of $139,343.91 and twenty-one
   (21) additional days to the contract of Gregory Construction Services, Inc.
   Approval Status & Date:  APPROVED, August 25, 2017
   Change Order Description:  Change Order #3 includes the following items:  steam tunnel
   removal; electrical changes; first floor ceiling & miscellaneous interior credits; and
   twenty-one (21) days to the contract.

# EXHIBIT 3

October 19, 2017

Change Order Justification:  These changes were due to latent job site conditions; and additional days for work as indicated herein.

Total Project Change Orders and Amount:  Three (3) change orders for a total amount of $437,507.82.

Project Initiation Date:  August 15, 2013

Design Professional:  Belinda Stewart Architects, P.A.

General Contractor:  Gregory construction Services, Inc.

Total Project Budget:  $9,800,000.00

8. **MSU– GS 113-136 – Meat Science Laboratory**
   **NOTE: This is a Bureau of Building project**
   **Approval Request #1:  Change Order #3**
   Board staff approved Change Order #3 in the amount of $15,219.54 and sixteen (16) additional days to the contract of Construction Services, Inc.  Approval is requested from the Bureau of Building, Grounds, and Real Property Management.

   Approval Status & Date:  APPROVED, July 21, 2017

   Change Order Description:  Change Order #3 includes the following items:  remove six (6) backflow preventers; provide weather proof GFCI with weather proof cover; provide Patriot "chair" in lieu of Fusion; install a handrail; re-configure the fire protection and domestic water connections; and sixteen (16) days to the contract.

   Change Order Justification:  These changes were due to errors & omissions in the plans and specifications; latent job site conditions; user/owner requested modifications; and additional days for work as indicated herein.

   Total Project Change Orders and Amount:  Three (3) change orders for a total credit amount of $35,906.03.

   Project Initiation Date:  October 17, 2013

   Design Professional:  Pryor & Morrow, P.A.

   General Contractor:  Construction Services, Inc.

   Total Project Budget:  $8,200,000.00

9. **MSU– IHL 205-271 – Robert L. Jones Circle Road and Utility Completion**
   **Approval Request #1:  Change Order #1**
   Board staff approved Change Order #1 in the amount of $9,090.75 and one hundred eighty-five (185) additional days to the contract of Mitchell Contracting, Inc.

   Approval Status & Date:  APPROVED, July 7, 2017

   Change Order Description:  Change Order #1 includes the following items:  add an out flume; add striping; add a sewer manhole extension; add a concrete flume and riprap to the west end of the project; to raise a sewer manhole in the southeast portion of the project; add traffic striping; and one hundred eight-five (185) days to the contract due to weather delays.

   Change Order Justification:  These changes were due to latent job site conditions; user/owner requested modifications; and additional days for work as indicated herein.

   Total Project Change Orders and Amount:  One (1) change order for a total amount of $9,090.75.

   Project Initiation Date:  October 17, 2013

# EXHIBIT 3

October 19, 2017

Design Professional:  Pritchard Engineering
General Contractor:  Mitchell Contracting, Inc.
Total Project Budget:  $1,260,315.00

10. **MSU– IHL 205-278 – MSU nSPARC Data Center**
    **Approval Request #1:  Change Order #3**
    Board staff approved Change Order #3 in the amount of $23,661.17 and fourteen (14) additional days to the contract of Burks-Mordecai Builders, Inc.
    Approval Status & Date:  APPROVED, August 2, 2017
    Change Order Description:  Change Order #3 includes the following items:  re-routing site fiber; added a solid panel door; installed window shades in an office; add a raised laminate floor; changes to electrical and low voltage; add a card access to a door; add a grounding system to the computer room; and fourteen (14) days to the contract.
    Change Order Justification:  These changes were due to latent job site conditions; user/owner requested modifications; and days for work as indicated herein.
    Total Project Change Orders and Amount: Three (3) change orders for a total amount of $238,222.88.
    Project Initiation Date:  November 20, 2014
    Design Professional:  Dale Partners Architects, P.A.
    General Contractor:  Burks-Modecai Builders, Inc.
    Total Project Budget:  $4,650,000.00

11. **MSU– IHL 205-279 – Addition & Renovation to Dudy Noble Field**
    **Approval Request #1:  Change Order #1**
    Board staff approved Change Order #1 in the credit amount of $469,800.00 and zero (0) additional days to the contract of Jesco, Inc.
    Approval Status & Date:  APPROVED, August 9, 2017
    Change Order Description:  Change Order #1 includes the following items:  insulation spec revision from ½" to 1" on chill water piping; delete roof drain where exposed to ambient temperatures; to apply 1" armaflex on heating water equipment in lieu of 3" fiberglass; change the outfield lounge rails from steel to aluminum; increase the mesh opening to 4"; to use Timber Tech composite decking in lieu of Trex decking at the outfield lounges; change out the existing two gas water heaters for Tricon water heaters; change out the existing water heater for the center field build  and install a Rhee water heater; delete all domestic cold and hot water insulation on branch lines; change the domestic cold and hot recirculation pipe size 2" and below to PEX 8; omit the requirement for PVC coated galvanized steel elbow for underground 90's; and omit the requirement for fire wrap.
    Change Order Justification:  These changes were due to user/owner requested modifications.
    Total Project Change Orders and Amount:  One (1) change order for a total credit amount of $469,800.00.
    Project Initiation Date:  May 21, 2015
    Design Professional:  Wier Boerner Allin Architects, PLLC
    General Contractor:  Jesco, Inc.

# EXHIBIT 3

October 19, 2017

<u>Total Project Budget</u>:  $55,000,000.00

12. **MSU - Demolition of Building #1132**
    **Approval Request #1 (INTERIM):**  In accordance with Board Policy §904 (B) Board Approval, *Interim Chair Approval* was granted by Mr. Hal Parker, Chair of the Real Estate and Facilities Committee on July 26, 2017 to approve the removal from inventory and demolition of the existing small garage/storage building (Building #1132).
    <u>Approval Status & Date</u>:  APPROVED, July 26, 2017

## MISSISSIPPI UNIVERSITY FOR WOMEN

13. **MUW- GS 104-187 – Turner Hall (Demonstration School) Renovation**
    **NOTE: This is a Bureau of Building project**
    **Approval Request #1:  Contract Documents**
    Board staff approved Contract Documents as submitted by Durrell Design Group
    <u>Approval Status & Date</u>:  APPROVED, August 14, 2017
    **Approval Request #2:  Advertise**
    Board staff approved request to advertise for receipt of bids.
    <u>Approval Status & Date</u>:  APPROVED, August 14, 2017
    <u>Project Initiation Date</u>:  August 8, 2016
    <u>Design Professional</u>:  Durrell Design Group
    <u>General Contractor</u>:  TBD
    <u>Total Project Budget</u>:  $1,777,500.35

14. **MUW – Memorandum of Agreement between MUW and the Mississippi Department of Archives and History (MDAH)**
    The Mississippi Archives and History (MDAH) Board of Trustees, MDAH staff, and Mississippi University for Women have agreed to a Memorandum of Agreement (MOA) that addresses the designation of three (3) new historical landmark buildings, thirteen (13) potential historical landmark buildings, and eleven (11) ineligible buildings for historical landmark designation on the MUW campus during a five (5) year time period beginning September 26, 2017 and ending September 26, 2022.   At the end of the five (5) year time period, the MOA will be reassessed by MDAH and MUW. A copy of the MOA that details the designation of each building will be kept on file with the Office of Real Estate and Facilities at IHL.

## UNIVERSITY OF MISSISSIPPI

15. **UM– IHL 107-308 – Union Addition & Renovation**
    **NOTE: This is a Bureau of Building project**
    **Approval Request #1:  Change Order #8**
    Board staff approved Change Order #8 in the amount of $461,754.00 and sixty-five (65) additional days to the contract of Roy Anderson Corporation.

# EXHIBIT 3

October 19, 2017

Approval Status & Date:  APPROVED, July 14, 2017

Change Order Description:  Change Order #8 includes the following items: removal and disposal of undocumented asbestos-contaminated material; add new water lines with Insterta-Valves; remove existing undocumented water lines and hydro-jet to locate other existing utilities to remain for construction of the new south porch; add an air handling unit with associated components including controls and painting at one of the buildings; add miscellaneous steel framing, plating & grating for floor openings & a sprinkler system at mechanical platforms; change the flooring in McAlister's back-of-house kitchen areas from tile to fluid-applied flooring to match the rest of the kitchens; change the material of overhead doors at the loading dock from painted steel to stainless steel and add sensing edge slack retraction safety features at the food brand security grilles; add crack suppression membrane under the terrazzo flooring at the light-weight concrete floor slabs; and sixty-five (65) days to the contract.

Change Order Justification:  This change was due to errors and omissions in the plans and specifications; latent jobsite conditions; user/owner requested modifications; and days for work as indicated herein.

Total Project Change Orders and Amount:  Eight (8) change orders for a total amount of $1,369,865.00.

Project Initiation Date:  August 18, 2011

Design Professional:  Eley Guild Hardy Architects – Jackson, P.A.

General Contractor:  Roy Anderson Corporation

Phased Project Budget:  $58,580,565.32

Total Project budget:  $58,900,000.00

16. **UM – IHL 207-376.2R – STEM Building – Site Utilities Relocation REBID**

   **Approval Request #1:  Change Order #1**

   Board staff approved Change Order #1 in the amount of $485,148.07 and sixty (60) additional days to the contract of Eubank Construction Co., Inc.

   Approval Status & Date:  APPROVED, July 7, 2017

   Change Order Description:  Change Order #1 includes the following items: additional hot and cold water valves; extend the electrical bore; additional water lines added to the new waterline to Faser Hall; excavation to abandon two (2) existing water well casings discovered during construction; additional construction fencing; relocation of a communications manhole into the sidewalk; storm drainage modifications; sanitary sewer line repair; additional bores and wire; an additional post indicator valve for a fire protection line; add 1200 amp outdoor disconnect and relocate the underground feeder; raise the manhole tops to match the existing grade; installation of a domestic water service connection; relocation of a domestic water line; additional boring for the water line installation; replace two (2) manholes and a gravity sewer line on the north end of the new line; install electrical conduit for future use; and sixty (60) days to the contract.

   Change Order Justification:  These changes were due to errors and omissions in the plan & specifications; latent job site conditions; user/owner requested modifications; and days for work as indicated herein.

   Total Project Change Orders and Amount: One (1) change order for a total amount of $485,148.07.

# EXHIBIT 3

October 19, 2017

      Project Initiation Date:  January 16, 2014
      Design Professional:  McCarty Architects, P.A.
      General Contractor:  Eubank Construction Co., Inc.
      Phased Project Budget:  $6,689,259.40
      Total Project Budget:  $14,000,000.00

17. **UM– IHL 207-389 – Vaught-Hemingway Stadium North End Zone**
    **Approval Request #1:  Change Order #11**
    Board staff approved Change Order #11 in the credit amount of $78,043.00 and zero (0) additional days to the contract of Roy Anderson Corporation.
    Approval Status & Date:  APPROVED, July 6, 2017
    Change Order Description:  Change Order #11 includes the following items:  Credit due to silt and fiber damage.
    Change Order Justification:  These changes were due to errors and omissions in the plans and specifications; latent job site conditions; and user/owner requested modifications.
    Total Project Change Orders and Amount:  Eleven (11) change orders for a total amount of $2,524,973.28.
    Project Initiation Date:  August 21, 2014
    Design Professional:  AECOM
    General Contractor:  Roy Anderson Corporation
    Total Project Budget:  $30,593,713.00

18. **UM – IHL 207-401 – Wastewater Treatment Facility Expansion**
    **Approval Request #1:  Change Order #5**
    Board staff approved Change Order #5 in the amount of $55,269.11 and eleven (11) additional days to the contract of Hemphill Construction Company, Inc.
    Approval Status & Date:  APPROVED, July 21, 2017
    Change Order Description:  Change Order #5 includes the following items: labor & material to pipe from clarifier to sludge drain; to extend electrical service for the new decant lift station; changes in the design of the cascade aerator structure; to fill the old degritter and headworks channel and cap with concrete in lieu of grating; change the type of vent louver in the headworks building from fixed to operable with associated electrical work; to locate and re-route unmarked water lines; to install additional probes & controllers and provide circuits to those locations; to modify a rotor access platform; and eleven (11) days to the contract due to weather delays.
    Change Order Justification:  These changes are due to errors and omissions in the plans and specifications; latent jobsite conditions; user/owner requested modifications; and days for work as indicated herein.
    Total Project Change Orders and Amount:  Five (5) change orders for a total amount of $121,747.04.
    Project Initiation Date:  February 18, 2015
    Design Professional:  Engineering Solutions, Inc.
    General Contractor:  Hemphill Construction Company, Inc.
    Total Project Budget:  $9,900,000.00

# EXHIBIT 3

October 19, 2017

19. **UM – IHL 207-436 – Kinard Water Treatment Replacement**
    **Approval Request #1:  Approval of Schematic Design Documents**
    Board staff approved the Schematic Design Documents as submitted by Engineering
    Solutions, Inc.
    Approval Status & Date:  APPROVED, August 16, 2017
    **Approval Request #2:  Waiver of Design Development Documents**
    Board staff approved the Waiver of Design Development Documents as submitted by
    Engineering Solutions, Inc.
    Approval Status & Date:  APPROVED, August 16, 2017
    Project Initiation Date:  June 15, 2017
    Design Professional:  Engineering solutions, Inc.
    General Contractor:  TBD
    Total Project Budget:  $1,100,000.00

## UNIVERSITY OF MISSISSIPPI MEDICAL CENTER

20. **UMMC– IHL 209-544 – Translational Research Center**
    **Approval Request #1:  Change Order #6**
    Board staff approved Change Order #6 in the amount of $57,867.53 and forty-one (41)
    additional days to the contract of Fountain Construction Company, Inc.
    Approval Status & Date:  APPROVED, July 27, 2017
    Change Order Description:  Change Order #6 includes the following items:  added paint
    scope at various basement rooms; add five (5) pipe bollards at the fuel tank; add a quazite
    enclosure to raise the existing medium voltage pull box at south drive; add removable
    caps at the animal holding rooms; install lab sinks in millwork at the 1st floor area;
    relocate stair vestibule smoke detectors at all floors; add a generator Float; install air flow
    switches and high humidity duct-mounted devices on six (6) air handling units; add a
    transformer for the interconnection between the emergency generator and the temporary
    generator docking station; install gypsum board at two (2) floor service elevator
    vestibules; add a fire damper at the 4th floor where wet labs are located; add a duct
    detector at one air handling unit; add electrical for an instant hot water heater for two (2)
    sterilizers in the surgery suite; and forty-one (41) days to the contract due to weather
    delays.
    Change Order Justification:  These changes are due to errors and omissions in the plans
    & specifications; latent job site conditions; user/owner requested modifications and
    weather delays for work as indicated herein.
    Total Project Change Orders and Amount:  Six (6) change orders for a total credit amount
    of $609,616.70
    Project Initiation Date:  November 17, 2011
    Design Professional:  Foil Wyatt Architects & Planners, PLLC
    General Contractor:  Fountain Construction Company, Inc.
    Phased Project Budget:  $44,259,496.98
    Total Project Budget:  $50,572,743.00

# EXHIBIT 3

October 19, 2017

21. **UMMC – IHL 209-557 – Med-Com/PES Renovations**
    **Approval Request #1:  Approval of Schematic Design Documents**
    Board staff approved the Schematic Design Documents as submitted by Canizaro
    Cawthon Davis.
    <u>Approval Status & Date</u>:  APPROVED, July 27, 2017
    <u>Project Initiation Date</u>:  June 16, 2017
    <u>Design Professional</u>:  Canizaro Cawthon Davis
    <u>General Contractor</u>:  TBD
    <u>Total Project Budget</u>:  $2,868,925.00


## UNIVERSITY OF SOUTHERN MISSISSIPPI

22. **USM– GS 108-279 – Lucas Administration Envelope Repairs**
    **NOTE: This is a Bureau of Building project**
    **Approval Request #1:  Change Order #3**
    Board staff approved Change Order #3 in the amount of $7,705.00 and zero (0) additional
    days to the contract of Finlo Construction Company, Inc.  Approval is requested from the
    Bureau of Building, Grounds, and Real Property Management.
    <u>Approval Status & Date</u>:  APPROVED, July 21, 2017
    <u>Change Order Description</u>:  Change Order #3 includes the following items:  replace
    corroded cast iron pipe with PVC pipe at two (2) locations on the roof drains.
    <u>Change Order Justification</u>:  This change is due to existing cast iron pipes that have
    deteriorated and are corroded.
    <u>Total Project Change Orders and Amount</u>:  Three (3) change orders for a total <u>credit</u>
    amount of $112,935.00.
    <u>Project Initiation Date</u>:  March 21, 2013
    <u>Design Professional</u>:  Albert & Associates Architects, P.A.
    <u>General Contractor</u>:  Finlo Construction Company, Inc.
    <u>Total Project Budget</u>:  $3,300,000.00

23. **USM– GS 108-281 – Joseph Greene Hall Renovations**
    **NOTE: This is a Bureau of Building project**
    **Approval Request #1:  Award of Construction Contract**
    Board staff approved the Award of Contract in the amount of $10,350,000.00 to the
    apparent low bidder, B. W. Sullivan Building Contractor, Inc.
    <u>Approval Status & Date</u>:  APPROVED, August 29, 2017
    <u>Project Initiation Date</u>:  September 18, 2014
    <u>Design Professional</u>:  Allred Architectural Group
    <u>General Contractor</u>:  B. W. Sullivan Building Contractor, Inc.
    <u>Total Project Budget</u>:  $13,000,000.00

# EXHIBIT 3

October 19, 2017

24. **USM– IHL 210-243 – Marine Education Center**
   **Approval Request #1:  Change Order #5**
   Board staff approved Change Order #5 in the amount of $99,170.00 and thirteen (13) additional days to the contract of Starks Contracting Co., Inc.
   Approval Status & Date:  APPROVED, August 2, 2017
   Change Order Description:  Change Order #5 includes the following items:  installation of a security camera and code blue rough-ins; additional communication fiber and wire to connect two buildings to the main hub in the visitors center; provide certified tested storefront door hardware on a building; relocate electrical transformers in two buildings; to replace a single wall exposed insulated duct with double wall insulated spiral duct in three buildings; additional communications fiber infrastructure; and thirteen (13) days to the contract.
   Change Order Justification:  This change is due to changes in requirements or recommendation by governmental agencies; user/owner requested modifications; and days for work as indicated herein.
   Total Project Change Orders and Amount:  Five (5) change orders for a total amount of $270,926.75.
   Project Initiation Date:  August 21, 2008
   Design Professional:  Lake Flato
   General Contractor:  Starks Contracting Co., Inc.
   Total Project Budget:  $16,115,659.75


## EDUCATION AND RESEARCH CENTER

25. **ERC– GS 111-052 – Structural & Subsurface Repair**
   **NOTE: This is a Bureau of Building project**
   **Approval Request #1:  Change Order #4**
   Board staff approved Change Order #4 in the amount of $230,975.00 and one hundred sixteen (116) additional days to the contract of Gregory Construction Services.
   Approval Status & Date:  APPROVED, August 31, 2017
   Change Order Description:  Change Order #4 includes the following items:  removal of unsuitable soils & provide new backfill and lime stabilization to the north access drive; fire main relocation, additional parking, removal of north parking lot sidewalks & relocated electrical service at the north parking lot; seal the crawl space opening in the foundation wall, backfill the area, construct a new sidewalk to tie into the existing sidewalk, & asphalt paving replacement in the affected area at the crawl space access; delete seven (7) planters in the east and west plaza; delete eleven (11) trees for the planters; delete the irrigation lines to the planters; and twenty-one (21) days to the contract.
   Change Order Justification:  These changes are due to latent job site conditions; user/owner requested modifications; and additional days for work due to weather delays as indicated herein.
   Total Project Change Orders and Amount:  Three (3) change orders for a total amount of $500,983.50.

# EXHIBIT 3

October 19, 2017

<u>Project Initiation Date</u>:  August 21, 2008
<u>Design Professional</u>:  JBHM
<u>General Contractor</u>:  Gregory Construction Services
<u>Total Project Budget</u>:  $4,178,570.87

# EXHIBIT 4

October 19, 2017

## <u>SYSTEM - REPORT OF PAYMENTS TO OUTSIDE COUNSEL</u>

### <u>Legal fees approved for payment to outside counsel in relation to litigation and other matters:</u>

Payment of legal fees for professional services rendered by Baker & Hostetler (statement dated 8/28/17) from the funds of Alcorn State University. (This statement, in the amount of $833.50, represents services and expenses in connection with general legal advice.)

**TOTAL DUE……………………………….……………$          833.50**

Payment of legal fees for professional services rendered by Ware Immigration (statements dated 8/1/17 and 8/9/17) from the funds of Alcorn State University. (These statements, in the amounts of $1,000.00 and $2,435.00, respectively, represent services and expenses in connection with immigration/labor certification.)

**TOTAL DUE……………………………….……………$        3,435.00**

Payment of legal fees for professional services rendered by Brunini, PLLC (statements dated 7/25/17 and 8/21/17) from the funds of Mississippi State University. (These statements, in the amounts of $4,200.00 and $50.00, respectively, represent services and expenses in connection with general legal advice.)

**TOTAL DUE……………………………….……………$        4,250.00**

Payment of legal fees for professional services rendered by Butler|Snow (statement dated 8/11/17) from the funds of Mississippi State University. (This statement, in the amount of $9,888.00, represents services and expenses in connection with general legal advice.)

**TOTAL DUE……………………………….……………$        9,888.00**

Payment of legal fees for professional services rendered by Ware Immigration (statement dated 8/1/17) from the funds of Mississippi State University. (This statement, in the amount of $500.00, represents services and expenses in connection with immigration/labor certification.)

**TOTAL DUE……………………………….……………$          500.00**

Payment of legal fees for professional services rendered by Butler|Snow (statement dated 8/11/17) from the funds of the University of Mississippi. (This statement, in the amount of $1,475.00, represents services and expenses in connection with general legal advice.)

**TOTAL DUE……………………………….……………$        1,475.00**

# EXHIBIT 4

October 19, 2017

Payment of legal fees for professional services rendered by Mayo|Mallette (statements dated 8/7/17 and 9/8/17) from the funds of the University of Mississippi. (These statements, in the amounts of $3,071.50 and $7,662.00, respectively, represent services and expenses in connection with general legal advice.)

**TOTAL DUE……………………………….………………$         10,733.50**

Payment of legal fees for professional services rendered by Ware Immigration (statements dated 8/1/17, 8/1/17, 9/1/17, 9/1/17, 9/1/17 and 9/1/17) from the funds of the University of Mississippi. (These statements, in the amounts of $500.00, $24.64, $24.68, $47.26, $80.00 and $30.05, respectively, represent services and expenses in connection with immigration/labor certification.)

**TOTAL DUE……………………………….………………$         706.63**

Payment of legal fees for professional services rendered by Bradley|Arant (statements dated 6/23/17, 8/7/17, 8/7/17 and 8/7/17) from the funds of the University of Mississippi Medical Center. (These statements, in the amounts of $6,177.88, $245.00, $4,195.30 and $3,260.20, respectively, represent services and expenses in connection with general legal advice.)

**TOTAL DUE……………………………….………………$         13,878.38**

Payment of legal fees for professional services rendered by Butler|Snow (statements dated 7/12/17, 7/13/17, 7/13/17, 7/13/17, 7/13/17, 7/17/17, 7/17/17, 7/20/17, 7/24/17, 8/4/17, 8/10/17, 8/11/17, 8/15/17, 8/15/17, 8/15/17 and 8/17/17) from the funds of the University of Mississippi Medical Center. (These statements, in the amounts of $122.50, $1,349.40, $10,048.00, $1,176.00, $343.00, $60.10, $2,548.00, $1,886.50, $8,302.50, $42,755.75, $23,189.81, $10,782.82, $9,972.60, $1,386.50, $88.50 and $6,287.70, respectively, represent services and expenses in connection with legal advice.)

**TOTAL DUE……………………………….………………$         120,299.68**

Payment of legal fees for professional services rendered by Hogan|Lovells (statements dated 7/31/17 and 8/22/17) from the funds of the University of Mississippi Medical Center. (These statements, in the amounts of $17,422.50 and $7,312.70, respectively, represent services and expenses in connection with legal advice.)

**TOTAL DUE……………………………….………………$         24,735.20**

Payment of legal fees for professional services rendered by Hood|Bolen (statement dated 8/8/17) from the funds of the University of Mississippi Medical Center. (This statement, in the amount of $1,155.00, represents services and expenses in connection with legal advice.)

**TOTAL DUE……………………………….………………$         1,155.00**

# EXHIBIT 4

October 19, 2017

Payment of legal fees for professional services rendered by Jones|Walker (statement dated 8/2/17) from the funds of the University of Mississippi Medical Center. (This statement, in the amount of $90.00, represents services and expenses in connection with legal advice.)

**TOTAL DUE…………………………….…………………$       90.00**

Payment of legal fees for professional services rendered by Watkins & Eager (statements dated 5/1/17, 5/16/17, 7/13/17, 8/29/17, 8/29/17, 8/29/17, 8/29/17 and 8/29/17) from the funds of the University of Mississippi Medical Center. (These statements, in the amounts of $610.50, $123.75, $6,398.99, $297.00, $511.50, $222.75, $297.00 and $12,688.50, respectively, represent services and expenses in connection with legal advice.)

**TOTAL DUE…………………………….…………………$       21,149.99**

Payment of legal fees for professional services rendered by Whitfield Law Group (statements dated 6/26/17, 7/5/17, 7/5/17, 7/6/17, 7/6/17, 7/6/17, 8/4/17, 8/4/17, 8/4/17, 8/4/17, 8/4/17, 8/4/17 and 8/9/17) from the funds of the University of Mississippi Medical Center. (These statements, in the amounts of $1,359.00, $2,901.45, $973.00, $8,032.20, $6,313.20, $5,299.10, $4,781.70, $5,910.20, $2,139.50, $10,939.86, $2,070.00, $700.00 and $4,817.82, respectively, represent services and expenses in connection with legal advice.)

**TOTAL DUE…………………………….…………………$       56,237.33**

Payment of legal fees for professional services rendered by Bryan, Nelson, Schroeder, Castigliola & Banahan (statement dated 9/7/17) from the funds of the University of Southern Mississippi. (This statement, in the amount of $11,485.50, represents services and expenses in connection with general legal advice.)

**TOTAL DUE…………………………….…………………$       11,485.50**

Payment of legal fees for professional services rendered by Butler|Snow (statements dated 2/3/17, 7/6/17, 7/7/17, 7/24/17, 8/8/17, 8/8/17, 8/10/17, 8/11/17 and 9/7/17) from the funds of the University of Southern Mississippi. (These statements, in the amounts of $552.00, $48.00, $1,397.65, $925.00, $2,112.00, $72.00, $1,327.50, $3,451.50, $816.00 and $955.50, respectively, represent services and expenses in connection with general legal advice.)

**TOTAL DUE…………………………….…………………$       10,732.15**

Payment of legal fees for professional services rendered by Ware Immigration (statements dated 8/1/17, 8/1/17, 8/1/17, 8/1/17, 8/1/17, 9/1/17, 9/1/17 and 9/1/17) from the funds of the University of Southern Mississippi. (These statements, in the amounts of $287.50, $8.61, $49.63, $47.10, $8.61, $1,500.00, $3,000.00 and $2,500.00, respectively, represent services and expenses in connection with immigration/labor certifications.)

**TOTAL DUE…………………………….…………………$       7,401.45**

# EXHIBIT 4

October 19, 2017

**Legal fees approved for payment to outside counsel in relation to patent and other matters:**

Payment of legal fees for professional services rendered by Butler|Snow (statements dated 6/29/17, 6/29/17, 6/29/17, 6/29/17, 7/21/17 and 7/24/17) from the funds of Mississippi State University.  (These statements represent services and expenses in connection with the following patents: "Micro-Fluidic Device for Measuring Osmotic Second Virial Coefficients" - $3,728.50; "Live Attenuated Catfish Vaccine and Method of Making" - $2,371.50; "Live Attenuated Catfish Vaccine and Method of Making" - $335.00; "Occidiofungin Patent Applications" - $65.00; "Cancer Therapeutic Use of Occidiofungin" - $5,315.89 and "Live Attenuated Edwardsiella Ictaluri Vaccine and Method of Using Same" - $1,416.00, respectively.)

> **TOTAL DUE…………………………….….……………$      9,881.89**

Payment of legal fees for professional services rendered by Mendelsohn|Dunleavy (statements dated 5/10/17 and 5/22/17) from the funds of Mississippi State University.  (These statements represent services and expenses in connection with the following patents:  "Engineering of the Production of a Conformational Variant of Occidiofungin that has Enhanced Inhibitory Activity against Fungal Species" - $1,998.75 and "Occidiofungin, A Unique Antifungal Glycopeptide Produced by a Strain of Burkholderia Contaminans" - $2,616.25, respectively.)

> **TOTAL DUE…………………………….….……………$      4,615.00**

Payment of legal fees for professional services rendered by Stites & Harbison (statements dated 7/24/17, 7/25/17 and 8/25/17) from the funds of Mississippi State University.  (These statements represent services and expenses in connection with the following patents:  "Methods of Synthesizing Graphene from a Lignin Source" - $285.00; "Novel Catalysts and Process for Liquid Hydrocarbon Fuel Production" - $2,176.00 and "Novel Catalysts and Process for Liquid Hydrocarbon Fuel Production" - $575.90, respectively.)

> **TOTAL DUE…………………………….….……………$      3,036.90**

Payment of legal fees for professional services rendered by Armstrong|Teasdale (statements dated 5/19/17, 7/11/17, 7/11/17, 8/23/17 and 8/23/17) from the funds of the University of Mississippi. (These statements represent services and expenses in connection with the following patents: "Systems and Methods for Detecting Transient Acoustic Signals" - $87.64; "Microphone Array for Reducing the Effect of Atmospheric Turbulence" - $1,319.22; "Microphone Array for Reducing the Effect of Atmospheric Turbulence" - $1,109.06; "Systems and Methods for Detecting Transient Acoustic Signals" - $40.00 and "Systems and Methods for Detecting Transient Acoustic Signals" - $406.00, respectively.)

> **TOTAL DUE…………………………….….……………$      2,961.92**

# EXHIBIT 4

October 19, 2017

Payment of legal fees for professional services rendered by Butler|Snow (statements dated 5/19/17, 7/18/17 and 8/30/17) from the funds of the University of Mississippi. (These statements represent services and expenses in connection with the following patents: "Cache Mapping Technology Matter" - $2,728.50; "Cache Mapping Technology Matter" - $2,008.50 and "Cache Mapping Technology Matter" - $1,360.50, respectively.)

**TOTAL DUE……………………………….…….……………$          6,097.50**

Payment of legal fees for professional services rendered by Hershkovitz & Associates (statements dated 5/1/17, 5/18/17, 7/18/17, 7/20/17, 8/8/17, 8/8/17, 8/9/17, 8/9/17, 8/10/17, 8/15/17, 8/15/17, 8/16/17, 8/17/17, 8/20/17, 8/23/17 and 8/23/17) from the funds of the University of Mississippi. (These statements represent services and expenses in connection with the following patents:  "Cannabidiol Prodrugs with Improved Ocular Bioavailability" - $1,541.75; "Compositions Containing Delta-9-THC-Amino Acid Esters" - $1,881.50; "Potent Immunostimulants from Microalgae" - $820.00; "Potent Immunostimulants from Microalgae" - $1,110.00; "Potent Immunostimulants from Microalgae" - $1,568.04; "Potent Immunostimulants from Microalgae" - $1,452.40; "Potent Immunostimulants from Microalgae" - $1,233.76; "Potent Immunostimulants from Microalgae" - $1,811.80; "Highly Selective Sigma Receptor Radioligands" - $150.00; "Potent Immunostimulants from Microalgae" - $2,264.51; "Potent Immunostimulants from Microalgae" - $1,315.06; "Potent Immunostimulants from Microalgae" - $2,010.00; "Potent Immunostimulants from Microalgae" - $1,049.79; "Compositions Containing Delta-9-THC Amino Acid Esters" - $4,670.00; "Potent Immunostimulants from Microalgae" - $1,126.79 and "Potent Immunostimulants from Microalgae" - $1,871.25, respectively.)

**TOTAL DUE……………………………….…….……………$          27,060.87**

Payment of legal fees for professional services rendered by Stites & Harbison (statements dated 5/17/17, 5/17/17, 7/25/17, 7/25/17, 7/25/17, 8/24/17, 8/24/17, 8/24/17, 8/24/17 and 8/24/17) from the funds of the University of Mississippi. (These statements represent services and expenses in connection with the following patents: "Method of Detecting Humans" - $550.50; "Gas Separating Membranes" - $40.00; "Stabilized Formulation of Triamcinolone Acetonide" - $1,216.00; "Use of Trans-Gnetin H or Extracts Containing Genetic H" - $2,378.00; "High Photovoltage per Area by Sequential Series Tandem (SST)" - $5,000.00; "Stabilized Formulation of Triamcinolone Acetonide" - $360.00; "Stabilized Formulation of Triamcinolone Acetonide" - $1,061.50; "Longitudinal Gait Velocity Monitoring of Older Population" - $28.50; "High Photovoltage per Area by Sequential Series Tandem (SS)" - $234.50 and "Use of Trans-gnetin H or Extracts Containing Genetic H" - $748.00, respectively.)

**TOTAL DUE……………………………….…….……………$          7,432.50**

# EXHIBIT 4

October 19, 2017

Payment of legal fees for professional services rendered by Stites & Harbison (statements dated 7/24/17, 7/24/17, 7/24/17, 7/24/17, 7/25/17, 7/25/17, 7/25/17, 7/25/17, 7/25/17, 8/23/17, 8/23/17, 8/23/17, 8/23/17, 8/23/17 and 8/24/17) from the funds of the University of Mississippi Medical Center. (These statements, in the amounts of $47.50, $85.50, $133.00, $332.50, $416.00, $5,274.50, $2,008.00, $295.00, $397.50, $5,317.53, $38.00, $575.00, $755.00, $38.00 and $4,138.31, respectively, represent services and expenses in connection with intellectual property patents.)

**TOTAL DUE……………………………….…….……………$       19,851.34**

# EXHIBIT 8

**AMENDED AND RESTATED LEASE**

Between

UNIVERSITY OF SOUTHERN MISSISSIPPI

AND

UNIVERSITY OF SOUTHERN MISSISSIPPI ATHLETIC FOUNDATION, INC.

AR-48544522

TABLE OF CONTENTS

I.    PREMISES ....................................................................................................................4

II.    TERM AND TIME ...........................................................................................................6

III.    IMPROVEMENTS ON PREMISES ..................................................................................6

IV.    INSURANCE ..................................................................................................................7

V.    UTILITIES ......................................................................................................................8

VI.    MAINTENANCE AND REPAIRS ....................................................................................8

VII.    WARRANTY OF TITLE AND QUIET POSSESSION .....................................................8

VIII.    CARE AND USE OF PREMISES ..................................................................................9

IX.    ASSIGNMENT AND SUBLETTING ..............................................................................10

X.    INSPECTION OF PREMISES .......................................................................................10

XI.    DEFAULT .....................................................................................................................10

XII.    PROPERTY OF LESSEE .............................................................................................11

XIII.    NOTICES .....................................................................................................................11

XIV.    SUCCESSORS IN INTEREST .....................................................................................11

XV.    LEASE CONTINGENT UPON CONSTRUCTION OF FACILITIES ..............................12

XVI.    SURRENDER OF LEASE AND IMPROVEMENTS THEREON ....................................12

XVII.    FURTHER ASSURANCES............................................................................................12

48024601-Execution Version

STATE OF MISSISSIPPI
COUNTY OF FORREST

### AMENDED AND RESTATED LEASE

THIS AMENDED AND RESTATED LEASE is made and entered into as of the date set

forth below, by and between the UNIVERSITY OF SOUTHERN MISSISSIPPI, an Institution of

Higher Learning of the State of Mississippi, hereafter referred to as "Lessor" or "University" and

the UNIVERSITY OF SOUTHERN MISSISSIPPI ATHLETIC FOUNDATION, INC., a Mississippi

nonprofit corporation, hereafter referred to as "Lessee."  Lessor and Lessee shall each be a

"Party" and shall collectively be "the Parties."

RECITALS

WHEREAS, Lessor and Lessee entered into that certain Lease dated as of July 1, 2017

(the "Original Lease"), providing for the Lessor to lease certain real property as described herein

on the campus of the University to Lessee for the construction of a new Volleyball Facility and/or

other athletics and student related space; and

WHEREAS, Mississippi Community Education Center, a Mississippi nonprofit

corporation (MCEC) serves as a statewide family and community outreach initiative and

requires access to facilities in University's area for various activities that benefit the area's

underserved population; and

WHEREAS, University has on its campus athletic facilities which are underutilized and

capable of other uses consistent with University's mission; and

WHEREAS, MCEC proposed to Lessee that University facilities on University's campus

be leased to the Foundation and subleased to MCEC for the delivery of services consistent with

the MCEC mission as well as services that coincide with existing University activities and

services and the mission of Lessor and Lessee; and

3

48024601-Execution Version

WHEREAS, University and Lessee are willing to modify the plans for the Volleyball Facility to create a space more suitable for the comprehensive programming offered by MCEC and other potential community needs consistent with the mission of the University, while concurrently allowing for the Facility's use for volleyball, thus creating a multi-use space to be known as the "Wellness Center"; and

WHEREAS, MCEC has proposed to prepay rent for the term of the lease so as to enable Lessee to promote and fund certain additions, alterations, and renovations to the new Wellness Center as provided herein, as well as to the Reed Green Coliseum (hereinafter, the "Coliseum"), and to help maintain and repair the M. M. Roberts Stadium (the "Stadium") and Pete Taylor Park (the "Baseball Park") all to further facilitate the delivery of needed services and otherwise enhance the mission of MCEC; and

WHEREAS, Lessee and MCEC are desirous of entering into a sublease agreement pertaining to the Premises described therein being the Wellness Center, the Coliseum, the Stadium and the Baseball Park (collectively, the "Athletic Facilities") in substantially the form found in Exhibit A hereto; and

WHEREAS, the Parties desire to amend and restate the Original Lease to enable the uses described above and to extend the term thereof and provide for certain additions, alterations, and renovations to the Wellness Center as provided herein, as well as to the Reed Green Coliseum.

WHEREAS, the Parties further desire to amend and restate the Original Lease to provide for the use of the Stadium and the Baseball Park by Foundation and its sublessee, MCEC, on an infrequent basis not to exceed ten times per facility per lease year with Lessee to facilitate coordination of use by MCEC and with Lessee performing incidental maintenance and repairs on the Stadium and the Baseball Park.

4

48024601-Execution Version

THEREFORE, in consideration of the foregoing, of the mutual promises set forth herein, and of other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending legally to be bound, hereby agree as follows:

ARTICLE I

PREMISES

For and in consideration of the sum of One Dollar ($1.00) cash in hand paid and an annual lease payment of One Dollar ($1.00) due at the time of execution of this Amended and Restated Lease and in further consideration of the covenants and agreements herein contained, Lessor does hereby lease to Lessee and Lessee does hereby lease from Lessor: (a) approximately two acres, more or less, of land located at the west end of the Payne Center parking lot located at 101 MK Turk Circle, Hattiesburg, MS 39406, which are currently used for parking and landscaping at the Payne Center and are more fully described in Exhibit B and reflected in Exhibit B-1 attached hereto; (b) the Coliseum and parking which are currently utilized by the Men's and Women's basketball teams, coaching, athletic training, strength and conditioning staff and the Women's Volleyball team, coaching, athletic training, strength and conditioning staff and others and is more fully depicted on Exhibit C attached hereto; (c) Stadium and parking which are currently utilized by the football team and band and is more fully depicted on Exhibit D attached hereto; and (d) the Baseball Park and parking which are currently utilized by the baseball team and is more fully depicted on Exhibit E attached hereto (collectively referred to as the "Premises"). Lessor shall have the right to designate the access to and from the Premises and to change such designations from time to time in its discretion and Lessee covenants and agrees to strictly adhere to such access restrictions and all rules and regulations by Lessor applicable to this Lease.

5

48024601-Execution Version

ARTICLE II

TERM AND TIME

The term of this Lease shall be for a period commencing on the date of this agreement as set forth below and continuing through July 31, 2022, unless sooner terminated under the terms of Articles XII and XV below.  This Lease shall only be for such times within the Term when the applicable Athletic Facility is not being used by the University (the "Time"). As to the Stadium and the Baseball Park, the time is further limited so as not to exceed ten days per facility per lease year.   All use is subject to scheduling as set forth in Article VII.  Lessee shall have no right of use of the applicable Athletic Facility during the time of any University event or activity including preparing for the event or activity, conducting the same and post-event cleaning and restoration.

ARTICLE III

IMPROVEMENTS ON PREMISES

Lessee shall have the right during the term hereof to construct a new Wellness Center and/or other athletics and student related space and to improve the aesthetics, video and technology services of the main arena of the Coliseum (hereinafter, the "Improved Facilities"). After the initial construction of the Wellness Center, Lessee shall have the right to construct additions, alterations and improvements to and further renovate the Wellness Center as necessary.  Lessee shall have the right during the term hereof and during such time as the Coliseum is not being used by the University to construct improvements to the main arena therein, including but not limited to aesthetic enhancement, video and technological upgrades and changes. All such construction work regarding the Premises shall be performed and completed in accord with plans and specifications (the "Plans") filed with and approved in writing by the Lessor's Physical Plant Department before any such work is begun.  Lessee shall have the right during the term hereof and during such time as the Stadium and Baseball Park are not

6

48024601-Execution Version

being used by the University and prior to or following the sublease of the same to MCEC to perform incidental maintenance and repair subject to approval by the Lessor's Physical Plant Department before such work is begun.

ARTICLE IV

INSURANCE

Lessor will insure the Premises against loss by fire, windstorm or other similar casualty with a company or companies licensed to do business in the State of Mississippi, in a total amount of not less than one hundred percent (100%) of the replacement cost of the Premises. Lessee shall at its own expense maintain or have its sublessee maintain: (a) fire, windstorm or other similar casualty insurance on Lessee's personal property, fixtures and equipment located on the Premises, (b) comprehensive general liability insurance for injury to and/or death of and/or damage to property of any person or persons, with policy limits of not less than One Million Dollars ($1,000,000) combined single limit for any claim arising out of any one occurrence; and (c) all workers' compensation and employer's liability insurance for any of Lessee's employees and as otherwise required by state law.  For purposes of any improvements and/or construction by Lessee at the Premises during the term, Lessee shall ensure that the agreement with the general contractor requires builder's risk insurance at an amount of insurance no less than the value of the agreement with the general contractor. Further, the Lessee shall insure that any such agreement with a general contractor requires payment and performance bonds for the improvements and/or construction.

On or before the execution of this Lease, Lessee will provide a certificate of insurance for the required insurance to the Lessor's Vice President for Finance and Administration and the Director of Procurement.  Lessee shall have the right to provide insurance riders or endorsements for the occasional use of the Stadium and the Baseball Park and shall, prior to

7

48024601-Execution Version

the use of any such facility, provide the insurance riders or endorsements to the Lessor's Vice

President for Finance and Administration and the Director of Procurement.

ARTICLE V

UTILITIES

Lessor will furnish all ordinary utility services, specifically including water, power,

sewage, and trash removal to the Premises for the time of use by the University and for the time

of use under the Amended Lease by Lessee.

ARTICLE VI

MAINTENANCE AND REPAIRS

Lessee shall not improve the Premises without the prior written consent of Lessor and

without approval by Lessor and the approval of the plans and specifications for such

improvements by the University's Physical Plant Department and any other consent required by

the University.  Furthermore, the Contractor must be approved by Lessor and the University's

Physical Plant Department and must coordinate the work with the University's Physical Plant

Department.  Insurance requirements are set forth above for any approved construction. Lessee

will maintain the Premises, including the Improved Facilities constructed thereon, in good

condition and repair at its own expense during its use of the same under this Lease with regular

and routine maintenance to be and remain with the Lessor.

Should the Premises be damaged or destroyed by fire or other casualty during or arising

from the use thereof by Lessee, Lessee will promptly repair, restore or rebuild the same as near

as possible to the condition it was in immediately prior to such damage or destruction. If such

damage is substantial and to such an extent as to render the Premises uninhabitable, then

Lessee will have the option to rebuild and restore the Premises or to clear the wreckage and

debris from the Premises and terminate this Lease, by giving written notice to Lessor within

ninety (90) days of such damage.

8

48024601-Execution Version

ARTICLE VII

WARRANTY OF TITLE AND QUIET POSSESSION AND SCHEDULING OF USE

Lessor covenants and warrants that it has good and marketable title to the Premises in fee simple, free and clear of any encumbrance other than easements of record, and that Lessee will have quiet possession of the Premises under the terms and conditions of this Lease. This covenant and warranty of quiet enjoyment is subject to: (i) the Lessor's rights set forth herein; (ii) Lessor's right to make improvements and/or install equipment or repairs and maintenance consistent with the Plans; (iii) Lessor's right of use of the Premises for activities and events; (iv) scheduling as set forth herein. Lessee (and its sublessees) shall work cooperatively with Lessor following reasonable procedures established by the University for scheduling of use of the Premises. All use of the Premises is subject to those matters set forth in (i) through (iv) above which shall be primary to the subordinate use of Lessee under this Lease.

ARTICLE VIII

CARE AND USE OF PREMISES

Lessee will use the Premises for the general objects and purposes of constructing and maintaining the Improved Facilities and constructing additions, alterations, and improvements and for repair and maintenance and further renovate the Premises as necessary and for related purposes and agrees that it will not use the Premises for any other purpose, unless authorized by the appropriate authorities of the Lessor.

Lessee will not use or permit any person to use, the Premises, or any part thereof, for any use or purpose in violation of the laws of the United States, the State of Mississippi, ordinances of the City of Hattiesburg, Mississippi, or rules and regulations of the Lessor. Lessee further acknowledges that its use of the Premises is, and at all times will be, subject to the

9

48024601-Execution Version

supervision of the University's President and Lessor's Director of Athletics or his or her successor.

Lessee covenants that it will comply at all times with all lawful health and policy regulations of the governmental entities referred to above and will keep the Premises and the improvements therein in a clean, secure and attractive condition.

ARTICLE IX

ASSIGNMENT AND SUBLETTING

The Parties hereto agree that the Premises shall not be assigned or sublet nor may this Lease be pledged as security for a loan to any person, corporation, society, or body, without the prior written consent of Lessor, which consent will not be unreasonably withheld or delayed. The Parties acknowledge the planned sublease of the Premises by Lessee with MCEC.

ARTICLE X

INSPECTION OF PREMISES

Lessee will permit Lessor, its agents and authorized representatives to enter upon the Premises at all times during reasonable hours for any purposes deemed necessary by Lessor including but not limited to the purpose of inspecting the Premises and protecting Lessor's interests. Such entry by Lessor will not unreasonably interfere with Lessee's use and occupancy of the Premises.

ARTICLE XI

DEFAULT

If Lessee should default in its performance of any of the covenants, conditions, agreements or undertakings herein contained to be kept and observed by Lessee and such default continue for thirty (30) days after written notice to Lessee, or if Lessee should vacate or abandon the leased Premises, it will be lawful for Lessor, at its option, to exercise any rights or remedies it may have at law or in equity against Lessee, including the right to remove and put

10

48024601-Execution Version

out Lessee and all persons occupying all or any part of the leased Premises, using such reasonable force as may be necessary in so doing, and Lessor shall be entitled to terminate the Lease.

ARTICLE XII

PROPERTY OF LESSEE

If, upon the expiration or earlier termination of the term of this Lease, Lessee abandons or leaves any personal property on the Premises after thirty (30) days written notice to Lessee, Lessor shall have the right to store or otherwise dispose of such property at Lessee's cost and expense, without being liable in any respect to Lessee.

ARTICLE XIII

NOTICES

All notices, required or elective, shall be in writing and shall be mailed by United States certified mail, return receipt requested, postage prepaid, addressed to Lessor at:

Vice President for Finance and Administration
University of Southern Mississippi
118 College Drive #5005
Hattiesburg, Mississippi 39406-0001

and to Lessee at:

Leigh Breal
President
University of Southern Mississippi Athletic Foundation, Inc.
118 College Drive #5017
Hattiesburg, MS  39406-0001

or to such other address as the respective Parties may designate. Notices shall be deemed complete upon receipt thereof.

ARTICLE XIV

SUCCESSORS IN INTEREST

11

The provisions of this Lease shall inure to the benefit of and shall bind the successors, transferees, and assigns of the respective Parties hereto.

ARTICLE XV

LEASE CONTINGENT UPON CONSTRUCTION OF FACILITIES

This Lease between Lessor and Lessee is contingent upon Lessee beginning construction of the Wellness Center within a reasonable time frame.  In the event that Lessee has not begun construction of the Wellness Center in accordance with plans and specifications approved by the Lessor's Physical Plant Department by the last day of March 31, 2019, this Lease Agreement will be terminated and thereafter considered null and void.

ARTICLE XVI

SURRENDER OF LEASE AND IMPROVEMENTS THEREON

Upon the termination of this Lease, Lessee will surrender to Lessor the Premises, together with any and all improvements thereon.  At the time of such surrender, all right, title, and interest of Lessee in and to the Premises and any Improved Facilities situated thereon will be transferred to and vest in the Lessor, and the Premises and Improved Facilities will be free and clear of all liens and encumbrances other than matters of record existing on the date of the commencement of the term of the Lease, and liens and encumbrances imposed as a result of an act or failure to act by Lessor.

ARTICLE XVII

FURTHER ASSURANCES

Each Party shall take such further reasonable actions and execute such further reasonable documents as may be necessary to implement and carry out the purpose and intent of this Lease.

12

48024601-Execution Version

IN WITNESS WHEREOF, effective on this the 2nd day of November, 2017, the respective Parties hereto have executed this Amended and Restated Lease, consisting of: Articles I through XVII and Exhibits A, B, B-1, C, D and E.

13

LESSOR, UNIVERSITY OF SOUTHERN MISSISSIPPI

By: _____
   Interim VP for Finance & administration
   FOR AND ON BEHALF OF LESSOR

Date: Nov 8, 2017

LESSEE, UNIVERSITY OF SOUTHERN MISSISSIPPI
ATHLETIC FOUNDATION, INC.

By: _____
   LEIGH BREAU, PRESIDENT,
   FOR AND ON BEHALF OF LESSEE

Date: Oct 26, 2017

14

EXHIBIT A

SUBLEASE

48024601-Execution Version

**SUBLEASE**

Between

THE UNIVERSITY OF SOUTHERN MISSISSIPPI ATHLETIC FOUNDATION, INC.

A N D

MISSISSIPPI COMMUNITY EDUCATION CENTER

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | PREMISES | 4 |
| II. | TERM AND TIME | 5 |
| III. | IMPROVEMENTS ON PREMISES | 6 |
| IV. | INSURANCE | 6 |
| V. | UTILITIES | 7 |
| VI. | IMPROVEMENTS, MAINTENANCE AND REPAIRS | 7 |
| VII. | WARRANTY OF TITLE AND QUIET POSSESSION | 9 |
| VIII. | CARE AND USE OF PREMISES | 10 |
| IX. | ASSIGNMENT AND SUBLETTING | 11 |
| X. | INSPECTION OF PREMISES | 11 |
| XI. | INDEMNITY | 11 |
| XII. | DEFAULT | 12 |
| XIII. | PROPERTY OF MCEC | 12 |
| XIV. | NOTICES | 12 |
| XV. | SUCCESSORS IN INTEREST | 13 |
| XVI. | SUBLEASE CONTINGENT UPON CONSTRUCTION OF WELLNESS CENTER AND VIABILITY OF THE AMENDED LEASE | 14 |
| XVII. | SURRENDER OF SUBLEASE AND IMPROVEMENTS THEREON | 14 |
| XVIII. | FURTHER ASSURANCES | 15 |

48021125_4  Execution Version

STATE OF MISSISSIPPI
COUNTY OF FORREST

### SUBLEASE

THIS SUBLEASE ("Sublease" or "Agreement") is made and entered into as of the date set

forth below, by and between the UNIVERSITY OF SOUTHERN MISSISSIPPI ATHLETIC

FOUNDATION, INC, a Mississippi nonprofit corporation, hereafter referred to as "Foundation" and

MISSISSIPPI COMMUNITY EDUCATION CENTER, a Mississippi nonprofit corporation, hereafter

referred to as "MCEC."  Foundation and MCEC shall each be a "Party" and shall collectively be

"the Parties."

WHEREAS, the University of Southern Mississippi (the "University") and Foundation entered

into that certain Lease dated as of July 1, 2017 (the "Original Lease"), providing for the University to

lease certain real property as described herein on the campus of the University to Foundation for the

construction of a new Volleyball Facility and/or other athletics and student related space; and

WHEREAS, Mississippi Community Education Center, a Mississippi nonprofit corporation

(MCEC) serves as a statewide family and community outreach initiative and requires access to

facilities in University's area for various activities that benefit the area's underserved population; and

WHEREAS, University has on its campus athletic facilities which are underutilized and

capable of other uses consistent with University's mission; and

WHEREAS, MCEC proposed to the Foundation that the University facilities on University's

campus be leased by the Foundation and subleased to MCEC for delivery of services consistent with

the MCEC mission as well as services that coincide with existing University activities and services

and the mission of the University and the Foundation; and

WHEREAS, University and Foundation are willing to modify the plans for the Volleyball

Facility to create a space more suitable for the comprehensive programming offered by MCEC and

other potential community needs consistent with the mission of the University, while concurrently

allowing for the Facility's use for volleyball, thus creating a multi-use space to be known as the

"Wellness Center"; and

3

48021125_4   Execution Version

WHEREAS, MCEC has proposed to prepay rent for the term of the lease so as to enable MCEC to promote and fund certain additions, alterations, and renovations to the new Wellness Center as provided herein, as well as to the Reed Green Coliseum (hereinafter, the "Coliseum"), and to help maintain and repair the M. M. Roberts Stadium (the "Stadium") and Pete Taylor Park (the "Baseball Park") all to further facilitate the delivery of needed services and otherwise enhance the mission of MCEC; and

WHEREAS, the University and the Foundation have amended and restated the Original Lease by an amended lease (the "Amended Lease") to enable the uses described above and to extend the term thereof and provide for certain additions, alterations, and renovations to the Wellness Center as provided herein, as well as to the Reed Green Coliseum.

WHEREAS, in the Amended Lease the University and the Foundation provided for the use of the Stadium and the Baseball Park by Foundation and MCEC, its sublessee, on an infrequent basis as set forth therein to facilitate coordination of use by MCEC with the Foundation performing incidental maintenance and repairs on the Stadium and the Baseball Park.

WHEREAS, the Foundation and MCEC desire to enter into this Sublease of the Premises being the Wellness Center, the Coliseum, the Stadium and the Baseball Park (collectively, the "Athletic Facilities") on the terms and conditions herein stated with such Sublease being in the best interest of the Foundation and MCEC.

THEREFORE, in consideration of the foregoing, of the mutual promises set forth herein, and of other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending legally to be bound, hereby agree as follows:

ARTICLE I

PREMISES

For and in consideration of the one-time payment of the sum of Five Million Dollars ($5,000,000) cash in hand paid due at the time of execution of this Sublease (the "Rent") and in further consideration of the covenants and agreements herein contained, subject to the terms and conditions herein, Foundation does hereby sublease to MCEC and MCEC does hereby

4

48021125_4   Execution Version

sublease from Foundation: (a) approximately two acres, more or less, of land located at the west end of the Payne Center parking lot located at 101 MK Turk Circle, Hattiesburg, MS 39406, which are currently used for parking and landscaping at the Payne Center and are more fully described in Exhibit A and reflected in Exhibit A-1 attached hereto; (b) the Coliseum and parking which are currently utilized by the Men's and Women's basketball teams, coaching, athletic training, strength and conditioning staff and the Women's Volleyball team, coaching, athletic training, strength and conditioning staff and others and is more fully depicted on Exhibit B attached hereto; (c) the Stadium and parking which are currently utilized by the football team and band and is more fully depicted on Exhibit C attached hereto; and (d) the Baseball Park and parking which are currently utilized by the baseball team and is more fully depicted on Exhibit D attached hereto (collectively referred to as the "Premises"). Foundation shall have the right to designate the access to and from the Premises and to change such designations from time to time in its discretion and MCEC covenants and agrees to strictly adhere to such access restrictions and all rules and regulations by Foundation and the University applicable to this Sublease. The Premises are currently used for various activities by the University and may be used during the Term for the same or other purposes by the University in its sole discretion with such University use to have priority over any use by Foundation and by MCEC.

ARTICLE II

TERM AND TIME

The term of this Sublease shall be for a period commencing on the date of this agreement as set forth below and continuing through July 31, 2022, unless sooner terminated under the terms of Article XII below.  This Lease shall only be for such times within the Term when the applicable Athletic Facility is not being used by the University (the "Time").  As to the Stadium and the Baseball Park, the time is further limited so as not to exceed ten days per facility per lease year.   All use is subject to scheduling as set forth in Article VII.  MCEC shall have no right of use of the applicable

5

Athletic Facility during the time of any University event or activity including preparing for the event or activity, conducting the same and post-event cleaning and restoration.

## ARTICLE III

### IMPROVEMENTS ON PREMISES

Foundation shall have the right during the term hereof to construct a new Wellness Center and/or other athletics and student related space and to improve the aesthetics, video and technology services of the main arena of the Coliseum (hereinafter, the "Improved Facilities").  After the initial construction of the Wellness Center estimated by the Parties to be completed on a date from approximately November, 2018 to approximately May, 2019, Foundation shall have the right to construct additions, alterations and improvements to and further renovate the Wellness Center as necessary.  Foundation shall have the right during the term hereof and during such time as the Coliseum is not being used by the University to construct improvements to the main arena therein, including but not limited to aesthetic enhancements, video and technological upgrades and changes. All such construction work regarding the Premises shall be performed and completed in accord with plans and specifications (the "Plans") filed with and approved in writing by the University's Physical Plant Department before any such work is begun.  Foundation shall have the right during the term hereof and during such time as the Stadium and Baseball Park are not being used by the University to perform incidental maintenance and repair subject to approval by the University's Physical Plant Department before such work is begun.  For the Wellness Center, upon substantial completion of the improvements, additions and alterations, Foundation shall furnish a written notice to MCEC of the date of substantial completion ("Notice of Substantial Completion") and the right of MCEC to begin scheduling the use of the Wellness Center, subject to the provisions of Article VII.

## ARTICLE IV

### INSURANCE

Foundation has an Amended Lease with the University under which the University will insure the Premises against loss by fire, windstorm or other similar casualty with a company or

6

48021125_4   Execution Version

companies licensed to do business in the State of Mississippi, in a total amount of not less than one hundred percent (100%) of the replacement cost of the Premises.. Under the Amended Lease, the Foundation agreed to maintain or have its sublessee maintain: (a) fire, windstorm and other similar casualty insurance on Foundation's personal property, fixtures and equipment located on the Premises, (b) comprehensive general liability insurance for injury to and/or death of and/or damage to property of any person or persons, with policy limits of not less than One Million Dollars ($1,000,000) combined single limit for any claim arising out of any one occurrence; and (c) all workers' compensation and employer's liability insurance for any of MCEC's employees and as otherwise required by state law. MCEC shall carry the same insurance set forth above (a — c) at its own cost and expense and shall name Foundation and University as additional insureds and may obtain coverage by policies or insurance riders or endorsements to policies all in a form reasonably acceptable to the Foundation. MCEC agrees to provide evidence of the same to Foundation upon request. If riders are obtained by MCEC for the occasional use of the Stadium and the Baseball Park, MCEC must furnish such insurance riders or endorsements and certificates of insurance to Foundation, whether or not requested by it.

## ARTICLE V

### UTILITIES

Under the Amended Lease, the University will furnish all ordinary utility services, specifically including water, power, sewage, and trash removal to the Improved Facilities for the time of use by the University and for the time of use under the Amended Lease by the Foundation.

## ARTICLE VI

### IMPROVEMENTS, MAINTENANCE AND REPAIRS

MCEC shall not improve the Premises without the prior written consent of Foundation and without approval by the University and the approval of the plans and specifications for such improvements by the University's Physical Plant Department and any other consent required by

7

the University. Furthermore, the Contractor must be approved by Foundation and the University's Physical Plant Department and must coordinate the work with the University's Physical Plant Department. Insurance requirements are set forth above for any approved construction.

MCEC will maintain the Premises, including the Improved Facilities constructed thereon, in good condition and repair at its own expense during its use of the same under this Sublease with regular and routine maintenance to be and remain with the University.   MCEC shall not be responsible for maintenance and repairs needed on the roof and/or outside structural walls of the Premises. MCEC shall not be responsible for maintenance and repairs needed on major mechanical, HVAC, plumbing and/or electrical facilities located upon the Premises unless damage to the same was caused by MCEC or by others during its occupancy and use of the applicable Athletic Facility.

MCEC shall not be responsible for any latent defects within the Premises. The Foundation shall notify the University to remove, correct or repair any latent defects within a reasonable time after written notice of said defect by MCEC. Foundation shall use its best efforts to cause the University to do the same with, in any case,  such work to be approved by the University's Physical Plant.

Should the Improved Facilities be damaged or destroyed by fire or other casualty during or arising from the use of MCEC, MCEC will promptly repair, restore or rebuild the same as near as possible to the condition it was in immediately prior to such damage or destruction or, at is sole option, Foundation shall cause the University to do the same with, in any case, such work to be approved by the University's Physical Plant. To the extent part or all of the Premises are unusable for the purposes set out herein as the result of fire or other casualty, the rent shall abate in proportion to the interference with the use of the Premises during the time of such repair and this Lease shall be extended for the period of the abatement.  The abatement shall be based on the value of the lost use established by an appraiser selected by the Foundation being the rental

8

value of the applicable Athletic Facility for the period of time involved based upon the value of the use of such facility and the value of the use of all other Athletic Facilities with the total value of use of all Athletic Facilities during the term being $5,000,000.00. No abatement shall be awarded if MCEC uses other portions of the Premises for its needed meetings and activities without interruption during the period of time of repair. No abatement shall be awarded if the damage occurred during or arose from the use of MCEC of the applicable Athletic Facility.

ARTICLE VII

WARRANTY OF TITLE AND QUIET POSSESSION AND REQUIREMENT FOR SCHEDULING OF USE

Under the Amended Lease, the University covenanted and warranted to Foundation (as tenant thereunder) that the University has good and marketable title to the Premises in fee simple, free and clear of any encumbrance other than easements of record. The Amended Lease further provides that the Foundation (as tenant thereunder) will have quiet possession of the Premises under the terms and conditions of the Amended Lease which allows the University to use the Premises for the Time required for its activities and uses and allows the Foundation and University to make improvements and/or install equipment consistent with the Plans and/or to maintain and repair the same. Foundation covenants and warrants to MCEC that Foundation has good leasehold title and that MCEC will have quiet possession of the Premises subject to the following for which there shall be no rebate, refunding or other return of rent: (i) the University's rights set forth herein and under the Amended Lease with the Foundation; (ii) Foundation's and University's right to make improvements and/or install equipment or repairs and maintenance consistent with the Plans; (iii) University's right of use of the Premises for activities and events; (iv) scheduling as set forth herein. MCEC shall work cooperatively with Foundation and University following reasonable procedures established by the University for scheduling of use of the Premises. MCEC shall coordinate dates with Foundation as early as possible for desired uses of the Premises.

9

All use of the Premises is subject to those matters set forth in (i) through (iv) above which shall be primary to the subordinate use of MCEC under this Sublease.

ARTICLE VIII

CARE AND USE OF PREMISES

MCEC will use the Premises for business purposes, educational purposes, meetings and conferences and related purposes for providing education and services for family and community outreach initiatives consistent with its mission.  All uses shall be subject to all restrictions and regulations of the University as to the use of its facilities as those restrictions and regulations may change from time to time. MCEC agrees that it will not use the Premises for any other purpose, unless authorized in writing in advance by the appropriate authorities of the Foundation. Upon receipt of the Notice of Substantial Completion of the Wellness Center, MCEC shall have the right to use that facility subject to the limitations and terms and conditions of this Sublease. Prior to receipt of the Notice of Substantial Completion of the Wellness Center, MCEC's use shall be limited to review of the construction of the work on the Wellness Center in a manner that does not interfere with construction and is in full compliance with all health and safety laws, rules and regulations of the Foundation, Foundation's contractor(s), the University (including but not limited to its Physical Plant).

MCEC will not use or permit any person to use, the Premises, or any part thereof, for any use or purpose in violation of the laws of the United States, the State of Mississippi, ordinances of the City of Hattiesburg, Mississippi, or rules and regulations of the University or the Foundation. MCEC further acknowledges that its use of the Premises is, and at all times will be, subject to the supervision of the University's President and the University's Director of Athletics or their successors.

MCEC covenants that it will comply at all times with all lawful health and policy regulations of the governmental entities referred to above and will keep the Premises and the improvements therein in a clean, secure and attractive condition.

10

48021125_4  Execution Version

ARTICLE IX

ASSIGNMENT AND SUBLETTING

The Parties hereto agree that the Premises shall not be assigned or sublet nor may this

Sublease be pledged as security for a loan to any person, corporation, society, or body, without the

prior written consent of Foundation, which consent will not be unreasonably withheld or delayed,

subject to any approval requirements of the Institutions of Higher Learning of the State of Mississippi

("IHL").

ARTICLE X

INSPECTION OF PREMISES

MCEC will permit Foundation, the University, IHL and their agents and authorized

representatives to enter upon the Premises at all times during reasonable hours for any purposes

deemed necessary by them including but not limited to the purpose of inspecting the Premises, the

use thereof, the activities thereon and otherwise protecting their interests. Such entry will not

unreasonably interfere with MCEC's use and occupancy of the Premises.

ARTICLE XI

INDEMNITY

MCEC covenants and agrees to promptly come in, defend, indemnify and hold

Foundation, the University and the Board of Trustees of IHL (and their agents, employees,

contractors, officers, directors and affiliates) harmless from any dispute, loss, claim or damage of

any kind or nature including but not limited to personal injury, death, real property damage,

personal property damage (collectively, "Claims") and all costs of defense, costs of court and

attorney's fees arising from any action or inaction of MCEC, any negligence, gross negligence or

intentional act of MCEC, or any Claims whatsoever arising under this Sublease. The term MCEC

in this paragraph shall include MCEC, its employees, agents, contractors, subcontractors,

guests, invitees, licenses or anyone acting on its behalf. Foundation and the University agree

that MCEC may select counsel of its own choosing to defend any Claim provided such counsel is

11

approved by University, such approval not to be unreasonably withheld, conditioned or delayed, with the cost of such counsel to be the responsibility of the MCEC. MCEC reserves the right to settle, compromise or resolve any Claim provided University counsel, IHL and the Attorney General of the State of Mississippi approves the same, with such approval not to be unreasonably withheld, conditioned or delayed.

ARTICLE XII

DEFAULT

If MCEC should default in its performance of any of the covenants, conditions, agreements or undertakings herein contained to be kept and observed by MCEC and such default continue for thirty (30) days after written notice to MCEC, or if MCEC should vacate or abandon the leased Premises and fail to use any part of the Premises for a period of twelve consecutive months, it will be lawful for Foundation, at its option, to exercise any rights or remedies it may have at law or in equity against MCEC, including the right to remove and put out MCEC and all persons occupying all or any part of the leased Premises, using such reasonable force as may be necessary in so doing, and Foundation shall be entitled to terminate the Sublease. There shall be no refund of Rent arising from any termination by Foundation.

ARTICLE XIII

PROPERTY OF MCEC

Upon the expiration or earlier termination of the term of this Sublease, MCEC shall have thirty (30) days in which to remove all of its personal property from the Premises. If MCEC abandons or otherwise fails to remove any of its personal property within said thirty (30) day period, Foundation shall have the right to store or otherwise dispose of such property at MCEC's cost and expense, without being liable in any respect to MCEC.

ARTICLE XIV

NOTICES

All notices, required or elective, shall be in writing and shall be mailed by United States

12

certified mail, return receipt requested, postage prepaid, addressed to Foundation at:

> Leigh Breal
> President
> University of Southern Mississippi Athletic Foundation, Inc.
> 118 College Drive #5017
> Hattiesburg, MS 39406-0001

With a copy to

> Christie Holloway
> Chief Financial Officer
> University of Southern Mississippi Athletic Foundation, Inc
> 118 College Drive #5017
> Hattiesburg, MS 39406-0001

and to MCEC at

> Nancy New
> President
> Mississippi Community Education Center
> 2525 Lakeward Dr., Suite 200
> Jackson, MS 39216

with a copy to

> Jesse Steven New Jr
> Brunini Grantham Grower & Hewes
> 190 E Capitol St
> Jackson, MS 39201-2149

or to such other address as the respective Parties may designate. Notices shall be deemed

complete upon receipt thereof.

ARTICLE XV

SUCCESSORS IN INTEREST

The provisions of this Lease shall inure to the benefit of and shall bind the successors,

transferees, and assigns of the respective Parties hereto.

48021125_4   Execution Version

ARTICLE XVI

SUBLEASE RENT CONTINGENT UPON CONSTRUCTION OF WELLNESS CENTER
AND THE VIABILITY OF THE AMENDED LEASE

The Rent for the Sublease between Foundation and MCEC is contingent upon Foundation

completing construction of the Wellness Center. Foundation anticipates the Wellness Center work

shall be completed between August, 2018 and May, 2019 but Foundation and MCEC understand

such work may be delayed but shall, in any event, be completed within 730 days of the date of this

Sublease. In the event that Foundation has not achieved substantial completion of the

Wellness Center in accordance with Plans within 730 days of the date of this Sublease, the Rent

shall be adjusted with a rebate due to MCEC. The adjustment shall be based on the

determination of value established by an appraiser selected by the Foundation as to the rental

value of the for the period of time from May, 2019 to the date of substantial completion of the

Wellness Center based upon the value of the use of such facility during such time and the value of

the use of all other Athletic Facilities with the total value of use of all Athletic Facilities during the

term being $5,000,000.00.  In the event the Amended Lease with Foundation as tenant is

terminated, this Sublease Agreement will be terminated and thereafter considered null and void

and Foundation shall refund the Rent to MCEC on a prorata basis for the number of days that

were not used by MCEC during the term of the Sublease.

ARTICLE XVII

SURRENDER OF SUBLEASE AND IMPROVEMENTS THEREON

Upon the termination of this Sublease, MCEC will surrender the Premises to the

Foundation, together with any and all improvements thereon. At the time of such surrender, all

right, title, and interest of MCEC in and to the Premises and any Improved Facilities situated

thereon will be transferred to and vest in the University and the Premises and Improved Facilities

will be free and clear of all liens and encumbrances other than matters of record existing on the

date of the commencement of the term of the Sublease, and liens and encumbrances imposed

as a result of an act or failure to act by the Foundation.

14

48021125_4   Execution Version

ARTICLE XVIII

<u>FURTHER ASSURANCES</u>

Each Party shall take such further reasonable actions and execute such further reasonable documents as may be necessary to implement and carry out the purpose and intent of this Sublease.

[The remainder of this page is intentionally left blank.]

48021125_4  Execution Version

IN WITNESS WHEREOF, on this the 2( day of _____Oct_____, 2017, the

respective Parties hereto have executed these presents, consisting of: Articles I

through XVIII.


UNIVERSITY OF SOUTHERN MISSISSIPPI ATHLETIC
FOUNDATION, INC.

By: ___Leigh Breal_____

LEIGH BREAL, PRESIDENT,
FOR AND ON ITS BEHALF

Date: __Oct 26, 2017_____


MISSISSIPPI COMMUNITY EDUCATION CENTER

By: __Dr. Nancy New_____

Dr. Nancy New, Exec. Dir.
FOR AND ON ITS BEHALF

Date: __Oct. 26, 2017_____

16

## SUBLEASE EXHIBIT A

### LEGAL DESCRIPTION

A parcel of land being located in the NW 1/4 of the NE 1/4 of Section 7, Township 4 North, Range 13 West, Forrest County, Mississippi and having bearings based upon Grid North as referenced to Mississippi State Plane Coordinates, East Zone, having a Convergence Angle of    -00 degrees 15 minutes 44.19 seconds, a Combined Factor of 0.999975418 being referenced from the POINT OF BEGINNING and being more particularly described as follows:

Commence at a 4" metal pipe found marking the NW Corner of the  NW 1/4 of the NE 1/4 of Section 7, Township 4 North, Range 13 West, Forrest County, Mississippi; thence run East, for 599.10 feet to a point; thence run  South  for 2.93 feet to a cotton spindle set on the south   margin of West 4th Street to and for the POINT OF BEGINNING: thence run  South 85 degrees 09 minutes 24 seconds  East along said south margin for 572.29 feet to an iron pin set; thence run  South 04 degrees 17 minutes 35 seconds  West  for 165.96 feet to an iron pin set; thence run  North 85 degrees 28 minutes 57 seconds  West  for 369.97 feet a PK nail set; thence run  South 68 degrees 08 minutes 31 seconds  West  for 38.24 feet to a PK nail set; thence run  North 51 degrees 01 minutes 41 seconds  West  for 78.74 feet to a PK nail set; thence run  North 62 degrees 25 minutes 25 seconds  West  for 58.63 feet to a PK nail; thence run  North 15 degrees 03 minutes 16 seconds  West  for 26.67 feet to an iron pin set; thence run  North 73 degrees 37 minutes 15 seconds  West  for 49.25 feet to an iron pin set; thence run  North 44 degrees 06 minutes 13 seconds  West  for 18.84 feet to an iron pin set; thence run  North 01 degrees 58 minutes 26 seconds  East  for 52.33 feet to an iron pin set; thence run  South 84 degrees 40 minutes 04 seconds  East  for 23.87 feet to an iron pin set; thence run  North 04 degrees 11 minutes 44 seconds  East  for 19.05 feet back to the POINT OF BEGINNING. Said parcel contains 2.10 acres, more or less.

Specifically excluded from the Premises descried on this exhibit are coaches' offices. Also excluded are any and all computers, printers and all other office equipment, supplies, intellectual property, business files, confidential information, and personal matters of coaches and players.

## SUBLEASE EXHIBIT A-1

### SURVEY OF THE REAL PROPERTY



## SUBLEASE EXHIBIT B

Specifically excluded from the Premises depicted on this Exhibit are coaches' offices, athletic training facilities, storage facilities, locker rooms and weight rooms. Also excluded are all computers, printers and all other office equipment, supplies, intellectual property, business files, confidential information and personal matters of coaches and players.

Southern Miss Campus Map     *SUBLEASE EXHIBIT B*





Coliseum (Reed Green Coliseum and Parking).
May also use Baseball Park parking.

**SUBLEASE EXHIBIT C**

The portion of the Premises depicted on this exhibit includes all of M.M. Roberts Stadium, except private suites, press box, locker rooms, storage facilities, unused former dormitory space and office space. Also excluded are all computers, printers and all other office equipment, supplies, intellectual property, business files, confidential information and personal matters of coaches and players.

Southern Miss Campus Map    *SUBLEASE EXHIBIT "C"*



 Stadium (M.M. Roberts Stadium and Parking)

**SUBLEASE EXHIBIT D**

Specifically excluded from the Premises depicted on this exhibit are suites, locker rooms and press box.  Also excluded are all computers, printers and all other office equipment, supplies, intellectual property, business files, confidential information, personal matters of coaches and players

Southern Miss Campus Map      *SUBLEASE EXHIBIT "D"*





Baseball Park (Pete Taylor Park and Parking).
Parking may also include Coliseum parking.

**EXHIBIT B**

**LEGAL DESCRIPTION**

A parcel of land being located in the NW 1/4 of the NE 1/4 of Section 7, Township 4 North, Range 13 West, Forrest County, Mississippi and having bearings based upon Grid North as referenced to Mississippi State Plane Coordinates, East Zone, having a Convergence Angle of -00 degrees 15 minutes 44.19 seconds, a Combined Factor of 0.999975418 being referenced from the POINT OF BEGINNING and being more particularly described as follows:

Commence at a 4" metal pipe found marking the NW Corner of the NW 1/4 of the NE 1/4 of Section 7, Township 4 North, Range 13 West, Forrest County, Mississippi; thence run East, for 599.10 feet to a point; thence run South for 2.93 feet to a cotton spindle set on the south margin of West 4th Street to and for the POINT OF BEGINNING: thence run South 85 degrees 09 minutes 24 seconds East along said south margin for 572.29 feet to an iron pin set; thence run South 04 degrees 17 minutes 35 seconds West for 165.96 feet to an iron pin set; thence run North 85 degrees 28 minutes 57 seconds West for 369.97 feet a PK nail set; thence run South 68 degrees 08 minutes 31 seconds West for 38.24 feet to a PK nail set; thence run North 51 degrees 01 minutes 41 seconds West for 78.74 feet to a PK nail set; thence run North 62 degrees 25 minutes 25 seconds West for 58.63 feet to a PK nail; thence run North 15 degrees 03 minutes 16 seconds West for 26.67 feet to an iron pin set; thence run North 73 degrees 37 minutes 15 seconds West for 49.25 feet to an iron pin set; thence run North 44 degrees 06 minutes 13 seconds West for 18.84 feet to an iron pin set; thence run North 01 degrees 58 minutes 26 seconds East for 52.33 feet to an iron pin set; thence run South 84 degrees 40 minutes 04 seconds East for 23.87 feet to an iron pin set; thence run North 04 degrees 11 minutes 44 seconds East for 19.05 feet back to the POINT OF BEGINNING. Said parcel contains 2.10 acres, more or less.

Specifically excluded from the Premises descried on this exhibit are coaches' offices. Also excluded are any and all computers, printers and all other office equipment, supplies, intellectual property, business files, confidential information, and personal matters of coaches and players.

48024601-Execution Version

EXHIBIT B-1

SURVEY OF THE REAL PROPERTY



48024601-Execution Version

**EXHIBIT C**

Specifically excluded from the Premises depicted on this Exhibit are coaches' offices, athletic training facilities, storage facilities, locker rooms and weight rooms. Also excluded are all computers, printers and all other office equipment, supplies, intellectual property, business files, confidential information and personal matters of coaches and players.

48024601-Execution Version

Southern Miss Campus Map        *EXHIBIT "C"*



W 4th St

W 4th St

W 4th St

Accreditation (http://www.usm.edu/about/accreditation)  |  Contact (http://www.usm.edu/contact)  |  Employment (http://www.usm.edu/employment-hr)  |  Privacy & Legal (http://www.usm.edu/about/privacy)

©2013 The University of Southern Mississippi. All rights reserved. | 601.266.1000 (tel:601.266.1000) | AA/EOE/ADAI

Pride Field

The University of Southern Mississippi

Reed Green Coliseum

Payne Center

Fraternity Dr

Fraternity Dr

Kappa Sigma Fraternity House

Village Cir

Fraternity Dr

Southern Miss Outdoor Adventure Center

The Childrens Center For Communication...

Research Dr

Coliseum (Reed Green Coliseum and Parking).
May also use Baseball Park parking.

**EXHIBIT D**

The portion of the Premises depicted on this exhibit includes all of M.M. Roberts Stadium, except private suites, press box, locker rooms, storage facilities, unused former dormitory space and office space. Also excluded are all computers, printers and all other office equipment, supplies, intellectual property, business files, confidential information and personal matters of coaches and players.

18

Southern Miss Campus Map

EXHIBIT "D"



Accreditation (http://www.usm.edu/about/accreditation)  |  Contact (http://www.usm.edu/contact)  |  Employment (http://www.usm.edu/employment/hr) (http://www.usm.edu/about/privacy)

©2013 The University of Southern Mississippi. All rights reserved.  |  601.266.1000 (tel:601.266.1000) | AA/EOE/ADAI

 Stadium (M.M. Roberts Stadium and Parking)

**EXHIBIT E**

Specifically excluded from the Premises depicted on this exhibit are suites, locker rooms and press box.  Also excluded are all computers, printers and all other office equipment, supplies, intellectual property, business files, confidential information, personal matters of coaches and players.

19

48024601-Execution Version

Southern Miss Campus Map          EXHIBIT E





Baseball Park (Pete Taylor Park and Parking).
Parking may also include Coliseum parking.

# EXHIBIT 9



No SIM

11:25 AM

58%

Brett

BF









and home lockers yet to build and Warren Hood is donating any lumber. If someone would build them on there spare time. Poncho mentioned the prison industry possibly as a builder. The architects can provide all specs

Let me get on it. Turkey hunting in Nebraska. Will be back

iMessage







EXHIBIT 10







