## IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
### FIRST JUDICIAL DISTRICT

**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES**                    **PLAINTIFF**

**VS.**                                        **CASE NO. 25CI1:22-cv-00286-EFP**

**MISSISSIPPI COMMUNITY EDUCATION CENTER, INC., et al**        **DEFENDANTS**

### PLAINTIFF MDHS'S RESPONSE TO
### DEFENDANT BRETT FAVRE'S MOTION TO DISMISS

Plaintiff Mississippi Department of Human Services respectfully submits the following response to Defendant Brett Lorenzo Favre's Motion to Dismiss and Incorporated Memorandum [Doc. 264] ("Favre Motion"):

### INTRODUCTION

Favre's submission is not a motion to dismiss; it is a long press release. Rather than base his motion on the actual allegations of MDHS's First Amended Complaint, Favre spends 17 pages reciting his version of the "facts." Regardless, this cannot be considered on a motion to dismiss, nor can Favre's 355 pages of inadmissible exhibits. Favre seeks to create his own inaccurate narrative because the First Amended Complaint properly states claims against him, and he can offer no cogent legal reason why those claims should be dismissed. The Court should disregard Favre's diatribe and inadmissible exhibits and, based on the well-pleaded allegations of the First Amended Complaint, deny his Motion to Dismiss.

### STANDARD OF REVIEW

"Mississippi is a 'notice-pleadings' state; fact pleadings are not required." *White v. Jernigan Copeland Attys., PLLC*, 346 So. 3d 887, 898 (Miss. 2022) (citing *City of Meridian v. $104,960.00 U.S. Currency*, 231 So. 3d 972, 975 (Miss. 2017)). Under the notice-pleading standard, "the plaintiff is not required to plead the specific wrongful conduct. At the pleading stage,

he is required only to place the defendant on reasonable notice of the claims against it and to demonstrate that he has alleged a recognized cause of action upon which, under some set of fact, he might prevail." *White*, 346 So. 3d at 898 (cleaned up). A motion to dismiss is proper only if there are "**no set of facts that would allow the plaintiff to prevail**." *City of Meridian*, 231 So. 3d at 974 (emphasis added) (quoting *J.B. Hunt Transp., Inc. v. Forrest Gen. Hosp.*, 34 So. 3d 1171, 1173 (Miss. 2010)).

The Court cannot consider matters outside the pleadings without converting Favre's motion to dismiss to one for summary judgment. *See* Miss. R. Civ. P. 12(b); *Jourdan River Estates, LLC v. Favre*, 212 So. 3d 800, 803 (Miss. 2015) ("Whenever a trial judge considers matters outside the pleadings, the Rule 12(b)(6) motion to dismiss must be converted into one for summary judgment…"). MDHS will not waive its right to discovery in this case, and it does not consent to the Court's considering matters outside the pleadings. MDHS moves the Court to strike all of Favre's exhibits and objects to conversion to summary judgment.

If the Court converts Favre's motion to one for summary judgment, MDHS asks that the Court give the parties notice prior to the hearing of this matter. Out of an abundance of caution, and without waiver of its position that no matters outside the pleadings should be considered, MDHS *conditionally* offers its own exhibits submitted in support of its opposition, along with its Rule 56(f) affidavit, demonstrating what further discovery is necessary for MDHS to fully oppose a motion for summary judgment. If the Court does not convert Favre's motion to one for summary judgment—and it should *not* do so at this stage of the litigation—then MDHS withdraws its exhibits and asks that they not be considered in denying Favre's motion to dismiss.

#101012587v4

## FACTUAL BACKGROUND

**I.     Allegations of the First Amended Complaint**

The following factual allegations are quoted verbatim from the First Amended Complaint but reformatted into paragraphs. Allegations not directly related to Favre have been omitted.

**A.     Brett Favre and the USM Athletic Foundation**

Brett Favre is an alumnus of the University of Southern Mississippi ("USM"). First Amended Complaint, ¶ 83. His daughter played volleyball at USM. *Id*. In April 2017, Brett Favre made a handshake deal with the USM Athletic Foundation (the "Foundation"), in which he committed to personally guarantee the funds necessary for the brick-and-mortar construction of a volleyball facility. *Id.* at ¶ 84. In furtherance of this agreement, Favre contributed $150,000 worth of autographed materials for the Foundation to auction to go toward the construction of the volleyball facility. *Id.* Favre solicited his connections from his time as a quarterback for the Green Bay Packers to contribute to the construction of the volleyball facility, and obtained a few donations from the Kohler family and others. *Id.* at ¶ 85. Favre, however, was unable to convince his friends and connections to donate enough money to meet his obligation to fund the construction of the volleyball facility, and he did not want to pay the costs out of his own pocket. *Id.*

Favre met with Nancy New in July 2017 to discuss funding for the volleyball facility. *Id.* at ¶ 86. Nancy New sat on the Board of Directors of the Foundation, as did Brett Favre. *Id.* On July 24, 2017, Brett Favre, Teddy DiBiase, Nancy New, John Davis, MDHS Deputy Executive Director Garrig Shields, and then-USM Athletic Director Jon Gilbert met to discuss MDHS's funding of the volleyball facility's construction. Jon Gilbert also sat on the Board of Directors of the Foundation. *Id.* at ¶ 87. At this July 24, 2017, meeting, John Davis suggested that MDHS could provide $4 million in funding for the construction of the volleyball facility. *Id.*

3

John Davis discussed his plan to "do good things for USM" and "give them 4 mil" with Christi Webb and Nancy New, both of whom enthusiastically agreed. *Id.* at ¶ 88. John Davis suggested that Nancy New tell Jon Gilbert that the facility should be named after Favre. *Id.* The Foundation told Brett Favre that they were "very leary [sic] of accepting such a large grant," and suggested "trying to find a way for John [Davis] to allocate money to an entity that could then give to us that would pay for brick and mortar." *Id.* at ¶ 89. Brett Favre also told Nancy New he "passed [this] same info[rmation] to John [Davis] and of course he [John Davis] sent back we will find a way to make it work." *Id.* at ¶ 90. John Davis, the Foundation, Nancy New, and Brett Favre all understood that grant funds provided by MDHS could not be used for brick-and-mortar construction. *Id.*

Despite the Foundation's expressing worries about "rais[ing] negative concerns" and being "scared to death," Brett Favre urged Nancy New that it was necessary for the Foundation to "utilize you guys [John Davis and Nancy New] in every way." *Id.* at ¶ 91. The Foundation, Nancy New, Zachary New, and Brett Favre all agreed for John Davis to direct funds to MCEC so that MCEC could provide the funds to the Foundation under the guise of a "sublease" which was in fact intended to finance the brick-and-mortar construction of the volleyball facility. *Id.* at ¶ 92.

Leigh Breal, then-President of the Foundation, executed a Sublease of the as-yet constructed volleyball facility between the USM Athletic Foundation and MCEC. *Id.* at ¶ 98. The volleyball facility was not complete until December 2019, some two years after the full payment of "rent" by MCEC. *Id.* at ¶ 101. The Sublease purported to lease access to other USM facilities to MCEC until such time as the volleyball facility was complete, yet MCEC only used a facility once over the five-year lease term. *Id.* The final construction costs of the volleyball facility exceeded the initial $5 million construction estimate, in part because of Brett Favre's insistence

that construction include a beach volleyball facility adjacent to the indoor volleyball facility. *Id.* at ¶ 101.

Because Brett Favre was unwilling to satisfy the difference with his own funds, Favre sought additional grant funds from Nancy New to finance the volleyball facility. *Id.* at ¶ 102. Nancy New and Favre agreed for MCEC to make payments on Favre's behalf to the USM Athletic Foundation, in exchange for a vague, illusory promise that Favre make appearances or record PSAs. *Id.* Favre knew that this was a sham designed to allow MDHS to cover Favre's commitment to fund construction of the volleyball facility. *Id.* at ¶ 103. Therefore, Favre expressed to Nancy New concern that the media never discover the source of these payments on his behalf. *Id.*

MCEC paid Favre $1.1 million in TANF grant funds supposedly as compensation for Favre's recording radio advertisements or making speeches or appearances on behalf of MCEC and FRC. *Id.* at ¶ 104. Favre possibly recorded a single twenty-second radio advertisement. *Id.* In 2020, Favre received a demand from the Office of State Auditor requiring the $1.1 million be repaid with interest. Recognizing that he had no right to payment for services never performed with funds designed for needy families, Favre repaid the $1.1 million to the State. *Id.* at ¶ 105. Favre has not, however, repaid the $5 million in TANF funds that he orchestrated for MCEC to pay to the Foundation to satisfy his personal guarantee to fund construction of the volleyball facility. *Id.* at ¶ 106.

Favre understood that the TANF Funds that MCEC paid to the Foundation were "grant funds" that were paid on his behalf. *Id.* at ¶ 107. Favre knew that John Davis was providing grant funds from MDHS to MCEC for construction of the volleyball facility, and he knew that MDHS is Mississippi's "welfare agency." *Id.* Favre discussed the source of the funding—MDHS—with

Jon Gilbert. *Id.* And Favre texted Jake Vanlandingham regarding Nancy New: "She has strong connections and **gave me 5 million for Vball facility via grant money**." *Id.* (emphasis added).

Zachary New, a current member of the Board of Directors of the Foundation, has pleaded guilty to defrauding MDHS with respect to payments made under the USM Athletic Foundation Sublease. *Id.* at ¶ 108.

**B.      Brett Favre and the Concussion Drug Company, Prevacus**

In late December 2018, Brett Favre was the largest individual outside investor and holder of corporate stock in Prevacus, Inc., a private, for-profit biotechnology corporation in which Favre had individually invested over $250,000. First Amended Complaint, ¶ 113. In December 2018, Prevacus was seeking investors to raise funds to pay for preliminary human trials of the concussion medicine it developed. Favre was committed to helping raise these funds and solicited professional athletes and celebrities to invest in Prevacus. *Id.* at ¶ 114.

In late December 2018, Brett Favre urged Jacob W. ("Jake") Vanlandingham, the Chief Executive Officer of Prevacus, to directly solicit Nancy New to use MDHS grant proceeds to invest in Prevacus stock, informing Vanlandingham that Nancy New had previously provided him $5 million in grant funds for the volleyball facility. *Id.* at ¶ 115. 116. On January 2, 2019, Favre hosted at his home in Lamar County, Mississippi, a meeting attended by Jake Vanlandingham, Nancy New, Zachary New, John Davis, and Ted M. DiBiase, Jr., for a sales pitch, delivered by Vanlandingham to the News and Davis, concerning a substantial stock investment in Prevacus. *Id.* at ¶ 116.

All participants in the January 2, 2019 stock sales presentation at Favre's house, including Favre and Vanlandingham, knew that John Davis was attending as MDHS Director, and that Nancy New and Zachary New were attending as a grantee of government funds from MDHS. *Id.*

6

at ¶ 117. All participants in the January 2, 2019 stock sales presentation at Favre's house knew that governmental grant funds received by New and MCEC would fund any resulting investment in Prevacus. *Id.* at ¶ 118. Vanlandingham, Prevacus (acting through Vanlandingham as its CEO), and Favre agreed with Nancy New, Jesse New, and Zachary New that the three News would spend substantial MDHS grant funds to purchase stock in Prevacus, and later in its corporate affiliate, PreSolMD, Inc. (which, through its CEO Vanlandingham, also agreed to investments with government grant funds). *Id.* at ¶ 119.

As each of those parties knew, or should and would have known if they had exercised reasonable care, use of TANF funds to purchase stock in a private, for-profit company was inconsistent with the pursuit of lawful TANF purposes (or with any other purpose of any grant funds received by MDHS from the United States Government), and was therefore an illegal transaction. *Id.* at ¶ 120. Favre, Vanlandingham, Prevacus, and PreSolMD, nevertheless agreed to act together, and with Nancy New, Zachary New, and Jesse New, for Nancy New and Zachary New to use TANF grant funds received from MDHS to invest substantial funds in ownership interests in both Prevacus and PreSolMD, in the personal names of Nancy New, Jesse New, Zachary New, and N3 Holdings, to the financial benefit of all six Defendants. *Id.* at ¶ 121.

As an overt act in pursuit of that agreement, Vanlandingham, Prevacus, and PreSolMD caused Nancy New and MCEC to enter a written contract with Prevacus, dated January 19, 2019, obligating MCEC to transfer $1.7 million in funds derived from MDHS to Prevacus to provide "development funding" to the for-profit Prevacus. *Id.* at ¶ 122. That same Agreement falsely pretended that the $1.7 million investment of MDHS-derived funds in Prevacus was for the purpose of securing "clinical trial sites" to be located within Mississippi to promote an experimental anti-concussion drug being developed by Prevacus. *Id.* at ¶ 123. That representation

7

of the purpose for investing $1.7 million of TANF funds into Prevacus and/or PreSolMD, was false. *Id.* at ¶ 124. The written Agreement was a sham, as it concealed the material fact that the actual purpose of the transaction was to financially benefit Nancy New, Zach New, Jesse New, Jacob Vanlandingham, Brett Favre, Prevacus and PreSolMD. Moreover, neither the purported purpose of the $1.7 million transfer of TANF funds to Prevacus, nor the actual purpose, had any relationship to the pursuit of lawful TANF purposes (as all of the agreeing Defendants knew). *Id.*

Nancy New and Zachary New have pleaded guilty to state crimes related to the fraudulent transfer of TANF funds to Prevacus and/or PreSolMD. *Id.* at ¶ 125.

## II.    Conditionally Offered Exhibits Outside the Pleadings

MDHS has not had the benefit of complete discovery. The documents it *has* received, however, support its claims. MDHS, therefore, sets forth the following facts demonstrated by its conditionally-offered exhibits. The Court should not consider these facts or the supporting exhibits unless it converts Favre's motion to one for summary judgment over MDHS's objection.

MDHS would note that although many of these emails and texts have already been filed in the docket of this case or cited in newspaper articles, Favre chose not to address any of the evidence cited below in his Motion. MDHS would also note that Favre has, as of this date, served no discovery on MDHS. MDHS has no outstanding obligation to provide Favre with any documents. Regardless, the following evidence demonstrates that MDHS based the allegations of its First Amended Complaint on a good faith, reasonable belief in the veracity of those allegations.

MDHS expects to discover further facts to support its allegations. *See* Exhibit "A," Rule 56(f) Affidavit. MDHS has been unable to obtain any discovery from John Davis, and it has not yet served subpoenas on all third-party witnesses with knowledge of the above allegations. Nor has it obtained Favre's financial records. *Id.* Favre objected to most of the discovery MDHS served

upon him as unduly burdensome, and MDHS received only 22 documents from him. *Id.* Finally, MDHS has not yet taken any depositions, and the depositions of Favre, New, Davis, Vanlandingham, Jon Gilbert, Eric James, and others, will be probative of the allegations against Favre. *Id.*

### A.     The Volleyball Facility

As of April 5, 2017, the USM Athletic Foundation was "in discussions" regarding a volleyball facility. *See* Exhibit "B," USM Athletic Foundation Minutes and D. Feig Letter. On April 7, 2017, Daniel Feig (USM Executive Associate Athletic Director) sent a letter to a consultant at Cardinal Advisors about preparing an Operational Report.[1] *Id.* Feig reported, "We are currently working with a donor on the funding of a stand-alone volleyball facility…Over the next few weeks, we will select a site on campus for the facility and attempt to get a clearer understanding from the donor as to his level of financial support for the facility." *Id.*

On July 24, 2017, a meeting took place at USM; in attendance were "Favre, John Davis, Teddy DiBiase, Nancy New, USM Athletic Staff and other MDHS and MCEC Officials." *See* MCEC's Memorandum in Support of Motion to Compel, pp. 1-2 [Doc. 132] and Exhibit 2 thereto [Doc. 131-2]. Favre's texts confirm the existence of this meeting, John Davis's presence there, and that MDHS funding, through MCEC, was discussed at this meeting: Favre wrote to New, "Nancy thank you again!! John mentioned 4 million and not sure if I heard him right. Very big deal and can't thank you enough." *See* MCEC's Motion to Compel, Ex. 3 [Doc. 131-3].

Favre did not sign a written pledge to fund the volleyball facility's construction until 2018. But the President of USM, Dr. Rodney Bennett, years later told then-Governor Bryant that Favre had "personally guaranteed the [volleyball] project, and **on his word and handshake we**

---

[1] The Athletic Foundation produced this letter.

proceeded." *See* Bryant Response to Motion to Compel, Exhibit 41 [Doc. 140-41]. The project *proceeded* in 2017. *See* Exhibit "C," BLF0000011 (noting that by July 2017, the Foundation had already hired architects to design plans). Therefore, this statement, combined with the Athletic Foundation's records of discussions with a donor on the funding of a stand-alone volleyball facility, support the reasonable inference that Favre personally committed to guarantee the volleyball facility's construction at the outset of the project.

This inference is bolstered by Favre's repeated boasts in 2017 that he was personally responsible for building the volleyball facility. He told then-Governor Bryant, "**Deanna[2] and I are building a volleyball facility** on campus and I need your influence somehow to get donations and or sponsorships." *See* Bryant's Response to Motion to Compel, Exhibit 4 [Doc. 140-4] (emphasis added). Favre told someone else, "Deanna and I wanted to do something for Southern Miss so **we decided to build a Vball facility** on campus…" *See* Exhibit "D," USMAF_001917 – USMAF_001918. In June 2017, a flooring vendor sent Favre an email with the subject line "information for the indoor volleyball complex you are working on." He wrote, "This is a lot of info…but I figured, **since you are building it**, you would want to know the details of a really important component – the surface!" *See* Exhibit "E," USMAF_001908 – USMAF_001910.

John Davis and Nancy New both believed that by giving the USM Athletic Foundation TANF funds, they were helping Brett Favre personally. Following their July 2017 meeting, Nancy New texted John Davis, "Brett is such a great guy and it's nice to help someone who does so much and could care less about getting any credit. He's pretty down to earth." *See* Exhibit "F," MCEC_00810704. Davis responded, "Oh, I agree that **we want to do something good for Brett**. If we are able to give them the 4 I think we should ask them to name [the volleyball facility] the

---

[2] "Deanna" refers to Mr. Favre's wife.

Brett Favre Center." *Id.* Favre also believed that he personally benefitted from MCEC's fraud: after MCEC illegally transferred the TANF funds to the USM Athletic Foundation, Favre said that Nancy New "gave **me** 5 million for Vball facility via grant money." Exhibit "G," Dec. 28, 2018 Favre & Vanlandingham Texts (emphasis added).[3]

Favre knew that the grant funds could not legally be used for "brick and mortar" construction. New told him about the grant, "While it won't pay for brick and mortar directly, we will write the proposal using the necessary terms that will allow us to use the money as needed." *See* Exhibit "H," MCEC_00940460. Favre wrote that the USM Athletic Director had "mention[ed] trying to find a way for John to allocate money to an entity that could then give to us that would pay for brick and mortar." MCEC's Reply, Ex. 2 [Doc. 148-2].

Favre knew that this transfer was illegal, but he encouraged the Athletic Foundation to accept it anyway. On July 26, 2017, he texted New, "Nancy I spoke with Jon Gilbert this evening and between you and I he is very Leary [sic] of accepting such a large grant. Got me very uneasy." *See* MCEC's Reply, Ex. 2 [Doc. 148-2]. Favre told New, "They are scared to death it seems." *See* MCEC's Reply, Ex. 7 [Doc. 148-7]. On July 29, 2017, Favre wrote to New, "It's obvious that you and John are tremendous assets for USM and in order for us to get ahead in the game we have to utilize you guys in every way." *See* MCEC's Reply, Ex. 6 [Doc. 148-6].

Afraid that the Foundation would reject the TANF money, Favre sought other ways to obtain the same money for the same purpose. On July 28, Favre and New discussed a contract for Favre to "record a few radio spots" and "whatever compensation could go to USM." *See* MCEC's

---

[3] The screen name "Cat Daddy" in Exhibit G (and other text message strings) is a reference to Vanlandingham.

Motion to Compel, Ex. 5 [Doc. 131-5]. New agreed and proposed a deal of "$500,000 and after Sept. we can renew." *Id.*

Favre asked, "Would this also solve the brick and mortar issue?" *See* Exhibit "I," MCEC _00940465. Again, Favre knew that grant funds could not be used for brick and mortar construction, but he sought to secretly obtain those funds for that purpose anyway. He asked, "Will the public perception be that I became a spokesperson for various state funded shelters, schools, homes, etc….and was compensated with state money? Or can we keep this confidential" *See* Exhibit "J," MCEC_00940467. He followed up with, "If you were to pay me is there anyway the media can find out where it came from and how much?" *See*  MCEC's Motion to Compel, Ex. 7 [Doc. 131-7]. New reassured him that it could not, but said, "I understand you being uneasy about that though. Let's see what happens on Monday with the conversation with some of the folks at Southern." *See* MCEC's Motion to Compel, Ex. 7 [Doc. 131-7].

Favre stayed abreast of the status of the MCEC "sublease" with the Foundation. New's texts with Favre state that Dr. Gordon Cannon (USM VP of Research) contacted her on August 10, 2017, to tell her "we are moving ahead to get this done" and again on August 19, 2017, to state, "meetings went well on accepting the money, etc. Next Wed. there is another meeting with MDHS attorney and USM to make sure all the wording is good before it goes to IHL Still keeping my fingers crossed. I still think it will happen." *See* MCEC's Motion to Compel, Ex. 8 and 9 [Doc. 131-8 & 131-9]. Favre responded that "Jon Gilbert [USM AD] said the same thing yesterday." *See* MCEC's Motion to Compel, Ex. 9 [Doc. 131-9].

Favre's goal—to obtain grant funds to build a volleyball facility—was plain. He told New, "My goal is for you and I to build what state and ole miss have or at least close." *See* Exhibit "K," MCEC _00940478. New responded, "I would so love to see that and John Davis wants that too.

He wants Southern to shine and even outshine others. I believe we can do it, if we can just get others to quit scratching their heads." *Id.*

After MCEC transferred the money to the USM Athletic Foundation, Favre was focused on getting even more money for the volleyball facility. He asked, "Nancy is it possible to have funding in the future? Similar to this year?" *Id.*  She responded, "Hey, yes but I am not sure we can pull the 5 mil again but I do think we will get more. What are you thinking and how much?" *See* Exhibit "L," Oct. 19 to Nov. 2, 2017 Favre & N. New Texts, at MCEC_00940483. He responded with plans about the beach volleyball facility. She told him, "Don't worry about the volleyball happening. You have pd. enough and now that we have the additional 5 million, we can get the additional 2-300 thousand. Thanks again." *Id.* New then wrote to Favre, "I want to make sure the present allocation that we will be dispersing to Southern in the near future is used as you have planned…I understand we will need to come up with more money but I want to make sure this money (4 mil) reaps volleyball facility." *Id.* at MCEC_00940484.

Then, without any contract, and without Favre having done an ounce of work, Nancy New just dropped off a check to Favre on December 27, 2017. He told her, "Nancy Santa came today and dropped some money off thank you my goodness thank you." Exhibit "M," MCEC_00940487. Finally, when the bids came in over budget, Favre told New, "Deanna and I are gonna cut a check for the difference to at least get started. To finish the inside will be more but can be paid the end of summer. You think we can get some through John once again?" Exhibit "N," MCEC_00940489.

New told Favre, "Hey Brett, I am making some progress on our money needs. What amount out of the whole loan that you signed would be most helpful right now? John and I may have a plan!!" Exhibit "O," MCEC_00940491.  Favre responded, "I only signed a guarantee for 1.4. I won't owe until the money that's there runs out, then I have to come up with the rest. Probably

about 6 months…So however you think we should proceed." *Id.* Nancy New told him, "good news. I have a little money for the 'project'--$500,000! Do you want me to send it Athletic Department or to your foundation?" *Id.* Favre responded, "I guess to the athletic dept. unless you think different. Thank you so much." *Id.* She assured him, "I am going to call Jon Gilbert or Daniel to make sure that the money we are sending tomorrow, the whole amount, will go toward the building." *Id.*

In 2019, Nancy New's funding from MDHS lessened, and Favre became panicked that he was going to be responsible for the remaining costs of construction of the volleyball facility. He told Jake Vanlandingham, "Nancy has been awesome to me and has paid 4.5 million for a 7 million dollar facility. And she said it was all gonna be taken care of until this morning. Suddenly she said I don't think I can do anymore. So now I am looking at a big payout." *See* Exhibit "P," July 16-17, 2019 Favre & Vanlandingham Texts. He told Governor Bryant: "**And I also paid for 3/4 Vball facility and the rest was a joint project with [Nancy New] and John [Davis] which was saving me 1.8 million.** I was informed today that she may not be able to fund her part. I and we need your help very badly Governor and sorry to even bring this up." *See* Bryant's Response to Motion to Compel, Exhibit 12 [Doc. 140-12].

MDHS looks forward to examining Favre's financial records to determine how he calculated his contributions to the volleyball facility as 75% of the cost, if he was not counting the $5 million MCEC sublease as part of that contribution. *See* Exhibit "A," Rule 56(f) Affidavit.

In short, Favre, rather than take personal responsibility for his part in the conspiracy to fraudulently transfer TANF funds for the volleyball facility, now asks the Court to believe that he just lied to everyone around him about being personally responsible for its construction. He knew that there were prohibitions on using the grant money for brick-and-mortar construction of the

facility, yet he pushed the Foundation and MDHS for MCEC to transfer those funds for that exact purpose—to save *him* money.

**B.     The For-Profit Concussion Drug Company**

Around the same time that Brett Favre was begging Nancy New to give grant money for construction of the volleyball facility, Favre was investing his personal funds into Prevacus, a start-up, for-profit drug company developing a drug to treat concussions. On June 6, 2017, he invested $70,000; on August 16, 2017, he invested $120,000; on August 31, 2017, he invested $50,000; on January 22, 2018, he invested $40,000; and on July 16, 2019, he invested $100,000. *See* Exhibit "Q," Prevacus Investor List at MDHS_00021563-64. As of 2019, he owned a total of 304,000 shares in the corporation, out of a total of 3,143,474 issued shares. *Id.*

The President of Prevacus, Jacob Vanlandingham, frequently texted with Favre and his friends about finding new investors and sources of funding. His goal was not altruistic: he was focused on making a profit. Vanlandingham predicted that eventually, "[W]e will have all the money needed to create a 4B a year drug and in 2-3 years collectively our stock will be worth over 100M." *See* Exhibit "R," Aug. 24, 2018 Favre & Vanlandingham Texts. Favre responded: "So hold on to our left one and hope and pray for the best and if they can get it to a certain point we start making money?" *Id.*

To get to that certain point, Favre told Vanlandingham to reach out to Nancy New: "Text Nancy and include me if you want and basically ask her if she can help with investors, grants or any other way possible. She has strong connections and **gave** **me** **5 million for Vball facility via grant money**. Offer her whatever you feel like." *See* Exhibit "G," Dec. 28, 2018 Favre & Vanlandingham Texts. Vanlandingham reached out to New. *See* Exhibit "S," Dec. 28, 2018 Vanlandingham & N. New Texts. After their conversation, Vanlandingham told Favre, "I'm going

to venture out on a limb and say of all the times you've helped me the key contact that gets us over the top will end up being Nancy New." *See* Exhibit "T," Dec. 29, 2018 Favre & Vanlandingham Texts.  Favre followed up with her: "Nancy thank you for talking to Jake. I'm gonna meet with y'all Wednesday. Don't know what I would do without you and John." *See* Exhibit "U," MCEC_00940500.

This was not just a favor Favre did for Vanlandingham.  Favre was persistent in making sure that Vanlandingham secured funding from New and John Davis. *See* Exhibit "V," Dec. 30, 2018 Favre & Vanlandingham Texts. And he told Vanlandingham, before their meeting with John Davis, "**I believe if it's possible she and John Davis would use federal grant money for Prevacus.**" *See id.*

Before the meeting, Favre told James and Vanlandingham, "They [John Davis and Nancy New] are going to do 750k and if at all possible they will do as much as possible." *See* Exhibit "W," Jan. 2, 2019 Favre & Vanlandingham Texts. He encouraged Vanlandingham to give New shares in Prevacus in return, asking repeatedly whether Vanlandingham had done so. *See* Exhibit "X," Dec. 30-31, 2018 & Jan. 14, 2019 Favre & Vanlandingham Texts.

In fact, Favre proposed rewarding John Davis—a public official—for securing federal grant funds for Prevacus: "This all works out we need to buy her and John Davis surprise him with a vehicle I thought maybe John Davis we could get him a raptor." *See id*. A "raptor" presumably refers to a Ford F-150 Raptor—a $75,000 truck.[4]

---

[4] https://tfltruck.com/2018/10/2019-ford-f150-raptor-limited-price/.

#101012587v4

## LEGAL ARGUMENT AND AUTHORITIES

**I.      The Complaint states a claim under the Uniform Fraudulent Transfer Act.**

Favre's argument displays a profound misunderstanding of Mississippi law and the Mississippi Uniform Fraudulent Transfer Act ("MUFTA"), Mississippi Code § 15-3-101.

First, MUFTA allows a "creditor" to bring a claim.  A "creditor" is an entity "with a claim," and a "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." MISS. CODE ANN. § 15-3-101(c).  "[T]he term 'is not limited to creditors holding claims against the debtor at the time of the transfer and includes creditors whose claims arise after the transfer occurs." *See* Jeffrey Barber, *Debtor-Creditor Relations*, ENCYCLOPEDIA OF MISS. LAW § 27:41 (citing MISS. CODE § 15-3-107(1)). In other words, the creditor's claim does not have to exist when the transfer takes place. MDHS alleged a current "debt due" from MCEC: a right to payment from MCEC, which has not yet been reduced to judgment and is disputed. *See* 1st Am. Compl., ¶ 297.  MDHS sufficiently pleaded it is a creditor of MCEC.

Second, MUFTA requires that MDHS plead (and eventually prove) that "the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of the debtor." Miss. Code Ann. § 15-3-107.  A "debtor" is "a person who is liable on a claim." MISS. CODE ANN. § 15-3-101(f).  MDHS has alleged that MCEC is liable on many claims, so MDHS has sufficiently alleged that MCEC is its debtor. *See* 1st Am. Compl, ¶¶ 368, 369.  And again, MDHS has alleged MCEC owes MDHS on these claims, so MDHS is a creditor. *Id.* Therefore, MDHS must plead that MCEC made a transfer with an actual intent to defraud MDHS.

Zachary New pleaded guilty to the following:

On or about April 8, 2019, Zachary New, while acting in concert with and/or aiding, abetting and assisting, or encouraging Nancy New, John Davis and others,

17

participated in a scheme to defraud the State of Mississippi by knowingly transferring, or causing to be transferred, $4,000,000.00 in TANF funds for the construction of a volleyball center at the University of Southern Mississippi, which was prohibited under the limited use guidelines of the grants from which the funds originated, and in furtherance of this scheme, acted with John Davis and others at their direction, to disguise the USM construction project as a 'lease' as a means of circumventing the limited purpose grant's strict prohibition against 'brick and mortar' construction projections in violation of Miss. Code Ann. 97-7-10.[5]

*See State v. New*, 25CI1:22-cr-00003-EP, Docket #7 (Hinds Co. Cir. Ct., April 22, 2022). MDHS pleaded the requisite actual fraudulent intent. *See* 1st Am. Compl., ¶ 108.

MUFTA does not allow a creditor to recover against the debtor who wrongfully transferred the funds; instead, it grants recovery against the first transferee or "the person for whose benefit the transfer is made." Miss. Code Ann. § 15-3-113(a).  MUFTA does not define "the person for whose benefit the transfer is made," nor does any Mississippi case law.

MDHS pleaded, both generally and specifically, that MCEC's transfer to the Athletic Foundation was to Favre's benefit.  MDHS alleged that Favre made a handshake deal to personally guarantee the funds necessary for the brick-and-mortar construction of a volleyball facility; that he did not want to pay the costs out of his own pocket; that he understood that the funds paid were "grant funds" that were paid on his behalf; and that he characterized MCEC's transfer to the Foundation as Nancy New's having given **him** $5 million of grant money for the volleyball facility. *See* 1st Am. Compl., ¶¶ 84, 102, 107. MDHS therefore specifically pleaded that Favre is a "person for whose benefit the transfer [was] made."

---

[5] Based on Nancy New's text messages with Favre, it appears that $4 million of the $5 million paid to the Athletic Foundation went to pay for repairs and maintenance to buildings other than the volleyball facility, which may explain the discrepancy in the amount to which Zach New pleaded guilty.

#101012587v4

### A.      Favre is the person for whose benefit the volleyball transfer was made.

Favre raises two arguments to claim that the volleyball transfer was not to his benefit.  First, he makes a factual argument that MDHS "made up" the alleged handshake deal, and he puts into the record exhibits demonstrating that Favre had not yet made a formal, written pledge when the deal was in place. *See* Favre Motion, p. 21. Favre's argument would not even be enough to obtain summary judgment, but it certainly fails on a motion to dismiss, where the Court must take the allegations of the First Amended Complaint as *true*. *See Tiger Prod. Co. v. Pace*, 353 So. 3d 429 (Miss. 2022) ("When considering a motion to dismiss, the allegations in the complaint must be taken as true and the motion should not be granted unless it appears beyond doubt that the plaintiff will be unable to prove any set of facts in support of his claim.").

If the Court pierces the pleadings—to which MDHS strongly objects—the evidence shows that at the outset of the volleyball project, Favre had some form of understanding with the Athletic Foundation that he would guarantee the construction costs. That is exactly what Rodney Bennett represented to Governor Bryant: that Favre had "personally guaranteed the [volleyball] project, and **on his word and handshake we proceeded**." *See* Bryant Response to Motion to Compel, Exhibit 41 [Doc. 140-41] (emphasis added).  Favre will argue that the text from Bennett to Bryant happened in 2019, after Favre had signed a written pledge in 2018 and after the $5 million in TANF funds were transferred in 2017. But Dr. Bennett told Governor Bryant that the Foundation had "*proceeded*" with the project based on Favre's commitment. The Foundation hired architects and solicited bids in 2017, before Favre ever signed the written pledge. *See* Exhibits "C" and "G." Taking Dr. Bennett's text in the light most favorable to the non-movant, the text supports the reasonable inference that Favre made some form of a personal guarantee at the beginning of the project in 2017.

Favre boasted that he and his wife were *personally* building the volleyball facility, and he represented that the $5 million in TANF funds were given **to him** and that Nancy New and John Davis had saved **him** money. *See* Bryant's Response to Motion to Compel, Exhibits 4 & 12 [Doc. 140-4 & 140-12]; *see also* Exhibits "D," "E," "G," "O." This evidence strongly supports the inference that Favre informally guaranteed the volleyball project at its outset and that, more importantly, the transfer was to his benefit. And none of this evidence has been hidden from Favre or the Court: many of these texts are in the public record as exhibits to motions filed by other Defendants. More fundamentally, they are Favre's own text messages. Yet Favre does not address with candor any of this evidence in his motion.

Second, Favre claims that for the transfer to have been to his benefit, MDHS had to plead facts showing that his "handshake deal" was enforceable under the Statute of Frauds. This is a red herring. There is *no* Mississippi case holding that a "benefit" under Section 15-3-113 must be the satisfaction of a legally enforceable obligation. Favre does not cite a single case holding as much; instead, he cites an irrelevant case, *Powertrain, Inc. v. Ma*, No. 1:11-cv-00105-GHD-DAS, 2014 U.S. Dist. LEXIS 110588 (N.D. Miss. Aug. 11, 2014). In *Powertrain*, the Court did not consider a fraudulent transfer claim; instead, it granted summary judgment on a breach of an oral "do no harm" agreement. *Id.* at *13. MDHS has not brought a breach of contract claim against Favre. *Powertrain* has nothing to do with MDHS's fraudulent transfer claim.

MDHS looked for any case, anywhere, holding that a "benefit" under the Uniform Fraudulent Transfer Act can only consist of the satisfaction of an obligation under a written contract enforceable under the Statute of Frauds. It found no such case. Instead, it found federal cases construing similar Bankruptcy Code language as allowing a court to "look through the form of a transaction and determine which entity actually benefitted from the transfer." *In re Compton*

20

*Corp.*, 831 F.2d 586, 595 (5th Cir. 1987), *on reh'g*, 835 F.2d 584 (5th Cir. 1988) (recognizing that "the entire purpose of the direct/indirect doctrine is to look through the form of a transaction and determine which entity actually benefitted from the transfer"); *see also Terry v. Meredith (In re Stephen S. Meredith, CPA, P.C.)*, 527 F.3d 372, 375-76 (4th Cir. 2008) (recognizing that "nothing in the text of § 550(a)(1) limits 'the entity for whose benefit' the transfer was made only to a debtor or guarantor and under some circumstances other persons will receive the benefit of a transfer from the bankrupt to a third party.").

Even if Favre could show that a benefit must be an enforceable contract, and even if he could show that the Statute of Frauds applies, it is an affirmative defense that Favre, not MDHS, bears the burden of pleading and proving. It is *not* apparent on the face of the First Amended Complaint that Favre's commitment to fund the volleyball facility was unenforceable.  *See Lagniappe Logistics, Inc. v. Buras*, 199 So. 3d 675, 679 (Miss. 2016) (affirming on interlocutory appeal denial of motion to dismiss).

MDHS is entitled to discovery on Favre's conversations with the Athletic Foundation and the basis for Bennett's and Favre's understanding of Favre's commitment. *See* Exhibit "A," Rule 56(f) Affidavit. Favre apparently anticipated that construction would take one year, and "the possibility of performance within fifteen months takes the contract out of the operation of the statute." *Morgan v. Jackson Ready-Mix Concrete*, 247 Miss. 863, 883, 157 So. 2d 772, 779 (1963); *see* Bryant Response to Motion to Compel, Exhibit 41 [Doc. 140-41] ("We want to start this summer and finish in a year or less."). And even if the Statute of Frauds applied, Favre nonetheless may have owed the Foundation based on promissory estoppel. *Sanders v. Dantzler,* 375 So. 2d 774, 776 (Miss. 1979).

In sum, the First Amended Complaint pleads that the fraudulent transfer of TANF funds for the construction of a volleyball facility was for Favre's benefit. The Court should not look outside the pleadings, but if it does, the evidence demonstrates MDHS's good-faith basis for its allegations. Favre fails to fulfill his obligation to support his argument with relevant authority, and there is no Mississippi case interpreting the word "benefit" in Miss. Code Ann. § 15-3-113 to mean an obligation under a written contract. Favre clearly thought that the fraudulent transfer benefitted him when, as MDHS pleaded, Favre said that Nancy New "**gave me 5 million for Vball facility via grant money**." *See* 1st Am. Compl., ¶ 197; Exhibit "G," Dec. 28, 2018 Favre & Vanlandingham Texts.

### B.      The Athletic Foundation is not the State.

Favre's second argument against MDHS's fraudulent transfer claim is equally misguided. He claims that the Athletic Foundation is, in actuality, the State, and therefore MDHS (a state entity) transferred funds to another state entity.  But Mississippi law has long held that university foundations are not public bodies.  "The foundations are not agencies or political subdivisions of the State of Mississippi, and the funds raised and collected by them are not public funds as defined by the statute until such time as they are paid over to the universities." Miss. A.G. Op., Bryant , Op. No. 98-0676, 1998 Miss. AG LEXIS 552, *6 (Nov. 6, 1998).  Even the Foundation has not claimed it is a State entity.  This argument fails on its face.

To be clear, MDHS has a claim against MCEC because MCEC owed a contractual and statutory duty to MDHS (*not* USM) to spend TANF funds on TANF purposes.  MCEC transferred TANF funds to the Athletic Foundation for a non-TANF purpose—the construction of a volleyball facility. MDHS did not obtain what it bargained for:  no TANF purposes were fulfilled. MDHS is

owed the misspent *money*, not a volleyball facility. MDHS still has a claim against MCEC, and Favre is still liable as the beneficiary of a fraudulent transfer.

### C.      MDHS properly pleaded MCEC's fraudulent intent.

Favre's third argument to dismiss the MUFTA claim is confused. He first claims MDHS must allege that MCEC engaged in transfers "'with the actual intent to hinder, delay or defraud any creditor' **of MCEC**." *See* Favre Motion, p. 24.  But then he claims, "MDHS must allege that the transfers were made with the actual intent to defraud, not MDHS itself, but the *creditors* **of MDHS**."  *Id.* (italics in original).  He got it right the first time: Miss. Code Ann. § 15-3-107 requires that MDHS allege that MCEC acted with an intent to defraud MCEC's creditors.  A creditor is a person with a claim against MCEC, so MDHS is MCEC's creditor.

MDHS can and did plausibly allege that MCEC acted with an intent to defraud MDHS, because Zach New pleaded guilty to just that. MDHS's pleading satisfies Mississippi's notice pleading standard. *See* 1st Am. Compl., ¶ 108. Whether this fraud was a secret and whether John Davis was a party to this fraud are legally irrelevant. So is whether Favre acted with fraudulent intent.  *See Crownover v. Crownover*, Civil Action No. DR:15-CV-132-AM-CW, 2018 U.S. Dist. LEXIS 237669, at *19 n.7 (W.D. Tex. Mar. 30, 2018) (applying Texas's version of the Uniform Fraudulent Transfer Act and noting that "transferees can be liable for the transfers even if there is no knowledge of the fraud.").

Favre's misunderstanding of MUFTA is no basis for dismissal.  The Court should find that MDHS states a fraudulent transfer claim against Favre.

### II.      The Complaint states a claim for civil conspiracy.

The First Amended Complaint states a claim against Favre with respect to the Athletic Foundation transfer *and* the Prevacus transfer. Favre claims that to be liable for conspiracy, he

must also have committed the underlying wrong. The Mississippi Supreme Court rejected this very argument in *Rex Distrib. Co. v. Anheuser-Busch, LLC*, 271 So. 3d 445, 455 (Miss. 2019).

There, Rex (a beer wholesaler) sued Anheuser-Busch (a beer supplier) for redirecting the sale of Rex's business to Mitchell (another beer wholesaler). *Id.* at 448. The Court found that Anheuser Busch violated the Beer Industry Fair Dealing Act, and Mitchell was liable for conspiracy to violate the Act. *Id.* at 455. Mitchell argued that there was no underlying tort; the Court held that a tort is not required and that Anheuser Busch's statutory violation was the underlying wrong. *Id.* Mitchell argued that *it* did not commit the statutory violation and therefore could not be liable for conspiracy. The Supreme Court characterized this argument as a "fundamental misstatement of the nature of a civil conspiracy—it exists as a cause of action to hold nonacting parties responsible." *Id.*

Here, Favre makes the same argument Rex did. He claims there must be an underlying actionable claim **against him** for MDHS to state a claim of conspiracy against him. Again, this is a "fundamental misstatement of the nature of a civil conspiracy." *Id.* MDHS states a claim against Favre's co-conspirators, the USM Athletic Foundation, John Davis, and MCEC (through its principals Nancy New and Zachary New) under Miss. Code Ann. §§§ 31-7-57(1), 43-1-27, and 43-17-1. Likewise, MDHS states a claim against Davis, Nancy New, Jacob Vanlandingham and Prevacus, under the same statutes. Just as Mitchell was liable as a co-conspirator for Anheuser-Busch's statutory violations, Favre is liable for his co-conspirator's statutory violations as well.

Favre cites *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178 (Miss. 2020), to argue that MDHS must have an actionable underlying claim *against him* to state a claim of conspiracy. *Yazaki* does not support his argument. There, the Attorney General sued nine manufacturers of automotive parts for Mississippi Consumer Protection Act violations, Mississippi Antitrust Act

violations, and civil conspiracy.  *Id.* at 1182.  The Supreme Court found that the State failed to state a claim for a statutory violation against **any** defendant, and therefore, the civil conspiracy claim was properly dismissed.  *Id.* at 1190.  For *Yazaki* to support Favre's argument, the Court would need to find that MDHS cannot state a claim against any of Favre's co-conspirators for the volleyball transfers or the Prevacus transfers.  Favre does not go so far as to argue that, nor can he, when Zach and Nancy New have pleaded guilty to defrauding the State with respect to both transfers.

Favre argues that the First Amended Complaint does not allege specific facts showing that Favre formed an agreement to do anything unlawful.  Not so. MDHS pleaded, "The Foundation, Nancy New, Zachary New, and Brett Favre all agreed for John Davis to direct funds to MCEC so that MCEC could provide the funds to the Foundation under the guise of a 'sublease' which was in fact intended to finance the brick-and-mortar construction of the volleyball facility."  1st Am. Compl. ¶ 91; *see also* ¶ 324. MDHS pleaded how this was unlawful. *Id.* at ¶ 58. And MDHS pleaded specific facts about how Favre expressed his agreement.  *Id.* at ¶¶ 82-112.  The same is true of Favre's Prevacus agreement. *Id.* at ¶¶ 113-126.

Under *Bradley v. Kelley Bros. Contractors, Inc.*, 117 So. 3d 331, 339 (Miss. App. 2013), MDHS does not need to plead or prove that Favre's agreement included knowledge and agreement to every detail of the scheme. "[A] n agreement between the parties must be established. But it need not extend to all details of the scheme and may be express, implied, or based on evidence of a course of conduct." *Id.* MDHS pleaded that Favre made two conspiratorial agreements, and facts from which those agreements can be implied based on evidence of a course of conduct.

Again, MDHS respectfully asks that the Court consider *no* evidence outside the pleadings in denying Favre's motion.  If the Court chooses otherwise, the Court should still deny Favre's

25

motion.  MDHS's conditionally-offered exhibits demonstrate at least his implied agreement with

New, Davis, and the Athletic Foundation on the volleyball facility, and New, Davis, and

Vanlandingham on Prevacus. The evidence shows that Favre knew that Davis and New were

distributing federal funds, and he was told over and over that others were uncomfortable or

questioning the use of these funds, but he did not care. He saw MDHS as a well to tap into every

time he needed more money, and he had no shame about asking New and Davis for money—so

long as the media did not find out. This is enough to demonstrate the basis for MDHS's allegations

of a conspiratorial agreement. MDHS expects discovery will fully flesh out the contours of Favre's

agreements.  *See* Exhibit "A," Rule 56(f) Affidavit.

Favre can argue to a jury that he was just ignorantly supporting his favorite causes—his

daughter's volleyball team and a for-profit drug company—and that he didn't mean to direct

federal grant money away from Mississippi's poorest citizens.  While he's at it, he can explain

why he planned on rewarding a public official with a $75,000 truck for the receipt of federal funds.

But he cannot obtain dismissal on the pleadings.

## III.    MDHS is not required to plead the tracing of TANF funds to state a claim.

Favre's argument that MDHS cannot prove that the funds in question were TANF funds is

a farce. The Court must take MDHS's allegations as true at the motion to dismiss stage.  *See Tiger*

*Prod. Co. v. Pace*, 353 So. 3d 429 (Miss. 2022). MDHS pleaded that the funds that went to the

USM Athletic Foundation were TANF funds. So, for that matter, did Zachary New, when he

pleaded guilty to fraud.  *See State v. New*, 25CI1:22-cr-00003-EP, Docket #7 (Hinds Co. Cir. Ct.,

April 22, 2022). MDHS is not required to plead more.

Favre attaches isolated portions of the State Auditor's single-purpose audit.  Had he

attached the entire audit, it would be clear that the State Auditor determined that the funds in

#101012587v4

question were TANF funds, and therefore, it is far from "legally impossible" that MDHS will be able to prove this. The State Auditor could do this by tracing the funds from MAGIC (the State online database of public funds) to MDHS's transfer of the funds to MCEC to MCEC's coding of the receipt and expenditure of the funds in its accounting software as TANF. That MCEC tried to obscure the source of the funds by improperly co-mingling funds in its bank accounts is no defense. The defendants cannot escape liability in this case by relying on MCEC's money laundering.

MDHS intends to designate an expert in forensic accounting to testify on the tracing of the funds. *See* Exhibit "A," Rule 56(f) Affidavit. At the motion to dismiss stage, however, Favre's argument and exhibits are misplaced.

**IV.    *In pari delicto* does not apply.**

The United States has identified MDHS as the victim of John Davis's fraud, not the perpetrator. *See USA v. Davis*, 3:22-cr-00104-CWR-FKB [Doc. 23], Plea Colloquy, Tr. at 3:17-23 ("THE COURT: Thank you, Mr. Fulcher. To the extent there are victims in this case, have they been notified of these proceedings? MR. FULCHER: Yes, sir. We have notified the – we've notified the Mississippi Department of Human Services' executive director, who's also present in the courtroom."). And Zach New pleaded guilty to "acting in concert with and/or aiding, abetting, assisting or encouraging **John Davis**," not MDHS. *See State v. New*, 25CI1:22-cr-00003-EP, Docket #7 (Hinds Co. Cir. Ct., April 22, 2022). Favre cites no Mississippi case in which a state entity victimized by an employee's fraud has been held responsible for that employee's fraud.

Under the Mississippi Tort Claims Act, no government entity can be liable for an employee's fraud or criminal offense. Miss. Code Ann. § 11-46-5(2). Even in breach of contract actions, government entities are not liable for an employee's unauthorized acts. This is one of the purposes of the well-established minutes rule: to prevent secret, unauthorized "side deals"—

corrupt or otherwise. Thus, in *Groundworx, LLC v. Blanton*, the Court refused to allow a wastewater company to enforce a side deal between certain "City representatives" to raise sewer rates, finding that those City officials had no authority to bind the City outside of record action on the minutes. 234 So. 3d 363, 370 (Miss. 2017). It would defy reason for MDHS to be immune for an employees' fraud when it is a *defendant*, but responsible when it is a *plaintiff*. The law is not so one-sided.

Corrupt public officials, acting outside their authority, cannot bind their government entity. *Richardson v. Canton Farm Equip., Inc.*, 608 So. 2d 1240 (Miss. 1992), makes this point clear. There, certain members of the Madison County Board of Supervisors "made hash" of the public bid laws and the minutes rule by awarding a lease-purchase contract for backhoes to the second lowest bidder six months *after* receiving the backhoes. *Id.* at 1246. The Court voided the contracts and held the individual supervisors *and* the winning bidder liable.[6] *Id.* at 1254; *see also Nichols v. Patterson*, 678 So. 2d 673, 676 (Miss. 1996) (holding Mayor liable for unauthorized purchases in suit brought by State Auditor); *Jackson v. Kirkland*, 276 So. 2d 654, 656 (Miss. 1973) (holding City of Jackson not bound by an illegally issued building permit); *Golding v. Salter,* 107 So. 2d 348, 356-57 (1958) (holding in favor of State Auditor on claims that trustees of public hospital gave unauthorized Christmas bonuses, "[t]hat a public officer entrusted with public funds has no right to give them away is a statement so obviously true and correct as to preclude the necessity for citation of many authorities.").

---

[6] The *Richardson* Court held that *if* the winning (second-lowest) bidder had acted in good-faith reliance on the Supervisor's actions, it had a remedy: an indemnity claim against the individual corrupt Supervisors—not the County. 608 So. 2d at 1255. Likewise, here, Favre can bring an indemnity claim against John Davis if he chooses, but he cannot thwart MDHS's recovery based on Davis's wrongful acts.

#101012587v4

These principles apply not only to municipal and county officials, but to state agency officials as well. In *Farrish Gravel Co. v. Mississippi State Highway Commission*, 458 So. 2d 1066, 1070 (Miss. 1984), Commissioners of the State Highway Commission attempted to retroactively delete a contractual clause that prohibited price adjustments for the cost of petroleum. The Court held that the attempted repeal was ineffective, because the Commissioners lacked the authority do so.  *Id.* at 1069-70 (quoting Miss. Const. art. 4, § 96). Just as the State Highway Commissioners could not constitutionally grant extra compensation to contractors, here John Davis could not authorize payment of any claim under any contract not authorized by law.  His attempts to do so are a nullity.

No public official is authorized to break the law. *See* Miss. Code Ann. § 31-7-57; *cf. In re Initiative Measure No. 65 v. Watson,* 338 So. 3d 599, 606-07 (Miss. 2021) ("Mississippi's government can only validly act in ways in which it has been given power to act by the people of Mississippi."). This bedrock principle has been applied in federal cases to bar estoppel arguments against the government.  For instance, in *Hicks v. Harris*, 606 F.2d 65, 68 (5th Cir. 1979), a lender sued the federal government for repayment of federally insured student loans.  The government refused to repay the loans, even though the federal Department of Education had stamped the loans as approved, because the lender had violated a federal regulation requiring a certificate of insurance before disbursal.  The lender claimed the government waived compliance with the regulation by stamping the loans approved.  The Court disagreed, holding that the government cannot be "bound nor estopped by the acts of their officers and agents in entering into an agreement or arrangement to do . . . what the law does not sanction or permit…" *Id.*  (quoting *Wilbur Nat'l Bank of Oneonta, N.Y.  v. U.S.*, 294 U.S. 120, 123-24 (1935)).

#101012587v4

As in *Hicks*, here John Davis had no power to bind MDHS to what the law does not permit. MDHS has specifically pleaded that John Davis, Garrig Shields, and Jacob Black violated § 31-7-57 by authorizing expenditures for an object not authorized by law. *See* 1st Am. Compl., ¶ 286-293. Their wrongdoing is not MDHS's wrongdoing, and MDHS cannot be barred from protecting the public interest as a result of their actions.[7]

**B.    As a matter of public policy, in pari delicto cannot apply to a government agency.**

None of Favre's cited cases consider an *in pari delicto* defense against a public body as plaintiff.  This is unsurprising, given that many defenses cannot be raised against the government. "The State enjoys certain procedural advantages in contrast to other litigants because it would often be impractical, impossible, and unjust on broad constitutional grounds to require the same standard of the State as an individual in all cases." *State ex rel. Pittman v. Griffin*, 450 So. 2d 426, 430-31 (Miss. 1984) (granting writ of prohibition to bar enforcement of contempt order against Attorney General).  Thus, "the State of Mississippi, because of the peculiar nature of its existence (for the benefit and welfare of all its citizens), occupies a different status from the ordinary litigant…" *Id.*

A government entity's different status means that not only do statutes of limitations not run against the State, but equitable defenses like laches, unclean hands, and estoppel also do not apply. *See* Miss. Const. Art. 4, § 104 (statute of limitations); *Hill v. Thompson*, 564 So. 2d 1, 14 (Miss. 1989) ("The principle that a governmental entity is not chargeable with the laches of its officials is also well settled."); *Love v. Robinson*, 161 Miss. 585, 593-94, 137 So. 499, 501 (1931) ("[T]he

---

[7]MDHS is not the only State entity with standing to recover misspent TANF funds, and Favre could make **no** *in pari delicto* argument against the State Auditor or the Attorney General—which makes ~~its~~ his argument a matter of form over substance. *See* MISS. CODE ANN. § 7-7-211(g) (authorizing State Auditor to sue on unpaid demands through Attorney General).

#101012587v4

reimbursement of public or quasi-public funds is not to be defeated by the private defense of the want of clean hands…"); *Jim Hood ex rel. Miss. v. Microsoft Corp.*, 2007 Miss. Trial Order LEXIS 1, *8-9 (Hinds Co. Ch. 2007) (Owens, J.) ("There is a significant question in the Court's mind as to what extent the doctrine of unclean hands would apply to the State. If it does apply, the Court feels it would take an extreme situation, which does not exist here."); *Rawls Springs Util. Dist. v. Novak*, 765 So. 2d 1288, 1292 (Miss. 2000) ("It is a 'well-established rule in Mississippi that the doctrine of equitable estoppel cannot be applied against the state or its counties where the acts of their officers were unauthorized.'"); *cf. Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60-61 (1984) ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined."). These cases recognize the injustice of punishing the citizenry for its public officials' misdeeds. Because *in pari delicto* is "an equitable, affirmative defense," *Mills v. Baker Donelson*, No. 3:18-CV-866-CWR-FKB, 2021 U.S. Dist. LEXIS 85656, at *24-25 (S.D. Miss. May 5, 2021), the same underlying principles apply here.

The United States Supreme Court has found *in pari delicto* inapplicable when it interferes with an important public purpose. For example, the Court rejected the defense in private antitrust actions, emphasizing "the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes." *Perma Life Mufflers, Inc. v. Int'l Parts Corp.,* 392 U.S. 134, 138 (1968), *overruled on other grounds*, *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)). The Supreme Court reached a similar conclusion in *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 315 (1985). There, the Court considered a circuit split on whether *in pari delicto* applied to private securities fraud cases based on insider trading. *Id.* at

305. The Court held that *in pari delicto* could be available in certain cases, but should be denied on the facts of that case. *Id.* at 315.

Favre cites *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185 (5th Cir. 2013), a case in which the Fifth Circuit denied an *in pari delicto* defense against a court-appointed receiver. Judge Reeves recently did the same in *Mills v. Baker*, No. 3:18-CV-866-CWR-FKB, 2021 U.S. Dist. LEXIS 85656 (S.D. Miss. May 5, 2021), reasoning that because the Receiver's purpose was to recover funds for innocent investors, *in pari delicto* would thwart the purpose of the receivership. *Id.*

Similarly, here MDHS, as a state agency, holds public funds in trust and acts for the benefit of innocent citizens. Therefore, public policy buttresses disallowance of an *in pari delicto* defense. To do otherwise would interfere with the important public purpose of MDHS's statutory right to recover misspent welfare funds under § 43-1-27: protection of the public purse. The public should not suffer more for John Davis and his co-conspirators' wrongdoing. MDHS therefore asks that the Court reject Favre's *in pari delicto* defense.

<u>**CONCLUSION**</u>

MDHS carefully and thoroughly pleaded facts in the First Amended Complaint that are more than sufficient to state a claim against Favre under Mississippi's notice-pleading standard. MDHS did not do so to harass Favre, and it did not fabricate those allegations; it based them on the mountain of text messages that came to light after the original complaint was filed. MDHS expects to develop further facts in discovery.

MDHS asks that the Court strike Favre's exhibits, consider his motion only on the pleadings, and deny the motion. If the Court nevertheless converts Favre's motion to one for summary judgment, MDHS asks that summary judgment be denied, because it has come forward

#101012587v4

with facts demonstrating the basis for its allegations, and it has not yet had the opportunity to

discover all facts related to its claims.

This the 13th day of March, 2023.

Respectfully submitted,

MISSISSIPPI DEPARTMENT OF HUMAN
SERVICES

By Its Attorneys,
JONES WALKER LLP

By:*/s/ Kaytie M. Pickett*_____
    KAYTIE M. PICKETT

Adam Stone, Bar No. 10412
Kaytie M. Pickett, Bar No. 103202
Clarence Webster III, Bar No. 102111
JONES WALKER LLP
190 East Capitol Street, Suite 800 (39201)
Post Office Box 427
Jackson, Mississippi 39205-0427
Telephone (601) 709-3344
Telecopy (601) 949-4804
Email  astone@joneswalker.com
       kpickett@joneswalker.com
       cwebster@joneswalker.com

Stephen F. Schelver, Bar No. 101889
Special Assistant Attorney General
Office of the Attorney General
Civil Litigation Division
Post Office Box 220
Jackson, Mississippi 39205
Telephone: (601) 359-3680
Facsimile:  (601) 359-2003
Email   stephen.schelver@ago.gov

#101012587v4

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this date filed the foregoing with the Clerk of the Court using

the ECF system which sent notification of such filing to all counsel of record:

Dated: March 13, 2023.

*/s/ Kaytie M. Pickett*
KAYTIE M. PICKETT

#101012587v4

IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

MISSISSIPPI DEPARTMENT OF HUMAN SERVICES                    PLAINTIFF

VS.                                        CASE NO. 25CI1:22-cv-00286-EFP

MISSISSIPPI COMMUNITY EDUCATION CENTER, INC., et al        DEFENDANTS

### RULE 56(f) AFFIDAVIT

BEFORE ME, the undersigned authority, personally appeared, KAYTIE M. PICKETT, who after being first duly sworn in by me, states under oath as follows:

1.       My name is Kaytie M. Pickett.  I am counsel of record for Plaintiff Mississippi Department of Human Services ("MDHS").

2.       On February 10, 2023, Defendant Brett Lorenzo Favre ("Favre") filed his Motion to Dismiss (Docket 264) under Miss. R. Civ. P. 12(b)(6), to which he attached thirty-seven exhibits.

3.       MDHS opposes the conversion of Favre's Rule 12(b)(6) Motion to Dismiss to a Motion for Summary Judgment, and it therefore objects to the Court's consideration of any exhibits outside the pleadings.

4.       Out of an abundance of caution, in the event that the Court converts the motion to one for summary judgment over MDHS's objection, I submit the following reasons that MDHS cannot present facts by affidavit or other sworn testimony essential to justify MDHS's opposition to summary judgment.

5.       MDHS filed this action on May 9, 2022.  It served requests for production on a limited number of defendants, including Favre, and it issued a subpoena to the University of

EXHIBIT

A

1

Southern Mississippi Athletic Foundation.  Favre produced less than thirty documents in response to MDHS's requests for production.

6.      Defendants John Davis and Nancy New filed motions to stay discovery pending their sentencing, which MDHS opposed.

7.      Several Defendants have served discovery requests upon MDHS. Given the volume of documents at issue, it has taken substantial time to respond to those discovery requests.  Favre has served no discovery on MDHS.

8.      MDHS filed its Motion for Leave to file its First Amended Complaint on December 5, 2022.

9.      Defendants Heart of David, Ted Dibiase, Sr., Lobaki Foundation, Lobaki, Inc., Austin Smith, Paul Lacoste, Victory Sports Foundation, Will Longwitz, Inside Capitol, Jacob Vanlandingham, Prevacus, PresolMD, Nicholas Coughlin, NCC Ventures, MCEC, Nancy New, Zachary New, Jess New, Magnolia Strategies, New Learning Resources, N3 Holdings,  Williams Weiss Hester, USM Athletic Foundation, and Favre all filed motions to dismiss.

10.      MDHS intends to seek a discovery conference and a scheduling order once the twenty-four motions to dismiss have been fully briefed and heard and further intends to set the pending motions for stays of discovery for hearing as well, so that discovery can move forward in this case in an expeditious and orderly fashion.

11.      Given the status of the case, MDHS has not had sufficient time to permit counter-affidavits to be obtained, depositions of these affiants to be taken, or discovery to be had as is necessary to fully respond.  Accordingly, MDHS cannot fully oppose the motion at this time.

12.     Specifically, MDHS believes that it needs discovery through deposition, interrogatories, requests for production, or otherwise for at least the following items relevant to Favre's motion:

        A.     Testimony or interrogatory responses of Favre, Nancy New, Zach New, and the USM Athletic Foundation regarding each's understanding of the nature of Favre's commitment to the construction of the USM Athletic Foundation volleyball facility;

        B.     Testimony or interrogatory responses of Favre, Nancy New, and John Davis regarding communications with Favre regarding the prohibition on use of federal TANF funds on brick-and-mortar construction;

        C.     Testimony of third-party witnesses, including but not limited to Jon Gilbert, Daniel Feig, Leigh Breal, Rodney Bennett, Wier Boerner Allin, and others, regarding Favre's commitment to the construction of the USM Athletic Foundation volleyball facility and their communications with Favre regarding the same;

        D.     Testimony or interrogatory responses of John Davis and newly-added Defendants Jacob Black and Garrig Shields regarding communications with Favre regarding the funding of the construction of the volleyball facility;

        E.     Financial records of Favre and/or entities controlled or owned by Favre reflecting payments made to the USM Athletic Foundation, Prevacus, and PresolMD; any payments made or benefits given to John Davis or Nancy New; and payments received from MCEC or Nancy New;

        F.     Full and complete production of documents responsive to MDHS's discovery requests, including text messages;

        G.     Testimony or interrogatory responses of Favre, Jacob Vanlandingham, Nancy New, Zach New, and John Davis regarding the meeting at Favre's house regarding Prevacus;

        H.     Testimony of third-party witnesses Bobby Culumber, Eric "Poncho" James, James "Bus" Cook, Deanna Favre, and Breleigh Favre regarding communications with Favre relating to the construction and funding of the volleyball facility and the funding of Prevacus.

        I.     Such other matters as may be relevant to Favre's motion.

13.     MDHS further intends to designate a forensic accountant as an expert to testify in the area of forensic accounting.  MDHS cannot obtain a counter-affidavit because it has not yet retained a testifying forensic accountant expert.

3

14.     If the Court converts Favre's motion to one for summary judgment over MDHS's objection, postponement of a ruling will enable MDHS, by discovery or other means, to rebut Favre's allegations, by allowing it the opportunity for cross-examination and discovery into the issues identified above.

KAYTIE M. PICKETT

Sworn to and subscribed before me this the 13th day of March, 2023.

Notary Public

My Commission expires:

STATE OF MISSISSIPPI
VIRGINA A SISK
NOTARY PUBLIC
Rankin County
Commission Expires
November 16, 2025
COMMISSION NUMBER 122114

**EXHIBIT B**

**Department of Intercollegiate Athletics**

**Daniel Feig**

Executive Associate Athletic Director
118 College Drive #5017
Hattiesburg, MS 39406
Phone:   601.266.6586
Fax:      601.266.6191
daniel.feig@usm.edu

**www.southernmiss.com**

April 7, 2017

Mr. Tom Thomas
Cardinal Advisors LLC
2125 Butterfield Drive
Suite 300N
Troy, MI  48084

### *Re:  Operational Priorities for 2017*

Tom:

Thanks for your call this morning.  I look forward to working with you on an *Operations Report*.

As we discussed, I have summarized our top goals and priorities for 2017 in each of the areas you requested.  In addition, I have included a brief summary of our academic success as a second attachment to my email.

## Academics

**(1) Facility project**: We need to identify a location for a future academic facility.  We are reviewing several new locations across campus as potential sites and we are also considering renovating the current location.  Funding of the project is also a significant concern. The location and size of the facility will heavily impact cost.  Our goal is to have these questions answered within the next few months and hopefully move to a temporary space by the end of 2017 (and possibly as early as this summer).

**(2) Coach and staff support**: Our coaches and staff generally support our athletic academic staff and our mission of supporting our student-athletes to make sure they have all of the resources they need to thrive academically and ultimately graduate from the University.  We have a relatively new academic staff and we need to ensure they feel fully supported by our coaches and administrative staff, which will lead to student-athlete academic success.  Throughout 2017, our goal is that the academic staff would be increasingly supported by our staff, particularly among a few sports that have not performed as well academically recently.  My personal goal is to be a resource for the academic staff to make their job easier and to demonstrate that our administrative staff supports them.

USMAF_001759

**(3) Staff retention**: Our future academic success will be achieved by a number of factors, including the retention of our current Academic Director Kylie Amato, our Assistant Director, Rob Shillito, and many of the remaining staff members.  It is difficult to have consistent department-wide success academically if the academic staff is a revolving door of employees. Our success in this area will be heavily based upon the level of support we provide from our coaches and staff, as discussed above.  Similarly, it will be effected significantly by a change in facility.  Thus, while I anticipate the loss of one of our academic coordinators this summer, our goal is that we would not lose any more of our full-time academic staff until at least the summer of 2018.

**(4) Academic misconduct**: Across all of higher education inside and outside of collegiate athletics, academic misconduct is an extremely high risk for all departments and universities.  It is particularly high risk at Southern Miss because we are on probation from the NCAA for an academic misconduct case involving our former Men's Basketball coaching staff.  Our goal is to continue to stay on the cutting edge of policies and practices to ensure we do not have any NCAA infractions involving academic misconduct throughout the year.

**(5) Increased academic performance**: Given our modest staff size and our facility deficiencies, our student-athlete academic performance has been relatively strong.  However, with our new academic staff and possibly a new (temporary) space for the fall semester, our goal is to continue to increase our department-wide GPA from roughly a 2.8 to a 2.9 for the fall 2017 semester.

### Sports Medicine

**(1) Overall sports medicine policy manual**: Our *Sports Medicine Policy and Procedure Manual* was most recently thoroughly reviewed in 2015.  As such, in 2017, our goal is to reexamine our policies and procedures to make sure they continue to reflect a best practices model and we continue to provide our student-athletes with the best service and support, while minimizing risk to our department and University.

**(2) Concussion protocol**: Our 2017 Concussion Safety Protocol must be submitted to the NCAA by May 1, 2017.  We need to ensure our protocol is reviewed closely and any changes in the industry that have occurred over the last 12 months should be reflected in our protocol submission.  This is an area of extremely high risk across collegiate athletics and our goal is to avoid undertaking any unneeded risk by ensuring that we follow our protocol closely in every situation, regardless of the sport or student-athlete involved.

**(3) Drug testing policy**: With Jon's arrival, we need to undertake a thorough review of our current policy to make sure it is consistent with his vision and the best practices in the industry.  We last undertook a review two years ago and the landscape across the country appears to have shifted significantly during the intervening time.  Our goal is to review our policy and others across the country to ensure we continue to employ a best practices policy that is consistent with other institutions in our region.

USMAF_001760

USMAF_001759_0002

(**4) Clinical policies and procedures**: Our sports medicine policy manual does not include clinical policies and procedures as noted in our phone conversation of April 7, 2017. Our goal is to thoroughly review this area and ensure that we develop a comprehensive policy and procedure manual by the end of 2017 that will assist us in lessoning our risk.

(**5) Vivature**: During 2016, we began an enhanced partnership with Vivature. In the past, we had utilized Vivature's software to house our medical records only. In 2016, we began utilizing Vivature to also submit bills and collect payments for medical work undertaken by our athletic training staff. In 2017, our goal is to continue to learn the details of this system and to collect as many payments as possible, while remaining true to our mission and providing excellent service and support to our student-athletes and coaches.

## Compliance

(**1) Support of the Compliance Director and staff**: When I arrived at Southern Miss in September, 2013, my responsibility included running the compliance office, along with overseeing the academic office, strength and conditioning, athletic training, legal and sport supervision. In August, 2015, I was promoted to Executive Associate Athletic Director and I began to assist the Athletic Director with running the day-to-day operations of the athletic department. As a result, at that time, I began handing off more of the daily compliance responsibilities to our Director of Compliance, who did a great job. Unfortunately, that Director left USM during the summer of 2016 and we promoted Anthony Martinez into the Compliance Director position to run the day-to-day operations of the compliance office. Anthony has loads of potential and he has a great rapport with our coaches and administrators. After his promotion, we hired in a recent law school graduate to fill his old position. Our goal in 2017 is to provide additional support and strategic vision to Anthony and the compliance staff to ensure our compliance office is providing excellent service and support to our coaches, while avoiding any significant errors or mistakes.

(**2) Coach and staff support**: Similar to our academic staff, our coaches and staff generally support our compliance staff. In addition, we have significant support from the President, since this office directly reports to him. As is the case with any athletic compliance office across the country, in order to continue to be successful, this office needs significant support from our coaches and administrative staff in all facets of the operation. This is best achieved by developing a strong personal rapport with our coaches so that they "buy-in" to our vision. Our goal is that we continue to strengthen these relationships during 2017 so that our coaches and staff continue to come to us with questions and potential issues that can be solved before they become huge problems. Currently, we are planning on having our compliance office move from our academic center to our athletic administration building. This move will likely occur in the next month or two and it will help us achieve these goals by facilitating more personal interaction among these staff members on a daily basis.

(**3) Heightened scrutiny because of NCAA probation**: We need to continue to be extremely vigilant in our monitoring of our programs to ensure we do not intentionally or inadvertently violate NCAA rules. We are under heightened scrutiny because of our recent NCAA men's

USMAF_001761

USMAF_001759_0003

basketball case and a relatively recent men's tennis major infraction (for which we completed our probation in January, 2017). Our goal is to continue to follow the requirements of our probation, while following a best practices compliance model.

**(4) Financial aid**: During the fall of 2016, Southern Miss adopted an aggressive reduction in out-of-state tuition that will be implemented during the 2017-18 academic year. Because of some nuances in NCAA rules, although the out-of-state tuition cost dropped, out-of-state student-athletes receiving partial scholarships will actually need to receive significantly higher scholarship equivalencies in the future in order to stay whole and not lose money. We received a waiver from the NCAA for one year to implement this change. We need to make sure that we implement the waiver correctly during the 2017-18 year, and we need to make sure that our coaches plan accordingly for 2018-19 when the waiver will no longer be available. Similarly, many of our women's sports will receive Cost of Attendance scholarships for the first time during the 2017-18 academic year. Our goal with both of these financial aid issues is to ensure we implement the changes correctly and do not inadvertently violate any NCAA rules.

### Strength and Conditioning

**(1) New Director and staff restructuring**: We have a new Strength and Conditioning Director who we promoted recently. Similar to our new Compliance Director, this is his first job as a Director of a unit. As such, I want to be sure I support him as much as possible as he begins this new leadership role and takes on more responsibility than he has had in the past. Similarly, his promotion resulted in the hire of other new staff, and at least one of those new staff members is young and will need significant guidance and support. Our goal is support our new Director and help transition the new staff to Southern Miss so that we can ensure that we continue to provide first class strength and conditioning training to our student-athletes in a safe manner.

**(2) Staff certification and continuing education**: We have at least one new staff that is working on a comprehensive certification in strength and conditioning, though he currently has a valid certification in a lesser program. Similarly, we have a track assistant coach that likes to lead her own student-athletes in workouts that has the same valid, but lesser certification. We need to continue to ensure our staff is highly trained in the newest and safest strength and conditioning techniques in order to minimize our risk. Our goal is that all of our staff members that lead our student-athletes in workouts have a comprehensive certification in one of the best programs by the end of 2017 (while understanding that they must have at least the lesser certification in order to lead a workout with our students per NCAA rules).

**(3) Facility enhancements**: We are currently reviewing two graphics companies regarding the addition or graphics to the weight room (this is more thoroughly discussed below in the *Facility* section). In addition to graphics, we are reviewing the possibility of constructing a nutrition bar in the weight room. It is our goal to construct a nutrition bar in the weight room by the end of the summer before the football team reports for fall camp.

4

USMAF_001762

USMAF_001759_0004

## Legal

**(1) Title IX review**: The Office of Civil Rights (OCR) reviewed our department last year and we entered into a *Resolution Agreement* with them in October, 2016. As part of that *Agreement*, we are undertaking a review of our current program and support of women's athletics. In addition, we have undertaken a review of several possible sport additions. Our goal is to add a sport and announce it publically very soon. Throughout the remainder of 2017, we will work on all of the details needed to add a sport, including facility, personnel, funding, logistics, recruitment, etc.

**(2) Sexual harassment/relationship violence**: We have not had any training in this area during this academic year for our student-athletes. We had two in-person programs last year for our students and one for our staff. As an institution, Southern Miss requires all employees to have continuous online training in this area, as well as many others (*e.g.* Title IX, FERPA, workplace discrimination, etc.). As such, our staff has had online training and testing throughout this academic year. Our goal is to have this training, in-person, for our student-athletes each year. We should be able to have a speaker on this subject by the end of 2017, but it may be during the 2017-18 academic year.

**(3) M-Club lease**: We are working through a potential lease of our M-Club by an educational nonprofit group named Families First of Mississippi, which is operated by one of our alumni and donors. We are currently working through all issues with the University's General Counsel and the Athletic Foundation's counsel in order to ensure we do not take on any unnecessary risk with the lease. It is our goal to lease the space soon and use the money from the lease to fund a renovation of the space by the end of the summer or early fall, 2017.

**(4) Apparel and IMG-L contract/process**: We have several contractual negotiations that are either ongoing or we will be undertaking soon. Our contract with IMG-L is under review currently and it officially ends on June 30, 2017, unless it is renewed. Our apparel contract with Russell ends on June 30, 2018, but they have given us the authority to begin soliciting bids from other companies now. As such, our goal is to review these areas as closely as possible to ensure we make an informed decision regarding our future and we are able to negotiate the best deal possible for our department. All contracts of this nature are thoroughly reviewed by our General Counsel's Office prior to execution.

**(5) NCAA litigation**: There is various class action litigation that is ongoing nationally concerning collegiate athletics. The University is a member of several of the lawsuits by virtue of our FBS membership. Our goal is to ensure we continue to communicate and work with our General Counsel's Office to comply with all requirements of the litigation.

## Facilities

**(1) Academic center**: As noted above, we are planning to renovate either the current academic center or another space on campus very soon to serve as our academic center. This plan has been underway for several years. Our goal is to thoroughly research the possible locations on

USMAF_001763

USMAF_001759_0005

campus and select one very soon. As soon as a site is selected, we need to select an architect and a contractor to get the project underway. Depending upon the cost of facility and the site location, our goal would be to begin construction before the end of 2017. While the construction is ongoing, our goal is to find an alternative site on campus to house our academic programming, since the current location is not conducive to academic success.

**(2) Volleyball facility**: We are currently working with a donor on the funding of a stand-alone volleyball facility. We are also working with a potential architect on drawings of a potential facility. Over the next few weeks, we will select a site on campus for the facility and attempt to get a clearer understanding from the donor as to his level of financial support for the facility. Once we have a clearer understanding of his financial support, we will design a facility with the architect that is consistent with the funding he is providing. Our goal is to break ground on this facility by the end of the summer or early fall.

**(3) M-Club and nutrition area**: We are currently working on the potential renovation of an area known as the "M-Club," which is located in our athletic center. Primarily, this renovation will involve expanding the current kitchen area and completely redesigning its layout and functionality. In addition, the renovation will involve new furniture and flooring for the room, as well as possible graphics. The goal is to secure the funding for the space (as discussed above in the *Legal* section) and complete the renovation by the end of the summer or early fall of 2017.

**(4) Team room and weight room graphics**: We are working with two graphics companies to design and install new graphics in the team room and weight room. Both companies have been to campus over the last month and they are currently completing their bids to submit to the University for review. Our goal is to select a company over the next two weeks and have the graphics installed by the end of the fiscal year, which is June 30.

<u>Grant</u>

**(1) Staff hiring**: We were awarded a $1,500,000 grant to support student-athletes, primarily in the areas of academic support, nutrition, leadership, life skills acquisition, and career development. We have hired a Director for this program and she is hiring other staff members associated with the program. Our goal is to have all of the full-time positions hired in the next month to six weeks.

**(2) Grant funding extension**: The grant is currently funded for one year, and it expires on September 30, 2017. By rule, all grant funds must be expended by that date. As such, our goal is to obtain an extension from the awarding agency (The Mississippi Department of Human Services) over the next two weeks that would allow us to continue to spend the grant money through 2018.

**(3) Future grant funding**: In addition to obtaining an extension to spend the current funds over a longer period, we need to request additional funds for next year in the same amount that was awarded this year. We are trying to determine the earliest we can make such a request, but it

USMAF_001764

USMAF_001759_0006

appears it cannot be made until the next fiscal year, which begins July 1st. Our goal is to secure additional funds for next year (and the following year), as well as receive an extension to spend our current funds next year, so that we can plan our programming accordingly.

**(4) Grant programming**: Because we are currently hiring the grant staff, we have not been able to implement any grant programming to this date. The recently hired Learning Specialist will begin assisting our student-athletes very soon, but the remainder of these programs will not be implemented until the summer. Our goal is to have a summer bridge program for our student-athletes and local high school students by the second session of the University's summer academic calendar. Our goal is to have the remainder of the grant programming in place (*e.g.* Life skills, Career Development, Leadership Academy) in place by the end of the summer or beginning of the fall semester.

### Conclusion

I hope this submission meets with your expectation. If I have omitted any information, or need to resubmit this information in a different format, please let me know. I can be reached anytime by cell phone at 205-523-2370. I look forward to working with you.

Best regards,

Daniel Feig
Executive Associate Athletic Director
The University of Southern Mississippi

USMAF_001765

USMAF_001759_0007

**THE UNIVERSITY OF SOUTHERN MISSISSIPPI ATHLETIC FOUNDATION**
Board of Directors Meeting
Wednesday, April 5, 2017 · 4:00 P.M.
Ogletree House – Poynter Room

**Members Present:**       Grant Dyess, Jon Gilbert, Dr. Rodney Bennett, Dr. Dennis Phillips, Jim Warren, Wren Hood, Eric "Poncho" James, Dr. Nancy New, Dr. Cathy Sessums, Larry Davis,  Lisa McMahon, Corky Palmer, Bobby Dews, Spencer Adams, Richard Johnston, Bruce Rosengrant, and Larry Payne. Staff included Daniel Feig, Christi Holloway, Kent Hegenauer, Brian Morrison, and Austin Cox.

**Call to Order**                                                                                           Grant Dyess, President

The meeting was called to order at 4:05 p.m. by Grant Dyess.

**Review/Approval of Minutes**                                                                 Grant Dyess, President

- Grant Dyess reviewed the minutes from the previous Athletic Foundation Board of Directors Meeting. Jim Warren offered the motion to accept the minutes, seconded by Cathy Sessums. Motion passed.

**Financial and Audit**                                                                             Christi Holloway, CFO

A. Unaudited Financial Statements – February 28, 2017 and 2016
   - Our cash position 2/29/17 versus 2/28/16 is $385k higher. Pledges received are up by $1.7m. Total investments at this time in 2016 were down, investments have increase from this period in 2016 by $582k. Notes payable has increased over last year by $800k. Contributions for the first eight months of FY17 are $4.45m vs FY16 of $2.49m.  Program expenditures are higher but that is contributed to payments to the locker room vendors for that project.

B. Debt Obligations
   - Accrued interest payable is comprised mainly of the interest swap. Debt obligations have increased by $744k due to the locker room project and reflecting debt servicing of the baseball facility and a decrease in the interest rate swap. There is an annual pledge of $400k for the locker room debt service but an annual payment is due of $529k.

**Director of Athletics' Update**                                                                     Jon Gilbert, AD

- First six weeks have gone well.  Have held a Head Coaches meeting and an All Staff meeting.
- Working to develop a unified athletic department mission statement and also a new reporting structure with the ultimate goal of presenting an operating report to the President.
- Marketing department is designing a new website to be more customer engaging with a clear concise message.
- Developing a clear bag policy for our ticketed events.

- Compliance office is relocating to the Duff Athletic Center.
- Apparel contract – a RFP will be prepared this summer.
- Volleyball – in discussions regarding a facility.
- Softball conference championship will be hosted by USM May 10-13.
- Tennis teams are doing well.
- Track will have some team members who have NCAA finals potential.
- Baseball program is having a great season and the C-USA tournament will be held at Shuckers, May 24th – May 28th.

**Development Report**                                             Brian Morrison, Assoc. AD

- The development group has brought in eight Circle of Champion members this year. Eagle Club membership is ramping up with the renewal letters having been sent. There have been two significant facility gifts and a new endowment since the prior board meeting. Development is strategizing with the Alumni Association to maximize donor cultivation opportunities.
- Kendall Towe has joined the development staff.
- Circle of Champions trip is currently planned for November 4th in Knoxville, TN.

**Affiliation Reports**

A. USM Foundation – Bruce Rosengrant, Chief Development Officer
   - The main focus is on the upcoming capital campaign.  It is important to establish a vision for the entire University, so a case study will be done for every unit of the University. In preliminary findings, donor want the student's stories and successes told. There will be a silent phase of the campaign which is generally a two year period and should begin July, 2018.
   - Honor Club gala was a great success.

B. M-Club –Corky Palmer, President
   - Preparing for Letterman day at the Spring Game.
   - Ballots for Hall of Fame nominations will go out soon.

**Upcoming Events**

A. April 22: Football Spring Game
B. Athletic Foundation Board Dates Attached

**New Business**                                                  Grant Dyess, President

| From: | Brett <favre Redacted - Non-Responsive |
|---|---|
| Sent: | Sunday, July 16, 2017 10:21 PM |
| To: | Jon Gilbert <Jon.Gilbert@usm.edu> |
| Subject: | Re: Volleyball |

**EXHIBIT C**

Ok Jon thanks

Sent from my iPad

On Jul 16, 2017, at 5:24 PM, Jon Gilbert <Jon.Gilbert@usm.edu> wrote:

> FYI – will send you her contact info.
>
> Jon
>
> **Jon Gilbert**
> Director of Athletics
> **Office:** 601.266.5422  **Fax:** 601.266.6595
> **E-mail:** Jon.Gilbert@usm.edu
> <image001.png>
>
> ---
>
> **From:** Jon Gilbert
> **Sent:** Sunday, July 16, 2017 5:18 PM
> **To:** nnew@newsummitschool.com
> **Cc:** Jon Gilbert <Jon.Gilbert@usm.edu>
> **Subject:** Volleyball
>
> Nancy –
>
> It was a pleasure to see you this past week.
>
> Thank you for taking time to visit with Brian and I.
>
> Attached is a copy of the current design of the volleyball facility. We have not formally announced this project but expect to do so in the next week to ten days.
>
> We have hired Weir Boerner Allin out of Jackson as the architect.
>
> They facility will be plus/minus 25,000 square feet with an approximate cost of $4 million.
>
> Brett and Deanna have agreed to help with fundraising for the facility. We currently have $1.2 in hand from a variety of people that have committed to the project.
>
> I would expect to finalize the layout of the building in short order. Once that is complete, the architects will provide us with renderings that we can use when visiting with potential donors.
>
> Based on our discussion last week, we are interested in presenting this project as one that will benefit women student-athletes. We would be interested in presenting to anyone that you would think have interest in Southern and women's athletics.
>
> I will find out what Brett's schedule is Tuesday and coordinate a time he can stop by that works for

BLF0000011

everyone.

Thank you very much for your assistance.

Please let me know if you need any additional information at this time.

All the best –
Jon

**Jon Gilbert**
Director of Athletics
**Office:** 601.266.5422  **Fax:** 601.266.6595
**E-mail:** Jon.Gilbert@usm.edu
<image001.png>

-

---

—

<2917 USM Volleyball_FLOOR PLANS_29JUN2017.pdf>

**From:** Jon Gilbert <Jon.Gilbert@usm.edu>
**Sent:** Friday, June 30, 2017 2:53 PM CDT
**To:** Carroll Segui <carroll.segui@fedex.com>
**Subject:** FedEx - Southern Miss volleyball

> **EXHIBIT**
> **D**

Carroll -

Let's do Tuesday at 1 pm eastern.

Can you confirm? My cell is <span style="background-color:red">REDACTED</span>

All the best -
Jon


On Jun 30, 2017, at 2:02 PM, Carroll Segui <carroll.segui@fedex.com> wrote:

> Good Afternoon Jon,
>
> Patrick asked me to give you some options for a call the week of July 10 [th]:
>
> | | |
> |---|---|
> | Tuesday, July 11th: | 1:00pm – 4:00pm ET |
> | Wednesday, July 12[th]: | 1:00pm – 2:30pm ET |
> | Thursday, July 13th: | 2:30pm – 4:00pm ET |
> | Friday, July 14th: | 9:00am – 12:00pm ET |
>
> Just let me know what works with your schedule and I'm happy to send an invite with call information.
>
> Thanks,
> Carroll
>
> **Carroll Segui**
> Executive Assistant to
> Patrick Fitzgerald, SVP
> Marketing & Communications
> FedEx Services
>
> ---
>
> **From:** Jon Gilbert [mailto:Jon.Gilbert@usm.edu]
> **Sent:** Friday, June 30, 2017 8:02 AM
> **To:** Patrick Fitzgerald
> **Subject:** FedEx - Southern Miss volleyball
>
> Patrick –
>
> Thank you very much for your follow-up regarding the volleyball project at Southern Miss.
>
> I will be out of the office next week.
>
> Would it be possible to schedule a call the week of July 10-14[th]?
>
> Give me a few times and I will get back to you in short order.
>
> All the best –
> Jon
>
> **Jon Gilbert**
> Director of Athletics
> **Office:** 601.266.5422  **Fax:** 601.266.6595
> **E-mail:** Jon.Gilbert@usm.edu
> <image001.png>
>
> ---
>
> **From**

**From:** Patrick Fitzgerald <patrick_fitzgerald@fedex.com>
**Date:** June 29, 2017 at 12:35:56 PM CDT
**To:** "brett REDACTED < REDACTED >
**Subject: FedEx - Southern Miss volleyball**

Hi Brett:

I'm writing to follow-up on your message to Fred.  My name is Patrick Fitzgerald, SVP of Marketing for FedEx.  I have responsibility for FedEx sports marketing and sponsorships around the world.  I would love to hear more about your plans for the volleyball facility and possible FedEx support. While our budgets our largely already committed, I am interested in finding out if there is a way we can support the project.  While volleyball may not provide as much exposure as some other sports, we look for opportunities to broaden and diversify our sports portfolio, and we also look for opportunities to support Mississippi.

Please let me know if you or someone working on the project is available for a call to discuss further – possibly later next week – July 6 or 7?

Fred also asked me to send his regards.

Thanks
Patrick Fitzgerald
REDACTED

-----Original Message-----
From: brett favre [mailto:brett REDACTED
Sent: Friday, June 23, 2017 10:50 AM
To: Frederick W. Smith
Subject:

Hi Fred this is Brett Favre. Deanna and I wanted to do something for Southern Miss so we decided to build a Vball facility on campus and hope to start construction in October and finish in September 2018. Trying to raise money is tough and as of today 1.12 is in acct and roughly 2.8 is left to cover. I asked George to help me out and he gave me your email. I know there isn't a lot of exposure in volleyball but I thought I would ask anyway if you would consider sponsorship which the good news it's the first of its kind in country and is gonna be really awesome when done. Hey I know it's a long shot but worth trying. Hope all is well. Tell Cannon hi for me. He was with you the day we had lunch.

**From:** Jason Gibel <jgibel@usm.edu on behalf of REDACTED @usm.edu>
**Sent:** Wednesday, June 28, 2017 4:36 PM CDT
**To:** brett favre <REDACTED>
**CC:** Jamie Wier <jwier@wbaarchitecture.com>
**Subject:** information for the indoor volleyball complex you are working on

Got it.

Thank you.

Sent from my iPhone

On Jun 28, 2017, at 4:09 PM, brett favre REDACTED wrote:

EXHIBIT
E

Sent from my iPhone

Begin forwarded message:

> **From:** Dan Sawyer <dsawyer@brock-international.com>
> **Date:** June 28, 2017 at 4:05:55 PM CDT
> **To:** Brett Favre <REDACTED>
> **Subject: information for the indoor volleyball complex you are working on**
>
> Hi Brett,
> I have reached out to a few people to help provide input into your project. It appears that the coach may
> want a wood floor since other schools he may compete with have that same surface. It does appear
> that there is the opportunity to "soften" the hardwood floor if it is designated solely for volleyball. This
> is a lot of info, and probably more than you wanted, but I figured, since you are building it, you would
> want to know the details of a really important component - the surface!
>
> Here are some good contacts.
>  In terms of vendors, Robbins and Connor are the two most popular athletic maple flooring manufacturing
> that I am aware of.  Typically in the indoor market, the manufacturer is not as heavily involved in
> design, etc, but rather it is done through the local representative.
>
> Robbins - http://www.robbinsfloor.com/products/permanent-wood-floors-3/
> Connor - http://www.connorsports.com/hardwood
>
> In terms of representatives, the head of the indoor division of ASBA is a guy named Joe Covington out
> of Birmingham, AL.  He would be a great resource and is a really nice guy.  He is a Robbins distributor.
> (ASBA is American Sports Builders Association. Brock is a member and this is a good group.)
>
> If you would like, I could call Joe Covington and "seed him" on your project. Let me know.
> - Dan
>
> Here are the notes from a couple contacts I made:
>
> *Megan Buczynski is a designer in Boston, again another national designer primarily for collegiate level
> projects. This is what she shared with me:*
>
>  Here's what I was able to pull together for floors. Southern Mississippi belongs to Conference USA. All of
> this schools have hardwood floors in their arenas or volleyball venues. I couldn't find specifics about any
> of the systems, but this is what I could gather from pictures or what was on the facility's website.
>
>
>> UNC Charlotte: Volleyball plays in the arena along with basketball. The floor looks like a
>> temporary floor that gets installed during the seasons. It looks like volleyball lines are taped
>> down on the floor during volleyball season.
>>
>> Florida International University: It looks like they play on different courts throughout the
>> arena. Sometimes they play on the main floor which is the one painted like a beach,
>> sometimes they play on a different floor. I believe when they play on the main court the
>> lines are taped on.
>>
>> Florida Atlantic University: Volleyball plays in the main arena. The floor is permanent and

the lines appear to be permanent as well.

Louisiana Tech University: Volleyball plays in the main arena, the floor appears to be permanent and the lines are either taped on or temporarily painted during volleyball season.

Marshall University: Volleyball plays in the main basketball arena which has a permanent floor. The lines are either taped or temporarily painted during the season.

Middle Tennessee State University: They play in their own gymnasium. The court is lined for only volleyball.

University of North Texas: They have their own volleyball center, which is permanently lined for volleyball only.

Rice University: Volleyball is played in the main arena, which has temporary flooring but volleyball is either painted or taped lines during the season.

University of Alabama at Birmingham: Volleyball plays in the main area, the main floor is permanent, but it seems like they put down a temporary floor over the permanent floor for basketball. The main floor is lined for basketball, volleyball, and maybe a few secondary basketball courts, but volleyball has a thick border around the side and end lines like many basketball courts have now.

University of Texas at El Paso: They play in a specific facility that has been refinished to have volleyball as the main sport even though the gym is also lined for basketball.

University of Texas at San Antonio: Volleyball plays in the main arena, the floor is a permanent system and is permanently lined for volleyball.

Western Kentucky University: Volleyball plays in the main arena on the permanent flooring system but the lines are either taped or painted for the season.

Comparing the different types of sub flooring systems its seems like anchored wood floors are what is recommended for higher level play. While floating floors are more economical, they do not hold up against humidity as well as the anchored systems.  It seems that many of the of manufacturers of these systems can create costume floors to work with the specific conditions of the installation location. It also looks like almost all of the anchored systems include some sort of resilient pad, whether it is continue or individual pads already standard into their systems.

I'm having trouble finding any additional information on the pads themselves, but MFMA states that volleyball flooring can be a little softer than basketball flooring so if the pads can be tweaked to provide a little higher of a shock absorption number I think that would be in the school's best interest.

_Tom Shay is a national designer for sports venues:_

We have completed some indoor sports surface options evaluation work for a municipal client in NY and obtained advice and product information from Milburn Flooring Mills : http://www.milburnflooring.com/ for evaluation a wood floor vs a multi-sport rubber type surface (Point Elastic type which is seemingly more common for this type of flooring surface). We provided pros and cons, gathered costs, considered maintenance, etc. Our focus was a review on Robbins Sport Surfaces products. I can check internally related to what information we are able to pass along but I am unable to pass that detailed information along in its current form at this time.

2.  I became aware recently of an indoor court installer in All American Sports Group out of Canton, MA. You may be generally aware of them as they also install some synthetic turf (affiliated with AstroTurf) but I have come to learn their experience is primarily in indoor surfaces. I know that Eric Hughes is aware of them. I suspect that a conversation with Mike DiNatale could provide some information to you to consider from an installer's perspective. http://www.aasportsgroup.com/

3.  I'm assuming this project might be in Mississippi so I would imagine that there will be more local installers and providers for advice but I'd expect some good information can be obtained from the entities above if needed.

4.  I am aware of ASTM F2772 which might guide you guys for some selection criteria and testing, etc. for surface performance characteristics.

5.  I talked to my closest volleyball experts and got a 50-50 response, which I am predicting might be

USMAF_001909

common.

a.  My wife, who played college volleyball stated that she had a preference for wood floors (as opposed to the multi-sport rubber type floors) as they had less friction and it was easier to glide across them and they were less sticky. My wife also stated that the consistency amongst the different wood surfaces (various different places she played) and reduced friction of wood floors was preferable and more conducive to her style of play and that the consistency of wood floors across various venues was preferable. The multi-sport floors just played differently which affected her game.

b.  My sister (who was an all-state volleyball player in NY who went on to play basketball in college) stated the opposite, that she preferred the multi-sport rubber type floors in that they were softer, easier on her knees, she felt a little more bounce and energy return (energy restitution) that at least gave the perspective but probably actually gave her a little extra vertical. She felt the multi-sport floors were more forgiving/softer when diving. She stated that maintenance of the wood floors was critical in that gym floors that were resurfaced over the summers in time for fall volleyball season were preferred over those that weren't recently maintained, so maintenance was key aspect, and no surprise there.

c.  This feedback was pretty interesting to me, knowing what we do related to outdoor surfaces especially turf, in that there are obvious preferences for style of play, position played, consistency amongst the other types of courts that the athletes play on, a coaches preference, etc.. I'd imagine that there could be some happy medium for an engineered floor specific to Volleyball, or certainly better or best designed surface that addresses both styles of play and surface preferences noted above. I know energy restitution and vertical deformation can be dialed in with people with your type of experience in athletic surface and materials science.

6.  I wonder if the coach might want wood from a legacy perspective or coaching style but the players might appreciate a more forgiving surface. I know my wood floor days of playing basketball absolutely killed my knees and shins leaving it challenging to run and jump at practice the couple days after games and I'm figuring that was my sister's point as well. Engineering the surface in the right manner and putting some new thoughts behind that actual sport surface performance metrics, and not just a generic surface material  (wood vs. multi-sport rubber surface) seems appropriate and in-line with your teams abilities and know how. Not sure if this is where you are headed but I'd expect that a Brock underlayment could be designed into either a wood system or a multi-sport system as both require a resilient pad in the system to improve the surface performance. Note that there are options from Sport Court as one example that provide the polypropylene surface but with a wood look, if the wood look is what the coach prefers.

7.  Consider the fact for whether this is a volleyball only facility or a multi-sport surface. Seems it is focused on volleyball so maybe that is the answer.

8.  Lastly, I know that there are different types of wood for indoor sport flooring (i.e. hard maple vs hybrids, etc.) and they are going to have various different pros and cons such as durability, longevity, maintenance, sport performance aspects, etc. when evaluating holistically.

Dan Sawyer
Founder & CEO
REDACTED
www.brockusa.com

<Brock Logo New Color.jpg>

This email message is for the exclusive use of the intended recipient(s) and may contain confidential, privileged  and non-disclosable information. any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by replay email immediately and destroy and all copies of the message.

Messages - Jd2 & Christi Webb

EXHIBIT
F

Jd2

I agree. These pics are killing me. I'm way too ugly for all that.  I do appreciate you greatly.  Garrig and Zack will be talking with guy at USM tomorrow. Anxious to get that completed and get them moving. Want to make it a good thing. Something within me wants to do good things for USM.

Jd2

Did we work out a deal with Ted or do you need me to pay him?  I keep feeling like I'm forcing ideas on you all. Make sure to let me know.

Jd2

I am excited about potential at Oakley. It could be AWESOME if done right.

Good and thank you. Well, we both had good experiences there as college students  so those are good memories. Plus, Southern needs all the help they can get. Also, Brett is a great guy and it's nice to help someone who does so much and could care less about getting any credit. He's pretty down to earth. Thank you.

John, you were awesome today. You are a great speaker and motivator. Thank you.

Jd2

Oh, I agree we want to do something good for Brett. If we are able to give them the 4 I think we should ask for them to name the Brett Favre Center.

Christi, I am glad you made it home safely. Love both of you too death.

Jd2

Thank you for the compliment. I can sometimes be over the top speaking. I love people.

Christi Webb

We are going to get a contract for Ted. We are letting him give us some ideas on how much.  We will have it done in a few days.  Adam should be on. Oats aug 1.

I do too! He would be so surprised and humbled.

Christi Webb

JD, you did a great job speaking today.  The message was. Sry appropriate and the audience was really engaged!!!!!

MCEC_00810704

EXHIBIT

G

10-4. I'll try sills again
Status: Sent
Delivered: 12/28/2018 9:32:34 AM(UTC-5)

12/28/2018 9:32:33 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x450F4BE (Table: message, chat, Size: 189030400 bytes)

REDACTED Cat Daddy
What do you think of us mtg with the governor and some big southern miss boosters?
Status: Sent
Delivered: 12/28/2018 10:50:29 AM(UTC-5)

12/28/2018 10:50:27 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4514E41 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre
If he can pull it off then yes!!
Status: Read
Read: 12/28/2018 11:27:30 AM(UTC-5)

12/28/2018 11:24:49 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4514A73 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Brett Favre
Text Nancy and include me if you want and basically ask her if she can help with investors,grants or any other way possible. She has strong connections and gave me 5 million for Vball facility via grant money. Offer her whatever you feel like. She may can help but won't hurt to ask. Look her up. She has a facility called family first in Jackson
Attachments:



Size: 150
File name: Dr Nancy New.vcf
Dr Nancy New.vcf
Status: Read
Read: 12/28/2018 11:34:19 AM(UTC-5)

12/28/2018 11:30:30 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x45148A0 (Table: message, handle, chat, attachment, Size: 189030400 bytes)
Jake's Phone/var/mobile/Library/SMS/Attachments/55/05/7DDEAB32-0C8F-443D-8303-362107EEF439/Dr Nancy New.vcf :  (Size: 150 bytes)

REDACTED Cat Daddy
10-4. I'm on it!!!
Status: Sent
Delivered: 12/28/2018 11:34:48 AM(UTC-5)

12/28/2018 11:34:48 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x45143AB (Table: message, chat, Size: 189030400 bytes)



You are so welcome. This center will impact not just young college lives but their families, etc. Now a couple of us will get a proposal written using the goals and expected outcomes that will justify the money. While it won't pay for brick and mortar directly, we will write the proposal using the necessary terms that will allow us to use the money as needed.          You heard John right. He said 4 million or close to it. Bam! I am very excited but humbled, too that John is so open minded. We will get this done, if it's the good Lord's willing" as my sweet mama would say. I believe He wants us to do this!

2017-07-24 17:24:31



**2017-07-25 13:13:06**

Hey, look who we are visiting with! Million [ Man himself! He is dying to meet you.

2017-07-25 13:14:08

Wow. Love that guy!!!

Oh my, now John Davis said, which one? Ha. I told him you love him too.

2017-07-25 13:23:42

Both for sure

MCEC_00940460

**EXHIBIT
I**

2017-07-29 07:26:38

Excuse my football intelligence but what is MOA?😅

> Working agreement, , no big deal. We will send you one and you can adjust

2017-07-29 08:26:28

My biggest concern is time commitment so we can manage that I'm good

**2017-07-29 09:41:34**

> Please do not worry about your time commitment. We can only imagine how many directions you are pulled. Just a few things here and there, spread out, will be plenty.

2017-07-29 09:42:22

Ok great

**2017-07-31 04:57:05**

2017-07-31 04:57:05

Would this also solve the brick and mortar issue?

**EXHIBIT J**

I can have my my cpa talk with you and get a better understanding of this and go from there. Maybe the university will figure out some things as well. As long as we can use the money any way we choose somehow. Will the public perception be that I became a spokesperson for various state funded shelters,schools,homes etc..... and was compensated with state money? Or can we keep this confidential

It will be confidential that you are accepting payment. Totally.  Zach, my accountant, John Davis and I are the only ones that will have that information on this end.

2017-07-31 06:44:11

Ok perfect.  I'll send you my CPA Bobby Culumber cell if ok?

Great. I will be glad to talk to him.

2017-07-31 06:54:36

**2017-07-31 07:05:15**

Thanks

2017-07-31 07:11:02

So if we keep confidential where money came from as well as amount I think this is gonna work

MCEC_00940467

**EXHIBIT K**

2017-08-10 12:45:24

That would be so awesome. My goal is for you and I to build what state and ole miss have or at least close

I would so love to see that and John Davis wants that too. He wants Southern to shine and even outshine others. I believe we can do it, if we can just get others to quit scratching their heads.

2017-08-10 12:50:19

For sure

Honestly, John Davis is so exhausted with trying yo get Southern to accept funding like every other university is doing. He told me last night that he would say to hell with it but he gave you and Jon Gilbert his word. He does not want to talk yo them any more though and left it in my hands. So I hope they listened today.

I meant that he does not want to talk to the university folks as he started meeting and talking to them over a year ago about many funding opportunities.

2017-08-10 13:05:18

I hope they get it

MCEC_00940478

2017-10-19 07:36:54

Finally and thanks Nancy. I hope it's enough now. Jon said 500k has to go to renovations for reed green and another 500 to maintenances fund

# EXHIBIT L

2017-10-19 07:37:08

See ya next week😊

We will still fundraiser, etc. we will get the rest. Also, I thought Jon let you know but we had to postpone the 25th due to Dr. Bennett's request but I will get us another date.

2017-10-19 08:12:43

Ok😊

Also, in the next few days could I send you a draft proposal to do a couple of psa's, etc. for Families First.

2017-10-19 08:17:09

K good

**2017-10-26 17:12:34**

2017-10-26 17:12:34

Nancy is it possible to have funding in future? Similar to this year?

MCEC_00940483

Hey, yes but I am not sure we can pull the 5 mil again but I do think we will get more. What are you thinking and how much?

2017-10-26 17:43:50

we want to get beach vball up and running. is a lot of info but you will see it's not very c

I will take a look. I bet we can get it figured out.

2017-10-26 17:51:17

Ok thanks Nancy. Also I think we talked about it before but an indoor facility is next big project for us

Definitely.

Brett, I want to make sure the present allocation that we will be dispersing to Southern in the near future is used as you have planned. I know a million is already going to a couple of other projects but let's make sure we get the facility you had hoped for. Are we still on track with that? I understand we will need to come up with more money possibly but I want to make sure this money (4 mil) reaps volleyball facility. Let me know if anything has changed.

MCEC_00940484

2017-10-26 18:58:59

Nancy I think it is but time will tell. I was a little disgruntled when I was told a million is going elsewhere.

Yes, that was news to me as well. I really stretched by adding more to our first ask as I knew the building would take more. It always does so I thought I was giving us a little bonus room there. Well, I think we need to be very pro active in reviewing plans, etc. to make sure this project turns out to be the original main purpose, volleyball. Keep me posted if you see anything going in another direction.

Also, if we need to revise drawings to get the outside area first, let's consider that, too.

2017-10-26 18:48:21

I most certainly will and again Nancy thank you

Absolutely.

**2017-11-02 15:38:22**

1 of 2 texts—

2017-11-02 15:39:48

Not sure what they want to meet on. You said it plain and clear

MCEC_00940485

Please let me know how that meeting goes. I feel pretty confident that we can come up with an additional $220 plus for the beach volleyball as well

Not sure either but the main thing was about volleyball so that needs to happen.

2017-11-02 15:43:21

You know I will keep you updated

I saw the Gov last night. We will still plan the fundraiser as well when we can get another date from him that works with your time, too. Surely, Southern folks won't say to postpone it again. At any rate it's all going to work out.

2017-11-02 15:44:15

I'm ready 👍

Thanks. Don't worry about the volleyball happening. You have pd. enough and now that we have the additional 5 million, we can get the additional 2-300 thousand. Thanks again.

2017-11-02 16:51:21

Ok Nancy thank you



MCEC_00940486

**EXHIBIT M**

**2017-12-27 20:22:36**

2017-12-27 20:22:36

> Nancy Santa came today and dropped some money off😊😊 thank you my goodness thank you. We need to setup the promo for you soon. Your way to kind

> Yes, he did. He felt you had been pretty good this year!  After these holidays let's get our calendars together on a few activities, etc. please know if we asked you to do something and you can't, it is ok. We will get it all worked out.

> How is the building coming along and Beach Volleyball?  Is it the way you had hoped?

2017-12-27 20:44:31

> Well it's more of when they will start it. Now it's February they are saying🖐

> That's ridiculous!

**2018-03-08 11:00:17**

> 1)2.   Hey Brett. I hope all is well with you. John Davis is excited that you all invited him tonight. He is looking forward to being there and I am glad he agreed to attend.  He doesn't do very much for fun so this is good.

MCEC_00940487

# EXHIBIT N

Wow, that is disturbing. Lordy, all this time and now to find this out. Well, let's see what the lowest bid comes back with and then if we need to, we will roll up our sleeves and get the rest. We can still have the fundraiser at the Governor's mansion, too. We can use Phil's business list that he offered earlier. I will be thinking and hopefully there will be something in the new budget for Families First to offer. But that's not til July. I will be thinking on other things. Thanks for letting me know.

2018-03-28 15:26:55

Ok Nancy thank you

**2018-04-23 06:42:15**

2018-04-23 06:42:15

Deanna and I are gonna cut a check for the difference to at least get started. To finish the inside will be more but can be paid the end of summer. You still think we can get some through John once again?

2018-04-23 06:43:12

Also I think I'm doing a farm bureau commercial in May somewhere in Jackson. We can do something for you then if you like

MCEC_00940489

**EXHIBIT O**

2018-04-24 05:51:52

Great news Nancy. Thank you

👍

**2018-04-26 16:38:33**

Hey, good job up there! Jimmy is a tad shorter than you! 😳

2018-04-26 16:48:12

Lol thanks Nancy

**2018-05-10 15:33:35**

Hey Bret, I am making some progress on our money needs. What amount out of the whole loan that you signed would be most helpful right now? John and I may have a plan!!👍👍

2018-05-10 15:35:48

I only signed a guarantee for 1.4. I won't owe until the money that's there runs out, then I have to come up with the rest. Probably about 6 months....

2018-05-10 15:36:27

So however you think we should proceed

MCEC_00940491

Ok. We are definitely working on a good plan. Have they started on any of it?

2018-05-10 15:37:20

Hell no. June 1 I was told at the latest

2018-05-10 15:41:26

Now the beach facility is done and it looks awesome

That is totally crazy but at least the beach facility is done.  Well, we are close to having some more help toward it. Lordy, they need to pick up their speed!

2018-05-10 15:53:31

I know Nancy I know

**2018-05-17 05:24:20**

Morning! Good news. I have a little money for the "project"—$500,000!  Do you want me to send to Athletic Dept. Or to your foundation? NN

2018-05-17 05:50:27

Well thank you Nancy. John told me you would be getting with me about some really good news. I guess to athletic dept unless you think different. Thank you so much

You are so welcome. I want to think about sending it to the Dept. I want to make sure it is used on our project!! We want to help get that note pd. off that you and we will continue to work toward that!

2018-05-17 06:21:41

Your so kind and very thoughtful Nancy. Thanks so much

Thank you but you and Deanna have been so generous. We appreciate you! I will be back in touch ASAP.

**2018-05-20 11:14:02**

Hey, Tomorrow I am going to call Jon Gilbert or Daniel to make sure that the money we are sending tomorrow, the whole amount, will go toward the building. We don't want it spread across other areas. I will let you know. The amount is a little more than 500,000 which is great. It's $650,000. We will kept chipping away to get it down even more. I hope you are having a good afternoon. It's hot as hec. One of my grandsons is playing in a baseball tournament this afternoon. It's way too hot!

2018-05-20 11:15:50

I know it Nancy. And you the best thank you



MCEC_00940493

**EXHIBIT P**

Here is my dilemma which isn't your concern. Nancy has been awesome to me and has paid 4.5 million for a 7 million dollar facility. And she said it was all gonna be taken care of until this morning. Suddenly she said I don't think I can do anymore. So now I am looking at a big pay out.

Status: Read

Read: 7/16/2019 9:36:43 AM(UTC-4)

7/16/2019 9:35:59 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x57C8FE8 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

I hear u. She was not able to come up with the full for Prevacus either and unfortunately I think she is calculating us together. Not sure what budget issues were that have hurt her from legislature. Maybe we try the governor to find other sources? If u and poncho can do 170k and David does the other 100k I'll squeeze 50k so we can get moving

Status: Sent

Delivered: 7/16/2019 9:40:49 AM(UTC-4)

7/16/2019 9:40:49 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x57C85D7 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

You talk to REDACTED ?

Status: Read

Read: 7/17/2019 9:00:19 AM(UTC-4)

7/17/2019 8:25:22 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x57EFDEC (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

Tag

Status: Sent

Delivered: 7/17/2019 9:00:24 AM(UTC-4)

7/17/2019 9:00:23 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x57EFC1F (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

What about reaching out to  and tell him about pre-cream

Status: Read

Read: 7/17/2019 9:45:58 AM(UTC-4)

7/17/2019 9:28:26 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x57EFA76 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

Perhaps but we need to take this money and move it forward for about 3-weeks.

Status: Sent

Delivered: 7/17/2019 9:46:33 AM(UTC-4)

7/17/2019 9:46:33 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x57EF6A0 (Table: message, chat, Size: 189030400 bytes)

| DATE | INVESTOR | AMOUNT | SHARES | STOCK CERTIFICATE |
|------|----------|--------|--------|-------------------|



MDHS_00021562



| DATE | INVESTOR | AMOUNT | SHARES | STOCK CERTIFICATE |
|---|---|---|---|---|
| 06/06/17 | Brett Farve | 70,000.00 | 56,000 | 204 |
| 08/16/17 | Brett Farve | 120,000.00 | 96,000 | 204 |
| 08/31/17 | Brett Farve | 50,000.00 | 40,000 | 204 |
| 01/22/18 | Brett Farve | 40,000.00 | 32,000 | 204 |

| DATE | INVESTOR | AMOUNT | SHARES | STOCK CERTIFICATE |
|---|---|---|---|---|



| DATE | INVESTOR | AMOUNT | SHARES | STOCK CERTIFICATE |
|---|---|---|---|---|
| 7/16/2019 | Brett Favre | 100,000.00 | 80,000 | |
| REDACTED | REDACTED | REDACTED | | |
| | | REDACTED | 3,143,474.55 | |



MDHS_00021564

Case: 25CI1:22-cv-00286-EF   REDACTED Document #: 320-18   Filed: 03/13/2023   Page 1 of 1

**EXHIBIT R**

REDACTED Cat Daddy

Agreed brother. U need to start throwing we are close to the finish line. I can get 60 yards.

Status: Sent
Delivered: 8/24/2018 9:49:19 AM(UTC-4)

8/24/2018 9:49:19 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x397EBD8 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

What does your gut tell you will happen

Status: Read
Read: 8/24/2018 9:50:58 AM(UTC-4)

8/24/2018 9:50:57 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x397E988 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

10M in to start with warrants up to 50M

Status: Sent
Delivered: 8/24/2018 9:51:37 AM(UTC-4)

8/24/2018 9:51:37 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x397E7A5 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

What will that mean to us?

Status: Read
Read: 8/24/2018 9:57:06 AM(UTC-4)

8/24/2018 9:55:49 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x397E252 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

Means we will have all the money needed to create a 4B a year drug and in 2-3 years collectively our stock will be worth over 100M

Status: Sent
Delivered: 8/24/2018 9:59:00 AM(UTC-4)

8/24/2018 9:59:00 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x397FAE2 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

So hold on to our left one and hope and pray for the best and if they can get it to a certain point we start making money?

Status: Read
Read: 8/24/2018 10:03:21 AM(UTC-4)

8/24/2018 10:03:14 AM(UTC-4)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x397F846 (Table: message, handle, chat, Size: 189030400 bytes)

< iMessage >

**2018-12-28 09:28:33**

EXHIBIT
S

JakeVanlandingh... 2018-12-28 09:28:33

Hey Nancy, I'm friends and colleagues with Brett Favre. Our company is Prevacus Inc and we are site-set to begin the first human trials including youth for treating concussion acutely and for 14-days post-injury. We are working with the Governor to bring some human trial sites and drug manufacturing to MS. Not sure if we can find some synergy but would love to find out. Lmk if you have time to chat and get to know each other's business. Thx, Jake VanLandingham.

10:14:45

Hi Jake. It's nice to hear from you and I am definitely interested in hearing more. Anything that can help children, count me in.  So Yes, let's talk as soon as your time permits. I am available off and on this afternoon, actually starting in a few minutes. If I miss your call, I will call back. This number REDACTED is fine to call.  Also, next week looks good, too. Nancy

JakeVanlandingh... 2018-12-28 10:19:47

Thx buddy. Can I call you around 145 your time?

10:20:24

Sure.

BrettFarve 2018-12-28 10:21:20

Glad you 2 will connect👍

EXHIBIT T

I'm going to venture out on a limb and say of all the times you've helped me the key contact that gets us over the top will end up being Nancy New. Thx brother she's great.

Status: Sent
Delivered: 12/29/2018 11:37:19 AM(UTC-5)

12/29/2018 11:37:18 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x452BE5B (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Funny you say that I almost sent you a message this morning that said if any one comes through it will be her!!

Status: Read
Read: 12/29/2018 12:07:02 PM(UTC-5)

12/29/2018 12:05:31 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x452E6B7 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

She's real strong. You know John Davis? She's meeting with him at lunch.

Status: Sent
Delivered: 12/29/2018 12:08:04 PM(UTC-5)

12/29/2018 12:08:02 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x452FFF4 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Yep. He is just like her

Status: Read
Read: 12/29/2018 12:10:52 PM(UTC-5)

12/29/2018 12:10:06 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x452FDCE (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

Awesome. Your brother and I finished up the pitch. He's moving forward. I told I'd chat with him about finders fee when he's free.

Status: Sent
Delivered: 12/29/2018 12:11:40 PM(UTC-5)

12/29/2018 12:11:40 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x452FBF3 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Good deal

Status: Read
Read: 12/29/2018 12:38:11 PM(UTC-5)

12/29/2018 12:11:54 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x452F955 (Table: message, handle, chat, Size: 189030400 bytes)

**EXHIBIT U**

> Merry Christmas to you and your family. I hope you are having a great holiday.

2018-12-24 18:51:38

Thank you Nancy and same to you guys.

**2018-12-31 05:27:27**

2018-12-31 05:27:27

Nancy thank you for talking to Jake. I'm gonna meet with y'all Wednesday. Don't know what I would do without you and John😊👍

> We had a really good discussion. I plan to come down if I can get a couple of meetings rescheduled. See you Wed.

2018-12-31 05:35:30

Maybe we can come to see you if it's easier. I'll see when jake is getting in

2018-12-31 05:53:38

Ok

**2019-01-01 05:38:12**

2019-01-01 05:38:12

Good morning Nancy and happy New Year and all that good stuff😊 we will come to your office for 2 tomorrow afternoon.

EXHIBIT
V

REDACTED 25 Cat...

Hell if I know.

Status: Read
Read: 12/29/2018 7:55:18 PM(UTC-5)

12/29/2018 7:55:04 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x453F77B (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

I hear u brother!!! Ly

Status: Sent
Delivered: 12/29/2018 7:55:43 PM(UTC-5)

12/29/2018 7:55:43 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x453F5C8 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

You hear back from Nancy

Status: Read
Read: 12/29/2018 8:52:44 PM(UTC-5)

12/29/2018 7:56:52 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x453F409 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

No but I haven't asked given its weekend. I'll text her tomorrow afternoon.

Status: Sent
Delivered: 12/29/2018 8:54:01 PM(UTC-5)

12/29/2018 8:54:01 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4541FF4 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Ok I was a point off

Status: Read
Read: 12/30/2018 9:30:15 AM(UTC-5)

12/29/2018 11:47:20 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x454158F (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Send Leonard an invite to hunt if you want

Status: Read
Read: 12/30/2018 9:30:15 AM(UTC-5)

12/30/2018 8:43:22 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x45413D4 (Table: message, handle, chat, Size: 189030400 bytes)

Case: 25CI1:22-cv-00286-E REDACTED ument #: 320-22   Filed: 03/13/2023   Page 2 of 3

I like Jeff. He's got some favre in him I can tell because he acts on things and doesn't wait.

Status: Sent
Delivered: 12/29/2018 12:38:47 PM(UTC-5)

12/29/2018 12:38:47 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x452F7B0 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Lol. When was Nancy gonna get back to you

Status: Read
Read: 12/29/2018 12:52:09 PM(UTC-5)

12/29/2018 12:49:47 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x452F38B (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

I just wrote her an overview. She's mtg John Davis now. I'll keep u posted.

Status: Sent
Delivered: 12/29/2018 12:53:06 PM(UTC-5)

12/29/2018 12:53:04 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4530FF4 (Table: message, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

Ok. Daryl is back Wednesday from CO. He has real connections and real money. We can go Wednesday night or Thursday morning. Lmk.

Status: Sent
Delivered: 12/29/2018 6:54:21 PM(UTC-5)

12/29/2018 6:54:21 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4535FF4 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Wednesday is good

Status: Read
Read: 12/29/2018 6:56:38 PM(UTC-5)

12/29/2018 6:55:39 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4536DA8 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

Ok. Back Thursday evening or stay if we miss the bucks and come back Friday afternoon?

Status: Sent
Delivered: 12/29/2018 6:57:34 PM(UTC-5)

12/29/2018 6:57:34 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4537FF4 (Table: message, chat, Size: 189030400 bytes)

REDACTED

Haha!!!  I'll check with Leonard

**Status:** Sent
**Delivered:** 12/30/2018 9:30:47 AM(UTC-5)

12/30/2018 9:30:47 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x45411ED (Table: message, chat, Size:
189030400 bytes)

REDACTED Brett Favre

Did you and Nancy discuss shares or commission?

**Status:** Read
**Read:** 12/30/2018 9:38:16 AM(UTC-5)

12/30/2018 9:33:37 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4542FF4 (Table: message, handle, chat, Size:
189030400 bytes)

REDACTED Cat Daddy

 We did briefly. She was all about it but graceful in saying she loved the cause and how
much it could help kids. She has 4 grandkids

**Status:** Sent
**Delivered:** 12/30/2018 9:39:36 AM(UTC-5)

12/30/2018 9:39:37 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4542E03 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

I figured that if you mentioned it most likely she would refuse. I believe if it's possible she
and John Davis would use federal grant money for Prevacus

**Status:** Read
**Read:** 12/30/2018 9:42:26 AM(UTC-5)

12/30/2018 9:42:11 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4542B61 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

She's thinks they could get grant money for the 3.5M but she thought she could get the 750k
asap from private investors.

**Status:** Sent
**Delivered:** 12/30/2018 9:44:11 AM(UTC-5)

12/30/2018 9:44:11 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4542891 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Yeah wouldn't surprise me

**Status:** Read
**Read:** 12/30/2018 9:44:47 AM(UTC-5)

12/30/2018 9:44:44 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x454260B (Table: message, handle, chat,
Size: 189030400 bytes)

EXHIBIT W

REDACTED Brett SM?

Ok let me know either way. If you need s place to meet my office is yours. Brett SM?

**Status:** Read
**Read:** 1/2/2019 7:58:54 AM(UTC-5)

1/2/2019 7:49:05 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x45808B9 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Meeting Bre so yeah

**Status:** Read
**Read:** 1/2/2019 7:58:54 AM(UTC-5)

1/2/2019 7:56:54 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4580669 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Brett Favre

7:20ish

**Status:** Read
**Read:** 1/2/2019 7:58:54 AM(UTC-5)

1/2/2019 7:57:18 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x458049C (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Last I talked with Nancy she expects us to meet her in Jackson

**Status:** Read
**Read:** 1/2/2019 8:02:24 AM(UTC-5)

1/2/2019 8:02:24 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x45802E7 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Poncho James

I just spoke to Nancy if we can't fly we going to meet her and John Davis in Mcgee she really wants John Davis to meet Jake

**Status:** Read
**Read:** 1/2/2019 10:00:20 AM(UTC-5)

1/2/2019 9:34:21 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x45843FA (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

Ok. I'll be there in 3 and 1/2 hrs

**Status:** Sent

1/2/2019 10:01:02 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4586FE4 (Table: message, chat, Size: 189030400 bytes)

They would like to meet in Mcgee as early as we can  weather sucks I've got the conference room at Trustmark lined up  jake what's your eta

Status: Read
Read: 1/2/2019 11:26:23 AM(UTC-5)

1/2/2019 11:17:40 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x458975B (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Let me know I'm on radio show now

Status: Read
Read: 1/2/2019 11:26:23 AM(UTC-5)

1/2/2019 11:21:58 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x458948F (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Poncho James

Jake I need to tell Nancy a time

Status: Read
Read: 1/2/2019 12:35:43 PM(UTC-5)

1/2/2019 11:57:18 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x45892A2 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Jake drive straight to Magee and meet those 2 so you can save time. They are gonna do 750k and trust me if at all possible they will do as much as possible

Status: Read
Read: 1/2/2019 12:35:43 PM(UTC-5)

1/2/2019 12:08:06 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x458AE0D (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Nancy said they are on there way now. And looks like they will drive all the way since she got schedule cleared for them both

Status: Read
Read: 1/2/2019 12:35:43 PM(UTC-5)

1/2/2019 12:18:23 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x458AB2B (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Poncho James

Brett you want to invite them to your house? Is anyone out there I just hung up with her and they will do whatever

Status: Read
Read: 1/2/2019 12:35:43 PM(UTC-5)

1/2/2019 12:20:53 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x458A889 (Table: message, handle, chat, Size: 189030400 bytes)

**EXHIBIT X**

Status: Sent
Delivered: 12/30/2018 4:32:02 PM(UTC-5)

12/30/2018 4:32:01 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x45524A3 (Table: message, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

Nancy New wants to meet with me around 2pm on Wednesday in Hattiesburg. She has another mtg with John Davis that morning and wants to drive down from Jackson to talk strategy. You up for mtg with us before we fly out? Thx brother

Status: Sent
Delivered: 12/30/2018 7:43:07 PM(UTC-5)

12/30/2018 7:43:05 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4558E3B (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Sure

Status: Read
Read: 12/30/2018 7:50:36 PM(UTC-5)

12/30/2018 7:44:38 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4559CB0 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

Thx buddy. I'll figure out where she wants to meet up.

Status: Sent
Delivered: 12/30/2018 7:51:19 PM(UTC-5)

12/30/2018 7:51:17 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x45596D6 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Did you offer Nancy anything?

Status: Read
Read: 12/31/2018 8:33:50 AM(UTC-5)

12/31/2018 8:29:50 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x455B538 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

She said she'd would love some shares but we didn't discuss how many yet.

Status: Sent
Delivered: 12/31/2018 8:34:42 AM(UTC-5)

12/31/2018 8:34:42 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x455B36B (Table: message, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

I'd  say we give her 70k shares per 1M she touches in incoming investments.

Status: Sent

Delivered: 12/31/2018 8:37:20 AM(UTC-5)

12/31/2018 8:37:18 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x455CC2A (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Told her just now we will try and come up there if it's easier. Maybe poncho can fly us

Status: Read

Read: 12/31/2018 8:38:48 AM(UTC-5)

12/31/2018 8:38:10 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x455C9FE (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

I got two other guys with me but I can leave em in hatty

Status: Sent

Delivered: 12/31/2018 8:39:36 AM(UTC-5)

12/31/2018 8:39:36 AM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x455C7B8 (Table: message, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

Any word back from Nancy?

Status: Sent

Delivered: 12/31/2018 1:59:00 PM(UTC-5)

12/31/2018 1:58:58 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4565FF4 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

And sounds like we can do either she said

Status: Read

Read: 12/31/2018 2:00:17 PM(UTC-5)

12/31/2018 2:00:13 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4565C68 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

Daryl thought inviting billy joe would be fine. I guess I should have asked u. U ok with that?

Status: Sent

Delivered: 12/31/2018 2:01:05 PM(UTC-5)

12/31/2018 2:01:04 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4565A83 (Table: message, chat, Size: 189030400 bytes)

REDACTED Jake Girie

Yeah

Status: Read
Read: 1/2/2019 3:40:41 PM(UTC-5)

1/2/2019 3:40:22 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4592308 (Table: message, handle, chat,
Size: 189030400 bytes)

REDACTED Cat Daddy

I am glad to help. I was real happy that I got John to meet too. Thank you for involving us.
It's not necessary. I would help you anyway but thank you. That is very nice.

From Nancy

Status: Sent
Delivered: 1/2/2019 3:40:49 PM(UTC-5)

1/2/2019 3:40:49 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4593FF4 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Hell we giving her something

Status: Read
Read: 1/2/2019 3:41:53 PM(UTC-5)

1/2/2019 3:41:51 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x459342B (Table: message, handle, chat,
Size: 189030400 bytes)

REDACTED Cat Daddy

I'll slip it to her

Status: Sent
Delivered: 1/2/2019 3:42:26 PM(UTC-5)

1/2/2019 3:42:26 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x459325E (Table: message, chat, Size:
189030400 bytes)

REDACTED Brett Favre

I sent you joe canizaro cell

Status: Read
Read: 1/2/2019 3:46:31 PM(UTC-5)

1/2/2019 3:44:36 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4594FF4 (Table: message, handle, chat,
Size: 189030400 bytes)

REDACTED Brett Favre

Will the drug work at a later date if there are signs of concussion weeks and months
later.

Status: Read
Read: 1/2/2019 3:46:45 PM(UTC-5)

1/2/2019 3:46:45 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4594C86 (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED

Governor connected us

Status: Read

Read: 1/14/2019 8:30:02 PM(UTC-5)

1/14/2019 8:30:01 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x467120F (Table: message, handle, chat,
Size: 189030400 bytes)

REDACTED Cat Daddy

Cool. I hope Nancy can get funding to us by the end of the week.

Status: Sent

Delivered: 1/14/2019 8:31:05 PM(UTC-5)

1/14/2019 8:31:04 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4672FF4 (Table: message, chat, Size: 189030400 bytes)

REDACTED Brett Favre

Ask her

Status: Read

Read: 1/14/2019 8:32:10 PM(UTC-5)

1/14/2019 8:31:43 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4672DDE (Table: message, handle, chat,
Size: 189030400 bytes)

REDACTED Brett Favre

This all works out we need to buy her and John Davis surprise him with a vehicle I thought maybe John Davis we could get him a raptor

Status: Read

Read: 1/14/2019 8:32:19 PM(UTC-5)

1/14/2019 8:32:17 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4672C3D (Table: message, handle, chat, Size: 189030400 bytes)

REDACTED Cat Daddy

She's working on it. Alls good!!!

Status: Sent

Delivered: 1/14/2019 8:32:40 PM(UTC-5)

1/14/2019 8:32:39 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x4672803 (Table: message, chat, Size:
189030400 bytes)

REDACTED Brett Favre

Honestly give me your thoughts on what you think all this means

Status: Read

Read: 1/14/2019 8:40:04 PM(UTC-5)

1/14/2019 8:33:41 PM(UTC-5)

Source Info:
Jake's Phone/var/mobile/Library/SMS/sms.db : 0x467262E (Table: message, handle, chat, Size: 189030400 bytes)

546