**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRETT LORENZO FAVRE, | **)** | Case No. 2:23-cv-45-KS-MTP |
| | **)** | |
| Plaintiff, | **)** | |
| | **)** | |
| v. | **)** | |
| | **)** | |
| PATRICK JUSTIN MCAFEE, | **)** | |
| | **)** | |
| Defendant. | **)** | |
| | **)** | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Alex Purvis (MSB 100673)
Michael Williams (MSB 104537)
James Stephen Fritz, Jr. (MSB 105936)
**BRADLEY ARANT BOULT**
**CUMMINGS LLP**
One Jackson Place
188 E Capitol Street, Suite 1000
Jackson, MS 39201
Phone:  601.948.8000
Fax:  601.948.3000
apurvis@bradley.com
mcwilliams@bradley.com
sfritz@bradley.com

Sarah A. Decker (*pro hac vice*)
Thomas J. Smith (*pro hac vice*)
Curtis B. Krasik (*pro hac vice*)
**K&L GATES LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone:  412.355.6500
Fax:  412.355.6501
sarah.decker@klgates.com
thomas.smith@klgates.com
curtis.krasik@klgates.com

*Counsel for Defendant Patrick Justin McAfee*

## I.  <u>INTRODUCTION</u>

Plaintiff, NFL Hall-of-Famer Brett Favre, has been sued by the Mississippi Department of Human Services ("MDHS") for his alleged involvement in the diversion of millions of dollars of welfare funds to himself personally, to his company, to a for-profit biotechnology company in which he was the largest individual stockholder, and to his alma mater for construction of a volleyball facility that he had agreed to personally fund (the "MDHS Lawsuit").  As publicly stated in official proceedings by both MDHS and the Mississippi Office of the State Auditor ("Auditor's Office"), those funds were earmarked for the assistance of Mississippi's neediest families, and there was no appropriate purpose for their payment to Favre and others for Favre's pet projects.  The Mississippi welfare fraud scandal, as it has become publicly known, and specifically the MDHS Lawsuit and Favre's involvement, has been the subject of intense public scrutiny and media attention for nearly three years.  Favre's attempt now to deflect attention away from MDHS's highly publicized claims against him and to silence media defendants from reporting on such claims should not be countenanced.

Favre originally filed this defamation action against comedic sports analyst and broadcaster Pat McAfee on February 9, 2023.  McAfee moved to dismiss Favre's Complaint in its entirety on March 31, 2023.  Conceding the deficiencies in his original pleading, Favre filed an Amended Complaint rather than even attempt to respond to McAfee's motion to dismiss.  The Amended Complaint includes pages of re-engineered allegations that attempt to discount the fatal impact of the MDHS Lawsuit and the extensive media coverage of Favre's involvement in it on his defamation claim.  But the Amended Complaint is as deficient as his original pleading.

Favre continues to paint himself as the defamed victim of two cherry-picked statements and a tweet allegedly made by McAfee, which the Amended Complaint again takes entirely out

of context.  Favre's new allegations do nothing to change the facts that (i) when taken in context as required by Mississippi law, McAfee's comments were not false statements of fact about Favre, and (ii) as comments on official proceedings by MDHS and the Auditor's Office, McAfee's comments are protected by a privilege well-established under Mississippi law.

Furthermore, as a public figure, Favre's amendment continues to insufficiently plead the essential element of "actual malice."  In fact, the Amended Complaint significantly admits that McAfee "***had no personal knowledge of any of the relevant facts***," Amended Complaint ("Am. Cmpl."), ECF No. 15, ¶ 23 (emphasis added), and was just reporting on allegations asserted against Favre in the MDHS Lawsuit and by other media outlets.  In light of these abundant public allegations against Favre, both in the MDHS Lawsuit and in the multitude of similar media reports about Favre's involvement in the Mississippi welfare fraud scandal, Favre has not—and, plainly, cannot—plead actual malice.  Finally, Favre failed to give McAfee the requisite 10-days-notice of suit, which, alone, constitutes statutory grounds for dismissal.

In meritless cases like this one, there is a powerful interest in ensuring free speech is not unduly burdened by the necessity of defending against expensive, baseless litigation.  As a public figure bringing suit against a media defendant for reporting on matters of public concern, which are the subject of official proceedings and detailed at length in public records, Favre cannot state a claim for defamation upon which relief can be granted.  Therefore, the Amended Complaint must be dismissed, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.      FACTUAL BACKGROUND

In some ways, the factual background of this case is quite simple—McAfee addressed Favre's involvement in the Mississippi welfare fraud scandal in a few seconds of commentary on a three-hour-plus broadcast and referenced Favre in a tweet.  *See* Am. Cmpl. ¶ 20 (alleging that McAfee said (1) "Every time [Favre's] name gets brought up, we have to mention that he tied the

hands of the poor people and took money right out of their pockets", and (2) "[Favre is] certainly in the middle of stealing from poor people in Mississippi right now"); ¶ 21 (alleging that McAfee tweeted "Devonta Smith doing 'The Favre' after that touchdown was crazy").  But, under Mississippi law, the Court must consider the context and surrounding circumstances of the utterances complained about, including that they are attributable to official proceedings and are about a public figure's involvement in a matter of public concern.  This factual background section cites just some of the extensive public records related to the MDHS Lawsuit.  All cited exhibits may be considered by the Court in deciding this Rule 12(b)(6) motion to dismiss.

Exhibit A is the subject segment of the November 30, 2022 broadcast of The Pat McAfee Show ("The Show"), which is expressly referenced in and integral to the Amended Complaint as the source of the allegedly defamatory statements.[1]  *See* Am. Cmpl. ¶ 20.  The remaining exhibits are public records or other materials of which the Court may take judicial notice, including filings in the MDHS Lawsuit.  *See Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record.") (citation omitted).[2]  As the Fifth Circuit has instructed, "[w]hen reviewing a motion to dismiss, a district court must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Funk*, 631 F.3d at 783 (internal quotations and citation omitted).  "If, based on the facts pleaded and judicially noticed, a successful affirmative defense appears, then dismissal under Rule 12(b)(6) is proper."  *Hall v. Hodgkins*, 305 F. App'x 224, 227-28 (5th Cir. 2008); *see*

---

[1] Exhibit A is a conventionally filed disk containing a two-minute-and-35-second segment of the November 30 broadcast, which is available in full at https://www.youtube.com/watch?v=ArwPSlqi1oU.
[2] *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (facts may be judicially noticed if they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

*also Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 588-93 (5th Cir. 2020) (affirming dismissal based on affirmative defense established by judicially-noticed records).

A.     **In May 2020, the Auditor's Office Announced Discovery of the Misuse of Tens of Millions of Dollars of Welfare (TANF) Funds.**

On May 4, 2020—more than two years before the November 30, 2022 broadcast of The Show in which McAfee made the allegedly defamatory statements cited in the Amended Complaint—the Auditor's Office announced its determination that "[m]illions of dollars of grants from [MDHS] were misspent, converted to personal use, spent on family members and friends of staffers and grantees, or wasted," including by the Mississippi Community Education Center ("MCEC"), a non-profit that received substantial MDHS grants over the prior three years, mostly from the Temporary Assistance for Needy Families (TANF) program.  Ex. B.  TANF is a program to "help low-income families with children achieve economic self-sufficiency."[3]  The Auditor's Office found "extensive misspending" by MCEC, which "made multiple donations with TANF money—like donations to . . . universities—and provided no proof the donations were used to help the needy."  *See id.*  Some of the "questioned costs" were:

- $1.1 million paid by MCEC to Favre Enterprises, Inc. ("Favre Enterprises"), Favre's company, on a contract for speaking engagements, because auditors were unable "to verify that any work was performed in order to fulfill the contract," Ex. C at 92; and

- $5 million paid by MCEC to the University of Southern Mississippi ("USM") Athletic Foundation (the "USMAF") on a "sublease" for use of a "Wellness Center" on campus, because auditors determined that the payment was "a donation to the [USMAF] for the construction of the Wellness Center and not a lease of the property," *id.* at 106-07.

B.     **In October 2021, the Auditor's Office Issued a Demand to Favre for Repayment of Misdirected TANF Funds.**

On October 12, 2021, the Auditor's Office announced confirmation of its findings by an

---

[3] *Temporary Assistance for Needy Families (TANF)*, U.S. Dep't of Health & Hum. Servs., https://www.acf.hhs.gov/ofa/programs/temporary-assistance-needy-families-tanf (last visited Mar. 20, 2023); *see also* Miss. Code Ann. § 43-17-1(4) (outlining the permissible uses of TANF funds).

independent forensic audit commissioned by MDHS.  Ex. D.  The Auditor's Office served

demands on multiple parties, including Favre and Favre Enterprises, for repayment of a total of

$77 million in misspent TANF funds.  *See id.*  Specifically from Favre and Favre Enterprises, the

Auditor's Office demanded repayment of $828,000.  *See id.*

**C.    In May 2022, MDHS Sued Favre for His Alleged Involvement in the Misdirection of TANF Funds to Himself, Favre Enterprises, and Biotechnology Company Prevacus.**

On May 9, 2022, MDHS filed a civil lawsuit against, among others, Favre and Favre

Enterprises (previously defined, the "MDHS Lawsuit").  Ex. E.  The MDHS Lawsuit accused

Favre and Favre Enterprises of conspiring with Nancy New, then-Chief Executive Officer of

MCEC, to divert $1.1 million in TANF funds to Favre and Favre Enterprises in exchange for

speeches and autograph signings Favre never performed:

| Defendants Who Agreed to Diversion of TANF Funds to Non-TANF Purposes: | Recipients of Diverted TANF Funds: | Amount of TANF Funds Diverted: | Non-TANF Purpose of Transfer: | Date of Transfer Diverting TANF Funds: |
|---|---|---|---|---|
| | | * | * | * |
| Brett L. Favre, Favre Enterprises, Inc., MCEC & Nancy New | Brett L. Favre and Favre Enterprises, Inc. | $1,100,000. | Autographs and 4 speeches (never performed) | +Dec. 2017 ($500,000) & June 2018 ($600,000) |

*Id.* ¶¶ 115, 130, 137-38.  MDHS alleged: "***Certainly no services were performed by Favre that

had anything to do with the pursuit of lawful TANF purposes.***"  *Id.* ¶ 137.[4]

The MDHS Lawsuit also accused Favre of diverting $2.1 million of TANF funds for non-

TANF purposes to Prevacus, Inc. ("Prevacus"), "a private, for-profit biotechnology corporation

---

[4] Unless indicated otherwise herein, all emphasis to quoted material has been added.

in which Favre" was "the largest individual outside investor and holder of corporate stock":

| Jacob VanLandingham, Prevacus, Inc., PreSolMD, LLC Brett Favre, Nancy New, Jesse New, Zachary New & John Davis | Prevacus, Inc. and PreSolMD LLC (affiliated for-profit biotech companies) | $2,100,000. | Personal Stock Ownership by Nancy New and son Zachary New in Prevacus, Inc. and ownership interests in PreSolMD LLC | Jan. 18, 2019 ($750,000), April 8, 2019 ($500,000), May 10, 2019 ($250,000), July 16, 2019 ($400,000), Sept. 24, 2019 ($100,000), & Oct. 7, 2019 ($100,000) |
|---|---|---|---|---|

*Id.* ¶¶ 115-16.  Specifically, MDHS alleged that ***Favre "urged" the Chief Executive Officer of Prevacus "to solicit Nancy New to use MDHS grant proceeds to invest in the stock of Prevacus***" in the personal names of herself and her son, Zachary New.  *Id.* ¶ 117.  According to MDHS, Favre hosted a stock sales presentation at his house attended by Nancy and Zachary New, then-MDHS Executive Director John Davis, former pro-wrestler Ted M. DiBiase, Jr., and the Prevacus CEO.  *Id.* ¶¶ 119-20.  MDHS alleged:

> *As each of those parties knew, or should and would have known if they had exercised reasonable care . . . any such use of such TANF funds was inconsistent with the pursuit of lawful TANF purposes (or with any other purpose of any grant funds received by MDHS from the United States Government), and was therefore an illegal transaction under statutory and common law.*

> Defendants ***Favre***, [the Prevacus CEO], Prevacus, and PreSolMD [a Prevacus affiliate], ***nevertheless agreed to act together, and with Nancy New and Zachary New, for Nancy New and Zachary New to use TANF grant funds received from MDHS to invest substantial funds in ownership interests in both Prevacus and PreSolMD***, in the personal names of Nancy New and Zachary New, to the financial benefit of all six such Defendants.

*Id.* ¶¶ 122-23.

**D.     In September 2022, Evidence Was Filed in the MDHS Lawsuit Demonstrating Favre's Involvement in the Misdirection to USM of Even More TANF Funds.**

On September 12, 2022—two months prior to The Show's November 30 broadcast—

MCEC filed a motion to compel the production of documents by non-party and former Mississippi Governor Phil Bryant in connection with the MDHS Lawsuit.  Ex. F.  In the motion, MCEC asserted that it paid $1.1 million in TANF funds "expressly to provide Favre with additional funds for construction of the Volleyball Facility" at USM.  *Id.* ¶ 6.  In support of its motion, MCEC attached text messages to and from Favre which it claimed showed that Bryant "knew that Favre was seeking grant funds from MDHS to build the Volleyball Facility . . . ."  *Id.* ¶ 11.  Those exhibits included the following text messages between Favre and Nancy New:

- Favre's text to New on July 24, 2017 expressing excitement that then-MDHS Executive Director John Davis had committed $4 million to the volleyball facility.  Ex. G.

- Favre's text to New on August 3, 2017 asking:  "***If you were to pay me is there anyway [sic] the media can find out where it came from and how much?***"  Ex. H.  New responded: "No, we never have had that information publicized.  ***I understand you being uneasy about that though.***"  *Id.*

- Favre's text to New on May 30, 2019 asking if she was "still confident [she] can cover the [$]1.8" million in remaining costs.  Ex. I.  New responded:  "In a meeting with [then-MDHS Executive Director] John Davis now. . . . We are on board!"  *Id.*

On September 23, 2022, Bryant filed a response to MCEC's motion to compel asserting that, "unbeknownst to [him], ***New and Favre were pursuing MDHS funds for the USM Volleyball Center***."  Ex. J at 10-11.  Bryant also attached texts to his filing, including texts in which Favre (i) suggested that MCEC compensate him for "a few radio spots," expressly so that he could pass that money along to USM for construction of the volleyball facility, *id.* at 11, and (ii) told Bryant "I want you to know how much I love Nancy New and John Davis.  What they have done for me and Southern Miss is amazing. . . . I paid for 3/4 of Vball facility [which was false] and the rest was a joint project with her [New] and John which was saving me 1.8 million."  *Id.* at 23.  Regarding the heavily reported August 3, 2017 text thread between Favre and New, Bryant's filing stated that Favre was "express[ing] uneasiness to New about their

arrangement being leaked to the press[.]"  *Id.* at 12.[5]

MDHS filed a First Amended Complaint in the MDHS Lawsuit on December 13, 2022, which, among other things, named the USMAF as a defendant; asserted additional allegations against Favre, including allegations related to his involvement in the misdirection of TANF funds for the prohibited purpose of brick and mortar construction of the volleyball facility at USM, under the guise of a "sublease" between MCEC and the USMAF; and sought substantially higher damages from Favre, including repayment of the $5 million allegedly paid by MCEC for construction of the volleyball facility.  Ex. O.  The MDHS Lawsuit remains pending against both Favre and Favre Enterprises.  On April 24, 2023, the court denied Favre's motion to dismiss. The court ruled that "Favre's legal arguments are unpersuasive and inapplicable," finding that MDHS' First Amended Complaint sufficiently pled that Favre conspired with MCEC and that Favre is "the person for whose benefit the transfer [to USMAF] is made."  Ex. P at 3.

**E.   Favre's Alleged Co-Conspirators Have Pled Guilty to Crimes Involving the Misdirection of TANF Funds, Including to Prevacus and USM.**

Nancy and Zachary New were each indicted by the State of Mississippi in January 2022. Exs. Q-R.  They pled guilty on April 22, 2022 to, among other charges, three counts each of wire fraud for their involvement in the transmission of MCEC's limited purpose grant funds to Prevacus "for purposes not allowed pursuant to the limited purpose grants from which the funds originated[.]"  Exs. S at 7 & T at 6-7.  Zachary New also pled guilty to one count of fraud against the government for his involvement in the transfer of $4 million in TANF funds "for the construction of a volleyball center at [USM], which was prohibited under the limited use guidelines of the grants from which the funds originated[.]"  Ex. T at 6.  He allocuted to having

---

[5] Bryant's filing also cited multiple media articles about Favre's involvement in the welfare fraud scandal. *See* Exs. K-N (cited in Ex. J at 17, 19-20).

acted with John Davis and others "to disguise the USM construction project as a 'lease' as a means of circumventing the limited purpose grant's strict prohibition against 'brick and mortar' construction projects[.]"[6]  *Id.*

John Davis was also indicted by the State in April 2022.  Ex. U.  On September 21, 2022, an Order of *Nolle Prosequi* was entered in the case against Davis upon the announcement of his global plea resolution with state and federal authorities whereby Davis "agreed to fully cooperate . . . in the prosecution of any and all additional criminally charged defendants, in State or Federal Court, for the criminal misuse of Federal TANF grant funds, State of Mississippi Funds, [MCEC] funds or any other funds available to or through" MDHS.[7]  Ex. V.  Criminal investigation into the Mississippi welfare fraud scandal remains ongoing, with Ted M. DiBiase, Jr. having been federally indicted on April 20, 2023.

**F.      On February 9, 2023, Favre Sued McAfee for Defamation.**

McAfee is the host of a nationally-distributed comedic sports media broadcast called The Pat McAfee Show (previously defined "The Show"), known for its energetic, comical, unfiltered, and unconventional reporting on sports and pop-culture.  The daily broadcast airs live on The Show's YouTube page Monday through Friday, 48 weeks a year, from noon to approximately 3:30 pm EST.  Segments of The Show that are particularly topical and easier to digest in a shorter fashion are clipped and uploaded to The Show's social media platforms.

Throughout each broadcast, McAfee, The Show's team of regular contributors, and its guests talk about current events and hot topics that are generating internet headlines around the sports universe.  Given McAfee's history as a punter for the Indianapolis Colts, The Show's

---

[6] The News were also federally indicted on related but different charges, which are still pending.
[7] Davis was also federally indicted on related but different charges and pled guilty to conspiracy and theft concerning programs receiving federal funds related to the misdirection of TANF funds.  Ex. W.

subject matter is dedicated mostly to NFL football with some coverage of other sports and humorous subjects found on the internet.  McAfee's loyal following of listeners join The Show as a mental reprieve while at home, their jobs, in class, or battling life's more serious challenges. The Show has advertising partners but is independently owned and operated.  McAfee and The Show have in many ways managed to disrupt the historically corporate sports media landscape.

On February 9, 2023, Favre sued McAfee for defamation.  Favre's lawsuit was originally filed in the Circuit Court of Lamar County, and McAfee timely removed the lawsuit to this Court.  On March 31, 2023, McAfee filed a motion to dismiss the Complaint.  In response, on April 14, 2023, Favre filed an Amended Complaint.

Favre's Amended Complaint continues to allege that McAfee defamed him by the following two statements purportedly made on the November 30, 2022 broadcast of The Show: (1) "Every time [Favre's] name gets brought up, we have to mention that he tied the hands of the poor people and took money right out of their pockets"; and (2) "[Favre is] certainly in the middle of stealing from poor people in Mississippi right now."  Am. Cmpl. ¶ 20 (alteration in original).  As reflected in the below verbatim transcript of the broadcast, however, the Amended Complaint materially alters McAfee's statements, which, in reality, were prefaced with, "from the information that we have currently," and followed McAfee's express acknowledgement that, "obviously, Brett Favre Enterprises is alleging that this is all wrong."  Ex. A.

The cherry-picked and out-of-context statements cited in the Amended Complaint constituted an approximately 85-second segment of The Show's more-than-three-hour broadcast in which McAfee and his team conversed about a joke made during the prior day's show:

| | |
|---|---|
| McAfee: | Honestly, there are limited times when I go, brain, what a good job there. |
| Other: | Mm-hmm. |
| McAfee: | As Aaron's talking about, you know, learning about being tough from |

|          | the guy that played football before him— |
|----------|-------------------------------------------|
| Other:   | Yeah. |
| McAfee:  | Brett Favre at Green Bay, my brain literally was like 'we're in holiday season.  Brett Favre, what did he do?  He didn't just steal from the poor.  Yeah, he did that.  What else?  Oh, he is the actual— |
| Other:   | Yeah. |
| McAfee:  | Sticky-finger bandits— |
| Other:   | Yep.  That's right. |
| McAfee:  | From Home Alone 2— |
| Other:   | Mm-hmm. |
| McAfee:  | In New York.'  So then I mentioned that to Aaron.  I think it took a couple seconds for everything to settle in, and then there was a 'Jesus.' |
| Other:   | Yeah. |
| McAfee:  | I was just waiting.  My brain was like so happy.  I was so pumped.  I'm like 'good for you, man. Way to put that together.'  And we have to make sure that it's mentioned every time that man's mentioned. |
| Other:   | Have to. |
| McAfee:  | Because that is a big deal that that happened. |
| Other:   | Terrible. |
| McAfee:  | That's a big deal.  Now obviously, Brett Favre Enterprises is alleging that this is all wrong. |
| Other:   | That's right. |
| McAfee:  | And I can't wait— |
| Other:   | A big ruse. |
| McAfee:  | And I can't wait to hear BFE— |
| Other:   | BFE. |
| McAfee:  | You know, drop BFE, Brett Favre Enterprises, I can't wait for bum f*** Egypt to drop Brett Favre Enterprises's side of the story, and we will judge it accordingly. |
| Other:   | Right. |
| McAfee:  | But from the information that we have currently, every time his name gets brought up, we have to mention— |
| Other:   | Hands are tied.  Have to do it. |
| McAfee:  | Yep.  He, he tied the hands of the poor people and took money right out of their pockets. |
| Other:   | That's right. |

| McAfee: | And we have to talk about that, even though a football player, incredibly tough football player— |
|---|---|
| Other: | Sure. |
| McAfee: | Football player, good football player, did a lot of things, certainly in the middle of stealing from poor people in Mississippi right now. |
| Other: | Absolutely. |
| McAfee: | Have to chat about that. |

Ex A.[8]

Favre also alleges he was defamed by the following December 24, 2022 tweet on The

Show's Twitter page:



Am. Cmpl. ¶ 21.

Taking McAfee's statements in context, the Amended Complaint does not and cannot

state a claim upon which relief can be granted and, thus, McAfee moves this Court to dismiss the

Amended Complaint, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6).

### III.   STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, a plaintiff's complaint must "contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Walker v.*

---

[8] The 85 seconds of content transcribed above runs from 11:34 through 12:59 of the full broadcast (i.e., 00:54 through 2:19 of the segment at Exhibit A).

*Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019) (first quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and then *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To be plausible, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]"  *Id.* at 734-35 (quoting *Twombly*, 550 U.S. at 555).  While the Court "must accept all well-pleaded facts as true and . . . view them in the light most favorable to the plaintiff," the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* at 735 (alteration in original) (citations omitted).  "'[D]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Because meritless defamation lawsuits like this one risk chilling the exercise of First Amendment-protected speech by forcing media defendants to incur unnecessary litigation costs, courts routinely dismiss them at the pleadings phase on the grounds asserted in this motion.  *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (dismissing complaint for failure to plausibly allege actual malice and noting the "powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation"); *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("[S]ummary proceedings are essential in the First Amendment area because if a suit entails long and expensive litigation, then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails.") (internal quotations and citation omitted)); *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013) ("Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage.") (internal quotations and citation omitted)), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

This Court has likewise ruled that "the nature of a libel action lends itself to judicial scrutiny in the early stages of a defamation lawsuit." *Mitchell v. Random House, Inc.,* 703 F. Supp. 1250, 1258 n.10 (S.D. Miss. 1988) (granting motion to dismiss by media defendant), *aff'd*, 865 F.2d 664 (5th Cir. 1989).  Because "in a libel suit the central event—the communication about which suit has been brought—is usually before the judge at the pleading stage[,] . . . [t]he trial court may . . . at the earliest stages, make sound determinations as to issues relating to the communication of which complaint is made." *Id.* (citation omitted).  As a result, "courts routinely consider on motions to dismiss issues [like those asserted here] such as whether the statement at bar is capable of bearing a defamatory meaning, . . . whether it is protected opinion, . . . and whether the suit is barred by privilege and frequently grant motions on these grounds and others." *Id.*  Given that Favre has already had the opportunity to amend his pleading to state his "best case" in response to McAfee's motion to dismiss his original Complaint, dismissal by the Court of the Amended Complaint should be with prejudice.  *Bolden v. Am. Airlines, Inc.*, No. 4:21-cv-00603-P, 2021 WL 3419682, at *5 (N.D. Tex. Aug. 5, 2021) (quoting *Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999) (dismissal with prejudice warranted where plaintiff has already had the opportunity to amend and state his "best case").

## IV.   ARGUMENT

The elements of a defamation claim are "(1) a false and defamatory statement concerning plaintiff; (2) unprivileged publication to third party; (3) fault amounting at least to negligence on part of publisher; (4) and either actionability of statement irrespective of special harm or existence of special harm caused by publication." *Armistead v. Minor*, 815 So. 2d 1189, 1193 (Miss. 2002) (citation omitted).  As a public figure, Favre faces "the additional burden of proving actual malice[.]"  *Id.* (quoting *Masson v. New Yorker Mag., Inc.,* 501 U.S. 496, 510 (1991)).

Favre's Amended Complaint against McAfee should be dismissed for four reasons.  <u>First</u>, Favre pleads no false statement of fact.  <u>Second</u>, Favre pleads no unprivileged publication. <u>Third</u>, Favre pleads no plausible allegations of actual malice.  <u>Fourth</u>, Favre did not give McAfee the required statutory 10-days-notice before filing suit.

## A.    THE AMENDED COMPLAINT PLEADS NO FALSE STATEMENT OF FACT

"[T]he court determines whether the statement bears the meaning ascribed to it by the plaintiff and whether this meaning is defamatory."  *Perkins v. Littleton*, 270 So. 3d 208, 215 (Miss. Ct. App. 2018) (quoting *Fulton v. Miss. Publishers Corp.*, 498 So. 2d 1215, 1216 (Miss. 1986)).  "If the court decides against the plaintiff on either of these questions, the case is ended." *Id.* at 215-16 (quoting *Fulton*, 498 So. 2d at 1216).  Here, the Amended Complaint pleads no actionable defamatory statements because (1) the November 30 statements do not contain any false statement of fact; and (2) the December 24 tweet is nonactionable innuendo.

### 1.    <u>The November 30 Statements Are Not Actionable Because They Do Not Contain Any False Statement of Fact.</u>

#### a.    **Given the general tenor of The Show, McAfee's comments cannot reasonably be interpreted as stating actual facts about Favre.**

Defamation requires a false statement of fact about the plaintiff.  *E.g., Armistead*, 815 So. 2d at 1193 (citation omitted).  "The plaintiff bears the burden to prove such falsity."  *Id.* at 1194 (citing *Blake v. Gannett Co.,* 529 So. 2d 595, 602 (Miss. 1988)) (other citation omitted).  Thus, "[t]he threshold question in a defamation suit is whether the published statements are false."  *Id.* (quoting *Franklin v. Thompson,* 722 So. 2d 688, 692 (Miss. 1998) (other citation omitted).

In determining whether a statement contains a false statement of fact, "[t]he said-to-be-offending words must be set in the context of the entire utterance.  Their complexion draws color from the whole."  *Lawrence v. Evans*, 573 So. 2d 695, 698 (Miss. 1990) (citing *Whitten v. Com. Dispatch Publ'g Co.*, 487 So. 2d 843, 845 (Miss. 1986); *Manasco v. Walley*, 63 So. 2d 91, 95

(Miss. 1953)).  A statement is true if it is "***substantially*** true"; it "need not be literally true."

*Pittman v. Gannett River States Publ'g Corp.*, 836 F. Supp. 377, 381 n.5 (S.D. Miss. 1993)

(emphasis added) (first citing *Blake,* 529 So. 2d at 603; and then Rest. 2d Torts § 581 cmt. f).  "A

broadcast is substantially true if the allegedly defamatory statement is not more damaging to the

plaintiff's reputation, in the mind of the average person, than the truthful statement."  *Green v.

CBS Inc.*, 286 F.3d 281, 283 (5th Cir. 2002).  Courts "look at the 'gist' of a broadcast to

determine whether it is substantially true."  *Id.*

     Statements that "***cannot reasonably be interpreted as stating actual facts*** about an

individual" are protected by the First Amendment.  *See Perkins*, 270 So. 3d at 217 (emphasis

added) (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (rhetorical hyperbole and

imaginative expression have "traditionally added much to the discourse of our Nation") (citation

omitted)).  In this regard, the Mississippi Supreme Court in *Roussel v. Robbins*, 688 So. 2d 714,

716 (Miss. 1996), adopted the following as "correct statements of [defamation] law with regard

to opinions":

> *[I]n order to ensure "uninhibited, robust, and wide-open" debate on matters of
> public concern, "a statement of opinion relating to matters of public concern
> which does not contain a provably false factual connotation," or which "cannot
> 'reasonably [be] interpreted as stating actual facts' about an individual,"
> continues to receive full constitutional protection.*

*Keohane v. Wilkerson*, 859 P.2d 291, 296 (Colo. Ct. App. 1993) (emphasis added) (quoting

*Milkovich*, 497 U.S. at 20)) (other citations omitted).

     In considering whether the November 30 statements are "reasonably susceptible to being

understood as an actual assertion of fact," the Court is "not limited to the literal meaning of the

words contained in the statement."  *See id.*  Instead, it "must consider the impression created by

the words as well as ***the general tenor of the conversation*** . . . from the point of view of the

reasonable person," as well as other factors including "the ***phrasing*** of the statement, the ***context*** in which it appears, and the ***surrounding circumstances*** of its publication[.]" *Id.* at 296-97 (emphasis added) (citations omitted).

Applying these principles, courts have specifically rejected defamation claims with respect to statements made on provocative, opinion-based news shows in connection with debates on matters of public concern. *See Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1159-60 (9th Cir. 2021) (dismissing defamation suit against Rachel Maddow for saying that OAN "really literally is paid Russian propaganda" based on article that OAN reporter was also paid by the Kremlin); *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 184-85 (S.D.N.Y. 2020) (dismissing defamation suit against Tucker Carlson for accusation that plaintiff's actions vis-à-vis Donald Trump were "a classic case of extortion"). These courts found that the audience for such shows "anticipates [the hosts'] effort to persuade others to [his/her] position[ ] by use of epithets, fiery rhetoric or hyperbole. Therefore, the medium through which the contested statement was made supports [the media defendants'] argument that a reasonable viewer would not conclude the statement implies an assertion of fact." *Maddow*, 8 F.4th at 1157; *see also McDougal*, 489 F. Supp. 3d at 183-84 ("This 'general tenor' of the show should then inform a viewer that he is not 'stating actual facts' about the topics he discusses and is instead engaging in 'exaggeration' and 'non-literal commentary.'"). In particular, the use of "'loose, figurative, or hyperbolic language ... negate[s] the impression' that the contested statement is an assertion of fact." *Maddow*, 8 F.4th at 1160 (alteration in original) (quoting *Milkovich*, 497 U.S. at 21); *McDougal*, 489 F. Supp. 3d at 184 ("Whether the Court frames Mr. Carlson's statements as 'exaggeration,' 'non-literal commentary,' or simply bloviating for his audience, the conclusion remains the same—the statements are not actionable.").

Like in *Maddow* and *McDougal*, given the comedic and unfiltered context of The Show, known for its unconventional and humorous reporting on hot topics in sports, reasonable listeners would expect McAfee to use subjective language, epithets, fiery rhetoric and hyperbole, to share his opinions.  True to form, McAfee kicked off the subject segment by joking that Favre is "the actual sticky finger bandits from Home Alone 2 in New York" and said that he could not "wait for bum f*** Egypt to drop Brett Favre Enterprises's side of the story," which he said should be "judge[d ] accordingly."  Ex. A.  McAfee never "implicitly assert[ed] any firsthand knowledge inaccessible to [The Show's] audience."  *Keohane*, 859 P.2d at 299 (citations omitted) (recognizing free commentary on matters of public concern as an important means to "stimulate[] public pressure for answers from those who know more").  Indeed, Favre concedes that McAfee has "no personal knowledge of any of the relevant facts."  Am Cmpl. ¶ 23.

With regard to the statement "Every time [Favre's] name gets brought up, we have to mention that he tied the hands of the poor people and took money right out of their pockets," McAfee's use of the phrases "tied the hands of," "took from the pockets of," "took money right out of their pockets" are such obvious rhetorical hyperbole that no reasonable listener would have interpreted his comments as actual statements of fact about Favre.

The statement "[Favre is] certainly in the middle of stealing from poor people in Mississippi right now," likewise is obvious rhetorical hyperbole which no reasonable listener would have interpreted as an actual statement of fact about Favre.  Favre urges the Court to adopt a singular, narrow interpretation of the word "stealing" to mean only that Favre has been **criminally charged** with theft.  *See, e.g.*, Am. Cmpl. ¶¶ 7, 20, 25, 27-29, 33.  But Favre's position runs contrary to what "has long been the law":

> [S]imply invoking a criminal act or accusing a person of a crime does not transform an otherwise nonfactual statement into a factual assertion if the accusation, in light

of the surrounding context, is 'rhetorical hyperbole' or where the record is 'devoid of evidence' that anyone thought a crime was actually committed.

*McDougal*, 489 F. Supp. 3d at 182 (citing *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970), and other cases holding that "accusations of 'extortion,' 'blackmail,' and related crimes . . . are often construed as merely rhetorical hyperbole"); *see also Church of Scientology of California v. Cazares*, 638 F.2d 1272, 1286 (5th Cir. 1981) (citing approvingly to ruling that "words and phrases, such as 'cheating,' '***stealing from the public***,' and 'fingers in the pot,' when read in their proper context, were not defamatory.") (emphasis added); *Anders v. Cuevas*, 984 F.3d 1166, 1186 (6th Cir. 2021) ("[T]erms such as 'blackmailer,' 'traitor,' 'crook,' '***steal***,' and 'criminal activities' much be read in context to determine whether they are merely exaggerations of the type often used in public commentary.") (quoting *Ghanam v. Does*, 845 N.W.2d 128, 144 (Mich. App. 2014)) (emphasis added); *Perkins*, 270 So. 3d at 217 (citing cases holding that "blackmail," "traitors," and "drug pusher" were rhetorical hyperbole and not defamatory).  "If a reasonable reader would understand these epithets as merely 'rhetorical hyperbole' meant to express strong disapproval rather than an accusation of criminal activity or actual misconduct, they cannot be regarded as defamatory."  *Ghanam*, 845 N.W.2d at 144 (citing *Greenbelt*, 398 U.S. at 14); *see also Perkins*, 270 So. 3d at 217-18 ("[N]o reasonable listener would have understood the radio ad's brief reference to [plaintiff] as charging him with a crime.").  "Such accusations of crimes also are unlikely to be defamatory where, as here, they are made in connection with debates on a matter of public or political importance. . . . This is especially true in the context of commentary talk shows like the one at issue here, which often use 'increasingly barbed' language to address issues in the news."  *McDougal*, 489 F. Supp. 2d at 182-83.

Like the word extortion at issue in *McDougal*, "[w]e all know of colloquial or hyperbolic uses of the term" stealing and "[a]lthough the term has a derogatory meaning when used either

way, we cannot assume that the term always refers to a crime or similarly heinous conduct." *Id.*
at 182 (quoting *Hogan v. Winder*, 762 F.3d 1096, 1108 (10th Cir. 2014)).  Just as *McDougal*
concluded, "[t]he context in which the offending statements were made here make it abundantly
clear that [McAfee] was not accusing [Favre] of actually committing a crime." *See id.* at 183.

> **b.** **Even if McAfee's hyperbolic comments reasonably could be**
> **interpreted as statements of fact, they would be substantially true.**

Prior to the subject November 30 segment of The Show:

- Favre was sued by MDHS for his involvement in the diversion of $3.2 million in TANF
  funds away from the poor people of Mississippi to himself, Favre Enterprises, and
  Prevacus.  Ex. E.

- Filings in the MDHS Lawsuit and multiple media articles (some cited in filings) alleged
  Favre's involvement in the misdirection of an additional $5 million in TANF funds to his
  alma mater, USM, for construction of a volleyball facility.  Exs. F-N.

- Text messages attached to certain of the filings show Favre expressing concern that the
  media may find out the source of the funding for the volleyball facility, i.e., TANF funds
  funneled through MCEC with the cooperation of Favre's alleged co-conspirators, Nancy
  and Zachary New, who pled guilty prior to the November 30 broadcast to crimes related
  to the misdirection of TANF funds.  Exs. G-I & S-T.

A verbatim recitation of these facts (and those at *supra* pp. 2-9) would have produced no
different effect on the minds of The Show's listeners than McAfee's hyperbolic rhetoric that,
although Favre denies it, "from the information that we have currently," "he tied the hands of the
poor people and took money right out of their pockets" (which, in context, immediately followed
another contributor's banter that *The Show's* "hands are tied" in that it cannot overlook the
allegations against Favre).  Ex. A.  Thus, that statement is substantially true and cannot form the
basis of a defamation claim.  *See Green*, 286 F.3d at 283.  It is also substantially true that Favre
has found himself "in the middle of stealing from poor people in Mississippi right now."  Ex. A.
Indeed, MDHS is suing him for misappropriating welfare funds that should have benefited poor
Mississippians.  Exs. E & O.  The Fifth Circuit has ruled that "[i]n cases involving media

defendants, such as this, the defendant need not show the allegations are true, but must only demonstrate that the allegations were made and accurately reported."  *Green*, 286 F.3d at 284.

        **2.**    <u>**The December 24 Tweet Is Nonactionable Innuendo.**</u>

      McAfee's December 24 tweet does not state any fact about Favre at all; at most, it is mere innuendo which cannot be defamatory under Mississippi law.  To be actionable, "defamation must be clear and ***unmistakable from the words themselves*** and ***not be the product of innuendo, speculation or conjecture***."  *Perkins*, 270 So. 3d at 216 (emphasis added) (quoting *Ferguson v. Watkins*, 448 So. 2d 271, 275 (Miss. 1984)); *see also Lawrence*, 573 So. 2d at 698 (citations omitted).  As made clear by the Mississippi Supreme Court, this "restriction[] upon the action for defamation [is] and must be strictly enforced."  *Perkins*, 270 So. 3d at 213 (quoting *Ferguson*, 448 So. 2d at 275).  Here, the words "Devonta Smith doing 'The Favre' after that touchdown was crazy" do not state any fact whatsoever about Favre, and any purported defamatory meaning would be solely the product of innuendo, speculation and conjecture about what was meant by "doing 'The Favre.'"  *See* Am. Cmpl. ¶ 21.

**B.**     **THE AMENDED COMPLAINT PLEADS NO UNPRIVILEGED PUBLICATION**

      An "unprivileged publication to a third party" is a necessary element of a defamation claim that must be proved by the plaintiff.  *Pittman*, 836 F. Supp. at 381 (citations omitted).  The First Amendment shields "accurate reports of judicial proceedings" and other government investigations.  *Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976); *see Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838-39 (1978).  Mississippi law likewise recognizes an "official proceedings privilege," pursuant to which "the 'publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."  *Pittman*, 836 F. Supp. at 382 (quoting *Brocato v. Miss.*

*Publishers Corp.,* 503 So. 2d 241, 244 (Miss. 1987) (quoting Rest. 2d Torts § 611)).  As

explained by this Court, to hold otherwise "might sap the vigor from public debate, and dissuade

the press from reporting important information due to the threat of legal action." *Id.*

 Applicability of the official proceedings privilege is "a matter for the court to decide."

*McDonald v. Raycom TV Broad., Inc.*, 665 F. Supp. 2d 688, 690 (S.D. Miss. 2009) (quoting

*Pittman*, 836 F. Supp. at 382).  "[S]o long as the [allegedly defamatory statement] is a fair and

accurate republication of an official report, [it] is protected, even if the official report is itself

false or inaccurate." *Id.*  For a report to be fair and accurate, "[i]t is enough that it conveys to the

persons who read it a substantially correct account of the proceedings." *Pittman*, 836 F. Supp. at

384 (citation omitted).  The allegedly defamatory statement need only "be ***attributable*** to an

official document or proceeding." *Id.* at 382 (emphasis added)*.* "***This does not mean that each***

***quote or statement must be specifically attributed to an official document or proceeding.***

Rather, it is necessary only that, when considered in context, it is clear that the [allegedly

defamatory statement] is quoting, paraphrasing or otherwise drawing upon official documents or

proceedings." *Id.* at 382-83 (emphasis added) (citation omitted).

 Here, McAfee's statements are indisputably attributable to allegations made against

Favre in the MDHS Lawsuit and information disclosed by the Auditor's Office and, thus, are

privileged under the First Amendment and Mississippi law.  Specifically,

- The complaint in the MDHS Lawsuit, filed more than six months prior to The Show's November 30 broadcast, alleged that Favre and Favre Enterprises accepted $1.1 million in TANF funds from MCEC purportedly in exchange for speeches and autograph signings he never performed. Ex. E ¶¶ 137-38 ("Certainly no services were performed by Favre that had anything to do with the pursuit of lawful TANF purposes.").

- The MDHS complaint also named Favre as a defendant who agreed to divert $2.1 million in TANF funds for non-TANF purposes to Prevacus, "a private, for-profit biotechnology corporation in which Favre" was "the largest individual outside investor and holder of corporate stock." *Id.* ¶¶ 115-16.

- Nancy and Zachary New, Favre's alleged co-conspirators, pled guilty to three counts each of wire fraud related to the transmission of MCEC's limited purpose grant funds to Prevacus "for purposes not allowed pursuant to the limited purpose grants from which the funds originated[.]"  Exs. S at 7 & T at 6-7.

- Zachary New also pled guilty to one count of fraud against the government for his involvement in the transfer of $4 million in TANF funds "for the construction of a volleyball center at [USM], which was prohibited under the limited use guidelines of the grants from which the funds originated[.]"  Ex. T at 6.

Like in *Pittman*, the "scandal" McAfee was reporting on "was the subject of intense public attention, which culminated in numerous media reports" to which his statements were attributable and, thus, his comments are privileged.  *Pittman*, 836 F. Supp. at 384.

## C.  THE AMENDED COMPLAINT PLEADS NO PLAUSIBLE ALLEGATIONS OF ACTUAL MALICE

In recognition of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964), the First Amendment provides heightened protection against defamation suits brought by individuals "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classified as public figures." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).  Favre cannot dispute that he is a public figure.  Accordingly, he faces "the additional burden of proving actual malice by clear and convincing evidence." *Armistead*, 815 So. 2d at 1193 (citations omitted).

"Actual malice" is "a statement made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (quoting *Masson*, 501 U.S. at 510).  Because the actual malice standard is subjective, it requires that the defendant "***in fact entertained serious doubts*** as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added), and a reckless disregard for the truth "requires more than a departure from reasonably prudent conduct." *Harte-Hanks Commc'ns, Inc. v Connaughton*, 491 U.S. 657, 688

(1989).  This standard has been rigorously applied under *Iqbal* and *Twombly*, with every Circuit that has considered the matter, including the Fifth Circuit, holding that a defamation claim may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice.  *See Walker*, 938 F.3d at 744-45 ("[T]he deficiency of Appellant's 'actual malice' allegations provides an independent, standalone basis for dismissal of [his] defamation claims.").[9]

Favre pleads that "McAfee knew that—or had a high degree of awareness of the fact that—he had no basis for" his allegedly defamatory statements because **(1)** "[n]o media report or anything or anyone else had stated that Favre had stolen any money from anyone," Am Cmpl. ¶ 23, and **(2)** it was never "alleged or argued in the MDHS proceeding that Favre had ever knowingly received welfare funds," *id.* ¶ 24.  These allegations are ***demonstrably false***.

Regarding **(1)** above, Favre's allegation is disproved by his own defamation lawsuit against sports media personality Shannon Sharpe also pending in this Court.  In that suit, based upon the September 14, 2022 episode of "a national weekday sports talk television show"—two months prior to McAfee's alleged comments— Favre alleges that Sharpe falsely "accus[ed]

---

[9] *See, e.g., Michel*, 816 F.3d at 702 ("[A] defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice."); *Pace v. Baker-White*, 850 F. App'x 827, 831-32 (3d Cir. 2021) (finding plaintiff Pace's "conclusory allegations" of actual malice "insufficient" because "[a]t the pleading stage, a public figure, like Pace, must allege *facts* to support an inference of actual malice") (emphasis in original)); *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 956 (8th Cir. 2020) ("Thus, if Nelson Auto is a public figure, federal law requires that its Amended Complaint plead sufficient facts to support a plausible finding of actual malice."); *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) ("[A] public figure plaintiff must plead . . . enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of actual malice.") (internal quotations and citation omitted)); *McDonald v. Wise*, 769 F.3d 1202, 1220 (10th Cir. 2014) (finding that the plaintiff's "factual allegations raise the reasonable inference" that the defendant acted with actual malice); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("[M]alice must still be alleged in accordance with Rule 8—a 'plausible' claim for relief must be articulated."); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (D.C. Cir. 2012) ("[T]o make out a plausible malice claim, a plaintiff must still lay out enough facts from which malice might reasonably be inferred.").

Favre of *'steal[ing] from the lowest of the low,' 'taking from the underserved [in Mississippi]'*

*and that '[Favre] stole money from people that really needed that money.'"*  *See Favre v.*

*Sharpe*, Case No. 2:23-cv-0042-KS-MTP (S.D. Miss. Mar. 20, 2023), ECF No. 1 Ex. A ¶ 5.

(alterations in complaint).  Multiple other media outlets similarly reported prior to the November 30

broadcast of The Show that Favre *stole* or took welfare funds, including, for example:[10]

- An April 8, 2022 Sports Illustrated article titled *Report: Texts show Brett Favre's Role in Mississippi Welfare Fraud Scandal*, reporting that Favre "allegedly took $1.1 million in welfare funds for himself" with the "goal [] to increase his personal wealth."  Ex. X.

- A September 21, 2022 Total Pro Sports article titled *ESPN Getting Blasted For Being Way Too Quiet About Brett Favre's Mississippi Welfare Scam (TWEETS)*, reporting that Favre was "*taking money from people who actually need it.*"  Ex. Y.

- A September 22, 2022 NBC Sports article titled *Former teammate calls out Brett Favre's involvement in alleged **welfare fraud***, reporting that "***Favre was involved in a scam that entailed stealing from the poor to give to the rich.***"  Ex. Z.

- A September 22, 2022 Deadspin article titled *The media needs to treat Brett Favre like it did Michael Vick and Colin Kaepernick*, reporting that Mississippi Today's "story earlier [that] month . . . included *text messages that proved that Favre & Co. were deliberately robbing the poor to give even more to the rich*" and stating "you have to remember who *Favre stole from—poor Black people in Mississippi.*"  Ex. AA.

- A September 23, 2022 Black Enterprise article titled *REPORT: LEGENDARY QUARTERBACK **BRETT FAVRE STOLE MILLIONS FROM POOREST MISSISSIPPI RESIDENTS***, reporting that "an investigation by a Mississippi newspaper reported that *[Favre] stole millions from the poorest residents in his home state* so his daughter's college could build a new volleyball stadium."  Ex. BB (emphasis altered).

- A September 26, 2022 Yahoo! Sports article titled *Brett Favre's involvement in Mississippi welfare scandal is getting plenty of attention. But what about companies that still back him?*, reporting "*growing evidence that [Favre] allegedly knowingly stole*

---

[10] In considering a Rule 12(b)(6) motion, the Court may take judicial notice of media articles for the fact of their publication.  *See Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 902-03 (E.D. La. 2014) (recognizing that district courts in Fifth Circuit have taken judicial notice of "newspaper and magazine articles" "as an indication of the information available to the public at the time"); *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) ("Pursuant to [Fed. R. Evid.] 201(b), Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles." (collecting cases)); *accord Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage . . . contained certain information, without regard to the truth of their contents"); *Shive-Ayala v. Pacelle*, No. 21-704, 2022 WL 782412, at *2 n.1 (D. D.C. Mar. 15, 2022) (taking judicial notice of articles "for their existence" in granting motion to dismiss defamation claim).

*millions of dollars from the poorest people in the country's poorest state*[.]"  Ex. CC.

- A September 29, 2022 Forbes article titled ***Is The Brett Favre Welfare Scandal a Case Of "The Rich Stealing From The Poor"?***, reporting that "the two questions for some are if this is a case of 'the rich stealing from the poor' and whether Bret [sic] Favre will be held accountable for his actions both legally and in public opinion[.]"  Ex. DD.

Regarding **(2)** above, MDHS's May 9, 2022 complaint repeatedly alleged that Favre misdirected TANF and MDHS funds to himself, Favre Enterprises, and Prevacus.  *See supra* pp. 5-6.  Multiple other filings in the MDHS Lawsuit pre-dating McAfee's comments similarly alleged that Favre was seeking TANF or MDHS funds.  For example, in its motion to compel Bryant to produce documents, MCEC asserted that "***Favre was seeking grant funds from MDHS***[.]"  Ex. F at ¶ 11.  In his response, Bryant asserted that (i) "New and ***Favre were pursuing MDHS funds***," Ex. J at 10; (ii) "New explained to Favre that she and Davis 'were on board' with satisfying Favre's debt with ***TANF funds***," *id.* at 21; and (iii) "It is apparent . . . that, after being told by New that ***additional MDHS funding*** was doubtful, Favre began a campaign to aggressively lobby the governor to help him cover the debt on the USM Volleyball Center," *id.* at 23.  Favre cannot dispute that TANF and MDHS funds are welfare funds.

Notably, MDHS recently reaffirmed its allegations against Favre in successfully opposing Favre's motion to dismiss the MDHS Lawsuit, stating that the facts pled in the MDHS Lawsuit were "carefully and thoroughly" pled based on a "mountain of text messages" reflecting Favre's involvement in the welfare fraud scheme.  Ex. EE at 32.  MDHS further stated:

> Favre can argue to a jury that he was just ignorantly supporting his favorite causes—his daughter's volleyball team and a for-profit drug company—and that he didn't mean to direct federal grant money away from Mississippi's poorest citizens.  While he's at it, he can explain why he planned on rewarding a public official [John Davis] with a $75,000 truck for the receipt of federal funds.  But he cannot obtain dismissal on the pleadings.

*Id.* at 26 (referencing Favre's text to the Prevacus CEO that if the investment of federal grant funds works out, they should buy then-MDHS Executive Director John Davis a truck).  The

court apparently agreed in denying Favre's motion to dismiss.  Ex. P at 3-4.

Accordingly, Favre's allegations that McAfee "either (i) knew that his remarks were fabrication and the products of his imagination or (ii) he harbored serious doubts about whether his remarks were true and in fact knew that they were probably false" are precisely the type of "conclusory allegations" and "unwarranted factual inferences" that the Court should not accept as true in considering this Rule 12(b)(6) motion to dismiss. *See In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010) (citing *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)) (other citation omitted).[11]

## D.  FAVRE FAILED TO GIVE MCAFEE TEN-DAYS-NOTICE OF SUIT

Favre failed to give McAfee ten days' notice before filing this lawsuit as required by Miss. Code Ann. § 95-1-5(1).[12]  Compliance with this statute "is clearly *a necessary preliminary step* to the proper filing of a libel action[.]"  *Brocato*, 503 So. 2d at 243 (emphasis added) (citation omitted).  The Amended Complaint states that Favre's counsel demanded that McAfee retract and apologize for his defamatory statements" on February 3, 2023, ¶ 30, and suit was filed on February 9, 2023—*just six days later*.  For this reason alone, the suit must be dismissed. *See, e.g.*, *King v. Mississippi*, No. 3:14-CV-157-CWR-FKB, 2015 WL 370175, at *4 n.11 (S.D. Miss. Jan. 27, 2015) (citing *Brocato*, 503 So. 2d at 243) ("With respect to the media Defendants, the defamation claim . . . would have to be dismissed because the Plaintiffs did not provide those Defendants notice required by Miss.Code.Ann. 95-1-5 before filing this action.").

---

[11] Favre also suggests that McAfee wanted to "accumulate more social media views, likes, and followers" and "generate publicity and attention for his media channel, which could usher in financial rewards and other benefits."  Am. Cmpl. ¶¶ 27, 28, 32 & 40.  Such motives, even if true, cannot prove actual malice. *Harte-Hanks*, 491 U.S. at 665, 667 (allegations "that the defendant published the defamatory material in order to increase its profits" or "to increase its circulation" do not suffice to prove actual malice.").

[12] The statute "applies to . . . other forms of news reporting services such as . . . cable or satellite news transmissions."  *Pannell v. Associated Press*, 690 F. Supp. 546, 549 n.2 (N.D. Miss. 1988).

## V.   <u>CONCLUSION</u>

WHEREFORE, Defendant Patrick Justin McAfee respectfully requests that the Court grant his Motion to Dismiss Plaintiff's Amended Complaint, dismiss the Amended Complaint with prejudice, and grant such other and further relief as the Court deems just and proper.

Dated:  April 28, 2023

Respectfully submitted,

/s/ Sarah A. Decker
Sarah A. Decker (admitted *pro hac vice*)
Thomas J. Smith (admitted *pro hac vice*)
Curtis B. Krasik (admitted *pro hac vice*)
**K&L GATES LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone:  412.355.6500
Fax:  412.355.6501
sarah.decker@klgates.com
thomas.smith@klgates.com
curtis.krasik@klgates.com

/s/ Alex Purvis
Alex Purvis (MSB 100673)
Michael Williams (MSB 104537)
James Stephen Fritz, Jr. (MSB 105936)
**BRADLEY ARANT BOULT CUMMINGS LLP**
One Jackson Place
188 E Capitol Street, Suite 1000
Jackson, MS 39201
Phone:  601.948.8000
Fax:  601.948.3000
apurvis@bradley.com
mcwilliams@bradley.com
sfritz@bradley.com

*Counsel for Defendant Patrick Justin McAfee*

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will notify and serve all counsel of record.

*/s/ Alex Purvis*_____